# Exhibit 1

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
Email: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. <br><br>        Plaintiff <br><br> vs. <br><br> HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. <br><br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION <br><br> DOCKET NO. _____ <br><br> CIVIL ACTION <br><br> **COMPLAINT** |

## COMPLAINT AND JURY DEMAND

Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. (the "Coalition"), by counsel, for its Complaint and Jury Demand against Defendant HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW

#343662v1

JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive (collectively, "Defendant"), allege as follows:

## INTRODUCTION

1.      This case involves a dispute over the value of emergency services provided to patients in hospital emergency rooms located in New Jersey.

2.      The Coalition works with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. It seeks to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

3.      Among the emergency medicine practice groups ("Physicians") with whom the Coalition collaborates are NES America, Inc. and NES Georgia, Inc. (collectively, "NES"). The Physicians have provided emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey, among other hospitals.

4.      At all relevant times, Defendants routinely offered and furnished healthcare insurance throughout New Jersey, including to persons who received medical care in Gloucester County. The Physicians rendered emergency services to Defendants' members. Defendants either failed to pay or significantly underpaid the Physicians for their provision of emergency services. In order to improve the Physicians' capability to provide quality emergency care and be reasonably paid, Physicians have assigned to the Coalition these accounts and the right to sue thereupon.

5.      Plaintiff brings this case to seek payment for the emergency services Physicians provided to Defendants' members.

## THE PARTIES

6.     Plaintiff, the HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. (the "Coalition" or "Plaintiff") is an organization whose mission is to pursue reasonable payment owed to emergency physicians, so as to support the accessibility of quality emergency care across New Jersey and to reform the problematic behavior of the health care insurance carriers.  It is a corporation organized and existing under the laws of the state of New Jersey.

7.     Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") is a corporation organized under the laws of the state of New Jersey with its principal place of business at 3 Penn Plaza East, Newark, New Jersey 07105-2248. Horizon BCBSNJ is a health insurance company that provides health insurance products to individuals and employers in New Jersey.

8.     Horizon Healthcare of New Jersey, Inc., ("Horizon NJ") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 3 Penn Plaza East, Newark, New Jersey 07105-2248. Horizon NJ is a health maintenance organization licensed in the state of New Jersey.

9.     The true names and capacities of the Defendants sued herein as DOES 1 through 20, inclusive ("Does"), are unknown to Plaintiff at this time, and therefore are sued by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of these Does when they have been ascertained. Plaintiff is informed and believes that each of the Defendants designated as Doe is responsible in some manner for the events and happenings herein alleged, as well as for the damages alleged.

10.     Defendants provide health insurance coverage for medical services, including emergency medical services, to people in New Jersey who are covered by the health plans they

underwrite or administer on behalf of employers. As such, they are subject to the New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act"), N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

### JURISDICTION AND VENUE

11.     Venue is proper in the Superior Court of New Jersey, Law Division, Gloucester County, pursuant to New Jersey Court Rule 4:3-2(a), as the place in which any party to the action resides at the time of its commencement.   Specifically, because Horizon NJ actually does business in Gloucester County, it "shall be deemed to reside in" Gloucester County pursuant to New Jersey Court Rule 4:3-2(b).  For instance, Horizon NJ is an "accepted insurance" at Jefferson Washington Township Hospital Inspira Health Center, which is within the County.[1]   Horizon NJ also partners with multiple Inspira facilities in Gloucester County, including Inspira Medical Center Mullica Hill and Inspira Medical Center Woodbury.[2] Therefore, venue is proper in Gloucester County.

12.     Courts within the State of New Jersey, including the Superior Court of New Jersey, Law Division, Gloucester County, have personal jurisdiction over the Defendants in this action because the Defendants have sufficient minimum contacts with the State of New Jersey and, as alleged below: (i) the Defendants are found in, have agents in, and/or transact their business and affairs in New Jersey; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in New Jersey; and (iii) the ends of justice require that those of the

---

[1] https://www.jeffersonhealth.org/your-health/patients-guests/health-insurance/accepted-insurances.
[2] https://www.horizonblue.com/providers/news/news-legal-notices/horizon-hospital-network-now-includes-inspira-mullica-hill.

#343662v1

Defendants residing outside New Jersey be brought before the Court to answer for their conduct engaged in and directed toward this State.

## STATEMENT OF FACTS

**A.    Background**

13.    In furtherance of its core mission as described above, the Coalition engages with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. The Coalition works to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

14.    Among the emergency medicine practice groups with whom the Coalition engages is NES, which provides emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey. At the time NES rendered emergency professional services to Defendants' members, it did not have a contract with Defendants, and set its own reasonable charges for the emergency services they provided. Defendants either failed to pay or significantly underpaid NES and Physicians for their provision of services. The Coalition has since been assigned those accounts and the right to sue thereupon.

15.    Systemic underpayments by health plans of the kind that Physicians have experienced threaten the stability of America's health care system by forcing emergency physician groups into bankruptcy and shuttering emergency departments. Even when physician groups are not forced to shut down, inadequate reimbursement may nonetheless force a reduction in physician coverage, negatively impacting patient care. The situation is especially dire in rural and medically under-served areas such as those serviced by the Physicians, where the closure of an emergency department can force people to travel much greater distances for basic care. For people suffering

from strokes, heart attacks, and other life-threatening conditions, even minutes can be the difference between life and death.  The Coalition's mission is to promote fair economics for emergency care by securing reasonable payment for emergency physician services so that qualified doctors can continue to render vital emergency care to all New Jersey residents.

16.     Physicians can, but are not obligated to, enter formal contractual arrangements with health care service plans, insurers, and other payors.  Physicians that enter into these formal agreements are considered to be "in network." Under such formal contracts, the in-network provider agrees to accept less than what it bills for services provided to patients in exchange for the various benefits of being contracted.

17.     In the emergency medicine context, some of the benefits for in-network providers may include, among others, certainty of timing for payment, the ability to submit electronic bills and communications to the payor, and cash flow certainty and payment timing and rates physicians will receive for their care services.

18.     Where the two sides have not agreed to enter into a formal agreement, the providers are considered to be "out of network". In the out-of-network scenario, none of these benefits are present.

19.     Out-of-network physicians have not agreed, in advance, to specified reimbursement rates with the payor.  As a result, they are not compelled to accept whatever the health plan chooses to pay for healthcare services rendered.

20.     Oftentimes, although physicians are willing to enter into an agreement, they are forced to operate "out-of-network" because the health plan simply refuses to contract with them, or the contract terms offered are unreasonable.  Where a health plan declines to pay an out-of-

network physician's full charges, then, the physician is entitled to seek payment of his or her full bill.

**B.      The Physicians Were Obligated to Render Emergency Medical Care**

21.      Regardless of whether a physician is "in-network" or "out-of-network," and regardless of whether a patient can afford to pay for services, physicians who practice in a hospital's emergency room, as the Physicians here did, are <u>required</u> by federal law to render lifesaving emergency health care services to patients seeking such services.  (*See* 42 U.S.C. § 1395dd ("EMTALA").)  New Jersey law likewise requires that hospitals provide emergent and urgent care, and if necessary, inpatient admission, to <u>all</u> patients regardless of their ability to pay. (N.J.S.A. 26:2H-18.64.)

22.      Thus, the Physicians were obligated to render emergency care to all the patients who presented to the emergency rooms at the hospitals at which they practiced, even if those patients were indigent, or covered by Medicaid, which is the payer of last resort.  Patients that pay a minimal amount – or that do not pay at all –constitute a significant proportion of the individuals that present to any emergency room.  Accordingly, the Coalition is entitled to pursue fair payment for the Physicians' services, so as to ensure that Defendants do not shirk their responsibility to the health care system – and to their own members, for whom Defendants promised to cover emergency services.

23.      As explained in more detail below, restitution and equity demand that Physicians – and by means of its valid assignment, the Coalition – be paid the reasonable value of the lifesaving care that the Physicians rendered to the members of Defendants' health plan.

C.    **The Claims At Issue**

24.    In this case, the Physicians provided emergency services to Defendants' members on an out-of-network basis. Defendants must therefore pay the Coalition for emergency services based upon the reasonable value of the emergency health care services provided by Physicians, which may be up to the full billed charges for those services.

25.    The Coalition has been assigned the reimbursement claims at issue from the Physicians and has the necessary rights and ability to sue to recover the full billed charges, or in the alternative, the reasonable value for the Physician services at issue.

26.    In total, this case involves 65,000 benefit claims spanning from dates of service from October 2017.  The total unpaid by Horizon BCBS is over $17 million, excluding interest.  Of the amounts due, approximately 93% of the dollars sought are for just six CPT codes: evaluation and management services rendered by NES physicians that were billed with codes 99281 through 99285; as well as 99291, a code that represents critical care services.

27.    In aggregate, Horizon BCBS paid just 22% of the billed charges for these services.

28.    Given the commonalities among the unpaid claims, just a few examples will suffice to illustrate Defendants' repeated wrongdoing in underpaying for the Physicians' emergency services.

29.    **Patient 1**.  Patient 1 presented to the emergency room at St. Michael's Medical Center on March 9, 2019 with sharp, lower abdominal pain – an acute but nonspecific symptom that could represent any number of underlying causes.  Patient 1 was promptly seen by Dr. Akbar Noormohamed, D.O.  Patient 1 was given a CT scan and was ultimately diagnosed with a urinary tract infection without hematuria, and then was released with instructions to follow up with Patient 1's primary medical doctor to obtain a referral to a urologist. The Physicians submitted a claim for

#343662v1

services for $1,915 for CPT code 99285.  Horizon BCBS, however, paid just $334.55, which is less than 17.5% of the Physicians' charges.

30.     **Patient 2**. On April 25, 2019, Patient 2 arrived at the emergency room by ambulance with hypoglycemia and was promptly seen by Dr. Noormohamed.  After treatment, Patient 2 regained consciousness but refused to cooperate with medical staff and would not submit to a medical work-up.  The Physicians submitted a claim for services for $845.00 for CPT code 99283.  Horizon BCBS, however, paid just $119.99, which represents just 14.2% of the Physicians' charges.

31.     **Patient 3**. Patient 3 came into the emergency room on July 5th, 2021, at Trinitas Regional Medical Center with severe chest pain. Patient 3 was seen by Dr. Ilya Parizh, D.O. An electrocardiogram was performed and diagnosed that the patient had chest pain and an edema of body fluid in their tissues. The Physicians submitted a claim for services for $2,168.00 for CPT codes 99285 and 93010. Horizon BCBS, however, paid just $324.00, which is less than 15.0% of the Physicians' charges.

32.     The Coalition will provide a full list of the underpaid claims to Defendants upon request. Such list has not been included with this Complaint in order to avoid the unnecessary disclosure of Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), given the sheer volume of claims at issue.  The Coalition reserves the right to add additional underpaid claims to the list.

## CAUSES OF ACTION

## COUNT ONE: (QUANTUM MERUIT)

33.     The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

34.     Under New Jersey law, a cause of action for Quantum Meruit requires: (l) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the amount charged for the services is reasonable.

35.     As alleged above, the federal law known as EMTALA, as well as New Jersey law, requires physicians to render emergency services to all patients who present at the emergency department regardless of insurance coverage or ability to pay. (*See* 42 U.S.C § 1395dd; N.J.S.A. 26:2H-18.64.)

36.     Restatement of Restitution (1937) Section 114, titled "Performance of Another's Duty to a Third Person in an Emergency," states,

> A person who has performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the other therefor if:
>
> he acted unofficiously and with intent to charge therefor, and the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person.

37.     Physicians provided emergency medical services to Members of Defendants' health care plans in good faith after Defendants undertook the obligation to pay for such services.

38.     Defendants were obliged to provide emergency care to their Members.  When those members presented to the emergency room, Physicians fulfilled that obligation on Defendants' behalf.  This, in turn, triggered Defendants' duty to pay the reasonable value for those services.  This is true even if Defendants did not become aware of Physicians' actions until *after* the emergency services were rendered.

39.     The Defendants themselves, as well as their Members, benefitted from the services Physicians provided under EMTALA.  For example, and without limitation, Defendants used and

enjoyed the benefit of Physicians' services because Physicians helped Defendants discharge their legal and contractual obligation to their insureds to provide them with emergency care.

40.     Physicians acted unofficiously and expected to be reasonably compensated for the medical services they provided to Defendants.

41.     Defendants' acceptance of the Physicians' services is further underscored by Defendants failure to reject the services, and in most cases, paying at least something for their Members' care.

42.     Defendants were also obligated by New Jersey law to pay for the emergency services rendered by Physicians.  Under governing law, Defendants "shall reimburse hospitals and physicians for all medically necessary emergency and urgent health care services covered under the health benefits plan, including all tests necessary to determine the nature of an illness or injury, in accordance with the provider agreement when applicable." N.J. Admin. Code § 11:24-5.3.

43.     Plaintiffs contend the reasonable value of the emergency medical services Physicians rendered to Defendants' Members is reflected by the amount Physicians charged for such services.

44.     As set out above, Defendants either paid for the claims at issue for the services provided at rates substantially lower than the reasonable value of the services provided or failed to pay any amount of the claims at issue.

45.     Under the doctrine of Quantum Meruit, Defendants are liable in restitution to Plaintiff for the difference between the amount Defendants paid and the reasonable value of the emergency services provided on the claims at issue.  The amount billed represents the reasonable value for the emergency care services.

## COUNT TWO: (IMPLIED CONTRACT)

46.     The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

47.     Defendants indicated, by a course of conduct, and in the context of the circumstances surrounding the relationship with the Physicians, that Defendants would pay for the emergency and medical services provided.

48.     Defendants routinely represent that their Members are able to go to any hospital emergency room when they need covered care, and even when they do so, those Members will be personally liable only for cost-sharing features of the plan (such as copayments, coinsurance and deductibles) at an in-network level.

49.     As alleged above, in exchange for the payment of premiums, Defendants had an obligation under the Members' health plans to cover timely emergency medical care for their Members.  The emergency services rendered by the Physicians were necessary to satisfy the Members' medical needs.

50.     Defendants are also fully aware that the Physicians were obligated by both federal and state law to treat any patient who presented to the emergency room regardless of ability to pay and regardless of whether the patients have insurance, or also whether the patients' insurance company is in or out of network with the Physicians.

51.     Defendants indicated, by their course of conduct and dealing, that they would hold their Members harmless.  In order to do so, Defendants necessarily had to pay the reasonable value for the emergency services rendered by the Physicians.

52.     Indeed, Horizon BCBS routinely sent Explanation of Benefit (EOB) forms to the Physicians which, after explaining what Horizon BCBS would and would not pay, announced that

its members "are not liable for full payment of inadvertent, emergent, or involuntary charges from out-of-network providers, and members cannot be billed for amounts above their costs . . . ."  The statement concluded, "If you treated this patient on an inadvertent, emergent or involuntary basis but the payment does not reflect that, call 1-800-624-1110."

53.     In other words, when they communicated with Physicians about payment, then, Defendants therefore regularly acknowledged that they had an obligation to pay the reasonable value for the Physicians' emergency services in order to make good on Defendants' promise to their own members.

54.     The Physicians rendered medically necessary and lifesaving emergency services, and in doing so reasonably expected compensation from Defendants.

55.     As alleged, the Physicians have now assigned to Coalition their entire right to sue Defendants for the reasonable value of their services.

56.     A reasonable person in Defendants' position would know or should have known that the Physicians were performing the services expecting that Defendants would pay for them appropriately.

57.     Defendants' failure to pay the reasonable value of the Physicians' services constitutes breach of their implied contract with Physicians.  Physicians were harmed as a direct result of this breach and suffered damages as a result.  The Coalition, as the direct assignee of Physicians, now seek to pursue their rights thereunder.

## COUNT THREE: (VIOLATION OF NEW JERSEY HEALTH CLAIMS AUTHORIZATION, PROCESSING, AND PAYMENT ACT ("HCAPPA")

58.     The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

#343662v1

59.   HCAPPA requires health insurers such as Defendants to pay health care providers' claims promptly, provided that the claims meet the criteria for payment set forth in N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

60.   Specifically, for out-of-network emergency claims governed by the Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act") for services rendered on or after August 30, 2018, such as the claims for the emergency treatment Plaintiff's physicians have provided to Defendants' Members, New Jersey law requires that such claims be paid in full no more than 50 days after electronic submission, except to the extent disputed in accordance with the procedures of the OON Act. *See* NJ.S.A. 26:2SS-9.

61.   Plaintiff's claims for the emergency treatment they provided to Defendants' Members meet all the criteria for payment under HCAPPA, NJ.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9). On the dates the services were provided, Defendants covered the out-of-network emergency services Physicians provided to Defendants' Members, and Physician submitted the claims to Defendants on the appropriate claim forms.

62.   However, as described more fully above, Defendants failed to remit full reimbursement of Physicians' charges for healthcare services or provide a written explanation for the failure to pay all or a portion of such claims within the statutorily proscribed time frames under HCAPPA or the OON Act.

63.   Moreover, as described more fully above, Defendants failed to provide written notice specifying that Physicians' out-of-network emergency claims were incomplete or contained incorrect information, that Defendants disputed the amounts claimed in whole or in part, or that there was strong evidence of fraud, as HCAPPA requires of any carrier that fails to timely pay a claim for reimbursement. N.J.S.A. 17B:26-9.l(d)(2), N.J.S.A. 17B:27-44.2(d)(2), or NJ.S.A.

N.J.S.A. 26:2J-8.1(d)(2). Nor did Defendants seek to dispute any of Physicians' out-of-network claims in accordance with the OON Act.

64.     Defendants' failure to timely pay the full amounts due to Physicians for their out-of-network emergency claims for services provided has resulted overdue payments under HCAPPA.

65.     Therefore, Plaintiff is entitled to recover from Defendants the full underpaid and unpaid amounts on all of Physicians' out-of-network emergency claims for services together with statutory interest in the amount of 12% per annum, N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9), and N.J.S.A. 26:2J-8.1(d)(9).

## PRAYER FOR RELIEF

WHEREFORE, HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., by counsel, respectfully requests the Court enter judgment in its favor and against Defendants in excess of $17 million, plus interest, the costs of this action, and all other appropriate relief.

## JURY DEMAND

Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., by counsel, respectfully demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

**LAULETTA BIRNBAUM, LLC**

Date: <u>February 27, 2024</u>

By: <u>*/s/ Dante B. Parenti*</u>
Dante B. Parenti, Esq.

ATTORNEYS FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

## CERTIFICATION UNDER LOCAL CIVIL RULE 11.2

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

Date: <u>February 27, 2024</u>

**LAULETTA BIRNBAUM, LLC**

By: <u>*/s/ Dante B. Parenti*</u>
Dante B. Parenti, Esq.

ATTORNEYS FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

## LOCAL CIVIL RULE 201.1 CERTIFICATION

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000, exclusive of interest and costs.

Respectfully submitted,

**LAULETTA BIRNBAUM, LLC**

Date: <u>February 27, 2024</u>

By: <u>*/s/ Dante B. Parenti*</u>
Dante B. Parenti, Esq.

ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

## CERTIFICATE OF SERVICE

I, Dante B. Parenti, certify that on this date, I caused a true and correct copy of the within pleading to be served on all counsel of record via the Court's ECF electronic filing system.

Respectfully submitted,

**LAULETTA BIRNBAU, LLC**

Date: <u>February 27, 2024</u>

By: *<u>/s/ Dante B. Parenti</u>*
Dante B. Parenti, Esq.

ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

# Civil Case Information Statement

**Case Details: GLOUCESTER | Civil Part Docket# L-000242-24**

**Case Caption:** HEALTHCARE JUSTICE C OALITION  VS
HORIZON HEALTHC

**Case Initiation Date:** 02/27/2024

**Attorney Name:** DANTE B PARENTI

**Firm Name:** LAULETTA BIRNBAUM, LLC

**Address:** 591 MANTUA BLVD STE 200
SEWELL NJ 08080

**Phone:** 8562321600

**Name of Party:** PLAINTIFF : Healthcare Justice Coalition

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** YES

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Healthcare Justice Coalition ?**
NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
        **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
        **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/27/2024
Dated

/s/ DANTE B PARENTI
Signed

GLOUCESTER COUNTY COURTHOUSE
GLOUCESTER COUNTY CIVIL DIVISION
1 NORTH BROAD ST
WOODBURY        NJ 08096

                              TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (856) 878-5050
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:   FEBRUARY 27, 2024
                    RE:     HEALTHCARE JUSTICE C OALITION  VS HORIZON HEALTHC
                    DOCKET: GLO L -000242 24

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON JAMES R. SWIFT

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      100
AT:  (856) 878-5050.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:
                         ATT: DANTE B. PARENTI
                         LAULETTA BIRNBAUM, LLC
                         591 MANTUA BLVD
                         STE 200
                         SEWELL          NJ 08080

ECOURTS

HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

Plaintiff

vs

HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, ET AL

Defendant

20240306122503

Superior Court Of New Jersey

GLOUCESTER Venue

Docket Number: GLO L 242 24

**Person to be served** (Name and Address):
HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS
BLUE SHIELD OF NEW JERSEY,
820 BEAR TAVERN ROAD
WEST TRENTON  NJ  08628
**By serving:**  CT CORPORATION SYSTEM

**Attorney:** DANTE B. PARENTI, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, TRACK ASSIGNMENT
NOTICE, PRAYER FOR RELIEF, CERTIFICATIONS

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| **Service Data:** | [X] Served Successfully | [ ] Not Served |
|---|---|---|

Date/Time: ___3/6/2024 1:00 PM___       _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

SCOTT KUNTZ

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M___  AGE:36-50  HEIGHT: 5'9"-6'0"___  WEIGHT: 161-200 LBS.___  SKIN:WHITE___  HAIR:BROWN___  OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:          Date/Time: _____
                              Date/Time: _____
                              Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this

6th day of March, 2024


Notary Signature
Rosemary Ramos
Name of Notary



September 25th, 2028
My Commission Expires

I, JANE NUNN,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.


Signature of Process Server

___03/06/2024___
Date

Name of Private Server: JANE NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

Plaintiff

vs

HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, ET AL

Defendant

20240306122955

Superior Court Of New Jersey

GLOUCESTER Venue

Docket Number: GLO L 242 24

**Person to be served** (Name and Address):
HORIZON HEALTHCARE OF NEW JERSEY, INC.,
820 BEAR TAVERN ROAD
WEST TRENTON  NJ  08628
**By serving:**  CT CORPORATION SYSTEM

**Attorney:** DANTE B. PARENTI, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, TRACK ASSIGNMENT NOTICE, PRAYER FOR RELIEF, CERTIFICATIONS

**Service Data:**     [X] Served Successfully          [ ] Not Served

Date/Time:    3/6/2024 1:00 PM          _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

# AFFIDAVIT OF SERVICE
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

Name of Person Served and relationship/title:

SCOTT KUNTZ

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M___  AGE:36-50_ HEIGHT: 5'9"-6'0"____  WEIGHT: 161-200 LBS.____  SKIN:WHITE_____   HAIR:BROWN____  OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:         Date/Time: _____
                           Date/Time: _____
                           Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this

6th day of March, 2024


Notary Signature
Rosemary Ramos                    September 25th, 2028
Name of Notary                     My Commission Expires



I, JANE NUNN,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

Signature of Process Server

03/06/2024
Date

Name of Private Server: JANE NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants*

```
------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW          :
JERSEY CORP.,                                :   SUPERIOR COURT OF NEW JERSEY
                                             :   LAW DIVISION: GLOUCESTER
                            Plaintiff,       :   COUNTY
                                             :
          -v-                                :   Docket No.: GLO-L-000242-24
                                             :
HORIZON HEALTHCARE SERVICES, INC., d/b/a     :   STIPULATION EXTENDING TIME
HORIZON BLUE CROSS BLUE SHIELD OF NEW        :   TO RESPOND TO COMPLAINT
JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, :
INC., and DOES 1-20, inclusive,              :
                                             :
                            Defendants.      :
------------------------------------------------------------------- x
```

**IT IS STIPULATED AND AGREED** by and between counsel for Plaintiff, Healthcare

Justice Coalition of New Jersey Corp., and counsel for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc., that the time within which said Defendants must answer, plead, or otherwise respond to the

Complaint is extended to and including May 10, 2024.

Dated: April 10, 2024

| | |
|---|---|
| /s/ Dante B. Parenti | /s/ Adam J. Petitt |
| Dante B. Parenti, Esq. (005571985) | Adam J. Petitt, Esq. (020822008) |
| **LAULETTA BIRNBAUM, LLC** | **ROBINSON & COLE LLP** |
| 591 Mantua Blvd., Suite 200 | 1650 Market Street, Suite 3030 |
| Sewell, NJ 08080 | Philadelphia, PA 19103 |
| Telephone: (856) 669-2584 | Telephone : (215) 398-0562 |
| Fax : (856) 232-1601 | Fax : (215) 398-0599 |
| E-mail: dparenti@lauletta.com | E-mail: apetitt@rc.com |
| | *Attorney for Defendants* |

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

*Attorneys for Plaintiff*

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants*

```
------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW          :
JERSEY CORP.,                                :     SUPERIOR COURT OF NEW JERSEY
                                             :     LAW DIVISION: GLOUCESTER
                    Plaintiff,               :     COUNTY
                                             :
      -v-                                    :     Docket No.: GLO-L-000242-24
                                             :
HORIZON HEALTHCARE SERVICES, INC., d/b/a     :     NOTICE OF MOTION TO CHANGE
HORIZON BLUE CROSS BLUE SHIELD OF NEW        :     VENUE PURSUANT TO R. 4:3-
JERSEY, HORIZON HEALTHCARE OF NEW            :     3(A)(3)
JERSEY, INC., and DOES 1-20, inclusive,      :
                                             :
                    Defendants.              :
------------------------------------------------------------------- x
```

**To:**   Dante B. Parenti, Esq.
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
*Attorneys for Plaintiff*

**PLEASE TAKE NOTICE** that on May 10, 2024 at 9:30 a.m., or as soon thereafter as

counsel may be heard, the undersigned attorneys for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc., will move before the Honorable James R. Swift of the Superior Court of New Jersey, Law

Division, Gloucester County, in Woodbury, New Jersey, for an Order pursuant to N.J. Ct. R. 4:3-

3(A)(3) to Change Venue from Gloucester County to Essex County.

**PLEASE TAKE FURTHER NOTICE** that in support of the motion, the undersigned will rely upon the annexed Certifications of Beth J. Feurey and Adam J. Petitt and Memorandum of Law in Support submitted herewith.

**PLEASE TAKE FURTHER NOTICE** a copy of the proposed form of Order is attached hereto and the Motion shall be deemed uncontested unless responsive papers are timely filed and served stating with particularity the basis of the opposition to the relief sought.

**PLEASE TAKE FURTHER NOTICE** that pursuant to R. 1:6-2, oral argument is requested.

Discovery End Date: None Listed
Arbitration Date: None Listed
Trial Date: None Listed

ROBINSON & COLE LLP
Attorneys for Defendants,

By: _____
Adam J. Petitt, Esq.

Dated: April 19, 2024

```
------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW         :
JERSEY CORP.,                               :    SUPERIOR COURT OF NEW JERSEY
                                            :    LAW DIVISION: GLOUCESTER
                      Plaintiff,            :    COUNTY
                                            :
         -v-                                :    Docket No.: GLO-L-000242-24
                                            :
HORIZON HEALTHCARE SERVICES, INC., d/b/a    :    ORDER
HORIZON BLUE CROSS BLUE SHIELD OF NEW       :
JERSEY, HORIZON HEALTHCARE OF NEW           :
JERSEY, INC., and DOES 1-20, inclusive,     :
                                            :
                      Defendants.           :
------------------------------------------------------------------- x
```

     **THIS MATTER** having been opened to the Court by Robinson & Cole LLP, attorneys for Defendants, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey, Inc., and the Court having considered the papers within, and oral argument, if any; and for good cause having been shown,

     **IT IS** on this _____ day of May, 2024;

     **ORDERED** that venue be and is hereby transferred from Gloucester County to Essex County; and it is further

     **ORDERED** that a copy of this Order be served upon all counsel within seven (7) days hereof.


                             _____
                             The Honorable James R. Swift, A.J.S.C.

_____ opposed
_____ unopposed

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

----------------------------------------------------------------- x

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY |
| Plaintiff, : | |
| -v- : | Docket No.: GLO-L-000242-24 |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive, : | **CERTIFICATION OF COUNSEL** |
| Defendants. : | |

----------------------------------------------------------------- x

I, Adam J. Petitt, Esq., hereby certify as follows:

1.     I am an attorney licensed to practice law in the State of New Jersey. I am a partner at the law firm of Robinson & Cole LLP, attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon").  I am entrusted with the management of the above-captioned matter and am familiar with the facts herein.

2.     This is an action by Plaintiff Healthcare Justice Coalition of New Jersey Corp. ("Plaintiff") to recover reimbursement for claims that were submitted to Horizon for emergency services rendered to its members at Saint Michael's Medical Center in Newark, New Jersey and Trinitas Regional Medical Center in Elizabeth, New Jersey.  Plaintiff alleges to be an assignee to

NES America, Inc. and NES Georgia, Inc., which provide emergency services at the aforementioned hospitals.  Plaintiff filed this action on February 27, 2024. A true and correct copy of the Complaint is annexed hereto as <u>Exhibit A</u>.

3.      Plaintiff served Horizon BCBSNJ on March 6, 2024.  A true and correct copy of the Affidavit of Service is annexed hereto as <u>Exhibit B</u>.

4.      Plaintiff served Horizon HNJH on March 6, 2024.  A true and correct copy of the Affidavit of Service is annexed hereto as <u>Exhibit C</u>.

5.      The deadline for Defendants to respond to the Complaint was extended from April 10, 2024 to May 10, 2024 by Stipulation of the parties. A true and correct copy of the Stipulation Extending Time to Respond to Complaint is annexed hereto as <u>Exhibit D</u>.

6.      According to public records maintained and available by the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Plaintiff is a New Jersey corporation with its main business address located in Woodmere, New York and its registered agent's is located in West Trenton, New Jersey, which is located in Mercer County. A true and correct copy of the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Certificate of Inc. (Profit) for Healthcare Justice Coalition of New Jersey Corp. is annexed hereto as <u>Exhibit E</u>.

7.      According to public records maintained and available by the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Prime Healthcare Services – St. Michael's, LLC is a Delaware limited liability company with its principal business address located in Newark, New Jersey, within Essex County. Prime Healthcare Services – St. Michael's, LLC does business as Saint Michael's Medical Center. A true and correct copy of the

2

New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Status Report for Prime Healthcare Services – St. Michael's, LLC is annexed hereto as <u>Exhibit F</u>.

8.     According to public records maintained and available by the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Trinitas Regional Medical Center is a New Jersey non-profit corporation located in Elizabeth, New Jersey, within Union County. A true and correct copy of the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Status Report for Trinitas Regional Medical Center is annexed hereto as <u>Exhibit G</u>.

9.     According to public records maintained and available by the Missouri Secretary of State, NES America, Inc. is a Missouri corporation with its principal office address located in Tiburon, California. A true and correct copy of the Missouri Secretary of State, Gen. Business – For Profit Details for NES America, Inc. is annexed hereto as <u>Exhibit H</u>.

10.     According to public records maintained and available by the Georgia Secretary of State, NES Georgia, Inc. is a Georgia corporation with its principal business address located in Tiburon, California. A true and correct copy of the Georgia Corporations Division, Business Search for NES Georgia, Inc. is annexed hereto as <u>Exhibit I</u>.

11.     Using Google Maps I ran a search for directions from Horizon BCBSNJ's office located at Three Penn Plaza East, Newark, New Jersey, to the Gloucester County Superior Court located at 70 Hunter St, Woodbury, New Jersey.  Horizon BCNSNJ's office is approximately 89 miles from the Court.  A true and correct copy of the directions from Google Maps is annexed hereto as <u>Exhibit J</u>.

12.     Using Google Maps I ran a search for directions from HNJH's office located at 1700 American Blvd., Pennington, New Jersey, to the Gloucester County Superior Court located

at 70 Hunter St, Woodbury, New Jersey.  HNJH's office is approximately 53 miles from the Court. A true and correct copy of the directions from Google Maps is annexed hereto as Exhibit K.

13.     Using the National Provider Identification ("NPI") Registry, I ran a search for Dr. Akbar Noormohamed, D.O.  Dr. Noormohamed's primary practice address is 111 Central Avenue, Newark, New Jersey 07102.  A true and correct copy of the NPI Registry Provider Information for Dr. Noormohamed is annexed hereto as Exhibit L.

14.     Using the NPI Registry, I ran a search for Dr. Ilya Parizh, D.O.  Dr. Parizh's primary practice address is 154 State Route 10, East Hanover, New Jersey 07936.  A true and correct copy of the NPI Registry Provider Information for Dr. Parizh is annexed hereto as Exhibit M.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

ROBINSON & COLE LLP

Attorneys for Defendants,

By: _____
        Adam J. Petitt, Esq.

Dated: April 19, 2024

# EXHIBIT A

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
Email: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No. 253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>　　　　　Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>　　　　　Defendants. | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO. _____<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

## COMPLAINT AND JURY DEMAND

Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. (the "Coalition"), by counsel, for its Complaint and Jury Demand against Defendant HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW

JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive (collectively, "Defendant"), allege as follows:

## INTRODUCTION

1.      This case involves a dispute over the value of emergency services provided to patients in hospital emergency rooms located in New Jersey.

2.      The Coalition works with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. It seeks to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

3.      Among the emergency medicine practice groups ("Physicians") with whom the Coalition collaborates are NES America, Inc. and NES Georgia, Inc. (collectively, "NES"). The Physicians have provided emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey, among other hospitals.

4.      At all relevant times, Defendants routinely offered and furnished healthcare insurance throughout New Jersey, including to persons who received medical care in Gloucester County. The Physicians rendered emergency services to Defendants' members. Defendants either failed to pay or significantly underpaid the Physicians for their provision of emergency services. In order to improve the Physicians' capability to provide quality emergency care and be reasonably paid, Physicians have assigned to the Coalition these accounts and the right to sue thereupon.

5.      Plaintiff brings this case to seek payment for the emergency services Physicians provided to Defendants' members.

## THE PARTIES

6.      Plaintiff, the HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.
(the "Coalition" or "Plaintiff") is an organization whose mission is to pursue reasonable payment
owed to emergency physicians, so as to support the accessibility of quality emergency care across
New Jersey and to reform the problematic behavior of the health care insurance carriers.  It is a
corporation organized and existing under the laws of the state of New Jersey.

7.      Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New
Jersey ("Horizon BCBSNJ") is a corporation organized under the laws of the state of New Jersey
with its principal place of business at 3 Penn Plaza East, Newark, New Jersey 07105-2248. Horizon
BCBSNJ is a health insurance company that provides health insurance products to individuals and
employers in New Jersey.

8.      Horizon Healthcare of New Jersey, Inc., ("Horizon NJ") is a corporation
organized under the laws of the State of New Jersey with its principal place of business at 3
Penn Plaza East, Newark, New Jersey 07105-2248. Horizon NJ is a health maintenance
organization licensed in the state of New Jersey.

9.      The true names and capacities of the Defendants sued herein as DOES 1 through
20, inclusive ("Does"), are unknown to Plaintiff at this time, and therefore are sued by such
fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of
these Does when they have been ascertained. Plaintiff is informed and believes that each of the
Defendants designated as Doe is responsible in some manner for the events and happenings herein
alleged, as well as for the damages alleged.

10.     Defendants provide health insurance coverage for medical services, including
emergency medical services, to people in New Jersey who are covered by the health plans they

underwrite or administer on behalf of employers. As such, they are subject to the New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act"), N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

## **JURISDICTION AND VENUE**

11.　　Venue is proper in the Superior Court of New Jersey, Law Division, Gloucester County, pursuant to New Jersey Court Rule 4:3-2(a), as the place in which any party to the action resides at the time of its commencement. Specifically, because Horizon NJ actually does business in Gloucester County, it "shall be deemed to reside in" Gloucester County pursuant to New Jersey Court Rule 4:3-2(b). For instance, Horizon NJ is an "accepted insurance" at Jefferson Washington Township Hospital Inspira Health Center, which is within the County.[1] Horizon NJ also partners with multiple Inspira facilities in Gloucester County, including Inspira Medical Center Mullica Hill and Inspira Medical Center Woodbury.[2] Therefore, venue is proper in Gloucester County.

12.　　Courts within the State of New Jersey, including the Superior Court of New Jersey, Law Division, Gloucester County, have personal jurisdiction over the Defendants in this action because the Defendants have sufficient minimum contacts with the State of New Jersey and, as alleged below: (i) the Defendants are found in, have agents in, and/or transact their business and affairs in New Jersey; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in New Jersey; and (iii) the ends of justice require that those of the

---

[1] https://www.jeffersonhealth.org/your-health/patients-guests/health-insurance/accepted-insurances.
[2] https://www.horizonblue.com/providers/news/news-legal-notices/horizon-hospital-network-now-includes-inspira-mullica-hill.

#343662v1

Defendants residing outside New Jersey be brought before the Court to answer for their conduct engaged in and directed toward this State.

## STATEMENT OF FACTS

**A.    Background**

13.    In furtherance of its core mission as described above, the Coalition engages with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. The Coalition works to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

14.    Among the emergency medicine practice groups with whom the Coalition engages is NES, which provides emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey. At the time NES rendered emergency professional services to Defendants' members, it did not have a contract with Defendants, and set its own reasonable charges for the emergency services they provided. Defendants either failed to pay or significantly underpaid NES and Physicians for their provision of services. The Coalition has since been assigned those accounts and the right to sue thereupon.

15.    Systemic underpayments by health plans of the kind that Physicians have experienced threaten the stability of America's health care system by forcing emergency physician groups into bankruptcy and shuttering emergency departments. Even when physician groups are not forced to shut down, inadequate reimbursement may nonetheless force a reduction in physician coverage, negatively impacting patient care. The situation is especially dire in rural and medically under-served areas such as those serviced by the Physicians, where the closure of an emergency department can force people to travel much greater distances for basic care. For people suffering

from strokes, heart attacks, and other life-threatening conditions, even minutes can be the difference between life and death.  The Coalition's mission is to promote fair economics for emergency care by securing reasonable payment for emergency physician services so that qualified doctors can continue to render vital emergency care to all New Jersey residents.

16.     Physicians can, but are not obligated to, enter formal contractual arrangements with health care service plans, insurers, and other payors.  Physicians that enter into these formal agreements are considered to be "in network." Under such formal contracts, the in-network provider agrees to accept less than what it bills for services provided to patients in exchange for the various benefits of being contracted.

17.     In the emergency medicine context, some of the benefits for in-network providers may include, among others, certainty of timing for payment, the ability to submit electronic bills and communications to the payor, and cash flow certainty and payment timing and rates physicians will receive for their care services.

18.     Where the two sides have not agreed to enter into a formal agreement, the providers are considered to be "out of network". In the out-of-network scenario, none of these benefits are present.

19.     Out-of-network physicians have not agreed, in advance, to specified reimbursement rates with the payor.  As a result, they are not compelled to accept whatever the health plan chooses to pay for healthcare services rendered.

20.     Oftentimes, although physicians are willing to enter into an agreement, they are forced to operate "out-of-network" because the health plan simply refuses to contract with them, or the contract terms offered are unreasonable.  Where a health plan declines to pay an out-of-

network physician's full charges, then, the physician is entitled to seek payment of his or her full bill.

**B.**     **The Physicians Were Obligated to Render Emergency Medical Care**

21.     Regardless of whether a physician is "in-network" or "out-of-network," and regardless of whether a patient can afford to pay for services, physicians who practice in a hospital's emergency room, as the Physicians here did, are <u>required</u> by federal law to render lifesaving emergency health care services to patients seeking such services.  (*See* 42 U.S.C. § 1395dd ("EMTALA").)  New Jersey law likewise requires that hospitals provide emergent and urgent care, and if necessary, inpatient admission, to <u>all</u> patients regardless of their ability to pay. (N.J.S.A. 26:2H-18.64.)

22.     Thus, the Physicians were obligated to render emergency care to all the patients who presented to the emergency rooms at the hospitals at which they practiced, even if those patients were indigent, or covered by Medicaid, which is the payer of last resort.  Patients that pay a minimal amount – or that do not pay at all –constitute a significant proportion of the individuals that present to any emergency room.  Accordingly, the Coalition is entitled to pursue fair payment for the Physicians' services, so as to ensure that Defendants do not shirk their responsibility to the health care system – and to their own members, for whom Defendants promised to cover emergency services.

23.     As explained in more detail below, restitution and equity demand that Physicians – and by means of its valid assignment, the Coalition – be paid the reasonable value of the lifesaving care that the Physicians rendered to the members of Defendants' health plan.

C.     **The Claims At Issue**

24.     In this case, the Physicians provided emergency services to Defendants' members on an out-of-network basis. Defendants must therefore pay the Coalition for emergency services based upon the reasonable value of the emergency health care services provided by Physicians, which may be up to the full billed charges for those services.

25.     The Coalition has been assigned the reimbursement claims at issue from the Physicians and has the necessary rights and ability to sue to recover the full billed charges, or in the alternative, the reasonable value for the Physician services at issue.

26.     In total, this case involves 65,000 benefit claims spanning from dates of service from October 2017.  The total unpaid by Horizon BCBS is over $17 million, excluding interest.  Of the amounts due, approximately 93% of the dollars sought are for just six CPT codes: evaluation and management services rendered by NES physicians that were billed with codes 99281 through 99285; as well as 99291, a code that represents critical care services.

27.     In aggregate, Horizon BCBS paid just 22% of the billed charges for these services.

28.     Given the commonalities among the unpaid claims, just a few examples will suffice to illustrate Defendants' repeated wrongdoing in underpaying for the Physicians' emergency services.

29.     **Patient 1**.  Patient 1 presented to the emergency room at St. Michael's Medical Center on March 9, 2019 with sharp, lower abdominal pain – an acute but nonspecific symptom that could represent any number of underlying causes.  Patient 1 was promptly seen by Dr. Akbar Noormohamed, D.O.  Patient 1 was given a CT scan and was ultimately diagnosed with a urinary tract infection without hematuria, and then was released with instructions to follow up with Patient 1's primary medical doctor to obtain a referral to a urologist. The Physicians submitted a claim for

services for $1,915 for CPT code 99285.  Horizon BCBS, however, paid just $334.55, which is less than 17.5% of the Physicians' charges.

30. **Patient 2**. On April 25, 2019, Patient 2 arrived at the emergency room by ambulance with hypoglycemia and was promptly seen by Dr. Noormohamed.  After treatment, Patient 2 regained consciousness but refused to cooperate with medical staff and would not submit to a medical work-up.  The Physicians submitted a claim for services for $845.00 for CPT code 99283.  Horizon BCBS, however, paid just $119.99, which represents just 14.2% of the Physicians' charges.

31. **Patient 3**. Patient 3 came into the emergency room on July 5th, 2021, at Trinitas Regional Medical Center with severe chest pain. Patient 3 was seen by Dr. Ilya Parizh, D.O. An electrocardiogram was performed and diagnosed that the patient had chest pain and an edema of body fluid in their tissues. The Physicians submitted a claim for services for $2,168.00 for CPT codes 99285 and 93010. Horizon BCBS, however, paid just $324.00, which is less than 15.0% of the Physicians' charges.

32. The Coalition will provide a full list of the underpaid claims to Defendants upon request. Such list has not been included with this Complaint in order to avoid the unnecessary disclosure of Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), given the sheer volume of claims at issue.  The Coalition reserves the right to add additional underpaid claims to the list.

## CAUSES OF ACTION

## COUNT ONE: (QUANTUM MERUIT)

33. The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

34.     Under New Jersey law, a cause of action for Quantum Meruit requires: (l) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the amount charged for the services is reasonable.

35.     As alleged above, the federal law known as EMTALA, as well as New Jersey law, requires physicians to render emergency services to all patients who present at the emergency department regardless of insurance coverage or ability to pay. (*See* 42 U.S.C § 1395dd; N.J.S.A. 26:2H-18.64.)

36.     Restatement of Restitution (1937) Section 114, titled "Performance of Another's Duty to a Third Person in an Emergency," states,

> A person who has performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the other therefor if:
>
> he acted unofficiously and with intent to charge therefor, and the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person.

37.     Physicians provided emergency medical services to Members of Defendants' health care plans in good faith after Defendants undertook the obligation to pay for such services.

38.      Defendants were obliged to provide emergency care to their Members.  When those members presented to the emergency room, Physicians fulfilled that obligation on Defendants' behalf.  This, in turn, triggered Defendants' duty to pay the reasonable value for those services.  This is true even if Defendants did not become aware of Physicians' actions until *after* the emergency services were rendered.

39.     The Defendants themselves, as well as their Members, benefitted from the services Physicians provided under EMTALA.  For example, and without limitation, Defendants used and

enjoyed the benefit of Physicians' services because Physicians helped Defendants discharge their legal and contractual obligation to their insureds to provide them with emergency care.

40.     Physicians acted unofficiously and expected to be reasonably compensated for the medical services they provided to Defendants.

41.     Defendants' acceptance of the Physicians' services is further underscored by Defendants failure to reject the services, and in most cases, paying at least something for their Members' care.

42.     Defendants were also obligated by New Jersey law to pay for the emergency services rendered by Physicians.  Under governing law, Defendants "shall reimburse hospitals and physicians for all medically necessary emergency and urgent health care services covered under the health benefits plan, including all tests necessary to determine the nature of an illness or injury, in accordance with the provider agreement when applicable." N.J. Admin. Code § 11:24-5.3.

43.     Plaintiffs contend the reasonable value of the emergency medical services Physicians rendered to Defendants' Members is reflected by the amount Physicians charged for such services.

44.     As set out above, Defendants either paid for the claims at issue for the services provided at rates substantially lower than the reasonable value of the services provided or failed to pay any amount of the claims at issue.

45.     Under the doctrine of Quantum Meruit, Defendants are liable in restitution to Plaintiff for the difference between the amount Defendants paid and the reasonable value of the emergency services provided on the claims at issue.  The amount billed represents the reasonable value for the emergency care services.

## COUNT TWO: (IMPLIED CONTRACT)

46.     The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

47.     Defendants indicated, by a course of conduct, and in the context of the circumstances surrounding the relationship with the Physicians, that Defendants would pay for the emergency and medical services provided.

48.     Defendants routinely represent that their Members are able to go to any hospital emergency room when they need covered care, and even when they do so, those Members will be personally liable only for cost-sharing features of the plan (such as copayments, coinsurance and deductibles) at an in-network level.

49.     As alleged above, in exchange for the payment of premiums, Defendants had an obligation under the Members' health plans to cover timely emergency medical care for their Members.  The emergency services rendered by the Physicians were necessary to satisfy the Members' medical needs.

50.     Defendants are also fully aware that the Physicians were obligated by both federal and state law to treat any patient who presented to the emergency room regardless of ability to pay and regardless of whether the patients have insurance, or also whether the patients' insurance company is in or out of network with the Physicians.

51.     Defendants indicated, by their course of conduct and dealing, that they would hold their Members harmless.  In order to do so, Defendants necessarily had to pay the reasonable value for the emergency services rendered by the Physicians.

52.     Indeed, Horizon BCBS routinely sent Explanation of Benefit (EOB) forms to the Physicians which, after explaining what Horizon BCBS would and would not pay, announced that

its members "are not liable for full payment of inadvertent, emergent, or involuntary charges from out-of-network providers, and members cannot be billed for amounts above their costs . . . ." The statement concluded, "If you treated this patient on an inadvertent, emergent or involuntary basis but the payment does not reflect that, call 1-800-624-1110."

53.     In other words, when they communicated with Physicians about payment, then, Defendants therefore regularly acknowledged that they had an obligation to pay the reasonable value for the Physicians' emergency services in order to make good on Defendants' promise to their own members.

54.     The Physicians rendered medically necessary and lifesaving emergency services, and in doing so reasonably expected compensation from Defendants.

55.     As alleged, the Physicians have now assigned to Coalition their entire right to sue Defendants for the reasonable value of their services.

56.     A reasonable person in Defendants' position would know or should have known that the Physicians were performing the services expecting that Defendants would pay for them appropriately.

57.     Defendants' failure to pay the reasonable value of the Physicians' services constitutes breach of their implied contract with Physicians. Physicians were harmed as a direct result of this breach and suffered damages as a result. The Coalition, as the direct assignee of Physicians, now seek to pursue their rights thereunder.

## COUNT THREE: (VIOLATION OF NEW JERSEY HEALTH CLAIMS AUTHORIZATION, PROCESSING, AND PAYMENT ACT ("HCAPPA")

58.     The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

59.    HCAPPA requires health insurers such as Defendants to pay health care providers'
claims promptly, provided that the claims meet the criteria for payment set forth in N.J.S.A.
17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

60.    Specifically, for out-of-network emergency claims governed by the Out-of-
Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON
Act") for services rendered on or after August 30, 2018, such as the claims for the emergency
treatment Plaintiff's physicians have provided to Defendants' Members, New Jersey law requires
that such claims be paid in full no more than 50 days after electronic submission, except to the
extent disputed in accordance with the procedures of the OON Act. *See* NJ.S.A. 26:2SS-9.

61.    Plaintiff's claims for the emergency treatment they provided to Defendants'
Members meet all the criteria for payment under HCAPPA, NJ.S.A. 17B:26-9.l(d)(9), N.J.S.A.
17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9). On the dates the services were provided,
Defendants covered the out-of-network emergency services Physicians provided to Defendants'
Members, and Physician submitted the claims to Defendants on the appropriate claim forms.

62.    However, as described more fully above, Defendants failed to remit full
reimbursement of Physicians' charges for healthcare services or provide a written explanation for
the failure to pay all or a portion of such claims within the statutorily proscribed time frames under
HCAPPA or the OON Act.

63.    Moreover, as described more fully above, Defendants failed to provide written
notice specifying that Physicians' out-of-network emergency claims were incomplete or contained
incorrect information, that Defendants disputed the amounts claimed in whole or in part, or that
there was strong evidence of fraud, as HCAPPA requires of any carrier that fails to timely pay a
claim for reimbursement. N.J.S.A. 17B:26-9.l(d)(2), N.J.S.A. 17B:27-44.2(d)(2), or NJ.S.A.

N.J.S.A. 26:2J-8.1(d)(2). Nor did Defendants seek to dispute any of Physicians' out-of-network claims in accordance with the OON Act.

64.    Defendants' failure to timely pay the full amounts due to Physicians for their out-of-network emergency claims for services provided has resulted overdue payments under HCAPPA.

65.    Therefore, Plaintiff is entitled to recover from Defendants the full underpaid and unpaid amounts on all of Physicians' out-of-network emergency claims for services together with statutory interest in the amount of 12% per annum, N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9), and N.J.S.A. 26:2J-8.1(d)(9).

## PRAYER FOR RELIEF

WHEREFORE, HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., by counsel, respectfully requests the Court enter judgment in its favor and against Defendants in excess of $17 million, plus interest, the costs of this action, and all other appropriate relief.

## JURY DEMAND

Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., by counsel, respectfully demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

**LAULETTA BIRNBAUM, LLC**

Date: February 27, 2024

By: */s/ Dante B. Parenti*
Dante B. Parenti, Esq.

ATTORNEYS FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

## <u>CERTIFICATION UNDER LOCAL CIVIL RULE 11.2</u>

I certify that the matter in controversy is not the subject matter of any other action pending

in any court or of any pending arbitration or administrative proceeding.

<div align="right">Respectfully submitted,</div>

Date: <u>February 27, 2024</u>              **LAULETTA BIRNBAUM, LLC**

By: <u>*/s/ Dante B. Parenti*</u>
Dante B. Parenti, Esq.

ATTORNEYS FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

## <u>LOCAL CIVIL RULE 201.1 CERTIFICATION</u>

I certify under penalty of perjury that the matter in controversy is not eligible for

compulsory arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000,

exclusive of interest and costs.

<div align="right">Respectfully submitted,</div>

<div align="right">**LAULETTA BIRNBAUM, LLC**</div>

Date: <u>February 27, 2024</u>              By: <u>*/s/ Dante B. Parenti*</u>
Dante B. Parenti, Esq.

ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

## <u>CERTIFICATE OF SERVICE</u>

I, Dante B. Parenti, certify that on this date, I caused a true and correct copy of the within pleading to be served on all counsel of record via the Court's ECF electronic filing system.

Respectfully submitted,

**LAULETTA BIRNBAU, LLC**

Date: <u>February 27, 2024</u>

By: *<u>/s/ Dante B. Parenti</u>*
Dante B. Parenti, Esq.

ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE
COALITION OF NEW JERSEY
CORP.

#343662v1

# Civil Case Information Statement

**Case Details: GLOUCESTER | Civil Part Docket# L-000242-24**

**Case Caption:** HEALTHCARE JUSTICE C OALITION  VS
HORIZON HEALTHC

**Case Initiation Date:** 02/27/2024

**Attorney Name:** DANTE B PARENTI

**Firm Name:** LAULETTA BIRNBAUM, LLC

**Address:** 591 MANTUA BLVD STE 200
SEWELL NJ 08080

**Phone:** 8562321600

**Name of Party:** PLAINTIFF : Healthcare Justice Coalition

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Healthcare Justice Coalition ?** NO

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
      **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
      **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/27/2024
Dated

/s/ DANTE B PARENTI
Signed

# EXHIBIT B

HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

Plaintiff

VS

HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, ET AL

Defendant

20240306122503

Superior Court Of New Jersey

GLOUCESTER Venue

Docket Number: GLO L 242 24

**Person to be served** (Name and Address):
HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY,
820 BEAR TAVERN ROAD
WEST TRENTON  NJ  08628
**By serving:** CT CORPORATION SYSTEM

**Attorney:** DANTE B. PARENTI, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, TRACK ASSIGNMENT NOTICE, PRAYER FOR RELIEF, CERTIFICATIONS

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| | | |
|---|---|---|
| **Service Data:** | [X] Served Successfully | [ ] Not Served |

Date/Time:     3/6/2024 1:00 PM          _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

SCOTT KUNTZ

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M___  AGE:36-50_  HEIGHT: 5'9"-6'0"____  WEIGHT: 161-200 LBS.____  SKIN:WHITE_____  HAIR:BROWN____  OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:          Date/Time: _____
                            Date/Time: _____
                            Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this

6th day of March, 2024


Notary Signature

Rosemary Ramos                    September 25th, 2028
Name of Notary                    My Commission Expires



I, JANE NUNN,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.


Signature of Process Server

03/06/2024
Date

Name of Private Server: JANE NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

# EXHIBIT C

HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

Plaintiff

VS

HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, ET AL

Defendant

20240306122955

Superior Court Of New Jersey

GLOUCESTER Venue

Docket Number: GLO L 242 24

**Person to be served** (Name and Address):
HORIZON HEALTHCARE OF NEW JERSEY, INC.,
820 BEAR TAVERN ROAD
WEST TRENTON  NJ  08628
**By serving:**  CT CORPORATION SYSTEM

**Attorney:** DANTE B. PARENTI, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, TRACK ASSIGNMENT NOTICE, PRAYER FOR RELIEF, CERTIFICATIONS

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| Service Data: | [X] Served Successfully | [ ] Not Served |
|---|---|---|

Date/Time:  3/6/2024 1:00 PM_____   _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

SCOTT KUNTZ_____

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M___  AGE:36-50_  HEIGHT: 5'9"-6'0"____  WEIGHT: 161-200 LBS.____  SKIN:WHITE_____  HAIR:BROWN___  OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:   Date/Time: _____
                      Date/Time: _____
                      Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this

6th day of March, 2024


Notary Signature
Rosemary Ramos
Name of Notary



September 25th, 2028
My Commission Expires

I, JANE NUNN,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.



Signature of Process Server

03/06/2024____
Date

Name of Private Server: JANE NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

# EXHIBIT D

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants*

------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW  :
JERSEY CORP.,                          :    SUPERIOR COURT OF NEW JERSEY
                                       :    LAW DIVISION: GLOUCESTER
                Plaintiff,             :    COUNTY
                                       :
        -v-                            :    Docket No.: GLO-L-000242-24
                                       :
HORIZON HEALTHCARE SERVICES, INC., d/b/a  :  **STIPULATION EXTENDING TIME**
HORIZON BLUE CROSS BLUE SHIELD OF NEW  :   **TO RESPOND TO COMPLAINT**
JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, :
INC., and DOES 1-20, inclusive,         :
                                       :
                Defendants.            :
------------------------------------------------------------------- x

      **IT IS STIPULATED AND AGREED** by and between counsel for Plaintiff, Healthcare

Justice Coalition of New Jersey Corp., and counsel for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc., that the time within which said Defendants must answer, plead, or otherwise respond to the

Complaint is extended to and including May 10, 2024.

Dated: April 10, 2024


/s/ Dante B. Parenti
Dante B. Parenti, Esq. (005571985)
**LAULETTA BIRNBAUM, LLC**
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601
E-mail: dparenti@lauletta.com

/s/ Adam J. Petitt
Adam J. Petitt, Esq. (020822008)
**ROBINSON & COLE LLP**
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Telephone : (215) 398-0562
Fax : (215) 398-0599
E-mail: apetitt@rc.com
*Attorney for Defendants*

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

*Attorneys for Plaintiff*

# EXHIBIT E

## NEW JERSEY DEPARTMENT OF THE TREASURY
## DIVISION OF REVENUE AND ENTERPRISE SERVICES

### CERTIFICATE OF INC, (PROFIT)

### HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.
### 0451090335

The above-named DOMESTIC PROFIT CORPORATION was duly filed in accordance with New Jersey State Law on 02/23/2024 and was assigned identification number 0451090335. Following are the articles that constitute its original certificate.

**1.  Name:**
HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

**2.  Registered Agent:**
VCORP AGENT SERVICES, INC.

**3.  Registered Office:**
820 BEAR TAVERN ROAD
WEST TRENTON, NEW JERSEY 08628

**4.  Business Purpose:**
TO ENGAGE IN ANY ACTIVITY WITHIN THE PURPOSES FOR WHICH CORPORATIONS MAY BE ORGANIZED UNDER NJSA 14A 1-1 ET SEQ: AND TO ENGAGE IN ANY AND ALL NECESSARY OR INCIDENTAL ACTIVITIES.

**5.  Duration:**
PERPETUAL

**6.  Stock:**
100

**7.  Effective Date of this filing is:**
02/23/2024

**8.  First Board of Directors:**
ELIOT LISTMAN
961 BROADWAY
SUITE 105
WOODMERE, NEW YORK 11598

JONATHAN NISSANOFF
961 BROADWAY
SUITE 105
WOODMERE, NEW YORK 11598

DAVID BRAINSON
961 BROADWAY
SUITE 105
WOODMERE, NEW YORK 11598

**9.  Incorporators:**
ELIOT LISTMAN
961 BROADWAY
SUITE 105
WOODMERE, NEW YORK 11598

**10. Main Business Address:**
961 BROADWAY, STE 105
WOODMERE, NEW YORK 11598

# NEW JERSEY DEPARTMENT OF THE TREASURY
## DIVISION OF REVENUE AND ENTERPRISE SERVICES

### CERTIFICATE OF INC, (PROFIT)

### HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.
### 0451090335

**Signatures:**

ELIOT LISTMAN
INCORPORATOR

*IN TESTIMONY WHEREOF, I have*
*hereunto set my hand and*
*affixed my Official Seal*
*23rd day of February, 2024*

*Elizabeth Maher Muoio*
*State Treasurer*

Certificate Number  4235231416
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Page 2 of 2

# EXHIBIT F

```
Status Report For:      PRIME HEALTHCARE SERVICES - ST. MICHAEL'S,
                        LLC
Report Date:            4/15/2024
Confirmation Number:    241063321575
```

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

```
Business ID Number:    0400584178
Business Type:         FOREIGN LIMITED LIABILITY COMPANY
Status:                ACTIVE
Original Filing Date:  06/28/2013
Stock Amount:          N/A
Home Jurisdiction:     DE
Status Change Date:    NOT APPLICABLE
```

## REVOCATION/SUSPENSION INFORMATION

```
DOR Suspension Start   N/A
Date:
DOR Suspension End     N/A
Date:
Tax Suspension Start   N/A
Date:
Tax Suspension End     N/A
Date:
```

## ANNUAL REPORT INFORMATION

```
Annual Report Month:   JUNE
Last Annual Report     05/30/2023
Filed:
Year:                  2023
```

## AGENT/SERVICE OF PROCESS (SOP) INFORMATION

```
Agent:                 COGENCY GLOBAL INC
Agent/SOP Address:     316 BERRHILL DRIVE ,WILLIAMSTOWN,NJ,08094
Address Status:        DELIVERABLE
Main Business Address: 111 Central Avenue, Newark, NJ, 07102
Principal Business     111 Central Avenue,Newark,NJ,07102
Address:
```

## ASSOCIATED NAMES

```
Associated Name:       PRIME HEALTHCARE SERVICES - ST. MICHAEL'S LLC
Type:                  PV
Associated Name:       SAINT MICHAEL'S MEDICAL CENTER
Type:                  FC
```

**PRINCIPALS**

Following are the most recently reported officers/directors (corporations), managers/members/managing members (LLCs), general partners (LPs), trustees/officers (non-profits).

| | |
|---|---|
| Title: | CHIEF FINANICAL OFFICERS |
| Name: | Aleman,Steve |
| Address: | 3480 East Guasti Road, Ontario, , , US |
| Title: | PRESIDENT |
| Name: | Leon,Luis |
| Address: | 3480 E. Guasti Road, Ontario, , , US |
| Title: | SECRETARY |
| Name: | Richlin,Abraham J |
| Address: | 3480 E. Guasti Road, Ontario, , , US |

**FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND LIMITED LIABILITY PARTNERSHIPS**

To order copies of any of the filings below, return to the service page, https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions for obtaining copies. Please note that trade names are filed initially with the County Clerk(s) and are not available through this service. Contact the Division for instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate)Date: | 2013 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| NAME CHANGE CORRECTION | 2014 |
| ALTERNATE NAME FILING | 2016 |
| ALTERNATE NAME RENEWAL | 2021 |
| Annual Report Filing with address change | 2016 |
| Annual Report Filing with address change | 2020 |
| Annual Report Filing with address change | 2021 |
| Annual Report Filing with address change | 2022 |
| Annual Report filing with officer/member change | 2016 |

| | |
|---|---|
| Annual Report filing with officer/member change | 2017 |
| Annual Report filing with officer/member change | 2020 |
| Annual Report filing with officer/member change | 2021 |
| Annual Report filing with officer/member change | 2022 |

Note:

Copies of some of the charter documents above, particularly those filed before June 1988 and recently filed documents (filed less than 20 work days from the current date), may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the service center at https://www.njportal.com/DOR/businessrecords/Default.aspx periodically, search for the business again and build a current list of its filings. Repeat this procedure until the document shows on the list of documents available for download.

The Division cannot provide information on filing requests that are in process. Only officially filed documents are available for download.

# EXHIBIT G

```
Status Report For:        TRINITAS REGIONAL MEDICAL CENTER, A NEW
                          JERSEY NONPROFIT CORPORATION
Report Date:              4/15/2024
Confirmation Number:      241063321455
```

**IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION**

```
Business ID Number:       0100804343
Business Type:            NON PROFIT CORPORATION
Status:                   ACTIVE
Original Filing Date:     01/06/2000
Stock Amount:             N/A
Home Jurisdiction:        NJ
Status Change Date:       12-28-2021
```

**REVOCATION/SUSPENSION INFORMATION**

```
DOR Suspension Start      N/A
Date:
DOR Suspension End        N/A
Date:
Tax Suspension Start      N/A
Date:
Tax Suspension End        N/A
Date:
```

**ANNUAL REPORT INFORMATION**

```
Annual Report Month:      JANUARY
Last Annual Report        12/26/2023
Filed:
Year:                     2024
```

**AGENT/SERVICE OF PROCESS (SOP)INFORMATION**

```
Agent:                    DAVID A. MEBANE, ESQ.
Agent/SOP Address:        C/O RWJ BARNABAS HEALTH, INC 95 OLD SHORT
                          HILLS ROAD,WEST ORANGE,NJ,07052
Address Status:           DELIVERABLE
Main Business Address:    225 WILLIAMSON ST, ELIZABETH, NJ, 07207
Principal Business        225 WILLIAMSON ST,ELIZABETH,NJ,07207
Address:
```

**ASSOCIATED NAMES**

```
Associated Name:          WILLIAMSON STREET CAMPUS
Type:                     FC
Associated Name:          TRINITAS HOSPITAL
Type:                     FC
Associated Name:          TRINITAS HOSPITAL-EAST JERSEY STREET CAMPUS
Type:                     FC
```

```
    Associated Name:        EAST JERSEY STREET CAMPUS
    Type:                   FC
    Associated Name:        ELIZABETH GENERAL MEDICAL CENTER
    Type:                   FC
    Associated Name:        ST. ELIZABETH HOSPITAL
    Type:                   FC
    Associated Name:        TRINITAS HOSPITAL-WILLIAMSON STREET CAMPUS
    Type:                   FC
    Associated Name:        TRINITAS HOSPITAL-NEW POINT CAMPUS
    Type:                   FC
    Associated Name:        NEW POINT CAMPUS
    Type:                   FC
    Associated Name:        TRINITAS HOSPITAL, A NEW JERSEY NONPROFIT
                            CORPORATION
    Type:                   PV
    Associated Name:        TRINITAS REGIONAL MEDICAL CENTER
    Type:                   FC
    Associated Name:        BAYONNE COMMUNITY MENTAL HEALTH CENTER
    Type:                   FC
    Associated Name:        BAYONNE COMMUNITY MENTAL HEALTH CENTER, A
                            SERVICE OF TRINITAS REGIONAL MEDICAL CENTER
    Type:                   FC
```

**PRINCIPALS**

Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

```
    Title:                  PRESIDENT
    Name:                   DiLiegro,Nancy
    Address:                225 WILLIAMSON STREET, ELIZABETH, , , US
    Title:                  TRUSTEES
    Name:                   Shaughnessy,Maureen
    Address:                225 WILLIAMSON STREET, ELIZABETH, , , US
    Title:                  CHAIRMAN OF THE BOARD
    Name:                   Richel,Victor
    Address:                225 WILLIAMSON STREET, ELIZABETH, , , US
```

**FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND
LIMITED LIABILITY PARTNERSHIPS**

To order copies of any of the filings below, return to the service page,
https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions
for obtaining copies. Please note that trade names are filed initially with the County
Clerk(s) and are not available through this service. Contact the Division for
instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

      Original Filing      2000
      (Certificate)Date:

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| NAME CHANGE | 2008 |
| MERGER | 2021 |
| RESTATED | 2021 |
| CONSOLIDATED | 2000 |
| CONSOLIDATED | 2000 |
| CHANGE OF AGENT AND OFFICE | 2001 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2000 |
| ALTERNATE NAME FILING | 2008 |
| ALTERNATE NAME FILING | 2018 |
| ALTERNATE NAME FILING | 2018 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2005 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2009 |
| ALTERNATE NAME RENEWAL | 2013 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |

| | |
|---|---|
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2015 |
| ALTERNATE NAME RENEWAL | 2018 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2020 |
| ALTERNATE NAME RENEWAL | 2023 |
| Annual Report filing with officer/member change | 2021 |
| Annual Report filing with officer/member change | 2023 |
| Annual Report filing with officer/member change | 2022 |

Note:
Copies of some of the charter documents above, particularly those filed before June 1988 and recently filed documents (filed less than 20 work days from the current date), may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the service center at https://www.njportal.com/DOR/businessrecords/Default.aspx periodically, search for the business again and build a current list of its filings. Repeat this procedure until the document shows on the list of documents available for download.

The Division cannot provide information on filing requests that are in process. Only officially filed documents are available for download.

# EXHIBIT H

# John R. Ashcroft
## Missouri Secretary of State

**MISSOURI ONLINE BUSINESS FILING**

| MY ACCOUNT | HOME | SEARCH | MISC INFO | UCC FILING | | ? Help |

## Gen. Business - For Profit Details as of 1/23/2024

Required Field *

File Documents - select the filing from the "Filing Type" drop-down list, then click FILE ONLINE.

File Registration Reports - click FILE REGISTRATION REPORT.

Copies or Certificates - click FILE COPIES/CERTIFICATES.

RETURN TO
SEARCH RESULTS

**Create Filing**
Articles of Amendment

FILE
ONLINE

ORDER COPIES/
CERTIFICATES

General Information      Filings      Principal Office Address      Contact(s)

| | | | |
|---|---|---|---|
| Name(s) | **NES AMERICA, INC.** | Principal Office Address | **39 Main St**<br>**TIBURON, CA 94920-2507** |
| Type | **Gen. Business - For Profit** | Charter No. | **00554243** |
| Domesticity | **Domestic** | Home State | **MO** |
| Registered Agent | **C T CORPORATION SYSTEM**<br>**120 S Central Ave**<br>**CLAYTON, MO 63105** | Status | **Good Standing** |
| Date Formed | **11/26/2003** | | |
| Duration | **Perpetual** | | |
| Renewal Month | **November** | | |
| Report Due | **2/29/2038** | | |

The information contained on this page is provided as a public service, and may change at any time. The State, its employees, contractors, subcontractors or their employees do not make any warranty, expressed or implied, or assume any legal liability for the accuracy, completeness or usefulness of any information, apparatus, product or process disclosed or represent that its use would not infringe on privately-owned rights.

Hey there! I am an A.I.
chatbot, let's talk.



# EXHIBIT I



# GEORGIA
# CORPORATIONS DIVISION

GEORGIA SECRETARY OF STATE
# BRAD RAFFENSPERGER

**HOME (/)**

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | | | |
|---|---|---|---|
| Business Name: | **NES GEORGIA, INC.** | Control Number: | **K511599** |
| Business Type: | **Domestic Profit Corporation** | Business Status: | **Active/Owes Current Year AR** |
| Business Purpose: | **NONE** | | |
| Principal Office Address: | **39 Main St., Tiburon, CA, 94920, USA** | Date of Formation / Registration Date: | **4/13/1995** |
| State of Formation: | **Georgia** | Last Annual Registration Year: | **2023** |

### REGISTERED AGENT INFORMATION

Registered Agent Name: **C T CORPORATION SYSTEM**

Physical Address: **289 S CULVER ST, LAWRENCEVILLE, GA, 30046, USA**

County: **Gwinnett**

### OFFICER INFORMATION

| Name | Title | Business Address |
|---|---|---|
| David Moattar | Secretary | 39 MAIN STREET, TIBURON, CA, 94920, USA |
| JENNIFER MOORE | CEO | 39 MAIN STREET, TIBURON, CA, 94920, USA |
| LISA MENNUCCI | CFO | 39 Main St., Tiburon, CA, 94920, USA |

Back

Filing History    Name History

Return to Business Search

# EXHIBIT J



**Google** Maps    3 Penn Plaza East, 3 Penn Plaza E, Newark, NJ 07105 to 70 Hunter St, Woodbury, NJ 08096    Drive 89.2 miles, 1 hr 43 min

Map data ©2024 Google    10 mi ⊢————⊣

🚗 **via I-95 S**      **1 hr 43 min**

Best route now due to traffic conditions      89.2 miles

⚠️ This route has tolls.

🚗 **via I-95 S and I-295 S**      **1 hr 42 min**

89.8 miles

🚌 1:04 PM—3:47 PM      2 hr 43 min

🚶 ⟩ 🚌 Greyhound US0305   ⟩ 🚌 402   401

410   412   ⟩ 🚶

## Explore nearby 70 Hunter St



🍴 Restaurants    🛏️ Hotels    ⛽ Gas stations    🅿️ Parking Lots    ••• More

# EXHIBIT K



**1700 American Blvd, Pennington, NJ 08534 to 70 Hunter St, Woodbury, NJ 08096**          Drive 53.0 miles, 54 min



Map data ©2024 Google      5 mi

🚗 **via I-295 N and I-95 S**                    **50 min**

Fastest route, the usual traffic          46.0 miles

🚗 **via I-295 S**                              **54 min**

⚠️ This route has restricted usage or          53.0 miles
private roads.

🚆 ℹ️ **1:18 PM—4:20 PM**          **3 hr 2 min**

🚶 › 🚌 608 › 🚈 WTR › 🚌 402 410
› 🚶

**Explore nearby 70 Hunter St**

🍴          🛏️          ⛽          🅿️          •••

Restaurants   Hotels   Gas stations   Parking Lots   More

# EXHIBIT L

NPPES NPI Registry          NPPES   Downloads   API   Help

# Provider Information for 1083640965

The following NPI(s) contain information matching your search criteria. Please select the NPI to view all the data associated with the NPI.

Home  /  NPI View

**Please Note:** **Issuance of an NPI does not ensure or validate that the Health Care Provider is Licensed or Credentialed. For more information please refer to NPI: What You Need to Know**

## Dr. AKBAR HUSSAIN NOORMOHAMED DO

## Gender: Male

NPI: 1083640965

Last Updated: 2008-07-18

Certification Date:

## Details

| Name | Value |
|---|---|
| NPI | 1083640965 |
| Enumeration Date | 2006-06-23 |
| NPI Type | NPI-1 Individual |
| Sole Proprietor | NO |
| Status | Active |
| Mailing Address | 66 W GILBERT ST<br>2ND FLOOR<br>RED BANK, NJ 07701-4918<br>United States |

NPPES NPI Registry          NPPES   Downloads   API   Help

| | |
|---|---|
| | Phone: 732 212 5551 \| Fax: 732 212 5552<br>View Map ⧉ |
| Primary Practice Address | 111 CENTRAL AVENUE<br>NEWARK, NJ 07102-1909<br>United States<br><br>Phone: 973-877-5000 \| Fax:<br>View Map ⧉ |
| Secondary Practice Address(es) | |

| Health Information Exchange | Endpoint Type | Endpoint | Endpoint Description | Use | Content Type | Affiliation | Endpoint Location |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Other Identifiers | Issuer | State | Number |
|---|---|---|---|
| | MEDICAID | NJ | 0109860 |
| | Other (non-Medicare) | NJ | 2736071000 |
| | Other (non-Medicare) | NJ | 60026407 |
| | Other (non-Medicare) | NJ | P00355190 |
| | Other (non-Medicare) | NJ | XK1701 |

| Taxonomy | Primary Taxonomy | Selected Taxonomy | State | License Number |
|---|---|---|---|---|
| | Yes | 207P00000X - Emergency Medicine | NJ | 25MB0802500 |

A federal government website managed by the
**U.S. Centers for Medicare & Medicaid Services**
7500 Security Boulevard, Baltimore, MD 21244

# EXHIBIT M

NPPES NPI Registry          NPPES   Downloads   API   Help

# Provider Information for 1619361995

The following NPI(s) contain information matching your search criteria. Please select the NPI to view all the data associated with the NPI.

Home / NPI View

**Please Note:** **Issuance of an NPI does not ensure or validate that the Health Care Provider is Licensed or Credentialed. For more information please refer to NPI: What You Need to Know**

## Dr. ILYA PARIZH D.O

## Gender: Male

NPI: 1619361995

Last Updated: 2023-06-09

Certification Date: 2023-06-09

## Details

| Name | Value |
|------|-------|
| NPI | 1619361995 |
| Enumeration Date | 2015-03-24 |
| NPI Type | NPI-1 Individual |
| Sole Proprietor | NO |
| Status | Active |
| Mailing Address | 25 SAVIN CT<br>STATEN ISLAND, NY 10304-4215<br>United States |

NPPES NPI Registry        NPPES   Downloads   API   Help

|  | Phone: ~~973-920-3091~~ \| Fax:  |
|---|---|
|  | View Map [↗] |
| Primary Practice Address | 154 STATE ROUTE 10<br>EAST HANOVER, NJ 07936-2107<br>United States<br><br>Phone: 973-920-3090 \| Fax:<br>View Map [↗] |
| Secondary Practice Address(es) |  |

| Health Information Exchange | Endpoint Type | Endpoint | Endpoint Description | Use | Content Type | Affiliation | Endpoint Location |
|---|---|---|---|---|---|---|---|

| Other Identifiers | Issuer | State | Number |
|---|---|---|---|
|  | MEDICAID | NJ | 0684686 |

| Taxonomy | Primary Taxonomy | Selected Taxonomy | State | License Number |
|---|---|---|---|---|
|  | No | 207P00000X - Emergency Medicine | NY | 293705 |
|  | No | 208D00000X - General Practice | NY | 293705 |
|  | Yes | 207P00000X - Emergency Medicine | NJ | 25MB1050430 |

---



A federal government website managed by the
**U.S. Centers for Medicare & Medicaid Services**
7500 Security Boulevard, Baltimore, MD 21244

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel: (215) 398-0562
E-mail: apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW       :
JERSEY CORP.,                             :   SUPERIOR COURT OF NEW JERSEY
                                          :   LAW DIVISION: GLOUCESTER
                          Plaintiff,      :   COUNTY
                                          :
        -v-                               :   Docket No.: GLO-L-000242-24
                                          :
HORIZON HEALTHCARE SERVICES, INC., d/b/a  :
HORIZON BLUE CROSS BLUE SHIELD OF NEW     :
JERSEY, HORIZON HEALTHCARE OF NEW         :
JERSEY, INC., and DOES 1-20, inclusive,   :
                                          :
                          Defendants.     :
------------------------------------------------------------------- x

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO CHANGE VENUE
PURSUANT TO R. 4:3-3(A)(3)**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

LEGAL ARGUMENT ......................................................................................................... 2

     A.    Venue Should be Transferred to Essex County Pursuant to R. 4:3-3(A)(3)
         and the Doctrine of *Forum Non Conveniens*. ........................................................ 2

CONCLUSION ................................................................................................................... 7

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*D'Agostino v. Johnson & Johnson, Inc.*,
    225 N.J. Super. 250 (App. Div. 1988) ..............................................................4, 5, 6

*Gore v. U.S. Steel Corp.*,
    15 N.J. 301 (1954) ...............................................................................................3

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947)..............................................................................................6

*Kurzke v. Nissan Motor Corp. in U.S.A.*,
    164 N.J. 159 (2000) .........................................................................................2, 3, 6

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)..............................................................................................4

*Varo v. Owens-Illinois, Inc.*,
    400 N.J. Super. 508 (App. Div. 2008) ......................................................................3

*Walker v. Inspira Health Network, Inc.*,
    No. A-3723-22, 2024 WL 791624 (N.J. Super. Ct. App. Div. Feb. 27, 2024).....................5, 6

**Rules**

New Jersey Rule 4:3-3 ..............................................................................................3

New Jersey Rule 4:4-4 ..............................................................................................3

## PRELIMINARY STATEMENT

Plaintiff Healthcare Justice Coalition of New Jersey Corp. ("Plaintiff") purports to be an assignee and stand in the shoes of two physician groups, NES America, Inc. ("NES America") and NES Georgia, Inc. ("NES Georgia") (collectively, "NES"), who provided emergency medical services at Saint Michael's Medical Center ("Saint Michael's") and Trinitas Regional Medical Center ("Trinitas") hospitals.  Plaintiff sued Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon") in this Court to recover allegedly underpaid claims for emergency services that NES's physicians provided to Horizon members at Saint Michael's and Trinitas.  However, there is no connection between the substance of Plaintiff's lawsuit and Gloucester County, where Plaintiff chose to file its action.  Indeed, the hospitals where the alleged emergency services took place are located in Essex County and Union County, and Horizon is located in Essex County.  Further, NES's physician groups are residents of Georgia, Missouri, and California.  This case has been improperly venued in Gloucester County given that the medical care and treatment at issue occurred in Essex County and Union County, and the Defendants reside in Essex County. Plaintiff resides out of state in Woodmere, New York.

## STATEMENT OF FACTS

Plaintiff, Healthcare Justice Coalition of New Jersey Corp., is a New Jersey corporation with its principal place of business located in Woodmere, New York. (Compl., ¶ 6; Certification of Adam J. Petitt ("Petitt Cert."), ¶ 6, Ex. E).  Plaintiff does not have a direct relationship with Horizon, nor does it provide medical services to patients enrolled in Horizon plans.  Rather, Plaintiff alleges that it obtained an assignment from physician groups NES America and NES Georgia to pursue allegedly underpaid claims that NES America and NES Georgia submitted to

1

Horizon for emergency services they provided to Horizon members at Saint Michael's Medical Center and Trinitas Regional Medical Center. (*Id.* at ¶¶ 2-5, 13). Saint Michael's and Trinitas, the hospitals where the alleged emergency services were rendered, are located in Newark, New Jersey and Elizabeth, New Jersey, respectively. (Petitt Cert., ¶¶ 7-8, Exhs. F–G). For their part, NES America and NES Georgia are citizens of Missouri and Georgia, respectively, and maintain their principal place of business in Tiburon, California. (Petitt Cert., ¶¶ 9–10, Exhs. H–I). Horizon BCBSNJ is a New Jersey corporation with its principal place of business in Newark, New Jersey. (Compl., ¶ 7; Certification of Beth Feurey ("Feurey Cert."), ¶ 2). HNJH is a New Jersey corporation with its principal place of business in Pennington, New Jersey. (Compl., ¶ 8; Feurey Cert., ¶ 5).

## **LEGAL ARGUMENT**

**A.    Venue Should be Transferred to Essex County Pursuant to R. 4:3-3(A)(3) and the Doctrine of *Forum Non Conveniens.***

In its Complaint, Plaintiff alleges only that venue is proper in Gloucester County because Horizon "does business" there. (Compl., ¶ 11). However, the Complaint fails to allege any connection between the substance of the lawsuit – alleged unpaid emergency claims at hospitals in Newark and Elizabeth – and Gloucester County. Indeed, beyond Horizon, none of the parties have any connection to Gloucester County. As discussed below, Gloucester County lacks a sufficient connection to the parties, witnesses, or location where the Complaint's causes of action accrued to justify the inconvenient venue. Accordingly, the Court should transfer this matter to Essex County, where the alleged emergency services were rendered and the majority of the parties, witnesses, and key documents are located.

The doctrine of forum non conveniens "is firmly embedded in the common law of this State." *Kurzke v. Nissan Motor Corp. in U.S.A.*, 164 N.J. 159, 164–65 (2000) (quoting *Civic*

*Southern Factors Corp. v. Bonat*, 65 N.J. 329, 332 (1974)).  Because the doctrine is "equitable in nature," "decisions concerning its application ordinarily are left to the sound discretion of the trial court."  *Id.* (citing *Civic Southern Factors Corp.*, 65 N.J. at 333).  This doctrine is codified in Rule 4:3-3(a)(3), which provides that the Assignment Judge or a designee may order a change of venue "for the convenience of the parties and witnesses in the interest of justice." R. 4:3-3(a)(3).  This rule allows a court to "decline jurisdiction where there is available another forum where trial will best serve the convenience of the parties and the ends of justice." *Gore v. U.S. Steel Corp.*, 15 N.J. 301, 305 (1954).  In determining whether to exercise of their discretion, courts generally apply a three-step process.  First, a court determines whether there is an adequate alternative forum to adjudicate the parties' dispute.  Next, if another forum exists, the court then considers the degree of deference properly accorded the plaintiff's choice of forum.  Finally, the court analyzes the private- and public-interest factors implicated in the choice of forum.  *See Varo v. Owens-Illinois, Inc.*, 400 N.J. Super. 508, 519 (App. Div. 2008).

"An alternative forum is adequate if the defendant[ ][is] amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Id.* (citation omitted). Horizon BCBSNJ and HNJH are citizens of New Jersey and able to be personally served at their principal places of business in Newark, New Jersey and Pennington, New Jersey, respectively. (N.J. R. 4:4-4(a)(6)).  Moreover, CT Corporation System is the registered agent for Horizon BCBSNJ and HNJH which is located in West Trenton, New Jersey (Mercer County).  (N.J. R. 4:4-4(a)(6)).  Indeed, in this case, Plaintiff served both Horizon BCBSNJ and HNJH through their registered agent.  (Petitt Cert., ¶¶ 3–4, Exhs. B–C).  As such, Mercer County and Essex County are alternative forums.

Mercer County and Essex County are not merely adequate alternative forums; rather, they are the most convenient and appropriate forums.  "There is a strong presumption in favor of retaining jurisdiction <u>where the plaintiff is a resident</u> who has chosen his home forum. A nonresident's choice of forum is entitled to substantially less deference." *D'Agostino v. Johnson & Johnson, Inc.*, 225 N.J. Super. 250, 262 (App. Div. 1988); *see also, Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981) ("[W]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable.").  However, Plaintiff is not a resident of Gloucester County.  In fact, Plaintiff does not have any connection to Gloucester County.  Plaintiff's registered agent is located in West Trenton, New Jersey (Mercer County), like Horizon BCBSNJ and HNJH's registered agent, and Plaintiff's principal place of business is located in Woodmere, New York.  (Petitt. Cert., ¶ 6, Ex. E).  Moreover, Plaintiff is merely an assignee standing in the shoes of NES's physicians who rendered the emergency services at issue. (Compl., ¶ 14).  Neither NES America nor NES Georgia are New Jersey residents.

Moreover, in the Complaint, Plaintiff provides three examples of Defendants' alleged underpayment to two specific physicians for emergency services.  (*Id.*, ¶¶ 28–31).  Plaintiffs allege that Dr. Akbar Noormohamed, D.O. and Dr. Ilya Parizh, D.O.  saw the patients and subsequently submitted claims to Defendants for emergency services.  (*Id.*).  Based on the National Provider Identification ("NPI") Registry, Dr. Noormohamed's primary practice address is located at Saint Michael's, within Essex County.  (Petitt Cert., ¶ 13).[1]  Dr. Parizh's primary address is located in

---

[1] On the NPI Registry, Dr. Noormohamed's primary practice address is 111 Central Avenue, Newark, New Jersey 07102, which is the same address as Saint Michael's. https://npiregistry.cms.hhs.gov/provider-view/1083640965 (last visited Apr. 19, 2024).

East Hanover, New Jersey, within Morris County.  (*Id.* at ¶ 14).[2]  There is no connection between the rendering physicians and Gloucester County.  Accordingly, the parties and potential witnesses, included the aforementioned physicians, in this action are located in North New Jersey counties.

Notably, Plaintiff's New Jersey corporate entity was formed on February 23, 2024, the day before it commenced this lawsuit in Gloucester County.  (Petitt Cert., ¶ 6, Ex. E).  As such, the fact that Plaintiff filed its action in Gloucester County should be given "substantially less deference."  *D'Agostino*, 225 N.J. Super. at 262.

Furthermore, all of the emergency services at issue in the Complaint were rendered at hospitals located in Newark, New Jersey (Essex County) and Elizabeth, New Jersey (Union County).  And Horizon BCBSNJ and HNJH are located in Essex County and Mercer County, respectively.  (Feurey Cert., ¶¶ 2, 4). Defendants' offices, key witnesses, and key documents are also located in Mercer County and Essex County.  (*See* Feurey Cert., ¶¶ 3, 5).  Horizon BCBSNJ is located approximately 89 miles from the Gloucester County courthouse.  (*See* Petitt Cert., ¶ 11). HNJH is located approximately 53 miles from the Gloucester County courthouse.  *See id.* ¶ 12; *see also Walker v. Inspira Health Network, Inc.*, No. A-3723-22, 2024 WL 791624, at *3 (N.J. Super. Ct. App. Div. Feb. 27, 2024) (transferring venue to a different county where the courthouse was about a half-hour drive one-way from where the parties live and work as opposed to a two-hour drive for the parties).  Thus, Gloucester County is an inconvenient forum and Essex County or Mercer County would be convenient to the majority, if not all, of the parties and potential witnesses.

The last step involves a balance of public and private factors a court must consider in determining whether to exercise its discretion to transfer venue. The private interest factors are:

---

[2] On the NPI Registry, Dr. Parizh primary practice address is 154 State Route 10, East Hanover, New Jersey 07936. https://npiregistry.cms.hhs.gov/provider-view/1619361995 (last visited Apr. 19, 2024).

> (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, (3) whether a view of the premises is appropriate to the action and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive, including the enforceability of the ultimate judgment.

*Kurzke*, 164 N.J. at 165–66, 752 A.2d at 711 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947)).

> The public interest factors are:

> (1) the administrative difficulties which follow from having litigation pile up in congested centers rather than being handled at its origin, (2) the imposition of jury duty on members of a community having no relation to the litigation, (3) the local interest in the subject matter such that affected members of the community may wish to view the trial and (4) the local interest in having localized controversies decided at home.

*Id.* (quoting *Gulf Oil Corp.*, 330 U.S. at 508–09); *see also D'Agostino*, 115 N.J. at 494–95 (reaffirming the *Gulf Oil* factors as providing the proper analytical framework to aid courts in deciding whether the plaintiff's choice of forum is appropriate).

Based on the foregoing factors, Defendants have met their burden of demonstrating that Gloucester County is an inconvenient and inappropriate forum for this matter, as it is not where Plaintiff resides, the parties or witnesses reside nor where the causes of action accrued. Indeed, Plaintiff, Defendants, and the majority of their potential witnesses all reside in Essex County or Mercer County. The remaining witnesses, including NES physicians who rendered the emergency services, either reside in North New Jersey Counties or out of state. There can be no dispute that keeping this matter in Gloucester County "costs the parties significant travel time and greater expenses for court appearances for motion practice and trial" than in Essex County or Mercer County. *Walker*, 2024 WL 791624, at *3 (further noting that the extended travel would "disrupt defendants' medical practices and their patients' care."). Thus, Plaintiff's improper choice of venue

6

does not outweigh the inconvenience to the parties and witnesses and the interests of justice. Moreover, to continue with litigation in Gloucester County would permit forum shopping. Furthermore, there would be an imposition of jury duty on members of a community who have no relation to the events underlying the litigation.

Thus, the Court should transfer this action to Essex County or Mercer County, an adequate and appropriate forum, for the convenience of the parties and witnesses in the interest of justice.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to change venue should be granted and venue should be transferred from Gloucester County to Essex County or Mercer County.

Respectfully submitted,

By: _____
Adam J. Petitt, Esq.

Dated: April 19, 2024

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue
Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health
(incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

----------------------------------------------------------------X

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY |
| Plaintiff, | |
| -v- | Docket No.: GLO-L-000242-24 |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive, | **CERTIFICATION OF BETH J. FEUREY** |
| Defendants. | |

----------------------------------------------------------------X

I, Beth J. Feurey, hereby certify as follows:

1.     I am the team leader of HCAPPA appeals, MAC BIC, and LDR for Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ"). As part of my duties and responsibilities, I investigate allegations set forth in complaints filed against Horizon BCBSNJ and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health ("HNJH") (together, "Horizon") by accessing and reviewing business records maintained by Horizon in the regular course of its business. In this capacity, I have regular access to plan enrollment, plan information, provider information and contracts, and claims information.

2.     Horizon BCBSNJ is a New Jersey corporation with its principal place of business located at Three Penn Plaza East, Newark, New Jersey.

3.    Horizon BCBSNJ's documents and claim information relating to emergency service claims like the ones alleged in the Complaint are maintained at its place of business in Newark, New Jersey.  Moreover, Horizon BCBSNJ's employees, who would be witnesses in this matter, work out of and are located at its place of business in Newark, New Jersey.

4.    HNJH is a New Jersey Corporation with its principal place of business located at 1700 American Blvd., Pennington, New Jersey.

5.    HNJH's documents and claim information relating to emergency service claims like the ones alleged in the Complaint are maintained at its place of business in Pennington, New Jersey, and also at Horizon BCBSNJ's office in Newark, New Jersey.  Moreover, HNJH's employees, who would be witnesses in this matter, work out of and are located at both HNJH's office in Pennington, New Jersey as well as Horizon BCBSNJ's location in Newark, New Jersey

6.    Neither Horizon BCBSNJ nor HNJH have any office locations in Gloucester County or the immediately surrounding areas of Gloucester County.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: April 19, 2024

_Beth J. Feurey_____
Beth J. Feurey

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | DOCKET NO.: GLO-L-000242-24 |
| vs. | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | **NOTICE OF MOTION TO ADMIT ERIC D. CHAN, ESQ. *PRO HAC VICE*** |
| Defendants. | |

**TO:    All Defendants' Counsel of Record**

        **PLEASE TAKE NOTICE** that on May 24, 2024 at 9:00 a.m. or as soon thereafter as

counsel may be heard, counsel for Plaintiff shall apply to the Honorable James R. Swift, J.S.C. of

the Superior Court of New Jersey, Gloucester County Court House, 1 North Broad Street,

Woodbury, New Jersey 08096, for an Order pursuant to rule 1:21-2 granting **Eric D. Chan,**

**Esq.**, admission to the Bar of this Court *pro hac vice* for purposes of participating in this matter;

        **PLEASE TAKE FURTHER NOTICE** that in support of said Motion, counsel shall rely

upon the attached Certifications of Dante B. Parenti, Esq., and Eric D. Chan, Esq.;

#338839v2

**PLEASE TAKE FURTHER NOTICE** that unless oral argument is requested by the Court or any party, this motion is submitted on the papers pursuant to Rule 1:6-2 and oral argument is hereby waived; and

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is annexed hereto pursuant to Rule 1:6-2(a).

LAULETTA BIRNBAUM, LLC

By: */s/ Dante B. Parenti*
   Dante B. Parenti, Esq.
   *Attorneys for Plaintiff*

Date: April 29, 2024

#338839v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. <br><br> Plaintiff <br><br> vs. <br><br> HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION <br><br> DOCKET NO.: GLO-L-000242-24 <br><br> CIVIL ACTION <br><br> **ORDER GRANTING ERIC D. CHAN, ESQ. ADMISSION *PRO HAC VICE*** |

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys for Plaintiff for an Order allowing Eric D. Chan, Esq., to appear and participate *pro hac vice*, and the court having considered the application, and any opposition thereto, and with good cause appearing:

**IT IS** on this _____ day of _____, 2024;

**ORDERED** that Eric D. Chan, Esq., shall be and is hereby admitted to practice before this Court *pro hac vice* pursuant to R. 1:21-2, for all purposes and in all proceedings connected with the above-referenced matter, in the same manner as an attorney who is admitted to practice

in this State and is domiciled and maintains an office for the practice of law in the State of New

Jersey provided that said attorney shall:

1.      Abide by the Rules of the Court for the State of New Jersey, including all
        disciplinary rules,

2.      Consent to the appointment of the Clerk of the Supreme Court as agent upon
        whom service of process may be made for all actions against the above-mentioned
        attorney or the attorney's firm that may arise out of the attorney's participation in
        this matter,

3.      Notify the Court immediately of any matter affecting the attorney's standing at
        the bar of any other Court, and

4.      Have all pleadings, briefs and other papers filed with the Court signed by Dante
        Parenti, Esq., who is a member in good standing of the New Jersey Bar, who shall
        be held responsible for said papers, for the conduct of the cause, and for the
        conduct of the above-mentioned attorney admitted *pro hac vice* pursuant to this
        Order.

**IT IS FURTHER ORDERED THAT**, Eric D. Chan, Esq., shall make the payment of

fees as provided in the New Jersey Rules of Court, R. 1:20-1(b), R. 1:28-1, and R. 1:28B-1(e)

within thirty (30) days of entry of this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of this Court shall forward a copy of

this Order to the Treasurer of the New Jersey Fund for Client Protection, and

**IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated

upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

_____
Honorable James R. Swift, J.S.C.

_____ Opposed
_____ Unopposed

#338839v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. | ) ) ) | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) | |
| vs. | ) ) | DOCKET NO.: GLO-L-000242-24 |
| | ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) | **CERTIFICATION OF DANTE B. PARENTI, ESQ. IN SUPPORT OF MOTION TO ADMIT ERIC D. CHAN, ESQ. *PRO HAC VICE*** |
| Defendants. | ) | |

I, Dante B. Parenti, of full age, upon my oath certify as follows:

1.      I am a member of the law firm Lauletta Birnbaum, LLC. I am admitted to practice

before the Courts of the State of New Jersey and the United States District Court for the District

of New Jersey.

2.      I submit this certification in support of the admission *pro hac vice* of Eric D.

Chan, Esq., of the law firm of Athene Law, LLP, to appear in this action as co-counsel for the

Plaintiff.

3.      Pursuant to R. 1:21-2(c)(4), I understand that all pleadings, briefs and other

papers filed with the Court shall be signed by me and that I shall be held responsible for them

#338839v2

and for the conduct of the cause and of the admitted attorney therein. Further, I agree to promptly notify the attorneys *pro hac vice* of the receipt of all notices, orders and pleadings.

    4.    On behalf of Plaintiff, I respectfully request that the Court grant the application to have Eric D. Chan, Esq. admitted *pro hac vice* and to participate as co-counsel in this matter pursuant to R. 1:21-2.

    I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                        */s/ Dante B. Parenti*
                        Dante B. Parenti

Date:  April 29, 2024

#338839v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>　　　　　Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF ERIC D. CHAN, ESQ. IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE*** |

I, **Eric D. Chan, Esq.**, of full age, upon my oath certify as follows:

1.　　　I am an attorney-at-law and a partner in the law firm Athene Law, LLP. I am admitted to practice in the State of California; U.S. District Court for the Central District of California; U.S. District Court for the Northern District of California; U.S. District Court for the Southern District of Indiana; U.S. District Court for the Eastern District of Texas (admitted *pro hac vice* only); U.S. Court of Appeals for the Fifth Circuit; U.S. Court of Appeals for the Ninth Circuit. I am admitted to practice in the State of California and a member in good standing of the bar of the highest court of California which is where I principally practice law.

#338839v2

2.      I submit this Certification in support of my application to be admitted *pro hac vice* pursuant to R. 1:21-2.

3.      I am associated in the matter before the Court with New Jersey counsel of record, Dante B. Parenti, Esq., who is qualified to practice pursuant to R. 1:21-1.

4.      I certify that no disciplinary proceedings are pending against me in any jurisdiction and no discipline has previously been imposed upon me in any jurisdiction.

5.      There is good cause for my admission because this matter involves a complex field of law in which I am a specialist and there is a lack of local counsel with adequate expertise in this field of law.

6.      Because of my firm's expertise in this area, Plaintiff has requested to be represented by Athene Law, LLP in connection with this lawsuit.

7.      I understand that I have a continuing obligation to notify the Court of any matter affecting my standing to the bar of the State of California or of any other court in which I am admitted to practice.

8.      I have reviewed the New Jersey Court Rules and agree to comply with said Rules, including all disciplinary rules, and to be associated with the law firm of Lauletta Birnbaum, LLC attorneys of record authorized to practice in the State of New Jersey, during the period of my *pro hac vice* admission.

9.      I agree to have all pleadings, briefs, and other papers filed with the Court signed by a member of the law firm of Lauletta Birnbaum, LLC attorneys of record authorized to practice in the State of New Jersey.

#338839v2

10.     I agree to remit to the New Jersey Lawyers' Fund for Client Protection the annual

payment required in accordance with New Jersey Court Rule 1:21-2(a), 1:20-1(b), 1:28-2,

1:28(b)-1(e) for each calendar year this matter is pending.

I certify that the foregoing statements made by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.


Date: April 29, 2024                                    */s/ Eric D. Chan*
                                                       **Eric D. Chan, Esquire**


#338839v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. <br><br> Plaintiff <br><br> vs. <br><br> HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION <br><br> DOCKET NO.: GLO-L-000242-24 <br><br> CIVIL ACTION <br><br> **NOTICE OF MOTION TO ADMIT AVI W. RUTSCHMAN, ESQ. *PRO HAC VICE*** |

**TO:**   **All Defendants' Counsel of Record**

   **PLEASE TAKE NOTICE** that on May 24, 2024 at 9:00 a.m. or as soon thereafter as

counsel may be heard, counsel for Plaintiff shall apply to the Honorable James R. Swift, J.S.C. of

the Superior Court of New Jersey, Gloucester County Court House, 1 North Broad Street,

Woodbury, New Jersey 08096, for an Order pursuant to rule 1:21-2 granting **Avi W.**

**Rutschman, Esq.**, admission to the Bar of this Court *pro hac vice* for purposes of participating

in this matter;

#338840v2

**PLEASE TAKE FURTHER NOTICE** that in support of said Motion, counsel shall rely upon the attached Certifications of Dante B. Parenti, Esq., and Avi W. Rutschman, Esq.;

**PLEASE TAKE FURTHER NOTICE** that unless oral argument is requested by the Court or any party, this motion is submitted on the papers pursuant to Rule 1:6-2 and oral argument is hereby waived; and

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is annexed hereto pursuant to Rule 1:6-2(a).

LAULETTA BIRNBAUM, LLC
By: */s/ Dante B. Parenti*
Dante B. Parenti, Esq.
*Attorneys for Plaintiff*

Date: April 29, 2024

#338840v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**ORDER GRANTING AVI W. RUTSCHMAN, ESQ. ADMISSION *PRO HAC VICE*** |

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys for Plaintiff for an Order allowing Avi. W. Rutschman, Esq., to appear and participate *pro hac vice*, and the court having considered the application, and any opposition thereto, and with good cause appearing:

**IT IS** on this _____ day of _____, 2024;

**ORDERED** that Avi. W. Rutschman, Esq., shall be and is hereby admitted to practice before this Court *pro hac vice* pursuant to R. 1:21-2, for all purposes and in all proceedings connected with the above-referenced matter, in the same manner as an attorney who is admitted

to practice in this State and is domiciled and maintains an office for the practice of law in the

State of New Jersey provided that said attorney shall:

1.   Abide by the Rules of the Court for the State of New Jersey, including all
     disciplinary rules,

2.   Consent to the appointment of the Clerk of the Supreme Court as agent upon
     whom service of process may be made for all actions against the above-mentioned
     attorney or the attorney's firm that may arise out of the attorney's participation in
     this matter,

3.   Notify the Court immediately of any matter affecting the attorney's standing at
     the bar of any other Court, and

4.   Have all pleadings, briefs and other papers filed with the Court signed by Dante
     Parenti, Esq., who is a member in good standing of the New Jersey Bar, who shall
     be held responsible for said papers, for the conduct of the cause, and for the
     conduct of the above-mentioned attorney admitted *pro hac vice* pursuant to this
     Order.

**IT IS FURTHER ORDERED THAT**, Avi. W. Rutschman, Esq., shall make the

payment of fees as provided in the New Jersey Rules of Court, R. 1:20-1(b), R. 1:28-1, and R.

1:28B-1(e) within thirty (30) days of entry of this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of this Court shall forward a copy of

this Order to the Treasurer of the New Jersey Fund for Client Protection, and

**IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated

upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

_____
Honorable James R. Swift, J.S.C.

_____ Opposed
_____ Unopposed

#338840v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>        Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF DANTE B. PARENTI, ESQ. IN SUPPORT OF MOTION TO ADMIT AVI W. RUTSCHMAN, ESQ. *PRO HAC VICE*** |

I, Dante B. Parenti, of full age, upon my oath certify as follows:

1.      I am a member of the law firm Lauletta Birnbaum, LLC. I am admitted to practice before the Courts of the State of New Jersey and the United States District Court for the District of New Jersey.

#338840v2

2.      I submit this certification in support of the admission *pro hac vice* of Avi. W. Rutschman, Esq., of the law firm of Athene Law, LLP, to appear in this action as co-counsel for the Plaintiff.

3.      Pursuant to R. 1:21-2(c)(4), I understand that all pleadings, briefs and other papers filed with the Court shall be signed by me and that I shall be held responsible for them and for the conduct of the cause and of the admitted attorney therein. Further, I agree to promptly notify the attorneys *pro hac vice* of the receipt of all notices, orders and pleadings.

4.      On behalf of Plaintiff, I respectfully request that the Court grant the application to have Avi. W. Rutschman, Esq. admitted *pro hac vice* and to participate as co-counsel in this matter pursuant to R. 1:21-2.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*/s/ Dante B. Parenti*
Dante B. Parenti

Date: April 29, 2024

#338840v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF AVI W. RUTSCHMAN, ESQ. IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE*** |

I, **Avi. W. Rutschman, Esq.**, of full age, upon my oath certify as follows:

1.      I am an attorney-at-law and an associate in the law firm Athene Law, LLP. I am admitted

to practice in the State of California; U.S. District Court for the Southern District of Indiana;

U.S. District Court for the Central District of California; U.S. District Court for the Northern

District of California; U.S. District Court for the Southern District of California; U.S. Court of

Appeals for the Ninth Circuit. I am admitted to practice in the State of California and a member

in good standing of the bar of the highest court of California which is where I principally

practice law.

#338840v2

2.      I submit this Certification in support of my application to be admitted *pro hac vice* pursuant to R. 1:21-2.

3.      I am associated in the matter before the Court with New Jersey counsel of record, Dante B. Parenti, Esq., who is qualified to practice pursuant to R. 1:21-1.

4.      I certify that no disciplinary proceedings are pending against me in any jurisdiction and no discipline has previously been imposed upon me in any jurisdiction.

5.      There is good cause for my admission because this matter involves a complex field of law in which I am a specialist and there is a lack of local counsel with adequate expertise in this field of law.

6.      Because of my firm's expertise in this area, Plaintiff has requested to be represented by Athene Law, LLP in connection with this lawsuit.

7.      I understand that I have a continuing obligation to notify the Court of any matter affecting my standing to the bar of the State of California or of any other court in which I am admitted to practice.

8.      I have reviewed the New Jersey Court Rules and agree to comply with said Rules, including all disciplinary rules, and to be associated with the law firm of Lauletta Birnbaum, LLC attorneys of record authorized to practice in the State of New Jersey, during the period of my *pro hac vice* admission.

9.      I agree to have all pleadings, briefs, and other papers filed with the Court signed by a member of the law firm of Lauletta Birnbaum, LLC attorneys of record authorized to practice in the State of New Jersey.

10.     I agree to remit to the New Jersey Lawyers' Fund for Client Protection the annual payment required in accordance with New Jersey Court Rule 1:21-2(a), 1:20-1(b), 1:28-2, 1:28(b)-1(e) for each calendar year this matter is pending.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: April 29, 2024                           *Avi W. Rutschman*
                                               **Avi W. Rutschman, Esquire**

#338840v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. <br><br> Plaintiff <br><br> vs. <br><br> HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION <br><br> DOCKET NO.: GLO-L-000242-24 <br><br> CIVIL ACTION <br><br> **OPPOSITION TO MOTION TO CHANGE VENUE PURSUANT TO R.4:3-3(A)(3)** |

## A.      INTRODUCTION

The Motion to Change Venue filed by Defendants Horizon Healthcare Services, Inc. and

Horizon Healthcare of New Jersey, Inc. ("Defendants" or "Horizon") suffers from a fatal flaw.

Defendants seek a transfer to Essex County in large part because they contend that this case has

been improperly venued in Gloucester County.  But their position is based on a misreading of

New Jersey's venue rules.  The Complaint in this action alleges that Defendants <u>actually do</u>

<u>business</u> in Gloucester County.  Defendants partner with Gloucester County hospitals and their

#353429v1

members and insureds receive covered health care services in Gloucester County.  Accordingly, Gloucester County is an appropriate venue for this lawsuit under New Jersey Rule of Court 4:3-2(a) regardless of whether Defendants believe that Plaintiff's causes of action arise elsewhere.

Not only is Plaintiff's choice of venue entitled to significant weight, but Defendants offer no compelling reason for another venue.  New Jersey courts have long recognized that there must be a significant showing of real hardship, or other compelling factors, in order to override the Plaintiff's choice of venue.  Defendants' only evidence is that one of them is located 53 miles from the Gloucester County courthouse, while another is located 89 miles away.  But travel time and costs are not the obstacle that Defendants claim, particularly for a billion-dollar company like Defendants'.  Case management conferences and motion hearings in this action can easily be held remotely.  Electronic filing and service further lessen the burden.  Plaintiff is entitled to its choice of venue, and would suffer significant prejudice if this case were transferred to the more congested Essex County docket. Defendants' mere preference for Essex County is not enough.

Defendants also cannot rely upon the doctrine of *forum non conveniens*, which applies only when the alternative venue is in another country (or state).  New Jersey Rule of Court 4:3-3(a), not that generalized doctrine, governs.  Defendants have not satisfied the Rule.  But even if the *forum non conveniens* doctrine did apply, it requires a threshold showing that the present forum is "inappropriate" − again, a showing that Defendants fail to make.   Should this Court consider the public and private factors that govern *forum non conveniens* determinations, however, those factors favor this Court retaining jurisdiction over this action, or are neutral.  The Motion to Change Venue should be denied.

**B.      FACTUAL BACKGROUND**

Plaintiff sues to recover reimbursement for claims that were submitted to Horizon for

emergency services rendered to Horizon members in the state of New Jersey. (Compl. ¶¶ 2-5.) The services in question were rendered by various physician groups (referred to in the Complaint as the "Physicians.") (*Id.* ¶ 3.) The Physicians rendered emergency services to Defendants' members, and thereafter submitted claims to Defendants for reimbursement. (*Id.* ¶¶ 4, 29-31, 61.) Defendants either failed to pay or significantly underpaid the Physicians for their provision of emergency services. (*Id.* ¶ 4.) Thereafter, the Physicians sold the outstanding balances on the reimbursement claims to Plaintiff, who now is the owner of those accounts and has been assigned all rights to sue thereupon. (*Id.*) Plaintiff brings this action to seek payment for the emergency services that the Physicians provided to Defendants' members under theories of implied in-fact contract, quantum meruit, and for violations of the New Jersey Health Claims Authorization, Processing, and Payment Act (HCAPPA). (*Id.* ¶¶ 33-65.)

## C.    LEGAL STANDARD

New Jersey Superior Court Rule 4:3-2, which governs venue in the New Jersey courts, is "specific and unambiguous in providing that it is the plaintiff who makes the determination as to where venue shall be when alternatives exist." *Doyley v. Schroeter*, 191 N.J. Super. 120, 124 (N.J. Super. Ct. 1983).

"In actions in the Superior Court a change of venue may be ordered . . . 1) if the venue is not laid in accordance with R. 4:3-2; or (2) if there is a substantial doubt that a fair and impartial trial can be had in the county where venue is laid; or (3) for the convenience of parties and witnesses in the interest of justice . . . ." N.J. Court Rules, R. 4:3-3(a). "Absent the likelihood of substantial inconvenience or injustice, reason dictates that a change in venue with its inevitable consequences be avoided." *Doyley*, 191 N.J.Super. at 126 (noting that these undesirable consequences may include a potential "duplication of effort" between two courts, "confusion,"

Page **3** of **14**

and "delay in the transfer process"). Thus, while venue "may be subject to change upon a showing of proper circumstances,"  New Jersey's "venue provisions . . . <u>do express strong policy considerations not to be lightly disregarded</u>."  *Diodato v. Camden Cty. Park Com.*, 136 N.J. Super. 324, 328 (Super. Ct. App. Div. 1975) (emphasis added).

Defendants also purport to base their motion to transfer venue upon the doctrine of forum non conveniens, which they say is "codified in" Rule 4:3-3(a), subdivision (3).  (Mot. at 3.) "Although phrased in a variety of ways, the essence of the doctrine is that a court may decline jurisdiction whenever the ends of justice indicate a trial in the forum selected by the plaintiff <u>would be inappropriate</u>." *D'Agostino v. Johnson & Johnson, Inc.*, 225 N.J. Super. 250, 259 (App.Div. 1988) (emphasis added).   "Although subject to the court's discretion, no court is compelled constitutionally or otherwise to grant a motion for dismissal based on forum non conveniens."  *Kurzke v. Nissan Motor Corp. in U.S.A.*, 164 N.J. 159, 165 (2000). "Consequently, a plaintiff's choice of forum ordinarily will not be disturbed <u>except upon a clear showing of real hardship or for some other compelling reason</u>. The choice of forum <u>must be demonstrably inappropriate</u>." *Civic S. Factors v. Bonat*, 65 N.J. 329, 333 (1974) (emphasis added).

## D.   ARGUMENT

### 1.   <u>Venue is Appropriate in Gloucester County</u>

Defendants are wrong that this case "has been improperly venued" (Mot. at 1) in Gloucester County.  Under Rule of Court 4:3-2(a), venue is appropriate in this action in <u>any county</u> where "any party to the action resides at the time of its commencement."  N.J. Court Rules, R. 4:3-2(a).  Crucially, Rule of Court 4:3-2(b) provides that "[f]or purposes of this rule, a business entity <u>shall be deemed to reside</u> . . . in <u>any</u> county in which it is actually doing business. (*Id*.(b) (emphasis added).)

The Complaint establishes that Horizon does business in Gloucester County.  Horizon

does not dispute these allegations.  (*See, e.g.*, Compl. ¶ 4 (alleging that "Defendants routinely offered and furnished healthcare insurance throughout New Jersey, including to persons who received medical care in Gloucester County"); *id.* ¶ 11 (alleging that Horizon's own website states that it "partners with" at least two hospitals in Gloucester County).)  These business activities are more than sufficient to establish venue here.  N.J. Court Rules, R. 4:3-2(a).

Regardless of where Defendants say they reside, <u>they do not and cannot dispute that they do business in Gloucester County.</u>  For purposes of venue, they are *also* considered to reside in Gloucester County. "[T]he policy underlying the 'actually doing business' requirement is that such an entity can reasonably foresee being sued in forums where it conducts business operations." *Crepy v. Reckitt Benckiser, LLC*, 448 N.J. Super. 419, 429 (Super. Ct. 2016).  It was reasonably foreseeable that Defendants could be sued in Gloucester County, where they maintain significant operations.

Defendants' only other argument is that "the medical care and treatment at issue occurred in Essex County and Union County."  Even assuming *arguendo* that the Physicians' causes of action, now asserted by Plaintiff as their valid owner and assignee, "arose" in other counties, Rule 4:3-2(a) is written in the disjunctive.  Venue is proper <u>either</u> "where the cause of action" <u>or</u> "where any party to the action resides."  N.J. Court Rules, R. 4:3-2(a).  Venue is proper in Gloucester County under the plain language of Rule 4:3-2(a) because Defendants reside here.

2.  <u>Defendants Will Have a Fair Trial in Gloucester County</u>

Next, Defendants do not (and cannot) claim that "there is a substantial doubt that a fair and impartial trial can be had in the county where venue is laid."  N.J. Court Rules, R. 4:3-3(a)(2).  They know they will get a fair trial in Gloucester County.  Indeed, their own cited authority, *Walker v. Inspira Health Network, Inc.*, endorsed the transfer of a case ***to*** Gloucester

County following the lifting of a civil trial moratorium last year.[1]  *Walker v. Inspira Health Network, Inc.*, Nos. A-3723-22, A-3724-22, A-3725-22, 2024 N.J. Super. Unpub. LEXIS 295, at *5 (Super. Ct. App. Div. Feb. 27, 2024).  This case has also been assigned to the Complex Business Litigation track and thus will likely be managed before a single judge up through the time of trial.  Any trial held here in Gloucester County will be fair.

 *Diodato*, supra, is instructive.  There, the Appellate Division rejected the argument that "the inconvenience resulting to [a party's] Bergen County witnesses should they be compelled to travel to Camden [County]" should dictate where an action should be transferred.  136 N.J.Super. at 328 (observing that any given venue might be inconvenient for some witnesses).  Google Maps reveals that the approximate distance between Bergen County and Camden County is between 98 to 101 miles. (Certification of Dante B. Parenti in Support of Opposition to Motion to Transfer Venue ("Parenti Cert.") ¶ 4.)  This is greater than the 53 to 89 miles that Defendants complain their witnesses might one day have to travel to Gloucester County for a jury trial.  Nearly fifty years ago, the *Diodato* court found that the potential burden of having witnesses travel a hundred miles was <u>not</u> a "sufficient reason to justify a departure from the venue requirements expressed in R. 4:3-2(a)."  *Id.* (finding the argument "not worthy of consideration" and reversing trial court transfer decision for abuse of discretion).  Litigation and case management have become far more convenient in the intervening decades with the advent of remote appearances, video conferencing, and electronic case filing and service.

---

[1] Statement of Chief Justice on Suspension of Civil and Matrimonial Trials in Vicinages Due to Vacancy Crisis, July 5, 2023, https://www.njcourts.gov/press-releases/2023/07/statement-of-chief-justice-suspension-of-civil-and-matrimonial-trials.

3.     <u>Considerations of "Convenience" Do Not Justify Transfer to Essex County</u>

Defendants insist that because the hospitals at which Physicians practiced are in Essex County and Union County and because Defendants have offices in Mercer and Essex Counties, respectively, Gloucester County "is an inconvenient forum." (Mot. at 5.) But in view of the "strong policy considerations" set forth in the plain wording of New Jersey's venue rules, which are "not to be lightly disregarded," *Diodato*, 136 N.J.Super. at 328, Defendants fail to meet their burden to show this case should be transferred to Essex County "for the convenience of parties and witnesses in the interest of justice" pursuant to Rule 4:3-3(a)(3).

Under the framework set forth above, Plaintiff's appropriate choice of Gloucester County for this action is entitled to significant weight. Defendants' contention that Essex County *might* be more convenient is not sufficient to override the filing of this action in the present, undisputedly proper venue. And while Defendants rely heavily on the unpublished trial court opinion in *Walker v. Inspira Health Network*, *supra*, 2024 N.J. Super. Unpub. LEXIS 295, the facts of *Inspira* are distinguishable. There is no reason that the parties in this case cannot hold all routine case management conferences and motion hearings remotely, whether by telephone or videoconference, to the extent this Court chooses to do so in this case as it has done in others. (*See generally* Parenti Cert. ¶ 3.) If anything, the "travel time" and "expenses for court appearances for motion practices" may be greater in Essex County than in Gloucester County to the extent that such appearances must be in person.

Last, unlike in *Inspira*, Defendants in this action do not, to Plaintiff's knowledge, maintain "medical practices" or see patients. Rather, they are health insurers and health plans. They therefore would not be nearly as inconvenienced as physicians and hospital staff might be by potential travel. Such travel would certainly not disrupt patient care. Indeed, to the extent that

any of the Physicians that assigned their claims to Plaintiff must be called as witnesses, it is they, not Defendants' witnesses, who would be inconvenienced by having to travel to Essex County. The Motion must be denied because Defendants fail to meet their burden of proof.

4.     The Inapplicable *Forum Non Conveniens* Doctrine Does Not Support Transfer

Defendants' final arguments are grounded in New Jersey's adoption of the doctrine of *forum non conveniens*. Rule of Court 4:3-3(a), however, governs motions to transfer cases from one county to another within New Jersey and must be followed here. Even if Defendants are correct that the *forum non conveniens* doctrine is "codified" in Rule of Court 4:3-3(a), the plain language of the Rule still governs.

Underscoring this conclusion is the fact that the *forum non conveniens* doctrine appears to be invoked primarily in cases where the alternate forum is a foreign country, or at least another state. *See, e.g.*, *Kurzke*, *supra*, 164 N.J. 159 (reversing dismissal on the basis of forum non conveniens where underlying car accident occurred in Germany); *D'Agostino*, *supra*, 115 N.J. 491 (reversing dismissal on the basis of forum non conveniens even though "a majority of witnesses [were] located in Switzerland"); *cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 512 (1947) (upholding New York federal court's dismissal where case would have been more properly brought in Virginia state courts). In such scenarios, the case filed in New Jersey must be dismissed if the forum is determined to be inconvenient because no mechanism exists to "transfer" the case to the foreign jurisdiction. Here, however, Defendants identify no reason that the plain language of New Jersey's Rules of Court cannot be applied to the facts at hand.

Even assuming for the sake of argument that New Jersey's body of law on the *forum non conveniens* doctrine is applicable, such law supports Plaintiff's interest in keeping this case in Gloucester County. The New Jersey Supreme Court has made clear time and again that the

*forum non conveniens* doctrine does not apply "<u>unless</u> the plaintiff's choice [of forum] is shown to be '<u>demonstrably inappropriate</u>.'" *D'Augostino*, *supra*, 115 N.J. at 494 (citing *Civic S. Factors*, supra, 65 N.J. at 333) (emphasis added). Defendants, who operate health plans that reported receiving $6 billion in premiums in the year 2022[2], certainly have not made a "clear showing of real hardship or [] some other compelling reason" justifying a transfer to Essex County. *Civic. S. Factors*, 65 N.J. at 333. All Defendants have shown is that they may someday have to drive either 53 (or 89) miles for a future trial. Nor is Plaintiff's choice somehow entitled to less weight because Defendants complain that it is a relatively recently formed corporate entity. No caselaw supports that proposition; nor is the venue preferred by a corporate plaintiff entitled to lesser weight than one that may be preferred by corporate defendants.

Moreover, to the extent that this Court finds it appropriate to examine the four public factors and the four private factors[3], those factors either favor retaining jurisdiction in this

---

[2] State of New Jersey Department of Banking and Insurance, Annual Statement For the Year Ending December 21, 2022 of the Condition and Affairs of Horizon Healthcare Services, Inc., https://www.nj.gov/dobi/division_insurance/solvency/annualstatements/2022/horizonbcbsnj/other.pdf.

[3] A court will consider certain public-interest and private-interest factors when considering a forum non conveniens issue. The public-interest factors include:

> (1) the administrative difficulties which follow from having litigation pile up in congested centers rather than being handled at its origin, (2) the imposition of jury duty on members of a community having no relation to the litigation, (3) the local interest in the subject matter such that the affected members of the community may wish to view the trial and (4) the local interest in having localized controversies decided at home.

*D'Agostino v. Johnson & Johnson*, 225 N.J. Super. 250, 263 (App. Div. 1988), *aff'd*, 115 N.J. 491 (1989) (reciting factors set forth in *Gulf Oil Corp v. Gilbert*, 330 U.S. 501, 508-09 (1947)). The private interest factors include:

> (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, (3) whether a view of the premises is appropriate to the action and (4) all other

County or are neutral in nature.  In our digital age, the "relative ease of access to sources of proof," the "availability of compulsory process," and "other practical problems that make trial of a case easy, expeditious and inexpensive" are not appreciably different in Gloucester County than they would be in Essex County. Litigation is also more likely to "pile up in congested centers" such as Essex County than here in Gloucester County, which weighs further in favor of retaining jurisdiction.  And because many residents of Gloucester County have health coverage through Defendants and received covered medical care in this County, and thus likely suffered harms similar to those alleged in the Complaint, "affected members of the community may wish to view the trial."  *See D'Agostino*, 225 N.J. Super. at 263 (citing *Gulf Oil*, 330 U.S. at 508-509). Defendants cannot ignore the plain language of New Jersey's own venue rules and insist that the *Gulf Oil* factors alone support the transfer of this action.  Even then, those factors lean decidedly against transfer.

**E.**   **CONCLUSION**

Venue is appropriate in Gloucester County.  Plaintiff's choice of venue is entitled to deference under the New Jersey Court Rules.  Any change of venue will unnecessarily prejudice Plaintiff, given that the docket in Essex County is more likely to be congested and slower to proceed to trial than this Court. The Motion to Transfer Venue must be denied in its entirety for all the reasons set forth herein.

<div style="text-align:right">

LAULETTA BIRNBAUM, LLC
By: */s/ Dante B. Parenti*
Dante B. Parenti, Esq.
*Attorneys for Plaintiff*

</div>

Date: May 2, 2024

---

practical problems that make trail of a case easy, expeditious and inexpensive, including the enforceability of the ultimate judgment.

*Id.*

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

---

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. ) <br><br> Plaintiff ) <br><br> vs. ) <br><br> HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. ) <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION <br><br> DOCKET NO.: GLO-L-000242-24 <br><br> CIVIL ACTION <br><br> **CERTIFICATION OF DANTE B. PARENTI, ESQ. IN SUPPORT OF OPPOSITION TO MOTION TO CHANGE VENUE PURSUANT TO R.4:3-3(A)(3)** |

I, Dante B. Parenti, of full age, upon my oath certify as follows:

1.     I am a member of the law firm Lauletta Birnbaum, LLC. I am admitted to practice before the Courts of the State of New Jersey and the United States District Court for the District of New Jersey.

2.     I submit this certification in support of the Opposition to Motion to Change Venue Pursuant to R.4:3-3(A)(3).

3.     I am presently counsel in an unrelated complex business track case presently before Judge Swift. In my experience, the parties in that case have largely held all routine case

management conferences and motion hearings remotely, whether by telephone or videoconference, with the approval of Judge Swift.

4.      Google Maps reveals that the approximate distance between Bergen County and Camden County is between 98 to 101 miles.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                                            */s/ Dante B. Parenti*
                                            Dante B. Parenti

Date: <u>May 2, 2024</u>

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

---

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. | ) ) ) | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) | DOCKET NO.: GLO-L-000242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) | **[PROPOSED] ORDER DENYING MOTION TO CHANGE VENUE PURSUANT TO R.4:3-3(A)(3)** |

---

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys

for Plaintiff for an Order to change venue, and the court having considered the Motion, and

opposition thereto, and with good cause appearing:

    **IT IS** on this _____ day of _____, 2024;

    **ORDERED** that the Motion to Change Venue is Denied in its entirety.

    **IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated

upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

_____
Honorable James R. Swift, J.S.C.

_____ Opposed
_____ Unopposed

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel: (215) 398-0562
E-mail: apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue
Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health
(incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

| | |
|---|---|
| ------------------------------------------------------------------ x | |
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., | : : : SUPERIOR COURT OF NEW JERSEY : LAW DIVISION: GLOUCESTER |
| Plaintiff, | : COUNTY : |
| -v- | : Docket No.: GLO-L-000242-24 : |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive, | : : : : : |
| Defendants. | : |
| ------------------------------------------------------------------ x | |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF ITS MOTION TO CHANGE VENUE PURSUANT TO R. 4:3-3(A)(3)

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ..................................................................................... 1

LEGAL ARGUMENT ..................................................................................................... 1

      A.     Gloucester County is the Inconvenient Forum and Venue Should be Changed to Essex County Pursuant to R. 4:3-3(A)(3) and the Doctrine of Forum *Non Conveniens*. ................................................................................................ 1

CONCLUSION ................................................................................................................ 5

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Diodato v. Camden Cnty. Park Comm'n*,
  136 N.J. Super. 324 (App. Div. 1975) ......................................................................5

*Gore v. U.S. Steel Corp.*,
  15 N.J. 301 (1954) ....................................................................................................4

*Litton Indus. Systems, Inc. v. Kennedy Van Saun Corp.*,
  117 N.J. Super. 52 (Law Div. 1971) .........................................................................2

*Vargas v. A.H. Bull S. S. Co.*,
  44 N.J. Super. 536 (Law Div. 1957) ..........................................................................2

*Varo v. Owens-Illinois, Inc.*,
  400 N.J. Super. 508 (App. Div. 2008) .......................................................................4

*Walker v. Inspira Health Network*,
  No. A-3723-22, 2024 WL 791624 (N.J. Super. Ct. App. Div. Feb. 27, 2024).....................4, 5

**Rules**

N.J. Ct. R. 4:3-2 ..........................................................................................................1, 3

## PRELIMINARY STATEMENT

Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon") respectfully submit this reply brief in further support of their motion to change venue pursuant to N.J. R. 4:3-3(a)(3).

As more fully discussed below and in Horizon's brief in support of its motion to change venue pursuant to R. 4:3-3(a)(3), this Court should grant Horizon's motion to change venue in all respects.

## LEGAL ARGUMENT

**A.    Gloucester County is the Inconvenient Forum and Venue Should be Changed to Essex County Pursuant to R. 4:3-3(A)(3) and the Doctrine of Forum *Non Conveniens.***

In its Opposition, Plaintiff incorrectly asserts that Horizon's motion argues that Gloucester County is an improper venue under R. 4:3-3(a)(1) or (2).  To be clear, as laid out in its motion, Horizon requests that the current matter be transferred to Essex County for the convenience of the parties and witnesses in the interest of justice pursuant to R. 4:3-3(a)(3) and the doctrine of forum *non conveniens*.  Nonetheless, Plaintiff's Opposition makes Horizon's point – neither Plaintiff nor its allegations in the Complaint have anything to do with Gloucester County and Plaintiff is undoubtedly engaging in forum shopping.

Horizon is a health insurer.  Naturally, it insures or administers health insurance for members that are located throughout the State of New Jersey, including Gloucester County.  However, the location of Horizon's business and witnesses remains in Essex County and Mercer County, in the case of Horizon NJ Health.  Such a varied menu of forums in which Horizon may be sued opens the door for forum shopping.  "A plaintiff may make the choice to harass a

defendant, in hopes of getting a better settlement or a higher jury verdict, by bringing the action in a forum where it is inconvenient and oppressive for defendant to litigate.  Plaintiff may, of course, have wholly legitimate reasons for his choice of forum, such as convenience of witnesses.  In order to combat this use of this practice, the doctrine of forum non conveniens has been developed over the last 50 years by many courts, and applied in situations where there is no substantial or legitimate bases for the plaintiff's choice of forum."  *Litton Indus. Systems, Inc. v. Kennedy Van Saun Corp.*, 117 N.J. Super. 52, 64-65 (Law Div. 1971); *see also Vargas v. A.H. Bull S. S. Co.*, 44 N.J. Super. 536, 544 (Law Div. 1957).

Plaintiff's Opposition makes clear that it has no substantial or legitimate basis for its choice of forum.  In fact, Plaintiff refuses to provide any explanation for its choice of venue.  For its part, Plaintiff is an admitted debt collector. (Pl. Opp. at 3 ("Physicians sold the outstanding balances on the reimbursement claims to Plaintiff, who now is the owner of those accounts and has been assigned all rights to sue thereupon.")).  Plaintiff has no connection to Gloucester County or New Jersey.  It's merely here to try and collect the account receivables it purportedly purchased from NES America, Inc. ("NES America") and NES Georgia, Inc. ("NES Georgia"), who operated at hospitals in Essex County (Saint Michael's Medical Center) and Union County (Trinitas Regional Medical Center) and submitted claims to Horizon.  Plaintiff is a "resident" of New Jersey on paper only by the grace of the 11th hour registration of its business name with New Jersey's Department of Treasury on February 24, 2024 – three days before it commenced this action on February 27, 2024.  In reality, Plaintiff does not operate a business or even have a location within the State of New Jersey.

Indeed, the filing history of Plaintiff's lawsuit against Horizon lays bare Plaintiff's efforts to engage in forum shopping.  This is Plaintiff's third effort to sue Horizon to recover alleged debts

owed to the Essex/Union County-based NES America and NES Georgia physician groups.  On November 27, 2023, Plaintiff, under the name "Healthcare Justice Coalition NJ, LLC," first sued Horizon in the **Superior Court of New Jersey, Union County** under docket number UNN-L-3877-23.  (Supplemental Certification of Adam J. Petitt ("Petitt Suppl. Cert."), Exh. A).  Notably, Plaintiff was **not** a citizen of New Jersey.  (*Id.* at Exh. B).  The sole member of Healthcare Justice Coalition NJ, LLC is "Healthcare Justice Coalition DE Corp.[, ] a citizen of Delaware."  (*Id.*).  Of course, Plaintiff filed its lawsuit in Union County because:

> 11.  Venue is proper in the Superior Court of New Jersey, Law Division, Union County, pursuant to New Jersey Court Rule 4:3-2(a), *as the place where the cause of action arose. NES physicians provided emergency medical services at Saint Michael's Medical Center and Trinitas Regional Medical Center, which are located, respectively, in Newark, New Jersey and Elizabeth, New Jersey, the latter of which is located in Union County. Plaintiff seeks payments for the services rendered by New Jersey licensed physicians at both hospitals. These causes of action arose as a direct result of services rendered in Essex and Union counties. Therefore, venue is proper in Union County.*

(*Id.* at Exh. A, at ¶ 11 (emphasis added)).

Plaintiff voluntarily dismissed its Union County complaint on December 7, 2023.  (*Id.*, ¶ 3).  On December 29, 2023, Plaintiff refiled its complaint, again as the Delaware resident Healthcare Justice Coalition NJ, LLC, this time in Gloucester County under docket number GLO-L-1421-23.  (*Id.*, ¶ 4).  Plaintiff again voluntarily dismissed that complaint on February 6, 2024. (*Id.*, ¶ 5). Then, on February 24, 2024, Plaintiff created the current version of its business name – Healthcare Justice Coalition of New Jersey Corp.  Three days later, on February 27, Plaintiff commenced the present action.  Now, Plaintiff's only justification for filing in this venue is because Horizon "does business" in Gloucester County.  Plaintiff's Opposition readily concedes that neither it nor the substance of its lawsuit has any substantive tie to Gloucester County.

As detailed in Horizon's motion to change venue, under Rule 4:3-3(a)(3) and the doctrine

of forum *non conveniens*, the Court has the discretion to decline jurisdiction where another forum best serves "the convenience of the parties and the ends of justice." *Gore v. U.S. Steel Corp.*, 15 N.J. 301, 305 (1954). In making such a determination, courts employ a three-step process that includes (1) deciding if there is an adequate alternative forum to adjudicate the parties' dispute; (2) determining what degree of deference is properly accorded the plaintiff's choice of forum; and (3) analyzing the private- and public-interest factors that are implicated. *See Varo v. Owens-Illinois, Inc.*, 400 N.J. Super. 508, 519 (App. Div. 2008).

As to the first step in the Court's consideration, Plaintiff does not dispute that Essex County is an adequate alternative forum to adjudicate the parties' dispute. Indeed, Plaintiff has conceded that venue is proper where the "causes of action arose as a direct result of services rendered in Essex and Union counties." (Petitt Suppl. Cert., Exh. A, at ¶ 11). Second, given Plaintiff's manipulative filing history of this lawsuit, little to no deference should be given to Plaintiff's unexplained choice of venue in Gloucester County. Instead, deference should be provided to Essex County where the alleged cause of actions in the Complaint accrued and where the witnesses are located.

Lastly, the private- and public-interest factors weigh in favor of transferring this matter to Essex County. Plaintiff's Opposition grasps at straws in an attempt to paint Essex County as the "inconvenient" venue. Without any support, Plaintiff blindly argues that travel time and expenses "may be greater in Essex County than in Gloucester County." (Pl. Opp. at 7). Plaintiff's attempt to distinguish *Walker v. Inspira Health Network*, is misplaced and misguided. It is of no moment that Horizon does not "maintain medical practices or see patients" or that Horizon "would not be nearly as inconvenienced as physicians and hospital staff might be by potential travel." (Pl. Opp. at 7). The fact remains that all of the witnesses and parties integral to this lawsuit are located in

4

or around Essex County.  None of the witnesses or parties are located in or around Gloucester County.  Critically, Plaintiff does not (and cannot) dispute that.  And that inconvenience to the witnesses and parties is the bedrock of the appellate division's decision to grant the motion to change venue in *Walker*.  *Walker v. Inspira Health Network,* No. A-3723-22, 2024 WL 791624, at *2-3 (N.J. Super. Ct. App. Div. Feb. 27, 2024).  The travel and expense of all of the witnesses and parties to Gloucester County for a case and trial that has no connection to Gloucester County will be an incredible inconvenience to all.

Moreover, Plaintiff's persistent reliance on *Diodato v. Camden Cnty. Park Comm'n*, is not persuasive. 136 N.J. Super. 324 (App. Div. 1975).  In *Diodato*, the plaintiffs in a personal injury action sought to avoid the venue of Camden County, in part, because it was inconvenient for one of the plaintiffs and some of the witnesses, but Camden County was the location where the accident that was the subject of the litigation had occurred. 136 N.J. Super. at 328.  In contrast to *Diodato*, there is nothing involved in the substance of this case that is connected to Gloucester County. Rather, the location of the alleged claims at issue here are in Essex County, where the case should be transferred to.

## **CONCLUSION**

For the foregoing reasons and those outlined in its initial brief and supporting certifications, Horizon's motion to change venue should be granted and venue should be transferred from Gloucester County to Essex County.

Respectfully submitted,

By: _____
Adam J. Petitt, Esq.

Dated: May 6, 2024

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue*
*Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health*
*(incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

| | |
|---|---|
| -------------------------------------------------------------------- x | |
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION: GLOUCESTER |
| Plaintiff, | : COUNTY |
| | : |
| -v- | : Docket No.: GLO-L-000242-24 |
| | : |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a | : **SECOND CERTIFICATION OF** |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW | : **ADAM J. PETITT, ESQ.** |
| JERSEY, HORIZON HEALTHCARE OF NEW | : |
| JERSEY, INC., and DOES 1-20, inclusive, | : |
| | : |
| Defendants. | : |
| -------------------------------------------------------------------- x | |

I, Adam J. Petitt, Esq., hereby certify as follows:

1.      I am an attorney licensed to practice law in the State of New Jersey.  I am a partner at the law firm of Robinson & Cole LLP, attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon").  I am entrusted with the management of the above-captioned matter and am familiar with the facts herein.

2.      On November 27, 2023, Healthcare Justice Coalition NJ, LLC filed a lawsuit against Horizon in the Superior Court of New Jersey, Union County, entitled *Healthcare Justice Coalition NJ, LLC v. Horizon Healthcare Services, Inc., et al.*, Docket No. UNN-L-003877-23

("Union County Lawsuit").  A true and correct copy of the complaint is attached hereto as <u>Exhibit A</u>.

3.      On December 7, 2023, Healthcare Justice Coalition NJ, LLC filed a notice of voluntary dismissal in the Union County Lawsuit.

4.      On December 29, 2023, Healthcare Justice Coalition NJ, LLC refiled its lawsuit against Horizon in the Superior Court of New Jersey, Gloucester County, entitled *Healthcare Justice Coalition NJ, LLC v. Horizon Healthcare Services, Inc., et al.*, Docket No. GLO-L-001421-23 ("First Gloucester County Lawsuit").

5.      On February 6, 2024, Healthcare Justice Coalition NJ, LLC filed a notice of voluntary dismissal in First Gloucester County Lawsuit.

6.      On February 21, 2024, in *Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, Inc., et al.*, Case No. 1:24-cv-00493-ESK-SAK (D.N.J.), Healthcare Justice Coalition NJ, LLC filed a diversity disclosure statement, a true and correct copy of which is attached hereto as <u>Exhibit B</u>.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

By: _____
       Adam J. Petitt, Esq.

Dated: May 6, 2024

2

# EXHIBIT A

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION NJ, LLC

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC )<br><br>Plaintiff )<br><br>vs. )<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. )<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY UNION COUNTY LAW DIVISION<br><br>DOCKET NO. _____<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

### COMPLAINT AND JURY DEMAND

Plaintiff HEALTHCARE JUSTICE COALITION NJ, LLC (the "Coalition"), by counsel, for its Complaint and Jury Demand against Defendant HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive (collectively, "Defendant"), allege as follows:

### INTRODUCTION

1.  This case involves a dispute over the value of emergency services provided to patients in

hospital emergency rooms located in New Jersey.

2.   The Coalition works with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. It seeks to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

3.   Among the emergency medicine practice groups ("Physicians") with whom the Coalition collaborates are NES Health, LLC and NES Georgia (collectively, "NES"). The Physicians provide emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey, among other hospitals.

4.   The Physicians rendered emergency services to Defendants' members. Defendants either failed to pay or significantly underpaid the Physicians for their provision of emergency services. In order to improve the Physicians' capability to provide quality emergency care and be reasonably paid, Physicians have assigned to the Coalition these accounts and the right to sue thereupon.

5.   Plaintiff brings this case to seek payment for the emergency services Physicians provided to Defendants' members.

## THE PARTIES

6.   Plaintiff, the Coalition for Healthcare Justice NJ, LLC (**the "Coalition"** or "Plaintiff") is an organization whose mission is to pursue reasonable payment owed to emergency physicians, so as to support the accessibility of quality emergency care across New Jersey and to reform the problematic behavior of the health care insurance carriers.  It is a limited liability company organized and existing under the laws of the state of New Jersey.

7.   Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") is a corporation organized under the laws of the state of New Jersey with

its principal place of business at 3 Penn Plaza East, Newark, New Jersey 07105-2248. Horizon BCBSNJ is a health insurance company that provides health insurance products to individuals and employers in New Jersey.

8.   Horizon Healthcare of New Jersey, Inc., ("Horizon NJ") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 3 Penn Plaza East, Newark, New Jersey 07105-2248. Horizon NJ is a health maintenance organization licensed in the state of New Jersey.

9.   The true names and capacities of the Defendants sued herein as DOES 1 through 20, inclusive ("Does"), are unknown to Plaintiff at this time, and therefore are sued by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of these Does when they have been ascertained. Plaintiff is informed and believes that each of the Defendants designated as Doe is responsible in some manner for the events and happenings herein alleged, as well as for the damages alleged.

10. Defendants provide health insurance coverage for medical services, including emergency medical services, to people in New Jersey who are covered by the health plans they underwrite or administer on behalf of employers. As such, they are subject to the New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act"), N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

## JURISDICTION AND VENUE

11. Venue is proper in the Superior Court of New Jersey, Law Division, Union County, pursuant to New Jersey Court Rule 4:3-2(a), as the place where the cause of action arose. NES physicians provided emergency medical services at Saint Michael's Medical Center and Trinitas Regional Medical Center, which are located, respectively, in Newark, New Jersey and Elizabeth,

New Jersey, the latter of which is located in Union County. Plaintiff seeks payments for the services rendered by New Jersey licensed physicians at both hospitals. These causes of action arose as a direct result of services rendered in Essex and Union counties. Therefore, venue is proper in Union County.

12. Courts within the State of New Jersey, including the Superior Court of New Jersey, Law Division, Union County, have personal jurisdiction over the Defendants in this action because the Defendants have sufficient minimum contacts with the State of New Jersey and, as alleged below: (i) the Defendants are found in, have agents in, and/or transact their business and affairs in New Jersey; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in New Jersey; and (iii) the ends of justice require that those of the Defendants residing outside New Jersey be brought before the Court to answer for their conduct engaged in and directed toward this State.

## **STATEMENT OF FACTS**

### A.    **Background**

13. In furtherance of its core mission as described above, the Coalition engages with emergency medicine practice groups who are responsible for providing lifesaving healthcare services on an emergency basis to members of health care service plans such as the Defendants'. The Coalition works to ensure that emergency physicians are not underpaid by health plans such as Defendants'.

14. Among the emergency medicine practice groups with whom the Coalition engages is NES, which provides emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey. At the time NES rendered emergency professional services to Defendants' members, it did not have a contract with Defendants, and set its own

reasonable charges for the emergency services they provided.  Defendants either failed to pay or significantly underpaid NES and Physicians for their provision of services.  The Coalition has since been assigned those accounts and the right to sue thereupon.

15. Systemic underpayments by health plans of the kind that Physicians have experienced threaten the stability of America's health care system by forcing emergency physician groups into bankruptcy and shuttering emergency departments.  Even when physician groups are not forced to shut down, inadequate reimbursement may nonetheless force a reduction in physician coverage, negatively impacting patient care.  The situation is especially dire in rural and medically under-served areas such as those serviced by the Physicians, where the closure of an emergency department can force people to travel much greater distances for basic care.  For people suffering from strokes, heart attacks, and other life-threatening conditions, even minutes can be the difference between life and death.  The Coalition's mission is to promote fair economics for emergency care by securing reasonable payment for emergency physician services so that qualified doctors can continue to render vital emergency care to all New Jersey residents.

16. Physicians can, but are not obligated to, enter formal contractual arrangements with health care service plans, insurers, and other payors.  Physicians that enter into these formal agreements are considered to be "in network." Under such formal contracts, the in-network provider agrees to accept less than what it bills for services provided to patients in exchange for the various benefits of being contracted.

17. In the emergency medicine context, some of the benefits for in-network providers may include, among others, the ability to submit electronic bills and communications to the payor, and cash flow certainty and payment timing and rates physicians will receive for their care services.

18. Where the two sides have not agreed to enter into a formal agreement, the providers

5

are considered to be "out of network". In the out-of-network scenario, none of these benefits are present.

19. Out-of-network physicians have not agreed, in advance, to specified reimbursement rates with the payor. As a result, they are not compelled to accept whatever the health plan chooses to pay for healthcare services rendered.

20. Oftentimes, although physicians are willing to enter into an agreement, they are forced to operate "out-of-network" because the health plan simply refuses to contract with them, or the contract terms offered are unreasonable. Where a health plan declines to pay an out-of-network physician's full charges, then, the physician is entitled to seek payment of his or her full bill.

**B.      The Physicians Were Obligated to Render Emergency Medical Care**

21. Regardless of whether a physician is "in-network" or "out-of-network," and regardless of whether a patient can afford to pay for services, physicians who practice in a hospital's emergency room, as the Physicians here did, are required by federal law to render lifesaving emergency health care services to patients seeking such services. (*See* 42 U.S.C. § 1395dd ("EMTALA").)

22. Thus, the Physicians were obligated to render emergency care to all the patients who presented to the emergency rooms at the hospitals at which they practiced, even if those patients were indigent, or covered by Medicaid, which is the payer of last resort. Patients that pay a minimal amount – or that do not pay at all –constitute a significant proportion of the individuals that present to any emergency room. Accordingly, the Coalition is entitled to pursue fair payment for the Physicians' services, so as to ensure that Defendants do not shirk their responsibility to the health care system – and to their own members, for whom Defendants promised to cover emergency services.

23. As explained in more detail below, restitution and equity demand that Physicians – and by means of its valid assignment, the Coalition – be paid the reasonable value of the lifesaving care that the Physicians rendered to the members of Defendants' health plan.

## C.    The Claims At Issue

24. In this case, the Physicians provided emergency services to Defendants' members on an out-of-network basis. Defendants must therefore pay the Coalition for emergency services based upon the reasonable value of the emergency health care services provided by Physicians, which may be up to the full billed charges for those services.

25. The Coalition has been assigned the reimbursement claims at issue from the Physicians and has the necessary rights and ability to sue to recover the full billed charges, or in the alternative, the reasonable value for the Physician services at issue.

26. The Coalition will provide a full list of the underpaid claims to Defendants upon request. Such list has not been included with this Complaint in order to avoid the unnecessary disclosure of Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

## CAUSES OF ACTION

### COUNT ONE: (QUANTUM MERUIT/ UNJUST ENRICHMENT)

27. The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

28. Under New Jersey law, a cause of action for Quantum Meruit requires: (l) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the amount charged for the services is reasonable.

29. As alleged above, federal law requires physicians to render emergency services to all patients who present at the emergency department regardless of insurance coverage or ability to pay. See 42 U.S.C § 1395dd ("EMTALA").

30. Restatement of Restitution (1937) Section 114, titled "Performance of Another's Duty to a Third Person in an Emergency," states,

> A person who has performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the other therefor if:
> he acted unofficiously and with intent to charge therefor, and the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person.

31. Physicians provided emergency medical services to Members of Defendants' health care plans in good faith after Defendants undertook the obligation to pay for such services.

32. Defendants were obliged to provide emergency care to their Members.  When those members presented to the emergency room, Physicians fulfilled that obligation on Defendants' behalf.  This, in turn, triggered Defendants' duty to pay the reasonable value for those services. This is true even if Defendants did not become aware of Physicians' actions until *after* the emergency services were rendered.

33. The Defendants themselves, as well as their Members, benefitted from the services Physicians provided under EMTALA.  For example, and without limitation, Defendants used and enjoyed the benefit of Physicians' services because Physicians helped Defendants discharge their legal and contractual obligation to their insureds to provide them with emergency care.

34. Physicians acted unofficiously and expected to be reasonably compensated for the medical services they provided to Defendants.

35. Defendants' acceptance of the Physicians' services is further underscored by Defendants failure to reject the services, and in most cases, paying at least something for their Members' care.

36. Plaintiffs contend the reasonable value of the emergency medical services Physicians rendered to Defendants' Members is reflected by the amount Physicians charged for such services.

37. As set out above, Defendants either paid for the claims at issue for the services provided at rates substantially lower than the reasonable value of the services provided or failed to pay any amount of the claims at issue.

38. Under the doctrine of Quantum Meruit, Defendants are liable in restitution to Plaintiff for the difference between the amount Defendants paid and the reasonable value of the emergency services provided on the claims at issue.  The amount billed represents the reasonable value for the emergency care services.

### COUNT TWO: (VIOLATION OF NEW JERSEY HEALTH CLAIMS AUTHORIZATION, PROCESSING, AND PAYMENT ACT ("HCAPPA")

39. The Coalition incorporates by reference all allegations set forth above as though set forth in full herein.

40. HCAPPA requires health insurers such as Defendants to pay health care providers' claims promptly, provided that the claims meet the criteria for payment set forth in N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-8.1(d)(9).

41. Specifically, for out-of-network emergency claims governed by the Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act") for services rendered on or after August 30, 2018, such as the claims for the emergency treatment Plaintiff's physicians have provided to Defendants' Members, New Jersey law requires that such claims be paid in full no more than 50 days after electronic submission, except to the extent disputed in accordance with the procedures of the OON Act. *See* N.J.S.A. 26:2SS-9.

42. Plaintiff's claims for the emergency treatment they provided to Defendants' Members meet all the criteria for payment under HCAPPA, NJ.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9)

and N.J.S.A. 26:2J-8.1(d)(9). On the dates the services were provided, Defendants covered the out-of-network emergency services Physicians provided to Defendants' Members, and Physician submitted the claims to Defendants on the appropriate claim forms.

43. However, as described more fully above, Defendants failed to remit full reimbursement of Physicians' charges for healthcare services or provide a written explanation for the failure to pay all or a portion of such claims within the statutorily proscribed time frames under HCAPPA or the OON Act.

44. Moreover, as described more fully above, Defendants failed to provide written notice specifying that Physicians' out-of-network emergency claims were incomplete or contained incorrect information, that Defendants disputed the amounts claimed in whole or in part, or that there was strong evidence of fraud, as HCAPPA requires of any carrier that fails to timely pay a claim 14 for reimbursement. N.J.S.A. 17B:26-9.l(d)(2), N.J.S.A. 17B:27-44.2(d)(2), or NJ.S.A. N.J.S.A. 26:2J-8.1(d)(2). Nor did Defendants seek to dispute any of Physicians' out-of-network claims in accordance with the OON Act.

45. Defendants' failure to timely pay the full amounts due to Physicians for their out-of-network emergency claims for services provided has resulted overdue payments under HCAPPA.

46. Therefore, Plaintiff is entitled to recover from Defendants the full underpaid and unpaid amounts on all of Physicians' out-of-network emergency claims for services together with statutory interest in the amount of 12% per annum, N.J.S.A. 17B:26-9.l(d)(9), N.J.S.A. 17B:27-44.2(d)(9), and N.J.S.A. 26:2J-8.1(d)(9).

## **PRAYER FOR RELIEF**

WHEREFORE, Healthcare Justice Coalition NJ, LLC, by counsel, respectfully requests the Court enter judgment in its favor and against Defendants in excess of $15 million, plus interest, the costs of this action, and all other appropriate relief.

## JURY DEMAND

Plaintiff Healthcare Justice Coalition NJ, LLC, by counsel, respectfully demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

Date: November 27, 2023

By: _____

Dante B. Parenti
ATTORNEYS       FOR       PLAINTIFF
HEALTHCARE  JUSTICE  COALITION  NJ, LLC

## CERTIFICATION PURSUANT TO RULE 4:5-1(b)(2)

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

Date: November 27, 2023

By: _____

Dante B. Parenti
ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE COALITION NJ, LLC

## CERTIFICATION PURSUANT TO RULE 4:5-1(b)(3)

I certify that confidential personal identifiers have been redacted from all documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Respectfully submitted,

Date: <u>November 27, 2023</u>

By: _____

Dante B. Parenti
ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE COALITION NJ,
LLC

## **CERTIFICATE OF SERVICE**

I, Dante B. Parenti, certify that on this date, I caused a true and correct copy of the within pleading to be served on all counsel of record via the Court's ECF electronic filing system.

Respectfully   submitted,

Date: <u>November 27, 2023</u>

By: _____

Dante B. Parenti
ATTORNEY FOR PLAINTIFF
HEALTHCARE JUSTICE COALITION NJ,
LLC

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC | Civil No. 24-cv-493 |
| Plaintiff(s), | |
| v. | |
| UNITEDHEALTH GROUP, INC., UNITEDHEALTHCARE INSURANCE COMPANY, OXFORD HEALTH PLANS (NJ), INC., UMR, INC., and DOES 1-20, | |
| Defendant(s). | |

## DISCLOSURE STATEMENT[1] PURSUANT TO FED. R. CIV. P. 7.1(a)(2)

| | | State(s) of Citizenship |
|---|---|---|
| Healthcare Justice Coalition NJ, LLC | ☐ Individual[2]<br>☐ Corporation[3]<br>☐ Partnership[4]<br>☑ Limited Liability Company[5]<br>☐ Other | See Below |
| | ☐ Individual<br>☐ Corporation<br>☐ Partnership<br>☐ Limited Liability Company<br>☐ Other | State(s) of Citizenship |
| | ☐ Individual<br>☐ Corporation<br>☐ Partnership<br>☐ Limited Liability Company<br>☐ Other | State(s) of Citizenship |

In cases where one or more parties are partnerships or LLCs, list all partners or members and their citizenship. This space should also be used where there are more than three parties. Additional sheets may be added as needed.

Healthcare Justice Coalition DE Corp. is a citizen of Delaware and is the sole member of Healthcare Justice Coalition NJ, LLC.

Pursuant to 28 U.S.C. § 1746 and Fed. R. Civ. P. 11, I certify that the foregoing is true and correct.

Eliot Listman

Date:     2/20/2024

DocuSigned by:

C43144312CDC43B

¹ This statement shall be filed by each party.

² 28 U.S.C. § 1332(a)(1); *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 219 n.4 (3d Cir. 2012) (citing *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("[M]ere residency in a state is insufficient for purposes of diversity [of citizenship].")). The natural person must be domiciled in the state and a citizen of that state. *See Gilbert v. David*, 235 U.S. 561 (1915); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015).

³ 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . ."); *Hertz Corp. v. Friend*, 559 U.S. 77 (2010); *S. Freedman & Co., v. Raab*, 180 F. App'x 316, 320 (3d Cir. 2006) (explaining that "'[i]n order to adequately establish diversity jurisdiction, a complaint must set forth with specificity a corporate party's state of incorporation and its principal place of business,'" and affirming dismissal of complaint alleging that corporation maintained "a principal place of business," rather than "its principal place of business" (quoting *Joiner v. Diamond M Drilling Co.*, 677 F.2d 1035, 1039 (5th Cir. 1982))). The parties are directed to list the state of incorporation and principal place of business of the corporation.

⁴ A partnership, as an unincorporated entity, takes on the citizenship of each of its partners. *Zambelli Fireworks MFG. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (citation omitted). The parties are directed to list each partner and its citizenship.

⁵ The citizenship of an LLC is determined by the citizenship of each of its members. *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015). The parties are directed to list each member and its citizenship. If any member is itself a partnership, limited liability company, or other unincorporated association, its partners or members and their citizenship must be set forth separately. *See Zambelli Fireworks MFG. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) ("And as with partnerships, where an LLC has, as one of its members, another LLC, the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be to determine the citizenship of the LLC.")

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Telephone: (215) 398-0562
E-mail: apetitt@rc.com
*Attorneys for Defendants*

---

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.,     : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY |
|     : | |
| Plaintiff,     : | |
|     : | |
| -v-     : | Docket No.: GLO-L-000242-24 |
|     : | |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a     : | **SECOND STIPULATION** |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW     : | **EXTENDING TIME TO RESPOND** |
| JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, : | **TO COMPLAINT** |
| INC., and DOES 1-20, inclusive,     : | |
|     : | |
| Defendants.     : | |

---

**IT IS STIPULATED AND AGREED** by and between counsel for Plaintiff, Healthcare

Justice Coalition of New Jersey Corp., and counsel for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc., that the time within which said Defendants must answer, plead, or otherwise respond to the

Complaint is extended to and including May 24, 2024.

Dated: May 9, 2024

<br>

| | |
|---|---|
| /s/ Dante B. Parenti | /s/ Adam J. Petitt |
| Dante B. Parenti, Esq. (005571985) | Adam J. Petitt, Esq. (020822008) |
| **LAULETTA BIRNBAUM, LLC** | **ROBINSON & COLE LLP** |
| 591 Mantua Blvd., Suite 200 | 1650 Market Street, Suite 3030 |
| Sewell, NJ 08080 | Philadelphia, PA 19103 |
| Telephone: (856) 669-2584 | Telephone : (215) 398-0562 |
| Fax : (856) 232-1601 | Fax : (215) 398-0599 |
| E-mail: dparenti@lauletta.com | E-mail: apetitt@rc.com |
| | *Attorney for Defendants* |

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

*Attorneys for Plaintiff*

```
------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW          :
JERSEY CORP.,                                :    SUPERIOR COURT OF NEW JERSEY
                                             :    LAW DIVISION: GLOUCESTER
                           Plaintiff,        :    COUNTY
                                             :
        -v-                                  :    Docket No.: GLO-L-000242-24
                                             :
HORIZON HEALTHCARE SERVICES, INC., d/b/a     :    ORDER DENIED
HORIZON BLUE CROSS BLUE SHIELD OF NEW        :
JERSEY, HORIZON HEALTHCARE OF NEW            :
JERSEY, INC., and DOES 1-20, inclusive,      :
                                             :
                           Defendants.       :
------------------------------------------------------------------- x
```

**THIS MATTER** having been opened to the Court by Robinson & Cole LLP, attorneys for Defendants, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey, Inc., and the Court having considered the papers within, and oral argument, if any; and for good cause having been shown,

**IT IS** on this _10th_ day of May, 2024;

~~**ORDERED** that venue be and is hereby transferred from Gloucester County to Essex County; and it is further~~  **DENIED**

**ORDERED** that a copy of this Order be served upon all counsel within seven (7) days hereof.

/s/ Timothy W. Chell, P.J.Cv.
The Honorable Timothy W. Chell, P.J.Cv.

__X__ opposed
_____ unopposed

## FINDINGS OF THE COURT

Standard for Change of Venue in the Superior Court

New Jersey Court Rules, R. 4:3-2 Venue in the Superior Court.
    (a) Where Laid. Venue shall be laid by the plaintiff in Superior Court actions as follows: [...] the venue in all other actions in the Superior Court shall be laid in the county in which the cause of action arose, or in which any party to the action resides

1

at the time of its commencement, or in which the summons was served on a nonresident defendant;

N.J. Ct. R. 4:3-2

Crucially, R. 4:3-2(b) provides that "[f]or purposes of this rule, a business entity shall be deemed to reside . . . in *any* county in which it is actually doing business. (Id.(b) (emphasis added).)

New Jersey Court Rules, R. 4:3-3(a) provides in pertinent part:

> In actions in the Superior Court **a change of venue** may be ordered [...] (1) if the venue is not laid in accordance with R. 4:3-2; or (2) if there is a substantial doubt that a fair and impartial trial can be had in the county where venue is laid; **or (3) for the convenience of parties and witnesses in the interest of justice;** [...]

N.J. Ct. R. 4:3-3

The essence of the common law doctrine of *forum non-convenien*s is that a court may dismiss a case when the forum selected by a plaintiff, despite the existence of jurisdiction and venue, is **so inconvenient** that it would be **unfair** to the defendant to conduct its defense of the claim in that location. Varo v. Owens-Illinois, 400 N.J. Super. 508, 518 (App. Div. 2008) (emphasis added). Application of the doctrine must be considered in light of the primary danger against which it guards, namely "'resort to a strategy of **forcing the trial at a most inconvenient place' . . . [in order to] 'vex,' 'harass' or 'oppress'" the adversary**. Id. at 519 (citing Lony v. E.I. DuPont de Nemours & Co., 935 F.2d 604, 615 (3d Cir.1991) (quoting Gulf Oil, supra, 330 U.S. at 507-08, 67 S. Ct. at 842-43, 91 L. Ed. at 1062) (emphasis added).

When a plaintiff brings an action in a court with jurisdiction, his or her choice of forum should rarely be disturbed. Varo, 400 N.J. Super. at 523. A defendant retains the heavy burden of overcoming the presumption that a plaintiff's choice of forum should govern. Ibid. A plaintiff's choice of forum may not be defeated upon a mere balance of conveniences. Id. at 524 (See also D'Agostino v. Johnson & Johnson, Inc., 115 N.J. 491, 494 (1989)). On the contrary, the burden is on the defendant to demonstrate the inappropriateness of a plaintiff's chosen forum and that it was designed to subject the defendant to harassment and vexation. Ibid.

Analysis of the Court

Here, Defendants do not argue that venue in Gloucester County is improper under R. 4:3-3(a)(1) or (2). Rather, Defendants rely on R. 4:3-3(a)(3) to ask the Court to transfer this matter to Essex County for the convenience of parties and witnesses in the interest of justice. Defendant asks the Court to transfer this matter to Essex County because that is where the alleged emergency services were rendered and the majority of the parties, witnesses, and key documents are located. Plaintiff argues that Defendant has not met its burden to transfer; the Court agrees. The Court finds Defendant has not met its heavy burden of overcoming the presumption that plaintiff's choice of forum—properly laid in Gloucester County—should govern.

The Complaint in this action alleges that Defendants actually do business in Gloucester County. Defendants partner with Gloucester County hospitals and their members and insureds receive covered health care services in Gloucester County. Accordingly, Gloucester County is an

appropriate venue for this lawsuit under New Jersey Rule of Court 4:3- 2(a). Defendants have not shown that Gloucester County is an inappropriate forum.

This matter is in the early stages of litigation. The discovery end date has yet to be set. Virtual platforms such as Zoom have obviated much of the need for travel formerly associated with trial preparation pre-pandemic. Further, there is no trial date scheduled in this matter and the parties may well resolve this dispute without ever stepping foot into a courtroom.

The facts as presented to the Court are insufficient at this time to grant the transfer of venue that Defendants seek. Defendants have made no assertion that Plaintiff chose Gloucester County to "vex, harass, or oppress" Defendants. Defendants have not made a clear showing of real hardship or provided some other compelling reason. The Court does not find cause to disturb Plaintiff's choice of forum as Gloucester County.

## <u>ORDER OF THE COURT</u>

Therefore, the Motion to transfer venue is DENIED.

**PREPARED BY THE COURT**

HEALTHCARE JUSTICE COALITION

     Plaintiff

        vs

HORIZON HEALTHCARE SERVICES

     Defendant

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART

GLOUCESTER COUNTY

DOCKET NO.:   L-242-24

**ORDER TO DELETE**

Upon review of the case jacket, it was determined that an Order was uploaded to the case jacket not pertaining to this matter and the Order should therefore be deleted.  (Transaction ID: LCV20241225136).

**IT IS** on this   __14th__   day of   __May__  2024, **ORDERED** that the Order uploaded to docket number L-242-24 with transaction ID # LCV20241225136 on May 14, 2024 (marked filed May 10, 2024) be deleted from the case jacket.

FILED

                _/s/ Timothy W. Chell, P.J.Cv._____
                TIMOTHY W. CHELL, P.J.Cv.

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**ORDER GRANTING ERIC D. CHAN, ESQ. ADMISSION *PRO HAC VICE*** |

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys for Plaintiff for an Order allowing Eric D. Chan, Esq., to appear and participate *pro hac vice*, and the court having considered the application, and any opposition thereto, and with good cause appearing:

**IT IS** on this __24th__ day of _____May_____, 2024;

**ORDERED** that Eric D. Chan, Esq., shall be and is hereby admitted to practice before this Court *pro hac vice* pursuant to R. 1:21-2, for all purposes and in all proceedings connected with the above-referenced matter, in the same manner as an attorney who is admitted to practice

in this State and is domiciled and maintains an office for the practice of law in the State of New

Jersey provided that said attorney shall:

1.    Abide by the Rules of the Court for the State of New Jersey, including all
disciplinary rules,

2.    Consent to the appointment of the Clerk of the Supreme Court as agent upon
whom service of process may be made for all actions against the above-mentioned
attorney or the attorney's firm that may arise out of the attorney's participation in
this matter,

3.    Notify the Court immediately of any matter affecting the attorney's standing at
the bar of any other Court, and

4.    Have all pleadings, briefs and other papers filed with the Court signed by Dante
Parenti, Esq., who is a member in good standing of the New Jersey Bar, who shall
be held responsible for said papers, for the conduct of the cause, and for the
conduct of the above-mentioned attorney admitted *pro hac vice* pursuant to this
Order.

**IT IS FURTHER ORDERED THAT**, Eric D. Chan, Esq., shall make the payment of

fees as provided in the New Jersey Rules of Court, R. 1:20-1(b), R. 1:28-1, and R. 1:28B-1(e)

within thirty (30) days of entry of this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of this Court shall forward a copy of

this Order to the Treasurer of the New Jersey Fund for Client Protection, and

**IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated

upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

/s/ Timothy W. Chell, P.J.Cv.
~~Honorable James R. Swift, J.S.C.~~

Hon Timothy W. Chell, P.J.Cv.

_____ Opposed
__X__ Unopposed

#338839v2

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No. 253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.<br><br>Plaintiff<br><br>vs.<br><br>HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive.<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**ORDER GRANTING AVI W. RUTSCHMAN, ESQ. ADMISSION *PRO HAC VICE*** |

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys for Plaintiff for an Order allowing Avi. W. Rutschman, Esq., to appear and participate *pro hac vice*, and the court having considered the application, and any opposition thereto, and with good cause appearing:

**IT IS** on this ___24th___ day of ____May____, 2024;

**ORDERED** that Avi. W. Rutschman, Esq., shall be and is hereby admitted to practice before this Court *pro hac vice* pursuant to R. 1:21-2, for all purposes and in all proceedings connected with the above-referenced matter, in the same manner as an attorney who is admitted

to practice in this State and is domiciled and maintains an office for the practice of law in the

State of New Jersey provided that said attorney shall:

1. Abide by the Rules of the Court for the State of New Jersey, including all disciplinary rules,

2. Consent to the appointment of the Clerk of the Supreme Court as agent upon whom service of process may be made for all actions against the above-mentioned attorney or the attorney's firm that may arise out of the attorney's participation in this matter,

3. Notify the Court immediately of any matter affecting the attorney's standing at the bar of any other Court, and

4. Have all pleadings, briefs and other papers filed with the Court signed by Dante Parenti, Esq., who is a member in good standing of the New Jersey Bar, who shall be held responsible for said papers, for the conduct of the cause, and for the conduct of the above-mentioned attorney admitted *pro hac vice* pursuant to this Order.

**IT IS FURTHER ORDERED THAT**, Avi. W. Rutschman, Esq., shall make the

payment of fees as provided in the New Jersey Rules of Court, R. 1:20-1(b), R. 1:28-1, and R.

1:28B-1(e) within thirty (30) days of entry of this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of this Court shall forward a copy of

this Order to the Treasurer of the New Jersey Fund for Client Protection, and

**IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated

upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

/s/ Timothy W. Chell, P.J.Cv.

~~Honorable James R. Swift, J.S.C.~~

Hon. Timothy W. Chell, P.J.Cv.

\_\_\_\_\_ Opposed

__X__ Unopposed

#338840v2

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
apetitt@rc.com
*Attorneys for Defendants*

------------------------------------------------------------------ x
HEALTHCARE JUSTICE COALITION OF NEW :    SUPERIOR COURT OF NEW JERSEY
JERSEY CORP.,    :    LAW DIVISION: GLOUCESTER
         :    COUNTY
             Plaintiff,    :
         :    Docket No.: GLO-L-000242-24
     -v-    :
         :
HORIZON HEALTHCARE SERVICES, INC., d/b/a    :    **NOTICE OF MOTION TO DISMISS**
HORIZON BLUE CROSS BLUE SHIELD OF NEW    :    **PLAINTIFF'S COMPLAINT**
JERSEY, HORIZON HEALTHCARE OF NEW    :
JERSEY, INC., and DOES 1-20, inclusive,    :
         :
            Defendants.    :
------------------------------------------------------------------ x

**To:**    Dante B. Parenti, Esq.
       LAULETTA BIRNBAUM, LLC
       591 Mantua Blvd., Suite 200
       Sewell, NJ 08080
       *Attorneys for Plaintiff*

     **PLEASE TAKE NOTICE** that on June 20, 2024 at 9:30 a.m., or as soon thereafter as

counsel may be heard, the undersigned attorneys for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc. ("Defendants"), will move before the Honorable James R. Swift of the Superior Court of New

Jersey, Law Division, Gloucester County, in Woodbury, New Jersey, for an Order granting

Defendants' Motion to Dismiss pursuant to N.J. Ct. R. 4:6-2(e).

**PLEASE TAKE FURTHER NOTICE** that in support of the motion, the undersigned will rely upon the annexed Certification of Adam J. Petitt, with exhibits, and Memorandum of Law in Support submitted herewith.

**PLEASE TAKE FURTHER NOTICE** a copy of the proposed form of Order is attached hereto and the Motion shall be deemed uncontested unless responsive papers are timely filed and served stating with particularity the basis of the opposition to the relief sought.

**PLEASE TAKE FURTHER NOTICE** that pursuant to R. 1:6-2, oral argument is requested.

<u>Discovery End Date</u>: None Listed
<u>Arbitration Date</u>: None Listed
<u>Trial Date</u>: None Listed

                                        ROBINSON & COLE LLP
                                        Attorneys for Defendants,


                                        By: _____
                                        Adam J. Petitt, Esq.

Dated: May 24, 2024

```
------------------------------------------------------------------ x
HEALTHCARE JUSTICE COALITION OF NEW    :
JERSEY CORP.,                          :   SUPERIOR COURT OF NEW JERSEY
                                       :   LAW DIVISION: GLOUCESTER
                    Plaintiff,         :   COUNTY
                                       :
       -v-                             :   Docket No.: GLO-L-000242-24
                                       :
HORIZON HEALTHCARE SERVICES, INC., d/b/a :  ORDER
HORIZON BLUE CROSS BLUE SHIELD OF NEW  :
JERSEY, HORIZON HEALTHCARE OF NEW      :
JERSEY, INC., and DOES 1-20, inclusive, :
                                       :
                    Defendants.        :
------------------------------------------------------------------ x
```

**THIS MATTER** having been opened to the Court by Robinson & Cole LLP, attorneys for Defendants, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. ("Defendants"), and the Court having considered the papers within, and oral argument, if any; and for good cause having been shown,

**IT IS** on this _____ day of May, 2024;

**ORDERED** that Defendants' Motion to Dismiss is granted and Plaintiff's Complaint is dismissed in its entirety and with prejudice; and it is further

**ORDERED** that a copy of this Order be served upon all counsel within seven (7) days hereof.

_____
The Honorable James R. Swift, A.J.S.C.

_____ opposed
_____ unopposed

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel: (215) 398-0562
 E-mail: apetitt@rc.com
*Attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue*
*Shield of New Jersey and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health*
*(incorrectly identified as "Horizon Healthcare of New Jersey, Inc.")*

| | | |
|---|---|---|
| ------------------------------------------------------------------- x | | |
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP., | : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY |
| Plaintiff, | : | |
| -v- | : | Docket No.: GLO-L-000242-24 |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive, | : | **CERTIFICATION OF ADAM J. PETITT, ESQ.** |
| Defendants. | : | |
| ------------------------------------------------------------------- x | | |

I, Adam J. Petitt, Esq., hereby certify as follows:

1.      I am an attorney licensed to practice law in the State of New Jersey. I am a partner at the law firm of Robinson & Cole LLP, attorneys for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon").  I am entrusted with the management of the above-captioned matter and am familiar with the facts herein.

2.      According to public records maintained and available by the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Plaintiff is a New Jersey corporation with its main business address located in Woodmere, New York and its registered agent's is located in West Trenton, New Jersey, which is located in Mercer County. A true and

correct copy of the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, Certificate of Inc. (Profit) for Healthcare Justice Coalition of New Jersey Corp. dated February 23, 2024 is annexed hereto as Exhibit A.

3.      A true and correct copy of the unpublished transcript of the Court's decision in *Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*, No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024), is annexed hereto as Exhibit B.

4.      A true and correct copy of Healthcare Justice Coalition NJ, LLC's Response to Pre-Motion Letter in *Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, Inc., et al.*, No. 24-cv-00493 (ESK)(SAK), ECF No. 12 (D. N.J. Feb. 23, 2024), is annexed hereto Exhibit C.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

ROBINSON & COLE LLP

Attorneys for Defendants,

By: _____
        Adam J. Petitt, Esq.

Dated: May 24, 2024

2

# EXHIBIT A

NEW JERSEY DEPARTMENT OF THE TREASURY
DIVISION OF REVENUE AND ENTERPRISE SERVICES

## CERTIFICATE OF INC, (PROFIT)

## HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.
## 0451090335

The above-named DOMESTIC PROFIT CORPORATION was duly filed in accordance with New Jersey State Law on 02/23/2024 and was assigned identification number 0451090335. Following are the articles that constitute its original certificate.

1. **Name:**
   HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

2. **Registered Agent:**
   VCORP AGENT SERVICES, INC.

3. **Registered Office:**
   820 BEAR TAVERN ROAD
   WEST TRENTON, NEW JERSEY 08628

4. **Business Purpose:**
   TO ENGAGE IN ANY ACTIVITY WITHIN THE PURPOSES FOR WHICH CORPORATIONS MAY BE ORGANIZED UNDER NJSA 14A 1-1 ET SEQ: AND TO ENGAGE IN ANY AND ALL NECESSARY OR INCIDENTAL ACTIVITIES.

5. **Duration:**
   PERPETUAL

6. **Stock:**
   100

7. **Effective Date of this filing is:**
   02/23/2024

8. **First Board of Directors:**
   ELIOT LISTMAN
   961 BROADWAY
   SUITE 105
   WOODMERE, NEW YORK 11598

   JONATHAN NISSANOFF
   961 BROADWAY
   SUITE 105
   WOODMERE, NEW YORK 11598

   DAVID BRAINSON
   961 BROADWAY
   SUITE 105
   WOODMERE, NEW YORK 11598

9. **Incorporators:**
   ELIOT LISTMAN
   961 BROADWAY
   SUITE 105
   WOODMERE, NEW YORK 11598

10. **Main Business Address:**
    961 BROADWAY, STE 105
    WOODMERE, NEW YORK 11598

Continued on next page ...

NEW JERSEY DEPARTMENT OF THE TREASURY
DIVISION OF REVENUE AND ENTERPRISE SERVICES

## CERTIFICATE OF INC, (PROFIT)

## HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.
## 0451090335

**Signatures:**

ELIOT LISTMAN
INCORPORATOR



Certificate Number : 4235231416
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

*IN TESTIMONY WHEREOF, I have
hereunto set my hand and
affixed my Official Seal
23rd day of February, 2024*

*Elizabeth Maher Muoio
State Treasurer*

# EXHIBIT B

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CIVIL PART
                              MERCER COUNTY
                              DOCKET NO. MER-L-001179-23


ABIRA MEDICAL LABORATORIES, LLC )
                                          TRANSCRIPT
     vs.                         )        OF
                                        JUDGE'S RULING
INDEPENDENCE ADMINISTRATORS,     )
INDEPENDENCE HEALTH GROUP, et al
_____


                    Place:  Mercer County, New Jersey
                            175 South Broad Street

                    Date:   January 11, 2024

BEFORE:

    THE HONORABLE DOUGLAS H. HURD, P.J., Civil

TRANSCRIPT ORDERED BY:

    KATHERINE M. KATCHEN, ESQ. (Robinson & Cole)

APPEARANCES:

    (None noted)




                         Transcriber Lois McFadden
                         Court Transcription Services
                         228 Lakeshore Drive
                         Marlton, NJ  08053

                         Audio Recorded
                         Operator, Heather Vitoritto
```

2

1                        I N D E X

2

3

4

5      THE COURT:                          Page

6         Decision                           3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (The following is a transcript of the Judge

2      Hurd's ruling held at 3:44 p.m.)

3              THE COURT:  We're on the record.  This matter

4      is docketed Mercer County Law Division 1179-23.  This

5      matter comes before the Court by way of a motion, by

6      the defendant's motion to dismiss.  The motion was

7      opposed and a reply was submitted and the Court had

8      oral argument January 5th.  Today's January 10th [sic]

9      and the Court is putting its decision on the record.

10     The Court will grant the motion but grant it without

11     prejudice in terms of the dismissal.

12             By way of background here, the defendant --

13     I'm sorry -- the plaintiff is seeking to collect

14     over -- just under $150,000 for medical laboratory

15     services including COVID-19 tests rendered to

16     Independence Administrators and Independence Health

17     Group.  Those are the defendants in the case.

18             Abira performed these services under various

19     circumstances including orders from physician members,

20     insurance companies, nonmember physicians or patient

21     members of insurance companies.  Abira claims to be an

22     assignee and authorized representative of the insured

23     claimants under 29 CFR 2650.503-1(b)(4) allowing its

24     final appeals and take legal action as the

25     instrumentality to secure benefits for the claimants.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 10 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 184 of 466 PageID: 203

4

1          The defendants dispute Abira's claims

2     asserting that it is pursuing an improper private right

3     of action.  Abira also challenges the defendant's

4     interpretation of the Coronavirus Aid Relief and

5     Economic Security Act, which is the CARES Act, and the

6     Families First Coronavirus Response Act, arguing that

7     it provides a constitutional avenue for recovery.

8          The defendants in their preliminary statement

9     challenge the sufficiency of Abira's amended complaint

10    asserting factual legal deficiencies.  They argue that

11    the amended complaint lacks specific details regarding

12    the services provided, patients involved, or the

13    purported assignments and requisition forms.

14         The defendants raise jurisdictional issues as

15    well asserting that the Court lacks personal

16    jurisdiction over that.

17         Just as a side note, the Court is not going

18    to address the jurisdictional issues claimed.  I

19    contend that ultimately if the case gets reinstated,

20    they would be subject to jurisdictional discovery.

21         They also claim that Abira's state law causes

22    of action are preempted by ERISA as they relate to

23    health benefit plans governed by ERISA, and the

24    defendants challenge Abira's standing as an alleged

25    assignee or authorized representative, arguing that

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 11 of 22  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 185 of 466 PageID: 204

5

1    Abira has not provided sufficient details about the

2    purported assignments.

3            The procedural background reveals that Abira

4    initiated the action in June 2023, with the defendants

5    filing a motion to dismiss in September 2023.  Abira

6    responded by filing its amended complaint in November

7    2023, and then we have the motion to dismiss the

8    amended complaint which the Court is dealing with now

9    under Rule 4:6-2(e).

10           The plaintiff invokes contract law and

11   assignment to hold the defendants liable for the

12   alleged failure to remunerate payment.  Plaintiff

13   claims turn upon two distinct touchstones.  One,

14   whether they are proper assignees of their patients'

15   rights, thereby conferring statutory standing.  And,

16   two, whether the state law claims are wholly preemptive

17   by operation of federal regulation.

18           The Court does agree with the defendant to

19   the extent that plaintiff has not properly demonstrated

20   any assignment of patient rights unto them and, thus,

21   the only plausible viable state law claims are

22   presently those not subject to the ambit of ERISA which

23   also have not been adequately pled.

24           So the Court grants defendants' motion in its

25   entirety but will do so without prejudice.

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 12 of 22  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 186 of 466 PageID: 205

6

1          As to the first issue, the assignment under

2    ERISA, plaintiff has not adequately demonstrated their

3    assignee status under 29 CFR 2650.503-1(b)(4).  To

4    plausibly plead that there has been a valid assignment

5    of benefits in ERISA, the Third Circuit has ruled that

6    a healthcare provider ordinarily must identify specific

7    patients who have assigned their claims for benefits as

8    well as a factual matter that indicates that the

9    provider is proceeding pursuant to an appropriate

10   assignment such as a copy of the assignment at issue,

11   the relevant language from the assignment or some of

12   the evidence in the scope of the assignment.  And

13   that's from the Minisohn Acupuncture Center Case, 2023

14   U.S. District Lexis 212016 at page 7.

15         A healthcare provider must plead specific

16   factual allegations that render it plausible that they

17   were properly assigned a patient's claims to establish

18   standing.  And that's from NJSR Surgical Center Case,

19   979 F. Supp. 2d at pages 522 to page 523.

20         Vague references to a purported assignment

21   will not satisfy that burden and that's from the

22   DeMaria versus Horizon Healthcare Services case, Civil

23   Number 11-7298-2012, U.S. District, Lexis 161241 at

24   page 4.  That's from the District of New Jersey on

25   November 9, 2012.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 13 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 187 of 466 PageID: 206

7

1      So, therefore, assignees must allege specific

2  factual allegations to render plausible their claim

3  that the assignments they receive from the plan

4  participants confer them with the right to receive the

5  full benefits of the plan.  And that's taken from

6  the NJSR Surgical Center case just mentioned above.

7      Despite repeatedly conclusory assertions

8  regarding the existence of valid assignments, the

9  amended complaint in this case still fails to provide

10  plausible evidence that plaintiff is demonstrably an

11  assignee, or at an absolute minimum even one patient.

12  So plaintiff is incorrect that they had no

13  responsibility to provide entity specific standing

14  allegations and full discovery.

15      Surely where an assignment is the very basis

16  of plaintiff's entitlement to sue, it may reasonably be

17  asked to at least allege its existence.  And that's

18  from one of the more -- the leading case, District of

19  New Jersey case from May 18th, 2022, entitled Open MRI.

20      So the Court declines to infer an assignment

21  conferring an assignee with the right of action and

22  dismissal without prejudice is proper under these

23  circumstances.

24      With respect to preemption, plaintiff's

25  claims are likely subject to preemption as well.  Like

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 14 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 188 of 466 PageID: 207

8

1       the case, the Genesis case cited, plaintiff alleges

2       several state law claims based on defendants' failure

3       to fully reimburse plaintiff for providing COVID-19

4       testing services to defendants' insureds' plan members

5       and beneficiaries.  Defendants argue that these claims

6       are preempted by ERISA because they are in recovering

7       ERISA governed benefits and ERISA would provide the

8       only available remedy.

9               Plaintiff responds that the state law claims

10      are not altogether preempted by ERISA perhaps because

11      they have neither a reference to nor a connection with

12      any ERISA benefit claim since defendants' obligation to

13      reimburse plaintiff is set by a separate federal law

14      known as the CARES Act.

15              The Court agrees here that with the

16      defendants in line with the Open MRI case as well as

17      the Murphy case.  This court finds that section 6001 of

18      the FFCRA and Section 3202 of the CARES Act must be

19      considered together with ERISA because they impose

20      legal requirements on ERISA plans.

21              Here, the plaintiff's opposition brief seems

22      to acknowledge the possibility that some of plaintiff's

23      reimbursement claims submitted to defendants were for

24      services governed by ERISA plans.  Plaintiff contends

25      even if some of the claims for services are governed by

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 15 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 189 of 466 PageID: 208

9

1    ERISA plans that their non-ERISA claims would still

2    survive for the most part.

3         Despite this possibility, plaintiff's

4    complaint does not distinguish between reimbursement

5    claims submitted for services governed by ERISA plans

6    and those not governed by ERISA plans.

7         So as in the Genesis case, this distinction

8    is paramount to the survival of plaintiff's state law

9    claims because to the extent that those claims relate

10   to ERISA plans, they are preempted by ERISA.  But to

11   the extent that those claims relate to non-ERISA plans,

12   they are not preempted by ERISA.  So as it is currently

13   pled, the plaintiff's state law claims fail.

14        Here, plaintiff also alleges that the

15   defendants violated the FFCRA and the CARES Act by

16   failing to reimburse plaintiff for the services it

17   provided to defendants' insured plan members and

18   beneficiaries.  Defendants contend that there is no

19   expressed or implied right of action under the FFCRA or

20   the CARES Act nor does the plaintiff properly sustain

21   as an assignee.

22        Plaintiff does not refute that there is no

23   expressed private rate of action but instead argues

24   that it is an assignee under the CFR cited earlier.

25        In accordance with the New Jersey District

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 16 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 190 of 466 PageID: 209

10

1    Court's conclusions on the same issue, the Court agrees

2    with the defendants and plaintiff's complaints are

3    flawed in that regard.

4            So even if Congress intended to create a

5    personal right of reimbursement for providers like

6    plaintiff, there is nothing in the text of the FFCRA or

7    the CARES Act suggesting that Congress intended to

8    afford a privately enforceable remedy to the plaintiff.

9            So the Court in line with the District

10   Court's dicta finds that plaintiff has no implied

11   private right of action under those statutes.  The only

12   avenue of recovery is via proper assignment and so the

13   matter will have to be dismissed without prejudice.

14           In consideration of the analysis and

15   findings, the Court does grant plaintiff's motion --

16   defendants' motion, as I said, without prejudice.  The

17   dismissal will be without prejudice.  The plaintiff has

18   failed to adequately demonstrate the assignee status

19   under ERISA, lacking tangible evidence of valid

20   assignments for patient claims.

21           So the Court cannot establish the plaintiff's

22   standing to pursue claims under ERISA or otherwise as

23   proper assignment is the mechanism and threshold upon

24   which all contractual claims are premised on.

25           Furthermore, the state law claims asserted by

1   the plaintiff are deemed preemptive by ERISA to the

2   extent that they relate to ERISA governed plans.

3   Relying on the reasoning in both MRI and Murphy, the

4   Court concludes that the FFCRA and CARES Act impose

5   legal requirements on ERISA plans subjecting state law

6   claims to ERISA preemption.

7        In other words, unless the plaintiff properly

8   evinces that their claims are not within ERISA's ambit,

9   the remaining causes of action will result in either

10  prejudice or dismissal, meaning no valid assignment or

11  removal.

12       Turning to the alternative claims, Counts 7

13  and 8 for unjust enrichment and quantum meruit, these

14  claims face similar challenges given the dismissal of

15  the primary claims on the grounds of ERISA preemption

16  and the absence of a valid assignment.  Unjust

17  enrichment and quantum meruit claims hinge on the same

18  issues of ERISA standing and preemption.

19       So the plaintiff's amended complaint will be

20  dismissed without prejudice and with respect to the

21  assignment of patient claims and ERISA preemption.  So

22  any proposed amendment would have to provide specific

23  and plausible evidence of valid assignments and

24  distinguish between claims covered by ERISA and those

25  that are not.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 18 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 192 of 466 PageID: 211

12

1          So the Court will have the order uploaded

2     dismissing the complaint without prejudice and that

3     concludes the decision.

4                    *   *   *   *   *

5               C E R T I F I C A T I O N

6

7          I, Lois McFadden, the assigned transcriber,

8     do hereby certify the foregoing transcript of

9     proceedings on index number from 3:44 to 3:57 is

10    prepared in full compliance with the current Transcript

11    Format for Judicial Proceedings and is a true and

12    accurate transcript of the proceedings as recorded.

13

14

15

16    *Lois McFadden*                    January 13, 2024

17    Lois McFadden, AOC No. 618          Date

18    Court Transcription Services

19

20

21

22

23

24

25

# EXHIBIT C



February 23, 2024

**VIA ECF**
Honorable Christine P. O'Hearn
United States District Judge
Mitchell H. Cohen Building & U.S. Courthouse, Room 1050
4th & Cooper Streets Camden, NJ 08102

**RE:**   *Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, inc., et al.*
       Civil Action No.: 1:24-cv-00493-CPO-SAK
       <u>Response To Pre-Motion Letter – Motion to Dismiss Amended Complaint and to Strike</u>

Dear Judge O'Hearn:

       Plaintiff submits this pre-motion conference letter in opposition to Defendants UnitedHealth Group, Inc. ("UHG"), UnitedHealthcare Insurance Company, and UMR's (collectively, "Defendants") pre-motion conference letter ("Letter") dated February 16, 2024. The Letter fails to set forth valid grounds warranting dismissal under Fed. R. Civ. P. 12(b)(1) or 12(b)(6) or warranting allegations to be struck under Fed. R. Civ. P. 12(f).

**I.     Motions To Strike Pleadings Are Highly Disfavored**

       "As a general matter, motions to strike under Rule 12(f) are highly disfavored." <u>Thompson v. Real Est. Mortg. Network, Inc.,</u> No. 11-1494, 2018 U.S. Dist. LEXIS 163670 at *2 (D.N.J. Sept. 24, 2018).  Motions to strike "will generally be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." <u>Garlanger v. Verbeke</u>, 223 F.Supp.2d 596, 609 (D.N.J. 2002).  "[W]here the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." <u>F.T.C. v. Hope Now Modifications</u>, No. 09-1204, 2011 U.S. Dist. LEXIS 24657, at *1 (D.N.J. Mar. 10, 2011).

       Defendants seek to strike nine paragraphs from Plaintiff's Amended Complaint on the basis that the allegations are misleading and "scandalous."  But each of the challenged paragraphs sets forth highly relevant allegations, including that Plaintiff partners with emergency physician practices to ensure they receive reasonable payment for providing lifesaving services; that Defendants routinely underpay for such services; that such underpayments negatively impact physicians' provision of emergency services, and that these physicians—and Plaintiff via assignment—have the right to pursue further payment.  Defendants' conclusory insistence to the contrary is not aided by their disparaging and irrelevant comment that Plaintiff is a "debt collector."  The allegations are valid.

**II.    The Amended Complaint Alleges Standing and Does Not Rely on Improper Group Pleading**

       Next, Defendants make what appears to be a facial challenge to Plaintiff's standing to

NEW JERSEY | 591 Mantua Boulevard, Suite 200 | Sewell, NJ 08080 | Phone 856-232-1600 | Fax 856-232-1601
PENNSYLVANIA | 226 Walnut Street | Philadelphia, PA 19106

**Doing Business Justice.®**
lauletta.com

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 21 of 22   Trans ID: LCV20241332836
Case 1:24-cv-08919-RMB-AMD   Document 1-2   Filed 08/26/24   Page 195 of 466 PageID: 214

February 23, 2024
Page 2 of 3

The, the Court must "accept [all] well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in [Plaintiff's] favor."  In re Horizon Healthcare Servs. Data Breach Litig., 846 F.3d 625, 632 (3d Cir. 2017).  Here, the Amended Complaint properly alleges that that Defendants underpaid emergency physicians for these services, and that those physicians sold those claims to Plaintiff, and in so doing assigned the right to sue to recover on any underpayments.  Nothing further is required.

Defendants rely on inapplicable case law.  See Demaria v. Horizon Healthcare Servs., Inc., No. 2:11-cv-7298, 2012 U.S. Dist. LEXIS 161241, at *2 (Nov. 9, 2012) (concerning written assignments of ERISA benefits); see also UD Tech. Corp. v. Phenomenex, Inc., No. 05-0842, 2012 U.S. Dist. LEXIS 642, at *7 (D. Del. Jan. 4, 2007) (discussing standing to sue for patent infringement).  Plaintiff does not bring any derivative cause of action for ERISA benefits, much less one for patent infringement.  Thus, in situations as here, "New Jersey's statutory and case law favoring assignments," including "common-law assignment principles," permit assignees to assert all the rights possessed by the assignor.  Inv'rs Bank v. Torres, 243 N.J. 25, 29 (2020) (holding that assignee of bank had right to collect on unpaid mortgage debt); accord Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 286 (2008) (holding that assignee "has standing to assert the injury in fact suffered by [an] assignor").

Nor has Plaintiff engaged in improper group pleading. The Amended Complaint states that a full list of all claims will be provided to Defendants upon request, subject to the entry of an appropriate Protective Order by the court to safeguard against the unnecessary disclosure of PHI.  (Amended Complaint, ¶ 33.)  Defendants have had Plaintiff's draft protective order for over a month, but still have not agreed to abide by such an order.

**III.    The HCAPPA Claim Does Not Fail as a Matter of Law**

"New Jersey's Appellate Division recently recognized that whether [HCAPPA] create[s] an implied private right of action, or whether enforcement authority rests solely with the Department of Banking and Insurance, has not yet been definitively decided."  Brainbuilders, LLC v. Aetna Life Ins. Co., No. 17-03626, 2024 U.S. Dist. LEXIS 17362, at *36 (D.N.J. Jan. 31, 2024) (citing Marc S. Menkowitz MD LLC v. Horizon Blue Cross Blue Shield of New Jersey, 2023 N.J. Super. Unpub. LEXIS 1463, at *3 (N.J. Super. Ct. App. Div. Aug. 24, 2023)).  Defendants attempt to refute this clear holding and argue that the HCAPPA does not provide a private right of action as a matter of law by citing to two federal district court cases.  However, "[a] decision of a federal district court judge is not binding precedent in either a different district, the same judicial district, or even upon the same [district] judge in a different case."  Daubert v. NRA Grp., LLC, 861 F.3d 382, 395 (3d Cir. 2017).  Plaintiff's HCAPPA cause of action may proceed.

**IV.    Plaintiff Properly Alleges a Quantum Meruit Claim**

"To recover under a theory of quantum meruit, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of services by the person whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'"  Starkey v. Estate of Nicolaysen, 172 N.J. 60, 68 (N.J. 2002).  In quantum meruit, the

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 22 of 22   Trans ID: LCV20241332836
Case 1:24-cv-05194-RMB-AMD   Document 1-2   Filed 08/16/24   Page 196 of 466 PageID: 215

February 23, 2024
Page 3 of 3

focus is on the provision of services, as opposed to unjust enrichment, which focuses on the conferring of a benefit.  Id.

Moreover, an explicit acceptance is not required in the context of emergency services. The Complaint's cause of action for quantum meruit relies upon Section 114 of the Restatement of Restitution, which states that he has "performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the other therefor if [¶] (a) he acted unofficiously and with intent to charge therefor, and [¶] (b) the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person."  (Am. Compl. ¶ 37.)  Courts across the country have allowed quantum meruit claims for emergency care based on these principles from the Restatement. See Bell v. Blue Cross of Cal., 131 Cal.App.4th 211, 221 (Cal. Ct. App. 2005) (relying on Restatement (First) Section 114); Prime Healthcare Servs. v. CIGNA Health & Life Ins. Co., 2024 U.S. Dist. LEXIS 16785, at *11–12 (D. R.I. Jan. 31, 2024) (relying upon Restatement (Third) of Restitution Section 22, the successor to Section 114); cf. Bellucci v. Dunn, No. NNH CV21-6117238 S, 2023 Conn. Super. LEXIS 2600, at *8 (Super. Ct. Oct. 30, 2023) (relying upon Section 22 as basis for related but distinct cause of action for unjust enrichment).  All the elements required by the Restatement are properly alleged here. (Am. Compl. ¶¶ 36–39).  Defendants' focus on whether they "accepted" any "benefit" therefore misses the mark.

**V.     Plaintiff Properly Alleges an Implied Contract Claim**

"An implied-in-fact contract is a true contract arising from mutual agreement and intent to promise . . . ." Matter of Penn Cent. Transp. Co., 831 F.2d 1221, 1228 (3d Cir. 1987).  "[I]mplied-in-fact contracts may have missing essential terms."  Leslie v. Quest Diagnostics, Inc., No. 17-1590, 2019 U.S. Dist. LEXIS 164190, at *14 (D.N.J. Sept. 25, 2019).  "When parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Id. (quoting Restatement (Second) of Contracts § 204 (1981)).  Here, the Amended Complaint alleges that the physicians and Defendants entered into a mutual agreement to provide and pay for emergency services against the backdrop of relevant federal and state laws, as well as Defendants' representations to its members that it would cover such services. (Amended Complaint, ¶¶ 43, 48–51.)  The only missing term is the price for the services, which Plaintiff contends is the reasonable value of the services, which may be supplied by the finder of fact.

Respectfully submitted,

/s/ Dante B. Parenti
Dante B. Parenti, Esq.
Lauletta Birnbaum, LLC

#343196v1

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel.: (215) 398-0562
E-mail: apetitt@rc.com
*Attorney for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey; Horizon Healthcare of New Jersey, Inc.*

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | SUPERIOR COURT OF NEW JERSEY |
| vs. | : | LAW DIVISION |
| | : | GLOUCESTER COUNTY |
| HORIZON HEALTHCARE SERVICES, | : | |
| INC. d/b/a HORIZON BLUE CROSS BLUE | : | DOCKET NO.  GLO-L-000242-24 |
| SHIELD OF NEW JERSEY; HORIZON | : | |
| HEALTHCARE OF NEW JERSEY, INC.; | : | |
| DOES 1-20, INCLUSIVE, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................... 2

ARGUMENT ............................................................................................................... 3

    I.      Standard of Review.......................................................................................... 3

    II.     Plaintiff Fails to Allege a Proper Assignment and, Therefore, Lacks Standing
          to Pursue NES' Claims. ............................................................................... 3

    III.    Plaintiff Fails to State a Cause of Action Against Horizon ................................ 6

          A.     Plaintiff Fails to State a Claim for Quantum Meruit (Count One) ............. 7

          B.     Plaintiff's Breach of Implied Contract (Count Two) Claim Fails as a
               Matter of Law. ...................................................................................... 10

          C.     Plaintiff's Claim for Violation of New Jersey's HCAPPA (Count Three)
               Must Be Dismissed Because Plaintiff Does Not Maintain a Private Right
               of Action .............................................................................................. 15

CONCLUSION........................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*,
No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024) ...........................................................4, 5

*Advanced Orthopedics & Sports Med. Inst. V. Anthem Blue Cross Life & Health Ins. Co.*,
No. 17-cv-8848 (MAS)(LHG), 2018 WL 6603650 (D.N.J. Dec. 14, 2018) .......................8, 9

*Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*,
410 N.J. Super. 510 (App. Div. 2009) .....................................................................................9

*AMISUB (SFH), Inc. v. Cigna Health & Life Ins. Co.*,
681 F. Supp.3d 842 (W.D. Tenn. 2023).................................................................................14

*Atl. Neurosurgical Specialists, P.A. v. MultiPlan, Inc.*,
No. 20-cv-10685 (LLS), 2023 WL 160084 (S.D.N.Y. Jan. 11, 2023) .............................11, 12

*Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group, Inc., et al.*,
Case No. GLO-L-001196-20 (Super. Ct. Aug. 24, 2022)..................................................12, 13

*BrainBuilders, LLC v. Aetna Life Ins. Co.*,
No. 17-cv-03626(GC)(DEA), 2024 WL 358152 (D.N.J. Jan. 31, 2024)...............................16

*Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*,
No. 11-cv-2775 (JBS)(JS), 2012 WL 762498 (D.N.J. Mar. 6, 2012)..................................8, 9

*Cohen v. Horizon Blue Cross Blue Shield of New Jersey*,
No. 15-cv-4525 (JMV), 2017 WL 685101 (D.N.J. Feb. 21, 2017) .......................................16

*Continental Bank of Pa. v. Barclay Riding Acad.*,
93 N.J. 153 (1983) ................................................................................................................13

*Cort v. Ash*,
422 U.S. 66 (1975)................................................................................................................17

*Coyle v. Englander's*,
199 N.J. Super. 212 (App. Div. 1985) ...................................................................................10

*Darakjian v. Hanna*,
366 N.J. Super. 238 (App. Div. 2004) .....................................................................................3

ii

*Demaria v. Horizon Healthcare Servs., Inc.*,
    No. 11-cv-7298 (WJM), 2012 WL 5472116 (D.N.J. Nov. 9, 2012)..........................5

*Emergency Physician Servs. Of New York v. UnitedHealth Grp., Inc.*,
    No. 20-cv-9183 (AJN), 2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) ................................14

*Energy Rec. v. Dept. of Env. Prot.*,
    320 N.J. Super. 59 (App. Div. 1999) ....................................................................3

*Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*,
    366 N.J. Super. 501 (App. Div. 2004) ....................................................................13

*Globe Motor Co. v. Igdalev*,
    225 N.J. 469 (2016) ....................................................................................10

*Haghighi v. Horizon Blue Cross Blue Shield of New Jersey*,
    No. 19-cv-20483 (FLW), 2020 WL 5105234 (D.N.J. Aug. 31, 2020) ..................................9

*Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, Inc., et al.*,
    No. 24-cv-00493 (ESK)(SAK) (D. N.J. Feb. 23, 2024) ...........................................6

*Hott v. MultiPlan, Inc.*,
    No. 21-cv-02421 (LLS), 2023 WL 185495 (S.D.N.Y. Jan. 13, 2023) ................................12

*J&M Interiors, Inc. v. Centerton Square Owners, LLC*,
    No. A-2536-19, 2021 WL 1976648 (N.J. Super. Ct. App. Div. May 18, 2021) ....................14

*Jalowiecki v. Leuc*,
    182 N.J. Super. 22 (App. Div. 1981) ....................................................................17

*Kavitz v. Int'l Bus. Machines, Corp.*,
    458 F. App'x 18 (2d Cir. 2012) ....................................................................11

*Lemelledo v. Beneficial Management Corp. of Am.*,
    150 N.J. 255 (1997) ....................................................................................19

*Lieberman v. Port Auth. of NY and NJ*,
    132 N.J. 76 (1993) ....................................................................................3

*M. Spiegel & Sons Oil Corp. v. Amiel*,
    No. A-3657-14T3, 2016 WL 3327126 (N.J. Super. Ct. App. Div. June 16,
    2016) ....................................................................................................13

*Medical Society of New Jersey v. AmeriHealth HMO, Inc.*,
    376 N.J. Super 48 (App. Div. 2005) ....................................................................19

*MHA, LLC v. Amerigroup Corp.*,
    539 F. Supp.3d 349 (D.N.J. 2021) ....................................................16, 17, 18

*Minisohn Chiropractic & Acupuncture Ctr., LLC v. Horizon Blue Cross Blue Shield of New Jersey*,
   No. 23-cv-01341 (GC)(TJB), 2023 WL 8253088 (D.N.J. Nov. 29, 2023) ..............................4

*Modern Orthopaedics of New Jersey v. United HealthCare Services, Inc.*,
   No. PAS-L-003127-22 (N.J. Super. Ct. July 21, 2023) ..........................................................12

*Morton v. 4 Orchard Land Trust*,
   180 N.J. 118 (2004) ................................................................................................................10

*NJSR Surgical Center, LLC v. Horizon Blue Cross Blue Shield of New Jersey*,
   979 F. Supp. 2d 513 (D.N.J. 2013) ..........................................................................................4

*Open MRI Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health & Life Ins. Co.*,
   No. 20-cv-10345 (KM)(ESK), 2022 WL 1567797 (D.N.J. May 18, 2022) ............................5

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
   116 N.J. 739 (1989) ..................................................................................................................3

*Progressive Spine & Ortho., LLC v. Empire Blue Cross Blue Shield*,
   No. 16-cv-01649 (JMV), 2017 WL 751851 (D.N.J. Feb. 27, 2017) ........................................5

*R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*,
   168 N.J. 255 (2001) ......................................................................................................15, 16, 19

*Rieder v. Dep't of Transp.*,
   221 N.J. Super. 547 (App. Div. 1987) ......................................................................................3

*Ryans v. N.J. Comm'n for the Blind & Visually Impaired*,
   542 F. Supp. 841 (D.N.J. 1982) ..............................................................................................15

*Scheidt v. DRS Technologies, Inc.*,
   424 N.J. Super. 188 (App. Div. 2012) ......................................................................................3

*Small v. Oxford Health Ins., Inc.*,
   No. 18-cv-13120 (JLL), 2019 WL 851355 (D.N.J. Feb. 21, 2019) ........................................9

*Smith v. Conseco Life Ins. Co.*,
   No. 13-cv-5253 (WHW), 2014 WL 3345592 (D.N.J. July 8, 2014) ......................................16

*Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*,
   172 N.J. 60 (N.J. 2002) .............................................................................................................7

*Temple Univ. Hosp., Inc. v. City of Philadelphia*,
   2006 WL 51206 (Pa. Com. Pl. Jan. 3, 2006) ..........................................................................14

*Township of Neptune v. State, Dept. of Envtl. Protec.*,
    425 N.J. Super. 422 (App. Div. 2012) ...................................................................10

*Troy v. Rutgers*,
    168 N.J. 354 (2001) .............................................................................................10

*VRG Corp. v. GKN Realty Corp.*,
    135 N.J. 539 (1994) ...............................................................................................8

*Wanaque Borough Sewerage Auth. V. Township of West Milford*,
    144 N.J. 564 (1996) .............................................................................................10

*Weichert Co. Realtors v. Ryan*,
    128 N.J. 427 (1992) .........................................................................................7, 11

*Woodlands Cmty. Ass'n, Inc. v. Mitchell*,
    450 N. J. Super. 310 (App. Div. 2017) .................................................................7

**Rules**

NJ Ct. R. 4:6-2 ..........................................................................................................1, 3

**Statutes**

Health Claims Authorization, Processing and Payment Act of 2006 .................................... *passim*

Insurance Trade Practices of 2022 ............................................................................19

N.J.S.A. 17:48E-10.1 ................................................................................................18

N.J.S.A. 17B:30-48, *et seq.* ...............................................................................*passim*

N.J.S.A. 26:2J-1, *et seq.* ..........................................................................................16

**Other Authorities**

1 Williston on Contracts § 1:5 (4th ed. 2007)................................................................10

## PRELIMINARY STATEMENT

Plaintiff Healthcare Justice Coalition of New Jersey Corp. ("Plaintiff") is an organization whose alleged mission is to pursue reasonable payment owed to emergency physicians.  At its core, the Complaint seeks to recover reimbursement for claims that were submitted to Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon") for emergency medical services rendered by physicians employed by NES America, Inc. and NES Georgia, Inc. (collectively, "NES"), emergency medicine practice groups, to Horizon members at Saint Michael's Medical Center ("Saint Michael's") and Trinitas Regional Medical Center ("Trinitas") hospitals.

In its Complaint, Plaintiff asserts claims of quantum meruit (Count One), breach of implied contract (Count Two) and violation of New Jersey's claims processing regulatory scheme, HCAPPA (Count Three).  However, Plaintiff, who has no relationship with Horizon, has no basis to recover reimbursement on claims that NES submitted to Horizon.  While purports to have an "assignment" from NES to pursue its claims, the Complaint fails to properly allege any assignment or rights that Plaintiff has obtained from NES that would provide standing to sue Horizon.  Moreover, even if Plaintiff could establish the proper standing to assert its claims, each of Plaintiff's claims fails to state a claim for relief against Horizon.

Accordingly, for the reasons stated below, Plaintiff's Complaint against Horizon should be dismissed pursuant to Rule 4:6-2(e).

1

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff is an organization whose alleged mission is to pursue reasonable payment owed to emergency physicians in order to support the accessibility of quality emergency care across New Jersey and to reform the problematic behavior of health care insurance carriers.  (Compl., ¶ 6).  Plaintiff was incorporated on February 23, 2024, only four days before this lawsuit was filed. (Certification of Adam J. Petitt ("Petitt Cert."), ¶¶ 2, 7 & Ex. A).

Plaintiff does not have a relationship with Horizon.  Rather, Plaintiff claims that it "engage[d]" with NES, which provides emergency medicine services at Saint Michael's Medical Center and Trinitas Regional Medical Center in New Jersey.  (*Id.* at ¶ 14).  Plaintiff purports to have an assignment from NES under which it now seeks to collect on alleged underpaid claims that NES submitted to Horizon.  (*Id.*, ¶¶ 4, 25-27, 32).  However, nowhere in the Complaint does Plaintiff actually allege the terms of the assignment which purportedly give Plaintiff standing to sue Horizon for NES' claims.  In reality, Plaintiff is admittedly a debt collector who bought the outstanding balances on NES' reimbursement claims.  Plaintiff purports to be the owner of those accounts and claims that it has been assigned all rights to sue thereupon.  (Pl. Opp. to Mot. to Change Venue, p. 3) (citing Compl. at ¶ 4)).  Accordingly, Plaintiff seeks reimbursement from Horizon for NES' out-of-network claims,  restitution and equity demand that Physicians – and by means of its valid assignment, the Coalition – be paid the reasonable value of the lifesaving care that the Physicians rendered to the members of Horizon's health plan.  (Compl. at ¶ 23).

In its Complaint, Plaintiff asserts three causes of action: (1) quantum meruit (Count One); (2) breach of implied contract (Count Two); and (3) violation of New Jersey's HCAPPA (Count Three).

---

[1] Horizon assumes the truth of Plaintiff's factual allegations for purposes of this motion to dismiss only.

## ARGUMENT

**I.     STANDARD OF REVIEW.**

Rule 4:6-2(e) permits asserting a defense of failure to state a claim upon which relief can be granted by way of motion.  In considering such a motion, a court must "accept as true the facts alleged in the complaint[,]" *Darakjian v. Hanna*, 366 N.J. Super. 238, 242 (App. Div. 2004), and "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim. . . ." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 746 (1989).  The court limits its review to the well-pled allegations of the complaint and any documents incorporated therein.  *See Lieberman v. Port Auth. of NY and NJ*, 132 N.J. 76, 79 (1993).  "The court may not consider anything other than whether the complaint states a cognizable cause of action."  *Rieder v. Dep't of Transp.*, 221 N.J. Super. 547, 552 (App. Div. 1987).

However, if the complaint states no basis for relief and discovery would not provide one, dismissal of the complaint is appropriate.  *Energy Rec. v. Dept. of Env. Prot.*, 320 N.J. Super. 59, 64 (App. Div. 1999).  For a claim to survive, a plaintiff must allege sufficient facts and may not rely only on conclusory allegations.  *Scheidt v. DRS Technologies, Inc.*, 424 N.J. Super. 188, 193 (App. Div. 2012).

**II.    PLAINTIFF FAILS TO ALLEGE A PROPER ASSIGNMENT AND, THEREFORE, LACKS STANDING TO PURSUE NES' CLAIMS.**

As an initial matter, Plaintiff's claims must be dismissed because Plaintiff has not sufficiently pled that it has standing to assert any of NES' claims against Horizon.  According to the Complaint, each of Plaintiff's claims are based on Plaintiff's alleged status as an "assignee" of NES' claims against Horizon for reimbursement of medical services.  (Compl., ¶¶ 4-5, 25).  However, Plaintiff has not attached or included the substance of any such "assignment" from NES

3

to permit Horizon to identify the claims and/or challenge the legal sufficiency of the purported assignments. This failure warrants dismissal of the Complaint. *NJSR Surgical Center, LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 979 F. Supp. 2d 513, 522-23 (D.N.J. 2013) (dismissing plaintiff's complaint because plaintiff's "conclusory allegation" of the existence of an assignment of benefits "fell short of what is required to withstand a motion to dismiss").

Specifically, in a recent decision from the Superior Court, Mercer County, *Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*, No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024),[2] Judge Hurd found that an out-of-network provider's failure to properly demonstrate an assignment of patient rights was detrimental to its causes of action. *See Abira* at p. 5. The court found that in order to plausibly plead a valid assignment of benefits a plaintiff must: (1) identify specific patients who have assigned their claims for benefits; (2) assert facts that indicate that the provider is proceeding pursuant to an appropriate assignment; and (3) attach the relevant language from the assignment or some of the evidence in the scope of the assignment. *Id.* at p. 6 (citing *Minisohn Chiropractic & Acupuncture Ctr., LLC v. Horizon Blue Cross Blue Shield of New Jersey*, No. 23-cv-01341 (GC)(TJB), 2023 WL 8253088, at *3 (D.N.J. Nov. 29, 2023)).[3] Furthermore, the court reasoned that "vague references to a purported assignment will not satisfy that burden." *Id.* (citing *NJSR Surgical Center, LLC*, 979 F. Supp.2d at 523). In examining the plaintiff's allegations in its complaint, Judge Hurd found that the plaintiff's "repeatedly conclusory assertions . . . fails to provide plausible evidence that plaintiff is demonstrably an assignee, or at an absolute minimum even one patient" and thus declines to infer

---

[2] A true and correct copy of the unpublished transcript of the Court's decision is attached to the Petitt Cert. as Exhibit B.
[3] True and correct copies of all unpublished decisions cited are attached hereto as Exhibit 1 in the order in which they appear.

assignment." *Id.* at p. 7; *see also Open MRI Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health & Life Ins. Co.*, No. 20-cv-10345 (KM)(ESK), 2022 WL 1567797, at *2 (D.N.J. May 18, 2022) (finding where an assignment is the very basis of plaintiff's entitlement to sue, it may reasonably be asked to at least allege its existence).

Here, not only has Plaintiff failed to demonstrate any assignment of patient rights unto NES, but plaintiff has also failed to demonstrate any assignment of rights from NES to Plaintiff. The Complaint is devoid of factual allegations that demonstrate Plaintiff has a valid assignment such that it has standing to pursue NES' claims to recover reimbursement for claims submitted to Horizon. Rather, Plaintiff attempts in conclusory fashion to assert the existence of a valid assignment without identifying any facts or details indicating Plaintiff is proceeding under a valid assignment. *See Demaria v. Horizon Healthcare Servs., Inc.*, No. 11-cv-7298 (WJM), 2012 WL 5472116, at *4 (D.N.J. Nov. 9, 2012) ("vague references to a common practice and purported assignment will not satisfy this burden."). Indeed, Plaintiff does not even include or attach the relevant language or a copy of the alleged assignment. Plaintiff does nothing more than assert vague references to the assignment, which cannot satisfy Plaintiff's pleading standard. Like *Abira,* this Court should also decline to infer an assignment without any supporting facts, and should dismiss Plaintiff's Complaint. *Abira*, at 7; *Progressive Spine & Ortho., LLC v. Empire Blue Cross Blue Shield*, No. 16-cv-01649 (JMV), 2017 WL 751851, at *5 (D.N.J. Feb. 27, 2017) (to allege a valid assignment, plaintiff must either "include in [its] complaint the particular language of the assignment itself or 'include the assignment of benefit document itself'"; a "conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing.").

In essence, Plaintiff is admittedly operating as a debt collector, which on its own is insufficient to confer standing to pursue accounts and rights of NES as an assignee.  In its Opposition to Horizon's Motion to Change Venue, Plaintiff admitted that NES "sold the outstanding balances on the reimbursement claims to Plaintiff, who now is the owner of those accounts and has been assigned all rights to sue thereupon."  (Pl. Opp. to Mot. to Change Venue, p. 3) (citing Compl. at ¶ 4)).  During oral argument on Defendants' Motion to Change Venue, Plaintiff's counsel further confirmed that Plaintiff collects on the outstanding debt and splits the proceeds it recovers with NES.  Moreover, in another similar lawsuit, the plaintiff, Healthcare Justice Coalition NJ, LLC, likewise acknowledged that "[the insurer-defendants] underpaid emergency physicians for these services, and that those physicians sold those claims to Plaintiff, and in so doing assigned the right to sue to recover on any underpayments." *Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, Inc., et al.*, No. 24-cv-00493 (ESK)(SAK), ECF No. 12 (D. N.J. Feb. 23, 2024) (emphasis added).[4]  Thus, it is imperative that Plaintiff establishes the bill of sale and assignment from NES, which purportedly gives Plaintiff the right to try to collect on NES' receivables from Horizon.

Accordingly, the Complaint should be dismissed for lack of standing.

## III. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION AGAINST HORIZON.

Even if Plaintiff could show that it has proper standing to assert NES' claims against Horizon, Plaintiff's Complaint fails to state a cause of action against Horizon.  Through the Complaint, Plaintiff seeks to recovery payment for claims for emergency medical services performed by NES' Physicians, to patients enrolled in health benefit plans issued or administered

---

[4] A true and correct copy of Healthcare Justice Coalition NJ, LLC's Response to Pre-Motion Letter in *Healthcare Justice Coalition NJ, LLC v. UnitedHealth Group, Inc., et al.*, No. 24-cv-00493 (ESK)(SAK), ECF No. 12 (D. N.J. Feb. 23, 2024), is attached to the Petitt Cert. as Exhibit C.

by Horizon.  (Compl., ¶¶ 13-32).  However, for the reasons discussed below, the Complaint fails to allege any claim against Horizon upon which relief can be granted.

Additionally, Plaintiff has not identified the claims at issue which it claims contains "65,000 benefit claims."  (Compl., ¶ 26).  Undoubtedly, the claims at issue will be governed by employer-based plans that are governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et. Seq.* ("ERISA"), other self-insured programs such as New Jersey's State Health Benefits Program and the Federal Employee Program, and plans administered by other Blue Cross Blue Shield entities for which Horizon is not responsible.  Accordingly, Horizon reserves all rights to assert additional grounds for dismissal, once the claims are produced and Horizon has the opportunity to review and determine the governing health plans at issue.

**A.**     **Plaintiff Fails to State a Claim for Quantum Meruit (Count One).**

Quantum meruit requires "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services."  *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 172 N.J. 60, 68 (N.J. 2002).  Recovery under this theory "requires a determination that defendant has benefitted from plaintiff's performance."  *Woodlands Cmty. Ass'n, Inc. v. Mitchell*, 450 N. J. Super. 310, 317, (App. Div. 2017).  Further, quantum meruit is applicable only "when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust."  *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437 (1992).

Here, Plaintiff alleges that "[the Horizon defendants] were obligated to provide emergency care to their Members."  (Compl., ¶ 38).  Plaintiff alleges that "when [Horizon's] members presented to the emergency room, Physicians fulfilled that obligation on [Horizon's] behalf," which "triggered [Horizon's] duty to pay the reasonable value for those services."  (*Id.*).  Plaintiff alleges that Horizon and its Members benefitted from the services Physicians performed under

EMTALA and New Jersey law, contending that "[Horizon] used and enjoyed the benefit of Physicians' services because Physicians helped [Horizon] discharge their legal and contractual obligation to their insureds to provide them with emergency care." (*Id.*, ¶ 39). Plaintiff claims that "the reasonable value of the emergency medical services Physicians rendered to [Horizon's] Members is reflected by the amount Physicians charged for such services." (*Id.*, ¶ 43). Horizon purportedly "either paid for the claims at issue for the services provided at rates substantially lower than the reasonable value of the services provided or failed to pay any amount of the claims at issue." (*Id.*, ¶ 44). As such, Plaintiff contends that "[the Horizon defendants] are liable in restitution to Plaintiff for the difference between the amount [Horizon] paid and the reasonable value of the emergency services provided on the claims at issue." (*Id.*, ¶ 45).

However, Plaintiff fails to "show both that [Horizon] received a benefit and that retention of that benefit without payment would be unjust." *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-cv-2775 (JBS)(JS), 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)). Indeed, the Complaint is devoid of factual allegations demonstrating that Horizon received a benefit. *See Advanced Orthopedics & Sports Med. Inst. V. Anthem Blue Cross Life & Health Ins. Co.*, No. 17-cv-8848 (MAS)(LHG), 2018 WL 6603650, at *4 (D.N.J. Dec. 14, 2018) ("Plaintiff must also establish that the benefit conferred by Plaintiff was conferred upon Defendants."). Rather, NES' Physicians provided emergency medical services that form the basis of Plaintiff's quantum meruit claim to their patients, not to Horizon.

A plaintiff bringing a claim for quantum meruit must have rendered the services at issue to the defendant. *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-cv-2775(JBS/JS), 2012 WL 762498, at *8 (D.N.J. March 6, 2012) ("to state a claim for quantum meruit and unjust

enrichment, the benefit at issue must have been conferred on United, as the Defendants."); *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 544 (App. Div. 2009) (requiring a conferral f a benefit on the defendants); *Advanced Orthopedics & Sports Med. Inst. V. Anthem Blue Cross Life & Health Ins. Co.*, No. 17-8848 (MAS) (LHG), 2018 WL 6603650, at *4 (D.N.J. Dec. 14, 2018) ("Here, Plaintiff's quantum meruit claim is subject to dismissal because the benefit at issue was conferred upon M.S., not Defendants."). Here, there are no allegations that the Plaintiff, or NES' Physicians, rendered any services directly to Horizon or to patients at Horizon's request. Rather, Plaintiff alleges that NES' Physicians rendered emergency medical services to their patients, who happened to be enrolled in health plans issued or administered by Horizon. (Compl., ¶ 10). Plaintiff claims that when NES' Physicians provided medical services to the patients, it purportedly triggered Horizon's duty to pay the reasonable value for the services. (*Id.*, ¶ 38). However, any service rendered was provided to the patients and any benefit conferred was conferred on those patients. Horizon, as the administrator for the patients' health benefit plans, "derive[d] no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured – which hardly can be called a benefit." *Broad St. Surgical Ctr. LLC*, 2012 WL 762498, at *8 (internal quotations omitted); *see also Alpert, Goldberg, Butler, Norton & Weiss, P.C.*, *supra*. Indeed, New Jersey courts have dismissed medical providers' quantum meruit claims against insurers for medical services rendered to insureds. *See Advanced Orthopedics & Sports Med. Inst.*, *supra*; *Haghighi v. Horizon Blue Cross Blue Shield of New Jersey*, No. 19-cv-20483 (FLW), 2020 WL 5105234, at *5 (D.N.J. Aug. 31, 2020) (dismissing the quantum meruit claim and following "numerous courts within this district [which] have found, the insured individual, rather than the insurer, derives the benefit from a healthcare providers' provision of medical services."); *Small v. Oxford Health Ins., Inc.*, No. 18-cv-13120 (JLL), 2019

WL 851355, at *6 (D.N.J. Feb. 21, 2019) (agreeing with the Defendant that "an insurance company does not derive a benefit from services provided for an insured for purposes of a quantum meruit claim" and, therefore, concluding that "Plaintiff cannot establish a *prima facie* claim for *quantum meruit*").

Accordingly, Plaintiff's quantum meruit claim must be dismissed as a matter of law.

**B.     Plaintiff's Breach of Implied Contract (Count Two) Claim Fails as a Matter of Law.**

Under New Jersey law, "contracts implied in fact are no different than express contracts." *Troy v. Rutgers*, 168 N.J. 354, 365 (2001) (quoting *Wanaque Borough Sewerage Auth. V. Township of West Milford*, 144 N.J. 564, 574 (1996)).   An implied contract "consists of an obligation arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words[.]" *Township of Neptune v. State, Dept. of Envtl. Protec.*, 425 N.J. Super. 422, 437 (App. Div. 2012) (internal quotations omitted); *see also* 1 Williston on Contracts § 1:5 (4th ed. 2007).   Accordingly, in order to establish a claim for breach of contract, a plaintiff has the burden to plead and prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff did what the contract required [it] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."  *See Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016); *see also Coyle v. Englander's*, 199 N.J. Super. 212, 223 (App. Div. 1985) (identifying essential elements for breach of contract claim as "a valid contract, defective performance by the defendant, and resulting damages").

It is well-established that a contract is formed when there is a "meeting of the minds" between the parties evidenced by an offer and an unconditional acceptance. *Morton v. 4 Orchard*

*Land Trust,* 180 N.J. 118, 129-30 (2004) (citing *Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 538-39 (1953)). In addition, a contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (quoting *Borough of W. Caldwell v. Borough of Caldwell*, 26 N.J. 9, 24-25 (1958)).   To be enforceable, parties to a contract must "agree on essential terms and manifest an intention to be bound by those terms." *See id.*

Here, Plaintiff alleges that "[Horizon] indicated, by a course of conduct, and in the context of the circumstances surrounding the relationship with the Physicians, that Defendant would pay for the emergency and medical services provided." (Compl., ¶ 47).  Plaintiff further alleges that "[Horizon] routinely represent that their Members are able to go to any hospital emergency room when they need covered care, and even when they do so, those Members will be personally liable only for cost-sharing features of the plan . . . at an in-network level." (*Id.*, ¶ 48).  Moreover, Plaintiff contents that "[Horizon] indicated, by their course of conduct and dealing, that they would hold their Members harmless," and that in order to do so, "[Horizon] necessarily had to pay the reasonable value for the emergency services rendered by the Physicians." (*Id.*, ¶ 51).

However, "[r]egardless of any previous course of dealing and any actions taken in reliance," Plaintiff's implied-in-fact contract count fails without including an allegation of fact to support the existence of "a clear and unambiguous promise." *Kavitz v. Int'l Bus. Machines, Corp.*, 458 F. App'x 18, 20 (2d Cir. 2012) (quoting *U.S. West Fin. Servs., Inc. v. Tollman*, 786 F.Supp. 333, 344 (S.D.N.Y.1992)) (finding that the implied-in-fact contract failed as a matter of law).  That is, "the relevant inquiry into whether an implied-in-fact contract exists is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay." *Atl. Neurosurgical Specialists, P.A. v. MultiPlan, Inc.*, No. 20-cv-10685 (LLS), 2023 WL

160084, at *4 (S.D.N.Y. Jan. 11, 2023) (citations omitted) (applying New Jersey state law).  This is not about where a Horizon member can go to an emergency room, rather this is about how much the doctors in the emergency room will be paid.  A defendant's "course of dealing" and "payment history on other claims does not provide any evidence of [its] intent to agree to pay the contract rates for the procedures under dispute here. . . . A history of paying the rate on some claims does not amount to giving binding assent to always pay the Contract rate." *Id.* at *5 (finding breach-of-implied contract claim fails as a matter of law); *see also Hott v. MultiPlan, Inc.*, No. 21-cv-02421 (LLS), 2023 WL 185495, at *4 (S.D.N.Y. Jan. 13, 2023) (same).

Plaintiff's Complaint alleges no facts to establish the creation of the purported implied-in-fact contract.  Rather, the Complaint entirely fails to allege a clear and unambiguous promise from Horizon to Plaintiff sufficient to state a cause of action for breach of contract.  *See Modern Orthopaedics of New Jersey v. United HealthCare Services, Inc.*, No. PAS-L-003127-22, at *4 (N.J. Super. Ct. July 21, 2023) (allegations that the defendant "never disclosed that it did not intend to pay the usual and customary value" for services even though "[d]efendant was "'aware that [the plaintiff] was an out-of-network provider'" were insufficient to withstand a motion to dismiss).  In *Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group, Inc., et al.*, this Court dismissed a breach of implied-in-fact contract claim where "the parties were not in agreement as [to the] benefit amount the defendants would pay for plaintiffs' services."  *Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group, Inc., et al.*, Case No. GLO-L-001196-20 (Super. Ct. Aug. 24, 2022).  Specifically, the Court noted that "Plaintiffs want the amount billed, as they contend it is a reasonable amount as to the value of their services," but "Defendants . . . paid a different amount- an amount they say is appropriate accordingly to the Data iSight methodology."  *Id.* at 7.  Thus, the Court concluded that the essential term, price "is in

no way an agreed upon term in this implied contract," and therefore dismissed the implied-in-fact claim for failing to state a cause of action.  *Id.*

Here, there is no mutual agreement between the parties as to the benefit amount that Horizon should purportedly have paid when the Physicians rendered emergency medical services to the Members, which is a material term for any such agreement.  Plaintiff asserts that "Defendants had to pay the reasonable value for the emergency services rendered by the Physicians."  (Compl., ¶¶ 23, 51).  Plaintiff further alleges that the "reasonable value may be up to the full billed charges for those services."  (*Id.*, ¶ 24).  Plaintiff is bringing this lawsuit to recover "the full billed charges, or in the alternative, the reasonable value for the Physician services at issue."  (*Id.*, ¶ 25).  However, Plaintiff entirely fails to allege that the parties agreed to a specific price term, which is required to establish the existence of a contract.  Indeed, the allegations fail to demonstrate that there was mutual agreement between the parties concerning the rates that the Physicians would be paid.

Moreover, Plaintiff fails to allege that Horizon received consideration or enjoyed a bargained-for benefit in exchange for agreeing to pay the full amount of the Physician's billed charges.  It is well-settled that contracts are not enforceable in the absence of consideration, i.e., "both sides must 'get something' out of the exchange."  *Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*, 366 N.J. Super. 501, 508 (App. Div. 2004); *M. Spiegel & Sons Oil Corp. v. Amiel*, No. A-3657-14T3, 2016 WL 3327126, at *2 (N.J. Super. Ct. App. Div. June 16, 2016) (citation and internal quotation marks omitted) ("As a basic premise, it is true that no contract is enforceable . . . without the flow of consideration—both sides must get something out of the exchange."); *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 N.J. 153, 170 (1983).  As a matter of law, the consideration cannot be the Physicians' provision of emergency medical services to members of Horizon's health plans.  First, those medical services were not received by

Horizon. *See Emergency Physician Servs. Of New York v. UnitedHealth Grp., Inc.*, No. 20-cv-9183 (AJN), 2021 WL 4437166, at *11 (S.D.N.Y. Sept. 28, 2021) ("Plaintiffs do not plead consideration because Plaintiffs provide healthcare services to patients not in exchange for United's payments but instead out of 'a pre-existing legal obligation,' which 'does not amount to consideration.'") (citation omitted).

Second, as Plaintiff alleges, the Physicians were already obligated under federal and New Jersey State law to render these emergency medical services to the patients without regard to the terms of payment. (Compl., ¶¶ 21-22). *See J&M Interiors, Inc. v. Centerton Square Owners, LLC*, No. A-2536-19, 2021 WL 1976648, at *6 (N.J. Super. Ct. App. Div. May 18, 2021) ("a subsequent promise to fulfil an obligation already required in a contract cannot be considered new or additional consideration"); *Temple Univ. Hosp., Inc. v. City of Philadelphia*, 2006 WL 51206, at *3 (Pa. Com. Pl. Jan. 3, 2006) (dismissing claim for breach of implied in fact contract where "there was no exchange of consideration because . . . [the hospital] was legally bound to provide emergency care services" under EMTALA); *see also Emergency Physician Servs. Of New York*, 2021 WL 4437166, at *12 (finding that the complaint "does not plead a necessary meeting of the minds as to the price of services").

In the Complaint, Plaintiff attempts to create an implied-in-fact contract resting on Horizon's alleged legal obligations under federal and state statutes. (Compl., ¶ 50). However, the Complaint contains no facts indicating that "the parties behaved in a way that created an implicit agreement" to reimburse disputed out-of-network claims. *AMISUB (SFH), Inc. v. Cigna Health & Life Ins. Co.*, 681 F. Supp.3d 842, 853 (W.D. Tenn. 2023). Furthermore, other than general statements of the parties' purported course of dealing, the Complaint utterly fails to allege any specific instances where this conduct occurred between the parties. The law requires that Plaintiff

allege facts, which if proven, would support a breach of implied-in-fact contract cause of action. Because the Complaint fails to allege such facts, and instead relies on bald conclusions, it fails as a matter of law and should be dismissed.

Accordingly, Plaintiff's breach of contract claim against Horizon must be dismissed.

### C.   Plaintiff's Claim for Violation of New Jersey's HCAPPA (Count Three) Must Be Dismissed Because Plaintiff Does Not Maintain a Private Right of Action.

Plaintiff's Count Three seeks to enforce prompt pay provisions under the Health Claims Authorization, Processing and Payment Act ("HCAPPA"), P.L. 2005, c. 352 (N.J.S.A. 17B:30-48 *et seq.*), which establishes timetables for health insurers to pay healthcare providers for submitted claims.  However, HCAPPA, under which the applicable prompt pay provisions exist, does not provide a private right of action for Plaintiff to pursue its claims against Horizon.

Plaintiff contends that Horizon violated the prompt pay provisions under HCAPPA because, among other things, Horizon "failed to remit full reimbursement of the Physicians' charges for healthcare services or provide a written explanation for the failure to pay all or a portion of such claims within the statutorily proscribed time frames under HCAPPA or the OON Act." (Compl., ¶ 62).  Plaintiff claims that it is therefore entitled to recover the full underpaid and unpaid amounts on all of Physicians' out-of-network emergency claims for services, plus statutory interest, from Horizon.  (*Id.*, ¶ 65).

In order to pursue such a claim, Plaintiff must first show that it has a private right of action under HCAPPA.  *See R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 272 (2001).  Whether such a right exists is a matter of statutory construction: the statute at issue must display the Legislature's intent to create not just a private right but also a private remedy, and when a statute is silent as to whether it creates a private right of action New Jersey courts are "reluctant" to the infer the existence of such a right.  *Id.* at 270; *see also Ryans v. N.J. Comm'n for the Blind*

*& Visually Impaired*, 542 F. Supp. 841, 848 (D.N.J. 1982) ("A court will not presume to find a private right of action in a statute silent as to remedy unless there is some evidence to indicate that the legislature impliedly intended to create one.").  Indeed, courts are "particularly 'unlikely' to find a private right of action in an area, like insurance, where a comprehensive legislative scheme provides for enforcement by regulators." *Smith v. Conseco Life Ins. Co.*, No. 13-cv-5253 (WHW), 2014 WL 3345592, at *3 (D.N.J. July 8, 2014) (quoting *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 271 (2001)) (further reasoning that "[i]n the context of insurance statutes, our courts have . . . concluded that where there is no discernable legislative intent to authorize a private cause of action in a statutory scheme that already contains civil penalty provisions, the courts will not infer a private cause of action."); *see also Cohen v. Horizon Blue Cross Blue Shield of New Jersey*, No. 15-cv-4525 (JMV), 2017 WL 685101, at *6 n.6 (D.N.J. Feb. 21, 2017) ("Plaintiff has not proven that [N.J.S.A. 26:2J-1 et seq.] permits a private cause of action").

Here, HCAPPA does not expressly authorize a private right of action or a private remedy for providers like Plaintiff.  Likewise, HCAPPA does not imply a private right of action.  *See MHA, LLC v. Amerigroup Corp.*, 539 F. Supp.3d 349, 359 (D.N.J. 2021) (finding no implied private right of action under the HCAPPA); *BrainBuilders, LLC v. Aetna Life Ins. Co.*, No. 17-03626(GC)(DEA), 2024 WL 358152, at *13 (D.N.J. Jan. 31, 2024).  To imply a private right of action under HCAPPA, the Court must consider: (1) whether plaintiffs are members of the class for whose special benefit the statute was enacted; (2) whether there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) whether it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy.  *See R.J. Gaydos*, 168 N.J. at 272 (adopting the applicable three-part, test established by

16

the United States Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975)).  Although varying weight is given to each one of these factors, "the primary goal has almost invariably been a search for the underlying legislative intent." *Jalowiecki v. Leuc*, 182 N.J. Super. 22, 30 (App. Div. 1981). This test is applied against a general reluctance by courts to imply a private right of action.  *R.J. Gayados, supra*.

In *MHA, LLC*, like this Court, the district court for the district of New Jersey was tasked with evaluating the statutory framework under the New Jersey Healthcare Information Networks and Technologies ("HINT") Act and its subsequent amendments under HCAPPA to determine whether a healthcare provider had a private right of action to enforce New Jersey's prompt pay laws.  539 F. Supp.3d at 357-59.  In holding that the provider did not possess a private right of action to enforce the HINT Act's prompt payment provisions, the district court reasoned that HCAPPA is dispositive in the private right of action analysis.  *Id.* at 358.

In 1999, the New Jersey Legislature enacted the larger statutory framework, known as the HINT Act, to regulate the electronic submission of claims by health care providers and their prompt payment. L. 1999, c. 154.  The HINT Act established timetables for health insurers to pay healthcare providers and imposed interest rates for late payments—which Plaintiffs now seek to enforce through this lawsuit.  *Id.*  In 2006, the Legislature declared that confusion still existed between providers, consumers and payers with respect to time frames for communications by carriers to deny, reduce or terminate benefits under applicable health benefits plans based upon utilization management decisions.  L. 2005, c. 352, § 2, codified at N.J.S.A. 17B:30-49.  As such, to protect consumers, the Legislature enacted HCAPPA to amend the HINT Act and establish uniform procedures and guidelines for providers and payers to follow in communicating utilization management decisions and determinations.  *Id.*  HCAPPA amended the HINT Act's prompt pay

provisions to provide that (1) insurers must establish an internal appeals process to resolve disputes with providers, (2) if an appeal is resolved in favor of the provider, the insurer must pay the provider with interest, (3) if an appeal is resolved in favor of the insurer, the provider may seek arbitration, (4) the arbitrator can order the insurer to make payment with interest, and (5) the arbitrator's decision is binding and final.  HCAPPA § 12, codified at N.J.S.A. 17:48E-10.1(e)(1). As such, the district court reasoned that the Legislature's creation of a detailed and specific arbitration mechanism clarified its intention that a provider's dispute with an insurer be resolved by arbitration, not litigation, and established that a private right of action is unnecessary to accomplish the statute's purposes.  *MHA, LLC*, 539 F. Supp.3d at 358-59 (noting that when interpreting a statute, the overriding goal must be to determine and effectuate the Legislature's intent, and that the court's analysis begins with an examination of the plain language of the statute, which provides the most reliable indicium of statutory intent).

Also, HCAPPA, by its terms, expressly charged the Commissioner of the Department of Banking and Insurance with administering and enforcing the regulatory framework governing the HINT Act's prompt pay provisions.  *See* HCAPPA § 17, codified at N.J.S.A. 17B:30-55(a), (c) ("a. The Commissioner of Banking and Insurance shall enforce the provisions of sections 2 through 7 of [HCAPPA] (C. 17B:30-49 through C. 17B:30-54) and sections 2, 3, 4, 5, 6 7 and 10 of [the HINT Act] (C. 17:48-8.4, 17:48A-7.12, 17:48E-10.1, 17B:27-44.2, 26:2J-8.1 and 17:48F-13.1) as amended by [HCAPPA] (C. 17B-30-48 et al.)) (emphasis added). Among other things, the Commissioner may assess fines and other civil penalties against payers that violate HCAPPA, including its prompt payment provisions. *Id.* Such penalties are at the discretion of the Commissioner and the Commissioner's determination constitutes a final agency decision that is subject to review only by the Appellate Division of the Superior Court.  *Id.*

There is no basis in the purpose, wording, or legislative history of the HINT Act or HCAPPA that permit a provider, like Plaintiff, to file a private lawsuit to enforce the statute's prompt pay provisions.  As noted above, New Jersey courts generally do not infer a private right of action "where the statutory scheme contains civil penalty provisions."  *R.J. Gaydos*, 168 N.J. at 274.  This is specifically the case with insurance statutes.  *Id.* at 275; *see also Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 272 (1997) (recognizing that the Department of Banking and Insurance has the authority to regulate the insurance industry in order to prevent fraud and that the Insurance Trade Practices Act, N.J.S.A. 17B:30-2 to -14, and other insurance statutes do not permit a private cause of action).  Neither the HINT Act nor HCAPPA specifically authorizes Plaintiff to file enforcement actions.  *See Medical Society of New Jersey v. AmeriHealth HMO, Inc.*, 376 N.J. Super 48, 59 (App. Div. 2005) (the HINT Act "does not specifically authorize private parties to file enforcement actions" and is, instead, to be "enforced by the Commissioner of Banking and Insurance.").  The statutes, by their terms, are to be administered and enforced by the Commissioner who may adopt rules and regulations to further the statutes' purposes.  N.J.S.A. 17B:30-55(a)-(c); 17B:30-56.  The Commissioner may take enforcement action against payers that violate HCAPPA and may impose a $10,000 penalty for each day the payer is in violation.  *Id.*  There is no indication that the HINT Act or HCAPPA permits any private right of action.

Accordingly, Plaintiff's claim to enforce the prompt pay provisions under the HCAPPA must be dismissed.

## **CONCLUSION**

For the reasons set forth above, the Court should grant Defendants' motion and dismiss the Complaint in its entirety, with prejudice.

Dated: May 24, 2024

Respectfully submitted,

**ROBINSON & COLE LLP**

*/s/ Adam J. Petitt*
ROBINSON & COLE LLP
1650 Market Street, Suite 3030
Philadelphia, PA 19103
(215) 398-0562
APetitt@rc.com

*Attorneys for Defendants*

# EXHIBIT 1

2023 WL 8253088
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

MINISOHN CHIROPRACTIC &
ACUPUNCTURE CENTER, LLC, and Estate
of Eric Minisohn, DC, LAC, Plaintiffs,
v.
HORIZON BLUE CROSS BLUE SHIELD OF
NEW JERSEY and ABC Entities I-X, Defendants.

Civil Action No. 23-01341 (GC) (TJB)
|
Signed November 29, 2023

**Attorneys and Law Firms**

Jeffrey B. Randolph, Glen Rock, NJ, for Plaintiffs.

Andrea Mai Smith, Robert J. Norcia, Stradley Ronon Stevens
& Young, LLP, Philadelphia, PA, for Defendant Horizon Blue
Cross Blue Shield of New Jersey.

**OPINION**

CASTNER, United States District Judge

**\*1** **THIS MATTER** comes before the Court upon
Defendant Horizon Blue Cross Blue Shield of New Jersey's
Motion to Dismiss the Complaint pursuant to Federal Rule
of Civil Procedure ("Rule") 12(b)(6). (ECF No. 4.) Plaintiffs
Minisohn Chiropractic and Acupuncture Center, LLC, and
the estate of Eric Minisohn opposed, and Defendant replied.
(ECF Nos. 6 & 8.) The Court has carefully considered the
parties' submissions and decides the matter without oral
argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).
For the reasons set forth below, and other good cause shown,
Defendant's motion is **GRANTED**. Plaintiffs shall have thirty
(30) days to file an amended complaint to the extent they can
remedy the pleading defects identified herein.

**I. BACKGROUND**

This is a dispute over denied claims for health benefits
stemming from chiropractic and acupuncture services
performed by the late Eric Minisohn.

**A. FACTUAL BACKGROUND** [1]

Dr. Minisohn was a licensed chiropractic physician as well
as a licensed acupuncturist in the State of New Jersey.
(ECF No. 1-1 at 3 ¶ 4. [2]) He formed Minisohn Chiropractic
and Acupuncture Center, LLC, to perform chiropractic
and acupuncture services within the scope of practice of
each license. (*Id.* ¶ 5.) Shortly after forming Minisohn
Chiropractic, Dr. Minisohn attempted to inform Horizon Blue
Cross Blue Shield of New Jersey of his dual licensure status
so that he could be reimbursed for the services he performed
on patients. (*Id.* at 3-4 ¶ 6.) Despite Dr. Minisohn's numerous
phone calls, emails, and the submissions of W-9s, Horizon
did not recognize Dr. Minisohn's dual licensure status and
did not set up Minisohn Chiropractic as a multidisciplinary
practice in its claims system. (*Id.* at 4 ¶¶ 7-9.) Horizon then
denied "clean claims for multiple years ... with no basis for"
the denials. (*Id.* ¶ 10.)

On or about August 24, 2020, Dr. Minisohn, through counsel,
sent Horizon's legal department a certified letter expressing
his concerns regarding his inability to establish his company
in Horizon's claims payment system and the impact it was
having on "his practice's financial status." (*Id.* at 4 ¶ 11, *id.*
at 9-10.) Four months later, on or about December 30, 2020,
Dr. Minisohn sent a follow-up letter reiterating his concerns
and noting that he had begun to receive payments, under the
wrong "tax id.," for acupuncture services. (*Id.* at 5 ¶ 12; *id.* at
12-13.) Rather than address Dr. Minisohn's concerns, Horizon
sent a notice of recoupment that "attempt[ed] to claw back
the few claims it did pay." (*Id.* at 5 ¶ 13.) Dr. Minisohn filed
a notice of appeal, challenging Horizon's attempt to recoup
funds. (*Id.* at 14-16.)

On March 21, 2022, Dr. Minisohn passed away from an
aggressive brain tumor. (*Id.* at 5 ¶ 15.) Dr. Minisohn's mother,
Pearl Minisohn, is the executrix of his estate and acting
managing member of Minisohn Chiropractic. (*Id.* ¶¶ 15-16.)
Horizon is alleged to owe over $250,000.00 plus interest in
claims rightfully due for services Dr. Minisohn rendered to
patients between May 1, 2019, and March 2022. (*Id.* ¶ 14.)

**B. PROCEDURAL BACKGROUND**

**\*2** On February 8, 2023, Minisohn Chiropractic and Dr.
Minisohn's estate, through its executrix, filed suit in the
Superior Court of New Jersey, Law Division, Monmouth
County. (ECF No. 1-1.) They allege that Dr. Minisohn's
patients are subscribers to health benefits plans issued and/

or administered by Horizon and that Minisohn Chiropractic "entered written assignment of benefits agreement[s] with the ... [Horizon] subscribers of their contractual rights under the policy of group health insurance ... and is, thus, ... empowered to bring a civil action against [Horizon] as a 'participant or beneficiary.' " (*Id.* at 2-3 ¶¶ 1-2.) Plaintiffs assert two counts. Count One is for unpaid claims under 29 U.S.C. § 1132(a)(1)(B) and for breach of fiduciary duties under 29 U.S.C. § 1132(a)(3) of the Employee Retirement Income Security Act ("ERISA"). (*Id.* at 5-6 ¶¶ 17-21.) Count Two is for common law breach of contract. (*Id.* at 7 ¶¶ 1-4.)

On March 10, 2023, Horizon removed the action from state court based on federal question jurisdiction. (ECF No. 1.) On April 17, 2023, Horizon then moved to dismiss the Complaint pursuant to Rule 12(b)(6). (ECF No. 4.) Plaintiffs opposed on May 1, and Horizon replied on May 8. (ECF Nos. 6 & 8.)

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.' " *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III. DISCUSSION

### A. STANDING

Horizon argues that Plaintiffs lack statutory standing to pursue their claims under ERISA because the Complaint "is devoid of any factual support" for Plaintiffs' contention that they have been assigned patients' claims for benefits under ERISA. (ECF No. 4-1 at 10.) Horizon submits that "a single, conclusory allegation that Minisohn 'has entered written assignment of benefits' ... is insufficient ... to establish derivative standing to bring an ERISA claim." (*Id.* at 11-12.) In opposition, Plaintiffs argue that the motion to dismiss should be denied because they "have plead that they have assignment of benefits for the Horizon plans at issue provided by their patients that are Horizon subscribers." (ECF No. 6 at 9.) They write that they will produce any assignments of benefits in discovery and that they should not be required to plead anything more "at this juncture." (*Id.*)

"ERISA is a 'comprehensive legislative scheme' designed to 'protect ... the interests of participants in employee benefit plans and their beneficiaries.' " *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 449 (3d Cir. 2018) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). To do so, "ERISA provides employees covered by such plans with the right to sue to 'recover benefits due ... under the terms of [the] plan.' " *Id.* (quoting 29 U.S.C. § 1132(a)(1)(B)). Although ERISA does not enable a healthcare provider to sue for benefits as a "participant" or "beneficiary" in a plan, "a valid assignment of benefits by a plan participant or beneficiary transfers to such a provider both the insured's right to payment under a plan and his right to sue for that payment." *Id.* at 450; *see also N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015) ("We hold that as a matter of federal common law, when a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a). An assignment of the right to payment logically entails the right to sue for non-payment.").

**\*3** To plausibly plead that there has been "a valid assignment of benefits" under ERISA, district courts in the Third Circuit have ruled that a healthcare provider ordinarily must identify a specific patient(s) who has assigned their claim(s) for benefits as well as factual matter that indicates that the provider is proceeding pursuant to an appropriate assignment, such as a copy of the assignment(s) at issue, the relevant language from the assignment(s), or some other evidence of the scope of the assignment(s). [3]

In *Dual Diagnosis Treatment Center, Inc. v. Horizon Blue Cross Blue Shield of New Jersey*, for example, the plaintiffs (for-profit substance abuse and mental health treatment centers) brought suit against Horizon for unpaid out-of-

network behavioral treatment services that the plaintiffs rendered to patients allegedly insured under Horizon's employee benefit plans. Civ. No. 20-15285, 2021 WL 2886085, at *1 (D.N.J. July 9, 2021). Horizon moved to dismiss for lack of standing, arguing that even though the plaintiffs alleged that they had obtained valid benefits assignments from patients, the allegations were conclusory and did not plausibly plead that a valid assignment was granted. *Id.* at *2. Judge Wigenton concurred with Horizon, finding that plaintiffs bear the "burden to ... establish[ ] that the standing requirements are met," which means that they must plead sufficient factual matter to plausibly infer that a healthcare provider is an "authorized assignee[ ] for a[ ] specific [p]atient[ ]." *Id.* at *3. Judge Wigenton wrote that absent specific factual allegations that establish that plaintiffs are "proceeding pursuant to an appropriate assignment of benefits," a court "cannot conclude that there is standing." *Id.* (quoting *Emergency Physicians of St. Clare's v. United Health Care*, Civ. No. 14-404, 2014 WL 7404563, at *10 (D.N.J. Dec. 29, 2014)). After the plaintiffs in *Dual Diagnosis* amended their complaint, Judge Wigenton again dismissed for lack of standing because the complaint "still fail[ed] to provide plausible [allegations] that each of the [p]laintiffs [wa]s an assignee for the [p]atients," underscoring that it "remain[ed] unclear whether ... [several of the plaintiffs] [we]re authorized assignees for any specific [p]atients." 2022 WL 1156760, at *3 (D.N.J. Apr. 19, 2022), *appeal dismissed*, 2022 WL 16945901 (3d Cir. Oct. 26, 2022).

In another example, *Association of New Jersey Chiropractors, Inc. v. Data Isight, Inc.*, Judge Vazquez considered whether the plaintiffs (licensed chiropractors and a corporation promoting the interests of chiropractors) had standing to sue health insurers for underpaying medical services in contravention of applicable ERISA plan documents. Civ. No. 19-21973, 2020 WL 4932458, at *2 (D.N.J. Aug. 24, 2020). The health insurers argued that a licensed chiropractor cannot establish derivative standing via an assignment when the chiropractor "fail[s] to identify any specific patients that assigned their rights." *Id.* at *4. Judge Vazquez agreed in part, concluding that when the plaintiffs are "seeking monetary damages for alleged underpayment related to specific patients[,] ... then [p]laintiffs would be required to plead sufficient facts to establish which patients were at issue." *Id.* at *4. When, however, plaintiffs seek to alter "billing practices generally," then "specific patient names" are not required to state a claim. *Id.*

**\*4** And in *Emergency Physicians of St. Clare's, LLC v. Horizon Blue Cross Blue Shield of New Jersey*, the plaintiffs (providers of emergency medical services) alleged that Horizon and other health insurers underpaid for emergency medical services that the plaintiffs had provided to patients. Civ. No. 19-12112, 2020 WL 2079286, at *1 (D.N.J. Apr. 30, 2020). Judge Cecchi dismissed the ERISA claims, finding that the plaintiffs had not adequately alleged the existence of valid assignments nor how the defendants had violated "specific terms of their patients' ERISA plans." *Id.* at *3. Summarizing precedent from the District of New Jersey, Judge Cecchi emphasized that the plaintiffs had not attached any assignments of benefits from any patients as exhibits to the complaint; had not indicated whether the assignment form they used was the same for all patients; did not quote from any assignments; and "otherwise provide[d] no details as to the terms, limitations, or specifics of the alleged assignments." *Id.* at *3-4.

Other district courts in this Circuit to have considered whether healthcare providers have derivative standing to bring ERISA claims have reached the same conclusion as those cases cited above, that is, "a conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing." *Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross Blue Shield*, Civ. No. 16-01649, 2017 WL 751851, at *5 (D.N.J. Feb. 27, 2017); *see also NJSR Surgical Ctr., L.L.C. v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 979 F. Supp. 2d 513, 523 (D.N.J. 2013) (McNulty, J.) ("Here, the complaint alleges no more than that 'the Patients provided assignments of benefits to the Plaintiffs.' That conclusory allegation ... falls short of what is required to withstand a motion to dismiss.").

Based on the above-cited case law, the Court finds that Plaintiffs here (who are seeking monetary damages for alleged underpayment related to specific patients) have not plausibly alleged the existence of valid assignments to establish derivative standing to bring claims on their patients' behalf under ERISA. The Complaint does not identify any specific patient who has allegedly assigned their claims to Plaintiffs nor does it plead any factual detail as to the terms, limitations, or specifics of the alleged assignments. Instead, the Complaint asserts in conclusory fashion that Minisohn Chiropractic "has entered written assignment of benefits agreement[s] with ... [Horizon] subscribers of their contractual rights under the policy of group health insurance issued by [Horizon]." (ECF No. 1-1 at 2 ¶ 2.) This solitary allegation is inadequate, and the Court will not depart from

the well-reasoned precedent of its sister courts, particularly when Plaintiffs have not cited to any relevant authority in opposition. [4] Accordingly, Plaintiffs' ERISA claims are dismissed in their entirety without prejudice.

## B. COUNT ONE—UNPAID BENEFITS AND BREACH OF FIDUCIARY DUTY

In addition to lack of standing, Horizon contends that Plaintiffs' ERISA claims for unpaid benefits and breach of fiduciary fail on alternative grounds. As to the claim for unpaid benefits, Horizon argues that it must be dismissed because the Complaint does not "identify a single plan or provision that Minisohn contends Horizon breached. Instead, the Complaint alleges only that Horizon denied an unidentified number of claims for unidentified patients under unidentified plans in violation of unidentified provision[s] of those plans." (ECF No. 4-1 at 13.) These spartan allegations, Horizon insists, fall short of the *Iqbal/Twombly* pleading standards, which require sufficient factual matter to state a claim that is plausible on its face. (*Id.* at 15.) As to the claim for breach of fiduciary duty, Horizon argues that it is duplicative of the claim for unpaid benefits and that Plaintiffs have not "allege[d] *anything* in support of a claim that Horizon breached ... duties" of loyalty and care. (*Id.* at 15-16.) In opposition, Plaintiffs do not meaningfully respond to these points or the case law cited by Horizon. They merely assert that "Horizon has all of this information [about plan provisions] in its custody and control as the Plan sponsor or issuer." (ECF No. 6 at 10.)

**\*5** Although the Court has already dismissed the ERISA claims in Count One for lack of standing, it agrees with Horizon that to avoid dismissal of these claims a second time, Plaintiffs should "identify specific terms of the plans that were violated." *Emergency Physicians of St. Clare's, LLC,* 2020 WL 2079286, at *4; *see also Hudson Hosp. OPCO, LLC v. Cigna Health & Life Ins. Co.,* Civ. No. 22-4964, 2023 WL 6439893, at *4 (D.N.J. Oct. 3, 2023) ("In order to plead sufficient facts to state a claim for relief, the plaintiff must identify a specific provision of the plan for which a court can infer this legally enforceable right."). And though some courts are hesitant to dismiss claims for breach of fiduciary duty that are plead in the alternative to well-plead claims for unpaid benefits, the Court expresses concern about Plaintiffs' failure to specify what alleged conduct breached Horizon's fiduciary duties and how, if at all, the breach of fiduciary duty claim differs from the claim for unpaid benefits. *See Shapiro v. Aetna, Inc.,* Civ. No. 22-1958, 2023 WL 4348601,

at *5-6 (D.N.J. June 5, 2023) ("Some courts in this district have found that ... it is ... premature to dismiss § 502(a)(3) claims alleged in the alternative on a motion to dismiss, before it is clear whether the plaintiff may attain adequate relief under § 502(a)(1).... Other courts have found that ... § 502(a)(3) claims alleged in the alternative to § 502(a)(1) claims should be dismissed, particularly where such claims are duplicative.").

## C. COUNT TWO—BREACH OF CONTRACT

Finally, because the Court has dismissed the ERISA claims upon which its subject-matter jurisdiction is predicated and because neither party alleges that there is diversity jurisdiction, the Court need not reach Plaintiffs' common law breach of contract claim, and the Court declines to exercise supplemental jurisdiction in light of the relatively early stage of this litigation. *See Doe v. Mercy Cath. Med. Ctr.,* 850 F.3d 545, 567 (3d Cir. 2017) ("A court may [decline supplemental jurisdiction] under 28 U.S.C. § 1367(c)(3) when it dismisses all claims over which it has original jurisdiction.").

Nevertheless, even if the Court were inclined to reach the contract claim, Plaintiffs have not identified a specific contractual term that was allegedly breached by Horizon; Plaintiffs simply allege that Horizon breached its "contracts of health insurance" by, among other things, "improperly denying claims" and "partially paying" claims. (ECF No. 1-1 at 7 ¶¶ 1-4.) This does not rise to the level of a plausible claim. To state a claim for breach of contract, plaintiffs must "plead or otherwise identify a contractual provision, requirement, or duty ... breached" and cannot rely solely on an alleged "general obligation" without tying it to a specific contractual provision. *Perry v. Nat'l Credit Union Admin.,* 2021 WL 5412592, at *2 (3d Cir. Nov. 19, 2021); *see also Coda v. Constellation Energy Power Choice, LLC,* 409 F. Supp. 3d 296, 303 (D.N.J. 2019) ("The plaintiff must also specifically identify portions of the contract that were allegedly breached." (quoting *Faistl v. Energy Plus Holdings, LLC,* Civ. No. 12-2879, 2012 WL 3835815, at *7 (D.N.J. Sept. 4, 2012))). If Plaintiffs reassert their breach of contract claim in an amended pleading, they should identify a contractual provision(s) that gives rise to this common law claim. [5]

## IV. CONCLUSION

For the reasons set forth above, and other good cause shown, Defendant's Motion to Dismiss Plaintiffs' Complaint is **GRANTED**. An appropriate Order follows.

**All Citations**

Slip Copy, 2023 WL 8253088

## Footnotes

1   On a motion to dismiss pursuant to Rule 12(b)(6), a court accepts as true all well-pleaded facts in the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

2   Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

3   Although Rule 12(b)(1) ordinarily governs motions to dismiss for lack of standing, the United States Court of Appeals for the Third Circuit has clarified that whether a party "has gained derivative status involves a merits-based determination.... Therefore, [a] motion to dismiss [i]s properly filed under Rule 12(b)(6)." *N. Jersey Brain & Spine Ctr.*, 801 F.3d at 371 n.3. In any event, "a motion for lack of statutory standing is effectively the same whether it comes under Rule 12(b)(1) or 12(b)(6)." *Id.*

4   To the extent Plaintiffs are concerned about patient privacy, they may either seek permission to file with the names under seal or use patients' initials in publicly filed documents, which is commonplace in the ERISA context. *See, e.g., California Spine & Neurosurgery Inst. v. Blue Cross of California*, Civ. No. 22-03782, 2023 WL 6226370, at *1 (N.D. Cal. Sept. 22, 2023) ("SJN identified the patients at issue (by their initials) and specifically alleged their respective ERISA plan that was administered/and or underwritten by Anthem.").

5   Although not raised at this juncture, the Court also questions whether the common law claim would be preempted by ERISA. *See, e.g., Robinson v. Allstate*, Civ. No. 22-6527, 2023 WL 3932852, at *2 (D.N.J. June 9, 2023) ("[S]tate common law claims ... are within the purview of ERISA's preemption clause if they relate to an ERISA-governed plan.").

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 33 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 229 of 466 PageID: 248
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

2022 WL 1567797
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

OPEN MRI AND IMAGING OF RP
VESTIBULAR DIAGNOSTICS, P.A., Plaintiff,
v.
CIGNA HEALTH AND LIFE
INSURANCE COMPANY, Defendant.

Civ. No. 20-10345 (KM) (ESK)
|
Signed 05/18/2022

**Attorneys and Law Firms**

Jeffrey B. Randolph, Glen Rock, NJ, Peter L. Nichols, Levine Desantis LLC, Springfield, NJ, for Plaintiff.

Eric Evans Wohlforth, Jr., Charlotte Mary Howells, Gibbons, P.C., Newark, NJ, Arielle E. Katz, Gibbons P.C., Philadelphia, PA, for Defendant.

### OPINION

KEVIN MCNULTY, United States District Judge:

**\*1** Open MRI and Imaging of RP Vestibular Diagnostics, P.A. ("Open MRI") is a medical practice that served patients insured by Cigna Health and Life Insurance Company ("Cigna"). Open MRI claims that it submitted invoices to Cigna for COVID-19 tests administered to Cigna-insured patients, but Cigna declined to pay. Open MRI brings this action on behalf of those patients for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

Now before the Court is Cigna's motion (DE 51) to dismiss Open MRI's Second Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[1] For the reasons stated herein, I will **DENY** the motion.

### I. SUMMARY

#### A. Factual Allegations
Open MRI is a New Jersey medical practice that provided COVID-19 testing to Cigna-insured patients, among other

medical services. (2AC at ¶¶ 4, 9.) Cigna insures and administers health plans that are governed by ERISA. (2AC at ¶6.)

The 2AC alleges that Open MRI submitted invoices to Cigna for these COVID-19 tests, totaling at least $1,522,644. (2AC at ¶ 9.) Open MRI contends that the Cigna-insured patients receiving these tests did so pursuant to their medical insurance plans (the "Plans"), which are "issued and maintained by [Cigna]." (2AC at ¶10.)

However, Cigna declined to pay Open MRI for these services because the services were purportedly (1) not rendered as billed, (2) did not match the services billed, or (3) because the billing was duplicative. (2AC at ¶¶ 14-16.) Open MRI claims that these grounds are invalid and attempted to resolve the dispute with Cigna to no avail. (2AC at ¶¶ 17-19.)

The 2AC states that the Cigna-insured patients who received COVID-19 tests "assigned their rights and benefits under the Plans" to Open MRI. (2AC at ¶12.) Accordingly, on behalf of those patients, Open MRI brings this ERISA claim against Cigna. (¶¶ 2AC 22-25.) Cigna moves to dismiss (Mot.)

#### B. Procedural Background
Open MRI filed the initial Complaint (DE 1) on August 12, 2020, and the Amended Complaint (DE 13) on December 11, 2020. On June 30, 2021, the Court granted Cigna's motion to dismiss in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). (DE 37; DE 38.)

The currently operative 2AC submits a revised claim under ERISA for the improper denial of benefits. (2AC at ¶¶ 22-24; see also 29 U.S.C. § 1132(a)(1)(B).) On September 23, 2021, Cigna filed the motion to dismiss before the Court, arguing that the 2AC, like the Amended Complaint, fails to state a claim and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). (DE 51.)

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing'

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 34 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 230 of 466 PageID: 249
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

rather than a blanket assertion of an entitlement to relief.")
(citation omitted). Thus, the complaint's factual allegations
must be sufficient to raise a plaintiff's right to relief above a
speculative level, so that a claim is "plausible on its face."
*Twombly*, 550 U.S. at 570; *see also* *West Run Student Hous.
Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d
Cir. 2013).

**\*2** That facial-plausibility standard is met "when the
plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While
"[t]he plausibility standard is not akin to a 'probability
requirement' ... it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if
it fails to state a claim upon which relief can be granted.
Defendant, as the moving party, bear the burden of showing
that no claim has been stated. *Animal Sci. Prods., Inc. v. China
Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For
the purposes of a motion to dismiss, the facts alleged in the
complaint are accepted as true and all reasonable inferences
are drawn in favor of the plaintiff. *New Jersey Carpenters &
the Trustees Thereof v. Tishman Const. Corp. of New Jersey*,
760 F.3d 297, 302 (3d Cir. 2014).

### III. DISCUSSION

#### A. ERISA Claim

ERISA "provide[s] a uniform regulatory regime over
employee benefit plans," including health insurance plans.
*Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Section
502(a)(1)(B) of ERISA provides that "[a] civil action may be
brought ... by a participant or beneficiary ... to recover benefits
due to him under the terms of his plan, to enforce his rights
under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

#### 1. Assignment of Benefits

By the statute's terms, only a "participant or beneficiary" may
bring a claim. *Pascack Valley Hosp. v. Local 464A UFCW
Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir.
2004). Nonetheless, a healthcare provider may bring claims if
it has a valid assignment of benefits from a plan participant.
*CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10
(3d Cir. 2014). The issue becomes whether the patient, who
possesses the right to seek reimbursement from the insurer,

has validly authorized the provider to exercise that right on the
patient's behalf. *See* *MedWell, LLC v. Cigna Corp.*, Civ. No.
20-10627, 2020 WL 7090745, at \*3 (D.N.J. Dec. 4, 2020);
*Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross
Blue Shield*, Civ. No. 16-01649, 2017 WL 751851 at \*5
(D.N.J. Feb. 27, 2017).

In dismissing the Amended Complaint, the Court found
that Open MRI failed to allege the existence of such an
assignment. (DE 37 at 3.) Open MRI asked the Court to *infer*
such an allegation from Cigna's explanation of benefit forms,
which did not cite "the lack of an assignment" as a ground
for the denial of the various claims. (DE 37 at 3.) The Court
rejected Open MRI's invitation, explaining that because "the
assignment is the very basis of [Open MRI's] entitlement
to sue, [it] may reasonably be asked to at least allege its
existence." (DE 37 at 3 (citing *MedWell, LLC v. Cigna Corp.*,
Civ. No. 20-10627, 2020 WL 7090745, at \*3 (D.N.J. Dec. 4,
2020)).)

The 2AC addresses the deficiencies identified in my previous
opinion. Specifically, the complaint now (1) alleges that the
Cigna-insured patients assigned "their rights and benefits
under the Plan" to Open MRI and (2) includes the language
from the "Assignment of Benefits form" that each patient
allegedly executed. [2] (2AC at ¶ 12); *see also* *Premier Health
Ctr., P.C. v. UnitedHealth Grp.*, No. CIV.A. 11-425 ES, 2012
WL 1135608, at \*7 (D.N.J. Apr. 4, 2012) (finding "that the
standard form language provided by [p]laintiffs is sufficient
to establish derivative standing by assignment to bring their
ERISA claims.") Cigna does not appear to dispute that an
assignment has now been alleged. (Mot. at 2) ("The [2AC] is
essentially identical to the ... Amended Complaint, except that
[Open MRI] has added allegations that purport to establish
that [it] is proceeding as assignee of all the different ERISA
plan beneficiaries alleged to have received treatment from
[Open MRI].") Accordingly, the Court finds that Open MRI
has established standing to sue under ERISA.

#### 2. Term of the Plan

**\*3** Having adequately alleged that it can sue in the patients'
stead, Open MRI must also allege a cause of action. In
particular, it must allege factually "that the benefits are
actually 'due' " under those patients' Cigna plans—"that
is, [the ERISA plaintiff] must have a right to benefits that
is legally enforceable against the plan." *Hooven v. Exxon
Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006); *see also*

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 35 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 231 of 466 PageID: 250
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

*Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012). Ordinarily, this means that Open MRI must identify a term of the plan which Cigna allegedly breached. *Univ. Spine Ctr. v. Cigna Health & Life Ins. Co.*, Civ. No. 17-13596, 2018 WL 4144684, at *3 (D.N.J. Aug. 29, 2018).[3]

The 2AC's allegations, however, do not follow that usual pattern of pointing to a breach of a specific provision written into the plan. Open MRI has a different theory: Federal law requires health insurers to cover COVID-19 testing, and this legal obligation is incorporated as a "term of the plan," enforceable by an ERISA plaintiff. (Opp. at 14-15.) In short, Open MRI alleges that the obligation to cover COVID-19 testing is not an express but an implied term of the plan, imposed as a matter of federal law. Specifically, Open MRI points to the Families First Act, Pub. L. No. 116-127, § 6001, 134 Stat. 178, 201 (2020) (codified at 42 U.S.C. § 1320b-5 note (Coverage of Testing for COVID-19)), and the CARES Act, Pub. L. No. 116-136, § 3202, 134 Stat. 281, 367 (2020) (codified at 42 U.S.C. § 256b note (Pricing of Diagnostic Testing)). (I will sometimes refer to these two together as the "Acts.")

The Families First Act provides that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage ... shall provide coverage ... for ... diagnostic products ... for the detection of SARS-CoV-2." Families First Act § 6001(a)(1). "The terms 'group health plan'; 'health insurance issuer'; 'group health insurance coverage', and 'individual health insurance coverage' have the meanings given such terms in [ERISA]." *Id.* § 6001(d). Another subsection, titled "Enforcement," states that the requirement "shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers ... as if included in the provisions of ... part 7 of [ERISA]." *Id.* § 6001(b). Part 7 of ERISA "identif[ies] requirements for group health plans." *Andre-Pearson v. Grand Valley Health Plan, Inc.*, 963 F. Supp. 2d 766, 773–74 (W.D. Mich. 2013); *see also* 18 U.S.C. §§ 1181–83, 1185. The CARES Act, passed a week after the Families First Act, provides that plans and insurers "shall reimburse the provider of the diagnostic testing." CARES Act § 3202(a).

**\*4** Whether those Acts authorize a plaintiff to bring a suit for damages under ERISA when an insurer denies payment for COVID-19 testing, however, is a distinct question, and one of first impression in this District. I start with the text of the Acts and ERISA, and, since this question involves multiple

statutes, I strive to harmonize them. *Intel Corp. Invest. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018).

The statutory text that creates the coverage requirement, the Families First Act, says that "group health plans" "shall provide coverage" for COVID-19 testing, § 6001(a), and that "group health plan" has the same meaning as in ERISA. By defining "group health plan" via cross-reference to ERISA, the Families First Act suggests, at the very least, that its requirement of COVID-19 testing coverage is intended to interlock with ERISA. *See Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (courts must follow a statute's explicit definition of a term); *United States v. Davis*, 139 S. Ct. 2319, 2331 (2019) ("Usually when statutory language is obviously transplanted from other legislation, we have reason to think it brings the old soil with it.") (cleaned up); *In re Trump Ent. Resorts*, 810 F.3d 161, 167 (3d Cir. 2016) (courts "assume that Congress passed each subsequent law with full knowledge of the existing legal landscape"). Put differently, while the Families First Act did not in so many words amend ERISA, its cross-reference and incorporation of definitions suggest that it is intended to work in tandem with ERISA. I take that to be an enacted expression of Congress's intent, apart from any arguments of legislative history.

That argument, in my view, can and should be pushed an extra step. By using the term "group health plan," Congress clearly conveyed that it was imposing obligations *on the plans*, not just on regulated entities in some more general sense. The importance of using the term "group health plan," an ERISA term of art, can hardly be overstated. The "plan" is the linchpin of ERISA and of the ERISA cause of action which allows the insured "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B); *see also US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013) ("The plan, in short, is at the center of ERISA."). This congruity and cross-reference suggest that Congress intended the testing coverage requirement to be part and parcel of ERISA-regulated plans. Indeed, reading the statutes in this way comports with the general principle of insurance law that applicable laws and mandated coverage are deemed to be incorporated as terms of an insurance plan. *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 861 (7th Cir. 1997) (collecting cases); 10A *Couch on Insurance* § 144:27 (3d ed. Dec. 2021 update); *see UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 376–77 & n.7 (1999) (recognizing that a plaintiff could sue under "§ 502(a)(1)(B) for benefits due" and use state insurance law "as a relevant rule of decision"); *United States*

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 36 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 232 of 466 PageID: 251
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

*v. Texas*, 507 U.S. 529, 535 (1993) ("[C]ourts may take it as a given that Congress has legislated with an expectation that the common law principle will apply except when a statutory purpose to the contrary is evident.")(cleaned up).

Bolstering these considerations is the subsection of the Families First Act which instructs the agency Secretaries to apply this COVID testing mandate *in pari materia* with other mandated forms of coverage under ERISA Part 7. Families First Act § 6001(b). The Act thus instructs at least the implementing agencies (if not the insurers directly) to treat the COVID-19 testing coverage requirement as an ERISA requirement.

**\*5** Cutting against this interpretation, says Cigna, is the general principle of fidelity to a plan's written terms: The U.S. Supreme Court has "recognized the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013). And it is true, of course, that a court generally cannot look outside the plan's own text when determining what benefits are due under "the terms of the plan." *CIGNA Corp. v. Amara*, 563 U.S. 421, 436 (2011). Statutory requirements, however, are not treated as extrinsic evidence; courts must apply the terms of the plan "insofar as they accord with the statute." *McCutchen*, 569 U.S. at 101 (citing 29 U.S.C. § 1104(a)(1)(D)); *see also Bauer v. Summit Bancorp*, 325 F.3d 155, 160 (3d Cir. 2003) ("We are required to enforce the Plan as written unless we find a provision of ERISA that contains a contrary directive.") (cleaned up).

The Acts, Cigna points out, do not explicitly amend ERISA. The Families First Act, for example, only instructs the Secretaries to apply the requirement "as if" it were in Part 7 of ERISA; it does not take the additional step of actually amending Part 7 itself. (Mot. at 15–16.)

That is true as far as it goes. The Acts do not explicitly announce themselves to be amendments to the ERISA statute. Nevertheless, I think that Congress's intent to tie these requirements to ERISA need not be divined but is expressed clearly enough in the statutory language. This is not, for example, a mere borrowing of a statutory definition for convenience. Congress explicitly required ERISA-regulated plans—*expressly defined as such*—to provide this COVID-related coverage. The Families First Act, by imposing this COVID testing coverage requirement on plans as defined by ERISA, made it an ERISA requirement. [4]

**\*6** Regardless, and more generally, the requirement is one imposed by federal law, so it is incorporated into plans. *Plumb*, 124 F.3d at 861. In other words, an express amendment of ERISA is not absolutely necessary. Rather, courts have held that a legal requirement from any source can become a "term of the plan" if such an intent is expressed clearly. *See id.* (collecting cases where Courts of Appeals held that state-law coverage requirements were incorporated as terms of an ERISA plan). So Cigna's quibbling with how and whether the Acts can be said to be part of the ERISA statute is not entirely to the point. What matters is that these Acts impose legal requirements on ERISA plans.

It is thus no great leap to find that, for an ERISA plan to accord with the statute, the COVID coverage requirement must be deemed a part of the plan.

Cigna makes a second, distinct argument that, by giving enforcement authority to the Secretaries, Congress intended to displace any private right of action to enforce the COVID-19 testing coverage mandate. (Mot. at 14-15, 16-17.) It is true that often, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). But this is not a case, like *Sandoval*, in which we are writing on a clean slate or construing one statute as a closed system. Rather, these statutes by their explicit terms require that I construe them together. ERISA already provides an express private cause of action to recover benefits under a plan, as Congress was surely aware when it passed the Families First and CARES Acts. Those two Acts mandate coverage of COVID-19 testing as a benefit under an ERISA plan. ERISA itself is a dual-enforcement statute. *See* 29 U.S.C. § 1132(a). The Acts' supplementation of the implementing agencies' authority does not undermine plan participants' already existing parallel ability to bring a private lawsuit. [5]

That brings me to the bottom line in this case: Congress mandated that health insurance plans cover COVID-19 testing, raising it to the status of a benefit of those plans. Congress also allows insureds to sue for benefits due to them. It therefore stands to reason that an insured can sue under ERISA when an insurer denies coverage for COVID-19 testing. [6] That is the best, most harmonious reading of these explicitly interrelated statutes. Accordingly, Open MRI, on behalf of patient assignors, has stated an ERISA claim.

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 37 of 155  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 233 of 466 PageID: 252
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

**\*7**  Accordingly, the Court denies Cigna's motion to dismiss Count 1 of the 2AC.

**IV. CONCLUSION**

For the reasons set forth above, I will **DENY** Cigna's motion (DE 51) to dismiss the 2AC. A separate order will issue.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1567797

## Footnotes

1    Certain citations to record are abbreviated as follows:

   "DE" = Docket entry number in this case

   "Am. Compl." = Open MRI's Amended Complaint (DE 13)

   "2AC" = Open MRI's Second Amended Complaint (DE 42)

   "Mot." = Cigna's Brief in Support of its Motion to Dismiss (DE 51)

   "Opp." = Open MRI's Opposition to Cigna's Motion to Dismiss (DE 63)

2    Naturally raising the question of why, if plaintiff possessed these assignments, it put the Court to the burden of analyzing its convoluted theory instead of just amending the complaint.

3    Indeed, in moving to dismiss, Cigna argues that the 2AC's ERISA claim is inadequately pled because Open MRI fails to "identify the plans at issue, nor the terms of those plans" allegedly violated by Cigna. Mot. at 5-6 (citing cases in this District that hold that a plaintiff "cannot state an ERISA benefits claim without identifying the plan provision that was breached").

   Cigna also asserts that Open MRI failed to allege "that particular provisions of the [Families First Act] and CARES Act are incorporated or recited as explicit terms in the plans at issue." Mot. at 8. However, for the reasons described below, *infra*, the Court finds that Cigna's reimbursement obligation for COVID-19 testing derives from the Family First Act and CARES Act, which effectively modifies the terms of the Plans. It follows that the Plans, irrespective of the particular details of their language, *could not* be interpreted to preclude Cigna's obligation to reimburse providers pursuant to federal law. Accordingly, Open MRI's failure to either (1) plead the specific plan language or (2) explicitly allege that the Families First Act and CARES Act "are incorporated or recited as explicit terms" in the Plans does not necessitate dismissal of the claim. *See Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 3:20CV1675(JBA), 2022 WL 743088, at \*8 (D. Conn. Mar. 11, 2022).

4    The parties dispute the relevance of a comparison to another component of Part 7 which requires that plans treat mental health benefits the same as medical benefits. The Secretary of Labor has taken the position in litigation that a plaintiff alleging a violation of that provision can bring a § 502(a)(1)(B) claim because the provision is deemed part of the plan, irrespective of what the plan may say. Brief of the Secretary of Labor as Amicus Curiae at 11–12, *N.R. v. Raytheon Co.*, No. 20-1639 (1st Cir. Oct. 7, 2020). The Secretary's views, which by analogy would support the result I reach here, are entitled to the most respectful consideration. *See Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1037 (9th Cir. 2013) (explaining when an agency's views expressed in litigation deserve consideration); *Conn. Off. of*

*Protect. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239–40 (2d Cir. 2006) (Sotomayor, J.) (same).

Nevertheless, I do not give them weight, for two reasons. First, courts have split on this issue in relation to the mental-health-benefits mandate. *Compare Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209, 1229 (D. Utah 2019) (rejecting a § 502(a)(1)(B) claim) *with N.R. by & through S.R. v. Raytheon Co.*, 24 F.4th 740, 752 (1st Cir. 2022) (allowing a § 502(a)(1)(B) claim) *and K.H.B. by & through Kristopher D.B. v. UnitedHealthcare Ins. Co.*, No. 18-cv-795, 2019 WL 4736801, at *4–5 (D. Utah Sept. 27, 2019) (allowing a § 502(a)(1)(B) claim).

Second, the differences between the mental-health-benefits mandate and the one at issue here make for a weak comparison. On the one hand, the latter is not a requirement to cover a specific benefit, but to treat certain benefits equally. Thus, the mandate here fits more squarely into those that have been deemed to become terms of the plan. *See* 10A *Couch on Insurance* § 144:27 ("Mandatory coverage provisions ... will be read into any appropriate policy...."). On the other hand, the mental-health-benefits mandate was expressly included in Part 7, putting it more firmly in ERISA. Yet, that difference can still be explained when one considers the legislative drafting pressures Congress faced with the Acts. That is, Congress was working to address a crisis, so it may have intended to write a provision that would apply across many statutory regimes and did not have the luxury of reorganizing each subchapter of the Code which this provision affected.

5    At any rate, the view that only the Secretaries can enforce this mandate does not accord with the statutory scheme. On one view, the Secretaries are authorized to add their voice to the COVID-19 testing coverage mandate—but that is already directly required by statute, and the issue concerns cases in which coverage is wrongfully denied in individual cases. Another possible view—that many thousands or millions of claims for COVID-19 testing must potentially be litigated by the Secretaries—is anomalous, and would perhaps require the erection of a huge administrative claims apparatus, for which there is no hint of authorization in the statute.

6    Two out-of-circuit decisions have come to the same conclusion, although the courts in these cases also addressed the question of whether there is an implied private right of action under the Families First Act and CARES Act (as opposed to a right to sue for a benefit under ERISA). In the first case, *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, the court did not find an implied private right of action under the Acts but allowed the provider to pursue a § 502 (a)(1)(B) claim under ERISA. 2022 WL 743088, at *5, *8. Judge Janet Bond Arterton reasoned that the plaintiff failed to identify "anything in the text or [the] structure of the CARES Act" evincing Congress's intent to afford plaintiffs "with a private enforceable remedy" *under those statutes.* 2022 WL 743088, at *5.

Nevertheless, Judge Arterton held that the provider could pursue a § 502 (a)(1)(B) ERISA claim, because Cigna's "reimbursement obligation derives from the Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide [COVID-19] tests at no cost to a patient." *Id.* at *8. Thus, the court rejected Cigna's argument that the plaintiff's "failure to plead the specific plan language or identify the individual assignor-beneficiaries" warranted dismissal of the claim. *Id.*

The second case, *Diagnostic Affiliates of Ne. Hou, LLC v. United Healthcare Servs., Inc.*, Judge Nelva Gonzales Ramos found that the provider could assert claims for COVID-19 testing reimbursement under the Acts and § 502 (a)(1)(B). No. 2:21-CV-00131, 2022 WL 214101, at *7-*9, *10-*11(S.D. Tex. Jan. 18, 2022). According to Judge Ramos, "the mandatory nature of the reimbursement right" supported recognizing an implied private right of action under the Acts. *Id.* at *7. Moreover, the court explained that the "administrative enforcement provisions ... [fell] short of providing any avenue for a COVID-19 testing provider" to be reimbursed because the Secretary is only empowered to impose a civil fine on providers that fail to publish the cash price for a COVID-19 test." *Id.* at *8 (emphasis added) (citing CARES Act § 32023(a)). As to the ERISA claim, the court found that the provider sufficiently alleged that (1) it had standing and (2) the claims

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 39 of 155  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 235 of 466 PageID: 254
Open MRI and Imaging of RP Vestibular Diagnostics, P.A...., Not Reported in Fed....

review process should be deemed exhausted or futile; accordingly, the Court allowed the provider's § 502 (a)(1)(B) claim to proceed. *Id.* at *9-11.

These decisions are of course nonbinding on this Court. Nonetheless, these decisions suggest (whether explicitly or implicitly) that by Congress making COVID-19 testing reimbursement an ERISA requirement, plaintiffs can sue under ERISA for such benefit.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24    05/24/2024 3:29:47 PM    Pg 40 of 155    Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD    Document 1-1    Filed 08/16/24    Page 236 of 466 PageID: 255
Demaria v. Horizon Healthcare Services, Inc., Not Reported in F.Supp.2d (2012)

54 Employee Benefits Cas. 2014

2012 WL 5472116

United States District Court, D. New Jersey.

Alphonse A. DEMARIA, D.C., T. Leonard Probe,
D.C. and James Proodian, D.C., on their own behalf
and on behalf of all others similarly situated, Plaintiffs,

v.

HORIZON HEALTHCARE SERVICES,
INC. d/b/a Horizon Blue Cross Blue Shield of
New Jersey; and Horizon Healthcare of New
Jersey, Inc. d/b/a Horizon HMO, Defendants.

Civ. No. 2:11–cv–7298 (WJM).
|
Nov. 9, 2012.

**Attorneys and Law Firms**

John W. Leardi, Paul D. Werner, Vincent Norman Buttaci,
Buttaci & Leardi, LLC, Princeton, NJ, for Plaintiffs.

James P. Flynn, Epstein, Becker & Green, PC, Newark, NJ,
for Defendants.

**OPINION**

WILLIAM J. MARTINI, District Judge.

**\*1**  Plaintiffs Alphonse A. Demaria, Leonard Probe and
James Proodian have brought this putative class action
on behalf of themselves and all other similarly-situated
chiropractic physicians. This matter comes before the Court
on Defendants' motion to dismiss pursuant to Federal Rule
of Civil Procedure 12(b)(6) for failure to state a claim upon
which relief may be granted. For the reasons set forth below,
Defendants' motion is **GRANTED.**

**I. BACKGROUND** [1]

Defendants Horizon Healthcare Services, Inc. and Horizon
Healthcare of New Jersey, Inc. (collectively "Horizon")
underwrite and/or administer the health insurance benefits
of more than 3.6 million persons in New Jersey
("Plan Participants") through various employer-sponsored,
individual and governmental health insurance coverage
plans ("Plans"). Through these Plans, Horizon provides
reimbursement for certain health care services rendered to
Plan Participants ("Covered Services"), subject to the terms

set forth in each individual Plan. Many of these Plans are
governed by ERISA. Other plans are ERISA-exempt.

Plaintiffs are chiropractors who would regularly provide
four types of chiropractic treatments to Plan Participants.
Namely: (1) evaluation and management services ("E/M");
(2) chiropractic manipulative therapy ("CMT"); (3) passive
adjunctive modalities ("passive modalities"); and (4) active
therapeutic procedures ("active therapies"). In the course
of providing those services to Plan Participants, all three
Plaintiffs assert that "as a matter of course," they would obtain
written assignments ("Assignments") from Plan Participants
which entitled Plaintiffs to any claims for reimbursement
which would otherwise be payable to the Plan Participants.
(Compl.¶ 9.) Pursuant to these Assignments, the Plan
Participants also remained personally liable to Plaintiffs for
any non-Covered Services. (*Id.*) Plaintiffs, however, have not
provided copies of any of these purported Assignments, nor
have they set forth the exact language contained in these
writings.

Plaintiffs would thereafter seek reimbursement from Horizon
for those services. [2]  Plaintiffs allege that from at least
March 2004 until April 15, 2010, Horizon systemically and
improperly denied their insurance benefit claims for E/M
services, passive modalities, and active therapies, and only
provided benefits for the CMT services. Horizon's proffered
reasons for denying those reimbursement claims, included,
among others:

"THIS PROVIDER WAS NOT CERTIFIED/ELIGIBLE TO
BE PAID FOR THIS PROCEDURE/SERVICE ON THIS
DATE OF SERVICE"; "B 106 THIS SERVICE IS NOT A
COVERED BENEFIT WHEN BILLED BY THIS TYPE
OF PROVIDER"; "F027 PROVIDER TYPE/SPECIALTY
CANNOT PERFORM THIS TYPE OF SERVICE";
"52 THE REFERRING/PRESCRIBING/RENDERING
PROVIDER IS NOT ELIGIBLE TO REFER/ PRESCRIBE/
ORDER/PERFORM THE SERVICE BILLED"; "97
PAYMENT IS INCLUDED IN THE ALLOWANCE
FOR ANOTHER SERVICE/PROCEDURE"; "X800
REIMBURSEMENT FOR THESE SERVICES IS
INCLUDED IN THE REIMBURSEMENT FOR THE
CHIROPRACTIC MANIPULATIVE TREATMENT." (*Id.* ¶
92.)

**\*2**  Horizon later took the position that it "bundled"
reimbursement for all four services into a "global fee" for
CMT. And on October 7, 2009, the New Jersey Department

Demaria v. Horizon Healthcare Services, Inc., Not Reported in F.Supp.2d (2012)

54 Employee Benefits Cas. 2014

of Banking and Insurance ("DOBI") held that Horizon's bundling practices violated New Jersey's Unfair Claim Settlement Practices Act, N.J.S.A. § 17B:30–13 .1. The DOBI therefore ordered Horizon to begin "to individually evaluate whether E/M [services, passive modalities, and active therapies] billed by chiropractors are significantly separable from CMT or other services provided by chiropractors." (*Id.* ¶ 15.) Plaintiffs concede that Horizon was in compliance with the DOBI's order by April 15, 2010, but nonetheless now seek relief from Horizon for its past pattern of improperly processing reimbursement claims for chiropractic treatments.

On December 16, 2011, Plaintiffs commenced this action in district court. Counts One and Two of the Complaint allege violations of § 502(a) of the Employment Retirement Security Income Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). The Court has original jurisdiction over claims arising under ERISA. 29 U.S.C. § 1132(e); *Metropolitan Life Ins. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The remaining counts in the Complaint allege various violations of New Jersey state law, over which Plaintiffs assert that the Court should exercise supplemental jurisdiction. (Compl. ¶ 23 (*citing* 28 U.S.C. § 1367).)

Presently, Horizon moves for dismissal of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b) (6), asserting, among other things, that the Court should dismiss Counts One and Two because Plaintiffs have not demonstrated that they have standing to assert claims against Horizon for its alleged § 502(a) ERISA violations.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) may be granted only if, accepting all well-pleaded allegations in the Complaint as true and viewing them in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs' claims have facial plausibility. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). This means that the Complaint contains sufficient factual allegations to raise a right to relief above the speculative level. *Id.* at 1965; *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008). *See also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Presently, Horizon moves for dismissal of Counts One and Two pursuant to Rule 12(b)(6) because the Assignments alleged by Plaintiffs do not demonstrate statutory standing for

Plaintiffs to assert their ERISA claims. [3]   And when, as here, standing is challenged on a motion to dismiss, the burden falls on the proponent of the claim to establish that it has standing to sue. *See Franco v. Connecticut General Life Ins. Co.,* 818 F.Supp.2d 792, 810–811 (D.N.J.2011) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Thus, here, the burden falls on Plaintiffs to establish that they have standing to sue under ERISA § 502(a).

## III. DISCUSSION

### a. ERISA Standing

**\*3** Under § 502(a) of ERISA:

(a) ... A civil action may be brought—

(1) by a participant or beneficiary ...

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan [or]; ...

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan ...

29 U.S.C. §§ 1132(a).

Thus, Plaintiffs will only have standing to sue under ERISA § 502(a) if their Complaint sets forth sufficient facts demonstrating that they are Plan "participants" or "beneficiaries." [4]   Those terms, generally, refer to individuals entitled to receive benefits under an employee benefit plan, and not to the healthcare providers who treat those individuals. *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan,* 388 F.3d 393, 399–400 (3d Cir.2004). And in spite of this general rule, Plaintiffs assert that the Assignments they received from Plan Participants are nonetheless sufficient to confer ERISA standing. Although the Third Circuit has not definitively ruled on whether a healthcare provider may obtain ERISA § 502(a) standing through an assignment, many other circuit courts have expressly held that providers may have standing to assert an ERISA § 502(a) claim "where a beneficiary or participant

**Demaria v. Horizon Healthcare Services, Inc., Not Reported in F.Supp.2d (2012)**

54 Employee Benefits Cas. 2014

has assigned to the provider that individual's right to benefits under the plan." *Id.* at 401 n. 7.

In *Franco v. Connecticut General Life Ins. Co.,* 818 F.Supp.2d 792 (D.N.J.2011), Judge Chesler reviewed recent District of New Jersey cases that have considered precisely what a healthcare provider must present to the court to establish that an assignment has conferred him with statutory standing to assert a § 502(a) ERISA claim. Those cases include: *North Jersey Ctr. for Surgery v. Horizon BCBS of New Jersey Inc.,* No. 07–4812, 2008 WL 4371754 (D.N.J. Sept.18, 2008) (vague references to a purported assignment failed to establish that there was a complete assignment of health insurance benefits for purposes of ERISA § 502(a) standing because the court must be satisfied that the alleged assignment encompasses the plan participants' rights to receive the full benefits of their plan (within the scope of ERISA), and not simply the right to reimbursement of medical expenses (beyond the scope of ERISA)); *Cooper Hosp. Univ. Med. Ctr. v. Seafarers Health and Benefits Plan,* No. 05–5941, 2007 WL 2793372, at *3 (D.N.J. Sept.25, 2007) (no ERISA jurisdiction where applicable assignment's language allowed the provider hospital to receive payments directly from the patient's health benefits insurer but did not support an 'unequivocal assignment of all of [the patient's] rights under [the ERISA] plan"); *Cmty. Med. Ctr. V. Local 464A UFCW Welfare Reimbursement Fund,* 143 Fed.Appx. 433, at 435 (3d Cir.2005) (observing in dicta that a court could not be satisfied that a provider has standing to pursue a claim under ERISA § 502(a) as an assignee without knowing the term or parameters of the purported assignments).

**\*4** In short, and as demonstrated in *Franco,* the scope of the "assignment of benefits" is critical to determining whether a provider has standing to sue under ERISA. *Franco* at 809 (2011). Thus, presently, Plaintiffs will meet their burden of establishing ERISA standing if their Complaint contains specific factual allegations to render plausible their claim that the Assignments they received from the Plan Participants conferred them with the right to receive the full benefits of that Plan. *Id.* However, vague references to a common practice and purported assignment will not satisfy this burden, in which case, dismissal of Counts One and Two will be proper.

**b. For Substantially the Same Reasons Set Forth in *Franco v. Connecticut General Life Insurance Company,* the Court Will Dismiss Counts One and Two**

In *Franco,* a group of healthcare providers who treated persons insured under Defendant CIGNA's healthcare plans ("Provider Plaintiffs") filed a putative class action in district court against CIGNA for its systematic underpayment for those services. The Provider Plaintiffs alleged that they would obtain assignments from patients which authorized them to receive reimbursement directly from CIGNA for services rendered, but which also allowed the Provider Plaintiffs to balance bill the patient for any amount disallowed by CIGNA. [5] *Id.* at 805. The Provider Plaintiffs further alleged that CIGNA improperly reimbursed them for healthcare services rendered. In response, CIGNA filed a motion to dismiss Plaintiff Providers' complaint for failure to state a claim. As part of that motion, CIGNA challenged the statutory standing of the Provider Plaintiffs to assert ERISA claims.

In ruling that dismissal of the Provider Plaintiff's ERISA claims for lack of standing was proper, the *Franco* Court noted that the Provider Plaintiffs' pleading "provide[d] only the most conclusory assertions that various Provider Plaintiffs obtained an assignment of 'benefits' from their patients." *Id.* at 810. ("Simply asserting that CIGNA subscribers have assigned their CIGNA plan benefits fails to plausibly establish that each Provider Plaintiff has obtained at least one actual assignment of a patient's right to assert a claim for benefits and pursue litigation under ERISA. Provider Plaintiffs ... fail to plead facts (for example, actual assignment language) to support their legal conclusion that a valid assignment of the proper breadth was given by patients." *Id.*

Similarly, in the current matter, Plaintiffs, who seek to represent a class of similarly situated healthcare providers, vaguely assert that they obtained Assignments from Plan Participants which entitle them to any claims for reimbursement which would otherwise be payable to the Plan Participants under the terms of each Plan. Moreover, pursuant to these Assignments, the Plan Participants remained personally liable to Plaintiffs for any non-Covered Services. On these facts, and as was the case in *Franco,* the Court finds that: "At best, the allegations provide only the most ambiguous and conclusory information about what the purported assignments entail. At worst for [Plaintiffs], they indicate that the assignments were limited to a patient's assigning his or her right to receive reimbursement from [Horizon] for the covered portion of the service bill, which in no way can be construed as tantamount to assigning the right enforce his or her rights under the plan. The Court cannot conclude, based on the information supplied in the Complaint [ ], that the assignments encompass a [Plan Participant's]

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 43 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 239 of 466 PageID: 258
*DeMaria v. Horizon Healthcare Services, Inc.*, Not Reported in F.Supp.2d (2012)
54 Employee Benefits Cas. 2014

claim to benefits, such that any of the [Plaintiffs] can legally be deemed a 'participant or beneficiary' of his or her patient's ERISA health plan. Simply put, [Plaintiffs] have not met their burden of demonstrating that they have derivative standing to sue under ERISA." *Id.* at 811–12.

**\*5** Accordingly, the Court will **GRANT** Horizon's motion to dismiss Counts One and Two of the Complaint based on Plaintiffs' failure to demonstrate standing to bring claims under § 502(a) of ERISA. At this time, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3) ("the district court[ ] may decline to exercise supplemental jurisdiction [if] the district court has dismissed all claims over which it has original jurisdiction."); *Glaziers and Glassworkers Union Local 252 Annuity Fund v. Newbridge Sec., Inc.,* 823 F.Supp. 1191, 1193 (E.D.Pa.1993) (declining to exercise supplemental jurisdiction over state law claims where ERISA claims dismissed on 12(b)(6) motion). Accordingly, the Court will dismiss this matter in its entirety, without prejudice.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED,** and this matter is dismissed without prejudice. An appropriate order follows.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 5472116, 54 Employee Benefits Cas. 2014

---

**Footnotes**

1   The following assumes the facts in Plaintiffs' Complaint as true.

2   Plaintiff DeMaria was a Horizon "Participating Provider," meaning that when he treated Plan Participants in certain—and heretofore unspecified—Horizon Plans, he agreed to accept payments directly from Horizon for Covered Services as payment in full. Plaintiffs Proodian and Probe were "Non–Participating Providers" who, under at least some of the Plans, were entitled to be reimbursed by Horizon, but also retained the right to "balance bill" Plan Participants for the difference between their submitted charges and any reimbursement paid to them by Horizon for Covered Services.

3   The Court reviews a motion to dismiss for lack of statutory standing under Federal Rule of Civil Procedure 12(b)(6). *Franco v. Connecticut General Life Ins. Co.,* 818 F.Supp.2d 792, 809 (2011) (distinguishing Rule 12(b)(6) dismissal for failure to meet statutory prerequisites to bring suit from Rule 12(b)(1) dismissal for lack of injury in fact) (*citing Maio v. Aetna, Inc.,* 221 F.3d 472, 482 n. 7 (3d Cir.2000).

4   Although § 1132(a)(3) also confers standing on "fiduciaries," for purposes of this motion, Plaintiffs' only colorable basis for § 502(a) ERISA standing is as "participants" or "beneficiaries." *See* 29 U.S.C. § 1002(21)(A) (defining "fiduciary").

5   In *Franco,* the only Provider Plaintiffs who received assignments and the right to balance bill were NonParticipating Providers. The Court wishes to make clear that in this action, the Complaint alleges that all three Plaintiffs received assignments and the right to balance bill for, at the very least, non-Covered Services, and that as alleged, Horizon improperly and systematically denied reimbursement for E/M services, passive modalities, and active therapies, because, among other reasons, they were non-Covered Services. In other words, as a practical matter, Plaintiffs allege that Horizon both implicitly and, at times, explicitly, denied reimbursement for these three treatments as non-Covered Services. Thus, although Plaintiff DeMaria was a Participating Provider who was precluded from billing Plan Participants above their negotiated rate for Covered Services, for at least some of the Plans, he could also balance bill for non-Covered Services.

**DeMaria v. Horizon Healthcare Services, Inc., Not Reported in F.Supp.2d (2012)**

54 Employee Benefits Cas. 2014

Accordingly, for purposes of this motion, as currently pled, Plaintiffs have failed to make any meaningful distinction between the Participating and Non–Participating Provider Plaintiffs.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:24-cv-08519-RMB-AMD Document 1-1 Filed 08/16/24 Page 241 of 466 PageID: 260
GLO-L-000242-24 05/24/2024 3:29:47 PM Pg 45 of 155 Trans ID: LCV20241332836
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

2017 WL 751851
Only the Westlaw citation is currently available.

<u>NOT FOR PUBLICATION</u>

United States District Court, D. New Jersey.

PROGRESSIVE SPINE &
ORTHOPAEDICS, LLC, Plaintiff,

v.

EMPIRE BLUE CROSS BLUE SHIELD, ABC
Inc.s 1-10, and John Does 1-10, Defendants.

Civil Action No. 16-01649
|
Signed 02/27/2017

**Attorneys and Law Firms**

Jordan Branson Dascal, Rajan & Rajan LLP, Kendall Park, NJ, for Plaintiff.

Amanda Lyn Genovese, Troutman Sanders LLP, New York, NY, for Defendants.

**OPINION**

John Michael Vazquez, U.S.D.J.

## I. INTRODUCTION

**\*1** This matter comes before the Court on Defendant Empire Blue Cross Blue Shield's ("Empire" or "Defendant") motion to dismiss and Plaintiff Progressive Spine & Orthopaedics, LLC's ("Progressive Spine" or "Plaintiff") cross-motion to remand to state court. The Court reviewed all submissions made in support of, and in opposition to, the motions. For the reasons that follow, Defendant's motion is granted in part and denied in part. As to Plaintiff's motion, it will have the option of filing an amended complaint or, alternately, having the matter remanded to state court if it decides to forego its claims based on the Employee Retirement Income Security Act ("ERISA").

## II. FACTS [1] AND PROCEDURAL HISTORY

Plaintiff is a healthcare provider located in Bergen County, New Jersey. Complaint ("Compl.") ¶ 1 (D.E. 1-1). Defendant is an insurance company that is "engaged in the business of providing or administering healthcare benefits, plans or policies." *Id.* ¶ 3. The crux of this matter is Defendant's refusal to pay Plaintiff for medical services that Plaintiff provided to four patients who are members of Defendant's health benefit plans. *Id.* ¶ 7. The parties do not dispute that the health benefit plans are ERISA-based plans.

Plaintiff performed "extensive spinal surgery operations and related procedures" on the following patients: A.G., D.F., C.P. and B.G. (collectively the "Patients"). *Id.* ¶ 8. Plaintiff does not have an agreement with Defendant setting rates for the provision of medical services. *Id.* ¶ 12. Instead, all of the Patients, except D.F., signed contracts "assign[ing] direct payment [by Defendant] of any ... medical insurance benefits" to Plaintiff. *Id.* ¶ 9. The operations performed on patients A.G., C.P., and B.G. were preauthorized by Defendant. *Id.* ¶ 10. Patient D.F. was admitted to a Bergen County hospital on emergency basis and preauthorization for his procedure was not obtained by Plaintiff. *Id.* ¶¶ 10-11.

Plaintiff alleges that it submitted "reasonable medical bills" to Defendant for its services, but Defendant declined to pay Plaintiff for those services. *Id.* ¶¶ 13-14. Plaintiff submitted numerous appeals, and Defendant eventually paid Plaintiff only "nominal amounts for the outstanding bills." *Id.* ¶ 15. Plaintiff seeks to recover the unpaid amounts. *Id.* ¶ 16.

On February 12, 2016, Plaintiff filed an eight-count complaint against Defendant alleging the following causes of action: (1) "Breach of Contract—Claims Assigned from A.G., C.P., and B.G.," (2) "Breach of Contract—Plaintiff's Original Claim for All Patients," (3) "Quantum Mer[u]it—Plaintiff's Original Claim for All Patients," (4) "Estoppel—Plaintiff's Original Claim for Patients A.G., C.P., B.G.," (5) "Unjust Enrichment—Plaintiff's Original Claim for All Patients," (6) "Denial of Benefits Under ERISA—Claims Assigned From Patients A.G., C.P., B.G.," (7) "Breach of Fiduciary Duties Under ERISA—Claims Assigned from Patients A.G., C.P., B.G.," and (8) "Failure to Provide Documents Under ERISA—Claims Assigned from Patients A.G., C.P., B.G." *Id.* ¶¶ 17-75.

**\*2** On March 24, 2016, Defendant removed this matter to the District of New Jersey pursuant to federal question jurisdiction under ERISA, 29 U.S.C. § 1001 et seq. and 29 U.S.C. § 1132(a)(1)(B). D.E. 1.[2] On April 28, 2016, Defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(6) and 8(a).[3] D.E. 5. Thereafter, Plaintiff filed an opposition and cross-motion to remand, to which Defendant replied. D.E. 11, 13.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 46 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 242 of 466 PageID: 261

Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

Defendant argues that Plaintiff does not have standing to assert claims on behalf of D.F. because Plaintiff has not alleged that D.F. assigned any benefits to Plaintiff and Plaintiff is not an ERISA beneficiary of the health plans at issue. Def. Br. at 8. Defendant posits that absent an alleged assignment, Counts Two, Three, and Five must be dismissed as they pertain to D.F. *Id.* at 8-9. Defendant contends that Plaintiff does not have standing to bring claims on behalf of B.G., A.G., and C.P. because Plaintiff has not adequately pleaded that there was a valid assignment from those patients. *Id.* at 9-10. Additionally, as to B.G. only, Defendant maintains that even if there was a purportedly valid assignment to Plaintiff, the assignment is nullified by virtue of the anti-assignment provision in B.G.'s health plan. *Id.* at 10-11.

Defendant further asserts that Plaintiff's breach of fiduciary duty claim (Count Seven) should be dismissed because it is duplicative of the relief sought in its denial of benefits claim (Count Six). *Id.* at 12. Also, Defendant argues that Plaintiff's state law claims for breach of contract, quantum meruit, estoppel, and unjust enrichment are completely and expressly preempted by ERISA and should be dismissed. *Id.* at 14. Finally, Defendant contends that Plaintiff fails to state a claim for Defendant's alleged failure to provide documents under Section 502(c) of ERISA because Plaintiff does not allege that it sent a written request for the Patients' health benefit plans. *Id.* at 15-16.

Plaintiff agrees with Defendant that its ERISA claims as applied to A.G., C.F., and D.F. were improperly pled and should be dismissed. Pl. Br. at 11. Plaintiff concedes that if ERISA applies, it will voluntarily dismiss Count One. *Id.* at 16 n.3. As a result, Plaintiff argues, the Court is divested of subject matter jurisdiction over the remaining state law claims and this matter must be remanded to state court. *Id.* at 11-13. Plaintiff notes, however, that "[e]ven if this court did decide Empire's Rule 12(b)(6) argument, the result should be the same: dismissal without prejudice" with the opportunity to re-plead. *Id.* at 15. Additionally, Plaintiff contends that the state law claims are not preempted by ERISA because they independently arise from "contracts (or quasi-contracts) with Empire, based on Empire's representations that Progressive Spine was authorized to perform the procedures in exchange for receiving reasonable payments." *Id.* at 16-19. Therefore, according to Plaintiff, those claims may properly be brought in state court.

**\*3** As to B.G., Plaintiff voluntarily dismisses all counts with prejudice except for failure to provide documents under

ERISA (Count Eight). *Id.* at 19. Plaintiff concedes, however, that Count Eight should be dismissed without prejudice with leave to amend. *Id.* Plaintiff maintains that the allegations concerning B.G. should be severed from those concerning the other patients in Count Eight, and the portion pertaining to B.G. should remain in federal court after any pleading deficiencies are cured. *Id.* at 19-21.

## III. LAW AND ANALYSIS

### A. Standard of Review

#### 1. F.R.C.P. 12(b)(6)

According to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court should dismiss a complaint when it fails "to state a claim upon which relief can be granted." In analyzing a motion to dismiss under Rule 12(b)(6) the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to the complaint, the Court may also consider any exhibits attached thereto. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that when deciding a motion to dismiss, courts generally consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record").

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. While not a "probability requirement," plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 47 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 243 of 466 PageID: 262
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

### 2. F.R.C.P. 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if the court lacks subject matter jurisdiction. In addition, "[a] motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b) (1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). "A district court has to first determine, however, whether a Rule 12(b) (1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).

A facial attack "concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (internal quotation marks omitted). For a factual attack, "the allegations of the complaint have no presumptive truthfulness and the court must weigh the evidence presented by the parties." *Bd. of Trs. of Trucking Emps of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (citing *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290-91 (3d Cir. 2006)). Regardless of whether the attack is facial or factual, "the Plaintiff has the burden to prove that the Court has jurisdiction." *Id.* (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006)).

### 3. Motion to Remand

**\*4** A motion to remand is governed by 28 U.S.C. § 1447(c), which provides that removed cases shall be remanded "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." The party removing the action has the burden of establishing federal jurisdiction. *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). This burden is heavy, since removal statutes are "strictly construed and all doubts should be resolved in favor of remand." *Id.* In matters where diversity jurisdiction is not alleged, removal requires that "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the

plaintiff's cause of action." *Concepcion v. CFG Health Sys. LLC*, No. 13-02081, 2013 WL 5952042, at *2 (D.N.J. Nov. 6, 2013) (internal quotation marks omitted).

### B. Application of ERISA

ERISA applies to "any employee benefit plan if it is established or maintained ... by any employer engaged in commerce." 29 U.S.C. § 1003(a). "ERISA recognizes two types of employee benefit plans: 'employee pension benefit plans,' and 'employee welfare benefit plans.' " *Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (citing 29 U.S.C. § 1002(3)). This matter concerns welfare benefit plans, which are defined by ERISA as follows:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise (A) medical, surgical, or hospital care or benefits[.]

29 U.S.C. § 1002(1).

As noted, Plaintiff does not contest that the Patients' plans are subject to ERISA. The Court likewise concludes that the plans at issue here are welfare benefit plans under ERISA. *See* D.E. 13-2 to-4. They provide medical, surgical, and hospital care benefits to their participants. *Id.* Additionally, there is no question that the documents providing those benefits are "plans" under ERISA as they are formally established and maintained in writing. *See Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982) (noting that "[i]t is obvious that a system of providing benefits pursuant to a written instrument" satisfying ERISA's requirements "constitute[s] a 'plan, fund or program' ").

Plaintiffs do, however, raise an issue as to the authenticity of the plans. Plaintiff contends that the benefit plans attached

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 48 of 155  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 244 of 466 PageID: 263
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

to Defendant's motion to dismiss do not necessarily govern this dispute because they are "unauthenticated, never before seen documents ... without an affidavit or declaration of someone with personal knowledge." Pl. Br. at 11. Defendant, however, properly authenticated the benefit plans by filing the declaration of one of its legal specialists who certified that based on her personal knowledge, the plans submitted by Defendant belonged to the Patients. D.E. 13-1; *Pension Ben. Guar. Corp.*, 998 F.2d at 1196 ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). Accordingly, the employer-benefit plans at issue are the Patients' benefit plans and controlled by ERISA.

### C. Plaintiff's Standing

Under ERISA's civil enforcement provision, Section 502(a), standing to file suit is limited to participants and beneficiaries of a plan. 29 U.S.C. § 1132(a). The Third Circuit, however, has held that "health care providers may obtain standing to sue by assignment from a plan participant." *Cardio Net, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014). This type of standing is known as "derivative standing." *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015). "The party seeking recovery under ERISA § 502(a) has the burden of establishing standing." *Cohen v. Horizon Blue Cross Blue Shield of New Jersey*, No. 15-4525, 2015 WL 6082299, at *3 (D.N.J. Oct. 15, 2015).

**\*5** When proving standing, a plaintiff must plausibly plead underlying facts demonstrating a valid assignment of benefits. *Prof'l Orthopedic Assocs., PA v. Excellus Blue Cross Blue Shield*, No. 14-6950, 2015 WL 4387981, at *6 (D.N.J. July 15, 2015). To do so, a plaintiff may include in its complaint the particular language of the assignment or "include the assignment of benefit document itself." *Cohen*, 2015 WL 6082299, at *3. But a conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing. *Id.* (finding no valid assignment of benefits when the "[c]ourt [was] left with nothing more than conclusory recitations of the legal standard, which is insufficient under *Iqbal* and *Twombly*").

Here, Plaintiff brings Counts One, Six, Seven, and Eight as an assignee of the rights of patients A.G., C.P., and B.G under their benefit plans. In its complaint, Plaintiff alleges that those patients "all signed contracts 'assign[ing] direct payment of

any ... medical insurance benefits' to [P]laintiff." Compl. ¶ 9. This conclusory language falls short of the plausible pleading requirement. Plaintiff did not set forth the actual language from the assignments in its complaint nor did it include a copy of the alleged assignments. Similarly, Plaintiff failed to paraphrase the important language from the assignments. As a result, Plaintiff has not adequately pled derivative standing. Counts One, Six, Seven, and Eight are dismissed without prejudice.

The Court also finds that Count Eight (failure to provide documents under ERISA) should be dismissed because it was insufficiently pled. To state a cause of action under Section 502(c)(1)(B), a plaintiff must plead: "(1) that he is a plan participant or beneficiary; (2) that he has made a written request to a plan administrator for information that falls within the purview of ERISA's disclosure requirements; and (3) that the plan administrator failed to provide the requested documents within thirty days of the written request." *In re Wargotz v. NetJets, Inc.*, No. 09-4789, 2010 WL 1931247, at *3 (D.N.J. May 13, 2010). Although Plaintiff alleges that it "requested plan materials on behalf of Patients A.G., C.P., [and] B.G.," Plaintiff does not allege that it sent a *written* request. Compl. ¶¶ 73-75. For that reason, Count Eight is insufficiently pled and dismissed without prejudice. *See Piscopo v. Pub. Serv. Elec. & Gas Co.*, No. 13-552, 2015 WL 3938925, at *6 (D.N.J. June 25, 2015), *aff'd*, 650 Fed.Appx. 106 (3d Cir. 2016) (granting motion to dismiss for claim under Section 502(c)(1)(B) when plaintiff failed to allege that it sent written request for information).

### D. Plaintiff's Motion to Remand: Complete Preemption under ERISA Section 502(a)

Plaintiff argues that if Counts One, Six, Seven, and Eight are dismissed, then remand is proper because the only remaining counts are state law claims, and thus, the Court is divested of its subject matter jurisdiction. Pl. Br. at 11, 16 n.4. Defendant counters that remand is inappropriate because ERISA completely preempts Plaintiff's state law claims, which provides a basis for the Court's jurisdiction. Def. Br. at 13-15. The Court finds that ERISA does not completely preempt Counts Two through Five.

Under the removal statute, 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant" to federal court. If a complaint alleges a

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 49 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 245 of 466 PageID: 264
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

federal question, then the matter may be removed to district court. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**\*6** In determining whether a complaint alleges a federal question, courts are generally guided by the well-pleaded complaint rule. The rule provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Generally speaking, a plaintiff is "entitled to remain in state court so long as its complaint does not, on its face, affirmatively allege a federal claim." *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 398 (3d Cir. 2004). However, an exception to the well-pleaded complaint rule is found through complete preemption. Complete preemption applies "if Congress has so completely preempted a particular area," so that any complaint raising a claim in that area is "necessarily federal in character" and may be removed to federal court. *LaMonica v. Guardian Life Ins. Co. of Am.*, No. 96-6020, 1997 WL 80991, at \*3 (D.N.J. Feb. 20, 1997). Put differently, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393.

Before addressing whether Plaintiff's state law claims are completely preempted, the Court notes that under ERISA, the term " 'preemption' is used in the law in more than one sense." *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999). The two forms of preemption found in ERISA are "complete preemption" under Section 502(a) and "ordinary preemption" under Section 514(a). *Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 171 (3d Cir. 1997). The significant difference between complete preemption and ordinary (or conflict) preemption is that "[u]nlike ordinary preemption, which would only arise as a federal defense to a state-law claim, complete preemption operates to confer original federal subject matter jurisdiction notwithstanding the absence of a federal cause of action on the face of the complaint." *In re U.S. Healthcare*, 193 F.3d at 160. In other words, if ERISA completely preempts a state law cause of action, then a defendant may remove the matter to federal court on that basis alone, "even if the well-pleaded complaint rule is not satisfied." *Joyce*, 126 F.3d at 171. "But if the doctrine of complete preemption does not apply, even if the defendant has a defense of 'conflict preemption' within the

meaning of § 514(a) because the plaintiff's claims 'relate to' an ERISA plan, the district court is without subject matter jurisdiction." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009); *see also Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (holding that "only complete preemption of a claim under ERISA § 502(a) is required for removal jurisdiction; conflict preemption under ERISA § 514 is not required"). In short, complete preemption pursuant to Section 502(a) is a matter of federal subject matter jurisdiction while conflict preemption under Section 514 is not.

There is a two-part test to determine whether a state law claim is completely preempted under Section 502(a). A federal court has jurisdiction over a state law claim when (1) the plaintiff could have brought the action under Section 502(a) of ERISA [4] and (2) no independent legal duty supports the plaintiff's claim. *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (holding that state law claim is completely preempted when action could have been brought under Section 502(a)(1)(B) and no other legal duty independent of ERISA exists). The test is fashioned in the conjunctive so that "a state-law cause of action is completely preempted only if *both* of its prongs are satisfied." *N.J. Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 303 (3d Cir. 2014) (emphasis added).

**\*7** The Third Circuit elaborated on the meaning of these two prongs in *Pascack Valley*. In that case, the plaintiff hospital entered into a "Network Hospital Agreement" with an independent consultant. 388 F.3d at 396. The consultant also had a "Subscriber Agreement" with the defendant benefit plan, which required the defendant to make timely (and discounted) payments to participating hospitals or pay the hospital's customary rate. *Id.* The defendant was an ERISA "employee welfare benefit plan," which the Third Circuit referred to as the "Plan." *Id.* at 395. The patients who the plaintiff treated were beneficiaries of the welfare benefit plan. The defendant failed to make timely payments, so the plaintiff sued for its customary rate. *Id.* at 396. The plaintiff hospital asserted breach of contract claims against the defendant, alleging that the defendant violated the "Subscriber Agreement" to which the plaintiff was a third-party beneficiary. *Id.* at 397. The plaintiff did not bring a cause of action pursuant to the patient's welfare benefit plan.

*Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....*

The Third Circuit held that the hospital's state law claims were not completely preempted by ERISA for two reasons. First, the court found that the hospital "could not have brought its claims under § 502(a) because the Hospital does not have standing to sue under that statute." *Id.* at 400. The hospital was neither a participant or beneficiary under the Plan and there was no proof that the hospital received a valid assignment of rights. *Id.* at 401-02. Due to the absence of an assignment of benefits, the Third Circuit concluded that the hospital did not have standing to sue the defendant under Section 502(a), and accordingly, the first prong was not satisfied. *Id.* at 402.

Next, the court held that the second prong was not satisfied because "the Hospital's state law claims are predicated on a legal duty that is independent of ERISA." *Id.* The court explained that there were three critical facts to support its decision:

> (1) the Hospital's claims in this case arise from the terms of a contract —the Subscriber Agreement—that is allegedly independent of the Plan; (2) the participants and beneficiaries of the Plan do not appear to be parties to the Subscriber Agreement; and (3) the dispute here is not over the right to payment, which might be said to depend on the patients' assignments to the Hospital, but the amount, or level, of payment, which depends on the terms of the Subscriber Agreement.

*Id.* at 403-04 (internal quotation marks omitted). Therefore, the court concluded that the hospital's state law claims were not completely preempted under Section 502. *Id.* at 404.

The court in *Pascack Valley* recognized that the plaintiffs "claims, to be sure, are derived from [the patient's] ERISA plan, and exist 'only because' of that plan." *Id.* at 402 (quoting *Davila,* 542 U.S. at 210). Yet, the Third Circuit also recognized that neither coverage nor eligibility were in dispute. *Id.* As a result, the court in *Pascack Valley* reasoned, the plaintiff's "right to recovery, if it exists, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself." *Id.* (citation omitted).

In reaching its conclusion, the Third Circuit relied on the Ninth Circuit's decision in *Blue Cross of California v. Anesthesia Care Assocs. Med. Grp., Inc.,* 187 F.3d 1045 (9th Cir. 1999). *Pascack Valley,* 388 F.3d at 402-03. *In Anesthesia Care,* four medical providers (the "Providers") entered into a provider agreement with Blue Cross of California ("Blue Cross") where Blue Cross's subscribers were directed to the Providers in exchange for the Providers agreeing to accept payment according to a specified fee schedule. *Anesthesia Care,* 187 F.3d at 1048. Blue Cross attempted to change the fee schedule, and the Providers filed suit alleging a breach of the provider agreements. *Id.* at 1049.

In rejecting the argument that the Providers' claims were completely preempted under Section 502(a), the Ninth Circuit held that "the Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not claims for benefits under the terms of ERISA plans." *Id.* at 1050. The court in *Anesthesia Care* observed that the dispute centered on the "alleged breach of the provider agreements' provisions regarding fee schedules, and the procedure for setting them, not what charges are 'covered' under the [benefit plan]." *Id* at 1051. To that end, the Ninth Circuit explained that the issue was not "the *right* to payment, which might be said to depend on the patients' assignments to the Providers, but the *amount,* or level, of payment, which depends on the terms of the provider agreements." *Id.* Therefore, the *Anesthesia Care* court concluded that because the Providers' suit did not depend upon interpretation of the terms of the plan, the Provider's claims were not completely preempted under Section 502(a). *Id.* at 1051-52.

**\*8** In another case from the Ninth Circuit, *Marin General,* 581 F.3d 941, the court again addressed whether certain state law claims were completely preempted under Section 502(a). There, the plaintiff hospital alleged that the defendant plan administrator verbally preauthorized a patient's treatment and agreed to pay 90% of the total charges. *Id.* at 943. The patients' health benefits were provided pursuant to an ERISA-governed plan. *Id.* After the procedure, the plan administrator only paid about 25% of the billed amount. *Id.* The lesser amount was paid pursuant to the patients' assignment to the plaintiff hospital. *Id.* at 947. The hospital then brought suit to recover the outstanding balance alleging breach of implied contract, breach of an oral contract, negligent misrepresentation, quantum meruit, and estoppel. *Id.* at 944. After the defendant removed the matter to federal court, the hospital moved to remand, arguing that its state law claims

GLO-L-000242-24   05/24/2024  3:29:47 PM   Pg 51 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 247 of 466 PageID: 266
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

were not completely preempted so that there was no basis for federal subject matter jurisdiction. *Id.*

Relying on *Anesthesia Care*, the Ninth Circuit first determined that the hospital was not asserting a claim under Section 502(a). The *Marin General* court explained that the state law claims were seeking relief not as an assignee of an ERISA plan's benefits, but based on the defendant plan administrator's alleged oral agreement to pay 90% of the total charges. *Id.* at 948. The court rejected the plan administrator's argument that "because the Hospital could have brought a suit under § 502(a)(1)(B) for payments owed to the patient by virtue of the terms of the ERISA plan, this is the only suit the Hospital could bring." *Id.* at 949. The court in *Marin General* explained that, like in *Anesthesia Care*, "even though the [hospital] had received an assignment of the patient's medical rights and hence could have brought a suit under ERISA, there was 'no basis to conclude that the mere fact of assignment converts the [hospitals] claims into claims to recover benefits under the terms of an ERISA plan.' " *Id.* (quoting *Anesthesia Care*, 187 F.3d at 1052). Therefore, the *Marin General* court found that the first prong of the complete preemption test was not met.

As to the second prong of the complete preemption test, the Ninth Circuit held that the hospital's state law causes of action were based on independent legal duties. The court in *Marin General* explained that all the state law claims arose out of the allegation that the plan administrator entered into an independent verbal contract or quasi-contract prior to the patient's medical procedure taking place. *Id.* at 949-50. According to the court, "[s]ince the state-law claims asserted in this case are in no way based on an obligation under an ERISA plan, and since they would exist whether or not an ERISA plan existed, they are based on other independent legal duties" and are not completely preempted. *Id.* at 950 (internal quotation marks omitted).

In this case, the issue presented is very similar to the one addressed by the Ninth Circuit in *Marin General*: whether Plaintiff's state law claims are completely preempted under Section 502(a) of ERISA when Defendant allegedly preauthorized the Patients' medical procedures and made an oral promise to pay Plaintiffs' "usual, customary, and reasonable amount." [5] Compl. ¶ 26. The common theme in *Marin General, Anesthesia Care*, and *Pascack Valley* is that the plaintiff's claims are not completely preempted when plan administrators enter into separate agreements (whether through a subscriber agreement or a verbal commitment)

prior to the procedures being performed. The plaintiffs, in turn, relied upon these agreements to their detriment. In each decision, the court found that the Section 502(a) complete preemption test was not satisfied because the plaintiff's' state law claims were based on those agreements, separate and apart from the ERISA plans at issue.

**\*9** Here, Plaintiff brings Counts Two through Five based on Defendant's alleged verbal promise or agreement to pay the usual, customary, and reasonable rate of the procedures. Moreover, Defendant allegedly made this promise before Plaintiff performed the surgeries at issue.

Turning to the first prong of the complete preemption test—whether Plaintiff's claim could have been brought pursuant to Section 502(a)—a critical distinction between the Third Circuit's decision in *Pascack Valley* and the Ninth Circuit's in *Marin Hospital*, was whether the plaintiff had received an assignment. In *Pascack Valley*, the Third Circuit found that, as to the first prong, the lack of an assignment of benefits was the dispositive factor to conclude that the hospital could not have brought its claim pursuant to Section 502(a). 388 F.3d at 404. By comparison, the hospital in *Marin General* had received an assignment (and, indeed, payment pursuant to the assignment), but the Ninth Circuit nevertheless found that the first prong favored the hospital. In *Marin General*, the Ninth Circuit explained that simply because the medical provider was assigned the patient's benefits and *could* have brought a claim under Section 502(a), it did not mean that a claim under Section 502(a) was the *only* cause of action the medical provider could bring. 581 F.3d at 949; *see also Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1347 (11th Cir. 2009) (explaining that "a provider that has received an assignment of benefits and has a state law claim independent of the claim arising under the assignment holds two separate claims ... the provider may assert a claim for benefits under ERISA, the state law claim, or both."). The court in *Marin General* concluded that state law claims based on an alleged oral contract between the medical provider and plan administrator preauthorizing the patient's medical procedure were not subject to Section 502(a), and therefore, were not completely preempted. *Marin Gen.*, 581 F.3d at 949.

The Court finds the Ninth Circuit's reasoning as to the impact of an assignment persuasive. However, the Court is bound by the Third Circuit's decision in *Pascack Valley.* As noted, the *Pascack Valley* court found the lack of an assignment to be the determinative factor as to the first prong of the complete preemption test. The Court was unable to find any decision by

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 52 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 248 of 466 PageID: 267
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

the Third Circuit which modified its findings as to the import of an assignment, or lack thereof. [6]

**\*10** Here, for the reasons discussed above in Section III.C, there is insufficient proof demonstrating a valid assignment to Plaintiffs. In the absence of a valid assignment, Plaintiff is not able to bring a claim under Section 502(a). However, Plaintiff "may not defeat removal by omitting to plead necessary federal questions in a complaint." *Pascack Valley*, 388 F.3d at 404 (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. California*, 463 U.S. 1, 22 (1983)). In other words, the fact that plaintiff inadequately pled an assignment of benefits cannot be a basis to negate subject matter jurisdiction if there actually was a valid assignment. Plaintiff clearly claims that it received valid assignments even though Plaintiff failed to plausibly plead facts concerning the assignments. In fact, Plaintiff brings ERISA claims pursuant to the assignments. As a result, in light of *Pascack Valley*, the Court finds that the first prong of the complete preemption test is met because Plaintiff's claim could be brought pursuant to Section 502(a). Yet, because the test for complete preemption is composed of two parts, and the test is in the conjunctive, Counts Two through Five may not be completely preempted if they are subject to an independent legal duty.

The second prong asks whether Plaintiff's state law claims "are predicated on a legal duty that is independent of ERISA." *Pascack Valley*, 388 F.3d at 393. Under this prong, a court "must examine whether interpretation or application of the terms and scope of the ERISA insurance plan form an 'essential part' of Plaintiff's claims." *N. Jersey Brain & Spine Ctr. v. Conn. Gen. Life Ins. Co.*, No. 10-4260, 2011 WL 4737067, at \*6 (D.N.J. June 30, 2011). Thus, this prong often turns on whether a plaintiff's claims are "inextricably intertwined with the interpretation and application of ERISA plan coverage and benefits." *Id.* at \*7.

In *Pascack Valley*, the Third Circuit identified three key facts to support its conclusion that the plaintiff hospital's claims were predicated on an independent legal duty and not completely preempted under Section 502(a). 388 F.3d at 403-04. Those facts were that (1) the hospital's claims arose from a written subscriber agreement independent of the ERISA plan, (2) the participants and beneficiaries of the plan were not parties to the subscriber agreement, and (3) the dispute centered on the amount of payment as opposed to the right to payment, which depended on the terms of the

subscriber agreement independent of the ERISA plan at issue. *Id.* All three of those factors support Plaintiff here.

First, Plaintiff alleges that Defendant formed an oral contract, or quasi-contract, with Plaintiff by preauthorizing the surgeries and agreeing to pay the usual, customary, and reasonable rate for the Patients' medical procedures. Second, the Patients were not parties to that alleged agreement and could not bring suit themselves for a breach of that verbal agreement. Finally, the amount of Plaintiff's recovery is determined by looking to the terms of the alleged verbal agreement as opposed to the terms of the Patients' ERISA plans. Therefore, for the same reasons discussed in *Pascack Valley*, the second complete preemption prong has not been met and Counts Two through Five are not a basis for subject matter jurisdiction. The amounts due to Plaintiff, if any, are not determined by the Patient's ERISA plans. Instead, the amounts are based on Defendant's verbal commitment to Plaintiff prior to Plaintiff's performing the surgeries.

The Court recognizes that in *Pascack Valley* there was a written subscriber agreement giving rise to the independent legal duty, whereas here, the alleged contract was the product of an oral agreement. Undoubtedly, a written contract provides clearer proof than a verbal agreement. The Court, however, need not consider the degree of proof at this stage in the proceedings. As a general matter, unless some specific exception such as the statute of frauds applies, an oral contract binds the parties in the same manner as a written contract. *Baer v. Chase*, 392 F.3d 609, 620 (3d Cir. 2004) ("A contract may be expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others."); *Marilyn Manson, Inc. v. N.J. Sports & Exposition Auth.*, 971 F. Supp. 875, 888 (D.N.J. 1997) ("A contract need not be expressed in writing as long as the parties agreed to do something that they previously did not have an obligation to do."). Accordingly, the Court sees no legal distinction between the written contract in *Pascack Valley* and the oral contract alleged in this matter. As noted, in *Marin General*, the contract creating the independent legal duty was formed pursuant to a telephone call. In finding that there was no complete preemption, *Marin General* relied on *Anesthesia Care*, an opinion that the Third Circuit found persuasive in *Pascack Valley*. Here, the Court finds the reasoning of *Marin General* persuasive and holds that the alleged oral contract, or quasi-contract, between Plaintiff and Defendant creates an independent legal duty removing Plaintiff's state law claims from the scope of ERISA's Section 502(a)'s complete preemption. [7]

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 53 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 249 of 466 PageID: 268
Progressive Spine & Orthopaedics, LLC v. Empire Blue..., Not Reported in Fed....

**\*11** At oral argument, Defendant directed the Court to two cases from the Ninth Circuit, which Defendant claimed distinguished *Marin General. See Filler v. Blue Cross of California*, 593 Fed.Appx. 685 (9th Cir. 2015); *Melamed v. Blue Cross of California*, 557 Fed.Appx. 659 (9th Cir. 2014). In *Filler, Marin General* is not cited to or discussed by the court. Additionally, the facts do not indicate that the defendant insurer made an independent promise to pay for medical services rendered to its insureds by the plaintiff. In *Melamed*, the court cited to *Marin General*, but the underlying facts did not concern an alleged independent contract between the medical provider and the plan administrator. Instead, the plaintiff physician alleged that he was a third-party beneficiary of the written ERISA contracts between the defendant insurer and its insureds, the physician's patients. *Melamed*, 557 Fed.Appx. at 661. *Filler* and *Melamed* are therefore inapposite. Accordingly, there is no federal question subject matter jurisdiction over Counts Two through Five of the complaint as to Patients A.G., C.P., and B.G.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is granted in part and denied in part. Counts One, Six, Seven, and Eight are dismissed without prejudice. The remaining causes of action, Counts Two through Five, as to Patients A.G., C.P., and B.G. [8] are not completely preempted by Section 502(a) of ERISA. Finally, Counts Two, Three, and Five are dismissed without prejudice as to Patient D.F.

Plaintiff has thirty days to file an amended complaint to address the pleading deficiencies addressed herein. [9] If, however, Plaintiff decides to forego its ERISA claims (Counts One, Six, Seven, and Eight) and proceed solely on Counts Two through Five, it shall likewise notify the Court in writing within thirty days. If Plaintiff elects to forego its ERISA claims, the Court will not have subject matter jurisdiction. The Court will, as a result, order that this matter be remanded to the Superior Court of New Jersey. An appropriate order accompanies this opinion.

## All Citations

Not Reported in Fed. Supp., 2017 WL 751851

## Footnotes

1    The facts of this matter derive from Plaintiff's complaint and the "undisputedly authentic" documents attached as exhibits to Defendant's motion to dismiss. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Those documents include the health benefit plans of four patients with the initials A.G., C.P., B.G., and D.F. D.E. 13.

2    The time period has expired for Defendant to claim an alternative form of subject matter jurisdiction, even if it could have been properly asserted in the original notice of removal. *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206 n.11 (3d Cir. 2003) (citing 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3733 at 358-61 (3d ed. 1998)) (explaining that after 30-day period for removal, a defendant may not add completely new grounds to establish subject matter jurisdiction).

3    Defendant's brief in support of its motion to dismiss (D.E. 5) will be referred to as "Def. Br." Plaintiff's brief in opposition and cross motion (D.E. 11) will be called "Pl. Br." Defendant's reply brief (D.E. 13) will be referred to as "Def. Rep."

4    A claim may be brought under Section 502(a) of ERISA by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53 (1987).

5    The Court does not address whether Counts Two through Five plausibly and adequately state a cause of action. *See Iqbal*, 556 U.S. 662. Although Defendant raised the plausibility issue at oral argument, Defendant

did not argue this point in its moving papers. Defendant's brief and reply argues only that Plaintiff's state law claims are preempted and that they may not be brought in the absence of a valid assignment. As to D.F., the facts alleged differ from the other Patients in that there is no allegation of a verbal promise preauthorizing D.F.'s surgery. Instead, Plaintiff bases its claims on its "expectation" that it would be paid the "usual, customary, and reasonable" rate when it provided emergency services to D.F. Compl. at ¶ 26. The Court could find no case law supporting Plaintiff's legal theories under those facts; however, as noted, the Court does not make a decision on this issue because Defendant did not move to dismiss on those grounds.

6    The Third Circuit employs a different analysis under the first preemption prong when a plan participant brings a case, as opposed to a third party asserting claims pursuant to an independent contract or agreement. *See Levine v. United Healthcare Corp.*, 402 F.3d 156, 162 (3d Cir. 2005) (noting that claims challenging "the administration of, or eligibility for, benefits ... fall within the scope of 502(a) and are preempted," but claims challenging "the quality of the medical treatment performed" fall outside of 502(a) and are not preempted); *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 447 (3d Cir. 2003) (explaining that complete preemption hinges on whether the claim concerns "eligibility decisions" or "treatment decisions," with the former satisfying the first prong of the complete preemption test); *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 272 (3d Cir. 2001) (same). When a plan participant brings a case, the question of whether there was a valid assignment is not a relevant inquiry.

7    The Court notes that a decision in this District held that state law breach of contract claims were completely preempted by ERISA despite the insurer's alleged preauthorization of the medical procedure at issue. *See Elite Orthopedic & Sports Med. PA v. Aetna Ins. Co.*, No. 14-6175, 2015 WL 5770474, at *3 (D.N.J. Sept. 30, 2015). The court in *Elite Orthopedic*, however, did not provide an in-depth analysis to support its conclusion and relied upon *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987)—a case where there was no independent promise of preauthorized coverage. In another case from this District, the court found that there was no complete preemption when the plaintiff medical provider alleged that the defendant insurer preauthorized the provider "to perform surgery on various of [the] [d]efendant's insureds" and the provider asserted state law claims "premised on distinct agreements with [the] [d]efendant independent of underlying ERISA plans." *Garrick Cox MD LLC v. Cigna Healthcare*, No. 16-4611, 2016 WL 6877778, at *1, *4 (D.N.J. Oct. 28, 2016), *report and recommendation adopted*, No. 16-4611, 2016 WL 6877740 (D.N.J. Nov. 21, 2016). In *Cox*, the court found that the defendant's alleged preauthorization of the surgeries sufficiently created an independent legal duty, thus removing the plaintiff's state law claims from the scope of Section 502(a) complete preemption. *Id.* at *4. The reasoning in *Cox* is consistent with the Court's analysis here.

8    Plaintiff requested that Counts One through Seven be dismissed with prejudice as to B.G. and Count Eight severed from the other Patients. The Court will give Plaintiff the benefit of this opinion prior to dismissing Counts One through Seven with prejudice. If Plaintiff still wishes to dismiss those Counts, it may do so.

9    If Plaintiff decides to re-plead its ERISA claims, and properly states a cause of action, the Court may exercise its supplemental jurisdiction over the remaining state law claims. *See Pryzbowski*, 245 F.3d at 275-76 (finding that when ERISA preempted certain state law claims, the district court properly exercised supplemental jurisdiction over the remaining state law claims because they "[were] derived from the same factual predicate" and therefore should "be combined in one judicial proceeding").

---

**End of Document**                                             © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 55 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 251 of 466 PageID: 270
Advanced Orthopedics and Sports Medicine Institute v...., Not Reported in Fed....

2018 WL 6603650
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

ADVANCED ORTHOPEDICS AND
SPORTS MEDICINE INSTITUTE, Plaintiff,
v.
ANTHEM BLUE CROSS LIFE AND HEALTH
INSURANCE COMPANY, et al., Defendants.

Civil Action No. 17-8848 (MAS) (LHG)
|
Filed 12/14/2018

**Attorneys and Law Firms**

Aaron Aubrey Mitchell, Cohen and Howard, LLP,
Shrewsbury, NJ, for Plaintiff.

Amanda Lyn Genovese, Stephen Steinlight, Troutman
Sanders LLP, New York, NY, Martin J. Healy, Porzio,
Bromberg & Newman, PC, Morristown, NJ, for Defendants.

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

 *1  This matter comes before the Court upon Defendants
Anthem Blue Cross Life and Health Insurance Company's
("Anthem") and Live Nation Entertainment, Inc.'s ("Live
Nation") (collectively, "Defendants") Motion to Dismiss.
(ECF No. 27.) Plaintiff Advanced Orthopedics and Sports
Medicine Institute ("Plaintiff") opposed (ECF No. 28), and
Defendants replied (ECF No. 29). The Court has carefully
considered the parties' submissions and decides this matter
without oral argument pursuant to Local Civil Rule 78.1. For
the reasons set forth below, Defendants' Motion to Dismiss
is granted.

**I. Background** [1]
Plaintiff is a healthcare services provider in the Township
of Freehold, New Jersey. (Am. Compl. ¶ 1, ECF No. 22.)
On April 29, 2015, Plaintiff provided emergency surgery to
M.S.[2] (Id. ¶¶ 15-17.)

Prior to the surgery, the hospital where the surgery was
conducted "obtained authorization for the admission of
[M.S.] through the emergency room department." (Id. ¶ 18.)
Plaintiff billed Defendants $93,945.00 for the surgery, and
Defendants paid Plaintiff $2,586.64. (Id. ¶¶ 21-22.)

On August 28, 2017, Plaintiff filed a complaint against
Defendants in the Superior Court of New Jersey, Monmouth
County, Law Division (the "State Court Action"). (See
Not. of Removal, Ex. A., ECF No. 1-1.) On October 20,
2017, Anthem removed the State Court Action to this
Court pursuant to 28 U.S.C. § 1446. (Not. of Removal 2,
ECF No. I.) Anthem argued that because Section 502 of
the Employee Retirement Income Security Act ("ERISA")
("ERISA Section 502") preempted all of Plaintiff's claims,
this Court has original jurisdiction over the matter pursuant
to 28 U.S.C. § 1331. (Id. at 4.) Anthem also argued that this
Court has subject matter jurisdiction over this matter pursuant
to the diversity jurisdiction provision in 28 U.S.C. § 1332. (Id.
at 11.)

On May 18, 2018, the Court granted Anthem's and Live
Nation's respective Motions to Dismiss (ECF Nos. 6, 7)
and dismissed Plaintiff's Complaint without prejudice. (Mem.
Order. 2, ECF No. 21.) The Court granted leave for "Plaintiff
to re-plead its claims and include sufficient facts to meet the
requirements of Federal Rule of Civil Procedure 8(a)." (Id.)
On June 18, 2018, Plaintiff filed an Amended Complaint
alleging (i) *Quantum Meruit*; (ii) Failure to Make All
Payments Pursuant to Member's Plan Under 29 U.S.C.
§ 1132(a)(1)(b); (iii) Breach of Fiduciary Duty and Co-
Fiduciary Duty Under 29 U.S.C. §§ 1132(a)(3), 1104(a)(1),
1105(a); and (iv) Failure to Establish/Maintain Reasonable
Claims Procedures Under 29 C.F.R. § 2560.503-1. (Am.
Compl. ¶¶ 31, 41, 51, 61.) On July 30, 2018, Defendants
filed a Motion to Dismiss the Amended Complaint pursuant to
Rule 12(b)(1)[3] and Rule 12(b)(6). (Mot. to Dismiss, ECF No.
27.) Defendants also seek attorneys' fees and costs. (Defs.'
Moving Br. 33, ECF No. 27-5.)

**II. Legal Standard**
 *2  On a motion to dismiss for failure to state a claim,
the "defendant bears the burden of showing that no claim
has been presented." Hedges v. United States, 404 F.3d 744,
750 (3d Cir. 2005). A district court is to conduct a three-
part analysis when considering a Rule 12(b)(6) motion to
dismiss. See Malleus v. George, 641 F.3d 560, 563 (3d Cir.
2011). "First, the court must 'tak[e] note of the elements a

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                                1

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 56 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 252 of 466 PageID: 271
Advanced Orthopedics and Sports Medicine Institute v..., Not Reported in Fed....

plaintiff must plead to state a claim.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). Second, the court must "review[ ] the complaint to strike conclusory allegations." *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

A motion to dismiss pursuant to Rule 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction. "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face ... [or] attack the existence of subject matter jurisdiction[.]" *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). The former is a "facial" challenge, while the latter is a "factual" challenge. A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 438 (D.N.J. 1999). When considering a facial challenge, the Court construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists. *Mortensen*, 549 F.2d at 891. A factual challenge, in contrast, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). When considering a factual challenge, the Court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff [bears] the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen*, 549 F.2d at 891). "[A] 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference

provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268.

## III. Discussion

### A. Counts II, III, and IV are Dismissed

Defendants' primary argument [4] attacks Plaintiff's standing to bring claims under ERISA. Specifically, Defendants assert that M.S.'s health benefits plan (the "Plan") contains an anti-assignment provision ("AAP") [5] that prevents Plaintiff from asserting derivative standing and "any assignment of benefits is legally unenforceable and void." (Defs.' Moving Br. 12.) Based on the AAP, Defendants seek dismissal of all of Plaintiff's claims, including the *quantum meruit* claim. (*Id.* at 14.) Defendants also argue that the Amended Complaint does not sufficiently "allege enough facts to detail the contents and scope of the assignment [Plaintiff] purports to hold." (*Id.*) Defendants view the lack of details in the Amended Complaint regarding the assignment as "an attempt to avoid dismissal of Counts Three and Four in the Amended Complaint due to insufficient language in the assignment." (*Id.* at 15.)

**\*3** Plaintiff advances several arguments in opposition to Defendants' standing argument. First, Plaintiff argues that an AAP must be a "unambiguous term" of a health insurance plan to be enforceable. (Pl.'s Opp'n Br. 2, ECF No. 28.) Plaintiff asserts that the AAP in the Plan is ambiguous and "not ripe to be decided on a Motion to Dismiss." (*Id.* at 3.) Second, Plaintiff asserts that the AAP in the Plan only prevents the assignment of "benefits," a term that is undefined in the Plan. (*Id.*) Plaintiff asserts that it "has been assigned [M.S.'s] rights to enforce the terms of the plan." (*Id.* at 2.) Finally, Plaintiff asserts that the Amended Complaint "clearly identifies that [M.S.] has assigned the rights under the Plan to Plaintiff." (*Id.* at 4 (citing to Am. Compl. ¶¶ 8, 35).) Plaintiff also argues that Defendants previously had knowledge of the assignment of rights because Plaintiff previously submitted a copy of the assignment to Defendants as part of an appeal. (*Id.*) Plaintiff's opposition brief includes a copy of the Assignment of Benefits form. (Pl.'s Opp'n Br., Ex. A., ECF No. 28-1.)

Defendants rebut Plaintiff's arguments on three grounds. First, Defendants argue that Plaintiff "incorrectly claims that the anti-assignment language in the Plan is ambiguous" without proffering an alternative explanation and without legal authority to support the claim of ambiguity. (Defs.'

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 57 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 253 of 466 PageID: 272
Advanced Orthopedics and Sports Medicine Institute v..., Not Reported in Fed....

Reply Br. 4, ECF No. 29.) Defendants also argue that two other district courts have found that identical language is "unambiguous and enforceable." (*Id.* (citing *Angstadt v. Empire Health Choice HMO, Inc.*, No. 15-1823, 2017 U.S. Dist. LEXIS 40406, at *14 (E.D.N.Y. Mar. 16, 2017); *Ctr. for Orthopedics & Sports Med. v. Anthem Blue Cross Life & Health Ins. Co.* (*COSM*), No. 16-8876, 2018 WL 1440325, at *7-10 (D.N.J. Mar. 22, 2018) ).) Second, Defendants argue that Plaintiff's attempts to distinguish between seeking benefits under the Plan and asserting M.S.'s rights under the Plan are undermined by Plaintiff's statement that "Plaintiff has standing to seek.... relief based on the assignment of benefits obtained by Plaintiff from Patient." (*Id.* at 5 (citing Am. Compl. ¶ 35).) Finally, interpreting Plaintiff's opposition to include an argument that Defendants waived their ability to object to the assignment of benefits, Defendants argue providing an appeals process prior to litigation does not waive the ability to enforce an AAP. (*Id.* at 6 (citing *Middlesex Surgery Ctr. v. Horizon*, No. 13-112, 2013 WL 775536, at *4 (D.N.J. Feb. 28, 2013) ).)

The Court agrees with Defendants regarding the enforceability of the AAP. The Third Circuit recently held "that anti-assignment clauses in ERISA-governed health insurance plans as a general matter are enforceable." *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 453 (3d Cir. 2018). Plaintiffs argument that the instant AAP is ambiguous is unpersuasive. "The determination of whether a term[, in an ERISA benefits plan,] is ambiguous is a question of law[,]" and "[a] term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991) (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980) ). Plaintiff has not proffered a reasonable alternative interpretation of the AAP in the Plan, and the Court cannot identify one. The Court, accordingly, joins the other district courts that have interpreted a similar AAP, and finds that the AAP in the Plan is unambiguous and enforceable. *See COSM*, 2018 WL 1440325, at *3 (interpreting an idential AAP); *Angstadt*, 2017 U.S. Dist. LEXIS 40406, at *14 (same); *Dual Diagnosis Treatment Ctr., Inc. v. Blue Cross of Cal.*, No. 15-0736, 2016 WL 6892140, at *28-29, 2016 U.S. Dist. LEXIS 162166, at *106-08 (C.D. Cal. Nov. 22, 2016) (interpreting the same AAP and dismissing ERISA claims); *Quaresma v. BC Life & Health Ins. Co.*, 623 F.Supp.2d 1110, 1129 (E.D. Cal. 2007) (interpreting a similar AAP and dismissing a healthcare provider's claims because of the provider's lack of standing to assert the claims).

**\*4** Plaintiff's attempt to distinguish between "rights" and "benefits" fails because Plaintiff has not identified any portion of the Plan that bifurcates M.S.'s "rights" and "benefits" under the Plan. Nor has Plaintiff identified any legal authority to support this argument. When the Third Circuit held that healthcare providers could gain derivative standing to sue through assignments, it recognized that the "right to payment logically entails the right to sue for non-payment." *N. Jersey Brain & Spine Ctr. v. Aetna. Inc.*, 801 F.3d 369, 372 (3d Cir. 2015). The Court declines to separate the right to payment under an ERISA benefits plan and other unidentified rights under the same. Moreover, Plaintiff's argument is undermined by Plaintiff's assertion that "Plaintiff has standing to seek [the relief sought in the Amended Complaint] based on the assignment of benefits obtained by Plaintiff[ ] from [M.S.,]" and that "Plaintiff is entitled to recover benefits due to [M.S.] under any applicable ERISA Plan and Policy." (Am. Compl. ¶¶ 35, 37.)

Finally, Plaintiff has failed to establish that Defendants have waived their right to enforce the AAP. Plaintiff provides no legal authority to support the assertion that Plaintiff's filing of an appeal pursuant to the appeals process outlined in the Plan is a waiver of Defendants' rights. The Third Circuit previously rejected a similar argument and held that the "routine processing of a claim form, issuing payment at the out-of-network rate, and summarily denying the informal appeal do not demonstrate 'an evident purpose to surrender' an objection to a provider's standing in a federal lawsuit." *Am. Orthopedic & Sports Med.*, 890 F.3d at 454. Here, Plaintiff has failed to establish that Defendants' conduct waived Defendants' ability to enforce the AAP in the Plan.

In sum, the Plan contains a valid and enforceable AAP and M.S.'s assignment of benefits to Plaintiff was invalid. Plaintiff, accordingly, does not have standing to assert claims under the Plan. As a result, Counts II, III, and IV are dismissed.

### B. Plaintiffs *Quantum Meruit* Claim is Dismissed

Plaintiff's *quantum meruit* claim is not based on an assignment of benefits from M.S. to Plaintiff,[6] but nonetheless, it is subject to dismissal. Under New Jersey law, to state a claim for *quantum meruit*, Plaintiff must establish four elements: "(1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 254 of 466 PageID: 273

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 58 of 155   Trans ID: LCV20241332836

Advanced Orthopedics and Sports Medicine Institute v...., Not Reported in Fed....

therefore; and (4) the reasonable value of the services." *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.* (*Broad Street*), No. 11-2775, 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012) (quoting *Sean Wood, L.L.C. v. Hegarty Grp., Inc.*, 422 N.J.Super. 500, 29 A.3d 1066, 1073-74 (N.J. Super. Ct. App. Div. 2011) ). Plaintiff must also establish that the benefit conferred by Plaintiff was conferred upon Defendants. *Id.* Here, Plaintiff's *quantum meruit* claim is subject to dismissal because the benefit at issue was conferred upon M.S., not Defendants.

**C. Plaintiffs Request for Remand is Denied**

Plaintiff's opposition concludes with the following statement: "This court lacks subject matter jurisdiction, and therefore this matter should be remanded back to state court." (Pl.'s Opp'n Br. 15.) This was preceded by a lengthy discussion of complete preemption under ERISA Section 502. While Plaintiff acknowledges the differences between complete and express preemption, [7] Plaintiff nonetheless advances arguments regarding complete preemption. However, complete preemption and the Court's subject matter jurisdiction are not at issue here because (i) Anthem's removal of the action from state court was based on diversity jurisdiction and federal question jurisdiction, and (ii) Plaintiffs Amended Complaint asserts three causes of action arising under federal law. As result of Plaintiff asserting three causes of action pursuant to ERISA, the Court has original jurisdiction over the matter. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 298 (3d Cir. 2005) (holding that "the District Court properly acquired subject matter jurisdiction by virtue of the amended complaint[,]" that asserted federal claims.) The Court, accordingly, denies Plaintiff's request for remand.

**D. Defendants' Request for Attorneys' Fees is Denied**

 **\*5**  Defendants seek attorneys' fees and costs arguing that the Amended Complaint was filed "to stall the inevitable dismissal of this case and drive up costs for Defendants," and that Plaintiff failed to follow this Court's order and proceeded under previously rejected theories. (Defs.' Moving Br. 33.) ERISA Section 502(g)(1) provides, "[i]n any action under this subchapter ... by *a participant, beneficiary, or fiduciary*, the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (emphasis added). When determining whether to award attorneys' fees and costs, the Court considers:

(1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

*Einhorn v. M.L. Ruberton Const. Co.*, 720 F.Supp.2d 639, 641-42 (D.N.J. 2010) (citing *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983) ). "The Court must weigh the totality of the factors; the absence of any one factor is not dispositive." *Id.*

Assuming this matter is one in which ERISA Section 502(g)(1) applies, [8] under the totality of the circumstances, the Court concludes that an award of attorneys' fees and costs is inappropriate. Unlike the parties in the cases cited by Defendants, Plaintiff is not a "prolific" filer of boilerplate lawsuits. Indeed, the Court can only identify two other lawsuits in this district in which Plaintiff is a named party. *See Advanced Orthopedics and Sports Med. Inst. v. Horizon Blue Cross Blue Shield* (*AOSM*), No. 17-11807 (D.N.J. July 31, 2018); *Goldberg v. Schindler Elevator Corp.*, No. 17-07147 (D.N.J. Sep. 6, 2018). In those matters, Plaintiff succeeded in having factually similar matters, which proceeded on different legal theories, remanded to state court. *See AOSM*, 2018 WL 3630131, at *1 (D.N.J. July 31, 2018); *Goldberg*, Order, ECF No. 18. Thus, an award of attorneys' fees would serve no deterrent effect on Plaintiff. The Court, accordingly, denies Defendants' request for attorneys' fees and costs.

**IV. <u>Conclusion</u>**

For the reasons set forth above, Defendants' Motion to Dismiss is granted, Defendants' request for attorneys' fees and costs is denied, and Plaintiff's request for remand is denied. An order consistent with this Memorandum Opinion will be entered.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6603650

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 59 of 155   Trans ID: LCV20241332836

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 255 of 466 PageID: 274

Advanced Orthopedics and Sports Medicine Institute v...., Not Reported in Fed....

## Footnotes

1   For the purpose of the instant motion, the Court accepts all factual allegations in the Amended Complaint as true. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

2   M.S. is the pseudonym of Plaintiff's patient.

3   All references to a "Rule" herein are references to the Federal Rules of Civil Procedure.

4   Defendants advance at least seven arguments in support of dismissal, but the Court will only address the two dispositive arguments.

5   The AAP reads as follows: "**Benefits Not Transferable.** Only the *member* is entitled to receive benefits under this *plan*. The right to benefits cannot be transferred." (Defs.' Moving Br., Ex. C 90, ECF No. 27-4 (emphasis in original).)

6   The Amended Complaint makes clear that Counts II, III, and IV, are based on "the assignment of benefits obtained by Plaintiff from" M.S., while Count I does not rely on the assignment. (*Compare* Am. Compl. ¶¶ 25-31 *with* Am. Compl. ¶¶ 35, 42, 52.)

7   Express preemption under ERISA Section 514(a) and complete preemption under ERISA Section 502 are two distinct concepts and the difference is important. *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 355 (3d Cir. 1995). "When the doctrine of complete preemption does not apply, but the plaintiffs state claim is arguably preempted under § 514(a), the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption. It lacks power to do anything other than remand to the state court where the preemption issue can be addressed and resolved." *Id.*

8   ERISA Section 502(g)(1) limits the award of attorneys' fees and costs to suits brought by a "participant, beneficiary, or fiduciary," and Plaintiff is neither a participant, beneficiary, or fiduciary, as defined in ERISA. Thus, the plain language of the statute appears to preclude this matter from being one in which ERISA Section 502(g)(1) would apply.

---

**End of Document**                                               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

2020 Employee Benefits Cas. 330,579

2020 WL 5105234
United States District Court, D. New Jersey.

Kayvon HAGHIGHI, et al., Plaintiffs,
v.
HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY, Defendant.

Civil Action No. 19-20483 (FLW)
|
Filed 08/31/2020

**Attorneys and Law Firms**

Thomas J. Pryor, Scott I. Unger, Stark & Stark, Princeton, NJ, for Plaintiffs.

Kristen Jeanine Coleman, Michael E. Holzapfel, Jacqueline Lindsey Olsen, Becker LLC, Philadelphia, PA, for Defendant.

**OPINION**

WOLFSON, Chief Judge:

**\*1** This matter comes before the Court on the Motion of Defendant Horizon Blue Cross Blue Shield of New Jersey ("Defendant" or "Horizon") to dismiss the Amended Complaint of Plaintiffs Kayvon Haghighi ("Dr. Haghighi") and the Maxillofacial Surgery Center for Excellence, LLC (together, "Plaintiffs"). Plaintiffs seek to recover the normal and reasonable charges for a surgical procedure that was rendered, pursuant to various state law contract, quasi contract, and tort claims. Defendant argues that the alleged claims are preempted under the Employee Retirement Income Security Act ("ERISA"), or, in the alternative, the Amended Complaint fails to assert a viable cause of action. For the reasons expressed herein, Defendant's Motion to dismiss is **GRANTED**. However, Plaintiffs are given leave to amend their breach of contract, negligent misrepresentation, and estoppel state law claims within 21 days from the date of this Opinion.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are taken from Plaintiffs' Amended Complaint and are presumed to be true for the purpose of this Motion. Dr. Haghighi is a New Jersey licensed physician who practices at the Maxillofacial Surgery Center for Excellence,

LLC, located in Red Bank, New Jersey. Am. Compl., ¶ 1. On December 17, 2015, Dr. Haghighi performed dental and medical surgical procedures on Madison Guido (the "Patient"), [1] who is insured under the benefits plan (the "Plan") of Silvia Guido, his relative. Id. at 3. Horizon serves as the administrator of the Plan. Id.

Plaintiffs allege that Horizon "pre-approved" the Procedure "in writing" on two separate dates; first in May 2015, before the surgical medical services were administered, and again in July 2016. Id. at 4. According to Plaintiffs, however, Defendant only paid $2,544.43 of the $50,000 claim that was submitted to Horizon, purportedly representing the "reasonable and customary" costs of the Procedures. Id. at 6-7. As a result, Plaintiffs assert that the "members," Silvia and Madison Guido, are "left exposed" to cover the remaining balance, which totals more than $47,455.57. Id. at 7. Despite appealing the amount paid three times on March 28, 2016, December 27, 2017, and March 23, 2018, Plaintiffs allege that they had no success in resolving their dispute with Horizon. Id. at 7-9.

On October 3, 2019, after failing to resolve their dispute through the administrative appeals process, Plaintiffs filed the instant action against Defendant in the Superior Court of New Jersey, Law Division, Monmouth County. The original complaint included various references to ERISA and the Plan, and identified Plaintiffs as the "assignees and designated representatives of" Silvia and Madison Guido. Moreover, while Plaintiffs alleged that the Procedures were eligible for coverage under the Plan, and that Defendant failed to compensate them pursuant to its terms, the original pleadings also asserted various state law contract, quasi contract, and tort law claims, resulting from Defendant's failure to remunerate Plaintiffs. On November 19, 2019, Defendant removed the case to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446, on the basis of preemption.

**\*2** On December 24, 2019, Plaintiffs filed an Amended Complaint, this time in their own individual capacities, rather than as the "assignees and designated representatives of" Silvia and Madison Guido. Furthermore, no new factual allegations or causes of action are asserted in the Amended Complaint; instead, it omits the original pleading's citations to ERISA and most references to the Plan. The Amended Complaint asserts the following seven common law claims against Defendants: (Count I) breach of contract and violation of good faith and fair dealing; (Count II) quantum meruit; (Count III) unjust enrichment; (Count IV) tortious

**Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....**

2020 Employee Benefits Cas. 330,579

interference with economic advantage; (Count V) violations of NJ statutes, regulations, and other requirements;[2] (Count VI) negligent misrepresentation; and (Count VII) promissory legal and equitable estoppel.

In the instant matter, Defendant moves to dismiss the pleadings, and argues that Plaintiffs' state law claims are preempted under ERISA. In the alternative, Defendant contends that Plaintiffs fail to assert a viable claim in the Amended Complaint. Plaintiffs oppose the Motion.

## II. DISCUSSION

### A. Legal Standard

A court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]") (quotations omitted). Thus, for a complaint to withstand a motion to dismiss under *Rule 12(b)(6)*, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ..." *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). When evaluating a motion to dismiss for failure to state a claim, district courts engage in a three-step progression.

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 662, 129 S.Ct. 1937. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 664, 129 S.Ct. 1937. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* This means that the inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and

evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir.2011). A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 578 F.3d at 211 (citations omitted).

**\*3** The Third Circuit has reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) *cert. denied*, 565 U.S. 817 (2011). Generally, when determining a motion under *Rule 12(b)(6)*, the court may only consider the complaint and its attached exhibits. However, while "a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (citation omitted); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

### B. ERISA Preemption

Defendant contends that ERISA operates to bar Plaintiffs' Amended Complaint, which asserts claims for breach of contract, quantum meruit, unjust enrichment, tortious interference, and negligent misrepresentation. According to Defendant, Plaintiffs cannot pursue these causes of action, because they relate to an ERISA Plan and are preempted under the statute. Defendant's Motion, at 9-11. Refuting these contentions, Plaintiffs argue that their state law claims are based on Defendant's breach of an enforceable freestanding agreement, separate and apart from the Plan. Plaintiffs' Opposition, at 1-2.

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). To achieve this goal, ERISA contains expansive preemption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which operate to keep the regulation of benefit plans in the federal domain. *Id.* ("ERISA includes expansive pre-emption provisions, ... which are intended to ensure that employee benefit plan regulation would be 'exclusively a

**Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....**

2020 Employee Benefits Cas. 330,579

federal concern.' ") (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)); *see also New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 303 (3d Cir. 2014) ("Congress enacted ERISA to ensure that benefit plan administration was subject to a single set of regulations and to avoid subjecting regulated entities to conflicting sources of substantive law."). Indeed, the ultimate objective of federal ERISA preemption is to "eliminate the threat of conflicting and inconsistent State and local regulation." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

ERISA's express preemption provision is set forth in § 514(a), which preempts "any and all State laws insofar as they ... relate to any employee benefit plan" covered under the statute. 29 U.S.C. § 1144(a) (emphasis added). State laws "relate to" an ERISA plan if the law either has a "reference to" or has a "connection with" the plan at issue. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 293-94 (3d Cir. 2014). "The scope of '[s]tate laws' that may 'relate to' a plan is expansive, encompassing "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *see also Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir., 2020) (citing 29 U.S.C. § 1144(c)(1)). "This includes ... state statutes, [and] common law causes of action." *Id.* (citing *Menkes*, 762 F.3d at 294); *see Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 83-84 (3d Cir. 2012) ("State common law claims fall within this definition and, therefore, are subject to ERISA preemption.").

**\*4** As to the first definition, the Third Circuit has instructed that a state law claim will make an impermissible "reference to" an insurance plan when (1) "the existence of an ERISA plan [is] a critical factor in establishing liability," *Ingersoll-Rand*, 498 U.S. at 139-40, 111 S.Ct. 478; or (2) the court's examination will "require interpreting the plan's terms." *Menkes*, 762 F.3d at 294; *1975 Salaried Ret. Plan for Eligible Employees of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992) (citations omitted). As to the second definition, the Third Circuit has recently explained that a state law claim has a "connection with" an insurance benefits plan when (1) the claim "directly affect[s] the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries," *Plastic Surgery Ctr.,*

*P.A.*, 967 F.3d 218, 235 (citaitons omitted); (2) "interfere[s] with plan administration," *Menkes*, 762 F.3d at 295-96; or (3) "undercut[s] ERISA's stated purpose[,]" *Iola*, 700 F.3d at 84-85; *Kollman*, 487 F.3d at 149.

In *Plastic Surgery Ctr.*,[3] the Third Circuit addressed the breadth of preemption under ERISA. There, the plaintiff, a medical provider, asserted various state law claims against the defendant insurer, arising from an oral agreement that the parties executed over the phone. *Plastic Surgery Ctr.*, 967 F.3d 218. Pursuant to the verbal contract's terms, the plaintiff agreed to perform certain surgical procedures on two patients, for which the defendant would compensate the plaintiff in a "reasonable amount," according to the terms of their plans. *Id.* Despite this arrangement, the defendant allegedly refused to compensate the plaintiff in the amount to which the defendant agreed, after the medical services were provided. *Id.* at \*4-5. In turn, the plaintiff alleged breach of contract, promissory estoppel, and unjust enrichment claims, which the defendant moved to dismiss as preempted under ERISA.

The Third Circuit found that the plaintiff's former two claims did not "relate to" an ERISA plan. In so holding, the Third Circuit explained that the parties executed a freestanding contract, defining the medical procedures that the plaintiff agreed to perform, and the amount that the defendant promised to provide in exchange for those services. *Id.* at \*20-21. As such, because the defendant's "oral offers and promises" delineated the scope of its duties, the Third Circuit found that the plaintiffs' state law claims arose from "obligations independent of the plans." *Id.* at \*18-22. However, the Third Circuit reached a different conclusion with respect to the claim for unjust enrichment, which requires a litigant to plead that a defendant received a benefit for which it never paid. According to the Third Circuit, in an ERISA action, the "benefit conferred" is the discharge of an insurer's obligation to an insured. *Id.* at \*37-38. Thus, the Third Circuit concluded that the plaintiffs' unjust enrichment claim was "premised on the existence of" a plan, and dismissed it as preempted under ERISA. *Id.*

### i. Breach of Contract

In Count I of the Amended Complaint, Plaintiffs assert a breach of contract claim against Defendant. At the outset, I note that while Plaintiffs contend that this action arises from an "independent relationship" with Defendant, the pleadings are unclear as to whether Plaintiffs bring this action

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 63 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 259 of 466 PageID: 278
Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....
2020 Employee Benefits Cas. 330,579

under the Plan, in which case ERISA preemption might be applicable, or an unrelated standalone agreement. For example, Plaintiffs' contract claims, as specifically pled in the Amended Complaint, are not based on a freestanding agreement that the parties executed before the rendered medical services, but rather on their alleged status as "beneficiaries" of the Plan. Am. Compl., ¶ 15, ("Defendant failed to pay Plaintiffs as third party beneficiaries ...."). As a result of the ambiguities in the pleadings, the Court cannot, at this time, engage in a preemption examination under ERISA. [4] Nevertheless, even if, for the purpose of this Motion, the Court presumes that Plaintiffs intend to allege claims based on a standalone agreement, the Amended Complaint fails to assert a viable cause of action. I first turn to Plaintiffs' breach of contract claim.

**\*5** To succeed on a breach of contract claim, a litigant must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Here, to establish the first element, *i.e.*, that the parties executed an independent contract from the Plan, the pleadings allege that Defendant preauthorized the Procedure in writing, prior to the date on which the medical services were administered. Am. Compl., ¶ 4. However, no substantive allegations pertaining to the "written preauthorization" are included in the Amended Complaint. Indeed, the Amended Complaint does not describe the preauthorization's contents whatsoever, including, for example, the extent and scope of covered treatment. While these matters need not be alleged in elaborate detail, Plaintiffs cannot depend on a simple preauthorization, in and of itself, to establish that the parties executed a standalone contract, intended to cover all rendered services. Importantly, courts within this district have found some preauthorizations, akin to the one alleged here, to bear a connection with, or have a relationship to, an ERISA plan. *See Atl. Shore Surgical Assocs. v. Horizon Blue Cross Blue Shield*, No. 17-07534, 2018 WL 2441770, at \*5-6, 2018 U.S. Dist. LEXIS 90734, at \*15 (D.N.J. May 31, 2018) (holding that a preauthorization did not constitute a freestanding contract, because the preauthorization was dependent on "the member's benefit plan."); *Advanced Orthopedics & Sports Med. Inst. v. Empire Blue Cross Blue Shield*, No. 17-08697, 2018 WL 2758221, at \*6, 2018 U.S. Dist. LEXIS 96814, at \*15 (D.N.J. June 7, 2018); *Glastein v. Horizon Blue Cross Blue Shield of Am.*, No. 17-7983, 2018 WL 3849904, at \*3, 2018 U.S. Dist. LEXIS 135911, at \*7 (D.N.J. Aug. 13, 2018). Therefore, because Plaintiffs have not alleged the existence

of an independent agreement from the Plan, their breach of contract claim is dismissed without prejudice. [5]

*ii. Unjust Enrichment and Quantum Meruit*

In Counts II and III, Plaintiffs assert unjust enrichment [6] and quantum meruit claims. An unjust enrichment claim requires a litigant to allege: "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 723-24 (D.N.J. 2011). To succeed on a claim for quantum meruit, a litigant must plead "(1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services." *Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68, 796 A.2d 238 (2002) (citing *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir.1994)). Moreover, to state unjust enrichment and quantum meruit claims, "the benefit at issue must have been conferred *on ... the [d]efendant.*" *Broad St. Surgical Ctr., LLC v. UnitedHealth Group, Inc.*, No. 11-2775, 2012 WL 762498, at \*8, 2012 U.S. Dist. LEXIS 30466, at \*22-23 (D.N.J. Mar. 6, 2012).

Here, Plaintiffs fail to allege a cognizable claim for unjust enrichment and quantum meruit. In the Amended Complaint, Plaintiffs base both claims on the same set of factual circumstances, and allege that "Defendant has received the benefit of, but not paid reasonable compensation for" the medical services that Plaintiffs performed. Am. Compl., ¶¶ 21, 25-26. However, as numerous courts within this district have found, the insured individual, rather than the insurer, derives the benefit from a healthcare providers' provision of medical services. Thus, Plaintiffs' unjust enrichment and quantum meruit claims are dismissed on these grounds. *See Small v. Oxford Health Ins., Inc.*, No. 18-13120, 2019 WL 851355, at \*6, 2019 U.S. Dist. LEXIS 27878, at \*17 (D.N.J. Feb. 21, 2019) ("[A]n insurance company does not derive a benefit from services provided for an insured for purposes of a quantum meruit claim."); *Advanced Orthopedics & Sports Med. Inst. v. Int'l Union of Operating Eng'rs Local 14-14B*, No. 19-5076, 2019 U.S. Dist. LEXIS 223586, at \*25-26 (D.N.J. Nov. 26, 2019) ("It is well-established that an insurer does not derive a benefit from services provided for an insured."); *Comprehensive Spine Care P.A. v. Oxford Health Ins., Inc.*, No. 18-10036, 2018 WL 6445593, at \*6, 2018 U.S. Dist. LEXIS 207782, at \*18 (D.N.J. Dec. 10, 2018)

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 64 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 260 of 466 PageID: 279
Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

2020 Employee Benefits Cas. 330,579

("[A]ny benefit conferred by [the plaintiff's] performance of the surgical procedure benefited [the patient], not [the defendant insurer.]").

### iii. Tortious Interference

**\*6** In Count IV, Plaintiffs raise a tortious interference claim. To allege such a claim, Plaintiffs must plead: (1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-52, 563 A.2d 31 (1989). "It is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *DeJoy v. Comcast Cable Communs.*, 941 F. Supp. 468, 477 (D.N.J. 1996) (quoting *Printing Mart-Morristown* 116 N.J. at 752, 563 A.2d 31); *Cappiello v. Ragen Precision Indus., Inc.*, 192 N.J. Super. 523, 529, 471 A.2d 432 (App. Div. 1984) (holding that a tortious interference claim "requires the meddling into the affairs of another"); *Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC*, No. 16-6510, 2018 WL 2455922, at \*4, 2018 U.S. Dist. LEXIS 92735 at \*11 (D.N.J. May 31, 2018) ("[A] party to a contract cannot be liable for tortiously interfering with its own contract.") (citations omitted).

Here, Plaintiffs' tortious interference claim fails, irrespective of whether it arises from an "independent agreement" or an ERISA plan, because Defendant is a contracting party to each. For this reason, Defendant's alleged misconduct must be redressed under traditional principles of contract law, and Plaintiffs' tortious interference claim is dismissed on these grounds. *See DeJoy*, 941 F. Supp. at 477 ("The rule of tortious interference was not meant to upset the rules governing the contractual relationship itself. Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law.") (quoting *Printing Mart-Morristown*, 116 N.J. at 753, 563 A.2d 31); *see Center for Concept Dev., Ltd. v. Godfrey*, 97-7910, No. 97-7910, 1999 WL 163006, at \*3, 1999 U.S. Dist. LEXIS 3337, at \*6 (E.D. Pa. Mar. 23, 1999) ("It is hornbook law that a party or successor party to a contract cannot tortiously interfere with its own contracts.") (citations omitted).

### iv. Negligent Misrepresentation and Estoppel

In Counts VI and VII, Plaintiffs allege negligent misrepresentation and estoppel claims. To assert a claim for negligent misrepresentation, a litigant must allege: "1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages." *McCall v. Metropolitan Life Ins. Co.*, 956 F. Supp. 1172, 1186 (D.N.J. 1996) (citation omitted). The elements of a promissory estoppel claim include: "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that it will induce reliance by the promisee; (3) the promisee must reasonably rely upon the promise; and (4) the promisee must experience detriment of a definite and substantial nature by relying on the promise." *Pitak v. Bell Atl. Network Servs.*, 928 F. Supp. 1354, 1367 (D.N.J. 1996) (citation omitted).

Here, Plaintiffs do not assert a viable estoppel claim. The Amended Complaint alleges that Defendant "provid[ed] written authorization" and "pre-approv[ed] the procedures at issue," and, as a result, Plaintiffs are entitled to recoup the reasonable charges for the rendered medical services, totaling $50,000. Am. Compl., ¶ 40. But, because Plaintiffs received a mere $2,544.43 from Defendant, Plaintiffs allege that Defendant "is estopped from refusing to provide reasonable reimbursement" for the rendered medical services. *Id.* However, Plaintiffs do not assert, for example, that the preauthorization agreement includes a specific billing rate, or that it contains an explicit provision entitling them to be paid in excess of $2,544.43; indeed, the pleadings are entirely devoid of factual allegations that relate to a fixed or agreed-upon rate of compensation. In that connection, Plaintiffs have not alleged that Defendant made a "clear and definite" promise to remunerate them in the "reasonable" amount of $50,000, and their estoppel claim is dismissed on this basis. [7] Moreover, Plaintiffs' negligent misrepresentation claim also fails for these reasons, as the Amended Complaint does not allege that Defendant "provided false information" as to the compensation that Plaintiffs would receive, for the rendered medical services.

**\*7** In sum, the Amended Complaint does not allege a standalone agreement, separate and apart from the Plan, and therefore, Plaintiffs' breach of contract claim cannot stand. Plaintiffs' negligent misrepresentation and estoppel

Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

2020 Employee Benefits Cas. 330,579

claims also fail, because the pleadings do not allege that Defendant discussed or promised to provide a certain amount of compensation for the rendered medical services. Moreover, because the insured individual, rather than the insurer, derives a benefit from the medical services of a health care provider, Plaintiffs' unjust enrichment and quantum meruit claims are dismissed. Plaintiffs also fail to allege a viable tortious interference claim, as an individual cannot interfere with his or her own contract. With the exception of their unjust enrichment, quantum meruit, and tortious interference causes of action, Plaintiffs are given leave to amend their state law claims. At that time, if appropriate, Defendant can move again to dismiss Plaintiffs' amended state law claims on the basis of preemption under ERISA. However, if there is no ERISA claim, leaving only state law claims, remand would be appropriate. *See* FN 4, *supra*.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to dismiss Plaintiffs' Amended Complaint is **GRANTED**. Nonetheless, Plaintiffs are given leave to amend their breach of contract, negligent misrepresentation, and estoppel state law claims within 21 days from the date of this Opinion and accompanying Order.

## All Citations

Not Reported in Fed. Supp., 2020 WL 5105234, 2020 Employee Benefits Cas. 330,579

## Footnotes

1     In particular, the following medical surgical procedures were performed on the Patient: "segmental Le Fort 1 osteotomy with bone graft; bilateral sagittal osteotomies of the mandibular ramus; septoplasty; bone marrow aspiration from the left anterior ileum[.]" Am. Compl., ¶ 3.

2     Because Plaintiffs do not discuss their claim for "violations of NJ statutes, regulations, and other requirements" in their opposition brief, the Court deems that claim abandoned. *See Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003), *aff'd*, 136 F. App'x 551 (3d Cir. 2005) ("Plaintiff makes no response to this argument, and thus has waived his opportunity to contest it."); *Powell v. Verizon*, No. 19-8418, 2019 WL 4597575, at *9, 2019 U.S. Dist. LEXIS 161552, at *22 (D.N.J. Sept. 20, 2019) ("A plaintiff concedes a claim when she fails to oppose arguments in support of a motion to dismiss ....."); *Person v. Teamsters Local Union 863*, No. 12-2293, 2013 WL 5676802, at *2, 2013 U.S. Dist. LEXIS 149252, at *2 (D.N.J. Oct. 17, 2013) ("Failure to raise legal arguments in opposition to a motion to dismiss results in waiver."). Therefore, in determining whether the Amended Complaint asserts a viable claim, the Court does not consider Plaintiffs' violation of NJ statutes claim.

3     The Court notes that the Third Circuit's opinion in *Plastic Surgery Ctr.* was issued after the instant motion was briefed. While neither litigant has discussed the decision's impact on Plaintiffs' claims, for the reasons discussed *infra*, the Court is dismissing Plaintiffs' Amended Complaint without reaching the issue of preemption. Because Plaintiff is given leave to amend, if another dismissal motion is filed, the parties are advised to discuss *Plastic Surgery Ctr.* and its impact on Plaintiffs' amended state law claims.

4     Because the pleadings are unclear as to whether Plaintiffs seek to enforce the provisions of a private agreement, and the extent to which their causes of action relate to an ERISA plan, the Court is retaining jurisdiction at this juncture. However, if Plaintiffs file a second amended complaint that asserts independent state law causes of action, such that the statute's preemption provision is inapplicable, this action would be remanded to state court for lack of subject matter jurisdiction.

5     Indeed, rather than contest Defendant's arguments as to the alleged contract claims, Plaintiffs concede that "their might be some ambiguit[ies]" in the Amended Complaint, "that was not previously addressed

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 66 of 155   Trans ID: LCV20241332836

**Haghighi v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....**

2020 Employee Benefits Cas. 330,579

when revising the Original Complaint," and request permission to amend their contractual claims in order to "articulate the factual basis for the claimed rights[.]" Pl.'s Opposition, at 19.

6    The Court recognizes that the Third Circuit's opinion in *Plastic Surgery Ctr.* held that the plaintiff's unjust enrichment claim, there, was preempted because it related to an ERISA Plan. Because of the Amended Complaint's ambiguities, *i.e.*, whether Plaintiffs bring this action as beneficiaries of the Plan, or instead to enforce the provisions of an independent agreement, the Court does not determine if Plaintiffs' unjust enrichment claim is precluded under ERISA. Nevertheless, for the reasons set forth *infra*, Plaintiffs do not state a viable claim for unjust enrichment.

7    I note that Plaintiffs also allege an equitable estoppel claim in the Amended Complaint, which is based on the same set of factual allegations that support their cause of action for promissory estoppel. The pleadings lump these two theories together, and thus, Plaintiffs' equitable estoppel claim fails for the same reasons that it has not alleged a claim for promissory estoppel. *See Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 162 (3d Cir. 2018) (dismissing the plaintiff's claim for promissory estoppel, and holding that the "absence of any clear promise" on the part of the [defendant corporation] also doom[ed] the [plaintiff's] equitable estoppel claim.").

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Small v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 851355
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Tzvi SMALL, M.D., Plaintiff,

v.

OXFORD HEALTH INSURANCE,

INC., et al., Defendants.

Civil Action No.: 18-13120 (JLL)
|
Signed 02/19/2019
|
Filed 02/21/2019

**Attorneys and Law Firms**

Aaron Aubrey Mitchell, Cohen and Howard, LLP,
Shrewsbury, NJ, for Plaintiff.

Matthew P. Mazzola, Michael H. Bernstein, Robinson &
Cole, Llp, New York, NY, for Defendants.

**OPINION**

JOSE L. LINARES, Chief Judge, United States District Court

*1 This matter comes before the Court by way of
Defendants Oxford Health Insurance, Inc. and United
Healthcare Services, Inc.'s Motion to Dismiss Plaintiff Tzvi
Small, M.D.'s Complaint, pursuant to Federal Rule of
Civil Procedure 12(b)(6). (ECF No. 8). Plaintiff submitted
opposition. (ECF No. 11). Despite being granted additional
time by this Court, (ECF No. 15), Defendants did not file a
reply. The Court has considered the parties' submissions and
decides this matter without oral argument pursuant to Federal
Rule of Civil Procedure 78. For the reasons stated herein,
the Court hereby denies Defendants' Motion in part, with the
exception that the Court shall dismiss Plaintiff's claim for
*quantum meruit.*

**I. BACKGROUND** [1]

Patient "D.H." is insured by and receives medical benefits
from Defendants, which are insurance companies with their
principal places of business in Connecticut. (Compl. ¶¶ 2–

3, 7; ECF No. 1 ¶ 7). Plaintiff is a plastic surgeon who
practices in New Jersey. (Compl. ¶¶ 1, 6, 18). Plaintiff is not
a participating provider in Defendants' insurance network.
(Compl. ¶ 14). Plaintiff alleges that he received written
authorization from Defendants to perform a "medically-
necessary" breast reconstruction surgery on Patient. (Compl.
¶¶ 16–17). Plaintiff performed said surgery on December 19,
2016. (Compl. ¶ 17).

After the surgery, Plaintiff requested payment from
Defendants in the amount of $ 129,600, which according
to Plaintiff "represents [the] normal and reasonable charges
for the complex procedure performed by a Board-
Certified Plastic Surgeon and Surgeon practicing in New
Jersey." (Compl. ¶ 19). However, Plaintiff claims that
Defendants only paid around $10,639, which left a remaining
balance of $118,960.75. (Compl. ¶ 20). Plaintiff alleges that
Defendants: (1) were aware that Plaintiff was not a provider
in their network; (2) did not disclose to Plaintiff that they
would not pay the full amount of the surgery; and (3) induced
Plaintiff to perform the surgery with no intention of paying
the full amount. (Compl. ¶ 21).

In addition to the above allegations, Plaintiff also alleges that
Medical Audit and Review Solutions ("Review Solutions")
contacted him at some point after the surgery. (Compl. ¶ 23).
According to Plaintiff, Review Solutions was an agent of
Defendants and attempted to resolve Plaintiff's claim against
Defendants for the cost of the surgery. (Compl. ¶ 23). Plaintiff
alleges that Review Solutions offered Plaintiff $31,055.20
if Plaintiff forgave the remaining balance of the surgery.
(Compl. ¶ 23). Plaintiff accepted this agreement, which
was allegedly memorialized in writing ("the Agreement").
(Compl. ¶¶ 23–24). Specifically, the Agreement was dated
January 9, 2017 and stated:

> Pursuant to our recent conversation, by signing below,
> [Plaintiff] agrees to: (i) accept the Agreed Amount [of
> $31,055.20] (less deductible, co-insurance, co-payment or
> other patient responsibility or non-covered services as
> defined by the plan) as payment in full for claims/bills
> from plans serviced by MultiPlan that are submitted by
> [Defendants] and determined to be eligible for the services
> rendered to the Patient on the dates listed above; (ii) not
> to balance bill the Patient for the difference between the
> Amount of the Claim/Bill and the Agreed Amount; and (iii)
> reduce the liability of the Patient and [Defendants].

*2 By signing below, the Provider agrees and
acknowledges that: (i) [Review Solutions] and MultiPlan

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 68 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 264 of 466 PageID: 283
*Small v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)*

are not payors and are not financially responsible for any payments due to [Plaintiff]; (ii) the payment of benefits, if any, is subject to the terms and conditions of the Patient's plan; and (iii) this agreement does not constitute, nor should it be construed as a guarantee of benefit payment by [Defendants]. [Plaintiff] retains the right to bill the Patient (or financially responsible party) for items not covered under the Patient's benefit plan.

(ECF No. 11-10 at 2 ("Agreement") ).

Despite the Agreement, Plaintiff claims that Defendants never made any payment beyond the original amount of approximately $10,639. (Compl. ¶ 26). Plaintiff argues that Defendants' failure to pay the remaining $20,415.92 was a breach of the Agreement. (Compl. ¶ 27). Furthermore, Plaintiff claims in the alternative that the course of conduct between the parties, and particularly Defendants' authorization of the surgery, created an implied contract in which Defendants agreed to pay "the fair and reasonable rates for" performing the surgery, *i.e.*, the remaining balance of $118,960.75. (Compl. ¶¶ 29–33).

Accordingly, Plaintiff brought suit in New Jersey Superior Court, alleging the following causes of action: (1) Breach of the Agreement ("Count One"); (2) Breach of Implied Contract ("Count Two"); (3) Promissory Estoppel ("Count Three"); (4) Account Stated ("Count Four"); and (5) *Quantum Meruit* ("Count Five"). (Compl. ¶¶ 22–51). Defendants removed the action to this Court. (ECF No. 1). Now, Defendants move to dismiss Plaintiff's Complaint.

## II. LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the Court must: (1) "tak[e] note of the elements [the] plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

### A. ERISA Preemption

Defendants argue that Plaintiff's claims are preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), because Patient's insurance plan is governed by ERISA. State law claims are preempted by ERISA under two "separate but related" standards—either completely or expressly. *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 270 (3d Cir. 2001). As explained in more detail below, Defendants have not persuaded the Court that ERISA preempts Plaintiff's claims under either standard.

### 1. Complete Preemption

**\*3** A state law claim is completely preempted by ERISA "only if: (1) the plaintiff could have brought the claim under § 502(a) [of ERISA]; and (2) no other independent legal duty supports the plaintiff's claim." *N.J. Carpenters & the Trs. Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 303 (3d Cir. 2014) (citing *Pascack Valley Hosp. Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004)). The first prong of this analysis, referred to as the *Pascack* test, requires the Court to determine whether the plaintiff would have standing to bring a claim under ERISA. *E. Coast Advanced Plastic Surgery v. AmeriHealth*, No. 17-8409, 2018 WL 1226104, at *2 (D.N.J. Mar. 9, 2018) (quoting *Progressive Spine & Orthopaedics, LLC v. Anthem Blue Cross Blue Shield*, No. 17-536, 2017 WL 4011203, at *5 (D.N.J. Sept. 11, 2017) ). In making this determination, the Court must look at whether Plaintiff "is the type of party that

*Smail v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)*

can bring a claim pursuant to" ERISA, and whether Plaintiff's claims "can be construed as ... colorable claim[s] for benefits" under ERISA. *Id.*

Here, Plaintiff's claims do not satisfy the first prong of the *Pascack* test. Plaintiff is not a beneficiary or participant of Patient's ERISA-regulated plan, and Plaintiff does not allege that he was assigned benefits to Patient's ERISA-regulated plan. (Compl. ¶ 14). Rather, Plaintiff is an out-of-network healthcare provider asserting state law contract claims on his own behalf, not on behalf of Patient. (*See generally* Compl.). Additionally, Plaintiff's claims cannot be construed as "colorable claim[s] for benefits," as he "does not challenge the type, scope or provision of benefits under" Patient's ERISA-regulated plan, but rather "only asserts [his] right as a third-party provider to be reimbursed for pre-authorized medical services [he] rendered" to Patient. *E. Coast Advanced Plastic Surgery*, 2018 WL 1226104, at *2. While ERISA "preempts claims regarding coverage or denials of benefits" under a plan, it "does not ... preempt claims over the amount of coverage provided, which includes disputes over reimbursement." *Id.* at *5. Because Plaintiff's claims do not meet the first prong of the *Pascack* test, the Court concludes, without reaching the second prong, that Plaintiff's state law claims are not completely preempted by ERISA.

### 2. Express Preemption

ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a). "[T]he phrase 'relate to' [is] given its broad commonsense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987) (quoting *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 739 (1985)). The Supreme Court has described two categories in which ERISA expressly preempts a state law claim: (1) "if [a state law claim] has a 'reference to' ERISA plans" or (2) if a state law claim "has an impermissible 'connection with' ERISA plans. *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (citations omitted).

In a recent and nearly identical case out of this District, the Court denied an insurance company's motion to dismiss, concluding that a plaintiff healthcare provider's state law claims, premised on the defendant's preauthorization of a medical procedure, were not preempted by ERISA. *Glastein v. Aetna, Inc.*, No. 18-9262, 2018 WL 4562467 (D.N.J. Sept. 24, 2018). The Court found that the plaintiff's claims did not "refer to" an ERISA plan because "the Complaint does not claim that Plaintiff was a contracting party to any ERISA plan" nor "allege that payment [was] due to [Plaintiff] according to the terms of an ERISA plan." *Id.* at *2. The allegations of an implied contract "[did] nothing to suggest" that the plaintiff's claims would "require examination of an ERISA plan." *Id.* The Court also concluded that the state law claims did not have an "impermissible connection with" an ERISA plan, since the "central purpose of ERISA is to protect plan participants and beneficiaries," and "claims brought by a provider against an insurance company do not implicate" that goal. *Id.* at *3.

**\*4** The Court reaches the same conclusion here. Plaintiff's claims do not "relate to" an ERISA-regulated plan because the Complaint does not seek damages pursuant to the terms of Patient's benefit plan. Indeed, nothing in the Complaint directs the Court to consider the terms of Patient's benefit plan. Instead, the Complaint seeks damages arising from an independent relationship between Plaintiff and Defendants. Although Defendants argue to the contrary that Plaintiff is seeking additional benefits from Defendants for out-of-network services and that the Agreement mentions benefit payments that are governed by Patient's plan, (ECF No. 8-3 at 19 20), the Court's analysis is not altered here because, at this stage in the proceedings, the Court is concerned with the four corners of the Complaint, which bases Defendants' liability solely on representations not facially related to Patient's insurance plan. [2] Accordingly, the Court finds that Plaintiff's claims are not completely or expressly preempted by ERISA.

### B. Breach of the Agreement

To establish a *prima facie* case for Count One, Plaintiff must show that: (1) a contract existed between the parties; (2) a party breached the contract; (3) the breach resulted in damages; and (4) the party alleging the breach performed its obligations in accordance with the contract. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citations omitted). In the absence of any ambiguity, the meaning of a contract can be interpreted as a matter of law. *J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989) (citations omitted).

Defendants argue that Plaintiff has failed to state a claim for Count One because Plaintiff has not demonstrated: (1)

*Small v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)*

that Review Solutions was Defendants' agent; and (2) that Defendants manifested an intention to be bound by the Agreement's plain terms. (ECF No. 8-3 at 8–9). The Court addresses each of these arguments in turn.

### 1. Authority to Enter into the Agreement

In order for an agreement between an agent and a third party to bind the principal under New Jersey law, Plaintiff must show that the agent had either

> (1) express or real authority [that] has been definitely granted; (2) implied authority—that is to do all that is proper, customarily incidental and reasonably appropriate to the exercise of the authority granted; or (3) apparent authority, such as where the principal by words, conduct, or other indicative manifestations has "held out" the person to be its agent.

*Derbin v. Access Wealth Mgmt., LLC*, No. 11-812, 2011 WL 4751992, at *6 (D.N.J. Oct. 7, 2011) (citing *Hoddeson v. Koos Bros.*, 47 N.J. Super. 224, 232 (App. Div. 1957) ).

Here, Defendants claim that Plaintiff has not set forth any allegations that Defendants expressly, implicitly, or apparently authorized Review Solutions to enter into the Agreement with Plaintiff. (ECF No. 8-3 at 8–9). Instead, according to Defendants, Plaintiff merely offers the conclusory statement that Review Solutions was an agent of Defendants. (*Id.*).

However, the Court finds that the allegations in the Complaint, when taken as true, are sufficient at this stage in the proceedings to support the conclusion that Review Solutions had some form of an agency relationship with Defendants. For example, Plaintiff alleges that Review Solutions approached Plaintiff as an agent of Defendants to resolve Plaintiff's claim against Defendants for the cost of the surgery. (Compl. ¶¶ 23–24). Moreover, the Agreement itself states that Defendants were the "Client/Payor" of Review Solutions, (*see* Agreement), which with more evidence may later indicate that an agency relationship existed between Defendants and Review Solutions. While the Court may

ultimately conclude that Review Solutions was not an agent of Defendants, it would nevertheless be premature to make such a determination at this early stage of the proceedings and in the absence of discovery. Accordingly, the Court rejects Defendants' first argument.

### 2. Intent to be Bound

**\*5** In their second argument, Defendants correctly point out that the parties must "manifest an intention to be bound" for an agreement to be enforceable under New Jersey law. *See Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992). Defendants argue that they were not obligated to abide by the Agreement and pay Plaintiff the agreed upon $31,055.20, because the second paragraph of the Agreement states that "this agreement does not constitute, nor should it be construed as a guarantee of benefit payment by [Defendants]." (ECF No. 8-3 at 9).

Though Plaintiff did not address it, the Court is nevertheless unconvinced by Defendants' argument. As the Third Circuit has explained, contracts must be read as a whole, rather than in isolation. *See III. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) (citing *Hardy ex rel. Dowdell v. Abdul-Matin*, 198 N.J. 95, 100 102 (2009)). Here, Defendants' interpretation of the second paragraph of the Agreement cannot be reconciled with the language of the first paragraph, which specifically states that Plaintiff would "accept the Agreed Amount" of $31,055.20 "as payment in full for claims/bills," and would further agree to "reduce the liability of the Patient and [Defendants]." (*See* Agreement). When construing the Agreement as a whole, contrary to Defendants' interpretation, the first paragraph can be properly understood as Plaintiff's acceptance of a settlement payment in exchange for the withdrawal of his claim against Defendants for the cost of the surgery, and the second paragraph merely clarifies that said payment is not for benefits under Patient's plan. At the very least, it would be more appropriate to interpret this language and the surrounding circumstances at summary judgment, after the parties have had the benefit of discovery. Accordingly, the Court rejects both of Defendants' arguments and finds that Count One survives Defendants' Motion to Dismiss.

### C. Breach of Implied Contract

"An implied-in-fact contract... is a true contract arising from mutual agreement and intent to promise, but in circumstances

*Small v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)*

in which the agreement and promise have not been verbally expressed." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) (quoting *In re Perm Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987) ). Therefore, in order to survive a motion to dismiss, Plaintiff must plead the elements of a contract claim: "(1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result." *Days Inn Worldwide, Inc. v. Shara & Sons, Inc.*, No. 13-1049, 2013 WL 5535959, at *3 (D.N.J. Oct. 7, 2013) (quoting *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007) ).

This Court has recently considered a nearly identical case in which it determined at the motion to dismiss stage that a healthcare provider sufficiently alleged the existence of an implied contract when the provider rendered services in reliance on the insurance company's preauthorization of medical services. *See Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.*, No. 18-10036, 2018 WL 6445593, at *5 (D.N.J. Dec. 10, 2018). Similar to that case, Plaintiff here has alleged that: (1) the parties entered into an implied contract based on Defendants' course of conduct; (2) Defendants failed to pay Plaintiff the reasonable and fair amount for the services rendered; and (3) Plaintiff suffered damages as a result. (Compl. ¶¶ 29–35). Irrespective of any questions regarding the exact terms of this implied contract, Plaintiffs allegations at this early stage are sufficient to entitle Plaintiff to discovery to further prove his claim. *See Comprehensive Spine Care, P.A.*, 2018 WL 6445593, at *5 (concluding same). Accordingly, Count Two survives Defendants' Motion to Dismiss.

### D. Promissory Estoppel

**\*6** A claim for promissory estoppel under New Jersey law requires a showing of the following elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it[;] (3) reasonable reliance; and (4) definite and substantial detriment." *Cotter v. Newark Hous. Auth.*, 422 F. App'x 95, 99 (3d Cir. 2011) (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders*, 194 N.J. 223, 253 (2008)). Here, Plaintiff sufficiently alleges that Defendants promised to pay him for the surgical services to be rendered at a "fair and reasonable rate," Plaintiff relied on this promise by performing the surgery, and Plaintiff suffered damages by Defendants' refusal to pay. (Compl. ¶¶ 37–39). Therefore, the Court concludes that Plaintiff has established a *prima face* claim for promissory estoppel and Count Three survives dismissal. *See E. Coast Advanced Plastic Surgery v. Aetna, Inc.*, No. 17-13676, 2018 WL 3062907, at *3 (D.N.J. June

21, 2018) (finding that the plaintiff provider sufficiently alleged promissory estoppel "because upon pre-authorizing the procedures, [the defendant] should have understood that it was reasonable for Plaintiff to rely on the representations .. which Plaintiff relied on to its detriment").

### E. Account Stated

"A claim for account stated is similar to a claim for breach of contract, and requires a plaintiff to prove that there is an 'exact and definite balance' for goods delivered or services rendered that can be proven by a statement of account." *Progressive Freight, Inc. v. Framaur Assoc, LLC*, No. 16-9366, 2017 WL 3872327, at *3 (D.N.J. Sept. 5, 2017) (quoting *Manley Toys, Ltd. v. Toys R Us, Inc.*, No. 12-3072, 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013)). Here, Plaintiff claims that: (1) he submitted a bill and request for payment to Defendants after he completed Patient's surgery; (2) Defendants acknowledged receipt of the bill, paid a small portion, and made no other objection to the billed amount; and (3) Defendants' refusal to pay the remaining balance caused Plaintiff to suffer damages. (Compl. ¶¶ 41–44). As the Court has already found that Plaintiff sufficiently alleged his claims for breach of contract, breach of implied contract, and promissory estoppel, the Court similarly finds that Plaintiff has sufficiently alleged a claim for account stated. *See E. Coast Advanced Plastic Surgery*, 2018 WL 3062907, at *3 (holding plaintiff provider sufficiently alleged account stated claim, reasoning that, "in pleading adequately the breach of contract and promissory estoppel claims, it follows that the parties' conduct may show mutual agreement as to the exact and definite amount [defendant insurer] owes Plaintiff). Accordingly, Count Four survives Defendants' Motion to Dismiss.

### F. Quantum Meruit

The doctrine of *quantum meruit* "is applied when, absent a manifest intention to be bound, one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 76 (D.N.J. 2018) (citing *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (App. Div. 2007)). "A plaintiff makes out a proper claim for *quantum meruit* when it pleads that 'services were performed with an expectation that the beneficiary would pay for them, and under circumstances that should have put the beneficiary on notice that the plaintiff expected to be paid.' " *Manley Toys, Ltd.*, 2013 WL 244737, at *6 (quoting *Weichert Co. Realtors*, 128 N.J. at 438).

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 72 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 268 of 466 PageID: 287
Small v. Oxford Health Insurance, Inc., Not Reported in Fed. Supp. (2019)

Here, Plaintiff claims that: (1) he provided Patient with a "medically-necessary medical service[ ]"; (2) "Defendants agreed to pay the fair and reasonable rates for" that service; (3) Defendants did not pay the full amount for the service performed for Patient; and (4) Plaintiff suffered damages. (Compl. ¶¶ 46–51). However, the Court agrees with Defendants that an insurance company does not derive a benefit from services provided for an insured for purposes of a *quantum meruit* claim. *See Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-2775, 2012 WL 762498, at *5 (D.N.J. Mar. 6, 2012) (stating same) (citations omitted). In light of this finding, the Court concludes that Plaintiff cannot establish a *prima facie* claim for *quantum meruit* and that Count Five must therefore be dismissed.

## IV. CONCLUSION

**\*7** For the aforementioned reasons, the Court hereby grants Defendants' Motion to Dismiss to the extent that it seeks to dismiss Count Five, but denies Defendants' Motion to the extent that it seeks to dismiss all other claims. An appropriate Order follows this Opinion.

### All Citations

Not Reported in Fed. Supp., 2019 WL 851355

## Footnotes

1    This background is derived from Plaintiffs Complaint, (ECF No. 1-1 ("Compl.") ), which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

2    To the extent that Defendants raise arguments regarding the language of the Agreement, as further discussed below *supra*, Section III.B.2., said language is better understood at this stage in the proceedings as part of a settlement payment that was separate from any ERISA-governed plan.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

458 Fed.Appx. 18
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

David A. KAVITZ, Plaintiff–Appellant,

v.

INTERNATIONAL BUSINESS MACHINES,
CORPORATION, Defendant–Appellee.

No. 10–3850–cv
|
Jan. 11, 2012.

**Synopsis**

**Background:** Employee sued employer for breach of express
and implied contract, breach of implied covenant of good
faith and fair dealing, breach of fiduciary duty, and money
had and received, challenging employer's calculation of his
commission on transaction. The United States District Court
for the Southern District of New York, McMahon, J., granted
summary judgment for employer. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] incentive plan was not enforceable contract;

[2] employer's lack of intent to create binding contract
governing incentive compensation precluded employee's
claim for breach of implied-in-fact contract;

[3] employee failed to establish claim for promissory
estoppel; and

[4] employer's lack of intent to create binding contract
governing incentive compensation precluded claims for
breach of implied covenant of good faith and fair dealing,
breach of fiduciary duty, and money had and received.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (4)

**[1]    Labor and Employment**    Employee
incentive program

Employer did not intend to be bound by terms of
employee incentive plan, as required for plan to
create enforceable contract under New York law,
as shown by plan language indicating that it was
not express or implied contract or promise by
employer to make any distributions under plan
and employer's reservation of right to adjust plan
terms or to cancel plan entirely.

14 Cases that cite this headnote
More cases on this issue

**[2]    Labor and Employment**    Employee
incentive program

Employee incentive plan, which stated that
it was not express or implied contract or
promise to make plan distributions and reserved
employer's right to adjust plan terms or to
cancel plan, established employer's lack of intent
to create binding contract governing incentive
compensation, precluding employee's claim for
breach of implied-in-fact contract under New
York law.

18 Cases that cite this headnote
More cases on this issue

**[3]    Estoppel**    Future events; promissory
estoppel

Employee incentive plan, which evidenced
employer's lack of intent to create binding
contract governing incentive compensation,

negated any inference that employer made clear and unambiguous promise to pay incentive compensation required for employee to establish claim for promissory estoppel based on his prior dealings with employer.

4 Cases that cite this headnote
More cases on this issue

**[4]**   **Implied and Constructive Contracts** 🔑 **Money Received**

**Labor and Employment** 🔑 Employee incentive program

Employer's lack of intent to create binding contract governing incentive compensation, established by language of employee incentive plan, precluded employee's claims for breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, and money had and received under New York law.

5 Cases that cite this headnote
More cases on this issue

**\*19**  Appeal from the United States District Court for the Southern District of New York (McMahon, J.).

**ON CONSIDERATION WHEREOF,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the judgment of the District Court be and hereby is **AFFIRMED.**

**Attorneys and Law Firms**

Alfred Dovbish, Law Office of Alfred Dovbish, Tiburon, CA, for Appellant.

Kevin G. Lauri (Peter C. Moskowitz, on the brief), Jackson Lewis LLP, New York, NY, for Appellee.

Present: PETER W. HALL, DENNY CHIN, Circuit Judges, ALVIN K. HELLERSTEIN, [*] District Judge.

**SUMMARY ORDER**

Plaintiff–Appellant David A. Kavitz appeals from the district court's (McMahon, *J.*) grant of summary judgment to Defendant–Appellee International Business Machines

Corporation ("IBM") on Kavitz's claims for breach of express and implied contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and money had and received, arising from IBM's calculation of Kavitz's commission for a transaction involving Motorola, IBM's customer, during the 2006 calendar year. Kavitz maintains that under the terms of his 2006 Incentive Plan Letter (the "Plan"), IBM was contractually obligated to award him a commission calculated pursuant to certain accelerators ("incentive compensation"). Kavitz also challenges a number of the district court's discovery rulings. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review the grant of summary judgment *de novo, see Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003), which is appropriate only if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law," Fed.R.Civ.P. 56(a).

**[1]**   Kavitz's principal argument is that the Plan constitutes an enforceable contract between himself and IBM, and by failing to pay him certain incentive compensation for the 2006 calendar year, IBM breached that contract. To establish the existence of an enforceable agreement under New York law, which the parties agree applies here, there must be "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Civil Serv. Employees Ass'n, Inc. v. Baldwin Union Free Sch. Dist.,* 84 A.D.3d 1232, 924 N.Y.S.2d 126, 128 (2d Dep't 2011) (internal quotation marks omitted). The relevant issue is whether the Plan evidences an intent by IBM to be bound by the document's terms. Kavitz asserts that it does, but he ignores the document's plain language. The Plan states explicitly that it "does not constitute an express or implied contract or a promise by IBM to make any **\*20** distributions under it," and that "IBM reserves the right to adjust the Plan terms, including but not limited to any quota and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms." Based on this express language, we agree with the district court that IBM did not intend for the Plan to constitute an enforceable contract. *See, e.g., Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 261–62 (2d Cir.1984) (concluding that where the documents at issue did not evidence defendant's intent to be bound, those documents did not constitute an offer by defendant to enter into a contractual relationship). We note that two of our sister circuits have reached the same conclusion based

on substantially similar language in an IBM incentive plan letter, and find persuasive the relevant analysis in those decisions. *See, e.g., Geras v. IBM,* 638 F.3d 1311, 1316 (10th Cir.2011) (holding that this same language "does not manifest an intent [by IBM] to be bound by the terms of its incentive plan, nor could [the plan] be reasonably relied upon by an employee as a commitment to comply with those terms"); *Jensen v. IBM,* 454 F.3d 382, 388 (4th Cir.2006) (holding that this same language "did not invite a bargain or manifest a willingness to enter into a bargain," but instead "manifested [a] clear intent to preclude the formation of a contract"). Even if we had any doubt on this point (and we do not), that IBM retained unfettered discretion under the Plan to adjust its terms or even to cancel the Plan entirely confirms that the document is not an enforceable contract. *See Barker v. NYNEX Corp.,* 305 A.D.2d 233, 760 N.Y.S.2d 138 (1st Dep't 2003).

 [2]  [3]   For similar reasons, we conclude that Kavitz's implied-in-fact contract claim fails as a matter of law. Although a "contract implied in fact may result as an inference from the facts and circumstances of the case, though not formally stated in words," such a contract nonetheless "derive[s] from the 'presumed' intention of the parties as indicated by their conduct." *Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–04, 369 N.Y.S.2d 400, 330 N.E.2d 414 (1975) (internal citations omitted); *accord Pache v. Aviation Volunteer Fire Co.,* 20 A.D.3d 731, 800 N.Y.S.2d 228, 229 (3d Dep't 2005). Here again, Kavitz's claim is undermined by the Plan's express language. While he maintains that IBM's prior actions with respect to the 2003 Motorola audit created an implied contract to pay incentive compensation in 2006, the Plan makes clear that IBM never intended to create a binding contract governing incentive compensation for 2006. Moreover, to the extent Kavitz asserts that his prior dealings with IBM support a claim for promissory estoppel, the Plan negates any inference that IBM made "a clear and unambiguous promise" to pay incentive compensation for the 2006 calendar year. *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989) (evidence of "a clear and unambiguous promise" by defendant is necessary to prevail on a claim for promissory estoppel); *see also U.S. West Fin. Servs., Inc. v. Tollman,* 786 F.Supp. 333, 344 (S.D.N.Y.1992) ("Regardless of any previous course of dealing and any actions taken in reliance, without a clear and unambiguous promise there is no promissory estoppel.").

 [4]   In light of the above, Kavitz's remaining claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and money had and received are all without merit. *See generally Rather v. CBS Corp.,* 68 A.D.3d 49, 886 N.Y.S.2d 121, 125 (1st Dep't 2009); *Nikitovich v. O'Neal,* 40 A.D.3d 300, 836 N.Y.S.2d 34, 35 (1st Dep't 2007); **\*21** *Anesthesia Group of Albany, P.C. v. New York,* 309 A.D.2d 1130, 766 N.Y.S.2d 448, 450 (3d Dep't 2003); *Kaufman Org., Ltd. v. Graham & James LLP,* 269 A.D.2d 171, 703 N.Y.S.2d 439, 442 (1st Dep't 2000). Finally, with respect to Kavitz's challenges to the district court's denial of his discovery-related motions, we review a lower court's discovery rulings for abuse of discretion, bearing in mind that a "district court has broad discretion to manage pre-trial discovery." *Wood v. F.B.I.,* 432 F.3d 78, 84 (2d Cir.2005). Based on a thorough review of the record, we cannot say that the court abused its discretion by denying Kavitz's two motions.

We have considered all of Kavitz's arguments and find them without merit. The judgment of the district court is therefore **AFFIRMED.**

### All Citations

458 Fed.Appx. 18

### Footnotes

| | |
|---|---|
| \* | The Honorable Alvin K. Hellerstein, District Judge for the United States District Court for the Southern District of New York, sitting by designation. |

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 76 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 272 of 466 PageID: 291
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

2023 WL 160084
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ATLANTIC NEUROSURGICAL
SPECIALISTS, P.A., Plaintiff,
v.
MULTIPLAN, INC., Connecticut
General Life Insurance Company, United
Healthcare Group Company, Defendants.

20 Civ. 10685 (LLS)
|
Signed January 11, 2023

**Attorneys and Law Firms**

Nicole Allocca, John William Leardi, Buttaci Leardi &
Werner LLC, Princeton, NJ, for Plaintiff.

Aimee Leigh Creed, D'arcambal Ousley & Cuyler Burk LLP,
New York, NY, Errol J. King, Katherine C. Mannino, Phelps
Dunbar LLP, Baton Rouge, LA, for Defendant Multiplan, Inc.

OPINION & ORDER

LOUIS L. STANTON, United States District Judge

*1   Atlantic Neurosurgical Specialists, P.A. ("Atlantic
Neuro") alleges it was underpaid for medical services it
provided to two patients who were insured by either
Cigna Health and Life Insurance Company ("Cigna") or
UnitedHealthcare Insurance Company ("United"). Atlantic
Neuro asserts various contractual and quasi-contractual
claims under New Jersey state law against Cigna and
United, and the administering preferred provider organization
("PPO"), MultiPlan, Inc. ("MultiPlan") to recover the
difference it is allegedly owed.

Defendants separately move to dismiss the First Amended
Complaint for failure to state a claim. For the reasons set forth
herein, Cigna's and United's motion is granted and MultiPlan's
motion is granted as to Counts IV and VI but denied as to
Counts I and V.

**BACKGROUND**

The following facts are taken from the First Amended
Complaint and are presumed to be true for the purpose of this
ruling. The parties' familiarity with the action is assumed and
the Court will only recount what is necessary for disposition.

Atlantic Neuro is a neurosurgical healthcare provider in
New Jersey. Dkt. No. 66 (First Amended Compl. ("FAC"))
¶ 2. Cigna and United administer employee benefit health
plans, Benefit Programs, and reimburse "healthcare expenses
incurred by program insureds for services and/or products
covered by the Benefit Programs." Id. ¶¶ 10, 14.

MultiPlan administrators a Preferred Provider Organization
("PPO") Network. MultiPlan offers a Complementary
Provider Network, which acts as a secondary network to an
insurance company's preferred provider network. Id. ¶ 26.
To create the Complementary Provider Network, MultiPlan
contracts with out-of-network providers, on one hand, who
agree to receive a discounted rate (the Contract Rate) for
services provided to patients whose health benefit plans
participate in MultiPlan's Complementary Provider Network.
Id. ¶ 27.

On the other hand, MultiPlan contracts with health plan
administrators for the right to access the Network and
provide clients the ability to visit otherwise out-of-network
providers at a discounted cost. "Notably, when a health
plan administrator such as Cigna or United contracts with
MultiPlan to access its Complementary Provider Network
and the Contract Rate payable to [out-of-network] providers
thereunder, not every one of the plans they administer are
MultiPlan's Complementary Provider Network, i.e., not every
one of [the health plan administrator's] plans participate
in MultiPlan's Complementary Provider Network." Id. ¶
28. Health plan administrators benefit from using the
Complementary Provider Network by either (1) paying the
discounted lower rate, as opposed to the standard out-of-
network rate, for claims they are responsible to pay directly or
(2) receiving from their self-insured clients a higher "Shared
Savings Fee," a percentage of the difference between the
provider's standard out-of-network charge and the amount
ultimately paid on the claim. Id. ¶¶ 31-32.

Cigna and United have contracted with MultiPlan to join the
Complementary Provider Network. Id. ¶¶ 12, 16. Both health
plan administrators advertise their association with MultiPlan
on their respective websites. Cigna's "website states that
'if the MultiPlan Savings Program logo appears on your
Cigna ID card, you may be eligible to receive discounts

when using an ONET [out-of-network], non-participating health care professional or facility that participates in the Network Savings Program.' " Id. ¶ 66. Similarly, United's website states: "United may have the right to access contracts and discounts that certain third parties have with ONET providers. When this program applies, the ONET provider's billed charges will be discounted." Id. ¶ 68. Atlantic Neuro has not entered into an express contract with either Cigna or United.

**\*2** On November 1, 2011, Atlantic Neuro contracted with MultiPlan to be a participating provider. Id. ¶ 35. Atlantic Neuro alleges that under the contract, the MultiPlan Participating Professional Group Agreement ("Agreement"), MultiPlan represented that its clients, including Cigna and United, "would pay Contract Rates to Atlantic Neuro for surgical and other related medical services rendered to Atlantic Neuro's patients enrolled in Benefit Programs underwritten and/ or administered by Cigna or United when any such patient accesses MultiPlan's Complementary Provider Network." Id. ¶ 36.

Thus, Atlantic Neuro alleges that the Agreement entitles it to be paid at the Contract Rate, 70% of its billed charges, when it provides covered services to patients "presenting" a Cigna or United "insurance card containing the MultiPlan logo." Id. ¶¶ 29, 37, 39. In exchange, Atlantic Neuro alleges it is bound to provide services when presented with a patient participating in the MultiPlan Network and cannot balance bill the patient for the difference between the Contract Rates and its usual fees. Id. ¶¶ 38, 42.

Atlantic Neuro has provided services to patients presenting a Cigna or United insurance card that also bears the MultiPlan logo. When a plan member's card has a MultiPlan logo on it, Cigna has paid Atlantic Neuro the Contract Rate on many occasions, before, during, and and after the claims arose in this case: July 29, 2016; February 14, 2017; April 18 and 28, 2017; May 15, 20, and 25, 2017; and July 1, 5, and 16, 2017; December 1, 2017; June 27, 2018; February 23, 2019; March 5, 2019; April 15 and 24, 2019; May 7, 2019; June 10, 11, 12, 13, 14, and 16, 2019; July 15, 2019; and September 8, 2019. Id. ¶¶ 48-49; 51-52. On each occasion, Cigna provided a written Explanation of Benefits ("EOB") letter to Atlantic Neuro stating "HEALTH CARE PROFESSIONAL: DO NOT BILL THE PATIENT FOR THE MULTIPLAN DISCOUNT THROUGH MULTIPLAN." Id. ¶¶ 50-52.

Likewise, when a plan member's card has a MultiPlan logo on it, United has paid Atlantic Neuro the Contract Rate on many occasions, before, during, and and after the claims arose in this case: August 29, 2017; September 1 and 19, 2017; October 13, 16, 24, and 31, 2017; November 6, 9, 10, 11, 12, 13, and 29, 2017; December 4, 2017; January 2, 4, 7, and 18, 2019; March 7, 2019; April 6, 22, 26, and 19, 2019; and February 9, 2021. Id. ¶¶ 56, 58-59. On each occasion, United provided a written EOB letter to Atlantic Neuro stating "THIS PHYSICIAN OR HEALTHCARE PROVIDER IS OUT-OF-NETWORK, BASED ON AN AGREEMENT WITH MULTIPLAN, THE PROVIDER HAS ACCEPTED A DISCOUNT FOR THIS SERVICE. THE DISCOUNT SHOWN IS YOUR SAVINGS AND NOT INCLUDED IN THE AMOUNT YOU OWE." Id. ¶¶ 57-59.

This case arises from Atlantic Neuro's performance of medical services on three such Cigna or United patients for which Atlantic Neuro alleges it was not paid the required Contract Rate. Id. ¶¶ 75-76. Atlantic Neuro alleges that all of the patients' Cigna or United insurance cards included the MultiPlan Logo and that all the services rendered qualify as "covered services" under the Agreement. Id. ¶¶ 75-76; 83; 86; 89; 94; 99; 102; and 105.

First, Atlantic Neuro performed three surgical procedures on H.I., who was insured through a Benefit Program administered by Cigna on behalf of CBRE. Id. ¶ 79. For the procedure rendered on November 9, 2017, Atlantic Neuro alleges Cigna only paid it $1,493.32 even though it submitted charges to Cigna in the amount of $39,020.00. Id. ¶¶ 81; 83. Cigna's sole explanation for its level of payment was that it was subject to a "pricing review performed by an outside vendor." Id. ¶ 84. For services rendered on January 25, 2019, Atlantic Neuro alleges Cigna paid nothing towards submitted charges of $137,773.46. Id. ¶¶ 85-86. For services rendered on March 6, 2019, Atlantic Neuro alleges Cigna only paid $6,571.20 although Atlantic Neuro submitted charges in the amount of $181,470.68. Id. ¶¶ 88-89.

**\*3** Second, Atlantic Neuro rendered services to M.D., a patient insured by United on behalf of Control4. Id. ¶ 91. Atlantic Neuro submitted claims totaling $49,803.02 for the rendered services but United paid only $481.98. Id. ¶ 94.

Third, Atlantic Neuro thrice provided medical care to C.F., who was insured by New York University's Benefit Program, under the administration of United. Id. ¶ 96. United underpaid

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 78 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 274 of 466 PageID: 293
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

on all of those claims, paying nothing towards December 17, 2018 services totaling $41,600, paying nothing towards December 21, 2018 services totaling $41,600, and paying $4,008.94 towards February 22, 2019 services totaling $42,681.60. Id. ¶¶ 99, 102, 105.

In total, Atlantic Neuro alleges that it was underpaid $431,208.69. Id. ¶ 78. On December 18, 2020, Atlantic Neuro brought suit to recover the amount owed alleging: (1) Breach of Contract against MultiPlan; (2) Breach of Contract against Cigna; (3) Breach of Contract against United; (4) Breach of Implied Warranty of Good Faith and Fair Dealing against all Defendants; (5) Promissory Estoppel against all Defendants; and (6) Quantum Meruit against all Defendants. Dkt. No. 1.

On January 8, 2022, the Court held that ERISA preemption did not apply but nonetheless dismissed all claims against Cigna and United. Dkt. No. 63. Against MultiPlan, the Court dismissed the claims for Breach of the Implied Warranty and Quantum Meruit. Id. Leave to amend was granted for all counts. Id.

The First Amended Complaint was filed on March 4, 2022. It again alleged: (1) Breach of Contract against MultiPlan; (2) Breach of Implied Contract against Cigna; (3) Breach of Implied Contract against United; (4) Breach of Implied Warranty of Good Faith and Fair Dealing against all Defendants; (5) Promissory Estoppel against all Defendants; (6) Quantum Meruit against all Defendants. Dkt. No. 66. Defendants each moved to dismiss for failure to state a claim upon which relief can be granted and MultiPlan moved for reconsideration as to the Court's previous ruling upholding the Breach of Contract and Promissory Estoppel claims against it. Additionally, Cigna alleges that Atlantic Neuro's state law claims are preempted by ERISA.

As MultiPlan does not allege any "controlling decisions or data that the court overlooked," the Court declines to reexamine its initial rulings that Atlantic Neuro successfully pled breach of contract and promissory estoppel claims against MultiPlan and that Atlantic Neuro's claims are not preempted by ERISA. See McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018). Therefore, the Court will only address the motions to dismiss the claims for breach of implied contract and promissory estoppel against Cigna and United and for quantum meruit against all defendants. [1]

## DISCUSSION

### I. Legal Standards

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The court reviews the complaint liberally, drawing all reasonable inferences in the plaintiff's favor and accepting as true all factual allegations, except for any legal conclusions couched as factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016).

**\*4** "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 570 (citations omitted).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents that are attached to the complaint, incorporated by reference to the complaint, or relied upon heavily such that they become integral to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

### II. Counts II and III–Breach of Implied Contract against Cigna and United

Atlantic Neuro argues that Cigna's and United's conduct and course of dealing, as well as their marketing communications revealed a promise to pay the Contract Rate to Atlantic Neuro for medical services provided to insureds whose plan was in MultiPlan's network. FAC ¶¶ 116-21; 125-30. That conduct, which Atlantic Neuro references, includes the placement of the MultiPlan logo on insurance cards issued by Cigna and United to H.I., M.D., and C.F., which Atlantic Neuro allegedly relied upon in determining whether to render medical services. FAC ¶¶ 118, 127. It also includes a history of Cigna and United paying the Contract Rate for services

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 79 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 275 of 466 PageID: 294
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

provided to their other patients who had insurance cards with the MultiPlan logo. FAC ¶¶ 48-52; 53-59. And, in conjunction with paying the Contract Rate for the services provided to the aforementioned other patients, Cigna's and United's provision to Atlantic Neuro an Explanation of Benefits ("EOB"), which acknowledged that the amount being paid to Atlantic Neuro was calculated in reference to a contract a MultiPlan. FAC ¶¶ 50, 57, 59, 61.

To state a claim for breach of implied contract under New Jersey law, [2] a plaintiff must plead facts showing that: (1) "the parties entered into a contract with specific terms;" (2) "the moving party acted in accordance with the contract;" (3) "the non-moving party failed to act ('breached') accordingly;" and (4) "the breach resulted in damages to the moving party." See Structured Assets Tr. v. Long, No. A-0164-14Tl, 017 WL 1282742, at *2 (N.J. Super. Ct. App. Div. Apr. 6, 2017) (citing Barr v. Barr, 418 N.J. Super. 18, 31-32 (N.J. Super. Ct. App. Div. 2011)); St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am., 32 N.J. 17, 23, 158 A.2d 825, 828 (1960) ("An implied-in-fact contract is in legal effect an express contract.").

The critical issue here is whether the parties entered into an implied-in-fact contract. "The true implied contract consists of an obligation 'arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.' " Id. (citation omitted). Therefore, the relevant inquiry into whether an implied-in-fact contract exists is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay. Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co., No. CV 17-2055, 2019 WL 1916205, at *6 (D.N.J. Apr. 30, 2019); Duffy v. Charles Schwab & Co., Inc., 123 F. Supp. 2d 802, 804 (D.N.J. 2000).

 *5 Here, there was no mutual agreement to pay Atlantic Neuro the Contract Rates for medical procedures performed on H.I., M.D., and C.F. The Court has already held that "the inclusion of the MultiPlan logo on Cigna's and United's insurance cards does not sufficiently demonstrate that Cigna and United offered to pay Atlantic Neuro" the contract amount. Op. at 20. As the Court explained, the inclusion of the MultiPlan logo on the Cigna and United cards advertises that the insurers are in the business of offering discounted rates for out of network providers, not that they will underwrite every procedure. Id.

Viewing the facts in the light most favorable to Atlantic Neuro, the insurers' marketing materials and course of conduct also only shows that Cigna and United were in business with MultiPlan and not that they had agreed to pay the Contract Rates for the procedures needed by these three individuals. There is no dispute that Cigna and United have contracted with MultiPlan to have the right to access MultiPlan's network of medical providers. The question is instead whether Cigna and United had promised Atlantic Neuro that they would access the MultiPlan network and pay the contract rates for H.I.'s, M.D.'s, and C.F.'s procedures.

Cigna's and United's payment history on other claims does not provide any evidence of their intent to agree to pay the contract rates for the procedures under dispute here. Atlantic Neuro does not allege that Cigna and United always paid the Contract Rate. A history of paying the rate on some claims does not amount to giving binding assent to always pay the Contract rate.

Cigna's and United's marketing materials similarly evidence an association with MultiPlan, but do not commit the insurers' to paying the Contract Rate for the claims underlying this case. The First Amended Complaint alleges that Cigna's website states, " 'if the MultiPlan Savings Program logo appears on your Cigna ID card, you may be eligible to receive discounts when using an ONET, non-participating health care professional or facility that participates in the Network Savings Program.' " FAC ¶ 66. But the First Amended Complaint omits the remainder of the quote which states "Discounts are not guaranteed." Dkt. No. 78 ("Declaration of E. Evans Wohlforth, Jr."), Ex. A. It alleges that United's website says United clients "may have the right to access contracts and discounts that certain third parties have with ONET providers. When this program applies, the ONET provider's billed charges will be discounted." FAC ¶ 68. In the face of these provisos, no professional healthcare provider could plausibly believe the language on the websites is a binding promise to pay the Contract Rates. See Read v. Profeta, 397 F. Supp. 3d 597, 626 (D.N.J. 2019) ("An implied-in-fact contract is 'unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do.' " (citation omitted)).

Finally, the fact that in the administration of other patient's insurance claims Cigna and United sent Atlantic Neuro EOB's that referenced the MultiPlan agreement has no bearing on this case. Atlantic Neuro did not receive any such EOB in

GLO-L-000242-24 05/24/2024 3:29:47 PM Pg 80 of 155 Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD Document 1-1 Filed 08/16/24 Page 276 of 466 PageID: 295
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

connection with H.I., M.D., and C.F. Rather, "Cigna's sole explanation for its level of payment was that it was subject to a 'pricing review performed by an outside vendor.'" FAC ¶ 84.

Because the First Amended Complaint fails to adequately show that Atlantic Neuro can prove there was a meeting of the minds between it and Cigna and United to pay the Contract Rates for H.I.'s, M.D.'s, and C.F.'s medical procedures, Counts Two and Three are dismissed.

### III. Count V-Promissory Estoppel against Cigna and United

**\*6** To state a claim for promissory estoppel under New Jersey law, a plaintiff must allege: "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499 (App. Div. 2003). Promissory estoppel is an alternative theory to breach of contract and a party may simultaneously plead each claim. See Goldfarb v. Solimine, 245 N.J. 326, 340-41 (2021) ("Suits to enforce contracts and suits predicated upon promissory estoppel are thus different in both their requisite elements and their goals.").

The First Amended Complaint alleges that Cigna's and United's "collective, consistent, and repeated representations" that they would pay the Contract Rate for the services rendered to H.I., M.D., and C.F. "represented a promise to pay Atlantic Neuro." FAC ¶ 141. The representations the First Amended Compliant relies on is not only the fact that the MultiPlan logo appeared on the Cigna and United insurance cards used by H.I., M.D., and C.F., but also the statements on the Cigna and United websites acknowledging their participation in the MultiPlan Network, FAC ¶¶ 65-68; 72, and the course of dealing between the parties-the 10 prior occasions for Cigna and 15 for United on which the insurers paid the Contract Rate for medical services provided to patients whose cards had the MultiPlan logo and issued EOBs that acknowledged that the reimbursement amount was based on participation in the MultiPlan Network, FAC ¶¶ 48-50; 55-57.

The First Amended Complaint does not adequately allege Cigna and United made a promise to pay. The general expectation of a benefit is insufficient to establish a claim for promissory estoppel. E. Orange Bd. Of Educ. v. N.J. Sch. Constr. Corp., 405 N.J. Super. 132, 147-48 (App. Div.), cert. denied, 199 N.J. 540 (2009) ("general expectation" of

a benefit is insufficient to establish a claim for promissory estoppel). Thus, while the First Amended Complaint delivers far more detail illustrating Cigna's and United's participation in the MultiPlan Network, it fails to state a claim for promissory estoppel because it does not provide any support for the claim that Cigna and United promised to pay the Contract Rates for the specific medical services received by H.I., M.D., and C.F.

The course of dealing between the parties cannot alone maintain a claim for promissory estoppel without an accompanying unambiguous promise. See North Jersey Brain & Spine Center v. Aetna Life Ins. Co., No. L-5817-18, 2019 WL 4889507, at \*16 (N.J.Super.L. Oct. 01, 2019) (maintaining a claim for promissory estoppel based on the parties course of dealing because the defendant gave a promise to pay for each service through either a prior authorization or an advisement that such authorization was unnecessary); Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank, 163 N.J. Super. 463, 480, 395 A.2d 222, 230 (App. Div. 1978) (finding that an "implied" promise of a loan of some indefinite amount was insufficient to support an promissory estoppel claim).

No unambiguous promise is shown to have ever been made between Cigna and United on one hand and Atlantic Neuro on the other. The placement of the MultiPlan logo on the Cigna and United insurance cards and the statements made on Cigna's and United's websites do not mean Cigna and United promised to pay the Contract Rates for H.I.'s, M.D.'s, and C.F.'s procedures. In fact, they provide notice that every claim might not be accepted.

**\*7** The Court has already held that the placement of the MultiPlan logo on Cigna's and United's insurance cards "alone does not sufficiently aver that Cigna and United promised to compensate Atlantic Neuro at the Contract Rates." Dkt. No. 63 at 25. This is especially true given that the United insurance card presented by M.D. and C.F. said "this card does not guarantee coverage," the exact opposite of an unambiguous promise to pay. See Dkt. No. 84 (Declaration of Matthew P. Mazzola), Exs. B & C.

The additional evidence of the statements on Cigna's and United's websites does nothing to change the statement of affiliation created by the placement of the MultiPlan logo into a promise to pay. As discussed above, the statements on the website made it clear that the MultiPlan rates would not apply to all scenarios.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 81 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 277 of 466 PageID: 296
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

Atlantic Neuro reliance on N. Jersey Brain & Spine Ctr. v. Aetna Life Ins. Co. to argue that a course of dealing is alone sufficient to plead promissory estoppel is misplaced. N. Jersey Brain & Spine Ctr. supports the opposite conclusion, consistent with the Court's holding, that a course of dealing still needs an unambiguous promise to pay in order to sustain a claim for promissory estoppel. North Jersey Brain & Spine Center, 2019 WL 4889507, at *16. In N. Jersey Brain & Spine Ctr. there is unambiguous evidence of a promise to pay—the defendant there gave prior authorization or advised that such authorization was not required. Id. No such communications have been alleged here.

Because a "clear and definite promise" is the "sine qua non" of a promissory estoppel claim, Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 479 (App. Div. 1978) and none is alleged in the First Amended Complaint, Atlantic Neuro's promissory estoppel claim against Cigna and United is dismissed.

### IV. Count VI-Quantum Meruit against all defendants

A claim of quantum meruit requires a showing that the defendant was unjustly enriched. See F. Bender, Inc. v. Jos. L. Muscarelle, Inc., 304 N.J. Super. 282, 285 (App. Div. 1997); Fuel Inc. v. BP Prod. N. Am., Inc., No. 08-CV-3947, 2009 WL 1873583, at *8 (D.N.J. June 29, 2009) ("Claims of quantum meruit 'rest[ ] on the equitable principle that a person shall not be allowed to enrich himself unjustly to the expense of another.' ") (citation omitted).

Atlantic Neuro alleges that "defendants received the benefit of Atlantic Neuro's participation in the MultiPlan's Complementary Provider Network and its treatment of the Cigna and United members in question, including but not limited to the collection and division of Shared Savings Fees by and among Cigna and United on the one hand, and MultiPlan on the other, without honoring Atlantic Neuro's Contract Rate." FAC ¶ 148.

However, Atlantic Neuro's allegation does not show that defendants received a benefit at Atlantic Neuro's expense. Its allegation of unjust enrichment is two-fold. The first is based on the premise that defendants collected and divided a "Shared Savings Fee" [3] at a higher rate than they would have if they had paid the Contract Rates. FAC ¶¶ 73, 148-49. But the Shared Savings Fee is paid by patients who have self-insured Cigna and United healthcare plans. United and

Cigna then pay a portion of Fee to MultiPlan. Accordingly, the benefit of the Fee was paid at the patient's or insurer's expense. It was realized solely because of agreements between Cigna, United, MultiPlan, and its clients. Atlantic Neuro had no direct role in producing for defendants the benefits of a higher Shared Savings Fee. What Atlantic Neuro provided was a benefit to the patients, as in the end defendants were still left with a ripened obligation to pay money. See Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc., No. CIV. 11-2775 JBS/JS, 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012) ("[T]he insurance company, 'derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured-which hardly can be called a benefit.' ") (quoting Travelers Indem. Co. of Conn. v. Losco Group, Inc., 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)).

**\*8** The second basis on which Atlantic Neuro claims defendants were unjustly enriched is through defendants' leveraging of their participation in the Complementary Provider Network in their promotional materials in an effort to induce additional customers to participate in their networks. See FAC ¶¶ 70, 73. But again the party conferring the benefit is not Atlantic Neuro. In this scenario, MultiPlan is the entity conferring the benefit of association. That benefit would continue to exist whether or not Atlantic Neuro was a provider in the MultiPlan Network. The promotional materials Atlantic Neuro cites did not guarantee Cigna or United clients access to the MultiPlan Network. It only said that clients "may be eligible to receive discounts" or "may have the right to access contracts and discounts that certain third parties have." FAC ¶¶ 66, 68.

Atlantic Neuro's indirect conferral of benefits is too remote to sustain a claim for quantum meruit and it is accordingly dismissed against all defendants. See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co., No. CV 17-2055, 2019 WL 1916205, at *8 (D.N.J. Apr. 30, 2019) ("District courts have consistently dismissed unjust enrichment claims under substantially similar circumstances, reasoning that, if anything, the benefit is derived solely by the insured party.").

### V. Leave to Amend

Atlantic Neuro is denied leave to amend. "Although leave to amend should be freely given 'when justice so requires,' it is 'within the sound discretion of the district court to grant or deny leave to amend.' " Lopez v. Stop & Shop Supermkt. Co. LLC, 2020 WL 4194897, at *2 (S.D.N.Y. July 21, 2020) (quoting Fed. R. Civ. P. 15(a)(2) and McCarthy v. Dun &

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 82 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 278 of 466 PageID: 297
Atlantic Neurosurgical Specialists, P.A. v. MultiPlan, Inc., Not Reported in Fed. Supp....

Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)). Atlantic Neuro's Opposition brief does not suggest the withholding of any curative facts that would show a promise was made or a benefit was conferred by the defendants. It "is well established that leave to amend a complaint need not be granted when amendment would be futile." Kirk v. Heppt, 423 F. Supp. 2d 147, 149 (S.D.N.Y. 2006) (quoting Ellis v. Chao, 336 F.3d 114, 126 (2d Cir. 2003))."

## CONCLUSION

The claims against the parties who made no promise to Atlantic Neuro are dismissed. Cigna's and United's Motions to Dismiss all Counts against them are granted, with prejudice.

What remains of this case are the claims that reflect an actual commitment and that are properly brought against the party which pledged them, MultiPlan. MultiPlan's Motion to Dismiss is granted, with prejudice, as to Counts IV (Breach of Implied Warranty) and VI (Quantum Meruit) but is denied as to Counts I (Breach of Contract) and V (Promissory Estoppel).

So Ordered.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 160084

## Footnotes

1    The First Amended Complaint also alleged a breach of the implied warranty of good faith and fair dealing against all defendants. But, because Atlantic Neuro does not oppose defendants' motions to dismiss that claim, the claim is dismissed. Dkt. No. 88 ("Plaintiff's Motion in Opposition") at 1.

2    The Agreement "shall be construed and governed in accordance with ... the laws of the state in which the health care services are rendered," here New Jersey. Dkt. 42, Exhibit A, § 9.3.

3    The Shared Savings Fee is paid by the patient to Cigna or United and is calculated by taking a percentage of the difference between the customary out of network rate for the medical service rendered and the amount Cigna or United ultimately paid to the provider on the claim. FAC ¶ 32. MultiPlan's compensation from Cigna or United is a portion of the Shared Savings Fee. Id. ¶ 34.

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 83 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 279 of 466 PageID: 298
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 185495
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan HOTT, M.D., Plaintiff,
v.
MULTIPLAN, INC., and Cigna Health
and Life Insurance Company, Defendants.

21 Civ. 02421 (LLS)
|
January 13, 2023

**Attorneys and Law Firms**

Nicole Allocca, John William Leardi, Buttaci Leardi &
Werner LLC, Princeton, NJ, for Plaintiff.

Aimee Leigh Creed, d'Arcambal Ousley & Cuyler Burk LLP,
New York, NY, Errol J. King, Katherine C. Mannino, Phelps
Dunbar LLP, Baton Rouge, LA, for Defendant MultiPlan, Inc.

Eric Evans Wohlforth, Jr., Debra A. Clifford, Gibbons,
Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for
Defendant Cigna Health and Life Insurance Company.

OPINION & ORDER

LOUIS L. STANTON, UNITED STATES DISTRICT
JUDGE

 **\*1**  Dr. Hott ("Hott") alleges he was underpaid for medical
services he provided to eighteen patients who were insured by
employee benefit programs underwritten by Cigna Health and
Life Insurance Company ("Cigna"). To recover the difference
he is allegedly owed, Hott asserts various contractual and
quasi-contractual claims under Arizona state law against
Cigna and the administering preferred provider organization
("PPO"), MultiPlan, Inc. ("MultiPlan").

Defendants separately move to dismiss the First Amended
Complaint for failure to state a claim. For the reasons set
forth herein, Cigna's motion is granted in full and MultiPlan's
motion is granted as to the breach of the implied warranty
of good faith and fair dealing and quantum meruit claims
but denied as the breach of contract and promissory estoppel
claims.

**BACKGROUND**

The following facts are taken from the First Amended
Complaint and are presumed to be true for the purpose of this
ruling. The parties' familiarity with the action is assumed and
the Court will only recount what is necessary for disposition.

Dr. Hott is a neurosurgery spine specialist in Arizona.
Dkt. No. 30 (First Amended Compl. ("FAC")) ¶ 2. Cigna
administers "Benefit Programs," a.k.a. employee benefit
health plans, by processing and adjudicating claims for
reimbursement of healthcare expenses incurred by plan
members on behalf of those Benefit Programs. FAC ¶ 8.

MultiPlan administers a preferred provider organization
("PPO") network. FAC ¶ 4. In that role, MultiPlan offers a
Complementary Provider Network, which acts as a secondary
network to a health plan administrator's preferred provider
network. FAC ¶¶ 4-5, 20. To create the Complementary
Provider Network, MultiPlan contracts with out-of-network
doctors and healthcare providers, who agree to receive a
discounted rate (the Contract Rate) for services provided to
patients whose health benefit plans participate in MultiPlan's
Complementary Provider Network. FAC ¶¶ 20-21.

MultiPlan then sells the right to access the providers' pre-
arranged rates to health plan administrators, like Cigna,
acting on behalf of their respective Benefit Plans. FAC
¶ 20. "Notably, when a health plan administrator such as
Cigna contracts with MultiPlan to access its Complementary
Provider Network and the Contract Rate payable to [out-
of-network] providers thereunder, not every one of the
plans they administer are given access to MultiPlan's
Complementary Provider Network, i.e., not every one of
Cigna's plans participate in MultiPlan's Complementary
Provider Network." FAC ¶ 22. Health plan administrators
benefit from using the Complementary Provider Network by
either (1) paying the discounted lower rate, as opposed to the
standard out-of-network rate, for claims they are responsible
to pay directly or (2) receiving from their self-insured clients
a higher "Shared Savings Fee," a percentage of the difference
between the provider's standard out-of-network charge and
the amount ultimately paid by the administrator on the claim.
FAC ¶¶ 24-27.

 **\*2**  Cigna advertises on its website its participation in the
MultiPlan Complementary Network. Cigna's website states
that "if the MultiPlan Savings Program logo appears on your

Cigna ID card, you may be eligible to receive discounts when using an [out-of-network], non-participating health care professional or facility that participates in the Network Savings Program." FAC ¶ 52.

In July 2012, Dr. Hott contracted with MultiPlan to be a participating provider in its Complementary Provider Network. Hott alleges that under the Provider Agreement (the "Agreement") MultiPlan represented to Dr. Hott that its Clients and Users would pay the Contract Rate to Dr. Hott for surgical and other related medical services rendered to Dr. Hott's patients enrolled in Benefit Programs underwritten and/or administered by Cigna when any such patient accesses MultiPlan's Complementary Provider Network. FAC ¶ 30. Thus, Hott alleges that the Agreement entitles him to be paid at the Contract Rate, 80% of his billed charges, when he provides covered services to patients presenting a Cigna insurance card containing the MultiPlan logo. FAC ¶¶ 30-31. In exchange, Hott alleges he is bound to provide services when presented with a patient participating in the MultiPlan Network and cannot balance bill the patient for the difference between the Contract Rates and his usual fees. FAC ¶¶ 32, 36.

Specifically, the Agreement states:

"MPI ["MultiPlan"] will require Clients and its Users to use the Contract Rates agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network." Dkt. No. 38, Ex. 2-A (the Agreement) § 4.7.

"MPI ["MultiPlan"] agrees that it has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rates, shall be subject to the terms of this Agreement." *Id.* at § 4.3.

Dr. Hott routinely provided services to patients presenting a Cigna insurance card that bears the MultiPlan logo. When Hott submitted claims for those services to Cigna, Cigna paid the Contract Rate, including: in 2012 on September 7 and 8, October 9, and November 29; in 2013 on February 18 and 19, May 20 and 21, June 4 and 5, August 19, October 9, 27, and 30, and November 5; in 2014 on February 27, April 21 and 29, May 5, 28, and 29, July 2 and 4, and August 15; in 2017 on May 30; and in 2018 on March 19 and May 7. FAC ¶¶ 42-44. For the services provided on May 30, 2017 and May 7, 2018, Cigna provided a written Explanation of Benefits ("EOB") letter to Hott stating "HEALTH CARE PROFESSIONAL: DO NOT BILL THE PATIENT FOR THE MULTIPLAN

DISCOUNT THROUGH MULTIPLAN." FAC ¶ 45. For the services provided on March 19, 2018, the Provider Portal Pricing Summary stated "Priced using the MultiPlan Network and the following provider; Jonathan S. Hott, MD." FAC ¶ 46.

This case arises because Dr. Hott was paid less than the Contract Rate when he allegedly provided "covered" medical services to eighteen patients enrolled in Benefit Programs administered by Cigna and whose insurance cards contained the MultiPlan logo. FAC ¶¶ 59, 62-163. In total, Hott alleges that he was underpaid not less than $900,000.00. FAC ¶ 61.

On March 31, 2022, Dr. Hott filed his First Amended Complaint to recover the amount owed alleging: (1) Breach of Contract against MultiPlan; (2) Breach of Implied Contract against Cigna; (3) Breach of Implied Warranty of Good Faith and Fair Dealing against all Defendants; (4) Promissory Estoppel against all Defendants; and (6) Quantum Meruit against all Defendants. Dkt. No. 30. On August 15, 2022, Defendants each moved to dismiss for failure to state a claim upon which relief can be granted. Dkt. Nos. 37 & 39. Dr. Hott's opposition was subsequently filed on October 17, 2022. Dkt. No. 47.

## DISCUSSION

### I. Legal Standards

**\*3**  "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 570 (citations omitted).

The court reviews a complaint liberally, drawing all reasonable inferences in the plaintiff's favor and accepting as true all factual allegations, except for any legal conclusions couched as factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016). In deciding the motion to dismiss, the court may consider documents that are attached to the complaint, incorporated by reference to the complaint, or relied upon heavily such that they become integral to the

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 85 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 281 of 466 PageID: 300
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

## II. Count I-Breach of Contract against MultiPlan
The First Amended Complaint states a claim for breach of contract against MultiPlan.

To state a claim for breach of contract under Arizona law,[1] a plaintiff must plead facts showing: "(1) a contract exists between the plaintiff and defendant; (2) the defendant breached the contract; and (3) the breach resulted in damage to plaintiff." Hannibal-Fisher v. Grand Canyon Univ., 523 F. Supp. 3d 1087, 1093-94 (D. Ariz. 2021) (quotation marks and citations omitted). The key issue here is whether Hott plausibly alleged that MultiPlan breached the contract.

The First Amended Complaint alleges that the Agreement required MultiPlan "to reimburse Dr. Hott his Contract Rate for surgical and related medical services rendered by Dr. Hott to patients whose Benefit Programs elected to participate in the MultiPlan program, as identified by the MultiPlan logo on the patients' insurance cards." FAC ¶ 172. MultiPlan breached the Agreement "by failing to ensure its Clients, including Cigna, reimbursed Dr. Hott for services rendered to S.A., S.C., J.C., P.D., D.F., V.G., L.K., R.K., M.L., S.M., W.M., M.M., R.P., J.R., B.R., D.S., R.S., and J.W., at the Contract Rate." FAC ¶ 175.

As evidence of the contractual promise that MultiPlan would require its clients to pay the Contract Rates, the First Amended Agreement cites the express language of the Agreement, stating that MultiPlan "has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rate, shall be subject to the terms of this Agreement," FAC ¶ 34 (citing § 4.3 of the Agreement); that MultiPlan "will require Clients and its Users to use the Contract Rate agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network," FAC ¶ 35 (citing § 4.7 of the Agreement); that participating providers cannot balance bill the patient beyond the patient's Deductible and/or Co-insurance in exchange for payment of the Contract Rate, FAC ¶ 36 (citing § 5.4 of the Agreement). Hott thus plausibly pleads that the Agreement created an obligation that MultiPlan breached when it failed to ensure that Cigna paid the Contract Rates.

**\*4** Whether the terms of the MultiPlan Handbooks nullify the alleged obligations created by those provisions in the Agreement, as MultiPlan argues they do, is outside the scope of this Motion because the Handbooks were not incorporated by reference in, heavily relied upon by, or integral to the Complaint. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (on a motion to dismiss, the court can only consider documents "incorporated by reference" in the complaint or "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint.").

## III. Count II-Breach of Implied Contract against Cigna
The First Amended Complaint fails to state a claim against Cigna for breach of an implied contract.

An implied in fact contract requires the same elements as an express contract-offer, acceptance, meeting of the minds, and consideration-and the only difference is "the parties' manifestation of assent is implied." Donaldson v. McNew, No. 1 CA-CV 09-0689, 2011 WL 2464204, at \*4 (Ariz. Ct. App. June 21, 2011). Thus, implied in fact contracts are created by " 'conduct rather than words to convey the necessary assent and undertakings.' " Griffey v. Magellan Health Inc., 562 F. Supp. 3d 34, 50 (D. Ariz. 2021) (citation omitted). Whether such mutual assent exists is "resolved by consideration of objective evidence, 'not the hidden intent of the parties.' " Turley v. Beus, No. 1 CA-CV 15-0107, 2017 WL 410976, at \*5 (Ariz. Ct. App. Jan. 31, 2017) (citation omitted).

The First Amended Complaint does not plausibly allege Cigna manifested assent to pay the Contract Rate for the services provided to the eighteen patients disputed here. It alleges the existence of an implied contract based on Cigna's "express representations, and course of conduct, that they would pay the Contract Rate to Dr. Hott for medical services provided to insureds whose plan was in the MultiPlan Savings Program." FAC ¶ 178. Those express representations include Cigna placing the MultiPlan logo on the insurance cards presented to Dr. Hott by the patients at issue and Cigna's marketing communications to its insureds that it participated in MultiPlan's Complementary Provider Network. FAC ¶¶ 180, 182. The course of conduct relied on is the fact that on 27 other occasions, before, during, and after the occurrence of the claims at issue here, Cigna paid Hott the Contact Rate for services performed on other patients whose insurance cards have the MultiPlan logo and, on certain occasions, provided

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 86 of 155   Trans ID: LCV20241332836
Case 1:24-cv-00519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 282 of 466 PageID: 301
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

an Explanation of Benefits acknowledging the MultiPlan pricing structure. FAC ¶¶ 40-48, 181.

But, Dr. Hott alleges no facts concerning the applicability of the Contract Rates to the specific services performed on the patients at issue here beyond the allegation that Cigna agreed, in general, to pay the Contract Rates for covered services. The inclusion of the MultiPlan logo on the Cigna insurance card does not show that Cigna agreed to pay the Contract Rate for every procedure performed on a patient who possesses that card. Atl. Neurosurgical Specialists, P.A. v. MultiPlan, Inc., 20 Civ. 10685 (LLS), 2022 WL 158658, at *7 (S.D.N.Y. Jan. 18, 2022). Nor do the representations on Cigna's website concerning its affiliation with MultiPlan, which explicitly caution that the discounts potentially available through MultiPlan "are not guaranteed." Dkt. No. 41 ("Declaration of E. Evans Wohlforth, Jr."), Ex. A.

Cigna's course of dealing and "payment history on other claims does not provide any evidence of their intent to agree to pay the contract rates for the procedures under dispute here." Atl. Neurosurgical Specialists, P.A. v. Multiplan, Inc., No. 20 Civ. 10685 (LLS), 2023 WL 160084, at *5 (S.D.N.Y. Jan. 11, 2023). "A history of paying the rate on some claims does not amount to giving binding assent to always pay the Contract Rate." Id. Especially in light of the fact that Hott, per the Agreement he entered into with MultiPlan, knew that Cigna had a "right to access" the Network, but not an obligation to do so. FAC ¶ 34 (citing § 4.3 of the Agreement).

*5 Because the allegations are conclusory, the First Amended Complaint fails to state a claim and the claim against Cigna is dismissed. Amendment is futile because "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim." Dakota Territory Tours ACC v. Sedona-Oak Creek Airport Auth. Inc., 383 F. Supp. 3d 885, 899 (D. Ariz. 2019).

IV. Count III-Breach of Implied Warranty of Good Faith and Fair Dealing

The First Amended Complaint fails to state a claim for breach of the implied covenant against either defendant.

Under Arizona law, a covenant of good faith and fair dealing is implied in every contract, meaning "neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." Maleki v. Desert Palms Prof'l Props., LLC, 214 P.3d 415, 421 (Ariz. Ct. App. 2009). This covenant is

breached when a party either exercises "express discretion in a way inconsistent with a party's reasonable expectations" or acts "in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." Bike Fashion Corp. v. Kramer, 46 P.3d 431, 435 (Ariz. Ct. App. 2002). "A party enjoys discretion in the relevant sense when the express terms of the contract do not specify how a party is to behave in all circumstances." Id. at 435 n.3.

No covenant of good faith and fair dealing can be implied in a way that would obliterate a right expressly given under the written contract. Id. A party seeking to invoke the covenant must therefore allege more than a direct breach of an express contractual obligation. Aspect Sys., Inc. v. L5am Rsch. Corp., No. 06-1620-PHX-NVW, 2006 WL 2683642, at *3 (D. Ariz. Sept. 16, 2006) ("Because Plaintiff has not explained how Defendants have breached the implied covenant other than through the breach of an express contractual term, Plaintiff's argument fails.").

A. *Against MultiPlan*

The First Amended Complaint states "MultiPlan failed to enforce Paragraph 4.7 of the Provider Agreement, where it 'will require Clients and its Users to use the Contract Rate.' " FAC ¶ 189. This is the same allegation in support of Hott's claim for breach of contract and as such the claim is duplicative.

In the alternative, Hott argues that the First Amended Complaint pleads that the Agreement endowed discretion on MultiPlan to choose whether or not to enforce their Client's right to access the Network, and in turn, whether or not to ensure that Dr. Hottwas paid the Contract Rates. He alleges MultiPlan exercised that discretion in a way that was inconsistent with his expectations.

The First Amended Complaint does not state a claim that MultiPlan breached the covenant through its exercise of discretion. It does not show that Hott can prove that the Agreement endowed MultiPlan with the discretion to decide when to enforce the Contract Rates. Hott does not cite, and the Court likewise cannot find, any portion of the Agreement that grants MultiPlan discretion. The Agreement dictates how MultiPlan is to act in all circumstances, that is to require its clients "use the Contract Rates agreed to in this Agreement

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 87 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 283 of 466 PageID: 302
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

solely for Covered Services rendered to Participants covered under a Program which utilizes the Network." FAC ¶ 35.

**\*6** Because the Agreement dictates how MultiPlan is to act in all circumstances and devoids the PPO of any discretion in enforcing the applicability of the Contract Rates, leave to amend would be futile. Owner-Operator Indep. Drivers Ass'n v. Pac. Fin. Ass'n, Inc., 388 F.3d 556, 562-63 (Ariz. Ct. App. 2017) ("denial of a motion to amend is proper if the amendment would be futile"). The claim against MultiPlan for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

### B. *Against Cigna*

"While every contract contains implied covenants of good faith and fair dealing, such covenants presume the existence of a valid contract." Norman v. State Farm Mut. Auto. Ins. Co., 33 P.3d 530, 537 (Ariz. Ct. App. 2001). Because there is no contract between Hott and Cigna, there is no covenant that Cigna could have allegedly breached. Accordingly, the claim is dismissed, and leave to amend is denied as futile.

### V. Count IV-Promissory Estoppel

To state a claim for promissory estoppel under Arizona law, a plaintiff must allege facts demonstrating that: "(1) Defendant made a promise to Plaintiff; (2) Defendant should have reasonably foreseen that Plaintiff would rely on that promise; (3) Plaintiff actually relied on that promise to his detriment; and (4) Plaintiff's reliance on the promise was justified." Clayton v. HSBC Bank USA, No. CV-17-01464-PHX-SPL, 2018 WL 1586649, at \*3 (D. Ariz. Mar. 31, 2018). As to the fourth element, Arizona courts have consistently recognized that "[r]eliance is justified when it is reasonable, but is not justified when knowledge to the contrary exists." Higginbottom v. State, 51 P.3d 972, 977 (Ariz. Ct. App. 2002).

### A. *Against MultiPlan*

Hott alleges that MultiPlan made a promise "to enforce ... the Contract Rate in the Provider Agreement for services rendered" to the eighteen patients at issue here. FAC ¶ 194. That promise is evidenced by the terms of the Agreement. See FAC ¶¶ 34-36. He further plausibly alleges MultiPlan should have known he would rely upon that promise and that he actually did so to his detriment when he performed

medical services for patients who had an insurance card with the MultiPlan logo but was not compensated at the Contract Rates. FAC ¶¶ 195-96.

MultiPlan argues that Hott's reliance was not justified because the plain language of the Agreement contradicts Hott's characterization of the promise. But, the fact that the parties have different interpretations of the obligations set forth in the Agreement does not mean, at this stage, that Hott's reliance on his interpretation of the Agreement was unjustified, especially when the Court finds his reading of the Agreement to be plausible.

The First Amended Complaint sufficiently states a claim of promissory estoppel against MultiPlan and accordingly Multiplan's motion to dismiss Count IV is denied.

### B. *Against Cigna*

Cigna argues that the First Amended Complaint fails to state a claim for promissory estoppel because Hott cannot demonstrate that Cigna made a clear promise to pay the Contract Rate for the procedures received by these eighteen patients. In reply, Hott argues that the pleadings allegations, taken together, concerning Cigna's payment of the Contract Rate for procedures done on other patients whose cards featured the MultiPlan logo; Cigna's express representations through its EOBs; and, Cigna's language on its website create a clear and definite promise from Cigna to Dr. Hott.

**\*7** But Hott fails to explain how a course of dealing with other patients and marketing materials with express disclaimers that the Contract Rates will not always apply are sufficient to demonstrate that Cigna made an unambiguous promise to Hott sufficient to support Hott's promissory estoppel claim. See Atl. Neurosurgical Specialists, P.A. v. Multiplan, Inc., No. 20 CIV. 10685 (LLS), 2023 WL 160084, at \*6 (S.D.N.Y. Jan. 11, 2023) ("The placement of the MultiPlan logo on the Cigna and United insurance cards and the statements made on Cigna's and United's websites do not mean Cigna and United promised to pay the Contract Rates for H.I.'s, M.D.'s, and C.F.'s procedures."); see also Bright LLC v. Best W. Int'l Inc., No. CV-17-00463-PHX-ROS, 2018 WL 4042122, at \*4 (D. Ariz. July 27, 2018) (dismissing plaintiff's claim for promissory estoppel when the evidence of a promise was communications with a third-party and not defendant); Valles v. Pima Cnty., 776 F. Supp. 2d 995, 1006 (D. Ariz. 2011), aff'd sub nom. Valles v. Cnty. of Pima, 502

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 88 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 284 of 466 PageID: 303
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

F. App'x 651 (9th Cir. 2012)(finding no promise existed to support a claim for promissory estoppel when the alleged promise was a contract to which plaintiff was not a signatory).

Accordingly, the First Amended Complaint fails to allege a claim for promissory estoppel against Cigna and leave to amend is denied as futile. Wheeler v. City of Santa Clara, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Leave to amend may be denied if the proposed amendment is futile or would be subject to dismissal.").

### VI. Count V-Quantum Meruit
The First Amended Complaint fails to state a claim for quantum meruit.

"Quantum meruit is actually a measure of damages, not a remedy... The claim for relief is for unjust enrichment." Landi v. Arkules, 835 P.2d 458, 467 (Ariz. Ct. App. 1992). To plead a claim for unjust enrichment, the party must plausibly allege that "(1) the other party was unjustly enriched at the expense of the claimant, (2) the claimant rendered services that benefitted the other party, and (3) the claimant conferred this benefit under circumstances that would render inequitable the other party's retention of the benefit without payment." W. Corr. Grp., Inc. v. Tierney, 96 P.3d 1070, 1077 (Ariz. Ct. App. 2004).

#### A. Against MultiPlan

"[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." Brooks v. Valley Nat. Bank, 548 P.2d 1166, 1171 (1976). Here, because the Agreement governs the relationship between Dr. Hott and MultiPlan, the unjust enrichment claim against MultiPlan cannot be sustained. See Trustmark Ins. Co. v. Bank One, Arizona, NA, 48 P.3d 485, 492 (Ariz. Ct. App. 2002), as corrected (June 19, 2002) (holding that because plaintiff could have pursued a breach of contract claim based on the contractual documents, the trial court correctly granted judgment as a matter of law dismissing the unjust enrichment claim).

Hott argues that an unjust enrichment claim can be brought in the alternative in conjunction with a breach of contract theory, especially in situations where if the contract is found to be invalid then the plaintiff would have no remedy to recover payment for services rendered. Dkt. No. 47 (Plaintiff

Opp.) at 24. But Hott "is not seeking to pursue its unjust enrichment claim in the alternative; rather, it seeks to avoid possible contractual limitations on its recovery by resorting to an unjust enrichment cause of action." Trustmark Ins. Co., 48 P.3d at 493. There is no risk of the Agreement being invalidated or of Hott being found to be the breaching party. The threat to recovery is the Court finding the Agreement does not impose a separate burden on MultiPlan to ensure its clients access the Contract Rates. A claim for unjust enrichment can not be sustained simply to allow Hott to hedge his bets in the event that the Agreement is interpreted against him.

**\*8** The claim is dismissed with prejudice because amendment is futile.

#### B. Against Cigna

The First Amended Complaint alleges that Cigna "received the benefit of Dr. Hott's participation in MultiPlan's Complementary Provider Network and its treatment of the Cigna members in question, including but not limited to the collection of the Shared Savings Fees by and among Cigna, and MultiPlan's refusal to enforce Dr. Hott's Contract Rate." FAC ¶ 201. The alleged benefit Cigna received from Hott's participation in MultiPlan includes Cigna's ability to associate with MultiPlan in its marketing and promotional materials. Dkt. No. 47 at 20. Cigna argues that the claim for unjust enrichment cannot survive because no benefit was conferred onto it by Hott.

The First Amended Complaint does not show that Cigna received a benefit from Hott. It contemplates a triangle of benefits: (1) that Cigna's patients received medical services from Hott; (2) that Cigna paid Hott for those services, albeit less than the allegedly required Contract Rates; and (3) that the patients allegedly paid Cigna a higher "Shared Savings Fee," a percentage of the difference between Hott's standard out-of-network amount and the amount Cigna actually paid to Hott, at the expense of underpaying Hott. At no point in this setup does Hott confer any benefits onto Cigna. Hott confers a benefit onto the patients by performing the medical services. Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc., No. CV-20-02007-PHX-MTL, 2022 WL 2390948, at *6 (D. Ariz. July 1, 2022) (dismissing quantum meruit claim because plaintiff provided a benefit-medical treatment-to the plan members, not the defendant and the complaint was "devoid of any facts" to show that Cigna requested medical services from

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 89 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 285 of 466 PageID: 304
Hott v. MultiPlan, Inc., Not Reported in Fed. Supp. (2023)

the plaintiff.) Any benefit conferred onto Cigna comes at the behest of its clients. See Western Corrections Group, Inc. v. Tierney, 96 P.3d 1070, 1077 (Ariz. Ct. App. 2004) (affirming dismissal of quantum meruit claim where it was evident that the plaintiff did not confer a benefit).

Hott also argues that Cigna benefited from his participation in MultiPlan's network when Cigna referenced MultiPlan in its marketing and promotional materials. As this Court has found in an analogous case, "again the party conferring the benefit is not [plaintiff]. In this scenario, MultiPlan is the entity conferring the benefit of association. That benefit would continue to exist whether or not [plaintiff] was a provider in the MultiPlan Network." Atl. Neurosurgical Specialists, P.A. v. Multiplan, Inc., No. 20 CIV. 10685 (LLS), 2023 WL 160084, at *8 (S.D.N.Y. Jan. 11, 2023).

The claim for quantum meruit is dismissed against Cigna with prejudice as "any amendment to this claim would be futile because [Hott] cannot allege that it conferred a benefit to Cigna." See Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc., No. CV-20-02007-PHX-MTL, 2022 WL 2390948, at *6 (D. Ariz. July 1, 2022).

## CONCLUSION

Cigna's Motion to Dismiss is granted. All claims against it are dismissed, with prejudice.

The Motion to Dismiss brought by the party which entered into an agreement with Hott, MultiPlan, is denied in part as to Count I (Breach of Contract) and Count IV (Promissory Estoppel) and is granted in part, with prejudice, as to Count III (Breach of the Implied Warranty of Good Faith and Fair Dealing) and Count V (Quantum Meruit).

**\*9** So Ordered.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 185495

## Footnotes

1    Pursuant to § 9.3 of the Agreement, the Agreement "shall be construed and governed in accordance with Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder"—in this case, Arizona. Dkt. No. 38, Ex. 2-A (the Agreement) § 9.3.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Michael H. Bernstein (NJ Bar ID No.: 253282017)
Matthew P. Mazzola (NJ Bar ID No.: 253252017)
ROBINSON & COLE LLP
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
Facsimile: (212) 451-2999
*Attorneys for Defendant United Healthcare Services, Inc.*

------------------------------------------------------------------------ x

| | |
|---|---|
| MODERN ORTHOPAEDICS OF NEW JERSEY, | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION, PASSAIC COUNTY, |
| Plaintiff, | : CIVIL PART |
| -v- | : |
| | : Docket No.: PAS-L-003127-22 |
| UNITED HEALTHCARE SERVICES, INC., | : |
| | : |
| Defendant. | : |

------------------------------------------------------------------------ x

## ORDER

WHEREAS, Defendant, United Healthcare Services, Inc., by and through its attorneys

Robinson & Cole LLP, upon notice to all interested parties, moved this Court for an order pursuant

to *N.J. Ct. R.* 4:6-2(e) dismissing the Complaint of Plaintiff, Modern Orthopaedics of New Jersey, and

the Court having considered the papers, and for good cause shown;

IT IS on this __21st__ day of _____July_____, 2023,

ORDERED that Defendant's Motion to Dismiss is granted to the extent Plaintiff's Complaint

is dismissed in its entirety with prejudice; and it is further

ORDERED that the Clerk's Office enter judgment accordingly.

☑ **OPPOSED**                                      **/s/ Vicki A. Citrino**
                                          _____

                                          **HON. VICKI A. CITRINO, J.S.C.**

**SEE ATTACHED STATEMENT OF REASONS**

Ordered that Plaintiff shall serve a copy of this Order upon Defendant by
regular mail within 7 days of the date hereof.

<u>Statement of Reasons</u>

Modern Orthopaedics of New Jersey v. United Healtcare

Docket No. PAS-L-3127-22

---

This is Defendant United Healthcare Services, Inc. ("UHS")'s Motion to Dismiss Plaintiff's complaint for failure to state a claim.

Plaintiff, Modern Orthopaedics of New Jersey ("Modern") filed a Complaint on December 15, 2022 against UHS for UHS's alleged refusal to pay Modern money which Modern seeks for providing necessary medical services to a patient. Modern employed a Board Certified orthopedic surgeon, Dr. Peter DeNoble, a non-participating or out-of-network provider who allegedly performed medically necessary services to the patient in the emergency room at The Valley Hospital on January 24, 2020. Modern claims that "the Hospital as part of the normal business practice, obtained authorization for the medically necessary treatment of the patient through the emergency room department. This authorization is also applicable to all physicians, including Dr. DeNoble, who is employed and/or contracted by Plaintiff." (Plaintiff's Complaint, ¶ 16).  Modern billed UHC for the primary surgeon charges a total of $55,110, of which UHS paid $7,160.86, leaving a balance of $47,949.14. Modern alleges breach of contract, promissory estoppel, account stated, and a count under the Surprise Bill (N.J.S.A. 26:2SS 1-20).

UHS has filed this motion arguing that UHS is not a proper party to the lawsuit, Plaintiff's state law counts are preempted by the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001 <u>et seq.</u> ("ERISA") and that the state law counts fail to state a claim for which relief may be granted.

This is a motion to dismiss Modern's complaint with prejudice pursuant to Rule 4:6-2(e) for failure to state a claim upon which relief may be granted. The dismissal of a complaint with prejudice is one of, if not the most, severe ruling a litigant can receive. Pleading deficiencies at this stage of the litigation may still be cured by amendment or through further discovery. Concerns of justice and the possibility of amendment or discovery means that such motions should be considered "with great caution" and "should only be granted in the rarest of circumstances," Printing Mart- Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772 (1989). The test for determining the adequacy of a pleading is whether a cause of action is suggested by the facts. Id. at 746. In reviewing a complaint on a Rule 4:6-2(e) motion, the court is directed to make a thorough and liberal search of the complaint to determine whether a cause of action may be gleaned even from an obscure claim, even giving opportunity to amend if necessary. Id.

The court is to take all reasonable inferences in favor of the plaintiff and is to strictly ascertain the "legal sufficiency" of the facts contained within the complaint. Id. The court does not consider whether the Modern will be able to prove the allegations, but rather only examines the adequacy of the facts alleged. Id. In evaluating under this standard, the court can review the "complaint, exhibits attached to the complaint, matters of public record and documents that form the basis of a claim." Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d. Cir. 2004). However, if the court considers "matters outside the pleading…the motion shall be treated as one for summary judgment and disposed of as provided by Rule 4:46. In addition, a judge may take judicial notice of certain relevant documents and of certain statements that were included in those documents. State v. Silva, 394 N.J. Super. 270, 275 (App. Div. 2007). Here, the court only considers the documents referenced in the Complaint, therefore, this motion is decided under the standard of Rule 4:6-2(e). The Court will review the insurance policy provided for the patient at

issue, which does not convert the standard to one of summary judgment, as the policy is referred to in the Complaint and forms the basis of the claim.

The patient in the present case was insured by a self-funded health benefit plan, the Benjamin Moore & Co. Welfare Benefit Plan, which was funded by the Plan Sponsor, Benjamin Moore & Co. This plan is an employee welfare benefit plan governed by ERISA and the plan states that the patient is "entitled to certain rights and protections under ERISA." (Defendant's Certification of Mabel S. Fairley Exhibit A, page 145 - eCourts page 156 – C.R. 000153).

Defendant first argues that the Patient's plan indicates that UnitedHealthcare Insurance Company ("UHIC"), and not UHS was the Claim Administrator for the plan. While UnitedHealthcare is identified as the Plan's Claims Administrator, the contact information for the Claims Administrator is indicated as United Healthcare Services, Inc., which is UHS. (Id. at page 144 - eCourts page 155 – C.R. 000152). UHS cites to page 153 of the Plan, but no pertinent information is on that page. The Court finds that the information provided in the plan is misleading as regards to the Claims Administrator, and therefore will not dismiss on this basis alone.

The Court does, however, find that all of Plaintiff's state law claims are preempted by ERISA. "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans…[by setting] various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA…ERISA embraces state common law claims. Finderne Mgmt. Co., Inc. v. Barrett, 355 N.J. Super. 170, 185 (App. Div. 2002).

3

Modern states in the Complaint that none of its claims are preempted by ERISA and cites to a Third Circuit case, in which the court did not find preemption where "(1) the medical provider's claims arose from a contract independent of the ERISA plan; (2) the patients were not parties to the contract between the provider and insurer; and (3) the dispute was limited to the amount of the payment, not the right to be paid." Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F. 3d 393, 403-04 (3d Cir. 2004).

The present matter stands in stark contrast to Pascack. The patient's plan explicitly provides that "UnitedHealthcare requires prior authorization for certain Covered Health Services…However, if you choose to receive Covered Health Services from a non-Network provider, you are responsible for obtaining prior authorization before you receive the services." (Exhibit A, page 14). Modern alleges that Defendant "never disclosed that it did not intend to pay the usual and customary value" for services even though Defendant was "aware that Modern was an out-of-network provider."

Yet Modern does not allege that Defendant promised to pay the usual, customary and reasonable (UCR) value, or that it promised to pay any sum at all. Pre-authorization is a routine procedure conducted pursuant to the Plan, and is thus not independent of the ERISA Plan. Another contrasting case is that of Plastic Surgery Center, P.A. v. Aetna Life Insurance Company, 967 F.3d 218 (3d Cir. 2020) where the Third Circuit reversed the District Court's granting of a motion to dismiss claims of breach of contract and promissory estoppel because the plan administrator was alleged to have agreed to make payments to the provider, which amounted to an oral agreement. In Plastic Surgery the court specifically highlights an agreement that was made "during telephone conversations between Aetna and Center employees," where, as "various contemporaneous notes" indicate, an employee of plaintiff had asked for a "one-off

4

'single case agreement' with a negotiated rate of payment" and "an Aetna employee called the Center back to confirm that Aetna 'agreed to approve and pay for' [a patient's] surgery and to provide payment at the 'highest in[-]network level.'" <u>Id</u>. at 224.

Modern does not any such factual allegations of a separate oral agreement here. Additionally, in resolving Plaintiff's claim a court would be required to interpret the payment rates as provided in the Plan, a task which is not independent or merely incidental to the Plan.

Finally, the Court notes that Modern in its Opposition to the present motion has withdrawn his fourth count under N.J.S.A. 26:2SS 1-20 (the NJ Surprise Bill Act), and therefore the Court will not address it.

For the foregoing reasons, Defendant's motion is granted.

Prepared by the Court

_____

| | |
|---|---|
| ATLANTIC ER PHYSICIANS, PA, *et al* : | Superior Court of New Jersey |
| Plaintiff : | Law Division- Gloucester County |
| v. : | |
| : | CIVIL ACTION |
| UNITEDHEALTH GROUP, INC., : | Docket No. GLO-L-1196-20 (CBLP) |
| UNITEDHEALTHCARE INS. CO., *et al* : | |
| And MULTIPLAN, INC. : | **Memorandum of Decision** |
| Defendants : | |

_____

These motions to dismiss under R. 4:6-2(e), arise from an action filed by
plaintiffs, "NJ Team Health", who are emergency room physicians groups from all over
the State who generally complain about out-of-network reimbursement rates from the
defendants, who are health insurers and third-party administrators of employee health
benefit plans.

More specifically, Team Health is a large emergency room staffing, billing and
collections company that operates throughout the United States.  They provide
outsourced emergency medicine services on a national scale, and operate as many as
3,400 emergency medical facilities, employing approximately 19,000 people.
Defendants are health insurers and third-party administrators who operate the largest
health insurance carrier in the United States.  These are primarily employee health
benefit plans.  Most healthcare providers enter into agreements ("network agreements")

with health insurers and third-party administrators which specify how much the health plan will reimburse the provider for medical services rendered to their covered insureds. Healthcare services provided without any contractual agreement specifying a providers' reimbursement rates are "out-of-network", and the benefit amount is governed by the applicable heath benefit plan of which the patient is enrolled.

With regard to the instant action, until May 2020, Team Health plaintiffs allege their relationship with the defendant was controlled by a written contract in which they agreed to accept a certain negotiated amount for the health care services they provided to the defendants' insureds.  It is alleged that around 2018, the United defendants unilaterally decided to substantially reduce reimbursement rates for plaintiffs' out-of-network services.  In May 2020, United began implementing that plan against plaintiffs by terminating the express written agreements between the parties and thereafter began paying substantially less than what was previously agreed and substantially less than the reasonable value of the services plaintiffs provide.  After May 2020, defendants contracted with defendant, Multiplan, Inc. to determine this out-of-network payment. Multiplan promotes itself as an unregulated cost management company that offers "cost control" through a program known as Data iSight.  Multiplan claims the Data iSight program determines a reasonable reimbursement rate for health care services by applying a proprietary formula to the submitted claims.  It is alleged that Multiplan receives a share of the fees an insurance company earns from adjudicating a health care provider's claim for less than the amount the provider charged.

This case involves 27,000 disputed claims for emergency services provided by plaintiffs to United members during the period from May 15, 2020, to December 31,

2021.  As emergency medicine providers, the plaintiffs are required by law to treat and stabilize patients who present to the emergency room regardless of insurance coverage.  The plaintiffs rely upon commercial insurance companies to pay a reasonable rate for the critical health care services provided.  Plaintiffs allege that United and Multiplan conspired together to deny plaintiffs their billed amounts for medical services relying upon Multiplan's payment methodology.  Plaintiffs contend that Multiplan's publicly stated claims process is based upon rational and accepted data is a fraud.  Plaintiffs insist that United dictates the rates to be paid and uses Multiplan as a cover for this fraud.  Plaintiffs contend that United and Multiplan reap huge profits at the expense of the plaintiffs.  Plaintiff are suing to recover the reasonable value of their services over what was paid on these 27,000 claims.  The plaintiffs' Second Amended Complaint sues the defendants alleging five separate causes of action- Count One- Breach of Implied-in Fact Contract; Count Two- Quantum Meruit; Count Three- Violation of New Jersey Health Claims Authorization, Processing and Payment Act ("HCPPA") (the first three counts are directed to defendants United, only); Counts Four and Five allege RICO violations and conspiracies as to both defendants. This similar litigation has been advanced in 6 or 7 other states to date.

## <u>STANDARD OF REVIEW</u>

Under R. 4:6-2(e), a motion to dismiss for failure to state a claim must be denied if, giving plaintiff the benefit of all the allegations asserted in the pleadings and all favorable inferences, a claim has been established.  <u>Grillo v. State</u>, 469 N.J. Super. 267 (App. Div. 2021).  The test for determining the adequacy of the pleading is whether a

cause of action is suggested by the facts. Motions to dismiss should be granted in only the rarest of instances. *See*, Printing Mart v. Sharp Elec. Corp., 116 N.J. 739 (1989).


## ERISA PREEMPTION


This matter was originally filed on November 2, 2020, and defendants removed to the United States District Court, District of New Jersey. On February 17, 2021, plaintiffs filed a motion to remand this lawsuit from the District Court. On March 30, 2022, United States District Court Judge Renee Marie Bumb entered an Order that states in pertinent part, "unless and until there is clearly established precedent, if United Defendants argue for federal subject matter jurisdiction in the future based upon ERISA preemption, they must disclose to the court the caselaw that cuts against their legal arguments. United Defendants should lay out that federal district courts in New Jersey, Pennsylvania, Nevada, Arizona, Florida and perhaps elsewhere have denied their arguments for ERISA preemption." When pressed at oral argument, plaintiffs' counsel conceded that no court has found ERISA preemption in this matter.

ERISA was passed by Congress in 1974 to address "mismanagement of funds accumulated to finance employee benefits. ERISA does not guarantee benefits. The statute seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures. Gobeille v. Liberty Mut. Ins. Co., 136 S.Ct. 936, 946 (2016). ERISA was created to ensure employee benefit plans would be subject to a uniform nationwide regulatory scheme, and not a patchwork of inconsistent state regulations. To that end, ERISA includes "expansive pre-emption

provisions" to ensure that the regulation of employee benefit plans remain "exclusively a federal concern". Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004). There are two preemption types. Complete preemption under Section 1132(a), which is jurisdictional in nature. This preemption was rejected by Judge Bumb. The other form of preemption is conflict preemption under Section 514(a). this section expressly preempts state action and state law claims that "relate to" an ERISA plan. United Defendants argue that plaintiffs' claims relate to ERISA-governed health benefit plans and therefore must be dismissed with prejudice as conflict preempted.

A common law claim "relates to" an employee benefit plan governed by ERISA "if it has a connection with or reference to such a plan". Providence Health Plan v. McDowell, 385 F.3d 1168, 1172 (9th Cir. 2004). At this stage of the proceeding, the court finds that plaintiffs' state law claims relate solely to the rate of reimbursement, not the right of reimbursement. Each of the 27,000 claims at issue here have been paid by the defendants. Plaintiffs are not disputing the right to coverage under the plan rather they plead that the United defendants did not pay the reasonable value of the emergency services or they were underpaid for these services. Plaintiffs cite the U.S. Supreme Court case of Rutledge v. Pharm. Care Mgmt. Ass'n, 141 S.Ct. 474 (2020) as support for their position. As stated therein, "[C]rucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan. That is especially so if a law merely affects costs." Id. at 480. Continuing, the Court says "ERISA does not preempt state rate regulations that merely increase costs..". At this stage, the court finds plaintiffs' arguments persuasive. As plaintiffs' state in their brief, they seek to hold United to its

obligation to pay a reasonable value for the benefits United has already agreed to pay out.  Plaintiff allegations do not implicate coverage determinations or plan administration requirements.  Plaintiffs allege that they are entitled to the "reasonable value" of their services under applicable state law- not an ERISA plan.  ERISA's goals of protecting participants and beneficiaries of employee benefits plans are not altered by plaintiffs claims.

Defendants request to dismiss for 514(a) preemption is denied.


## DEFENDANTS CLAIM THAT PLAINTIFF CASE SHOULD BE DISMISSED BY THE ARBITRATION PROCESS ENACTED IN N.J.S. 26:2SS-1

In 2018, the New Jersey Legislature passed the "Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act (the "Act").  Defendants claim that plaintiffs must arbitrate any claims decision at issue in this case under the process outlined in Sections 9,10 and 11 of the Act.  This argument is without merit.  The Act's definitions under Section 3 specifically exclude self-funded plans unless the self-funded plan elects to be subject to the provisions of the Act.  United defendants claim they are self-funded plans in their argument regarding preemption and have not provided any proof that they have opted-in to this statutory scheme.  This basis alone precludes dismissal of plaintiffs' complaint.

## COUNT ONE- BREACH OF IMPLIED-IN-FACT CONTRACT

United defendants seek dismissal of Count One of the Second Amended Complaint that alleges breach of an implied-in-fact contract.  Plaintiffs' complaint alleges that prior to May 2020, the parties had a written contract for the reimbursement rates to be paid for out-of-network emergency health care services.  They allege in paragraph 3 that in 2017 to 2018, "United concluded it could make more money by paying Plaintiffs and other emergency room doctors less, so United embarked on a scheme to do just that."  In paragraph 28 through 31, it is alleged that United terminated the express written agreement in place to pursue greater profits by substantially reducing reimbursement rates it provided plaintiffs.  The complaint says that United cut reimbursement rates to less than half what United had paid in the past pursuant to its previous contract.  The plaintiffs now sue for recovery of the difference between what they bill versus what they were paid.

The essential feature of an implied-in-fact contract cause of action is that the asserted contractual obligation must have arisen from mutual agreement and intent to promise but where no written agreement is in place.  However, the facts as pleaded decisively refute the existence of such agreement.  To prevail on a breach of contract action, whether written or implied, a plaintiff must be able to prove all of the necessary terms of the contract.  Here, the Second Amended Complaint could not be clearer that the parties were not in agreement as benefit amount the defendants would pay for the plaintiffs' services.  Plaintiffs want the amount billed, as they contend it is a reasonable amount as to the value of their services.  Defendants, however, paid a different amount-an amount they say is appropriate according to the Data iSight methodology.  This

essential term- price is in no way an agreed upon term in this implied contract. Certainly, the court agrees that many of the other factors are in place, i.e. the agreement to provide out-of-network emergency services to the plan members and the expectation that the providers would be paid. But price is the element that does not exist in this arrangement. Plaintiffs specifically plead defendants terminated the contract in place prior to May 2020 because defendants did not want to pay the agreed upon rates. This undermines this cause of action.

Count One of plaintiffs' complaint is dismissed for failing to state a cause of action as plead.

## COUNT TWO- QUANTUM MERUIT

In order to recover on a claim for the quasi-contractual theory of quantum meruit, a plaintiff must establish four elements: (1) the performance of services in good faith; (2) the acceptance of services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services. Sean Wood LLC v. Hegarty Group, 422 N.J. Super. 500, 513 (App. Div. 2011). "Quasi-contractual recovery on the basis of quantum meruit rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another" Id. at 512.

In order for plaintiffs to sufficiently plead this cause of action, it must demonstrate that the services they performed in good faith conferred a benefit not only on the patients they served (who are not defendants) but rather on the insurers of the patients. The complaint alleges in paragraph 59 that "[B]oth United and United's Members benefited from the services Plaintiff provided. For example, United used and enjoyed the benefit of Plaintiff's services because Plaintiffs help United discharge its

legal and contractual obligation to its insureds to provide them with emergency care".
At this stage of the proceedings, this argument is persuasive.  The insurer defendants
received a benefit by paying the plaintiffs a rate of reimbursement significantly less than
a reasonable rate.  They were able to pocket the difference in profits while
simultaneously discharging its contractual obligation to pay for out-of-network
emergency care for its members.  Though the benefit conferred is not direct, there is
arguably a benefit conferred to the defendants.

## COUNT THREE- VIOLATION OF NEW JERSEY HEALTH CLAIMS AUTORIZATION, PROCESSING AND PAYMENT ACT ("HCAPPA")

Team Health plaintiffs allege in Count Three that the defendants failed "to timely
pay the full amounts due to plaintiffs for their out-of-network emergency claims", in
violation of HCAPPA, N.J.S. 17B:26-9.1.  This statute permits the provider from
recovering 12% interest on any unpaid claims.  The parties go back and forth on
whether the statute confers a private right of action by a medical provider against an
insured.  At this point, the court does not have to reach this answer.  This statutory
penalty for failing to pay a valid insurance claim promptly is only applicable if plaintiff is
successful in this litigation compelling payment from the defendants.  The court will
revisit this issue upon a successful recovery by plaintiff.

## COUNTS FOUR AND FIVE- VIOLATIONS OF NJ-RICO (as to both sets of defendants)

In Counts Four and Five of the Second Amended Complaint, plaintiffs allege that
the defendants committed acts of theft under N.J.S. 2C:20-3(a) and (b), 2C:20-4(a)-(c)
and 2C:20-8(a) by a pattern of racketeering activity in violation of N.J.S. 2C:41-1.

Basically, the plaintiffs state that United and Multiplan engaged in a conspiracy to divert millions of dollars away from the plaintiffs by falsely and fraudulently hiding behind Data iSight methodology, which in fact was a deceitful ploy to pay reimbursement rates set by United rather than reasonable value.

To state a claim for violation of New Jersey's RICO law (N.J.S. 2C:41-1, et seq.), a plaintiff must allege (1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated in the conduct of the affairs of the enterprise; (5) that the defendants participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the activity. Marina Dist. Dev. Co. v. Ivey, 216 F. Supp. 3d 426, 436 (N.J. Dist. Ct. 2016).  A defendant in a racketeering conspiracy need not itself commit or agree to commit predicate acts. Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001). Rather, "all that is necessary for such a conspiracy is that the conspirators share a common purpose." Id. Thus, if defendants agree to a plan wherein some conspirators will commit crimes and others will provide support, "the supporters are as guilty as the perpetrators." Salinas v. United States, 522 U.S. 52, 64, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997). Each defendant must "agree to commission of two or more racketeering acts," United States v. Phillips, 874 F.2d 123, 127 n.4 (3d Cir. 1989), and each defendant must "adopt the goal of furthering or facilitating the criminal endeavor," Smith, 247 F.3d at 537.

Defendants first argue that plaintiff's pleading is deficient in that it does not comply with the heightened pleading standard required by R. 4:5-8. This rule requires "[I]n all allegations of misrepresentation, fraud, …. Particulars of the wrong, with dates and items *if necessary*, shall be stated *insofar as practicable.* (emphasis supplied). Here, the complaint satisfies the Rule by placing defendants on notice of the alleged wrongs. Specifically, the complaint states that between May 2020 and December 2021, United Healthcare defendants conspired with Multiplan defendant to unilaterally set the rate of reimbursement for the plaintiffs. This rate was set by United but asserts fraudulently that the reimbursement rate was determined by Data iSight at a geographically competitive rate. The fraud/conspiracy began just before the May 2020 change. The plaintiff alleges damages calculated at the amount billed by plaintiff minus the amount paid by defendants. This pleading is sufficient as to R. 4:5-8.

The more interesting argument raised by both defendants is that plaintiffs fail to allege that the defendants' racketeering conduct was the proximate cause of their damages. See, <u>Maio v. Aetna Inc.</u>, 221 F.3d 472, 483 holding that plaintiff must "make two related but analytically distinct threshold showings…(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendants' [RICO] violation. The defendants argue that plaintiffs are required to treat all patients who arrive at hospitals for emergency care, and even if the defendants shared their payment methodology, nothing would change, i.e. the plaintiffs would receive the same amount. This court finds this unpersuasive as the argument ignores the alleged fraud as alleged. Plaintiffs say that the Data iSight rate is merely a cover for

United's reimbursement rate that it unilaterally set.  The plaintiffs allege that United and Multiplan conspired to set an artificially low rate to reap huge profits disguising its conspiracy by pretending the rate was set by Data iSight.  Their damages would be the difference between they amount they billed and the amount they received.  As alleged, the plaintiff's damages are the proximate cause of the RICO conspiracy.  They may has performed the same services as required by law, but they would have received significantly more money for doing so, if not defrauded by the defendants.

The court requests the defendants prepare an Order consistent with this opinion.

DATED: August 23, 2022                          _____

                                                JAMES R. SWIFT, JSC

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 108 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 304 of 466 PageID: 323
M. Spiegel & Sons Oil Corp. v. Amiel, Not Reported in A.3d (2016)

2016 WL 3327126
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

M. SPIEGEL & SONS OIL CORP., d/
b/a SOS Fuels, Plaintiff–Respondent,
v.
Yuval AMIEL, a/k/a Val Amiel, a/k/a Amiel
Yuval, a/k/a Youval Amiel, and Guy Madmon,
a/k/a Guy Hromadka, a/k/a Guy Nadmon, a/
k/a Guy Kmadmon, Defendants–Appellants.

A-3657-14T3
|
Submitted June 1, 2016.
|
Decided June 16, 2016.

On appeal from Superior Court of New Jersey, Law Division,
Bergen County, Docket No. L–2160–14.

**Attorneys and Law Firms**

Stephen C. Gilbert, attorney for appellants (Mr. Gilbert, of
counsel and on the briefs; John T. Knapp, of counsel and on
the briefs).

Winne, Banta, Basralian & Kahn, P.C., attorneys for
respondent (Gary S. Redish and Christine R. Smith, of
counsel and on the brief).

Before Judges ST. JOHN and VERNOIA.

**Opinion**

PER CURIAM.

 **\*1** Defendants Yuval Amiel and Guy Madmon appeal
March 6, 2015 orders granting plaintiff's motion for summary
judgment in the amount of $991,871.99 and denying
defendants' cross-motion for summary judgment. Based upon
our review of the record, we reverse the order granting
plaintiff's motion for summary judgment, affirm the order
denying defendants' motion for summary judgment, and
remand for further proceedings.

*I.*

We discern the following undisputed facts from the record
and view the facts and all reasonable inferences therefrom
in the light most favorable to the respective non-moving
parties. *Robinson v. Vivirito,* 217 *N.J.* 199, 203 (2014); *Brill
v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540 (1995).
Plaintiff M. Spiegel & Sons Oil Corp. provides goods and
services to the petroleum industry, including the delivery of
fuel oil to retail gas stations. Defendants formed G & Y
Realty, L.L.C. (G & Y) in 2009. G & Y operated two gas
stations and purchased fuel oil from plaintiff.

In March 2012, plaintiff claimed that G & Y owed it over $1
million for fuel oil deliveries and ceased making deliveries
to G & Y's stations. Plaintiff thereafter approached G & Y
about converting the indebtedness into an agreement pursuant
to which G & Y would make regular monthly payments to
plaintiff.

On April 26, 2012, G & Y executed a promissory note in the
amount of $1,052,143.85 in favor of plaintiff for the sum due
and owing for the fuel oil deliveries. G & Y is identified as
the "Maker" of the promissory note. Defendants signed the
note on behalf of G & Y. During G & Y's discussions with
plaintiff regarding the note, defendants were never requested
to provide a personal guarantee of the obligations in the
promissory note and never agreed to do so.

Following execution of the promissory note and later in the
day on April 26, 2012, plaintiff presented defendants with a
Personal Guarantee. In pertinent part it provided as follows:

> To induce [plaintiff] (the "Payee")
> to extend credit or other financial
> accommodation to or on behalf of the
> Maker, G & Y REALTY LLC, the
> Guarantors hereby unconditionally,
> absolutely and irrevocably guarantee
> to Payee the full and punctual
> payment, performance and discharge
> of all indebtedness, liabilities and
> obligations of Maker to Payee now
> existing or hereafter arising or
> acquired.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 109 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 305 of 466 PageID: 324
M. Spiegel & Sons Oil Corp. v. Amiel, Not Reported in A.3d (2016)

Defendants signed the personal guarantee.

In the certification supporting plaintiff's motion for summary judgment, its treasurer asserted that the personal guarantee was provided by defendants to induce plaintiff to continue to supply fuel oil to G & Y's stations. Defendants' affidavit, however, stated that at the time the personal guarantee was first presented, G & Y had already received the fuel which created the indebtedness, executed the promissory note for the payment of the indebtedness, made arrangements for the purchase of fuel from another supplier, and there was "no obligation taken on by [p]laintiff in exchange for receiving the [p]ersonal [g]uarant[ee]."

**\*2** G & Y defaulted under the promissory note in January 2014. In February 2014, G & Y filed a Notice of Assignment for the benefit of creditors in the Hudson County Chancery Division. Plaintiff filed a proof of claim in the matter for $954,576.91 it claimed was due and owing under the promissory note as of February 20, 2014. Plaintiff has not received any payments as a result of its filing in that action.

On March 6, 2014, plaintiff filed a complaint against defendants alleging that they were obligated under the personal guarantee for the sums due and owing as a result of G & Y's default on the promissory note. Defendants filed a timely answer. After the discovery period ended, plaintiff filed a motion for summary judgment for the amount it claimed was due under the personal guarantee, including an amount for reimbursement of attorney's fees and costs.[1] Defendants filed a cross-motion for summary judgment, arguing that the personal guarantee was void because of a lack of consideration. Defendants also argued that plaintiff failed to mitigate its damages.

On March 6, 2015, the court heard oral argument and for reasons stated in an oral opinion granted plaintiff's motion and denied defendants' cross-motion. The court found that the "personal guarantee [was] very clear and direct," G & Y did not make the required payments under the promissory note, and the "forbearance of the plaintiff to forego collection of the full amount" and to "span out a payment plan" provided consideration supporting defendants' obligations under the personal guarantee. The court entered orders granting plaintiff's motion and denying defendants' cross-motion. This appeal followed.

## II.

When reviewing an order of the trial court granting summary judgment, we apply the same standard that the trial court applies when ruling on a summary judgment motion. *State v. Perini Corp.,* 221 *N.J.* 412, 425 (2015). Summary judgment may be granted when there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. *R.* 4:46–2(c).

"An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *Ibid.* We "must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." *Bhagat v. Bhagat,* 217 *N.J.* 22, 38 (2014); *see also R.* 4:46–2(c). Based upon the record, we are convinced the court erred by granting plaintiff's motion for summary judgment.

"As a basic premise, it is true that 'no contract is enforceable ... without the flow of consideration—both sides must "get something" out of the exchange.' " *Oscar v. Simeonidis,* 352 *N.J.Super.* 476, 484 (App.Div.2002) (alteration in original) (quoting *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.,* 93 *N.J.* 153, 170, *cert. denied,* 464 *U.S.* 994, 104 *S.Ct.* 488, 78 *L. Ed.*2d 684 (1983)). However, consideration does not have to pass directly between parties who enter into a guaranty agreement because "any consideration moving from the original obligor[ ] to the guarantor ... is sufficient" consideration for the guaranty. *Great Falls Bank v. Pardo,* 263 *N.J.Super.* 388, 401 (Ch. Div.1993), *aff'd,* 273 *N.J.Super.* 542 (App.Div.1994).

**\*3** If a guarantee is not executed at the same time or as part of the same agreement as a loan, it " 'must be supported by separate [sic] consideration moving to the guarantor or the renunciation of something substantial [by the guarantee].' " *Id.* at 400–01 (quoting *S. Kosson & Sons v. Harris,* 108 *N.J.L.* 162, 166 (E. & A.1931)). "A mere promise to pay an antecedent debt of another is not generally regarded as consideration for a guaranty." *Id.* at 401. There must be at least "a slight benefit to the promisor or a trifling inconvenience to the promisee." *Ibid.*

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 110 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 306 of 466 PageID: 325
M. Spiegel & Sons Oil Corp. v. Amiel, Not Reported in A.3d (2016)

Defendants opposed plaintiff's summary judgment motion, arguing that there was no consideration provided for the personal guarantee. Plaintiff supported its motion with a singular factual assertion concerning the consideration provided for the personal guarantee. Plaintiff's supporting certification stated that defendants provided the personal guarantee "to induce [p]laintiff to continue to supply the fuel" to G & Y's stations. Plaintiff did not offer any other factual assertion supporting its position that it provided consideration for defendants' personal guarantee.

We are convinced the court erred in granting plaintiff's motion for summary judgment because defendants' opposition certification directly disputed plaintiff's singular factual assertion concerning consideration. Defendants' certification stated that at the time the personal guarantee was signed, G & Y had not received fuel from plaintiff for more than one month, had obtained another fuel supplier, and never again received a delivery of fuel from plaintiff. The certification states that defendants did not execute the personal guarantee to induce plaintiff to make future fuel deliveries to G & Y.

We are satisfied that the parties' submissions presented the court with a genuine issue of material fact as to whether there was consideration for defendants' grant of the personal guarantee. Resolution of the fact issue was required for the court to decide whether there was sufficient consideration supporting defendants' personal guarantee as a matter of law.

The trial court did not address the factual issue directly raised in the parties' submissions, instead finding that plaintiff's forbearance from its right to collect the sums due from G & Y provided consideration for defendants' agreement to the personal guarantee. There was no evidence in the record supporting the court's finding. *See Brill, supra,* 142 *N.J.* at 540 (holding that a court may only consider "competent evidential materials" in deciding a motion of summary judgment).

Although it appears that plaintiff's forbearance from its right to collect the sum due from G & Y provided consideration for G & Y's execution of the promissory note, plaintiff's supporting certification does not state that such forbearance provided the basis for defendants' execution of the personal guarantee. As noted, plaintiff's supporting certification stated only that the personal guarantee was provided to induce plaintiff to continue supplying fuel oil to G & Y. As a result, there was no evidence supporting the court's finding that plaintiff's forbearance provided consideration for defendants' execution of the personal guarantee.

**\*4** We are therefore convinced that there was a genuine issue of material fact which precluded the court's award of summary judgment to plaintiff. The factual issue also precluded an award of summary judgment to defendants.

Because we reverse the court's award of summary judgment to plaintiff, it is unnecessary to address defendants' argument regarding plaintiff's alleged failure to mitigate damages, which is an issue of fact and law which the court will address as appropriate on remand. We also need not address the propriety of the court's award of attorney's fees because the award was based upon the court's grant of summary judgment to plaintiff.

The court's award of summary judgment to plaintiff is reversed. The court's denial of defendants' cross-motion for summary judgment is affirmed. We do not express an opinion on the merits of the parties' claims and remand the matter for further proceedings. We do not retain jurisdiction.

**All Citations**

Not Reported in A.3d, 2016 WL 3327126

## Footnotes

1        The personal guarantee provided for plaintiff's recovery of attorney's fees and costs in any action against defendants to collect sums due as a result of G & Y's default under the promissory note.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 111 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 307 of 466 PageID: 326
Emergency Physician Services of New York V...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

2021 WL 4437166

United States District Court, S.D. New York.

EMERGENCY PHYSICIAN SERVICES

OF NEW YORK, et al., Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., et al., Defendants.

20-cv-9183 (AJN)
|
Signed 09/28/2021

**Attorneys and Law Firms**

Matthew M. Lavin, Aaron Modiano, Arnall Golden Gregory, LLP, Washington, DC, Wendy Helene Schwartz, Sarah Dowd, Binder & Schwartz LLP, New York, NY, Jonathan Eric Siegelaub, United States District Court, Fort Lauderdale, FL, Salvatore Charles Badala, Napoli Shkolnik PLLC, Melville, NY, for Plaintiffs.

Dimitri Portnoi, Jason Orr, O'Melveny & Myers, LLP, Los Angeles, CA, K. Lee Blalack, II, Gregory Frederick Jacob, O'Melveny & Myers LLP, Washington, DC, Amanda Lyn Genovese, O'Melveny & Myers LLP, New York, NY, for Defendant UnitedHealth Group, Inc.

Aimee Leigh Creed, d'Arcambal Ousley & Cuyler Burk LLP, New York, NY, Errol J. King, Katherine C. Mannino, Phelps Dunbar LLP, Baton Rouge, LA, for Defendant Multiplan, Inc.

OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** Plaintiffs Emergency Physician Services of New York, Buffalo Emergency Associates, Exigence Medical of Binghamton, Exigence Medical of Jamestown, and Emergency Care Services of New York are hospital-based emergency room physicians who practice medicine in the State of New York. They bring this action against Defendants UnitedHealth Group, Inc. and Multiplan, Inc., alleging that Defendants conspired to create a healthcare claim repricing mechanism in order to systematically underpay invoices submitted to them, in violation of the federal Racketeer Influenced and Corrupt Organizations Act and New York law. Defendants have moved to dismiss the Complaint. For the reasons that follow, Defendants' motions are granted in part and denied in part.

**I. Background**

For the purpose of resolving Defendants' motions to dismiss, the Court accepts all well-pled facts in the Complaint as true, and draws all reasonable inferences in Plaintiffs' favor. *See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).* The following account is therefore taken from Plaintiffs' factual allegations contained in the Complaint.

**A. Factual background**

Plaintiffs are all physician practice groups who staff the emergency rooms of numerous hospitals across New York. Compl. ¶¶ 24–29, Dkt. No. 1. They are out-of-network healthcare providers with United and regularly provide emergency medical services to United's insureds. *Id.* ¶¶ 24–29. Defendant United is the parent company of over 1,200 wholly owned subsidiaries, including non-parties United Healthcare Services, Inc., UnitedHealthcare of New York, Inc., UnitedHealthCare Insurance Company of New York, UnitedHealthcare, Inc., and Optum Group, LLC. *Id.* ¶ 30. Defendant MultiPlan develops and operates healthcare provider networks and offers related cost-management products to insurance companies and other payers of health benefits. Id. ¶ 34. Among these products is Data iSight, which Multiplan is offers to United and other payers. *Id.*

**1. The relevant legal structure**

As emergency room physicians, Plaintiffs have a professional obligation to render treatment on their patients even if they are unable to verify a patient's insurance benefits and obtain authorization for treatment from insurance companies like United. *Id.* ¶¶ 38–42. As a result, Plaintiffs rely on health insurance companies to comply with their legal obligations to pay a "reasonable" rate to providers after treatment is rendered, including providers (like Plaintiffs) who are not "in-network" or "participating" providers. *Id.* ¶ 43. In order to implement this system, hospitals that provide emergency services obtain the patient's insurance information and demographics and send the patient's demographics, medical records, and insurance information to Plaintiffs. *Id.* ¶¶ 44–45. Plaintiffs' billing departments transcribe the medical charts into standardized billing codes, generate invoices with standard charges, medical coding, and patient demographics,

Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

and send those invoices to United through interstate wire communications. *Id.* ¶¶ 45–48. All invoices are submitted through a common United portal, regardless of which United subsidiary or entity administers a particular patient's plan. *Id.*

**\*2** Both Plaintiffs and United are bound by legal obligations to engage in this system in good faith. On Plaintiffs' side, Plaintiffs are required under state and federal law to provide treatment to all patients who present at emergency departments. The federal Emergency Medical Treatment and Labor Act ("EMTALA") provides that hospitals and physicians who staff hospital emergency rooms have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department. 42 U.S.C. §§ 1395dd(a)–(b), (d), (h). If "the individual has an emergency medical condition," Plaintiffs are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." *Id.*; *see also* Compl. ¶¶ 69–71. Under New York law, "[a]ny licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment ... shall be guilty of a misdemeanor and subject to a term of imprisonment not to exceed one year and a fine not to exceed one thousand dollars." N.Y. Pub. Health Law § 2805-b(2)(b); *see also* Compl. ¶ 72 & n.9.

United is also bound by legal obligations to participate in this system in good faith. At the federal level, some courts have interpreted EMTALA's requirement and purpose as requiring compensation at reasonable rates, for in the absence of such an obligation, "an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." *N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S. 2d 540, 545 (Sup. Ct. 2011); Compl. ¶ 81. State law similarly requires that health insurance companies pay a reasonable amount for the services of out-of-network emergency medical providers. N.Y. Fin. Serv. Law § 605(a); Compl. ¶ 80.

That basic structure governs all of the claims at issue in this litigation. Plaintiffs did not have a written contract with United that would establish a contractual rate of payment for their services. Compl. ¶¶ 65–66. So what Plaintiffs are owed comes down to reasonableness. As relevant here, a "reasonable" rate is calculated as the lesser of Plaintiffs' billed charges or the "usual and customary rates" for similar providers in the same geographic area. *Id.* ¶¶ 67–68.

### 2. The alleged RICO enterprise

Plaintiffs allege that Defendants conspired to implement a repricing mechanism that would systematically underpay Plaintiffs for the claims they submitted. According to Plaintiffs, this is not the first time that United has engaged in such a scheme. Just over a decade ago, a United subsidiary, Ingenix, was investigated by the New York Attorney General for allegedly running a fraudulent payment system. *Id.* ¶¶ 83–87. United paid around $400 million in settlements in 2009, including $50 million that went to the establishment of the FAIR Health database and website. *Id.* ¶¶ 84, 93. The settlement agreement also indicated that United must use FAIR Health as the basis for determining the Allowed Amounts for Covered Out-Of-Network Services or Supplies. *Id.* ¶ 87.

Also in 2009, the New York Attorney General's Office announced the result of its investigation into Ingenix in an agreement titled "Assurance of Discontinuance Under Executive Law § 63(15)." *Id.* ¶ 88. It detailed that the prices generated by Ingenix were inadequate and it required the insurance industry to cease using Ingenix and to create a new, independent database for the purpose of determining fair and accurate reimbursement rates. *Id.* ¶¶ 88–92. The settlement led to the creation of FAIR Health, Inc., a non-profit that was funded by insurance companies that included United Group. *Id.* ¶ 93. As relevant here, FAIR Health operated a database that uses information directly from insurers to estimate what providers charge, and what insurers pay, for providing healthcare to patients. *Id.* ¶¶ 131–33. The purpose of the database is to prevent insurers from using skewed methodologies to calculate payments. *Id.* ¶ 134. In 2015, United's legal obligation to utilize FAIR Health under the 2009 Agreement ended. *Id.* ¶¶ 97, 137.

**\*3** Shortly thereafter, United sought out the services of MultiPlan for purposes of determining rates. *Id.* ¶¶ 98, 138–40. The agreement between the two companies forms the basis of the RICO enterprise that Plaintiffs allege exists. According to Plaintiffs, United and MultiPlan formed an ongoing informal organization with the common purpose of developing and implementing a scheme to underpay out-of-network emergency medical services. *Id.* ¶¶ 101–04. Plaintiffs claim that the enterprise formed by the two companies shared a common purpose that includes financial gain as the direct result of the scheme. *Id.* ¶ 108. Plaintiffs also claim that the two companies have a relationship that includes

*Emergency Physician Services of New York v...., Not Reported in Fed...*

RICO Bus.Disp.Guide 13,573

contracts, coordination of efforts, and money-sharing plans, which are detailed in "Whitepapers" that provide the roadmap for how the companies reached the rates they charged. *Id.* ¶¶ 109–12.

As detailed in the Complaint, United would send "target prices" to MultiPlan, and MultiPlan would then arrive at a number under that rate. *See id.* ¶¶ 113, 142–61. It does so by sending claim information to MultiPlan through an electronic data interchange program that allows United to communicate claims information, "[r]outing to designated repricing tool," the benchmark target price; and the percentile of Data iSight's proprietary database to use to set a benchmark rate. *Id.* ¶ 183. The key to this enterprise is MultiPlan's Data iSight, which Plaintiffs allege provides the mechanism by which MultiPlan achieves the new benchmark prices while ignoring the usual and customary rates that were supposed to be used; in the process, Plaintiffs argue, MultiPlan relies on purposely faulty data. *Id.* ¶¶ 114, 152–58, 180–86. Data iSight first sorts claims information based on type of care. *Id.* ¶¶ 187–89. From there, it implements an algorithm that "edits" and recalculates payment rates through a process known internally at MultiPlan as "DiP," or "Data iSight Professional." *Id.* ¶¶ 188–212. After receiving a number through the DiP process, that rate is compared to a target payment amount provided by United, known as the "meet or beat" price. *Id.* ¶¶ 181–82, 221. United would then pay the lowest of three numbers: the target price, the billed amount, or the DiP rate. *Id.* ¶¶ 181–82, 215–20. United compensates MultiPlan based on the amount by which the claims were underpaid—that is, MultiPlan was paid a fee equal to between 6% and 9% of the difference between the target amount that United sent and the amount of the new, lower payment that MultiPlan calculated using Data iSight. *Id.* ¶¶ 115, 218–19. Both companies profit: United profits by lowering its costs, while MultiPlan profits when United shares money obtained through the scheme. *See id.* ¶¶ 116–18. Plaintiffs argue that the scheme has been ongoing for years and that it continues to operate. *Id.* ¶¶ 124–30.

After the rate is calculated and sent back to United, United sends Provider Remittance Advice letters ("PRAs") that provided a detailed explanation of the price reductions. *Id.* ¶¶ 222–25. While those letters reveal that Data iSight was used, Plaintiffs claim that the description of the system was designed to deceive Providers into accepting the reduced rates. *Id.* Along similar lines, the Data iSight Portal information describes a transparent basis for the reductions in billed amounts, but in doing so contains numerous

misrepresentations. *Id.* The thrust of Plaintiffs' argument is that the entire system is designed to conceal how the scheme actually operates. *Id.* ¶¶ 222–36.

In order to coordinate the use of Data iSight, MultiPlan and United met frequently and exchanged internal non-public documents called "Whitepapers." *Id.* ¶¶ 237–43. Some of these meetings occurred at annual events hosted by the Client Advisory Board of MultiPlan that were attended by MultiPlan executives. *Id.* ¶¶ 244–46. There, MultiPlan would market the profits that could be gained by using their system. *Id.* ¶ 247. And in those meetings, MultiPlan allegedly detailed how the use of the DiP technology would provide a veneer of independence that, among other things, would allow the parties to avoid liability for intentional underpayments. *Id.* ¶¶ 237–56. In addition, Defendants would discuss situations where patients or providers pushed back and agreed that the DiP methodology and rate could be presented as a "fair" and "transparent" justification for the rate. *Id.* ¶ 255. Through it all, the parties depended on keeping the terms and methodologies of DiP secret. *Id.* ¶ 256. Similar meetings took place at "MultiPlan's secret road shows," where MultiPlan's CAB would again provide detailed descriptions of the methodology, receive input from clients like United, and otherwise discuss the specifics of the scheme. *Id.* ¶¶ 257–62.

**\*4** The "Whitepapers" are secret internal documents produced by MultiPlan that explain how the DiP methodology can be implemented to justify United's target price, regardless of what the language of a patient's health plan mandates. *Id.* ¶ 264. United's executives reviewed those Whitepapers, provided feedback, and use the information contained in them to structure United's relationship with MultiPlan. *Id.* ¶ 265. At times, United's representatives provide direction to MultiPlan with respect to the information contained in the Whitepapers in order to ensure that the DiP methodology will work as advertised. *Id.* ¶¶ 258–62. According to Plaintiffs, the collaboration provides a "partial blueprint" of the RICO enterprise that both parties contribute to. *Id.* ¶¶ 263–69.

The core of Plaintiffs' claims of mail and wire fraud rely on allegations of material misrepresentations regarding how United and MultiPlan reach the rates that they pay to providers. These allegations include general misrepresentations regarding how rates are calculated (and failure to disclose the system described above). They also include related misrepresentations regarding the use of geographic adjustments; Data iSight claims to readjust based

**Emergency Physician Services of New York v...., Not Reported in Fed....**

RICO Bus.Disp.Guide 13,573

on geography and the labor costs in the providers' area, but in practice, Data iSight does not adjust for geographic differences. *Id.* ¶ 308–11. Instead, its payment rates across six states were identical despite different costs of living, expenses of providing care, and other relevant metrics. *Id.* ¶¶ 308–14.

The cornerstone of Defendants' schemes is the PRAs, which are mailed to providers. The PRAs, Plaintiffs allege, misstate the pricing methodologies used. For example, one of the PRAs described Data iSight as using an actual database of "paid" claim data to determine the rate of payment without disclosing how the DiP calculation actually works. *See id.* ¶¶ 366–79. The Complaint details many such examples of misrepresentations contained in the PRAs and through other means designed to deceive Plaintiffs regarding how the rates were calculated. *See id.* ¶¶ 366–772. They note that the PRAs failed to mention that the DiP calculation is adjusted and manipulated, that the data used is "national" generic data and not geography-specific, and that MultiPlan reverse engineers rates rather than calculating them through fair means. *Id.* ¶ 375.

After Plaintiffs contacted Defendants regarding the rates, Defendants allegedly obfuscated how the rates were calculated. *See id.* ¶¶ 275–307. These misrepresentations were made through a variety of fora, including through Data iSight's online portal; at no point, claim Plaintiffs, have Defendants disclosed the "meet or beat" mechanism or the process of editing claims in order to generate reduced prices. *Id.* ¶¶ 275–307, 335–60. Plaintiffs' examples of misrepresentations also repeatedly detail that they consulted the Data iSight website, on United's urging, and were deceived by the information contained there. *E.g., id.* ¶¶ 377, 391, 405.

In sum, Plaintiffs allege that Defendants are engaged in a "nationwide scheme injuring thousands of other ER providers" in addition to Plaintiffs. *Id.* ¶¶ 788–90. They claim further that United's failure to compensate Plaintiffs at a reasonable rate enriches United, whose insureds will continue to use Plaintiffs' services, which Plaintiffs are obligated to provide. *Id.* ¶¶ 794–99.

### B. Procedural history

Plaintiffs initially filed this action against Defendants United and Multiplan on November 2, 2020, alleging five causes of action. Compl. ¶¶ 800–63. As to both Defendants,

Plaintiffs alleged a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (Count One), participation in a RICO conspiracy, 18 U.S.C. § 1964(d) (Count Two), and a request for a declaratory judgment, 28 U.S.C. § 2201 (Count Five). Compl. ¶¶ 800–35, 857–63. As to United, Plaintiffs also alleged two violations of New York law: a claim for breach of an implied-in-fact contract (Count Three) and a claim for unjust enrichment (Count Four). *Id.* ¶¶ 836–56.

**\*5**  On January 25, 2021, United and Multiplan each filed a motion to dismiss the Complaint. United Motion, Dkt. No. 28; United Br., Dkt. No. 29; Multiplan Motion, Dkt. No. 30. Plaintiffs on February 8, 2021, declined the Court's invitation to amend the Complaint. Dkt. Nos. 31, 37. Plaintiffs filed oppositions to Defendants' motions, Pls. United Opp'n Br., 38; Pls. Multiplan Opp'n Br., Dkt. No. 39, and Defendants filed replies, Multiplan Reply, Dkt. No. 45; United Reply, Dkt. No. 47. Plaintiffs on March 19, 2021, filed a notice of two supplemental authorities, Pls. Suppl. Auths., Dkt. No. 48, to which United responded, United Suppl. Auths. Resp., Dkt. No. 56.

### II. Legal standard

When considering a motion to dismiss for failure to state a claim, courts "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *York v. Ass'n of Bar of City of N.Y.,* 286 F.3d 122, 125 (2d Cir. 2002). Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The complaint's factual allegations must be sufficient to "nudge[ ]" the plaintiff's claims "from conceivable to plausible." *Iqbal,* 556 U.S. at 680 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "In addition to the allegations in the complaint itself, a court may consider documents attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters." *ACE Sec. Corp.*

Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

*Home Equity Loan Tr. v. DB Structured Prods.,* 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014).

### III. Discussion

Plaintiffs allege that both Defendants are liable for violating the federal RICO and for participating in a RICO conspiracy. Compl. ¶¶ 800–835. They also seek declaratory relief as to all Defendants that would establish the appropriate payment rates and methodology to be used in order to prevent further harm. Specifically, they seek a determination (i) that United has an obligation to pay Plaintiffs for the services rendered at rates equal to the reasonable value of the emergency services rendered; (ii) that the rates calculated by MultiPlan using the Data iSight service are fraudulent; and (iii) that the rates paid by United for the claims at issue are inadequate and violate United's obligation to pay Plaintiffs for their services rendered at a reasonable value. *Id.* ¶¶ 857–63. Finally, they bring state law claims under breach of implied-in-fact contract and unjust enrichment under New York state law. *Id.* ¶¶ 836–56.

### A. Plaintiffs fail to state a claim under RICO

The Court begins with Plaintiffs' RICO claim against both Defendants. Together, Defendants' attack nearly every elements of Plaintiffs' RICO claim. United Br. at 7–14; MultiPlan Motion at 7–11. But the Court need address only proximate causation.

### 1. Applicable law

RICO creates a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962" of RICO. 18 U.S.C. § 1964(c). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.* § 1962(c). The statute defines "racketeering activity" by reference to a variety of criminal offenses, including wire fraud and mail fraud. *Id.* § 1961(1); *see also Empire Merchs., LLC v. Reliable Churchill LLLP,* 902 F.3d 132, 139–40 (2d Cir. 2018). A "pattern of racketeering activity," as defined by Congress, "requires at least two acts of racketeering activity" that occur within ten years of each other. 18 U.S.C. § 1961(5).

But "while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' " *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n.14 (1985). When considering whether a plaintiff has alleged at least two acts of racketeering activity, "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir. 1997). Plaintiffs allege that Defendants violated the federal wire fraud and mail fraud statutes. The two statutes have roughly the same elements: "(1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires [or mail communications] to further the scheme." *Empire Merchs.,* 902 F.3d at 139–40 (citation omitted); *see also Chanayil v. Gulati,* 169 F.3d 168, 170–71 (2d Cir. 1999).

**\*6** RICO also requires that a plaintiff establish that the underlying § 1962 violation was "the proximate cause of his injury." *Empire Merchs.,* 902 F.3d at 140 (quoting *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 132 (2d Cir. 2010)). Proximate cause in the RICO context is not identical to the concept of proximate cause in the common law; rather, under RICO, a plaintiff must show "some 'direct relation between the injury asserted and the injurious conduct alleged.' " *Id.* (quoting *Holmes v. Sec. Inv'r Prot. Corp.,* 503 U.S. 258, 268 (1992)).

### 2. Plaintiffs fail to plead the proximate-cause requirement

Plaintiffs' RICO claim fails as a matter of law because Plaintiffs fail to plausibly state that the underlying RICO violations were the proximate cause of their injury. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006). More recently, a plurality of the Supreme Court explained that to establish proximate cause, a RICO plaintiff must show a causal connection between the predicate offense and the alleged harm. *Hemi Grp., LLC v. City of New York,* 559 U.S. 1, 10–11 (2010). Even drawing all inferences in Plaintiffs' favor, they have failed to plausibly allege that the mail and wire fraud violations proximately caused their injury.

Nowhere in the Complaint do Plaintiffs plead facts that establish that someone *relied* on the alleged fraud. It is

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 116 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 312 of 466 PageID: 331
Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

undisputed that first-person reliance is not a prerequisite to predicating a RICO violation on mail or wire fraud. *Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639, 648–650 (2008). But in *Bridge*, the Supreme Court went on to explain that it was *not* suggesting that "a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations," and it observed that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658–59; *see also id.* ("[T]he complete absence of reliance may prevent the plaintiff from establishing proximate cause.").

After *Bridge*, the Second Circuit reaffirmed that "plaintiffs must also demonstrate reliance," even if not first-person reliance, "on a defendant's common misrepresentation to establish causation under RICO." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013). More recently, the Second Circuit observed that "[a]lthough reliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that someone—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentation." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015); *see also NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 196–97 & n.15 (2d Cir. 2019).[1] And district courts in this circuit have observed that a showing of *some* reliance is functionally a prerequisite to establish proximate cause. *E.g.*, *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992 (KBF), 2016 WL 1241531, at *12 (S.D.N.Y. Mar. 28, 2016), *aff'd sub nom. Ritchie v. Taylor*, 701 F. App'x 45 (2d Cir. 2017); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 458–59 (S.D.N.Y. 2014).

**\*7** Plaintiffs do not attempt to argue that they pled facts to support third-party reliance on the allegedly fraudulent statements. Instead, they claim that this case is an exception to the general rule that *some* reliance is required to prove causation because reliance is not a necessary part of their causation theory. Pl.'s United Opp'n Br. at 13. They observe that they were required to treat all patients, that United was required to pay for emergency services, and that neither had the ability to prevent the patients from seeking treatment, and they thus argue that there was no room for reliance to play a role. *Id.* The Court assumes that there are rare exceptions where a RICO plaintiff can establish proximate cause without

any showing of reliance on any of the misrepresentations at the heart of the scheme.

But even drawing all inferences in Plaintiffs' favor, the facts alleged in the Complaint do not support the proposition that this is such a case. In the absence of reliance, it is not plausibly alleged how the scheme to defraud was a proximate cause of Plaintiffs' alleged injuries. According to Plaintiffs, Defendants engaged in a scheme to artificially misrepresent the sources of the rates that they would pay out to providers like Plaintiffs, and to further that scheme, they used mail and wire communications to obfuscate the mechanisms used to calculate those rates. Missing from Plaintiffs' analysis is an alternative theory of causation that links the misrepresentations at the heart of the scheme to defraud with the alleged losses they incurred. As the Second Circuit explained, "reliance will typically be a necessary step in the causal chain linking the defendant's alleged misrepresentation to the plaintiffs' injury: if the person who was allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury." *Sergeants*, 806 F.3d at 87.

Phrased differently, the Complaint fails to plead facts to plausibly support the proposition that Plaintiffs' injuries were a *direct* result of Defendants' misrepresentations, rather than of other factors, like Plaintiffs' legal obligation to provide care. *See Anza*, 547 U.S. at 459. Indeed, while not dispositive, the Complaint's concession that United disclosed that rates would decrease further supports the proposition that Plaintiffs' injuries were not sufficiently the product of the scheme to hide the repricing. *See* United Br. at 8 (citing Compl. ¶¶ 346–47).

The Court concludes that while the rare RICO fraud case may not require any allegations of anyone's reliance on the alleged fraud, Plaintiffs have failed to articulate an alternative theory of causation sufficient to satisfy the proximate-cause requirement. Notably, at least one other district court has reached the same conclusion against these Defendants. *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, No. 20-60757-CIV, 2021 WL 2525262, at *7 (S.D. Fla. Mar. 16, 2021).[2]

This deficiency defeats both Plaintiffs' RICO claim and their RICO-conspiracy claim against Defendants. Because

GLO-L-000242-24    05/24/2024 3:29:47 PM    Pg 117 of 155    Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD    Document 1-1    Filed 08/16/24    Page 313 of 466 PageID: 332
Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

Plaintiffs alleged only RICO claims against Multiplan, it is dismissed from this suit.

### B. ERISA does not preempt Plaintiffs' state-law claims

**\*8** As to United, Plaintiffs also raised two New York state-law claims for breach of an implied-in-fact contract and for unjust enrichment. Compl. ¶¶ 836–56. United argues that Plaintiffs do not adequately plead their state-law claims. *Id.* at 5–6, 22–25. It also argues that these state-law claims are preempted by the Employment Retirement Income Security Act of 1974. United Br. at 15–22.

The Court considers first whether ERISA preempts Plaintiffs' remaining claims. As relevant here, ERISA can preempt state-law claims in two ways: express preemption and complete preemption. *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238–39 (2d Cir. 2014).

### 1. Plaintiffs' state-law claims are not expressly preempted

ERISA *expressly* preempts "any and all State laws" that "relate to any employee benefit plan" unless the state law "regulates insurance." 29 U.S.C. § 1144(a)–(b); *Wurtz*, 761 F.3d at 240. This provision's purpose is to preempt any state law that "interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 479 (2020) (quoting *Egelhoff*, 532 U.S. at 148).

But the Second Circuit has warned against a "very broad view of preemption." *Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 n.8 (2d Cir. 2003). And "[c]ourts are reluctant to find that Congress intended to preempt state laws that do not affect the relationships among" "the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself." *Id.* at 324.

The Court concludes that Plaintiffs' state-law claims are not expressly preempted. First, United's asserted liability "does not 'derive' from 'the particular rights and obligations established by any benefit plan.'" *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 60 (2d Cir. 2010) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 213 (2004)). Nor do Plaintiffs

allege a violation of any plan provision. *Id.* at 61. Rather, as alleged, United's obligation to compensate Plaintiffs comes from, among other authorities, New York state law. *E.g.*, N.Y. Fin. Serv. Law § 605(a) (requiring that "the health care plan shall pay an amount that it determines is reasonable for the emergency services rendered by the non-participating physician").

Second, Plaintiffs' state-law claims do not "purport to require a plan administrator, employer, or beneficiary to follow a standard inconsistent with those provided by ERISA." *Stevenson*, 609 F.3d at 61. Instead, they "are in themselves neutral toward ERISA plans." *Id.* at 62. Tellingly, United does not contend that Plaintiffs' claims, if successful, would undermine "the uniformity of the administration of benefits that is ERISA's key concern" or require United to tailor its plans state-by-state. *Id.* at 61. At the least, Plaintiffs' claims would create no greater disuniformity than Arkansas's drug-pricing law recently upheld against an express-preemption challenge. *See Rutledge*, 141 S. Ct. at 480–81.

United responds that Plaintiffs' claims "require explicit reference to the terms of ERISA-governed benefit plans," supporting express preemption. United Br. at 16–18 (citing, e.g., *Stevenson v. Bank of N.Y. Co.*, 2007 WL 9815654, at *6 (S.D.N.Y. Mar. 30, 2007)). But the Second Circuit, in overturning the very precedent on which United relies, has made clear that mere "reference to ERISA plans" does not give rise to preemption when the claims "will not *affect* the referenced plans, particularly not in a way that threatens ERISA's goal of uniformity." *Stevenson*, 609 F.3d at 62 (emphasis added). [3]

**\*9** The Court concludes that ERISA does not expressly preempt Plaintiffs' state-law claims.

### 2. Plaintiffs' state-law claims are not completely preempted

The scope of ERISA's *complete* preemption of state-law claims is defined by the two-prong *Davila* test. *Wurtz*, 761 F.3d at 241 (citing *Davila*, 542 U.S. at 210). Under *Davila*, "claims are completely preempted by ERISA if they are brought (i) by an individual who at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and (ii) under circumstances in which there is no other independent legal duty that is implicated by a defendant's actions." *Id.* (cleaned up). By demonstration, the *Davila* Court held that the state-law claims of a plan participant and a plan beneficiary,

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 118 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 314 of 466 PageID: 333
Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

each of whom sought relief against their insurance company for the denial of plan benefits, were completely preempted. *Davila*, 542 U.S. at 211 ("[R]espondents complain only about denials of coverage promised under the terms of ERISA-regulated employee benefit plans. Upon the denial of benefits, respondents could have paid for the treatment themselves and then sought reimbursement through a § 502(a)(1)(B) action....").

The Court concludes that neither prong of *Davila* is met here. First, Plaintiffs could not have brought their claim under ERISA. Section 502(a)(1)(B) of ERISA authorizes a plan "participant or beneficiary" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(B); *see id.* § 1002(8) (defining a beneficiary as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder"). Plaintiffs are "physician practice groups who staff the emergency rooms" in New York hospitals and "out-of-network healthcare providers with United." Compl. ¶ 24. Such providers would not ordinarily qualify as participants or beneficiaries, but the Second Circuit has recognized an exception: "healthcare providers to whom a beneficiary has *assigned* his claim in exchange for health care" may sue as beneficiaries, *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017) (emphasis added) (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 329 (2d Cir. 2011)). United argues that exception applies here because Plaintiffs' billing of United is "only possible with an assignment of benefits." *Lodi Mem'l Hosp. Ass'n v. Tiger Lines, LLC*, 2015 WL 5009093, at *6 (E.D. Cal. Aug. 20, 2015). The Court finds such a conclusion unwarranted, or at least premature. It may consider only those allegations contained in the Complaint, which makes no claim that Plaintiffs were assigned benefits. And United's assertion that assignment *must* have occurred is belied by the Second Circuit's holding in *McCulloch*, which concluded that a plan's anti-assignment provision barred a provider's suit under Section 502. *See McCulloch*, 857 F.3d at 147–48; *see also Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 117–20 (S.D.N.Y. 2016) (finding that United's anti-assignment provisions prevented healthcare providers from pursuing a Section 502(a)(1)(B) action). [4]

*\*10 The Court additionally concludes that the first *Davila* prong is not met because, like in *McCulloch*, Plaintiffs are out-of-network providers whose suit "does not depend on

the specific terms of the relevant health care plan or on Aetna's determination of coverage or benefits pursuant to those terms." 857 F.3d at 149. Framed another way, Plaintiffs' claims are about the "amount of payment," not the "right to payment," and so not subject to preemption. *Montefiore*, 642 F.3d at 331.

Nor is the second *Davila* prong satisfied. Again, much like *McCulloch*, Plaintiffs' claims against United arise "not from an alleged violation of some right contained in the plan, but rather from a freestanding state-law duty." 857 F.3d at 150. Unlike in *Montefiore*, on which United relies, Plaintiffs "had no preexisting relationship with" United and were not "required by the plan to pre-approve coverage for [their services]." *Id.* (citing *Montefiore*, 642 F.3d at 332). As the Ninth Circuit recently concluded with respect to a nearly identical suit, because Plaintiffs "assert legal duties arising under an implied-in-fact contract" and unjust enrichment, and would exist "whether or not an ERISA plan existed," the claims are "based on independent legal duties," avoiding preemption. *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F. App'x 299, 300 (9th Cir. 2021) (quoting *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 950 (9th Cir. 2009)).

Because at least one *Davila* prong is not satisfied, Plaintiffs' state-law claims are not completely preempted. *See Montefiore*, 642 F.3d at 328. [5]

## C. Whether Plaintiffs adequately pleaded their state-law claims

United argues that Plaintiffs fail to adequately plead either of their state-law claims because Plaintiffs do not identify information specific to each claim for which they seek compensation and because they do not plead facts sufficient to satisfy the elements of a claim for a breach of implied-in-fact contract or for unjust enrichment. The Court considers these three arguments in turn and concludes that Plaintiffs adequately pled a claim for unjust enrichment but not a claim for breach of an implied-in-fact contract.

### 1. Plaintiffs provided adequate claim-specific identifying information

Plaintiffs allege that United "under paid Plaintiffs on thousands of claims" for services rendered to patients with United plans. Compl. ¶ 786; *see also id.* ¶ 21. But, United

GLO-L-000242-24    05/24/2024 3:29:47 PM    Pg 119 of 155    Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD    Document 1-1    Filed 08/16/24    Page 315 of 466 PageID: 334
*Emergency Physician Services of New York v...., Not Reported in Fed....*

RICO Bus.Disp.Guide 13,573

notes, Plaintiffs' Complaint provides specific details for only a sample of these thousands of claims. *Id.* ¶¶ 366–406, 416–513, 524–63, 572–655, 661–772. "Without factual allegations regarding the benefit plans, members, and specific claims," United contends it "cannot possibly identify the specific health benefit claims at issue, and cannot adequately plead the specific defenses that they expect to raise in response to the causes of action tied to those individual benefit claims," requiring dismissal. United Br. 5–6; *see also* United Reply at 1 (arguing that, but for the plans, United would be "a stranger to the transactions" in the Complaint).

The Court disagrees. Both authorities cited by United in which a court required more specific claim information involved actions by healthcare providers under Section 502(a)(1)(B) of ERISA to recoup payments under plaintiffs' insurance plans. *See MC1 Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at *2, *8 (D. Conn. May 7, 2019); *Michael A. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675, at *3 (S.D.N.Y. Aug. 19, 2020). As explained, Plaintiffs do not, and could not, bring suit against United under ERISA. Plaintiffs need not plead specific details of United's plans because Plaintiffs have not alleged entitlement to recoup payments under those plans. *See* Pls. United Opp'n Br. at 4.

### 2. Plaintiffs did not adequately plead a claim for breach of an implied-in-fact contract

**\*11** Under New York law, [6] "to make a claim for breach of contract, a plaintiff must allege: (1) the existence of an agreement between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). With respect to the first element, "a complaint must 'allege the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated." *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Sirohi v. Trs. of Columbia Univ.*, 162 F.3d 148, at *2 (2d Cir. 1998) (summary order)). "A complaint 'fails to sufficiently plead the existence of a contract' if it does not provide 'factual allegations regarding, inter alia, the formation of the contract,

the date it took place, and the contract's major terms.' " *Id.* (quoting *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand*, 455 F. App'x 102, 104 (2d Cir. 2012) (summary order)).

"[A]bsent a written agreement between the parties, a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 455 (S.D.N.Y. 2014). "An implied-in-fact contract is 'just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.' " *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)). Accordingly, "[a]n implied-in-fact contract requires all of the elements required of any valid contract, including consideration, mutual assent, legal capacity, and legal subject matter." *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006).

United first argues that Plaintiffs failed to plead an implied-in-fact contract because there was no "meeting of the minds" as to reimbursement rates. United Br. at 23. In fact, United notes, the Complaint alleges that Plaintiffs *rejected* the reimbursement rates that United proposed in attempting to negotiate a written contract. Compl. ¶¶ 347–49, 357. United additionally argues that Plaintiffs failed to plead any consideration for its implied-contract claim because Plaintiffs provided service out of a pre-existing legal obligation and because United's insureds, not United itself, received any benefit of those services. United Br. at 23–24.

Even drawing all inferences in Plaintiffs' favor, the Court agrees with United. First, Plaintiffs do not plead consideration because Plaintiffs provide healthcare services to patients not in exchange for United's payments but instead out of "a pre-existing legal obligation," which "does not amount to consideration." *Hinterberger v. Cath. Health Sys., Inc.*, 536 F. App'x 14, 17 (2d Cir. 2013) (quoting *Murray*, 444 F.3d at 178). Plaintiffs attempt to address this deficiency by suggesting that because the parties knew they "would be required to deal with one another, ... their actions demonstrate their intent to be bound." Pls. United Opp'n Br. at 23. This claim simply misapplies New York law. *Goncalves v. Regent Int'l Hotels, Ltd.*, 447 N.E.2d 693, 700 (N.Y. 1983) ("A promise to perform an existing legal obligation is not valid consideration to provide a basis for a contract"). Notably,

GLO-L-000242-24    05/24/2024 3:29:47 PM    Pg 120 of 155    Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD    Document 1-1    Filed 08/16/24    Page 316 of 466 PageID: 335
Emergency Physician Services of New York v...., Not Reported in Fed...

RICO Bus.Disp.Guide 13,573

the case law that Plaintiffs cite for support involved implied-in-*law* contracts (i.e., claims for unjust enrichment), not implied-in-*fact* contracts. *See N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 544 (Sup. Ct. 2011); *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 59 (Tenn. Ct. App. 2002) ("[T]he terms 'unjust enrichment' and 'contract implied in law' are used virtually interchangeably.").

**\*12** Second, the Complaint does not plead a necessary meeting of the minds as to the price of services, which under New York law is an essential contract term. *See Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 256 (S.D.N.Y. 2000) ("Once the price becomes uncertain, the contract becomes devoid of a critical term." (cleaned up)); *e.g.*, *Cent. Fed. Sav., F.S.B. v. Nat'l Westminster Bank, U.S.A.*, 574 N.Y.S.2d 18, 19 (N.Y. App. Div. 1991) ("Essential terms such as ultimate price were left open. Clearly, there was no 'meeting of the minds' to support the existence of an enforceable contract."); *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 318 (Sup. Ct. 2011) (stating that "price is an essential element of a contract").

### 3. Plaintiffs adequately plead an unjust-enrichment claim

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement.*" *Id.* (quoting *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005)).

United's only response to Plaintiffs' unjust-enrichment claim is that it received no benefit from Plaintiffs' services, only United's insureds did. United Reply at 24–25. But this objection is unpersuasive. New York courts have found, consistent with the courts of several other states, that "where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." *Wellcare*, 937 N.Y.S.2d at 545. As the Third Circuit recently explained, the insurer's benefit "is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240–41

(3d Cir. 2020) (citing *Rabinowitz v. Mass. Bonding & Ins. Co.*, 197 A. 44, 47 (N.J. 1938)). Other federal courts have reached the same conclusion for similar reasons. *E.g.*, *El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010) ("While it is true that the immediate beneficiaries of the medical services were the patients, and not Molina, that company did receive the benefit of having its obligations to its plan members, and to the state in the interests of plan members, discharged."); *Fla. Emergency Physicians*, 2021 WL 2525262, at \*12; *Cal. Spine & Neurosurgery Inst. v. Oxford Health Ins. Inc.*, No. 19-CV-03533-DMR, 2019 WL 6171040, at \*6 (N.D. Cal. Nov. 20, 2019) (collecting cases). That is exactly the theory Plaintiffs pled here. Compl. ¶¶ 850–51.

United cites no persuasive authority to the contrary. United Br. 24–25. First, *Travelers Indemnity Co. of Connecticut v. Losco Group, Inc.*, 150 F. Supp. 2d 556, 562–63 (S.D.N.Y. 2001), which did not involve healthcare services, held that an insurer does not benefit when services are provided to the insured at the insured's "behest." Yet here, Plaintiffs have alleged that their provision of services is compelled by law. *See Sasson Plastic Surgery, LLC v. UnitedHealthcare of N.Y., Inc.*, No. 17-CV-1674, 2021 WL 1224883, at \*15 (E.D.N.Y. Mar. 31, 2021); *Wellcare*, 937 N.Y.S.2d at 546. Second, *MC1 Healthcare, Inc. v. United Health Group, Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at \*10 (D. Conn. May 7, 2019), interprets Connecticut, not New York law and so does not consider the *Wellcare* court's clear holding.

**\*13** Last, short on law, United appeals to policy, arguing that recognizing Plaintiffs' claim would permit providers to "grossly inflate their bills." United Reply at 10. But that is not so. As alleged, United's duty is to pay Plaintiffs a "reasonable" rate for their services, Compl. ¶¶ 65–82, not to pay whatever amount Plaintiffs decide to bill United. Moreover, an equally unappealing outcome could result from United's position that Plaintiffs have no recourse if United fails to reasonably compensate them, which would conceivably incentivize insurers like United to pay as little as possible while Plaintiffs remain obligated to treat United's insureds.

### D. The Court will not dismiss Plaintiffs' claim for declaratory judgment

Last, Plaintiffs request, in Count Five of the Complaint, a determination of United's obligation to pay Plaintiffs a

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 121 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 317 of 466 PageID: 336

Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

reasonable rate and that United's rates are fraudulent, citing as authority the Declaratory Judgment Act, 28 U.S.C. § 2201. Compl. ¶¶ 858, 862. A declaratory judgment action requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (cleaned up). At least at this stage, Plaintiffs' allegations satisfy that standard.

United contends that the request is duplicative of Plaintiffs' other claims. United Br. at 25 (citing *Fleisher v. Phx. Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012)). The Court concludes that such a determination is premature. It therefore declines to dismiss Plaintiffs' declaratory-judgment claim.

## IV. CONCLUSION

For the reasons above, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss. The Court dismisses Plaintiffs' RICO claims, Counts One and Two of the Complaint, as to both Defendants and Plaintiffs' claim for breach of an implied-in-fact-contract, Count Three, as to United. It does not dismiss Plaintiffs' unjust-enrichment or declaratory-judgment claims.

The Court, having already provided Plaintiffs an opportunity to amend the Complaint after Defendants filed their motions,

Dkt. No. 31, denies Plaintiffs' request for leave to amend, Pls. Multiplan Opp'n Br. at 23; *see F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017) (upholding denial of leave to amend where plaintiff had "an opportunity to amend in response to full briefing of the defendants' motion to dismiss" and did not "its own briefing on the motion ... explain how it proposed to amend the complaint to cure its defects").

The Court continues to have jurisdiction over this action. Though the Court dismisses Plaintiffs' federal causes of action,[7] upon which this Court originally based jurisdiction, it appears the Court now has diversity jurisdiction as between Plaintiffs and United. *See* Compl. ¶¶ 24–30; *Wright v. Musanti*, 887 F.3d 577, 585 (2d Cir. 2018).

By October 19, 2021, United shall file an answer to the complaint. Further, the parties shall jointly file by October 19, 2021, a proposed case management plan.

This resolves docket numbers 28 and 30.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2021 WL 4437166, RICO Bus.Disp.Guide 13,573

## Footnotes

1    Plaintiffs cite for the contrary *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010), Pls. United Opp'n Br. at 12, but that case did not directly address the issue, and indeed found that "[third-party] reliance is a necessary part of the causation theory advanced by the plaintiffs," *Eli Lilly* at 133. And while the above binding authorities are sufficient to reach the conclusion here, the Court notes that other circuits impose the same reliance requirement. *E.g.*, *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir. 2016).

2    Plaintiffs' supplemental authority, *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2021 WL 930624 (N.D. Cal. Mar. 11, 2021), is not to the contrary. That case found patients insured by United had adequately alleged RICO claims against United and Multiplan. *Id.* at *5 & n.7. That court had earlier concluded that the plaintiffs, who are not healthcare providers like Plaintiffs here, satisfied the proximate-cause requirement by alleging third-party reliance. *LD v. United Behav. Health*, 508 F. Supp. 3d 583, 601 (N.D. Cal. 2020).

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 122 of 155  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 318 of 466 PageID: 337
Emergency Physician Services of New York v...., Not Reported in Fed....

RICO Bus.Disp.Guide 13,573

3    Unfortunately, this is not the only authority upon which the attorneys representing United rely that is no longer good law. United also trumpeted its successful dismissal in *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare Inc.*, 448 F. Supp. 3d 1077, 1086 (D. Ariz. 2020), United Br. at 3, 21–22, without mentioning in its reply brief that the decision had since been reversed on appeal, *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F. App'x 299, 300 (9th Cir. 2021).

4    United may later introduce evidence on this issue, as the parties apparently did in *Lodi Memorial*. 2015 WL 5009093, at *6 (citing the "Plan Document, Ex. B"); *see also Enigma Mgmt. Corp. v. Multiplan, Inc.*, 994 F. Supp. 2d 290, 297 (E.D.N.Y. 2014) (submitting a declaration to demonstrate assignment).

5    This conclusion is consistent with other district courts that have considered suits filed by out-of-network emergency healthcare providers. *E.g.*, *Fla. Emergency Physicians*, 2021 WL 2525262, at *10; *Emergency Servs. of Okla., PC v. Aetna Health, Inc.*, No. CIV-17-600-J, 2021 WL 3914255, at *3 (W.D. Okla. Aug. 24, 2021).

6    The parties assume that New York law applies to Plaintiffs' implied-contract and unjust-enrichment claims, citing only cases applying New York law throughout their briefing. No party argues that the substantive law of another jurisdiction should govern. Accordingly, the Court will apply New York law. *See Texaco A/S (Denmark) v. Com. Ins. Co. of Newark*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.") (internal quotation marks omitted).

7    Plaintiffs' declaratory-judgment claim, alone, is insufficient to confer federal-question jurisdiction. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 123 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 319 of 466 PageID: 338
J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)

2021 WL 1976648
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey, Appellate Division.

J&M INTERIORS, INC., Plaintiff-Respondent,

v.

CENTERTON SQUARE OWNERS, LLC, Centerton
Square Manager, Corp., Prestige Properties &
Development Co., Inc., Burlingtoncoat Factory
Warehouse, Corporation, d/b/a Burlington Stores,
Inc., d/b/a Burlington, d/b/a BCF, d/b/a Burlington
Coat Factory, d/b/a Burlington Store, d/b/a Burlington
Coat Factory Warehouse of New Jersey, Inc., d/
b/a Burlington Coat Factory Direct Corporate,
United Rentals (North America) J.R. Prisco,
Inc., and Breaker Electric, Inc., Defendants,
and

Petore Associates, Inc., d/b/a Petore
Construction, Defendant-Appellant,
and

United Rentals (North America),
Inc., Defendant/Third-Party Plaintiff,

v.

Harvey Onore, Theodore Vitale a/k/a Ted Vitale
and Mary Ann Vitale, Third-Party Defendants.
Breaker Electric, Inc., 488 Monmouth Road,
Clarksburg, NJ 08510, Plaintiff-Respondent,

v.

Petore Associates, Inc., d/b/a Petore Construction, 1518
Highway 138, Wall, NJ 07719, Defendant-Appellant,
and

Burlington Coat Factory Warehouse Corporation,
1830 Route 130 North Burlington, NJ 0016, and
Centerton Square Owners, LLC, 546 Fifth Avenue,
15th Floor, New York, NY 10036, Defendants.

DOCKET NO. A-2536-19
|
A-2882-19
|
Submitted February 22, 2021
|

Decided May 18, 2021

On appeal from the Superior Court of New Jersey, Law
Division, Burlington County, Docket Nos. L-1045-18 and
L-1125-18

**Attorneys and Law Firms**

Davidson, Eastman, Munoz, Paone, PA, attorneys for
appellants (James A. Paone, II, of counsel and on the briefs;
Herschel P. Rose, on the briefs).

Kreiser & Associates, PC, attorneys for respondent J&M
Interiors, Inc. (Travis L. Kreiser, on the brief)

Cohen Seglias Pallas Greenhall & Furman, PC, attorneys for
respondent Breaker Electric, Inc. (George E. Pallas, Ashling
A. Ehrhardt and Sydney Pierce, on the brief).

Before Judges Messano, Hoffman, and Smith.

**Opinion**

PER CURIAM

**\*1** These two related appeals arise out of two breach of
contract actions separately brought by subcontractors J&M
Interiors, Inc. (J&M) and Breaker Electric, Inc. (Breaker)
(collectively, plaintiffs) against defendant Petore Associates,
Inc., seeking payment of outstanding balances for work on a
construction project.

In A-2536-19, defendant appeals from the October 25, 2019
order awarding J&M $107,285.80 plus interest and fees and
the December 20, 2019 order denying defendant's motion
for reconsideration. In A-2882-19, defendant appeals the
December 20, 2019 order awarding Breaker $209,939.09 plus
interest and fees and the February 14, 2020 order denying
defendant's motion for reconsideration. In both appeals,
defendant raises essentially identical arguments regarding
identical contract provisions, contending the trial court erred
in granting summary judgment and abused its discretion
in declining to reconsider. Following our review, we are
satisfied that defendant's arguments lack substantive merit.
Accordingly, we consolidate these appeals for the purposes of
this opinion and affirm.

I.

In November 2017, Burlington Coat Factory (Burlington)
hired defendant as a general contractor to perform renovations

GLO-L-000242-24 05/24/2024 3:29:47 PM Pg 124 of 155 Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD Document 1-1 Filed 08/16/24 Page 320 of 466 PageID: 339
J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)

at multiple retail stores. Defendant hired plaintiffs separately to perform certain work at Burlington's store at the Centerton Mall in Mount Laurel.

### Appeal A-2882-19 (Breaker)

On November 11, 2017, defendant entered into a written subcontract agreement with Breaker, wherein Breaker agreed to perform certain electrical work at the Centerton Mall store for $275,000. The subcontract provided that "[r]eceipt of payment for Subcontractors work from [Burlington] by [defendant] shall be a condition precedent to the right of the Subcontractor to receive payment from [defendant]" and Breaker "expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed) ... and any other indirect damages, costs or expenses ... arising out of or related to the Agreement, including the breach thereof by [defendant]."

Over the course of the project, Breaker and defendant entered into change orders to amend the subcontract, adjusting the total value to $331,089. By January 8, 2018, Breaker completed all work set forth in the subcontract and subsequent change orders.

Breaker submitted six invoices to defendant, totaling $331,089; defendant made three payments to Breaker, totaling $88,458. For the second and third payments, Breaker signed a "Partial Lien Waiver" and "Subcontractor/Supplier Partial Waiver of Liens & Release" (the waivers), wherein it "acknowledged that the amount of payments received to the date of the waiver represents the current amount agreed to be due" and that it "[had] no claims for additional work, damages, or for any other reasons whatsoever." In addition, Breaker waived and released

> all liens or rights to lien, claims, and demands of every kind whatsoever now existing for work, labor or materials furnished to Owner and acknowledges that all payments heretofore and/or contemporaneously received have been and are accepted in full satisfaction of the liens or right to lien waived hereunder and all the work performed up to the Date of Requisition.

**\*2** After the third payment, Breaker received no further payments toward the remaining balance of $209,939.09. On May 31, 2018, Breaker filed suit against defendant, alleging breach of contract, unjust enrichment, and violation of the Prompt Payment Act (PPA), N.J.S.A. 2A:30A-2.

On November 22, 2019, Breaker moved for summary judgment against defendant before Judge Aimee Belgard. Opposing summary judgment, defendant argued Breaker waived its claims to the full payment and nonetheless was not entitled to full payment until defendant received full payment from Burlington. By this time, Burlington had paid defendant the full contract price, except for a contractually designated ten percent retainage. Defendant opted to accept the judge's tentative decision in lieu of arguing the motion.

On December 20, 2019, the judge issued an order granting Breaker's motion in its entirety. In a well-reasoned written opinion, the judge rejected each of defendant's arguments, finding (1) the plain language of the waivers do not release defendant's obligation to pay the full amount; (2) no mutual intent for the waivers to amount to accord and satisfaction; and (3) defendant's payment from Burlington satisfied the condition precedent to trigger full payment of Breaker by defendant. The judge awarded Breaker $209,939.09 plus interest, reasonable costs, and attorney's fees, pursuant to the PPA.

On January 13, 2020, defendant filed a motion for reconsideration of the summary judgment order. On February 14, 2020, Judge Belgard issued an order denying defendant's motion and provided an additional written opinion, finding no basis to alter her original decision. This appeal followed. [1]

### Appeal A-2536-19 (J&M)

On November 15, 2017, defendant entered into a written subcontract agreement with J&M, wherein J&M agreed to perform certain carpentry work at the Centerton Mall store for $203,000. The relevant provisions of J&M's subcontract are materially identical to those in Breaker's subcontract. Over the course of the project, J&M and defendant entered into change orders to amend the subcontract, adjusting the total value to $221,576.20. By February 15, 2018, J&M had completed all work set forth in the subcontract and subsequent change orders.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 125 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 321 of 466 PageID: 340
J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)

J&M submitted five invoices to defendant, totaling $221,576.20; defendant made three payments to J&M, totaling $114,290. For each of the three payments, J&M signed partial waivers of liens. The relevant provisions of the partial waivers are materially identical to those signed by Breaker.

**\*3**  After the third payment, J&M received no further payment from defendant toward the remaining $107,285.80 balance. On May 18, 2018, J&M filed suit against defendant, alleging breach of contract, unjust enrichment, and violation of the PPA.

On September 26, 2019, J&M moved for summary judgment against defendant, which was followed by defendant's cross-motion for summary judgment. On October 22, 2019, Judge Belgard heard oral argument on the motions. On October 25, 2019, the judge issued an order, accompanied by another well-reasoned written opinion, granting J&M's motion for essentially the same reasons she granted Breaker's motion – any conditions precedent for defendant to pay J&M were met and J&M did not waive its right to full payment. The judge awarded J&M $107,285.80 plus interest, reasonable costs, and attorney's fees, pursuant to the PPA.

On November 22, 2019, defendant filed a motion for reconsideration of the summary judgment order. On December 20, 2019, Judge Belgard issued an order denying defendant's motion and provided an additional written opinion, finding that defendant "failed to satisfy its burden to demonstrate the [c]ourt entered its decision on palpably incorrect or irrational basis or show the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." This appeal followed. [2]

In this consolidated opinion, we restate the issues raised on these appeals as follows: (1) whether the subcontracts conditioned defendant's obligation to pay plaintiffs on defendant receiving full payment from Burlington; (2) whether plaintiffs waived their rights to full payment and to assert PPA claims in the subcontracts; and (3) whether plaintiffs' execution of partial waivers of liens and defendant providing partial payment created a valid accord and satisfaction.

<center>II.</center>

We review the trial court's grants of summary judgment de novo, "applying the same standard governing the trial court." Brennan v. Lonegan, 454 N.J. Super. 613, 618 (2018) (citing Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014)). R. 4:46-29(c) provides that the court should grant summary judgment:

> [I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

The court need only submit an issue to the trier of fact when the non-moving party has presented sufficient evidence such that a "rational factfinder" could "resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). However, "[i]f there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Ibid. Ultimately, "when the evidence 'is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." Ibid. (internal citations omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

**\*4**  We review the trial court's denial of motion for reconsideration under an abuse of discretion standard. Cypress Point Condominium Ass'n, Inc. v. Adria Towers, L.L.C., 441 N.J. Super. 369, 372 (App. Div. 2015), aff'd, 226 N.J.403 (2016) (citing Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996)). The court should only grant a motion for reconsideration when "1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 126 of 466   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 322 of 466 PageID: 341
J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)

failed to appreciate the significance of probative, competent evidence[,]" or 3) "if a litigant wishes to bring new or additional information to the Court's attention which it could not have provided on the first application[.]" Cummings, 295 N.J. Super. at 384 (quoting D'Atria v. D'atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). The court should not reconsider its decision "merely because of [a litigant's] dissatisfaction with a decision of the Court." D'Atria, 242 N.J. Super. at 401. Rather, the "litigant must initially demonstrate that the Court acted in an arbitrary, capricious, or unreasonable manner, before the Court should engage in the actual reconsideration process." Ibid.

A.

We first address defendant's argument that the trial court erred in interpreting the following provision in plaintiffs' subcontracts: "Receipt of payment for Subcontractors work from [Burlington] by [defendant] shall be a condition precedent to the right of the Subcontractor to receive payment from [defendant]." Defendant contends this provision conditioned defendant's obligation to pay plaintiffs on Burlington's full payment to defendant. Defendant further contends the condition triggering payment to plaintiffs never occurred because Burlington never paid defendant the full contract price, and therefore defendant was not required to perform. At the very least, defendant maintains, this provision is ambiguous, and the trial court erroneously determined its meaning on summary judgment.

The interpretation and construction of a contract is a question of law, "subject to de novo review by an appellate court." Kieffer v. Best Buy, 205 N.J. 213, 222 (2011). "The interpretation of a contract is ordinarily a legal question for the court and may be decided on summary judgment unless 'there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation[.]' " Celanese Ltd. v. Essex County Imp. Authority, 404 N.J. Super. 514, 528 (App. Div. 2009) (quoting Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000)).

When parties dispute the meaning of a contract, it is the court's task to "discern and implement the common intention of the parties." Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016) (quoting Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)). "In interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant

circumstances, and the objects the parties were striving to attain." Celanese, 404 N.J. Super. at 528. When a contract's terms are clear and unambiguous, the court must enforce those terms as written, using their plain and ordinary meaning, as those "words presumably will reflect the parties' expectations." Kieffer, 205 N.J. at 223.

"An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations[.]" Schor v. FMS Financial Corp., 357 N.J. Super. 185, 191 (App. Div. 2002) (alteration in original) (quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). "The court should examine the document as a whole and the 'court should not torture the language of [a contract] to create ambiguity." Ibid. (alteration in original) (quoting Nester, 301 N.J. Super. at 210).

Applying these principles and viewing the subcontracts in the light most favorable to defendant, defendant's argument fails. The subcontracts condition defendant's obligation to pay plaintiffs on defendant's "[r]eceipt of payment ... from [Burlington]." Nothing in the subcontracts' plain language requires defendant to receive full or final payment from Burlington before paying plaintiffs. At most, the subcontracts condition defendant's payment to plaintiffs on defendant's receipt of total payment for plaintiffs' work. Plaintiffs performed all work under their subcontracts. Defendant received total payment for the plaintiffs' work, as the only money not paid by Burlington to defendant was the contractually designated retainage. Therefore, defendant was obligated to make full payment to plaintiffs.

B.

**\*5** Next, we address defendant's argument that the trial court erred in interpreting the following provision in the plaintiffs' subcontracts: "[plaintiffs] expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed) ... and any other indirect damages, costs or expenses in any way arising out of or related to the Agreement, including the breach thereof by [defendant]." Defendant contends plaintiffs' claims under the PPA are claims for "indirect damages ... arising out of" the subcontracts and, therefore, plaintiffs waived their claims when they signed their subcontracts. Defendant further contends the provision is at least ambiguous regarding this waiver of rights, and the trial court erroneously construed this ambiguity in favor of plaintiffs instead of defendant.

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 127 of 155  Trans ID: LCV20241332836

Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 323 of 466 PageID: 342

J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)

The PPA grants subcontractors a right to sue if their general contractor fails to pay "within [ten] calendar days of the receipt of each periodic payment, final payment or receipt of retainage monies, the full amount received for the work of the subcontractor ... based on the work completed ... under the applicable contract." N.J.S.A. 2A:30A-2(b). That said, "individuals may waive a right, without regard to whether its source is constitutional, statutory, contractual, or otherwise, so long as the individual had full knowledge of the right and intentionally surrendered it." General Motors Acceptance Corp. v. Cahill, 375 N.J. Super. 553, 566 (App. Div. 2005). "[U]nder New Jersey law, any contractual 'waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously' to its terms." Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430, 443 (2014) (quoting Leodori v. Cigna Corp., 175 N.J. 293, 302 (2003)).

In order for a party to agree to a waiver-of-rights provision clearly and unambiguously, a party must "have full knowledge of his legal rights and intent to surrender those rights." Atalese, 219 N.J. at 442 (quoting Knorr v. v. Smeal, 178 N.J. 169, 177 (2003)). The waiving party must also be aware of the ramifications of waiving his or her rights. Id. at 443. Further, a "clause depriving a citizen of access to the courts should clearly state its purpose" and its language should be clear and unambiguous. Id. at 444, 445 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001)). When a court interprets a waiver-of-right provision, "contractual language alleged to constitute a waiver will not be read expansively." Garfinkel, 168 N.J. at 132 (quoting Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ., 78 N.J. 122, 140 (1978)). Such provision need not "list every imaginable statute by name to effectuate a knowing and voluntary waiver of rights" but should at least inform the waiving party that it agrees to waive all statutory claims arising out of the contractual relationship. Garfinkel, 168 N.J. at 135. It should also be noted that a "[w]aiver of a statutory right ... will not be allowed where it 'would violate a public policy expressed in the statute.' " Cahill, 375 N.J. at 566 (quoting City Hall Bldg. & Loan Ass'n. of Newark v. Florence Realty Co., 110 N.J. Eq. 12, 14 (Ch. 1932)).

Here, even if a complete waiver of the right to sue is permissible on public policy grounds, the provision in question fails to constitute an unambiguous and clear waiver of plaintiffs' statutory rights. The waiver provision in the subcontract did not specifically state that plaintiffs waived

their rights to any or all statutory rights associated with the subcontracts. We are satisfied the record lacks any evidence to support defendant's claim that plaintiffs knowingly or intentionally waived their statutory rights under the PPA. These provisions are not ambiguous, and the trial court appropriately determined their meaning as a matter of law on summary judgment.

### C.

**\*6**  Finally, we address defendant's argument that plaintiffs waived their rights to full payment by signing the partial waivers of release. Plaintiffs each signed waivers releasing "all liens or rights to lien, claims, and demands of every kind whatsoever now existing for work, labor or material furnished to the Owner" and "acknowledging that the amount of payments received to the date of this waiver represents the current amount agreed to be due to it in accordance with its agreement and work completed[.]"

Defendant contends that, on summary judgment, the trial court should have interpreted plaintiffs' signing of the partial waivers as accepting less payment than owed and waiving all claims. Defendant maintains that the plain language of these waivers released defendant of its obligations to make full payment under the subcontracts. In addition, defendant contends that the trial court erred in declining to consider the accord and satisfaction argument raised in its motion for reconsideration because defendant properly brought it to the court's attention in its opposition to plaintiffs' summary judgment motions.

Defendant's arguments lack merit. Generally, any agreement to modify an existing contract "must be based upon new or additional consideration" from both parties. County of Morris v. Fauver, 153 N.J. 80, 100 (1998) (citing Ross v. Orr, 3 N.J. 277, 282 (1949)); see also Decker v. George W. Smith & Co., 88 N.J.L. 630, 632, 96 A. 915 (E. & A. 1916) ("A consideration is necessary to render an accord and satisfaction valid."). "[A] promise to perform a pre-existing duty" is insufficient consideration to modify the terms of a contract. Segal v. Lynch, 211 N.J. 230, 253 (2012) (citing Williston on Contracts § 7:37 (4th ed. 2008)). In other words, a subsequent promise to fulfil an obligation already required in a contract cannot be considered new or additional consideration.

Here, defendant did not provide new or additional consideration in exchange for plaintiffs' partial waivers.

**J&M Interiors, Inc. v. Centerton Square Owners, LLC, Not Reported in Atl. Rptr. (2021)**

Plaintiffs agreed to release of their liens, but plaintiffs did not " 'get something' out of the exchange." Oscar v. Simeonidis, 352 N.J. Super. 476, 484 (App. Div. 2002) (quoting Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc., 93 N.J. 153, 170 (1983)). Therefore, the waivers do not alter defendant's obligation to pay plaintiffs under the subcontracts.

The trial court appropriately granted summary judgment and we find no error in the denial of defendant's motion for reconsideration.

Affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2021 WL 1976648

---

## Footnotes

1    Defendant's appeal of the December 20, 2019 summary judgment order is untimely. Rule 2:4-1(a) requires appeals from final judgments "be taken within 45 days of their entry." Rule 2:4-3(e) provides that the time to appeal is tolled by "the timely filing and service" of a motion for reconsideration. Accordingly, the forty-five days for appealing the summary judgment order began running on December 20, 2019 but tolled when defendant filed its reconsideration motion on January 13, 2020; at that time, twenty-four of the allotted forty-five days had elapsed. The time to appeal resumed when Judge Belgard denied the reconsideration motion on February 14, 2020; with twenty-one days remaining, defendant was required to appeal the summary judgment order no later than March 6, 2020. Defendant filed this appeal on March 23, 2020. Nonetheless, we address the merits of this summary judgment order on appeal.

2    Defendant's appeal of the October 25, 2019 summary judgment order is similarly untimely. See R. 2:4-1(a), (e). Nonetheless, we also address the merits of this summary judgment order.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

GLO-L-000242-24    05/24/2024 3:29:47 PM    Pg 129 of 155    Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD    Document 1-1    Filed 08/16/24    Page 325 of 466 PageID: 344
Temple University Hosp., Inc. v. City of Philadelphia, Not Reported in A.2d (2006)

2006 WL 51206
Only the Westlaw citation is currently available.
Court of Common Pleas of
Pennsylvania, Philadelphia County.

TEMPLE UNIVERSITY HOSPITAL, INC., Plaintiff,

v.

CITY OF PHILADELPHIA, Defendant.

No. 1794 MARCH TERM 2003, CONTROL 042309.
|
Jan. 3, 2006.

MEMORANDUM OPINION

JONES, J.

**\*1** In this action plaintiff Temple University Hospital ("TUH") filed this lawsuit to recover $2,476,517.26 from defendant City of Philadelphia ("City") for medical treatment provided to pre-arraignment detainees in the City's custody. Presently before the court is the City's Partial Motion for Summary Judgment to Counts I (unjust enrichment) and II (breach of an express contract) of the complaint. For the reasons discussed below, the Partial Motion for Summary Judgment is Granted.

BACKGROUND

Between April 17, 2000 and July 22, 2001, TUH rendered medical care to prisoners at TUH's facilities at Temple University and Episcopal Hospital. At the time of the treatment TUH alleges that the prisoners were arrested, were being detained and were in the custody of the City. (Exhibit "A" to Dfts. Mt. for SJ.). The medical care rendered by TUH to the prisoners was commensurate with their conditions and was necessary for their health and welfare. (Id).

TUH instituted suit against the City alleging claims for unjust enrichment (Count I), breach of an express contract (Count II) and detrimental reliance (Count III). The City has now filed a motion for summary judgment to Counts I and II of the complaint.

DISCUSSION

I. LEGAL STANDARD

The law pertaining to motions for summary judgment is well settled. Once the relevant pleadings have closed, any party may move for summary judgment. Pa. R.C.P. 1035.2. "Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law." *Rausch v. Mike-Mayer,* 783 A.2d 815, 821 (Pa.Super.2001). Furthermore, "A proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a prima facie cause of action or defense and, therefore, there is no issue to be submitted to the jury." *McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 940 (Pa.Super.1998). The moving party bears the burden of proving that no genuine issues of material fact exist. *Rausch,* 783 A.2d at 821. The trial court then must view the record in the light most favorable to the non-moving party and resolve all doubts against the moving party. *See id.* "Only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment." *Id.*

II. The City is Entitled to Summary Judgment as to Count I.
Count I of the complaint purports to state a claim for unjust enrichment. TUH alleges that since the City has a federal constitutional duty to render medical care to pre-arraignment detainees in police custody and since TUH discharged the City's duty by providing the needed medical care, the City received a benefit for which it is obligated to pay. The court does not agree.

The Due Process Clause of the United States Constitution requires the responsible government or governmental agency to provide medical care to persons, such as the pre-arraignment detainees. *Revere v. Massachusetts Gen.Hosp.,* 463 U.S. 239, 244, 77 L.Ed.2d 605, 103 S.C. 2979 (1983). How the City obtains such treatment is not a federal constitutional question. *Id.* at 463 U.S. at 245-46, 103 S.Ct. at 2984. [1]

**\*2** Here, the City fulfilled its constitutional obligation by seeing that the pre arraignment detainees were taken to the hospital for treatment. As long as the City ensures that the medical care needed is in fact provided, the Constitution does

GLO-L-000242-24  05/24/2024 3:29:47 PM  Pg 130 of 155  Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 326 of 466 PageID: 345
Temple University Hosp., Inc. v. City of Philadelphia, Not Reported in A.2d (2006)

not dictate how the cost of that care should be allocated as between the City and the provider of the care, in this case TUH. That is a matter of state law. *Id.*

The court has not found and the parties have not directed the court to any Pennsylvania authority which imposes upon the City the obligation to pay the costs of medical treatment rendered to pre-arraignment detainees.[2] On the contrary, authority exists which obligates TUH to supply a reasonable amount of medical care to indigents when medically necessary without regard to a patient's ability to pay. *See* Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et. seq.,* Health Care Facilities Act, 35 P.S. §§ 448.101-448.904b and 28 Pa.Code § 117.1(b).

In fact TUH has a policy in place to provide medical treatment to anyone who presents to the emergency room, whether the person is a pre-arraignment detainee in police custody or indigent regardless of insurance status or the ability to pay. Exhibit "E" to Dfts. Mt. for SJ pp. 16, 17, 24, 27, 42-44. The provision of this medical care is to satisfy TUH's own statutory obligations. Thus, when TUH rendered medical care to the City's detainees, the hospital discharged its own duty to provide medical care. The fact that the City may have received an incidental benefit does not impose upon it the duty to pay for the medical care rendered by TUH.

In the absence of any statute obligating the City to pay the medical bills of the pre-arraignment detainees and TUH's obligation to provide the required care notwithstanding the detainees' ability to pay, the City is not responsible for these medical costs under a theory of unjust enrichment. Accordingly Defendant's Motion for Partial Summary Judgment is granted and Count I is dismissed.

III. The City is Entitled to Summary Judgment as to Count II.

Count II of the complaint purports to state a claim for breach of an implied in fact contract that arose after litigation between TUH and the City in 1994. Specifically, TUH maintains that an implied in fact contract exists as a result of the City's custom and practice of routinely paying seventy five (75%) percent of the charges from 1994 to 2000. In April 2000 allegedly without notice to TUH the City unilaterally terminated this practice. TUH alleges that the sudden and unannounced change in a practice and custom constitutes a

breach of the implied in fact contract that was created by the parties' long standing course of dealing.

A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. *Ingrassia Constr. Co. v. Walsh,* 337 Pa.Super. 58, 67, 486 A.2d 478 (Pa.Super.1984). It has the same legal effect as any other contract and differs from an express contract only in the manner of its formation. An express contract is formed by either written or verbal communication. The intent of the parties to an implied in fact contract "is inferred from their acts in light of the surrounding circumstances." *Id.* (*quoting Cameron v. Eynon,* 332 Pa. 529, 532, 3 A.2d 423, 424 (1939)).

**\*3** While a contract implied-in-fact may arise when two parties impliedly agree to perform certain duties, such a contract, as all others, will only arise when there is an exchange of legal consideration. *Chatham Communications Inc. v. General Press Corp.,* 463 Pa. 292, 344 A.2d 837 (1975). In situations where one party is legally bound to perform an act for another, there is no legal consideration, because there is no benefit to the recipient who is entitled to the performance or detriment to the party who was legally obligated to perform. Thus, there is no exchange of value. Id.

In this case, there was no exchange of consideration because, as discussed above, TUH was legally bound to provide emergency care services to the pre-arraignment detainees under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, et. seq., Health Care Facilities Act, 35 P.S. §§ 448.101-448 .940b and 28 Pa.Code § 117.1(b). Because there was no exchange of legal consideration, the court finds there was no breach by the City. Accordingly, the City's Motion for Summary Judgment to Count II of the complaint is granted and Count II is dismissed.

CONCLUSION

For the foregoing reasons, the City's Partial Motion for Summary Judgment is Granted and Counts I and II of the complaint are dismissed. An order consistent with this Opinion will be issued contemporaneously with this opinion.

ORDER

AND NOW, this 3RD day of January, 2006, upon consideration of the Partial Motion for Summary Judgment of

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 131 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 327 of 466 PageID: 346
Temple University Hosp., Inc. v. City of Philadelphia, Not Reported in A.2d (2006)

Defendant City of Philadelphia, all responses in opposition, Memoranda, all matters of record and in accord with the contemporaneous Memorandum Opinion, it hereby is ORDERED that Defendant's Motion for Partial Summary Judgment is Granted and Counts I and II are dismissed.

**All Citations**

Not Reported in A.2d, 2006 WL 51206

## Footnotes

1    Plaintiff relies upon *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989), *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996), *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374 (E.D.Pa.1995) and *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992) to impose a payment obligation upon the City. While these cases stand for the proposition that a government owes certain duties to persons with whom it has a special relationship, they do not impose any duty on the government to pay for the cost of medical care to pre trial detainees.

2    Plaintiff's reliance on *Robert Packer Hospital v. Kratochvil,* 517 A.2d 566 (1986) is misplaced since the statute discussed therein only pertains to counties of the third, fourth, fifth and sixth classes which do not include Philadelphia.

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

*Smith v. Conseco Life Ins. Co., Not Reported in F.Supp.3d (2014)*

2014 WL 3345592
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Mary SMITH, Plaintiff,

v.

CONSECO LIFE INS. CO., Defendant.

No. 2:13–cv–5253 (WHW).
|
Signed July 8, 2014.

**Attorneys and Law Firms**

Robert J. Degroot, Newark, NJ, for Plaintiff.

Elizabeth Ann Kenny, Steven P. Del Mauro, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Newark, NJ, for Defendant.

## OPINION

WALLS, Senior District Judge.

**\*1**  Defendant moves for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The motion, decided from the written submissions of the parties under Rule 78, is granted.

## FACTUAL AND PROCEDURAL HISTORY

William Michael Patterson purchased a life insurance policy in December 1993 from Massachusetts General Life, the predecessor to Conseco Life Insurance Company ("Conseco Life" or "Defendant"). Compl. ¶ 3 (ECF No. 1); Def.'s Mot. for Partial J. on the Pleadings ("Def.'s Mot. JOP"), Certification of E. Kenny ("Kenny Cert.") ¶ 5 (ECF No. 10–2); *id.* Ex. C (the "Policy"). Plaintiff, Mary Smith, was the named beneficiary. Compl. ¶ 4; Policy at CLIC000017. Patterson died October 2, 2012 at age 67. Compl. ¶ 8. Plaintiff filed a claim for benefits of $300,000, *id.* ¶ 9, but Defendant denied it because it had canceled the policy after Patterson stopped making premium payments in July 2012, *id.* ¶ 10.

Plaintiff filed her complaint on September 2, 2013. It states two counts: one for breach of contract and one that Defendant

"acted in bad faith." *Id.* ¶¶ 11–19. Both are grounded in the same allegations: that Defendant failed to notify the insured (or a third party) that he had fallen behind on his premium payments, *id.* ¶¶ 13, 17, that this failure caused the lapse in the policy, *id.* ¶ 14, and that Defendant wrongly denied Plaintiff's claim for benefits, *id.* ¶ 18. In addition, Plaintiff accuses Defendant of failing to annually remind the insured of his right to designate a third party to receive such notices, as required by a New Jersey statute regarding senior citizen insureds. *See id.* ¶¶ 6–7 (citing N.J.A.C. § 11:2–19.3). [1]

In its answer, Defendant admits that Plaintiff was the "named beneficiary" of the insured's policy, Answer ¶ 4 (ECF No. 3), and that it canceled the policy and denied the claim because of failure to pay premiums after July 2012, *id.* ¶ 10. But it denies that this amounts to a breach of contract, that it acted in bad faith or that it caused Plaintiff any damages. *Id.* ¶¶ 13–15, 17–19. Defendant also denies that N.J.A.C. § 11:2–19.3 (i.e., N.J.S.A. § 17:29C–1.2) is applicable to this case. *Id.* ¶¶ 6–7.

On March 10, 2014, Defendant moved for partial judgment on the pleadings, arguing that the reason N.J.S.A. § 17:29C–1.2 does not apply is because it became effective in 2000 and is not "retroactive" to policies entered before that year. Def.'s Mot. JOP at 2. Plaintiff argues that retroactivity is not at issue. Pl.'s Opp'n to Def.'s Mot. for J. on the Pleadings at 4, 22 (ECF No. 11–3). In reply, Defendant clarified that it moves only with regard to the third party notice statute, not with regard to Plaintiff's accusations about notice to the insured. Def.'s Reply at 1 (ECF No. 12).

The parties' submissions did not address the question of whether N.J.S.A. § 17:29C–1.2 implies a private right of action, so on June 10, 2014, the Court asked the parties to submit briefs on that issue. Letter order (ECF No. 14) (citing *Estate of Gleiberman v. Hartford Life Ins. Co.,* 94 Fed. App'x 944, 947 (3d Cir.2004), which states that N.J.S.A. § 17:29C–1.2 does not contain an explicit private right of action). The parties did so. (ECF Nos. 15, 17.)

## STANDARD OF REVIEW

**\*2**  A motion under Rule 12(c) is decided under the same standard applicable to a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Turbe v. Gov't of Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991). That standard requires a court to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff,

Smith v. Conseco Life Ins. Co., Not Reported in F.Supp.3d (2014)

and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 306 (3d Cir.2007) (quotation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires more than mere speculation: "[a] motion for judgment on the pleadings, like a motion to dismiss, will be granted if the plaintiff has not articulated enough facts to 'raise a right to relief above the speculative level.' " *Bangura v. City of Philadelphia,* 338 Fed. App'x 261, 264 (3d Cir.2009) (citing *Twombly* ).

In aid of its analysis, the Court may consider the allegations of the complaint, as well as documents "integral to or specifically relied on in the complaint" without converting the motion to one for summary judgment. *Mele v. Fed. Reserve Bank of N.Y.,* 359 F.3d 251, 256 n. 5 (3d Cir.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)); *see also* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (3d ed.2014) (noting that courts routinely consider "exhibits attached to the complaint whose authenticity is unquestioned").

A federal court sitting in diversity must apply the substantive law of the forum state. *Highland Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir.2004). Where the state's supreme court has not ruled on an issue, the court must predict how it would rule. *Holmes v. Kimco Realty Corp.,* 598 F.3d 115, 118 (3d Cir.2010). "To that end the federal court may consider a wide range of reliable sources, including relevant state precedents, analogous decisions and reasoned dicta, as well as the policies and doctrinal trends informing and emerging from those decisions." *Highland Ins. Co.,* 373 F.3d at 351.

## DISCUSSION

The first question is whether Plaintiff may assert a private right of action for violation of N.J.S.A. § 17:29C–1.2. She cannot.

## I. The New Jersey Standard for an Implied Private Right of Action.

The Third Circuit has said, with regard to N.J.S.A. § 17:29C–1.2, "this statute does not provide a private right of action." *Estate of Gleiberman,* 94 Fed. App'x at 947 (finding that the district court correctly dismissed a statutory claim for this reason, among others). Instead, under New Jersey Administrative Code § 11:2–19.4, violation of this statute (codified in the Administrative Code at § 11:2–19.3) subjects an insurer to penalties under N.J.S.A. §§ 17:33–2 and 17B:21–2, which explain that fines of $1,000 to $2,000 "shall be enforced and collected by" the commissioner of the state's Department of Banking and Insurance (DOBI).

**\*3** Although a statute lacking an explicit private right of action may imply one, "New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action." *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.,* 168 N.J. 255, 271, 773 A.2d 1132 (2001). Determining if a private right of action exists is based on whether: "(1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy." *Id.* at 272, 773 A.2d 1132 (applying the test from *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as adopted by New Jersey in *In re State Comm'n of Investigation,* 108 N.J. 35, 41, 527 A.2d 851 (1987)). In considering these factors, "the primary goal has almost invariably been a search for the underlying legislative intent." *Id.* (quoting *Jalowiecki v. Leuc,* 182 N.J.Super. 22, 30, 440 A.2d 21 (App.Div.1981)). [2] It is particularly "unlikely" to find a private right of action in an area, like insurance, where a comprehensive legislative scheme provides for enforcement by regulators: "[i]n the context of insurance statutes, our courts have ... concluded that where there is no discernable legislative intent to authorize a private cause of action in a statutory scheme that already contains civil penalty provisions, the courts will not infer a private cause of action." *Id.* at 275, 440 A.2d 21. *See also Medical Society of N.J. v. Amer i-Health HMO, Inc.,* 376 N.J.Super. 48, 59, 868 A.2d 1162 (App.Div.2005) ("This is specifically the case with insurance statutes.").

Smith v. Conseco Life Ins. Co., Not Reported in F.Supp.3d (2014)

In *R.J. Gaydos,* plaintiff insurance agents asserted a breach of contract claim premised on violation of a state insurance regulation, the Fair Automobile Insurance Reform Act ("FAIRA"). 168 N.J. at 271, 773 A.2d 1132. Applying the three-part *Cort* test, the New Jersey Supreme Court declined to find an implied private right of action because the statute was designed to benefit consumers, not agents, because there was no indication of legislative intent to create a private right of action, given that the "statutory scheme vests enforcement powers exclusively in the Commissioner," and because allowing such an action would "undermine the State's ability to properly regulate" the industry. *Id.* at 279–81, 773 A.2d 1132. The court remanded the matter to the trial court with instructions to refer to the DOB I the determination of whether the insurer had violated the FAIR Act. *Id.* at 283–84, 773 A.2d 1132. If it had, the Court said, the plaintiff could return to court on a claim for breach of the implied duty of good faith and fair dealing. *Id.* Other cases have also declined to find private rights of action under New Jersey insurance statues. *See, e.g., Assoc. of N.J. Chiropractors, Inc. v. Horizon Healthcare Svcs., Inc.,* No. A–6033–11T4, 2013 WL 5879517, at *4 (N.J.Super.Ct.App.Div. Nov.4, 2013)* (affirming the trial court's finding that a state statute does not allow chiropractors a private right of action because the statute was designed to benefit consumers, not practitioners, there were no signs of legislative intent, and allowing practitioners a private right of action "would create tension with the [DOBI's] extensive regulatory authority"); *Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.,* 376 N.J.Super. 48, 58, 868 A.2d 1162 (N.J.App.Div.2005)* (affirming a trial court's finding that a state statute regarding payment of health care providers does not allow an association of physicians a private right of action, finding instead that it must file a complaint with the DOBI). *But see Ensey v. Gov't Employers Ins. Co.,* No. 12–cv–07669 JEI, 2013 WL 5963113, at *3 (D.N.J. Nov.7, 2013)* ("Failure to satisfy this statutory obligation [regarding uninsured motorist coverage] can ground a private right of action.") (citing *Wei nsich v. Sawyer,* 123 N.J. 333, 340, 587 A.2d 615 (1991); *Avery v. Wysocki,* 302 N.J.Super. 186, 191, 695 A.2d 283 (App.Div.1997)), *recon. denied,* 2014 WL 941359 (D.N.J. Mar.11, 2014).

**\*4** New Jersey's state courts have not addressed whether an implied private right of action exists under N.J.S.A. § 17:29C–1.2 and the Third Circuit in *Gleiberman* addressed only the absence of an explicit right of action. The Court has considered whether to infer a private right of action based on

its best prediction of how the Supreme Court of New Jersey would treat the issue and the submissions of the parties.

**a) There is No Implied Private Right of Action Under the Statute.**

The Supreme Court of New Jersey would most likely find no implied private right of action for violation of N.J.S.A. § 17:29C–1.2.

Here, Plaintiff is a member of the class for whose benefit the statute was enacted—namely, the beneficiary of a life insurance policy held by an insured until a few months before his death. This weighs in favor of finding an implied private right of action.

But, as in *R.J. Gaydos,* there is no evidence that the New Jersey Legislature intended to create a private right of action and inferring one would run counter to the legislative scheme. There is no language in the statute implying a private right of action, and the state Assembly and Senate committee reports unfortunately do little more than repeat verbatim the words of the statute as adopted. Staff of Assemb. Comm. on Senior Issues and Cmty. Svcs., 208th Leg., Rep. on A.B. 307 (1998); Staff of S. Comm. on Senior Citizens, Veterans' Affairs and Human Svcs., 208th Leg., Rep. on A.B. 307 (1999). The question is not, as Plaintiff suggests, whether "the New Jersey State Legislature intended to afford greater protections to senior citizen insureds," Pl.'s Supp. Br. at 2–5 (ECF No. 17), as indicated by the language of the statute and the legislature's unanimous support for the measure, *id.* at 9 n. 5, 773 A.2d 1132, but whether there was intent to create a private right of action. *See, e.g., Beye v. Horizon Blue Cross Blue Shield of N.J.,* 568 F.Supp.2d 556, 571 (D.N.J.2008) ("[T]he key inquiry is whether Congress intended to provide the plaintiff with a private right of action.") (quoting *First Pacific Bancorp, Inc. v. Helfer,* 224 F.3d 1117, 1121–22 (9th Cir.2000)). The lack of any such intent weighs against inferring a right of action.

It would not be consistent with the legislative scheme to infer a private remedy. Though the statute subjects violators to fines of up to $2,000, Plaintiff says "[t]he $2,000 fine is not sufficient to accomplish the remedial purpose of the statute to prevent lapses in coverage ..." Pl.'s Supp. Br. at 9. Plaintiff also points to two cases where courts have allowed private rights of action for violation of statutory notice provisions: *Echevar ias v. Lopez,* 240 N.J.Super. 104, 572 A.2d 671 (App.Div.1990) and *Barbara Corp. v. Bob Maneely Ins. Agency,* 197 N.J.Super. 339, 484 A.2d 1292 (App.Div.1984).

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 135 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 331 of 466 PageID: 350
Smith v. Conseco Life Ins. Co., Not Reported in F.Supp.3d (2014)

In those cases, New Jersey's Appellate Division held that an insurer could be liable under § 17:29C–1, a state statute requiring insurers to notify their insureds of any plan to not renew a policy. In *Barbara Corporation,* the court held that § 17:29C–1 required an insurer to notify its insured it was being cut off, regardless of whether its plan to not renew was absolute or conditional. 197 N.J.Super. at 345, 484 A.2d 1292. The court said that this reading of the statute was "necessary to effectuate fully the legislative intent—the prevention of lapse in coverage." Neither case discusses the fact that the statute does not provide an explicit right of action and that § 17:29C–1, like § 17:29C–1.2, is governed by the civil penalty provisions of § 17:33–2. Importantly, these cases predate the guidance from the Supreme Court of New Jersey in *R.J. Gaydos.*

**\*5** A private right of action is not consistent with the "underlying purpose of the legislative scheme." This Court is obliged to heed the words of New Jersey's Supreme Court, which disfavors finding an implied private right of action in the context of a "comprehensive legislative scheme including an integrated system of procedures for enforcement," such as "civil penalty provisions." *R.J. Gaydos,* 168 N.J. at 275, 773 A.2d 1132 (quoting *In re Commissioner of Insurance's March 24, 1992 Order,* 256 N.J.Super. 158, 176, 606 A.2d 851 (App.Div.1992)). The course set out in R.J. Gaydos holds here as well.

**b) Conclusion**

Because the Court finds that Plaintiff cannot assert a private right of action for violation of N.J.S.A. § 17:29C–1.2, it does not reach the question of whether the statute applies retroactively.

## CONCLUSION

Defendant's motion is granted with regard to Plaintiff's statutory claim under N.J.S.A. § 17:29C–1.2 and N.J.A.C. § 11:2–19.3. Plaintiff's claim, to that extent only, is dismissed with prejudice.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3345592

## Footnotes

1    This is the regulatory enactment of N.J.S.A. § 17:29C–1.2.

2    The Third Circuit has noted that the three-part test from *Cort* is now disfavored and instead, the focus is solely on legislative intent. *Wisniewski v. Rodale, Inc.,* 510 F.3d 294, 301 (3d Cir.2007). Because this case is here on diversity jurisdiction, however, the relevant law is that of New Jersey, where legislative intent is the "primary" but not exclusive focus. *See, e.g., Brockwell & Carrington Contractors, Inc. v. Dobco, Inc.,* A–4869–11T3, 2013 WL 6800074, at \*5 (N.J.Super.Ct.App.Div. Dec.26, 2013).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 685101
Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

Jason COHEN, M.D., F.A.C.S. and Professional
Orthopaedic Associates, PA as Assignee
and Designated Authorized Representatives
of Patient AM and Patient AM, Plaintiffs,
v.
HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY, Defendants.

Civil Action No. 15-4525
|
Signed 02/21/2017

**Attorneys and Law Firms**

Jonathan Simeon Goodgold, Goodgold Law LLC, East
Hanover, NJ, Mitchell Craig Beinhaker, The Beinhaker Law
Firm, LLC, Millburn, NJ, for Plaintiffs.

Matthew A. Baker, Connell Foley LLP, Cherry Hill, NJ, for
Defendants.

**OPINION**

John Michael Vazquez, U.S.D.J.

## I. INTRODUCTION

**\*1** This matter comes before the Court on Plaintiffs Jason
D. Cohen, M.D. ("Dr. Cohen") and Professional Orthopaedic
Associates, PA's ("POA") (collectively "Plaintiffs") motion
to remand to state court. Defendant opposes this motion.[1]
This motion was decided without oral argument pursuant to
Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.
The Court has considered the parties' submissions, and for the
reasons stated below, Plaintiffs' motion is denied.

## II. FACTS [2] AND PROCEDURAL HISTORY

Dr. Cohen is a board certified orthopedic surgeon with an
office in Tinton Falls, New Jersey. FAC ¶ 1. Dr. Cohen owns
and/or operates POA, a professional medical association. *Id.*
¶¶ 1, 2. Patient AM was a patient of Dr. Cohen and POA.
*Id.* ¶ 4. Defendant is an insurance company that is "the Plan
Administrator for Plaintiff AM's health insurance plan." *Id.* ¶

5. Neither party contests that the health insurance plan was a
plan governed by the Employee Retirement Income Security
Act ("ERISA"). This matter centers on Defendant's refusal
to pay Plaintiffs for emergency medical services provided to
Patient AM. Plaintiffs are allegedly assignees and designated
authorized representatives of Patient AM. *Id.* ¶¶ 15, 31.
Plaintiffs do not allege that they had a separate agreement,
whether verbal or written, with Defendant regarding Plaintiffs
provision of medical services to Patient AM.

On or about July 4, 2014, "[Dr.] Cohen performed
emergency spinal surgery on Patient AM." *Id.* ¶ 20. Plaintiffs
allege that the services were "medically necessary and
appropriate according to recognized medical standards in the
community where [Dr.] Cohen practices medicine." *Id.* ¶ 22.
Subsequently, on July 18, 2014, "Dr. Cohen submitted a claim
to Horizon in the amount of $169,390.00 for the [s]ervices
rendered to Patient AM." *Id.* ¶ 24. Defendant did not pay the
claim. *Id.* ¶ 30.[3] "On or about November 24, 2014, POA and
Dr. Cohen filed an appeal [with Defendant] as 'the designated
representative' of patient AM." *Id.* ¶ 31. By a letter dated
December 22, 2014, Horizon denied the appeal. *Id.* ¶ 32. On
or about February 26, 2015, POA and Dr. Cohen submitted
a second appeal. *Id.* ¶ 34. By a letter dated March 22, 2015,
Horizon denied the second appeal. *Id.* ¶ 36. Subsequently,
Plaintiffs brought the present action seeking to recover the
unpaid amounts. *Id.* ¶¶ 38-42.

**\*2** On May 15, 2016, Plaintiffs filed a four-count complaint
in the Superior Court of New Jersey against Defendant,
which asserts: (1) Violation of N.J.A.C. 11:24-5.3, (2) Unjust
Enrichment, (3) Violation of the New Jersey Healthcare
Information and Technologies Act ("HINT"), and (4)
Misrepresentation. D.E. 1., Ex. A. On June 26, 2015, Horizon
removed the action to this Court, alleging federal question
jurisdiction on the grounds that all of the state law claims
asserted in the complaint were preempted by ERISA. *Id.* On
July 17, 2015, Horizon moved to dismiss pursuant to Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6). D.E. 4.
Judge Linares dismissed the complaint without prejudice and
allowed Plaintiffs to file an amended complaint to cure any
noted deficiencies. D.E. 15. Judge Linares did not reach the
ERISA preemption issue raised by Defendant. *Id.* Plaintiffs
subsequently amended their Complaint on December 4, 2015,
alleging the following causes of action: (1) violation of
N.J.A.C. 11:24-5.3 ("emergency services regulation"), (2)
unjust enrichment, and (3) violation of HINT.[4] FAC ¶¶
43-72. Defendant answered the FAC. D.E. 20. Plaintiffs now
move to remand. D.E. 37.

Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

Plaintiffs allege that this Court lacks subject matter jurisdiction to hear this case and therefore the case should be remanded to state court. Pl. Br. at 1. Since the claims alleged are premised on New Jersey regulations related to emergency medical treatment, Plaintiffs allege that they are not preempted by ERISA. *Id.* at 3. Defendant responds that Plaintiffs are essentially seeking reimbursement under the terms of an ERISA-governed health plan so that the state law claims are preempted, resulting in the Court having subject matter jurisdiction. Def. Opp'n at 1.

### III. LAW AND ANALYSIS

#### A. Standard of Review

A motion to remand is governed by 28 U.S.C. § 1447(c), which provides that removed cases shall be remanded "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." Initially when a case is filed in state court, a defendant may remove any action over which the federal courts have jurisdiction. 28 U.S.C. § 1441(a). The party removing the action has the burden of establishing federal jurisdiction. *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). This burden is heavy, since removal statutes are "strictly construed against removal and all doubts should be resolved in favor of remand." *Id.* For removal to be proper, a federal court must have original jurisdiction, that is, the removed claims must arise from a "right or immunity created by the Constitution or laws of the United States." *Concepcion v. CFG Health Sys. LLC*, No. 13-02081, 2013 WL 5952042, at *2 (D.N.J. Nov. 6, 2013); *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

"In determining whether a complaint alleges a federal question, courts are generally guided by the well-pleaded complaint rule. According to the rule, a plaintiff is ordinarily entitled to remain in state court so long as its complaint does not, on its face, affirmatively allege a federal claim." *Concepcion*, 2013 WL 5952042, at *2. However, an exception to the well-pleaded complaint rule is found through complete preemption. Complete preemption applies when "Congress has so completely preempted a particular area" any complaint raising a claim in that area is "necessarily federal in character" and may be removed to federal court. *LaMonica*

*v. Guardian Life Ins. Co. of Am.*, No. 96-6020, 1997 WL 80991, at *3 (D.N.J. Feb. 20, 1997). Put differently, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987). In short, complete preemption establishes federal jurisdiction even when there are no federal claims on the face of the complaint. *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 271 (3d Cir. 2001). ERISA's civil enforcement mechanism, Section 502(a), is "one of those provisions with such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 399-400 (3d Cir. 2004) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004)).

**\*3** On its face, Plaintiffs' FAC does not present a federal question. Rather, the FAC asserts state law claims pursuant to New Jersey regulations and common law. While the FAC does not expressly refer to ERISA, Defendant alleges that ERISA completely preempts the state law claims.

#### B. ERISA PREEMPTION

Before addressing whether Plaintiffs' state law claims are completely preempted, the Court notes that under ERISA, the term " 'preemption' is used in the law in more than one sense." *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999). The two forms of ERISA preemption are "complete preemption" under Section 502(a) and "ordinary preemption" under Section 514(a). *Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 171 (3d Cir. 1997). The significant difference between complete preemption and ordinary (or conflict) preemption is that "[u]nlike ordinary preemption, which would only arise as a federal defense to a state-law claim, complete preemption operates to confer original federal subject matter jurisdiction notwithstanding the absence of a federal cause of action on the face of the complaint." *In re U.S. Healthcare*, 193 F.3d at 160.

In other words, if ERISA completely preempts a state law cause of action, then a defendant may remove the matter to federal court on that basis alone, "even if the well-pleaded complaint rule is not satisfied." *Joyce*, 126 F.3d at 171. To this end, ERISA's complete preemption provision, Section

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 138 of 155   Trans ID: LCV20241332836

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 334 of 466 PageID: 353

Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

502, is a misnomer, since it is "really a jurisdictional rather than a preemption doctrine, as it confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009). "But if the doctrine of complete preemption does not apply, even if the defendant has a defense of 'conflict preemption' within the meaning of § 514(a) ... the district court is without subject matter jurisdiction." *Id.*; *see also Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (holding that "only complete preemption of a claim under ERISA § 502(a) is required for removal jurisdiction; conflict preemption under ERISA § 514 is not required"). By comparison, "[s]tate law claims which fall outside of the scope of § 502, even if preempted by § 514(a), are still governed by the well-pleaded complaint rule and, therefore, are not removable under the complete-preemption principles." *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 355 (3d Cir. 1995). In short, complete preemption pursuant to Section 502(a) is a matter of federal subject matter jurisdiction while conflict preemption under Section 514 is not.

At the outset, the Court notes that in their reply, Plaintiffs apparently confuse the two different types of preemption analyses under ERISA. Pl. R. Br. at 5-11. The cases analyzed by Plaintiffs address conflict preemption under Section 514, which does not provide a means to confer federal jurisdiction, but instead can be used as a defense in state court.

Here, the Court is addressing its subject matter jurisdiction. Thus, only Section 502(a) is relevant. Section 514 does not enter into the Court's analysis. Pursuant to Section 502(a), state law claims are completely preempted when (1) the plaintiff could have brought the action under Section 502(a) of ERISA and (2) no independent legal duty supports the plaintiff's claims. *See Davila*, 542 U.S. at 210; *Pascack Valley Hosp.*, 388 F.3d at 400. "Because [this] test is conjunctive, a state-law cause of action is completely preempted only if both of its prongs are satisfied." *N.J. Carpenters & Tr. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 303 (3d Cir. 2014). As to the first prong of the *Davila* test, a claim may be brought under Section 502(a) "to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53 (1987); *see also Pryzbowski*, 245 F.3d at 272 ("[C]laims challenging the quantum of benefits due under an ERISA-regulated plan are completely preempted under § 502(a)'s civil enforcement scheme.").

**\*4**   Additionally, when asserting a cause of action under Section 502(a), a plan's participant or beneficiary may assign his or her rights under the plan to a health care provider. *Vaimakis v. United Healthcare/Oxford*, No. 07-5184, 2008 WL 3413853, at *3 (D.N.J. Aug. 8, 2008). Doing so confers derivative standing on the health care provider. *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (D.N.J. 2015). An assignment, however, does not change the preemption analysis except that a health care provider must also show that it "received *valid* assignments from individuals that receive benefits under an ERISA-governed plan." *Vaimakis*, 2008 WL 3413853, at *3. (emphasis added). Defendant has not contested Plaintiffs' assignment in its papers, so for the purposes of this analysis, the Court will assume a valid assignment. [5]

A legal duty is "independent" if it "would exist whether or not an ERISA plan existed." *Marin Gen. Hosp.*, 581 F.3d at 950. Under the second prong, a court "must examine whether interpretation or application of the terms and scope of the ERISA insurance plan form an essential part of Plaintiffs' claims." *N. Jersey Brain & Spine Ctr. v. Conn. Gen. Life Ins. Co.*, No. 10-4260, 2011 WL 4737067, at *6 (D.N.J. June 30, 2011) (internal quotation marks omitted). Thus, this prong often turns on whether plaintiff's claims are "inextricably intertwined with the interpretation and application of ERISA plan coverage and benefits." *Id.* at *7.

Generally, the Third Circuit has broadly addressed two separate scenarios concerning complete preemption pursuant to Section 502(a). The first involves suits by medical providers, rather than plan participants, against ERISA plans or plan administrators. *See, e.g., Pascack Valley*, 388 F.3d at 395. The second concerns plan participants' direct suits against the plans or their administrators. *See, e.g., Pryzbowski*, 245 F.3d at 271. The current matter involves the first scenario, which would logically lead to the conclusion that the Court should analyze this case pursuant to *Pascack Valley* and its progeny. However, *Pascack Valley* concerned a medical provider's separate agreement, apart from the ERISA plan itself, with the administrator of the plan. Here, Plaintiffs do not allege that they had a separate agreement with Defendant which entitles Plaintiffs to payment. As a result, the Court finds that the facts of *Pascack Valley* and similar cases do not easily lend themselves to a comparative analysis to the present matter. As a result, the Court will consider the analysis in *Pryzbowski* and related cases as their guidance is pertinent to the issues here.

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 139 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 335 of 466 PageID: 354
Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

In *Pryzbowski*, the Third Circuit addressed the issue of "how a claim that the HMO or plan administrator delayed in the approval of benefits should be treated under ERISA." 245 F.3d at 273. There, the plaintiff had an insurance policy with defendant which required her to receive prior written authorization for services performed by non-participating providers and facilities. *Id.* at 269. In conjunction with a back injury, the plaintiff requested approval from defendant to receive surgery from a non-participating surgeon. *Id.* After six months of requesting such authorization, the plaintiff received approval and underwent the surgery. *Id.* However, due to the delay, the plaintiff continued to suffer back pain after the procedure. *Id.* at 270. As a result, the plaintiff asserted claims alleging that the defendant "negligently and carelessly delayed in authorizing and/or obtaining authorization [ ] for the surgery." *Id.*

**\*5** The plaintiff filed her complaint in state court, and the defendant removed the case to federal court. The district court held that removal was proper since the plaintiff's claims were completely preempted pursuant to Section 502, and the plaintiff appealed. *Id.* at 271. In reviewing whether the plaintiff's state law claims were preempted by ERISA, the Third Circuit reviewed cases which had focused on "the distinction between claims raising quality of care issues," which *were not* preempted by ERISA and "claims raising quantity of benefits issues," which *were* completely preempted. *Id.* at 272. Yet, the *Pryzbowski* court noted that "the distinction will not always be clear." *Id.* Thus, the Third Circuit laid out an alternative to the quality/quantity framework for determining whether a case is completely preempted under Section 502(a) of ERISA. *Id.* at 273. This framework distinguished between "eligibility decisions, which turn on the plan's coverage of a particular condition or medical procedure for its treatment" and "treatment decisions, which are choices in diagnosing and treating a patient's condition." *Id.* (internal quotation marks omitted). The court in *Pryzbowski* concluded that "the ultimate distinction to make for purposes of complete preemption is whether the claim challenges the administration of or eligibility for benefits, which falls within the scope of § 502(a) and is completely preempted, or the quality of the medical treatment performed, which may be the subject of a state action." *Id.*

*Pryzbowski* also acknowledged that there was a category of cases falling between the two poles of eligibility and treatment, and in those cases it is necessary to look to Section 502(a), keeping in mind that "Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court." *Id.* The claims at issue in *Pryzbowski* fell into the third category, with the court ultimately determining that the claims were "limited to [defendant's] delay in approving benefits," which fit "squarely within administrative function" and were therefore completely preempted by ERISA. *Id.* at 274.

After *Pryzbowski*, the Third Circuit again recognized that certain cases did not fit neatly within the two analytical parameters set forth in *Pryzbowski. See Levine v. United Healthcare Corp.*, 402 F.3d 156, 162 (3d Cir. 2005). In *Levine*, the Third Circuit looked "beyond the framework set out in *Pryzbowski* to determine whether [the] case [fell] within section 502(a)." *Id.* In *Levine*, the plaintiffs suffered personal injuries and their medical expenses were initially paid by defendant pursuant to the plaintiffs' ERISA health plan. *Id.* at 159. After they settled their underlying tort cases, the plaintiffs reimbursed their health insurance companies for their medical expenses. *Id.* at 159-60. Several years later the New Jersey Supreme Court invalidated the New Jersey regulation that had required the plaintiffs to reimburse their insurance companies. *Id.* at 160. The plaintiffs in *Levine* then brought suit to recover the amounts that they had previously reimbursed defendants. *Id.*

The Third Circuit determined that plaintiffs' claims were essentially claims for "benefits due" and were therefore completely preempted by ERISA. *Id.* at 163. Comparing the claims to those in *Pryzbowski*, the Third Circuit found that the claims were more akin to challenges to the "administration of benefits" than challenges to the "quality of benefits received." *Id.* Noting that "[i]t is impossible to determine the merits of the [i]nsureds' claims without delving into the provisions of their ERISA-governed plans," the *Levine* court held that the claims were completely preempted by ERISA and federal subject matter jurisdiction was appropriate. *Id.*

In *Difelice v. Aetna U.S. Healthcare*, the Third Circuit once again addressed ERISA preemption in the context of a claim that did not fall directly into one of *Pryzbowski's* two discrete categories. 346 F.3d 442, 449 (3d Cir. 2003) ("[T]he decision here was in some sense both a medical treatment and an eligibility decision."). In *Difelice*, the plaintiff claimed that his insurance provider negligently interfered with his medical care by denying plaintiff access to a special tracheostomy tube and by forcing plaintiff to be discharged too soon. *Id.* at 445. The plaintiff's medical benefits were provided pursuant to an

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 140 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 336 of 466 PageID: 355
Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

ERISA plan that was administered by the defendant. *Id.* at 444.

**\*6** Under the plan, the plaintiff was entitled to covered benefits if defendant made the determination that they were "medically necessary." *Id.* at 444. After defendant made the decision that the special tracheostomy tube was not medically necessary and therefore not covered, plaintiff's doctor used a different tube that resulted in pain, infection, and surgery. *Id.* Relying on *Pryzbowski*, the court in *Difelice* found that the defendant's decision on whether to approve the specific tube fell between the two clear cut categories of eligibility and medical treatment. As a result, the Third Circuit referred to section 502(a) to determine whether the claim could have been the subject of a civil enforcement action under ERISA. *Id.* at 449. The *Difelice* court concluded that defendant's decision could only have been an eligibility decision because there was no allegation that defendant actually provided the medical care. *Id.* at 449. The plaintiff therefore could have brought a 502(a) action to request an injunction or recover for benefits due to him under the plan. *Id.* Concluding that the plaintiff could have brought the tracheostomy claim under ERISA, the Third Circuit held that it was completely preempted. *Id.*

As to the count concerning the plaintiff's discharge, the court found that there was not enough information to demonstrate it was preempted by ERISA. *Id.* at 452-54. Unlike the first claim, the plaintiff did not allege that the hospital stay was "medically necessary," nor did the plaintiff rely on his plan's discharge policy. *Id.* at 452. Since there was nothing in the pleadings to suggest that the defendant was following the plan's terms in suggesting discharge, the *Difelice* court held that the count was not clearly "plan-related." *Id.* The Third Circuit concluded that, as a result, the count was not completely preempted and could be brought pursuant to state law negligence liability. *Id.*

With the foregoing guiding its analysis, the Court now turns to whether Plaintiffs' claims are completely preempted pursuant to Section 502(a).

Count I
Plaintiffs bring Count I under N.J.A.C. 11:24-5.3, a New Jersey regulation promulgated pursuant to the authority set forth in N.J.S.A. 26:2J-1 *et seq.* [6] Plaintiffs allege that, pursuant to the emergency services regulation, an insurance

carrier must "limit a member's liability for emergency care rendered by non-participating providers." FAC ¶ 50.

The regulation begins by stating that "[t]he HMO [7] shall establish written policies and procedures governing the provision of emergency and urgent care which shall be distributed to each subscriber at the time of enrollment." N.J.A.C. 11:24-5.3. Subsection 5.3(b)(3) of the regulation indicates that "[e]mergency and urgent care services shall include, but are not limited to ... [c]overage for out-of-service area medical care when medically necessary for urgent or emergency conditions where the member cannot reasonably access in-network services." *Id.* And finally, the regulation states that, with respect to the services provided (including those in (b)(3)), "carriers shall reimburse hospitals and physicians for all medically necessary emergency and urgent health care services *covered under the health benefits plan*, including all tests necessary to determine the nature of an illness or injury, in accordance with the provider agreement when applicable." *Id.* 5.3(c) (emphasis added).

**\*7** Here, prong one of the *Davila* test is met. At the outset, no argument is made concerning the treatment decisions or the quality of treatment (to the contrary, Plaintiffs claim that they provided appropriate treatment), so the clear non-ERISA category set forth in *Pryzbowski* is not relevant. Instead, Plaintiffs argue that the regulation explicitly provides that they are entitled to their normal and customary fees. Plaintiffs' argument, however, misses a key condition precedent to this payment. The emergency health services for which reimbursement is sought must first be "covered under the health benefits plan[.]" N.J.A.C. 11:24-5.3(c). Thus, the threshold question is what benefits were covered under Patient AM's health plan? As a result, it is impossible to determine the merits of Plaintiffs' claim without first reviewing the provisions of Patient AM's ERISA-governed plan. Like *Levine* and *Defelice*, this requirement puts Plaintiffs' claim squarely within Section 502(a)'s complete preemption reach.

Prong two of the *Davila* test is similarly met since the emergency services regulation does not create an independent legal duty. Again, the regulation requires the benefits covered to be determined by a review of Patient AM's plan. The regulation requires an HMO (see, *supra*, notes 8 & 9) to "establish written policies and procedures governing the provision of emergency and urgent care" and goes on to provide what that care includes, but the plan itself is the source for determining which services are "covered." Thus,

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 141 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 337 of 466 PageID: 356
Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

the regulation does not create an independent legal duty and Count I is preempted by ERISA.

### Count II

In Count II Plaintiffs bring a claim against Defendant for unjust enrichment. Plaintiffs allege that "[f]ailure of Defendant to [ ] pay for the Services rendered to Patient AM by Dr. Cohen and POA would be unjust." *Id.* ¶ 58.[8] To demonstrate unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff expected remuneration and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC v. Envtl. Barrier Co., LLC*, 440 N.J. Super. 325, 350 (App. Div. 2015) (internal quotation marks omitted). Again, Plaintiffs do not base their unjust enrichment claim on an independent agreement with Defendants; instead Plaintiffs rely on Patient AM's plan and Plaintiffs' status as an alleged assignee and designated representative of AM.

Plaintiffs point to no case in which an out-of-network physician or medical practice has been able to proceed with an unjust enrichment claim against a plan administrator solely because medical services have been provided to a plan participant. Indeed, Plaintiffs have not addressed their unjust enrichment claim in any detail. *See* note 11, *supra*. As a result, the Court assumes that the basis for Plaintiffs' claim is its alleged assignment from Patient AM. While the assignment can confer derivative standing for ERISA claim purposes, the assignment works to put Plaintiffs in the shoes of AM. AM, in turn, could bring a claim pursuant to Section 502(a), which by definition meets the first prong of *Davila*. Also, such a claim would be dependent upon, rather than independent of, AM's plan. So, the second prong is also met. Plaintiffs' unjust enrichment count is therefore subject to complete preemption.

### Count III

**\*8** In Count III, Plaintiffs apparently allege a violation of N.J.A.C. 11:22-1.5.[9] Plaintiffs allege that the regulation "requires that a health insurer, such as the Defendant, shall remit payment for every insured claim no later than the 30[th] calendar day following receipt of the claim." *Id.* ¶ 64. N.J.A.C. 11:22-1.5, titled "Prompt payment of claims," provides that:

(a) A carrier and its agent shall remit payment of clean claims pursuant to the following time frames:

1. Thirty calendar days after receipt of the claim where the claim is submitted by electronic means or the time established for the Federal Medicare program by 42 U.S.C. § 1395u(c)2(B), whichever is earlier; or

2. Forty calendar days after receipt of the claim where the claim is submitted by other than electronic means.

(b) Carriers and their agents shall pay claims that are disputed or denied because of missing information or documentation within 30 or 40 calendar days of receipt of the missing information or documentation, as applicable, pursuant to (a) above.

N.J. Admin. Code § 11:22-1.5(a) & (b).

The regulation only applies to "clean claims."[10] A "clean claim" is, in turn, defined in N.J.A.C. 11:22-1.2. Among other things, the term means that "the claim is for a service or supply *covered by the health benefits plan*[.]" *Id.* (emphasis added). As a result, and for similar reasons discussed concerning Count I, Count III is completely preempted. First, Count III could be brought pursuant to Section 502(a) because it is a claim to recover benefits or enforce rights under AM's plan. To do so, Count III requires the Court to delve into AM's plan to determine what is covered. Second, Count III is not based upon an independent legal duty. To the contrary, the regulations make clear that basis for recovery is determined by the plan itself and what is covered.

**\*9** In sum, each of Plaintiffs' three asserted claims are completely preempted by Section 502 of ERISA, and the Court has subject matter jurisdiction. Therefore, Plaintiffs' motion to remand is denied.

### IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion to remand is **DENIED.** An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2017 WL 685101

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 142 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 338 of 466 PageID: 357
Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

## Footnotes

1   Plaintiffs' brief in support of its motion to remand will be referred to hereinafter as "Pl. Br." (D.E. 37), Defendant's opposition to Plaintiffs' brief will be referred to hereinafter as "Def. Opp'n" (D.E. 44), and Plaintiffs' reply brief in support of its motion to remand will be referred to hereinafter as "Pl. R. Br." (D.E. 45).

2   The facts of this matter derive from Plaintiffs' First Amended Complaint ("FAC"). D.E. 17. In ruling on a motion to remand, "the district court must assume as true all factual allegations of the complaint." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987).

3   According to the parties' briefs, since the filing of the complaint, Defendant has paid Plaintiffs a few thousand dollars. Pl. Br. at 6; Def. Opp'n at 3.

4   The amended complaint provides no statutory cite for HINT. HINT can be found at N.J.S.A. 17B:26-9.1. In their moving brief, Plaintiffs cite N.J.A.C. 11:22-1.5 as the applicable regulation for Count III. The cited regulation, N.J.A.C. 11:22-1.5, implements N.J.S.A. 17B:30-26 through 34. N.J.A.C. 11:22-1.1. In other words, the cited regulation does not apply to HINT.

5   The Court is not ruling that the assignment at issue was in fact valid or that it was not subject to anti-assignment provision. Instead, solely for purposes of this Opinion, the Court assumes the validity of the assignment.

6   N.J.S.A. 26:2J-1 *et seq.* applies to Health Maintenance Organizations, or HMOs. Defendant has not argued that the regulation, in light of the underlying statute, does not apply to Defendant. Likewise, Plaintiff has not proven that the regulation permits a private cause of action, and Defendant has not contested whether a private right of action exists. As a result, solely for purposes of this Opinion, the Court will assume that the regulation applies to Defendant and Plaintiffs have a private right of action. However, the Court is not finding that Defendant is necessarily governed by the regulation nor is the Court finding that Plaintiffs have a private cause of action pursuant to the regulation.

7   HMO stands for Health Maintenance Organization. "HMO," and other specific words and phrases such as "carrier," are subject to specific definitions set forth in N.J.A.C. 11:24-1.2. Neither party has addressed whether the particular definitions impact the Court's analysis. For example, Plaintiff has alleged that Defendant is a "plan administrator." Nowhere has Plaintiff alleged that Defendant is either an HMO or a carrier as defined under the regulation.

8   Although Plaintiffs are asking for a complete remand, they inexplicably fail to address Count II—whether ERISA preempts their claim for unjust enrichment. If the Court found that ERISA preempts Count II (as it does), then it would not need to address preemption with respect to Counts I and III since it could exercise supplemental jurisdiction over those claims. *See Pryzbowski*, 245 F.3d at 275-76 (finding that when ERISA preempted certain state law claims, the district court properly exercised supplemental jurisdiction over the remaining state law claims because they "[were] derived from the same factual predicate" and therefore should "be combined in one judicial proceeding").

9   As discussed in note 6, Count III lists HINT (without citation) but then make allegations consistent with N.J.A.C. 11:22-1.5 and Plaintiffs claim in their brief that N.J.A.C. 11:22-1.5 is the pertinent regulation. As a result, the Court is substantively analyzing the count pursuant to the regulation.

10   Defendant disputes that N.J.A.C. 11:22-1.5 applies to the present claim since the regulation only applies to "clean claims" and "does not apply to claims that are denied or disputed." Def. Opp'n at 7 n.5. Since this claim is disputed, Defendant contends that the regulation is not applicable. *Id.* Additionally, Defendant argues that

GLO-L-000242-24   05/24/2024 3:29:47 PM   Pg 143 of 155   Trans ID: LCV20241332836
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 339 of 466 PageID: 358
Cohen v. Horizon Blue Cross Blue Shield of New Jersey, Not Reported in Fed. Supp....

pursuant to *Briglia v. Horizon Healthcare Services, Inc.*, No. 03-6033, 2005 WL 1140687, at *1 (D.N.J. May 13, 2005), no private cause of action exists to pursue a violation of the PPA. Def. Opp'n at 7 n.5. Defendant is incorrect in its analysis of *Briglia*. In *Briglia*, the court found that N.J.A.C. 11:22-1.5 was inapplicable to the facts there and thus did not reach the issue of whether the statute contained a private cause of action. *Id.* at *11. Here, since there is no pending motion to dismiss, the Court does not reach the issues raised by Defendant—whether Plaintiffs have adequately pled a clean claim or whether Plaintiffs have a cause of action pursuant to the regulation. The Court is analyzing the regulation solely in terms of ERISA complete preemption. However, nothing in this Opinion prohibits Defendant from raising its arguments in an appropriate motion if it so chooses.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 358152
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

BRAINBUILDERS, LLC, et al., Plaintiffs,

v.

AETNA LIFE INSURANCE COMPANY,

Aetna Health Inc., and Aetna Inc., Defendants.

Civil Action No. 17-03626 (GC) (DEA)
|
Signed January 31, 2024

**Attorneys and Law Firms**

William Aaron Lesser, Cozen O'Connor, New York, NY, for Plaintiffs.

Benjamin McCoy, Fox Rothschild LLP, Blue Bell, PA, Mariellen Dugan, Calcagni & Kanefsky, LLP, Newark, NJ, for Defendants.

**OPINION**

CASTNER, United States District Judge

**\*1 THIS MATTER** comes before the Court upon the Motion to Dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) filed by Defendants Aetna Life Insurance Company, Aetna Health Inc., and Aetna Inc. (together, "Aetna"). (ECF No. 80.) Plaintiffs opposed, and Defendants replied. (ECF Nos. 92 & 95.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Aetna's motion is **GRANTED**.

**I. BACKGROUND**

This case involves claims brought under state law as well as the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., based on Aetna's alleged nonpayment or underpayment for autism therapy services provided by BrainBuilders, LLC. Plaintiffs allege that, from August 2014 through June 2022, Aetna underpaid for these services by about $50,000,000.00 in total.

**A. FACTUAL BACKGROUND** [1]

Because the allegations in the operative pleading span 156 pages and 891 paragraphs, the Court summarizes only the facts critical to understanding the dispute.

BrainBuilders is a therapeutic intervention agency located in Lakewood, New Jersey. (ECF No. 72 ¶ 8.) It provides to children with autism-spectrum-related disorders a variety of medical services, including applied behavioral analysis, physical therapy, occupational therapy, and speech therapy. (Id.) BrainBuilders requires its patients to execute assignments of benefits and assignments of rights to pursue ERISA and other legal and administrative remedies. (Id.) The eighty-four individual Plaintiffs are the parents and/or legal guardians of ninety patients [2] who have been diagnosed with autism. (Id. ¶¶ 9-92, 129-741.) The patients have been or are currently being treated by BrainBuilders under the terms of at least fifty-six different ERISA-governed health benefit plans issued by Aetna. [3] (Id.) Aetna is both a health insurer and a health plan administrator. (Id. ¶¶ 93-95.)

**\*2** Prior to providing services to Aetna's members, BrainBuilders (an out-of-network provider) received "written pre-authorization from Aetna that these services would be covered under the [plans] at issue." (Id. ¶ 102.) Specifically, "Aetna represented that its members and beneficiaries are covered for [the out-of-network] services, that they may go to BrainBuilders to receive autism therapy services, and that Aetna will remit payment at the rate of BrainBuilders' fully billed charges (less in-network patient responsibility)." (Id. ¶ 103.) BrainBuilders bills Aetna using recognized CPT codes. [4] (Id. ¶ 102.)

Until July 2014, Aetna reimbursed BrainBuilders for its services at approximately ninety percent of BrainBuilders' billed rates. (Id. ¶ 106.) Then, without explanation, Aetna began reimbursing BrainBuilders at "much lower ... and inconsistent rates that do not adhere with any coverage or reimbursement provisions under the [plans]." (Id. ¶¶ 107-08.) Aetna also began using new temporary CPT codes for autism therapy services that do not correspond to any usual, customary, reasonable and/or Medicare-based rate on FAIR Health's Consumer Cost Lookup. [5] (Id. ¶ 109.) Aetna acknowledged that no rate existed for the new CPT codes. (Id. ¶ 111.)

Aetna's inconsistent reimbursement rates are illustrated by its use of "different reimbursement calculations" for children who are on the same plan. (*Id.* ¶ 112.) This resulted in at least three different rates "for patients for whom BrainBuilders billed for the same services using the same CPT codes." (*Id.* ¶ 114.) Aetna did not "offer any explanation as to the actual numbers used as a basis for its calculations in determining the[ ] varying rate amounts." (*Id.*) Despite these inconsistencies, BrainBuilders continued to provide autism therapy services to Aetna's members. (*Id.* ¶ 116.)

Pursuant to duly-executed assignments of benefits, BrainBuilders appealed Aetna's alleged underpayments in accordance with the terms of the patients' ERISA plans. (*Id.* ¶ 127.) Aetna either "failed ... to respond to the appeals, responded in an insufficient or untimely manner contrary to the terms of the [plan] documents, or denied the appeals." (*Id.*) Aetna also failed to respond, or responded "in an insufficient or untimely manner," to BrainBuilders' requests for "information and documents from Aetna regarding its benefits reductions related to autism therapy services." (*Id.* ¶ 128.)

On November 7, 2017, shortly after Plaintiffs initiated this suit, Aetna notified BrainBuilders that it was placed on pre-payment review. (*Id.* ¶ 744.) Aetna used this process to delay and reduce payment to BrainBuilders to about ten percent of its billed claims. (*Id.* ¶ 745.) Then, in June 2021, Aetna began denying all but approximately five percent of BrainBuilders' claims and reducing its payments in 2022 to about less than half a percent of the total billed amounts. (*Id.* ¶ 746.) BrainBuilders has turned away Aetna-insured patients because it can no longer afford to treat them. (*Id.* ¶ 749.)

### B. PROCEDURAL BACKGROUND

Plaintiffs sued on May 20, 2017. (ECF No. 1.) On August 21, 2017, Aetna moved to dismiss the original Complaint under Rules 12(b)(1), 12(b)(6), and 12(f). (ECF No. 22.) The parties completed briefing on September 26, 2017. (ECF Nos. 27 & 29.)

**\*3** On October 3, 2017, Aetna moved to stay the case. (ECF No. 30.) Aetna argued that one of the issues raised in its motion to dismiss—the enforceability of anti-assignment clauses in the applicable health benefit plans—was before the United States Court of Appeals for the Third Circuit, and it asked for a stay pending a decision. (ECF No. 30-1 at 4-8. [6] ) Plaintiffs opposed on November 6, 2017. (ECF No. 35.)

Following oral argument, the Court (Shipp, J.) granted the stay and terminated the motion to dismiss without prejudice. (ECF No. 42.)

On May 16, 2018, the Third Circuit issued its opinion in *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445 (3d Cir. 2018). Among other things, the Court held that "anti-assignment clauses in ERISA-governed health insurance plans as a general matter are enforceable." *Id.* at 453. This Court then lifted the stay and reopened the case. (ECF No. 44.)

On August 15, 2022, Plaintiffs filed the First Amended Complaint. (ECF No. 69.) Then, on September 14, 2022, Plaintiffs filed, with consent, the Second Amended Complaint. (ECF Nos. 71 & 72.) The Court allowed the SAC to remain under seal because it includes the names of patients and information relating to autism therapy services provided to them. (ECF No. 75.)

Plaintiffs assert fifteen causes of action in the SAC. The first four counts are asserted by all Plaintiffs under ERISA: Count One, breach of plan provisions for benefits in violation of 29 U.S.C. § 1132(a)(1)(B); Count Two, breach of fiduciary duties of loyalty and due care in violation of 29 U.S.C. §§ 1104(a)(1) and 1132(a)(3); Count Three, denial of full and fair review in violation of 29 U.S.C. § 1133; and Count Four, failure to provide information in violation of 29 U.S.C. § 1132(c). (ECF No. 72 ¶¶ 752-795.) The remaining eleven counts are asserted by BrainBuilders under New Jersey law: Count Five, violations of New Jersey's Healthcare Information Networks and Technologies Act ("HINT Act") and Health Claims Authorization, Processing and Payment Act ("HCAPPA"); Count Six, declaratory judgment; Count Seven, temporary and permanent injunctive relief; Count Eight, violation of New Jersey's Autism Mandate; Count Nine, conversion; Count Ten, tortious interference with business relations; Count Eleven, tortious interference with prospective economic advantage; Count Twelve, quantum meruit; Count Thirteen, unjust enrichment; Count Fourteen, breach of implied contract; and Count Fifteen, promissory estoppel. (*Id.* ¶¶ 796-890.)

On October 26, 2022, Aetna moved to dismiss the SAC under Rule 12(b)(6). (ECF No. 80.) Plaintiffs opposed, and Aetna replied. (ECF Nos. 92 & 95.)

### II. **LEGAL STANDARD**

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.' " *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III. DISCUSSION

### A. INDIVIDUAL PLAINTIFFS' ARTICLE III STANDING

**\*4** Aetna argues that the individual Plaintiffs lack standing under Article III of the United States Constitution because they have not alleged that "the[y] ... have suffered or will suffer any injury." (ECF No. 80-2 at 22-23.) There is no indication, Aetna posits, that BrainBuilders will "balance bill" the patients for the services rendered, and there are thus no "plausible allegations of actual harm." (*Id.* at 23.)

Challenges to Article III standing are brought pursuant to Rule 12(b)(1), "because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted); *accord N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 n.3 (3d Cir. 2015) ("Ordinarily, Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter."). There are two types of standing challenges under Rule 12(b)(1): "either a facial or a factual attack." *Davis*, 824 F.3d at 346. The distinction determines, among other things, whether the court accepts as true the non-moving party's facts as alleged in the pleadings. *Id.* Here, Aetna's challenge is a facial challenge based on the SAC's allegations.

Article III standing consists of three inquiries: has plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). As to the first element, "an injury in fact must be both concrete and particularized." *Id.* at 340 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). To be "concrete," an injury must "actually exist," that is, be "real, and not abstract." *Id.* (citations omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (explaining that "traditional tangible harms, such as physical harms and monetary harms" qualify as concrete, as do certain "intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion"). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 561 n.1).

The Court finds little merit in Aetna's contention that the individual Plaintiffs, as participants or beneficiaries in Aetna's health benefit plans, lack standing to sue for benefits. Even if BrainBuilders, the out-of-network provider, has not yet billed the individual Plaintiffs for what Aetna refuses to cover, there is certainly the risk that this might occur. Consequently, the individual Plaintiffs face the ongoing threat of a collectable debt. *See, e.g., James v. City of Dallas, Tex.*, 254 F.3d 551, 564 (5th Cir. 2001), *abrogated on other grounds by M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839-41 (5th Cir. 2012) ("The continued threat of collection actions ... on the unpaid debt also suffices to demonstrate the likelihood of real and immediate future injury.").

Further, courts "have recognized that an insured has standing when she alleges violations of an ERISA plan without having to prove that the insured paid the provider or was balance billed by the provider." *Peters v. Aetna, Inc.*, Civ. No. 15-00109, 2016 WL 4547151, at \*6 (W.D.N.C. Aug. 31, 2016) (collecting cases). Courts in this District support this conclusion. *See, e.g., Atl. Plastic & Hand Surgery, PA v. Anthem Blue Cross Life & Health Ins. Co.*, Civ. No. 17-4599, 2018 WL 5630030, at \*6 (D.N.J. Oct. 31, 2018) ("To the extent Anthem argues the Providers have not yet billed [the individual plaintiff] for the balance due, and therefore any potential injury is speculative, drawing all inferences in favor of Plaintiffs, the consequential liability [the individual plaintiff] faces is sufficient to constitute a concrete and

particularized injury."); *Pro. Orthopedic Assocs., Pa., Cohen v. Horizon Blue Cross Blue Shield of New Jersey,* Civ. No. 14-4731, 2015 WL 5455820, at *2 (D.N.J. Sept. 16, 2015) ("[T]he receipt of a lesser benefit than Horizon allegedly should have paid had it honored plan terms is a sufficiently concrete invasion of [the insured's] legally protected interest under ERISA and her plan to confer Article III standing.").

**\*5**  Accordingly, the Court finds that the individual Plaintiffs have Article III standing to pursue their claims for unpaid and underpaid health benefits. [7]

### B. BRAINBUILDERS' STANDING AS AN ASSIGNEE UNDER ERISA

Aetna next argues that BrainBuilders, as an alleged assignee of the individual Plaintiffs, does not have standing under ERISA, because the plans at issue contain anti-assignment clauses. (ECF No. 80-2 at 24-25.)

Typically, "standing to sue under ERISA is 'limited to participants and beneficiaries.' " *Prestige Inst. for Plastic Surgery, P.C. o/b/o S.A. v. Horizon Blue Cross Blue Shield of New Jersey,* Civ. No. 20-3733, 2021 WL 4206323, at *3 (D.N.J. Sept. 16, 2021) (quoting *Univ. Spine Ctr. v. Anthem Blue Cross Blue Shield,* Civ. No. 18-2912, 2018 WL 6567702, at *2 (D.N.J. Dec. 13, 2018)). Nevertheless, "[h]ealthcare providers that are neither participants nor beneficiaries in their own right may obtain derivative standing by assignment from a plan participant or beneficiary," *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.,* 801 F.3d 369, 372 (3d Cir. 2015), so long as the ERISA plan does not include a valid anti-assignment clause, *Am. Orthopedic,* 890 F.3d at 453.

Here, Aetna provides a summary chart and excerpts from forty-nine of the fifty-six plans to demonstrate that those plans contain valid anti-assignment clauses. (ECF No. 80-3 at 2-15.) The plans generally state (except for four of the forty-nine plans provided [8]) that they "will not accept an assignment to an out-of-network provider" or will accept an assignment only with Aetna's written consent, which is not alleged to have been obtained. (*Id.*) In response, Plaintiffs argue that Aetna waived the anti-assignment provisions because of "cross-plan offsetting." (ECF No. 92 at 29.) In other words, Plaintiffs claim that Aetna treats BrainBuilders' patients "as one account for all benefit payment and billing purposes" and that this should result in waiver of the anti-assignment provisions. (*Id.*) However, Plaintiffs give only one alleged instance when Aetna deducted from the benefits

payment for a child based on an alleged overpayment made to a different child. (*Id.* at 29-30.)

**\*6**  The Court agrees with Aetna that BrainBuilders is foreclosed from pursuing ERISA claims as derivative standing where the plans contain valid anti-assignment provisions. *See Am. Orthopedic,* 890 F.3d at 453 ("We now join that consensus and hold that anti-assignment clauses in ERISA-governed health insurance plans as a general matter are enforceable."); *Neurosurgical Assocs. of NJ, P.C. v. Aetna, Inc.,* Civ. No. 17-13210, 2019 WL 851280, at *3 (D.N.J. Feb. 22, 2019) ("[T]he *American Orthopedic* decision is consistent with a long line of decisions from this district that have denied standing after finding a valid anti-assignment clause in an ERISA-governed health insurance plan."). And the Court is unconvinced that the single alleged example of supposed "cross-plan offsetting" is sufficient to find any enforceable anti-assignment provisions waived.

Under New Jersey law, [9] "waiver is defined as an 'intentional relinquishment of a known right.' " *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc.,* 399 F. Supp. 3d 241, 253 (D.N.J. 2019) (quoting *Knorr v. Smeal,* 836 A.2d 794, 798 (N.J. Super. Ct. 2003)). "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it." *Id.* at 254. "Such words or acts, however, must be 'voluntary, clear and decisive,' such that they imply 'an election to forego some advantage which the waiving party might have insisted on.' " *Id.* (quoting *Deerhurst Ests. v. Meadow Homes, Inc.,* 165 A.2d 543, 549 (N.J. Super. Ct. App. Div. 1960)). "The burden of proving waiver is upon the party asserting it." *Id.* (quoting *Cacon, Inc. v. Rand Env't Servs., Inc.,* 2006 WL 2389553, at *3 (N.J. Super. Ct. App. Div. Aug. 21, 2006)).

Here, weighed against the clear anti-assignment provisions present in forty-five of the plans, the Court does not find that BrainBuilders has met its burden to plausibly establish waiver under those plans. Plaintiffs cite no authority that persuades the Court that the anti-assignment provisions in dozens of Aetna plans (involving at least ninety patients) could be inferred to be waived or rendered unenforceable by one alleged example (involving two patients) of Aetna engaging in cross-plan offsetting. [10] Plaintiffs point to one case, *Lutz Surgical Partners PLLC v. Aetna, Inc.,* Civ. No. 15-02595, 2021 WL 2549343 (D.N.J. June 21, 2021), *vacated,* 2023 WL 2472403 (D.N.J. Feb. 8, 2023), but not only was *Lutz* vacated following a settlement by the parties—it is also largely inapposite. There, the crux of the plaintiffs' claims

was that Aetna's recovery policy was unlawful because Aetna withheld amounts allegedly overpaid to providers on behalf of Plan A (for services rendered to Plan A insureds) from payments due to providers of Plan B (for services rendered to Plan B insureds). *Id.* at *1. On summary judgment, the court declined to decide if such conduct constituted waiver and reserved on the question as to whether "Aetna, by undertaking cross-plan offsets, deemed the benefits as being owed to Plaintiffs and recognized Plaintiffs had a legal claim to the benefit payment." *Id.* at *10. In comparison, this case is focused on alleged underpayments or nonpayments of claims by Aetna—not overpayments that then resulted in cross-plan offsetting. Nor do Plaintiffs plausibly allege that Aetna has engaged in the same kinds of widespread billing practices at issue in *Lutz. See Atl. Plastic & Hand Surgery, PA v. Anthem Blue Cross Life & Health Ins. Co.*, Civ. No. 17-4600, 2018 WL 1420496, at *5 (D.N.J. Mar. 22, 2018) ("[C]ourts within this District routinely enforce unambiguous anti-assignment provisions contained in ERISA-governed plans, and thus, find that providers lack derivative standing to seek benefits from the plan on behalf of their patients." (collecting cases)).

 **\*7** Accordingly, because BrainBuilders is not a beneficiary or participant in Aetna's plans, and because the anti-assignment provisions in forty-five of the plans provided invalidate any purported assignment of benefits to BrainBuilders, BrainBuilders lacks standing to pursue the ERISA claims at issue under those plans, and Aetna's motion to dismiss is granted on this issue. [11]

### C. COUNT ONE—PLAN BENEFITS

Even if Plaintiffs have standing to sue for unpaid or underpaid health plan benefits under ERISA, Aetna argues that they do not state such a claim because the SAC does not identify the terms of the plans allegedly breached. (ECF No. 80-2 at 27-28.)

ERISA establishes "a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Specifically, Section 502(a)(1) provides that a "participant or beneficiary" may bring a civil action "to recover benefits due ... under the terms of [the] plan, to enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

To plead a plausible claim for benefits, a plaintiff "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006). Phrased differently, a plaintiff "must identify a term of the plan which [the defendant] allegedly breached." *Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health & Life Ins. Co.*, Civ. No. 20-10345, 2022 WL 1567797, at *3 (D.N.J. May 18, 2022); *see also Emami v. Cmty. Ins. Co.*, Civ. No. 19-21061, 2021 WL 4150254, at *5 (D.N.J. Sept. 13, 2021) ("The Complaint does not point to a specific provision within the ERISA Plan.... Rather, Dr. Emami vaguely pleads in his Complaint that '[d]efendants improperly denied benefits due ... under the terms of the Plan for the reasons set forth above.' Such an allegation is not enough.").

Plaintiffs contend that they sufficiently identify the ERISA plan terms breached where they allege that "all 56 Plans cover ABA therapy and mental therapy, including via out-of-network providers." (ECF No. 92 at 35-38.) Plaintiffs insist that they are not required to attach ERISA plan documents to their pleadings or to quote from the plans. (*Id.*) Although Plaintiffs may not be required to quote from or to attach ERISA plan documents at this stage, they must "identif[y] a particular [plan] provision ... which ... entitles [them] to benefits." *Shapiro v. Aetna, Inc.*, Civ. No. 22-1958, 2023 WL 4348601, at *4 (D.N.J. June 5, 2023). That is, they must show in some way—typically, through a description of the plan terms—that there is a plausible basis, not simply speculative, to infer that they are owed unpaid benefits under each plan.

 **\*8** In *Hudson Hospital OPCO, LLC v. Cigna Health and Life Insurance Company*, for example, the district court dismissed ERISA benefits claims where the plaintiffs did "not point to, describe, or quote any language from the actual Cigna Plans that, they claim[ed], entitle[d] them to reimbursement for elective services on the thousands of allegedly underpaid claims." Civ. No. 22-4964, 2023 WL 6439893, at *5 (D.N.J. Oct. 3, 2023) (Salas, J.). Collecting cases, the court explained that "judges in this district have required plaintiffs to do more than vaguely plead that benefits are due under the terms of the plan, and courts have required plaintiffs to 'tie [their] allegations of ERISA violations to specific provisions of an applicable plan.' " *Id.* at *6 (citations omitted). This is because "[o]nly the words of the Plan itself can create an entitlement to benefits." [12] *Id.* (quoting *Hein v. F.D.I.C.*, 88 F.3d 210, 215 (3d Cir. 1996)).

The court's approach in *Hudson Hospital* is consistent with many others in this District. *See, e.g., Gotham City*

*Orthopedics, LLC v. Cigna Health & Life Ins. Co.*, Civ. No. 21-1703, 2022 WL 2116864, at \*2 (D.N.J. June 13, 2022) (Wigenton, J.) ("Plaintiff asserts that, 'upon information and belief,' payment was required at the Usual Customary and Reasonable rates ... but fails to put forth a cognizable basis for its assertions or delineate the source of the information and belief undergirding the allegations. Such blanket assertions are insufficient under Rule 8."); *Univ. Spine Ctr. v. Anthem Blue Cross of California*, Civ. No. 19-12639, 2020 WL 814181, at \*6 (D.N.J. Feb. 18, 2020) (McNulty, J.) ("It is a plaintiff's duty to cite specific plan provisions that entitle it to recovery."); *E.S. by & through To.S. v. Marsh & McLennan Companies, Inc. Benefits Admin. Comm.*, Civ. No. 17-03351, 2019 WL 3928660, at \*6 (D.N.J. Aug. 20, 2019) (Hayden, J.) ("What is not identified in any way, however, is language in any other self-funded plan for which Aetna is the claims administrator that allegedly provoked the same application of the same criteria with the same result—in other words, the specific facts that would make plausible E.S.'s charge that in adopting its allegedly uniform codified criteria, Aetna breached its fiduciary duties ...."); *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, Civ. No. 11-2775, 2012 WL 762498, at \*15 (D.N.J. Mar. 6, 2012) (Simandle, C.J.) ("It is the Plaintiff's burden of proof to have the plan documents and cite to specific plan provisions when filing a civil complaint to obtain ERISA benefits. As the Plaintiff has not cited to or attached the plan documents for the remaining nine ERISA plans, the Plaintiff has failed to state a claim under ERISA's civil enforcement provision.").

\*9  Here, there are a few instances in the SAC where Plaintiffs identify language in plan booklets that they assert support their benefits claims: for the SCHI Plan (ECF No. 72 ¶¶ 131-134), Global Plan (*id.* ¶¶ 202-205), Citrin Plan (*id.* ¶¶ 225-226), and Wilner Plan (*id.* ¶¶ 246-248). Even if the Court accepts this as sufficient, those four plans cover only twelve patients. For the majority of the fifty-six plans and ninety patients, however, Plaintiffs do not cite to any particular plan provision. Rather, Plaintiffs base the alleged entitlement to health benefits on the cookie cutter assertion that, "[u]pon information and belief": each plan "permits a patient to obtain [out-of-network] health care services from providers who have not entered into contracts with Aetna," "provides covered benefits for patients with mental health illness including autism," and "reimburses for covered expenses by out-of-network providers." (*Id.* ¶¶ 255-257, 265-267, 280-282, 289-291, 298-300, 307-309, 318-320, 332-334, 343-345, 352-354, 361-363, 370-372, 379-381, 388-390, 397-399, 406-408, 415-417, 424-426, 433-435,

442-444, 451-453, 460-462, 469-471, 478-480, 487-489, 496-498, 505-507, 514-516, 523-525, 532-534, 541-543, 551-553, 560-562, 571-573, 580-582, 589-591, 598-600, 607-609, 616-618, 625-627, 634-636, 645-647, 654-656, 663-665, 672-674, 681-683, 690-692, 699-701, 708-710, 717-719, 726-728, 735-737.) Such allegations are not precise enough to elevate claims for unpaid benefits to a plausible level. The Court therefore finds that Plaintiffs have not stated ERISA benefits claims upon which relief can be granted for these plans.

Based on the substantial number of plans and patients impacted by this pleading defect, the Court will dismiss without prejudice Count One in its entirety and grant Plaintiffs an opportunity to submit a further amended pleading.

### D. COUNT TWO—BREACH OF FIDUCIARY DUTIES

Because the Court finds that Plaintiffs do not state their benefits claims in Count One, it is unnecessary to address whether Aetna has allegedly breached its fiduciary duties under 29 U.S.C. §§ 1104(a)(1) and 1132(a)(3) in connection with the benefits denials. "Absent a plausible claim for additional reimbursement," the Court need not "evaluate any alleged associated breach of fiduciary duty claim." *Univ. Spine Ctr. v. Anthem Blue Cross Blue Shield*, Civ. No. 17-9108, 2018 WL 3327930, at \*7 (D.N.J. July 5, 2018). Accordingly, Count Two is also dismissed without prejudice.

### E. COUNT THREE—DENIAL OF FULL AND FAIR REVIEW

Aetna argues that the Court should dismiss Count Three for denial of full and fair review in violation of 29 U.S.C. § 1133 because there is no separate cause of action under this section of ERISA. (ECF No. 80-2 at 34.) The Court concurs. In this District, it is settled that section 503, 29 U.S.C. § 1133, "does not provide an independent cause of action." *Advanced Orthopedics & Sports Med. Inst. on behalf of MS v. Anthem Blue Cross Life & Health Ins. Co.*, Civ. No. 20-13243, 2022 WL 13477952, at \*12 (D.N.J. Oct. 21, 2022); *see also Rahul Shah, M.D. v. Horizon Blue Cross Blue Shield*, Civ. No. 15-8590, 2016 WL 4499551, at \*11 (D.N.J. Aug. 25, 2016) ("Recent decisions in this District, faced with similar fact patterns and arguments, have also reached the conclusion that neither [s]ection 503 of ERISA, 29 U.S.C. § 1133, nor its accompanying regulation, 29 C.F.R. § 2560.503-1, gives rise to a private cause of action." (collecting cases)). To the extent Aetna is alleged to have failed to comply with the

requirements of 29 U.S.C. § 1133, this can be appropriately considered on review of a claim for denial of plan benefits. *See Advanced Orthopedics*, 2022 WL 13477952, at \*12 ("[C]omplying with § 503 may be 'probative of whether the decision to deny benefits was arbitrary and capricious.' " (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 851 (3d Cir. 2011))). And if it is found that Aetna has not conducted a full and fair review, "the remedy ... is to remand to the plan administrator so the claimant gets the benefit of [such] a ... review." *Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir. 2000). Accordingly, Count Three is dismissed without prejudice.

### F. COUNT FOUR—FAILURE TO PROVIDE PLAN DOCUMENTS

The fourth count of the SAC, for failure to provide plan documents, is asserted pursuant to Section 502(c)(1) of ERISA, which in relevant part provides:

> Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 [13] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

**\*10** [29 U.S.C. § 1132(c)(1).]

"In order to state a claim under § 1132(c)(1), a [plan participant or beneficiary] must allege that 1) it made a request to a plan administrator, 2) who was required to provide the requested material, but 3) failed to do so within 30 days of the request." *Spine Surgery Assocs. & Discovery Imaging, PC v. INDECS Corp.*, 50 F. Supp. 3d 647, 656 (D.N.J. 2014).

Here, Plaintiffs allege that "BrainBuilders, on behalf of the Aetna subscribers, requested plan documents, including documentation regarding how Aetna was calculating reimbursement for ABA therapy for Aetna insured patients who had assigned their insurance benefits to BrainBuilders." (ECF No. 72 ¶ 792.) Then Aetna, "[a]s the plan administrator, ... failed to provide the requested plan documents." (*Id.* ¶ 793.) According to Plaintiffs, "it has been

nearly 2,500 days since BrainBuilders requested certain plan documents." (*Id.* ¶ 795.)

These vague allegations are insufficient to plausibly state a claim under section 1132(c)(1). Essential factual matter omitted includes: on which participant's/beneficiary's behalf such a request (or requests) for documents was made, to which plan or plans such a request (or requests) was directed, and specific allegations that Aetna is in fact the plan administrator for the plan or plans at issue. Indeed, it is unclear if BrainBuilders is claiming that it directed a single request for documents to Aetna on behalf of all the insureds under fifty-six different plans or if it sent separate requests on behalf of each insured to each plan, or if it pursued some other course of action. While there is no "probability requirement at the pleading stage," a plaintiff must furnish "enough fact to raise a reasonable expectation that discovery will reveal evidence" in support of the elements of the claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Plaintiffs have not yet done so. Accordingly, Count Four is dismissed without prejudice.

### G. EXPRESS PREEMPTION OF BRAINBUILDERS' STATE LAW CLAIMS

Aetna argues that BrainBuilders' state law claims should be dismissed as expressly preempted by ERISA because they "relate to" ERISA plans and "all seek benefits provided under the [p]lan[s]." (ECF No. 80-2 at 37-40.) BrainBuilders disagrees, arguing that it should be allowed to plead its state law claims in the alternative. (ECF No. 92 at 48-52.) BrainBuilders says that the plans have "no bearing on [its] independent relationship" with Aetna that allegedly gives rise to its state law claims. (*Id.* at 52-55.)

A critical part of the ERISA scheme is section 514(a)—"a broad express preemption provision"—that states that ERISA " 'supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.' " *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020) (quoting 29 U.S.C. § 1144(a)). Congress aimed "to make clear that ERISA's mandates supplanted the patchwork of state law previously in place and to ensure that plans were not crippled by the administrative cost of complying with not only ERISA, but also innumerable, potentially conflicting state laws." *Id.*

**\*11**  Recognizing, however, that without any limiting principles the preemption provision could be stretched too far, the United States Supreme Court "has sought to craft

a functional test for express preemption, instructing that a state law 'relates to' an employee benefit plan if it has either (1) a 'reference to' or (2) a 'connection with' that plan." *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)). "The first applies '[w]here a State's law acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation.' The second covers state laws that 'govern[ ] ... a central matter of plan administration or interfere[ ] with nationally uniform plan administration,' and those state laws that have 'acute, albeit indirect, economic effects [that] force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.' " *Id.* (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016)).

To determine if a state law cause of action makes "impermissible 'reference to' ERISA plans," the Third Circuit has "distill[ed] two overlapping categories of claims 'premised on' ERISA plans: (a) claims predicated on the plan or plan administration, *e.g.*, claims for benefits due under a plan, or where the plan 'is a critical factor in establishing liability'; and (b) claims that 'involve construction of [the] plan[ ],' or 'require interpreting the plan's terms.' " *Id.* at 230 (citations omitted). To determine if a state law cause of action has a "connection with" an ERISA plan, the analysis "focus[es] primarily on whether claims (a) 'directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries'; (b) interfere with plan administration; or (c) undercut ERISA's stated purpose." *Id.* at 235 (citations omitted).

Where a complaint suggests that the out-of-network provider is seeking payment pursuant to an ERISA-governed plan or where the alleged source of the independent obligation stems from a member's ERISA-governed plan, district courts find common law claims to be preempted. In *AHS Hospital Corporation. v. Aetna Health*, for example, the district court found a hospital's common law claims expressly preempted when each was "dependent on [Aetna's] position as the insurer," and "[i]n fact, ... [the] overarching theory [wa]s that [the hospital was] owed payment pursuant to the plan." Civ. No. 22-6601, 2023 WL 3585265, at *1 (D.N.J. May 22, 2023) (Vazquez, J.). In support, the court pointed to arguments in the hospital's brief that the suit had been brought to recover benefits under the patient's plan. *Id.*

Similarly, in *Gotham City Orthopedics v. Aetna*, the court found the common law claims "clearly 'relate[d] to' the [p]atients' Aetna ERISA plans," relying on the fact that the complaint "repeatedly acknowledge[d] that the [p]atients were insured under ERISA plans and demand[ed] payment according to those plan benefits." Civ. No. 20-14915, 2021 WL 1541069, at *2 (D.N.J. Apr. 19, 2021) (Wigenton, J.). The court wrote that nothing in the complaint would "suggest any circumstances that would remove [p]laintiff's claims from the ERISA plans' scope and allow them to survive preemption." *Id.* at *3.

In contrast, where a complaint suggests that an out-of-network provider is seeking to enforce an obligation based not on an ERISA-governed plan but on independent representations or agreements between the provider and the insurer, district courts find common law claims to not be preempted. In *Premier Orthopaedic Associates of Southern NJ v. Anthem Blue Cross Blue Shield*, for example, the court declined to find the common law claims preempted when there was no pre-authorization letter to review and "nothing in the [c]omplaint direct[ed] th[e] [c]ourt to consider the patient's healthcare benefit plan." Civ. No. 22-02407, 2023 WL 3727889, at *4 (D.N.J. May 30, 2023) (Bumb, C.J.).

**\*12** Considering the above precedent, the Court finds that ERISA § 514(a) expressly preempts BrainBuilders' state law claims in this case. Both the SAC as well as BrainBuilders' opposition to the motion to dismiss confirm that BrainBuilders predicates its claims on what Plaintiffs assert is due under the terms of the insureds' ERISA plans. BrainBuilders cannot maintain state law claims parallel to ERISA claims when its own representations do not support the inference that there is a separate contractual relationship or obligation. *See* AHS Hosp. Corp., 2023 WL 3585265, at *3 ("Plaintiff's overarching theory is that it is owed payment pursuant to the plan. This is illustrated by Plaintiff's arguments in opposition to the motion .... Accordingly, Plaintiff's state-law claims are predicated on the plan and its administration.").

Notably, Plaintiffs write in their brief that they "simply seek for Aetna to pay for the treatment it is obligated to cover *under the individual plaintiffs' plans*" and that they take issue with Aetna's alleged decision, in or around July 2014, to stop paying for the services "pursuant to *the rates set forth in the Plans*" and to instead begin "denying and underpaying the submitted claims at lower, arbitrary, and inconsistent rates." (ECF No. 92 at 15-17 (emphases added).) And in the

SAC itself Plaintiffs repeatedly reference the patients' ERISA plans as the source of Aetna's obligations to both cover the autism therapy services and for the alleged rate Aetna should be paying for those services. (ECF No. 72 ¶ 104 ("The autism therapy services provided by BrainBuilders are *covered services under the PLANS* at issue. These *PLANS permit members to obtain covered services* from out-of-network ... providers ... and then require Aetna to pay for OON covered services using specified methodologies." (emphases added)); ¶ 106 ("Aetna previously reimbursed BrainBuilders for these services ... *in accordance with the PLANS'* documents ...." (emphasis added)); ¶ 108 ("On or about July 2014, Aetna ... reimbursed BrainBuilders at much lower ... rates that do not adhere with any *coverage or reimbursement provisions under the PLANS.*" (emphasis added)); ¶ 120 ("BrainBuilders is ... entitled to payment *under the PLANS* for the autism therapy services provided to Aetna's subscribers." (emphasis added)).)

In opposition, BrainBuilders contends that its state law claims are "on all fours" with those that the Third Circuit found not preempted in *Plastic Surgery Center*. (ECF No 92 at 53-54.) But that contention is inaccurate. In *Plastic Surgery Center*, the out-of-network provider contacted Aetna to discuss proposed surgeries for two patients—one patient insured by a plan that did not cover out-of-network services and another patient only covered for emergencies. *Plastic Surgery Ctr.*, 967 F.3d at 223-24. Over a series of telephonic conversations, Aetna agreed to cover the out-of-network provider's surgical procedures at agreed-upon reimbursement rates. *Id.* at 224. Then, after the procedures were performed, "Aetna allegedly refused to live up to its end of the bargain" and paid a fraction of what was billed. *Id.* Under those factual circumstances, the Third Circuit held that the out-of-network provider's common law claims for breach of contract and promissory estoppel were not expressly preempted, because the claims "arose precisely because there was no coverage under the plans for services performed by an out-of-network provider." *Id.* at 231. Instead, the provider's claims arose from an alleged separate agreement that the provider had worked out with Aetna. *Id.*

Here, in contrast, Plaintiffs allege that the autism therapy services were covered by the ERISA plans and Aetna failed to reimburse BrainBuilders for those services in accordance with the terms of the insureds' plans. (ECF No. 72 ¶¶ 104, 108 ("The autism therapy services provided by BrainBuilders are covered services *under the PLANS at issue.* ... On or about July 2014, Aetna ... [started] reimburs[ing] BrainBuilders

at much lower, arbitrary, and inconsistent rates that *do not adhere with any coverage or reimbursements provisions under the PLANS.*" (emphases added)).) Therefore, the allegations strongly suggest that BrainBuilders' state law claims arise not from a freestanding agreement reached with Aetna, but from the ERISA plans' coverage for out-of-network services. *See Advanced Orthopedics & Sports Med. Inst., P.C. v. Oxford Health Ins., Inc.*, Civ. No. 21-17221, 2022 WL 1718052, at *8 (D.N.J. May 27, 2022) ("Plaintiff has not alleged an 'ad hoc arrangement[ ] in which the provider agrees to render services (which are *not* covered by the terms of the plan).'" (emphasis in original) (quoting *Plastic Surgery Ctr.*, 967 F.3d at 229)). Under these factual circumstances, the Court finds that BrainBuilders has not plausibly established that its state law claims arise from a separate agreement with Aetna. Accordingly, BrainBuilders' state law claims are expressly preempted by ERISA § 514(a).

## H. PLAUSIBILITY OF STATE LAW CLAIMS

**\*13** Even if some of the state law claims (under New Jersey statutes and for tort) are not expressly preempted, the Court finds them presently subject to dismissal for failure to state a claim.

There is an open question as to whether a private cause of action exists for Count Five under the HINT Act and HCAPPA as well as for Count Eight under New Jersey's Autism Mandate. BrainBuilders cites no court that permits a private cause of action to be maintained under the Autism Mandate, and the statute does not explicitly contemplate private enforcement; rather, it repeatedly references New Jersey's Commissioner of Banking and Insurance. *See* N.J. Stat. Ann. § 17B:27A-19.20. As to the HINT Act and HCAPPA, New Jersey's Appellate Division recently recognized that whether the statutes create an implied private right of action, or whether enforcement authority rests solely with the Department of Banking and Insurance, has not yet been definitively decided. *See Marc S. Menkowitz, MD LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 2023 WL 5447697, at *3 (N.J. Super. Ct. App. Div. Aug. 24, 2023) ("[W]e agree with [the trial court's] decision not to decide whether the HINT Act or HCAPPA create a private right of action for recovery of interest on late payments of claims."). In this District, however, Judge McNulty analyzed the HINT Act's and HCAPPA's statutory scheme as well as relevant precedent before ultimately "declin[ing] to imply a private right of action to seek damages." [14] *MHA, LLC v. Amerigroup Corp.*, 539 F. Supp. 3d 349, 359 (D.N.J. 2021). Given this

backdrop, this Court is reluctant to expand the scope of New Jersey law and to find private causes of action under either the HINT Act, HCAPPA, or New Jersey's Autism Mandate when no such right has been expressly set forth in the text of the statutes by the New Jersey Legislature. *See Zanetich v. Wal-Mart Stores E., Inc.*, Civ. No. 22-05387, 2023 WL 3644813, at *5 (D.N.J. May 25, 2023) ("This Court's analysis is guided by federal courts' reluctance to interpret a state statute to create a private right of action where a private right of action is not expressly stated in the statute.").

Count Six for declaratory judgment is duplicative of Plaintiffs' substantive claims, and it is well settled that "[c]ourts may dismiss [ ]claims requesting declaratory judgment where they are redundant." *Lilac Dev. Grp., LLC v. Hess Corp.*, Civ. No. 15-7547, 2016 WL 3267325, at *3 (D.N.J. June 7, 2016). Particularly where, as here, "the plaintiff seeks declaratory relief simply to 'resolve the parties' obligations" that are at issue in other contract-based claims, a court can "dismiss claims for declaratory judgment that are duplicative." *Golden State Med. Supply Inc. v. AustarPharma, LLC*, Civ. No. 21-17137, 2022 WL 2358423, at *7 (D.N.J. June 30, 2022) (quoting *AV Design Servs., LLC v. Durant*, Civ. No. 19-8688, 2021 WL 1186842, at *12-13 (D.N.J. Mar. 30, 2021)).

**\*14** Count Seven for injunctive relief may be dismissed because such an application is a request for a remedy and is not a separate cause of action. *See Chruby v. Kowaleski*, 534 F. App'x 156, 160 n.2 (3d Cir. 2013) ("We agree ... that an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary."); *see also Hartman v. Borough*, Civ. No. 21-01735, 2022 WL 2513043, at *5 (M.D. Pa. July 6, 2022) ("A plaintiff may request injunctive relief as a remedy, but not as a separate cause of action; if a plaintiff does so, it can be dismissed."); *Schraeder v. Demilec (USA) LLC*, Civ. No. 12-6074, 2013 WL 3654093, at *5 (D.N.J. July 12, 2013) (dismissing counts for injunctive relief as separate causes of action, but declining to address requests for injunctive relief as remedies for other claims, "because at this stage in the litigation, before a substantial factual record has been developed, it would be premature to determine what remedies are appropriate").

Counts Ten and Eleven for tortious interference with business relations and with prospective economic advantage do not, among other things, identify a single patient actually lost as a result of Aetna's alleged interference. *See, e.g., Magic Reimbursements LLC v. T-Mobile USA, Inc.*, Civ.

No. 22-02121, 2023 WL 4866930, at *8 (D.N.J. July 31, 2023) ("[C]ourts in this Circuit have held that claims for tortious interference must plead the existence and identity of at least a single, specific customer lost as a result of the alleged interference." (collecting cases)). BrainBuilders merely alleges that it has "had to begin turning Aetna-insured patients away," (ECF No. 72 ¶ 749), but such a "vague allegation that unknown, prospective [patients] may have been lost [is] [in]sufficient to survive dismissal." *New Jersey Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 310 (D.N.J. 2015).

The remaining counts—for conversion, quantum meruit, unjust enrichment, breach of implied contract, and promissory estoppel—are the kinds of claims traditionally found expressly preempted when they are based, as here, on the alleged denial or underpayment of benefits pursuant to an ERISA-governed plan. *See, e.g., Plastic Surgery Ctr.*, 967 F.3d at 241 (holding unjust enrichment claim expressly preempted because the claim requires a court to find an ERISA plan exists to show that Aetna "received a benefit"); *Advanced Orthopedics*, 2022 WL 1718052, at *8 ("Plaintiff's implied contract, breach of warranty of good faith and fair dealing, and promissory estoppel claims 'relate' to an ERISA plan, ... and accordingly, are preempted."); *Roche v. Aetna, Inc.*, 167 F. Supp. 3d 700, 711 (D.N.J. 2016) (dismissing state law claims for breach of contract, duties related to contract, conversion, and unjust enrichment as expressly preempted under ERISA).

## IV. LEAVE TO AMEND

Because this is the first dismissal and because the claims have been dismissed without prejudice, the Court will grant Plaintiffs forty-five days to file a further amended complaint to try to remedy the defects in their pleading. *See, e.g., In re: Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 739 (D.N.J. 2016).

## V. CONCLUSION

For the reasons set forth above, and other good cause shown, Aetna's Motion to Dismiss (ECF No. 80) the Second Amended Complaint (ECF No. 72) is **GRANTED**. An appropriate Order follows.

## All Citations

Slip Copy, 2024 WL 358152

## Footnotes

1   On motions to dismiss pursuant to Rule 12(b)(6), courts accept as true all well-pleaded facts in the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

2   Some of the patients are no longer children. (*See* ECF No. 71 at 6 ("Because several of the patients are no longer minors, Plaintiffs revised the language to reflect that.").)

3   The plans include the 315 Arch St Realty LP Plan, Adapt Health Plan, ADP Plan, Amazon Plan, Amneal Pharmaceuticals Plan, Amtrak Plan, Arup US Inc. Plan, Bank of America Plan, Bausch Health US LLC Plan, Beach Street Plan, Bed Bath & Beyond Plan, Beth Medrash Govoha of America Inc. Plan, Bristol Myers Squibb Plan, Central Jersey HIF Plan, CFGI LLC Plan, Citibank Plan, Citrin Cooperman & Company, LLP Open Access Elect Choice—Low Plan ("Citrin Plan"), Clark Board of Education Plan, Cognizant Plan, Cohn Reznick Plan, Diligence Research Group Plan, Docusign Inc. Plan, Extensis Plan, Global Healthcare Fiscal Services Group LLC Open Access Managed Choice Plan ("Global Plan"), Icon Clinical Research LLC Plan, IMS Technologies Plan, Infosys Limited Plan, Johnson & Johnson Plan, Justworks Employment Group Plan, Lockheed Martin Corp. Plan, Mail Handlers Benefit Plan, New Roads Healthcare Plan ("New Roads Plan"), New York Post Plan, OFS Fitel LLC Plan, Pacira Pharmaceuticals Inc. Plan, Perth Amboy Board of Education Plan, Pridestaff Inc. Plan, Ray Builders Inc. Plan, Reckitt Benckiser LLC Plan, RJ Brands LLC DBA Chefman Plan, SAP America Plan, School for Children with Hidden Intelligence Open Access Managed Choice Plan ("SCHI Plan"), Southern Coastal HIF Plan, Superb Staffing Services Plan, Taiho Oncology Inc. Plan, Tata Consultancy Services Plan, Telos Plan, TIAA Consumer Choice Plan, Toms River Regional Schools Plan, Transamerica Corporation Plan, Trinet Group Plan, Tryko Partners Plan, Unisys Plan, Veranova Plan, Walmart Plan, and the NJ Silver OAMC 2500 90/70 PY HAS TIF Small Group Health Benefits Plan ("Wilner Plan"). (ECF No. 72 ¶ 3.)

4   "CPT" refers to the Current Procedures Terminology, which is a system for coding medical services and procedures.

5   FAIR Health "is a national, independent, nonprofit organization dedicated to bringing transparency to healthcare costs and healthcare insurance information and data products, consumer resources and health systems research support." *Univ. Physicians Assocs. v. Transp. Drivers, Inc.*, 2017 WL 3597249, at *2 n.4 (N.J. Super. Ct. App. Div. Aug. 22, 2017) (citation omitted).

6   Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

7   The two cases cited by Aetna do not compel a different result. In *Franco v. Connecticut Gen. Life Ins. Co.*, a panel of the Third Circuit Court of Appeals, in a non-precedential opinion, considered standing for a claim under the Racketeer Influenced and Corrupt Organizations Act (not ERISA), and summarily affirmed without providing reasoning. 647 F. App'x 76, 81 (3d Cir. 2016). And in *Bryant v. Am. Seafoods Co.*, the plaintiffs did not show that "any medical provider was dissatisfied with an employer's initial payment." 348 F. App'x 256, 257 (9th Cir. 2009). Here, in contrast, it is evident that BrainBuilders is dissatisfied with Aetna's rate of reimbursement. *Bryant*, moreover, was followed by a precedential opinion from the Ninth Circuit Court of Appeals, which held that "[n]o one ... would contend that the beneficiaries [of an ERISA plan] would have lacked Article III standing," even if the provider had not yet "sought to recover from its patients any shortfall." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014).

8   Aetna did not respond to Plaintiffs' assertion that the Bank of America Plan anti-assignment language is limited to the context of long-term disability. (ECF No. 80-22 at 3; ECF No. 92 at 29 n.15.) Further, the

Pridestaff Plan merely states that "[a] direction to pay a provider is not an assignment of legal rights." (ECF No. 80-36 at 3.) No explanation is given for how such language can foreclose an assignment. For the Unisys Plan, the parties do not explain how the seemingly conflicting language should be interpreted. The plan states that an insured "may assign [their] right to benefits to a provider who rendered medical ... services" and then states that "[c]overage and [their] rights under this plan may not be assigned." (ECF No. 80-50 at 3.) For the Walmart Plan, no anti-assignment language appears in the excerpt from the summary plan description that has been submitted. (ECF No. 80-52 at 3.) For these four plans, the Court reserves judgment on the enforceability of the anti-assignment provisions.

9   Both parties cite New Jersey law, and the Court concurs that New Jersey law is applicable.

10   Plaintiffs does not support with well-pleaded factual matter its conclusory allegation that Aetna generally "treat[s] the [i]ndividual Plaintiffs as one account." (ECF No. 72 ¶ 123.)

11   As noted above, the Court has reserved judgment on the enforceability of the anti-assignment provisions in the Bank of America, Pridestaff, Unisys, and Walmart Plans, which cover five patients (W.F., I.C., D.C., J.M., and Z.M.). Aetna also did not submit the anti-assignment provisions from seven plans that allegedly cover the claims of seven patients in this case: Wilner Plan (patient A.W.), Diligence Research Group Plan (patient S.O.), Docusign Inc. Plan (patient J.C.(1)), Mail Handlers Benefit Plan (patient J.C.(2)), Southern Coastal HIF Plan (patient D.D.), Citibank Plan (patient R.M.), and Taiho Oncology Inc. Plan (patient D.N.). Due to this omission, the Court cannot now find that those plans contain valid anti-assignment provisions that foreclose BrainBuilders from suing for benefits thereunder as an assignee.

12   The court highlighted an opinion from the Southern District of Florida, *Sanctuary Surgical Centre, Inc. v. UnitedHealth Group, Inc.*, where the plaintiffs sought out-of-network benefits under "at least 300 different health insurance plans governing 996 derivative ERISA benefit claims asserted on behalf of approximately 500 different patients." Civ. No. 10-81589, 2013 WL 149356, at *1 (S.D. Fla. Jan. 14, 2013). There, the district court dismissed the ERISA benefits claims, reasoning that the "plaintiffs must at least identify the specific plan provisions under which coverage is conferred with respect to *each* of the 996 derivative ERISA claims identified in its complaint, and to allege sufficient facts to plausibly show the services rendered to each patient were indeed covered under that *particular* plan." *Id.* at *3 (emphases in original). The court wrote that "[w]ithout a precise description of the relevant coverage and exclusionary language of all plans, ... plaintiffs fail[ ] to state plausible ERISA benefits claims upon which relief can be granted." *Id.* at *6.

13   The penalty for an administrator's failure to respond to a request for information was increased to $110.00 per day for violations after July 29, 1997. *See* 29 C.F.R. § 2575.502c-l.

14   BrainBuilders cites to a non-precedential decision from a trial court in Hudson County Superior Court that declined to dismiss private causes of action under the HINT Act and HCAPPA. *See New Jersey Brain and Spine, PC v. Independent Care Group Plus Trust,* 2021 WL 1511282, at *8 (N.J. Super. Ct. Law Div. Apr. 12, 2021).

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax : (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*Pro Hac Vice*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*Pro Hac Vice*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. )<br><br>Plaintiff )<br><br>vs. )<br><br>HORIZON HEALTHCARE SERVICES, INC., )<br>d/b/a HORIZON BLUE CROSS BLUE )<br>SHIELD OF NEW JERSEY, HORIZON )<br>HEALTHCARE OF NEW JERSEY, INC., and )<br>DOES 1-20, inclusive. )<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION<br><br>DOCKET NO.: GLO-L-000242-24<br><br>CIVIL ACTION<br><br>**OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

## A.    INTRODUCTION

Emergency room physicians are required by law to treat individuals who require

emergency care. Meanwhile, health insurers like Horizon Healthcare Services, Inc. d/b/a Horizon

Blue Cross Blue Shield of New Jersey, Horizon Healthcare of New Jersey, Inc., and DOES 1-20,

inclusive (collectively "Defendants") are required to cover emergency care for their members.

The emergency room physicians involved in this dispute, NES America, Inc., and NES Georgia,

Inc. (collectively "NES"), fulfilled their obligations under the law and rendered emergency care

to Defendants' members. Unfortunately, Defendants either failed to pay or significantly underpaid NES for the care provided.

Plaintiff Healthcare Justice Coalition DE Corp. ("Plaintiff") works with NES and other emergency physician groups to ensure they are being properly paid by health plans such as Defendants. Though Plaintiff has purchased NES' accounts and has been assigned the right to sue thereon, Defendants mischaracterize Plaintiff as a "debt collector."  A debt collector works to obtain payment on a debt on behalf of a creditor and bears no risk if the debt remains uncollected. Plaintiff, in contrast, not only purchased the amounts that Defendants owe to NES but maintains an ongoing partnership with them.  Through this two-way partnership, Plaintiff assumes the risk, uncertainty and cost of helping NES pursue the fair payment it is owed from Defendants.

In this action, Plaintiff seeks to hold Defendants accountable through three causes of action: (1) quantum meruit; (2) implied contract; and (3) violation of New Jersey Health Claims Authorization, Processing, and Payment Act ("HCAPPA"). The Motion seeks to dismiss Plaintiff's lawsuit on various grounds, none of which have merit. For instance, Defendants contend that Plaintiff lacks standing to bring the causes of action at issue. But as the sole owner of the physicians' validly-assigned accounts, Plaintiff has prudential standing and may validly rely upon the injury-in-fact suffered by Physicians. Plaintiff seeks damages in its own right. It is the appropriate party to initiate this lawsuit.

Defendants also argue that Plaintiff cannot allege a quantum meruit claim because they were not "benefited" by the emergency services provided by NES.  Under their misguided theory, only the patients—who were Defendants' members and insureds—received such a benefit.  Defendants' argument is flatly inconsistent with black letter New Jersey law.  The New

Jersey Supreme Court has confirmed that out-of-network emergency providers that fulfill the duty of another to provide emergency services and care are entitled to restitution in quasi contract. *Saint Barnabas Med. Ctr. v. Cty. of Essex*, 111 N.J. 67, 79 (1988).

The Complaint alleges that Defendants were obligated to provide emergency services and care to their members. Defendants did not, however, render such care through their network of emergency providers. Rather, it was NES physicians, who are not contracted with Defendants, who fulfilled Defendants' duty.  NES, through its physicians, did so unofficiously, consistent with their own legal obligations, and with the intent to charge for their services. In so doing, NES fulfilled Defendants' legal duty, and thereby conferred a benefit on Defendants. Defendants unjustly retained that benefit by paying NES significantly less than the reasonable value of those emergency services and pocketing the difference in profits. The essential facts of this case are indistinguishable from those of *Saint Barnabas*.  Thus, the cause of action for quantum meruit must be allowed to proceed.

Defendants likewise fail to prove that Plaintiff does not plead a valid claim for implied contract. Contrary to Defendants' contentions, Plaintiff sufficiently alleges the parties entered into an implied contract, wherein NES provided emergency services to Defendants' members and that Defendants were obligated to pay for those services on their members' behalf. Defendant breached this contract by failing to fulfill its payment obligations correctly for the services provided by NES, and Plaintiff suffered damages as a result. All elements of an implied contract have been properly pled. *See generally Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007).

Defendants' final argument is that HCAPPA does not provide a private right of action for Plaintiff to pursue its claims against Horizon.  However, New Jersey courts have made clear that

an *implied* private right of action can exist even where the Legislature has not expressly authorized such an action. "To determine if a statute confers an implied private right of action, courts consider whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative schedule to infer the existence of such a remedy." *R.J. Gayados Ins. Agency, Inc. v. Nat'l Consumer Ins. Co*., 168 N.J. 255, 272 (2001). Plaintiff's claim meets all these criteria. The Motion to Dismiss should be rejected in full for all the reasons provided herein.

## B.    SUMMARY OF ALLEGATIONS

NES provided emergency services to Defendants' members at hospital emergency departments pursuant to both state and federal laws obligating them to do so. (Compl. ¶¶ 13-14, 21-22). Defendants were obligated under the law to cover these emergency services for their members and received the benefit of NES discharging Defendants' legal and contractual obligations to their members. (Compl. ¶¶ 38-39). Defendants failed to reimburse NES for the emergency services rendered. (Compl. ¶ 44). NES has since assigned to Plaintiff their right to recover the amounts owed, and Plaintiff has been assigned both the uncollected accounts and all right to sue thereupon. (Compl. ¶ 14). Plaintiff sues for quantum meruit, implied contract and violations of HCAPPA.

## C.    LEGAL STANDARD

On a motion to dismiss, the court is to take all reasonable inferences in favor of plaintiff and is to strictly ascertain the "legal sufficiency" of the facts contained within the complaint. *Printing Mart-Morristown v. Sharp Electronics Corp*., 116 N.J. 739, 772 (1989). In reviewing a complaint on a Rule 4:6-2(e) motion, the court is directed to make a thorough and liberal search

of the complaint to determine whether a cause of action may be gleaned even from an obscure allegation, even giving the opportunity to amend if necessary. *Id*.

**D.     ARGUMENT**

1.     <u>The Complaint Properly Alleged That Plaintiff Purchased The Claims at Issue From NES And That It Is The Owner of Those Claims</u>

Defendants argue that Plaintiff lacks standing to assert any of NES's claims because it fails to properly allege a valid assignment.  This misrepresents the allegations and scope of the Complaint.  When viewed in the light most favorable to Plaintiff, the allegations establish a clear inference that Plaintiff has <u>purchased</u> the claims in their entirety and, as their sole owner, has the right to sue Defendants.  *See, e.g.* Compl. ¶¶ 1, 13–14, 22–23, 45, and 57.  This is all that is required to satisfy New Jersey pleading standards.  *See* N.J. Court Rules, R. 4:5–7 (requiring that "[e]ach allegation of a pleading shall be simple, concise and direct, and no technical forms of pleading are required.").

Defendants also insist that Plaintiff must provide express proof of its assignment from the NES physicians, or even include the assignment itself with the Complaint.  But New Jersey law requires no particular form of assignment.  Rather, a valid assignment requires only "evidence of the intent to transfer one's rights" and a sufficient description to make the assignment "capable of being readily identified."  *See K. Woodmere Assocs., L.P. v. Menk Corp.*, 316 N.J. Super. 306, 314 (1998); *see also New Century Fin. Servs., Inc. v. Oughla*, 437 N.J. Super. 299, 319 (App. Div. 2014) (confirming that an assignment from one party to another "need not specify each account transferred" because "the key is the intent of the assignor").  The facts of the Complaint allege a valid sale of the outstanding claims by NES to Plaintiff, along with an assignment of all associated rights to pursue the unpaid balances. Nothing more is required under New Jersey law.

The right assigned by NES to Plaintiff—the right to bring an action to recover a debt, money, or thing—is a chose in action, and "a chose in action has almost time out of mind been assignable." *Morris v. Glaser*, 106 N.J. Eq. 585, 610 (Ch. 1930) *aff'd* 110 N.J. Eq. 661; *see also* N.J.S.A 1:1–2 (defining a chose in action in the statutory definition of "personal property"). Neither the New Jersey Rules of Court nor New Jersey state law impose a heightened pleading standard on such assignments. *See* N.J. Court Rules, R. 4:5-7 (noting that "no technical forms of pleading are required."). Rather, all that is required is that pleadings "fairly apprise [th]e adverse party of the claims and issues to be raised at trial." *Bauer v. Nesbitt*, 198 N.J. 601, 610 (2009).

Here, Plaintiff alleges that NES physicians rendered emergency services to Defendants' members pursuant to state and federal law compelling them to do so, (Compl., ¶ 21); that the NES physicians did so on an out-of-network basis, (*id.* ¶ 24); and that Defendants owe NES additional payments because they refused to pay the reasonable value for such services, (*id.* ¶¶ 45, 57.) Importantly, the Complaint also alleges that NES has since "assigned those accounts and the right to sue thereupon" to Plaintiff. (*Id.* ¶ 14.) These allegations set forth all the facts necessary to establish a valid assignment.

As a result of the valid purchase agreement and assignment of claims, Plaintiff has standing to sue Defendants in equity for restitution. "New Jersey's statutory and case law favoring assignments," which incorporates "common-law assignment principles," permit assignees to assert all the rights possessed by the assignor. *Inv'rs Bank v. Torres*, 243 N.J. 25, 29 (2020) (holding that assignee of bank had the right to collect on unpaid mortgage debt); *accord Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (holding that assignee "has standing to assert the injury in fact suffered by [an] assignor).

Defendants' arguments to the contrary rely entirely on inapplicable federal case law concerning federal claims. Every cited case concerns an assignment of a patient's benefits, which is a pre-requisite for a provider to bring a denial of benefits claim pursuant to 29 U.S.C. § 1332(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"). *See NJSR Surgical Center, LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 979 F.Supp.2d 513, 522–23 (D.N.J. 2013) (examining whether the plaintiffs had adequately pled that they had "derivative standing to bring ERISA claims by virtue of assignments from their patients"); *Minisohn Chiropractic & Acupuncture Ctr., LLC v. Horizon Blue Cross Blue Shield of New Jersey*, No. 23-cv-01341 (GC)(TJB), 2023 U.S. Dist. LEXIS 212016, at *5 (D.N.J. Nov. 29, 2023) (analyzing whether plaintiff "lack[ed] statutory standing to purse their claims under ERISA" because they allegedly failed to adequately plead they had been assigned patient's claims for benefits); *Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*, No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024) (same).

Unlike in these cases, <u>Plaintiff does *not* plead a claim for ERISA benefits.</u> Plaintiff does not, in this action, sue for benefits under any ERISA-governed benefit plan. Rather, the Complaint asserts causes of action belonging to NES itself under New Jersey state law. Such rights—such as the right to sue in quantum meruit for the reasonable value of emergency services—do not depend on the terms of any benefit plan. Nor do they depend upon any patient's entitlement to such benefits under any such plan. Defendants' attack is therefore fundamentally misguided. Because NES does not assert the rights belonging to any patient under any ERISA plan, the standard for pleading the assignment of such patient rights simply

does not apply.[1]  Plaintiff has alleged a valid assignment of NES' rights that supports standing in this action.

      2.    <u>Plaintiff Alleges a Valid Claim For Quantum Meruit</u>

To state a quantum meruit claim, "a plaintiff must show both that the defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). Defendants present a single argument in support of their motion to dismiss this claim: that the emergency services provided by the NES Physicians benefited Defendants' members and not Defendants.  (Motion at 8.)

The allegations in the Complaint prove otherwise.  Specifically, Plaintiff avers that

> Defendants were obliged to provide emergency care to their Members.  When those members presented to the emergency room, Physicians fulfilled that obligation on Defendants' behalf.

(Compl. ¶ 38.)  The Complaint then alleges that "Defendants used and enjoyed the benefit of Physicians' services because Physicians helped Defendants discharge their legal and contractual obligation to their insureds to provide them with emergency care."  (*Id*. ¶ 39.)

In *Saint Barnabas Med. Ctr. v. Cty. of Essex*, the New Jersey Supreme Court held that a hospital could recover in quantum meruit for emergency medical services <u>specifically</u> because the hospital discharged defendant's duty to provide such care. 111 N.J. 67, 79 (1988).  There, the defendant, the County of Essex, was statutorily obligated to provide emergency care, but could not provide it.  *Id*. at 70.  The patient was then transported to the hospital for treatment at its specialized burn unit.  *Id*.  Under these circumstances, the Court determined that defendant had unjustly received and retained a benefit and was liable for the reasonable value of those

---

[1] ERISA only permits a claim for plan benefits to be brought by a "participant" or "beneficiary" of such a plan. 29 U.S.C.§ 1132 (a).  Thus, physicians who seek to sue under ERISA may do so, if at all, based on an assignment of rights from such a participant or beneficiary.

emergency services.  *Id.* at 79-80 (observing that "[i]n the case of actual contracts the agreement defines the duty, while in the case of *quasi* contract the duty defines the contract") (citing, inter alia, *Insulation Contracting & Supply v. Kravco, Inc.*, 209 N.J. Super. 367, 376 (App.Div.1986)).  *See also Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (N.J. 2002) (allowing quantum meruit recovery where defendants benefitted); *cf. Bellucci v. Dunn*, No. NNH CV21-6117238 S, 2023 WL 7381560, 2023 Conn. Super. LEXIS 2600 , at *8 (Super. Ct. Oct. 30, 2023) (analogous discharge of duty supporting unjust enrichment claim).

 Here, Defendants had a duty to provide emergency care to their members and insureds through their network of emergency providers.  NES, through its emergency physicians, performed that duty on Defendants' behalf.  (Compl. ¶¶ 37, 38.)  They did so unofficiously and with the intent to charge therefor.  (*Id.* ¶¶ 40, 36 (quoting Restatement of Restitution (1937) Section 114, titled "Performance of Another's Duty to a Third Person in an Emergency").)  On these facts, black letter law compels the conclusion that Defendant received a benefit and that restitution is due and owing to Plaintiff (as NES' assignee and the owner of the claims).  *See, e.g.*, Restatement (First) of Restitution § 114; Restatement (Third) of Restitution and Unjust Enrichment § 22, Illustrations 10, 12).  Indeed, Illustration 12 in Section 22 of the Restatement (Third) was modeled after the *Saint Barnabas* decision itself.  This underscores that restitution is readily available under the circumstances alleged in the Complaint.

 At least one Gloucester County trial court has followed these principles to find that defendant insurers benefit from the rendering of out-of-network emergency care.  In *Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group Inc., et al.*, GLO-L-1196-20 (CBLP), UnitedHealth Group ("United") moved to dismiss a claim for quantum meruit brought by an emergency physician practice group.  United argued that a plaintiff bringing a

claim for quantum meruit under New Jersey law must have rendered the services at issue to the

defendant.  United moved to dismiss the claim for quantum meruit on the grounds that the

services rendered by the emergency physicians benefited United's members, and not United.

Judge James R. Swift rejected the argument, noting:

> [United] received a benefit by paying the plaintiffs a rate of
> reimbursement significantly less than a reasonable rate.  They were
> able to pocket the difference in profits while simultaneously
> discharging its contractual obligation to pay for out-of-network
> emergency care for its members.  Though the benefit conferred is
> not direct, there is arguably a benefit conferred to the defendants.

(*Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group Inc., et al.*,

GLO-L-1196-20 (CBLP) (Super. Ct. Aug. 24, 2022), at 9 (the "*Atlantic ER Physicians Team*"

decision), attached as Exhibit A to the Certification of Dante Parenti Supp. Opp'n to Defts.'

Motion to Dismiss ("Parenti Cert.").)  In denying United's motion to dismiss, the Court relied on

allegations in the plaintiff's complaint that "United used and enjoyed the benefit of Plaintiff's

services because Plaintiffs help United discharge its legal and contractual obligations to its

insureds to provide them with emergency care."  (*Id*. at pp. 8–9.)

Defendants rely on older federal case law that ignores the rulings of the New Jersey

Supreme Court.  But even *federal* courts in New Jersey now reject Defendants' argument.  *See*

*MedWell, LLC v. Cigna Corp.*, Civ. No. 20-10627 (KM) (ESK), 2021 WL 2010582, at *5

(D.N.J. May 19, 2021) ("although some courts in this District had accepted" the argument that

the insurer is not benefitted by services rendered to the patient, "Third Circuit precedent now

forecloses it"); *MHA, LLC v. Amerigroup Corp.*, 539 F.Supp.3d 349, 361 (D.N.J. 2021) (similar).

Some of Defendants' cases are also factually distinguishable because they involved non-

emergency claims.  *See, e.g., Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-cv-

2775 (JBS)(JS), 2012 WL 762498, at *2 (D.N.J. Mar. 6, 2012).  Both state and federal courts,

then, reject Defendants' position.  Plaintiff's quantum meruit claim must be allowed to proceed.

To find otherwise would enable Defendants, and insurers everywhere, to pay nothing at all to

emergency providers for life-saving care.  The Court should not countenance such an absurd and

unjust result.

       3.     <u>Plaintiff Properly Alleges Breach of Implied Contract</u>

      Plaintiff's complaint sufficiently pleads facts to show the requisite elements of an implied

contract claim. In order to establish a valid implied contract claim, Plaintiff must allege facts

showing that: (1) the parties entered into a valid contract; (2) that Defendants did not perform its

obligations under the contract, despite Plaintiff performing its obligations; and (3) that Plaintiff

suffered damages as a result. *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007).

      Defendants contend that Plaintiff's cause of action should be dismissed because the

Complaint purportedly does not include allegations of fact to support the formation of a contract.

This ignores the plain allegations of the Complaint.  Plaintiff properly alleges that Defendants

and Plaintiff entered into an implied contract wherein Plaintiff would provide emergency

medical services to members of Defendants' health plans and that Defendants understood they

"necessarily had to pay the reasonable value for the emergency services rendered by" Plaintiff.

(Compl. ¶ 51). An implied contract "is a true contract arising from mutual agreement and intent

to promise, but in circumstances in which the agreement and promise have not been verbally

expressed. The agreement is rather inferred from the conduct of the parties." *In re Penn. Cent.*

*Transp. Co*., 831 F.2d 1221, 1228 (3d Cir. 1987). Defendants routinely represent that their health

plan members are able to go to any hospital emergency room and that such services are covered

by Defendants, with members paying only cost-sharing features of the plan (copayments,

coinsurance, and deductibles) at an in-network level. (Compl. ¶ 48). When the emergency room

physicians happen to be out-of-network (and Defendants do not have a formal agreement with

<div align="right">Page **11** of **20**</div>

them to provide services), Defendants, must therefore make the necessary arrangements.  That is precisely what the Complaint alleges here: an implied agreement between Defendants and NES. Plaintiff, via its assignment, is now entitled to pursue the reasonable value of the services.

Defendants contend the facts do not reveal a "promise to pay" on their part.  Not so. Pursuant to the course of dealing alleged in the Complaint, Defendants created an expectation that NES could expect to be paid the reasonable value of their services. In reliance on such expectations, NES rendered out-of-network emergency services to Defendants' members. (Compl. ¶¶ 37-41).  Defendants routinely sent Explanation of Benefit (EOB) forms to NES that acknowledged Defendants' obligation to pay the reasonable value for emergency services - and frequently paid at least some amount. (Compl. ¶¶ 52-54). If there was no "promise to pay," then why did Defendants repeatedly remit payment, along with EOBs stating that members could not be billed for the remaining balance?

When the allegations are viewed in the light most favorable to Plaintiff, Plaintiff has alleged sufficient facts to determine the terms of an implied-in-fact contract, namely a promise to provide out-of-network services in return for a promise to pay Plaintiff's usual, customary and reasonable charges. *See MHA, LLC. V. Wellcare Health Plans, Inc*., Dkt. No. ESX-L-003949-19, 2020 WL 1427919 at*18, 2020 N.J. Super. Unpub. LEXIS 4871, *51 (Essex Cty. Sup. Ct. Mar. 17, 2020) (denying a motion to dismiss because complaint similarly alleged Defendants promised to pay NES's charges, including usual, customary, reasonable charges under an implied-in-fact contract obligation).

Defendants also received ample consideration for its agreement with NES. Defendants' members and insureds, after all, pay premiums to Defendants *specifically* so that they will be covered in the event of an emergency.  (*Id*. ¶ 49.)  NES then fulfilled Defendants' statutory and

legal obligations to cover their members' emergency care. (Compl. ¶¶ 48-54).  But despite receiving the full benefit of its bargain with NES, Defendants failed to live up to their end of the bargain by paying NES for the reasonable value of those services.

The New Jersey cases cited by Defendants are wholly distinguishable.  *Modern Orthopaedics of New Jersey* involved non-emergency care that was rendered pursuant to a prior authorization. *Modern Orthopaedics of New Jersey v. United HealthCare Services, Inc.*, No. PAS-L-003127-22, at *4 (N.J. Super. Ct. July 21, 2023).  In contrast, the Complaint alleges a course of dealing and conduct that arose when NES provided *emergency care* to Defendants' members.  Defendants also selectively cite Judge Swift's decision in *Atlantic ER Physicians Team*.  (Parenti Cert., ¶ 3, Ex A.) But that case involved an entirely different course of dealing: there, the provider and health plan had terminated their prior written contract specifically because they no longer agreed on an amount of reimbursement.  Here, in contrast, the conduct of the parties provides the evidentiary basis for determining the agreed-upon contract terms.

Defendants are also wrong that a specific price term is required to establish an implied contract. "[I]t is settled that an agreement is not unenforceable for lack of definiteness of price (i.e., dues) if the parties specify a practicable method by which the amount can be determined." *Moorestown Management, Inc. v. Moorestown Bookshop, Inc.*, 104 N.J. Super. 250, 259 (N.J. Super. Ct. Ch. Div. 1969). Plaintiff is entitled to discovery to demonstrate how the parties would have understood or measured the reasonable value to be paid to NES under the agreement alleged.

Finally, this Court should simply give no weight to the out-of-state federal case law upon which Defendants hang their hat.  (*Atl. Neurosurgical Specialists, P.A. v. MultiPlan, Inc.*, No. 20-cv-10685 (LLS), 2023 WL 160084, at *4 (S.D.N.Y. Jan. 11, 2023); *Hott v. MultiPlan, Inc.*,

No. 21-cv-02421 (LLS), 2023 WL 185495, at *4 (S.D.N.Y. Jan. 13, 2023)).  A federal court

sitting in New York and interpreting New York contract law has no bearing upon whether an

implied contract was formed under New Jersey law.  Regardless, these cases are irrelevant

because they, like many of the other cases Defendants cite, do not involve a course of conduct

relating to out-of-network emergency care.  Defendants' reliance upon a Tennessee federal court

decision that interprets Tennessee law is equally unpersuasive for this reason. *AMISUB (SFH),*

*Inc. v. Cigna Health & Life Ins. Co.*, 681 F.Supp.3d 842, 853 (W.D. Tenn. 2023).

    Plaintiff sufficiently alleges the parties entered into an implied contract, Defendant

breached this contract by failing to fulfill its payment obligations correctly for the services

provided by NES, and NES (and now Plaintiff) suffered damages as a result. All elements of an

implied contract have been properly pled. Defendants' Motion to Dismiss should be denied.

    4.    <u>Plaintiff Has an Implied Private Right of Action Under HCAPPA</u>

    Next, Defendants are wrong that HCAPPA does not provide a private right of action for

Plaintiff to pursue its claims against Horizon.  New Jersey courts have made clear that an *implied*

private right of action can exist even where the Legislature has not expressly authorized such an

action. *R.J. Gayados Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 271-72 (2001).

"To determine if a statute confers an implied private right of action, courts consider whether: (1)

plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is

evidence that the Legislature intended to create a private right of action under the statute; and (3)

it is consistent with the underlying purposes of the legislative schedule to infer the existence of

such a remedy." *Id.* at 272. Plaintiff's claim squarely meets these criteria.

    HCAPPA amends the Health Care Information Networks and Technologies Act ("HINT"

Act) and requires health insurers like Defendants to pay health care providers' claims promptly,

provided the claims meet the criteria for payment set forth in N.J.S.AS. 17B:26-9.1(d)(9),

N.J.S.A./ 17B:27-44.2(d)(9) and N.J.S.A. 26:2J-9.1(d)(9). Providers must be given notice of disputed payments, and insurers are required to pay 12% interest on overdue payments. N.J.S.A. 17B:26-9.1. NES, as a healthcare provider, benefits directly from HCAPPA's statutory protections.

For this reason, at least one court has held that HCAPPA gives rise to a cause of action for healthcare providers like NES:

> The statutory text appears to contemplate a payment of interest directly to the provider and thus the right of the provider to charge and recover the same. The provider, the Plaintiff here, is certainly among the parties whom the statute is intended to protect or benefit, in addition to the protection of the general public interest. It appears the manifest purpose of the statute — prompt payment of uncontested statements and/or prompt notice of billing disputes — would be advanced by finding an implied right of action.

*MHA v. Wellcar*e, 2020 WL 1427919 at *23, 2020 N.J. Super. Unpub. LEXIS 4871, *64.  On this basis, the court found definitively that "the statute appears to evince an intention to permit a private right of action for interest at the established statutory and regulatory rate." *Id.*  And because NES has enforceable rights under HCAPPA, Plaintiff, as the outright owner of the claims, may likewise sue thereunder.

In the alternative, this Court need not determine at all at this early stage whether a cause of action exists.  That is the approach recently taken by Judge Swift in a similar action venued in Gloucester County.  (*Atlantic ER Physicians Team*, Parenti Cert. Ex. A, at 9.)  As Judge Swift observed in *Atlantic ER Physicians Team*, "this statutory penalty for failing to pay a valid insurance claim promptly [under HCAPPA] is only applicable if plaintiff is successful in this litigation compelling payment from the defendants."  (*Id.*)  Thus, [t]he court will revisit this issue upon a successful recovery by plaintiff."  (*Id.*)  The Plaintiff in this action has likewise not yet been given the opportunity to recover on the claims at issue.  So a minimum, it is premature to

rule now whether plaintiff is entitled to statutory interest under HCAPPA on any specific, individual claims.

Ignoring the wisdom and experience of New Jersey's own trial courts, Defendants rely almost exclusively on a single federal district court's non-binding interpretation of New Jersey state law. *See MHA, LLC v. Amerigroup Corp.*, 539 F. Supp.3d 349, 359 (D.N.J. 2021). Defendants forget that the present action is appropriately venued in Gloucester County Superior Court, not in federal court.  Again, this Court need not decide at all whether a cause of action for statutory interest exists at this juncture.  The motion to dismiss on this ground should therefore be denied as to this ground as well.

## E.     CONCLUSION

The Motion to Dismiss Plaintiff's Complaint must be denied in its entirety for all the reasons set forth herein.

<div style="margin-left: 40%;">

LAULETTA BIRNBAUM, LLC

By: */s/ Dante B. Parenti*
    Dante B. Parenti, Esq.
    *Attorneys for Plaintiff*

</div>

Date: June 25, 2024

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*Pro Hac Vice*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*Pro Hac Vice*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. | ) ) ) | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) | DOCKET NO.: GLO-L-000242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) ) ) | **CERTIFICATION OF DANTE B. PARENTI, ESQ. IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| Defendants. | ) | |

I, Dante B. Parenti, of full age, upon my oath certify as follows:

1.      I am a member of the law firm Lauletta Birnbaum, LLC. I am admitted to practice before the Courts of the State of New Jersey and the United States District Court for the District of New Jersey.

2.      I submit this certification in support of the Opposition to Motion to Dismiss Plaintiff's Complaint.

3.      A true and correct copy of the unpublished opinion of Judge Swift in *Atlantic ER Physicians Team Pediatric Associates, PA, et al. v. UnitedHealth Group Inc.*, et al., GLO-L-1196-20 (CBLP) (Aug. 24, 2022), is annexed hereto as **Exhibit A**.

4.      I certify that the foregoing statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.


                                        */s/ Dante B. Parenti*
                                        Dante B. Parenti

Date:  June 25, 2024

Prepared by the Court

_____

| | | |
|---|---|---|
| ATLANTIC ER PHYSICIANS, PA, *et al* | : | Superior Court of New Jersey |
| Plaintiff | : | Law Division- Gloucester County |
| v. | : | |
| | : | CIVIL ACTION |
| UNITEDHEALTH GROUP, INC., | : | Docket No. GLO-L-1196-20 (CBLP) |
| UNITEDHEALTHCARE INS. CO., *et al* | : | |
| And MULTIPLAN, INC. | : | **Memorandum of Decision** |
| Defendants | : | |

_____

These motions to dismiss under R. 4:6-2(e), arise from an action filed by plaintiffs, "NJ Team Health", who are emergency room physicians groups from all over the State who generally complain about out-of-network reimbursement rates from the defendants, who are health insurers and third-party administrators of employee health benefit plans.

More specifically, Team Health is a large emergency room staffing, billing and collections company that operates throughout the United States.  They provide outsourced emergency medicine services on a national scale, and operate as many as 3,400 emergency medical facilities, employing approximately 19,000 people. Defendants are health insurers and third-party administrators who operate the largest health insurance carrier in the United States.  These are primarily employee health benefit plans.  Most healthcare providers enter into agreements ("network agreements")

with health insurers and third-party administrators which specify how much the health plan will reimburse the provider for medical services rendered to their covered insureds. Healthcare services provided without any contractual agreement specifying a providers' reimbursement rates are "out-of-network", and the benefit amount is governed by the applicable heath benefit plan of which the patient is enrolled.

With regard to the instant action, until May 2020, Team Health plaintiffs allege their relationship with the defendant was controlled by a written contract in which they agreed to accept a certain negotiated amount for the health care services they provided to the defendants' insureds.  It is alleged that around 2018, the United defendants unilaterally decided to substantially reduce reimbursement rates for plaintiffs' out-of-network services.  In May 2020, United began implementing that plan against plaintiffs by terminating the express written agreements between the parties and thereafter began paying substantially less than what was previously agreed and substantially less than the reasonable value of the services plaintiffs provide.  After May 2020, defendants contracted with defendant, Multiplan, Inc. to determine this out-of-network payment. Multiplan promotes itself as an unregulated cost management company that offers "cost control" through a program known as Data iSight.  Multiplan claims the Data iSight program determines a reasonable reimbursement rate for health care services by applying a proprietary formula to the submitted claims.  It is alleged that Multiplan receives a share of the fees an insurance company earns from adjudicating a health care provider's claim for less than the amount the provider charged.

This case involves 27,000 disputed claims for emergency services provided by plaintiffs to United members during the period from May 15, 2020, to December 31,

2021.  As emergency medicine providers, the plaintiffs are required by law to treat and stabilize patients who present to the emergency room regardless of insurance coverage.  The plaintiffs rely upon commercial insurance companies to pay a reasonable rate for the critical health care services provided.  Plaintiffs allege that United and Multiplan conspired together to deny plaintiffs their billed amounts for medical services relying upon Multiplan's payment methodology.  Plaintiffs contend that Multiplan's publicly stated claims process is based upon rational and accepted data is a fraud.  Plaintiffs insist that United dictates the rates to be paid and uses Multiplan as a cover for this fraud.  Plaintiffs contend that United and Multiplan reap huge profits at the expense of the plaintiffs.  Plaintiff are suing to recover the reasonable value of their services over what was paid on these 27,000 claims.  The plaintiffs' Second Amended Complaint sues the defendants alleging five separate causes of action- Count One- Breach of Implied-in Fact Contract; Count Two- Quantum Meruit; Count Three- Violation of New Jersey Health Claims Authorization, Processing and Payment Act ("HCPPA") (the first three counts are directed to defendants United, only); Counts Four and Five allege RICO violations and conspiracies as to both defendants. This similar litigation has been advanced in 6 or 7 other states to date.

## STANDARD OF REVIEW

Under R. 4:6-2(e), a motion to dismiss for failure to state a claim must be denied if, giving plaintiff the benefit of all the allegations asserted in the pleadings and all favorable inferences, a claim has been established.  Grillo v. State, 469 N.J. Super. 267 (App. Div. 2021).  The test for determining the adequacy of the pleading is whether a

cause of action is suggested by the facts.  Motions to dismiss should be granted in only the rarest of instances.  *See*, Printing Mart v. Sharp Elec. Corp., 116 N.J. 739 (1989).

## ERISA PREEMPTION

This matter was originally filed on November 2, 2020, and defendants removed to the United States District Court, District of New Jersey.  On February 17, 2021, plaintiffs filed a motion to remand this lawsuit from the District Court.  On March 30, 2022, United States District Court Judge Renee Marie Bumb entered an Order that states in pertinent part, "unless and until there is clearly established precedent, if United Defendants argue for federal subject matter jurisdiction in the future based upon ERISA preemption, they must disclose to the court the caselaw that cuts against their legal arguments.  United Defendants should lay out that federal district courts in New Jersey, Pennsylvania, Nevada, Arizona, Florida and perhaps elsewhere have denied their arguments for ERISA preemption."  When pressed at oral argument, plaintiffs' counsel conceded that no court has found ERISA preemption in this matter.

ERISA was passed by Congress in 1974 to address "mismanagement of funds accumulated to finance employee benefits. ERISA does not guarantee benefits.   The statute seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures.  Gobeille v. Liberty Mut. Ins. Co., 136 S.Ct. 936, 946 (2016).  ERISA was created to ensure employee benefit plans would be subject to a uniform nationwide regulatory scheme, and not a patchwork of inconsistent state regulations.  To that end, ERISA includes "expansive pre-emption

provisions" to ensure that the regulation of employee benefit plans remain "exclusively a federal concern". <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 208 (2004).  There are two preemption types.  Complete preemption under Section 1132(a), which is jurisdictional in nature.  This preemption was rejected by Judge Bumb.  The other form of preemption is conflict preemption under Section 514(a).   this section expressly preempts state action and state law claims that "relate to" an ERISA plan.  United Defendants argue that plaintiffs' claims relate to ERISA-governed health benefit plans and therefore must be dismissed with prejudice as conflict preempted.

A common law claim "relates to" an employee benefit plan governed by ERISA "if it has a connection with or reference to such a plan". <u>Providence Health Plan v. McDowell</u>, 385 F.3d 1168, 1172 (9th Cir. 2004).  At this stage of the proceeding, the court finds that plaintiffs' state law claims relate solely to the rate of reimbursement, not the right of reimbursement.  Each of the 27,000 claims at issue here have been paid by the defendants. Plaintiffs are not disputing the right to coverage under the plan rather they plead that the United defendants did not pay the reasonable value of the emergency services or they were underpaid for these services.  Plaintiffs cite the U.S. Supreme Court case of <u>Rutledge v. Pharm. Care Mgmt. Ass'n</u>, 141 S.Ct. 474 (2020) as support for their position.  As stated therein, "[C]rucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan.  That is especially so if a law merely affects costs." Id. at 480.  Continuing, the Court says "ERISA does not preempt state rate regulations that merely increase costs..".  At this stage, the court finds plaintiffs' arguments persuasive.  As plaintiffs' state in their brief, they seek to hold United to its

obligation to pay a reasonable value for the benefits United has already agreed to pay out.  Plaintiff allegations do not implicate coverage determinations or plan administration requirements.  Plaintiffs allege that they are entitled to the "reasonable value" of their services under applicable state law- not an ERISA plan.  ERISA's goals of protecting participants and beneficiaries of employee benefits plans are not altered by plaintiffs claims.

Defendants request to dismiss for 514(a) preemption is denied.


## DEFENDANTS CLAIM THAT PLAINTIFF CASE SHOULD BE DISMISSED BY THE ARBITRATION PROCESS ENACTED IN N.J.S. 26:2SS-1

In 2018, the New Jersey Legislature passed the "Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act (the "Act").  Defendants claim that plaintiffs must arbitrate any claims decision at issue in this case under the process outlined in Sections 9,10 and 11 of the Act.  This argument is without merit.  The Act's definitions under Section 3 specifically exclude self-funded plans unless the self-funded plan elects to be subject to the provisions of the Act.  United defendants claim they are self-funded plans in their argument regarding preemption and have not provided any proof that they have opted-in to this statutory scheme.  This basis alone precludes dismissal of plaintiffs' complaint.

## COUNT ONE- BREACH OF IMPLIED-IN-FACT CONTRACT

United defendants seek dismissal of Count One of the Second Amended Complaint that alleges breach of an implied-in-fact contract.  Plaintiffs' complaint alleges that prior to May 2020, the parties had a written contract for the reimbursement rates to be paid for out-of-network emergency health care services.  They allege in paragraph 3 that in 2017 to 2018, "United concluded it could make more money by paying Plaintiffs and other emergency room doctors less, so United embarked on a scheme to do just that."  In paragraph 28 through 31, it is alleged that United terminated the express written agreement in place to pursue greater profits by substantially reducing reimbursement rates it provided plaintiffs.  The complaint says that United cut reimbursement rates to less than half what United had paid in the past pursuant to its previous contract.  The plaintiffs now sue for recovery of the difference between what they bill versus what they were paid.

The essential feature of an implied-in-fact contract cause of action is that the asserted contractual obligation must have arisen from mutual agreement and intent to promise but where no written agreement is in place.  However, the facts as pleaded decisively refute the existence of such agreement.  To prevail on a breach of contract action, whether written or implied, a plaintiff must be able to prove all of the necessary terms of the contract.  Here, the Second Amended Complaint could not be clearer that the parties were not in agreement as benefit amount the defendants would pay for the plaintiffs' services.  Plaintiffs want the amount billed, as they contend it is a reasonable amount as to the value of their services.  Defendants, however, paid a different amount- an amount they say is appropriate according to the Data iSight methodology.  This

essential term- price is in no way an agreed upon term in this implied contract.

Certainly, the court agrees that many of the other factors are in place, i.e. the

agreement to provide out-of-network emergency services to the plan members and the

expectation that the providers would be paid.  But price is the element that does not

exist in this arrangement.  Plaintiffs specifically plead defendants terminated the

contract in place prior to May 2020 because defendants did not want to pay the agreed

upon rates.  This undermines this cause of action.

Count One of plaintiffs' complaint is dismissed for failing to state a cause of

action as plead.

## COUNT TWO- QUANTUM MERUIT

In order to recover on a claim for the quasi-contractual theory of quantum meruit,

a plaintiff must establish four elements: (1) the performance of services in good faith; (2)

the acceptance of services by the person to whom they are rendered; (3) an expectation

of compensation therefore; and (4) the reasonable value of the services.  Sean Wood

LLC v. Hegarty Group, 422 N.J. Super. 500, 513 (App. Div. 2011).  "Quasi-contractual

recovery on the basis of quantum meruit rests on the equitable principle that a person

shall not be allowed to enrich himself unjustly at the expense of another" Id. at 512.

In order for plaintiffs to sufficiently plead this cause of action, it must

demonstrate that the services they performed in good faith conferred a benefit not only

on the patients they served (who are not defendants) but rather on the insurers of the

patients.  The complaint alleges in paragraph 59 that "[B]oth United and United's

Members benefited from the services Plaintiff provided.  For example, United used and

enjoyed the benefit of Plaintiff's services because Plaintiffs help United discharge its

legal and contractual obligation to its insureds to provide them with emergency care".

At this stage of the proceedings, this argument is persuasive.  The insurer defendants

received a benefit by paying the plaintiffs a rate of reimbursement significantly less than

a reasonable rate.  They were able to pocket the difference in profits while

simultaneously discharging its contractual obligation to pay for out-of-network

emergency care for its members.  Though the benefit conferred is not direct, there is

arguably a benefit conferred to the defendants.

## COUNT THREE- VIOLATION OF NEW JERSEY HEALTH CLAIMS AUTORIZATION, PROCESSING AND PAYMENT ACT ("HCAPPA")

Team Health plaintiffs allege in Count Three that the defendants failed "to timely

pay the full amounts due to plaintiffs for their out-of-network emergency claims", in

violation of HCAPPA, N.J.S. 17B:26-9.1.  This statute permits the provider from

recovering 12% interest on any unpaid claims.  The parties go back and forth on

whether the statute confers a private right of action by a medical provider against an

insured.  At this point, the court does not have to reach this answer.  This statutory

penalty for failing to pay a valid insurance claim promptly is only applicable if plaintiff is

successful in this litigation compelling payment from the defendants.  The court will

revisit this issue upon a successful recovery by plaintiff.

## COUNTS FOUR AND FIVE- VIOLATIONS OF NJ-RICO (as to both sets of defendants)

In Counts Four and Five of the Second Amended Complaint, plaintiffs allege that

the defendants committed acts of theft under N.J.S. 2C:20-3(a) and (b), 2C:20-4(a)-(c)

and 2C:20-8(a) by a pattern of racketeering activity in violation of N.J.S. 2C:41-1.

Basically, the plaintiffs state that United and Multiplan engaged in a conspiracy to divert millions of dollars away from the plaintiffs by falsely and fraudulently hiding behind Data iSight methodology, which in fact was a deceitful ploy to pay reimbursement rates set by United rather than reasonable value.

To state a claim for violation of New Jersey's RICO law (N.J.S. 2C:41-1, et seq.), a plaintiff must allege (1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated in the conduct of the affairs of the enterprise; (5) that the defendants participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the activity. Marina Dist. Dev. Co. v. Ivey, 216 F. Supp. 3d 426, 436 (N.J. Dist. Ct. 2016).  A defendant in a racketeering conspiracy need not itself commit or agree to commit predicate acts. Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001). Rather, "all that is necessary for such a conspiracy is that the conspirators share a common purpose." Id. Thus, if defendants agree to a plan wherein some conspirators will commit crimes and others will provide support, "the supporters are as guilty as the perpetrators." Salinas v. United States, 522 U.S. 52, 64, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997). Each defendant must "agree to commission of two or more racketeering acts," United States v. Phillips, 874 F.2d 123, 127 n.4 (3d Cir. 1989), and each defendant must "adopt the goal of furthering or facilitating the criminal endeavor," Smith, 247 F.3d at 537.

Defendants first argue that plaintiff's pleading is deficient in that it does not comply with the heightened pleading standard required by R. 4:5-8.  This rule requires "[I]n all allegations of misrepresentation, fraud, …. Particulars of the wrong, with dates and items *if necessary*, shall be stated *insofar as practicable.* (emphasis supplied).  Here, the complaint satisfies the Rule by placing defendants on notice of the alleged wrongs.  Specifically, the complaint states that between May 2020 and December 2021, United Healthcare defendants conspired with Multiplan defendant to unilaterally set the rate of reimbursement for the plaintiffs.  This rate was set by United but asserts fraudulently that the reimbursement rate was determined by Data iSight at a geographically competitive rate.  The fraud/conspiracy began just before the May 2020 change.  The plaintiff alleges damages calculated at the amount billed by plaintiff minus the amount paid by defendants.  This pleading is sufficient as to R. 4:5-8.

The more interesting argument raised by both defendants is that plaintiffs fail to allege that the defendants' racketeering conduct was the proximate cause of their damages.  See, Maio v. Aetna Inc., 221 F.3d 472, 483 holding that plaintiff must "make two related but analytically distinct threshold showings…(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendants' [RICO] violation.  The defendants argue that plaintiffs are required to treat all patients who arrive at hospitals for emergency care, and even if the defendants shared their payment methodology, nothing would change, i.e. the plaintiffs would receive the same amount.  This court finds this unpersuasive as the argument ignores the alleged fraud as alleged.  Plaintiffs say that the Data iSight rate is merely a cover for

United's reimbursement rate that it unilaterally set.  The plaintiffs allege that United and Multiplan conspired to set an artificially low rate to reap huge profits disguising its conspiracy by pretending the rate was set by Data iSight.  Their damages would be the difference between they amount they billed and the amount they received.  As alleged, the plaintiff's damages are the proximate cause of the RICO conspiracy.  They may has performed the same services as required by law, but they would have received significantly more money for doing so, if not defrauded by the defendants.

The court requests the defendants prepare an Order consistent with this opinion.

DATED: August 23, 2022                    _____

                                          JAMES R. SWIFT, JSC

Dante B. Parenti, Esq. (005571985)
LAULETTA BIRNBAUM, LLC
591 Mantua Blvd., Suite 200
Sewell, NJ 08080
Telephone: (856) 669-2584
Fax: (856) 232-1601
E-mail: dparenti@lauletta.com

ERIC D. CHAN (California State Bar No.
253082) (*Pro Hac Vice*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*Pro Hac Vice*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

Attorneys for Plaintiff HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP.

---

| | |
|---|---|
| HEALTHCARE JUSTICE COALITION OF NEW JERSEY CORP. | SUPERIOR COURT OF NEW JERSEY GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | DOCKET NO.: GLO-L-000242-24 |
| vs. | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | **[PROPOSED] ORDER DENYING MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

---

**THIS MATTER** having been brought before the Court by Lauletta Birnbaum, LLC, attorneys for Plaintiff for an Order to Dismiss the Complaint, and the court having considered the Motion, and opposition thereto, and with good cause appearing:

    **IT IS** on this _____ day of _____, 2024;

    **ORDERED** that the Motion to Dismiss Plaintiff's Complaint is Denied in its entirety.

    **IT IS FURTHER ORDERED THAT** service of this Order shall be deemed effectuated upon all parties upon its upload to e-Courts. Pursuant to Rule 1:5-1(a) movant shall serve a copy

of this Order on all parties not served electronically within seven (7) days of the date of this

Order.

_____
Honorable Timothy W. Chell, P.J.Cv.

_____ Opposed
_____ Unopposed

Adam J Petitt
020822008
1650 MARKET ST
PHILADELPHIA PA 19103

**Superior Court of New Jersey**
**Civil Division, Civil Part**
Gloucester County

Healthcare Justice Coalition
       vs.
Horizon Healthcare Services, Horizon Healthcare
Of Nj, Inc., Does 120, Inclusive

Docket No. GLO-L-000242-24

**Civil Action**

## Adjournment Request

1) I, Adam J Petitt, am the attorney for Horizon Healthcare Services, Horizon Healthcare Of Nj, Inc..

2) I request an adjournment of the Motion Dismissal Hearing scheduled on 07/05/2024 at 10:00am before -To Be Assigned.

3) The new date proposed for the Motion Dismissal Hearing is 07/19/2024.

4) I have attempted to contact all counsel or parties.

5) I have consent of all parties to adjourning the Motion Dismissal Hearing.

6) I have consent of all parties to the new date proposed for the Motion Dismissal Hearing.

7) I request this adjournment because: Defendants require additional time to file a reply in light of the upcoming holiday weekend.

| | | |
|---|---|---|
| Original DED: | Current DED: | # of DED Extension: 0 |
| Original Arb Date: | Current Arb Date: | # of Arb Adjournments: 0 |
| Original Trial Date: | Current Trial Date: | # of Trial Adjournments: 0 |

/S/ Adam J Petitt

1

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC | ) ) ) | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) | |
| | ) | DOCKET NO.: GLO-L-242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) | **DISCOVERY CONFIDENTIALITY ORDER** |
| Defendants. | ) | |

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1.      Any party to this litigation (the "Parties"), and any third-party that discloses or produces information in connection with this matter (together with the Parties, "Producing Parties") shall have the right to designate as "Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential information, or (c) that contains information received in confidence from third parties, or (d) which the Producing Party otherwise believes in good faith to be entitled to protection under *R*. 4:10-3(g). Any Producing Party, who produces or discloses any Confidential material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the forgoing or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

2.      Any Producing Party shall have the right to designate as "Attorneys' Eyes Only" and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the Producing Party including information concerning third-party pricing and/or reimbursement rates (e.g., reimbursement rates that providers other than Plaintiffs have charged or accepted and that insurers and payors other than the Defendants have paid for claims similar to those at issue in this case). Any Producing Party who produces or discloses any Attorneys' Eyes Only material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Attorneys' Eyes Only").

3.      All Confidential material including all Attorneys' Eyes Only material shall be used by the receiving party solely for the purposes of the prosecution or defense of this action, shall not

be used by the receiving party for any business, commercial, competitive, personal or other purpose, and shall not be disclosed by the receiving party to anyone other than those set forth in Paragraphs 4 or 5, unless and until the restrictions herein are removed either by written agreement of counsel for all Parties and applicable Producing Parties, or by Order of the Court. It is, however, understood that counsel may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Confidential or Attorneys' Eyes Only material, provided that such advice and opinions shall not reveal the content of such Confidential material, except by prior written agreement of counsel for the Parties and applicable Producing Parties, or by Order of the Court.

4.     Confidential material, and the contents of Confidential material, may be disclosed only to the following individuals under the following conditions, who shall not make further disclosure to anyone except as allowed by this Protective Order:

    a.     Outside counsel (herein defined as any attorney at the Parties' outside law firms), contract attorneys retained by counsel for the Parties to provide services in connection with this litigation, and relevant in-house counsel for the Parties;

    b.     Outside experts or consultants retained by counsel for purposes of this action, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A;

    c.     Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

    d.     The Court and court personnel;

    e.     Any deponent may be shown or examined on any information, document or thing designated Confidential if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein, or is employed by the Producing Party who produced the information, document or thing, or if the Producing Party consents to such disclosure, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, and provided that if Confidential Information is first disclosed to a deponent during a deposition, then after the deposition, the deponent shall promptly execute the Acknowledgement.

    f.     Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, members of a document review team, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials, provided the vendor's representative and/or each member of the document review team has signed a Non-

Disclosure Agreement in the form attached hereto as Exhibit A, which counsel for the Party retaining the vendor(s) shall be obligated to retain and make available to all other Parties and/or their counsel upon request;

g.     The Parties. In the case of Parties that are corporations or other business entities, "Parties" shall mean executives who are required to participate in decisions with reference to this lawsuit and employees who are witnesses or potential witnesses in the matter.

5.     Material produced and marked as Attorneys' Eyes Only and the contents of such material may be disclosed only to the following individuals under the following conditions, who shall not make further disclosure to anyone except as allowed by this Protective Order:

a.     Outside counsel (herein defined as any attorney at the Parties' outside law firms), contract attorneys retained by counsel for the Parties to provide services in connection with this litigation, and in-house counsel with responsibilities in connection with this litigation and without responsibility for managed care network or rate negotiations ("Designated In-house Counsel"). To the extent each Designated In-house Counsel acquires any role, involvement, or responsibility for managed care network or rate negotiations during the litigation, that in-house counsel will recuse himself or herself from any matters involving or relating to the other Party and may be replaced with a Designated In-house Counsel who meets the above criteria;

b.     Outside experts or consultants retained by counsel for purposes of this action, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A;

c.     Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

d.     The Court and court personnel;

e.     Any deponent may be shown or examined on any information, document or thing designated Attorneys' Eyes Only if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein or is employed by the Producing Party who produced the information, document or thing, or if the Producing Party consents to such disclosure, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, and provided that if Attorneys' Eyes Only is first disclosed toa deponent during a deposition, then after the deposition, the deponent shall promptly execute the Acknowledgement;

f.     Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters,

members of a document review team, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials, provided the vendor's representative and/or each member of the document review team has signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, which counsel for the Party retaining the vendor(s) shall be obligated to retain and make available to all other Parties, applicable Producing Parties, and/or their counsel upon request; and

6.      With respect to any depositions that involve a disclosure of Confidential material or Attorneys' Eyes Only material of a Producing Party, such Party receiving the transcript shall notify all counsel by letter other agreed-upon means upon such receipt and, if practicable, provide a copy thereof, and all other Parties and applicable Producing Parties shall have until twenty-five (25) days after receipt of the deposition transcript within which to inform all Parties that portions of the transcript are to be designated Confidential and/or for Attorneys' Eyes Only, which period may be extended by agreement of the Parties and applicable Producing Parties. No such deposition transcript shall be disclosed to any individual other than the individuals described in Paragraphs 4(a), (b), (c), (d) and (f) above and the deponent during these twenty-five (25) days, and no individual attending such a deposition shall disclose the contents of the deposition to any individual other than those described in Paragraphs 4(a), (b), (c), (d) and (f) above during said twenty-five (25) days. Upon being informed that certain portions of a deposition are to be designated as Confidential and/or for Attorneys' Eyes Only, all Parties shall immediately cause each copy of the transcript in tis custody or control to be appropriately marked and limit disclosure of that portion of the transcript in accordance with Paragraphs 4 and 5.

7.      If counsel for a Party receiving documents or information designated as Confidential or Attorneys' Eyes Only hereunder objects to such designation of any or all of such items, the flowing procedure shall apply:

a.      Counsel for the objecting Party shall serve on the Producing Party a written objection to such designation, which shall describe with particularity the documents or information in question and shall state the grounds for objection. Counsel for the Producing Party shall respond in writing to such objection within ten (10) days after receipt of the objection, and shall state with particularity the grounds for asserting that the document or information is Confidential or Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void. If the Producing Party makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute.

b.      If a dispute as to a Confidential or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall present the dispute to the Court, in accordance with R. 4:105-4, before filing a formal motion for

an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

8.     If the need arises during trial or in any application to/at any hearing before the Court for any Party to disclose Confidential or Attorneys' Eyes Only information, it may do so only after giving three business days' notice to the Producing Party, and if the Producing Party or any other party objects within those three business days, after receiving an order form the Court permitting the requested disclosure. Nothing in this Order shall limit a Producing Party's ability to use its own documents or information, however designated, at a hearing in this litigation or in any other proceeding, subject to the Court's determination of the admissibility of the documents or information.

9.     To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential material or Attorneys' Eyes Only material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a Producing Party's claim of confidentiality, either as to the specific information, document or thing disclosed, or as to any other material or information concerning the same or related subject matter. Within a reasonable time after disclosure such inadvertent or unintentional disclosure may be rectified by notifying, in writing, counsel for all Parties to whom the material was disclosed that the material should have been designated Confidential or Attorneys' Eyes Only. Such notice shall constitute a designation of the information, document or thing as Confidential or Attorneys' Eyes Only under this Discovery Confidentiality Order.

10.     Information shall not be deemed or considered to be Confidential material or Attorneys' Eyes Only material under this Discovery Confidentiality Order if that information is (i) in the public domain, (ii) already known by the receiving Party through proper means, or (iii) becomes or is available to a Party from a source, other than the Producing Party asserting confidentiality, if that source is rightfully in possession of such information on a non-confidential basis.

11.     This Discovery Confidentiality Order shall not deprive any Party or Producing Party of its right to object to discovery by any other Party or Producing Party to move the Court for modification or for relief from any of its terms. This Discovery Confidentiality Order does not alter the Court Rules and case law regarding the court's obligation to conduct open hearings, or the Parties' obligation to file pleadings electronically. The Parties further acknowledge that electronic filing system used by the New Jersey Superior Court permits free and open access for the public. Any petition to seal pleadings, documents, records or testimony must be subject to a separate court order.

12.     This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court, or by the written stipulation of the Parties and applicable Producing Parties filed with the Court.

13.     Upon final conclusion of this litigation, which includes the exhaustion of all appeals and/or expiration of the time within which to file therefore, each Party, or other individual subject to the terms hereof, shall be under an obligation to assemble and to return to the originating source all originals and unmarked copies of documents and things containing Confidential material or Attorney's Eyes Only material and to destroy, should such source so request, all copies of Confidential material or Attorneys' Eyes Only material that contain and/or constitute attorney work product, excerpts, summaries and digests revealing Confidential material or Attorneys' Eyes Only material; provided, however, that counsel may retain complete copies of all transcripts and pleadings, including any exhibits attached thereto, for archival purposes, subject to the provisions of this Discovery Confidentiality Order. To the extent a Producing Party requests the return of Confidential material or Attorneys' Eyes Only material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom, and all related proceedings, the Producing Party shall file a motion seeking such relief.

14.     The production of documents and information shall not constitute a waiver in this litigation, or any other litigation, matter or proceeding, of any privilege (including, but not limited to, the attorney-client privilege, attorney work product privilege or common defense privilege) applicable to the produced materials or for any other privileged or protected materials containing the same or similar subject matter. The fact of production of privileged information or documents by any Producing Party in this litigation shall not be used as a basis for arguing that a claim of privilege of any kind has been waived in any other proceeding. Without limiting the foregoing, this Protective Order shall not affect the Producing Parties' legal rights to assert privilege claims over documents in any other proceeding. If a Producing Party inadvertently produces privileged documents or information, the Producing Party shall contact the receiving Party as promptly as reasonably possible after the discovery of the inadvertent production, and inform the receiving Party in writing of the inadvertent production and the specific material at issue. The receiving Party upon receiving such notice, shall promptly destroy or delete all such inadvertently produced privileged materials in its possession.

15.     If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this litigation as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" that Party must: (1) promptly notify in writing the Producing Party and such notification shall include a copy of the subpoena or court order; (2) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order and such notification shall include a copy of this Order; and (3) cooperate with respect to all reasonable procedures sought to be pursued by the Producing Party who Confidential Information may be affected. If the Producing Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" before a determination by the Court form which the subpoena or order issued, unless the Party has obtained the Producing Party's permission. The Producing Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a receiving Party in this litigation to disobey a lawful directive form another court.

IT IS SO ORDERED.


Dated:_____                          _____
                                                Hon. James R. Swift, J.S.C.


**The parties consent to the form and entry of this Discovery Confidentiality Order:**


*/s/ Dante B. Parenti*_____                 */s/ Adam J. Petitt*_____
Dante B. Parenti, Esq. (005571985)             Adam J. Petitt, Esq. (020822008)
LAULETTA BIRNBAUM, LLC                          ROBINSON & COLE LLP
591 Mantua Blvd., Suite 200                     1650 Market Street, Suite 3030
Sewell, NJ 08080                                Philadelphia, PA 19103
Telephone: (856) 669-2584                       Telephone : (215) 398-0562
Fax : (856) 232-1601                            Fax : (215) 398-0599
E-mail: dparenti@lauletta.com                   E-mail: apetitt@rc.com
                                                *Attorney for Defendants*


ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com


*Attorneys for Plaintiffs*

# Exhibit A

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC | ) ) ) | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) ) | DOCKET NO.: GLO-L-242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) ) | **NON-DISCLOSURE AGREEMENT TO BE BOUND BY DISCOVERY CONFIDENTIALITY ORDER** |
| Defendants. | | |

I, _____, being duly sworn, state that:

    1.    My address is _____

    2.    My present employer is _____ and the address of

my present employment is _____

    3.    My present occupation or job description is _____

    4.    I have carefully read and understood the provisions of the attached Discovery

Confidentiality Order in this case signed by the Court on _____, and I

will comply with all provisions of the Discovery Confidentiality Order.

    5.    I will hold in confidence and not disclose to anyone not qualified under the

Discovery Confidentiality Order and Confidential material or Attorneys' Eyes Only material or

any words, summaries, abstracts, or indices of Confidential material or Attorneys' Eyes Only

material disclosed to me.

    6.    I will limit use of Confidential material Attorneys' Eyes Only material disclosed

to me solely for purpose of this action.

7.       No later than the final conclusion of the case, I will return all Confidential

material and Attorneys' Eyes Only material, including summaries, abstracts, and indices thereof,

which come into my possession, and documents or things which I have prepared relating thereto,

to counsel for the party for whom I was employed or retained.

I certify that the foregoing statements made by me are true. I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.


Dated:_____                    _____
                                                                            [Name]

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC | ) ) ) | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) | |
| | ) | DOCKET NO.: GLO-L-242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) | **DISCOVERY CONFIDENTIALITY ORDER** |
| Defendants. | ) | |

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1.      Any party to this litigation (the "Parties"), and any third-party that discloses or produces information in connection with this matter (together with the Parties, "Producing Parties") shall have the right to designate as "Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential information, or (c) that contains information received in confidence from third parties, or (d) which the Producing Party otherwise believes in good faith to be entitled to protection under $R$. 4:10-3(g). Any Producing Party, who produces or discloses any Confidential material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the forgoing or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

2.      Any Producing Party shall have the right to designate as "Attorneys' Eyes Only" and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the Producing Party including information concerning third-party pricing and/or reimbursement rates (e.g., reimbursement rates that providers other than Plaintiffs have charged or accepted and that insurers and payors other than the Defendants have paid for claims similar to those at issue in this case). Any Producing Party who produces or discloses any Attorneys' Eyes Only material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Attorneys' Eyes Only").

3.      All Confidential material including all Attorneys' Eyes Only material shall be used by the receiving party solely for the purposes of the prosecution or defense of this action, shall not

be used by the receiving party for any business, commercial, competitive, personal or other purpose, and shall not be disclosed by the receiving party to anyone other than those set forth in Paragraphs 4 or 5, unless and until the restrictions herein are removed either by written agreement of counsel for all Parties and applicable Producing Parties, or by Order of the Court. It is, however, understood that counsel may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Confidential or Attorneys' Eyes Only material, provided that such advice and opinions shall not reveal the content of such Confidential material, except by prior written agreement of counsel for the Parties and applicable Producing Parties, or by Order of the Court.

4.  Confidential material, and the contents of Confidential material, may be disclosed only to the following individuals under the following conditions, who shall not make further disclosure to anyone except as allowed by this Protective Order:

   a.  Outside counsel (herein defined as any attorney at the Parties' outside law firms), contract attorneys retained by counsel for the Parties to provide services in connection with this litigation, and relevant in-house counsel for the Parties;

   b.  Outside experts or consultants retained by counsel for purposes of this action, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A;

   c.  Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

   d.  The Court and court personnel;

   e.  Any deponent may be shown or examined on any information, document or thing designated Confidential if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein, or is employed by the Producing Party who produced the information, document or thing, or if the Producing Party consents to such disclosure, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, and provided that if Confidential Information is first disclosed to a deponent during a deposition, then after the deposition, the deponent shall promptly execute the Acknowledgement.

   f.  Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, members of a document review team, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials, provided the vendor's representative and/or each member of the document review team has signed a Non-

2

Disclosure Agreement in the form attached hereto as Exhibit A, which counsel for the Party retaining the vendor(s) shall be obligated to retain and make available to all other Parties and/or their counsel upon request;

g.     The Parties. In the case of Parties that are corporations or other business entities, "Parties" shall mean executives who are required to participate in decisions with reference to this lawsuit and employees who are witnesses or potential witnesses in the matter.

5.     Material produced and marked as Attorneys' Eyes Only and the contents of such material may be disclosed only to the following individuals under the following conditions, who shall not make further disclosure to anyone except as allowed by this Protective Order:

a.     Outside counsel (herein defined as any attorney at the Parties' outside law firms), contract attorneys retained by counsel for the Parties to provide services in connection with this litigation, and in-house counsel with responsibilities in connection with this litigation and without responsibility for managed care network or rate negotiations ("Designated In-house Counsel"). To the extent each Designated In-house Counsel acquires any role, involvement, or responsibility for managed care network or rate negotiations during the litigation, that in-house counsel will recuse himself or herself from any matters involving or relating to the other Party and may be replaced with a Designated In-house Counsel who meets the above criteria;

b.     Outside experts or consultants retained by counsel for purposes of this action, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A;

c.     Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

d.     The Court and court personnel;

e.     Any deponent may be shown or examined on any information, document or thing designated Attorneys' Eyes Only if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein or is employed by the Producing Party who produced the information, document or thing, or if the Producing Party consents to such disclosure, provided they have signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, and provided that if Attorneys' Eyes Only is first disclosed toa deponent during a deposition, then after the deposition, the deponent shall promptly execute the Acknowledgement;

f.     Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters,

members of a document review team, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials, provided the vendor's representative and/or each member of the document review team has signed a Non-Disclosure Agreement in the form attached hereto as Exhibit A, which counsel for the Party retaining the vendor(s) shall be obligated to retain and make available to all other Parties, applicable Producing Parties, and/or their counsel upon request; and

6.      With respect to any depositions that involve a disclosure of Confidential material or Attorneys' Eyes Only material of a Producing Party, such Party receiving the transcript shall notify all counsel by letter other agreed-upon means upon such receipt and, if practicable, provide a copy thereof, and all other Parties and applicable Producing Parties shall have until twenty-five (25) days after receipt of the deposition transcript within which to inform all Parties that portions of the transcript are to be designated Confidential and/or for Attorneys' Eyes Only, which period may be extended by agreement of the Parties and applicable Producing Parties. No such deposition transcript shall be disclosed to any individual other than the individuals described in Paragraphs 4(a), (b), (c), (d) and (f) above and the deponent during these twenty-five (25) days, and no individual attending such a deposition shall disclose the contents of the deposition to any individual other than those described in Paragraphs 4(a), (b), (c), (d) and (f) above during said twenty-five (25) days. Upon being informed that certain portions of a deposition are to be designated as Confidential and/or for Attorneys' Eyes Only, all Parties shall immediately cause each copy of the transcript in tis custody or control to be appropriately marked and limit disclosure of that portion of the transcript in accordance with Paragraphs 4 and 5.

7.      If counsel for a Party receiving documents or information designated as Confidential or Attorneys' Eyes Only hereunder objects to such designation of any or all of such items, the flowing procedure shall apply:

a.      Counsel for the objecting Party shall serve on the Producing Party a written objection to such designation, which shall describe with particularity the documents or information in question and shall state the grounds for objection. Counsel for the Producing Party shall respond in writing to such objection within ten (10) days after receipt of the objection, and shall state with particularity the grounds for asserting that the document or information is Confidential or Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void. If the Producing Party makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute.

b.      If a dispute as to a Confidential or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall present the dispute to the Court, in accordance with R. 4:105-4, before filing a formal motion for

an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

8.     If the need arises during trial or in any application to/at any hearing before the Court for any Party to disclose Confidential or Attorneys' Eyes Only information, it may do so only after giving three business days' notice to the Producing Party, and if the Producing Party or any other party objects within those three business days, after receiving an order form the Court permitting the requested disclosure. Nothing in this Order shall limit a Producing Party's ability to use its own documents or information, however designated, at a hearing in this litigation or in any other proceeding, subject to the Court's determination of the admissibility of the documents or information.

9.     To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential material or Attorneys' Eyes Only material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a Producing Party's claim of confidentiality, either as to the specific information, document or thing disclosed, or as to any other material or information concerning the same or related subject matter. Within a reasonable time after disclosure such inadvertent or unintentional disclosure may be rectified by notifying, in writing, counsel for all Parties to whom the material was disclosed that the material should have been designated Confidential or Attorneys' Eyes Only. Such notice shall constitute a designation of the information, document or thing as Confidential or Attorneys' Eyes Only under this Discovery Confidentiality Order.

10.     Information shall not be deemed or considered to be Confidential material or Attorneys' Eyes Only material under this Discovery Confidentiality Order if that information is (i) in the public domain, (ii) already known by the receiving Party through proper means, or (iii) becomes or is available to a Party from a source, other than the Producing Party asserting confidentiality, if that source is rightfully in possession of such information on a non-confidential basis.

11.     This Discovery Confidentiality Order shall not deprive any Party or Producing Party of its right to object to discovery by any other Party or Producing Party to move the Court for modification or for relief from any of its terms. This Discovery Confidentiality Order does not alter the Court Rules and case law regarding the court's obligation to conduct open hearings, or the Parties' obligation to file pleadings electronically. The Parties further acknowledge that electronic filing system used by the New Jersey Superior Court permits free and open access for the public. Any petition to seal pleadings, documents, records or testimony must be subject to a separate court order.

12.     This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court, or by the written stipulation of the Parties and applicable Producing Parties filed with the Court.

13.     Upon final conclusion of this litigation, which includes the exhaustion of all appeals and/or expiration of the time within which to file therefore, each Party, or other individual subject to the terms hereof, shall be under an obligation to assemble and to return to the originating source all originals and unmarked copies of documents and things containing Confidential material or Attorney's Eyes Only material and to destroy, should such source so request, all copies of Confidential material or Attorneys' Eyes Only material that contain and/or constitute attorney work product, excerpts, summaries and digests revealing Confidential material or Attorneys' Eyes Only material; provided, however, that counsel may retain complete copies of all transcripts and pleadings, including any exhibits attached thereto, for archival purposes, subject to the provisions of this Discovery Confidentiality Order. To the extent a Producing Party requests the return of Confidential material or Attorneys' Eyes Only material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom, and all related proceedings, the Producing Party shall file a motion seeking such relief.

14.     The production of documents and information shall not constitute a waiver in this litigation, or any other litigation, matter or proceeding, of any privilege (including, but not limited to, the attorney-client privilege, attorney work product privilege or common defense privilege) applicable to the produced materials or for any other privileged or protected materials containing the same or similar subject matter. The fact of production of privileged information or documents by any Producing Party in this litigation shall not be used as a basis for arguing that a claim of privilege of any kind has been waived in any other proceeding. Without limiting the foregoing, this Protective Order shall not affect the Producing Parties' legal rights to assert privilege claims over documents in any other proceeding. If a Producing Party inadvertently produces privileged documents or information, the Producing Party shall contact the receiving Party as promptly as reasonably possible after the discovery of the inadvertent production, and inform the receiving Party in writing of the inadvertent production and the specific material at issue. The receiving Party upon receiving such notice, shall promptly destroy or delete all such inadvertently produced privileged materials in its possession.

15.     If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this litigation as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" that Party must: (1) promptly notify in writing the Producing Party and such notification shall include a copy of the subpoena or court order; (2) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order and such notification shall include a copy of this Order; and (3) cooperate with respect to all reasonable procedures sought to be pursued by the Producing Party who Confidential Information may be affected. If the Producing Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" before a determination by the Court form which the subpoena or order issued, unless the Party has obtained the Producing Party's permission. The Producing Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a receiving Party in this litigation to disobey a lawful directive form another court.

IT IS SO ORDERED.


Dated: JULY 15, 2024                      /S/ Timothy W. Chell, P.J.Cv.
                                          ~~Hon. James R. Swift, J.S.C.~~


**The parties consent to the form and entry of this Discovery Confidentiality Order:**


/s/ Dante B. Parenti                      /s/ Adam J. Petitt
Dante B. Parenti, Esq. (005571985)        Adam J. Petitt, Esq. (020822008)
LAULETTA BIRNBAUM, LLC                    ROBINSON & COLE LLP
591 Mantua Blvd., Suite 200               1650 Market Street, Suite 3030
Sewell, NJ 08080                          Philadelphia, PA 19103
Telephone: (856) 669-2584                 Telephone : (215) 398-0562
Fax : (856) 232-1601                      Fax : (215) 398-0599
E-mail: dparenti@lauletta.com             E-mail: apetitt@rc.com
                                          *Attorney for Defendants*


ERIC D. CHAN (California State Bar No.
253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State
Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com


*Attorneys for Plaintiffs*

# Exhibit A

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC | ) ) ) | SUPERIOR COURT OF NEW GLOUCESTER COUNTY LAW DIVISION |
| Plaintiff | ) ) ) | DOCKET NO.: GLO-L-242-24 |
| vs. | ) ) | CIVIL ACTION |
| HORIZON HEALTHCARE SERVICES, INC., d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, HORIZON HEALTHCARE OF NEW JERSEY, INC., and DOES 1-20, inclusive. | ) ) ) ) ) ) ) | **NON-DISCLOSURE AGREEMENT TO BE BOUND BY DISCOVERY CONFIDENTIALITY ORDER** |
| Defendants. | | |

I, _____, being duly sworn, state that:

    1.    My address is _____

    2.    My present employer is _____ and the address of my present employment is _____

    3.    My present occupation or job description is _____

    4.    I have carefully read and understood the provisions of the attached Discovery Confidentiality Order in this case signed by the Court on _____, and I will comply with all provisions of the Discovery Confidentiality Order.

    5.    I will hold in confidence and not disclose to anyone not qualified under the Discovery Confidentiality Order and Confidential material or Attorneys' Eyes Only material or any words, summaries, abstracts, or indices of Confidential material or Attorneys' Eyes Only material disclosed to me.

    6.    I will limit use of Confidential material Attorneys' Eyes Only material disclosed to me solely for purpose of this action.

7.      No later than the final conclusion of the case, I will return all Confidential material and Attorneys' Eyes Only material, including summaries, abstracts, and indices thereof, which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party for whom I was employed or retained.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:_____               _____
                                                                                        [Name]

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel.: (215) 398-0562
E-mail: apetitt@rc.com
*Attorney for Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield
of New Jersey; Horizon Healthcare of New Jersey, Inc.*

| | | |
|---|---|---|
| HEALTHCARE JUSTICE COALITION NJ, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | SUPERIOR COURT OF NEW JERSEY |
| vs. | : | LAW DIVISION |
| | : | GLOUCESTER COUNTY |
| HORIZON HEALTHCARE SERVICES, | : | |
| INC. d/b/a HORIZON BLUE CROSS BLUE | : | DOCKET NO.  GLO-L-000242-24 |
| SHIELD OF NEW JERSEY; HORIZON | : | |
| HEALTHCARE OF NEW JERSEY, INC.; | : | |
| DOES 1-20, INCLUSIVE, | : | |
| | : | |
| Defendants. | : | |


# DEFENDANTS' REPLY BRIEF IN SUPPORT OF
# THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ...................................................................... 1

LEGAL ARGUMENT ...................................................................................... 1

    A.    Plaintiff Fails to Allege a Proper Assignment and, Therefore, Lacks Standing to Pursue NES' Claims. ................................................................. 1

    B.    Plaintiff Fails to State a Cause of Action for Relief Against Horizon. ................... 4

        1.    Count One – Quantum Meruit ................................................ 4

        2.    Count Two – Breach of Implied Contract .................................. 8

        3.    Count Three – Violation of HCAPPA ...................................... 10

CONCLUSION ................................................................................................ 11

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*,
No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024) .............................................................2

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*,
890 F.3d 445 (3d Cir. 2018).................................................................................................3

*Atlantic ER Physicians Team Pediatric Associates PA, et al. v. UnitedHealth Group Inc., et al.*,
GLO-L-1196-20 (CBLP) (Aug. 23, 2022)............................................................................5, 6

*BrainBuilders, LLC v. Aetna Life Ins. Co.*,
No. 17-cv-03626 (GC) (DEA), 2024 WL 358152 (D.N.J. Jan. 31, 2024).............................11

*CardioNet, Inc. v. Cigna Health Corp.*,
751 F.3d 165 (3d Cir. 2014).................................................................................................2

*Emergency Physician Servs. Of New York v. UnitedHealth Grp., Inc.*,
No. 20-cv-9183 (AJN), 2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) .............................9, 10

*Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*,
366 N.J. Super. 501 (App. Div. 2004) ....................................................................................9

*Gotham City Orthopedics, LLC v. Aetna Inc.*,
No. 20-cv-19634 (KM)(JBC), 2021 WL 9667963 (D.N.J. Sept. 10, 2021) .......................3, 7

*J&M Interiors, Inc. v. Centerton Square Owners, LLC*,
No. A-2536-19, 2021 WL 1976648 (N.J. Super. Ct. App. Div. May 18, 2021) ...................10

*MHA, LLC v. Amerigroup Corp.*,
539 F. Supp. 3d 349 (D.N.J. 2021) ......................................................................................11

*MHA, LLC v. Wellcare Health Plans, Inc.*,
No. ESX-L-003949-19, 2020 WL 1427919 (N.J. Super. L. Mar. 17, 2020)................6, 10, 11

*NJSR Surgical Center, LLC v. Horizon Blue Cross Blue Shield of New Jersey*,
979 F. Supp. 2d 513 (D.N.J. 2013) .........................................................................................2

*Open MRI Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health & Life Ins. Co.*,
No. 20-cv-10345 (KM)(ESK), 2022 WL 1567797 (D.N.J. May 18, 2022) ...........................2

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*,
  967 F.3d 218 (3d Cir. 2020) ...................................................................6, 7, 8

*Saint Barnabas Medical Center v. County of Essex*,
  111 N.J. 67 (1988) ................................................................................4, 5

*Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*,
  172 N.J. 60 (N.J. 2002) ...............................................................................7

*Temple Univ. Hosp., Inc. v. City of Philadelphia*,
  2006 WL 51206 (Pa. Com. Pl. Jan. 3, 2006) ........................................10

**Statutes**

Employee Retirement Income Security Act of 1974 ............................................ *passim*

**Rules**

N.J. R. 4:6-2 ..........................................................................................................1

## PRELIMINARY STATEMENT

Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ") and Horizon Healthcare of New Jersey, Inc. d/b/a Horizon NJ Health (incorrectly identified as "Horizon Healthcare of New Jersey, Inc.") ("HNJH") (collectively, "Horizon") respectfully submit this reply brief in further support of their motion to dismiss pursuant to N.J. R. 4:6-2(e).

As more fully discussed below and in Horizon's brief in support of its motion to dismiss pursuant to Rule 4:6-2(e), this Court should grant Horizon's motion to dismiss in all respects and dismiss Plaintiff Healthcare Justice Coalition of New Jersey Corp.'s ("Plaintiff") Complaint in its entirety and with prejudice.

## LEGAL ARGUMENT

**A.    Plaintiff Fails to Allege a Proper Assignment and, Therefore, Lacks Standing to Pursue NES' Claims.**

In its Opposition, Plaintiff incorrectly asserts that it has sufficiently alleged a valid assignment of the rights of NES, the emergency medicine practice groups, that supports standing in this action.  (Pl. Opp. at 5-8).  Plaintiff acknowledges that it purchased the debt from NES and claims that "the allegations establish a clear inference that Plaintiff has purchased the claims in their entirety and, as their sole owner, has the right to sue Defendants."  (*Id.* at 5, citing to ¶¶ 1, 13-14, 22-23, 45, 47 of the Complaint) (emphasis omitted)).  It is undisputed however that Plaintiff has not asserted any factual allegations relating to the substance of any purported assignment Plaintiff received from NES by way of its debt purchase that would permit Horizon or this Court to evaluate the legal sufficiency of any such assignments.  Rather, Plaintiff contends that its allegations are sufficient to satisfy the requirements of New Jersey pleading standards, and that New Jersey law requires no particular form of assignment.

1

Plaintiff is incorrect.  Plaintiff's mere conclusory allegations are wholly insufficient to plead that it has standing to assert any of NES' purported claims against Horizon.  *See NJSR Surgical Center, LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 979 F. Supp. 2d 513, 522-23 (D.N.J. 2013) (dismissing plaintiff's complaint because its "conclusory allegation" of the existence of an assignment of benefits "fell short of what is required to withstand a motion to dismiss"); *Abira Medical Laboratories, LLC v. Independence Administrators, Independence Health Group, et al.*, No. MER-L-001179-23 (N.J. Sup. Ct. Jan. 11, 2024) (reasoning that "vague references to a purported assignment will not satisfy that burden")[1]; *Open MRI Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health & Life Ins. Co.*, No. 20-cv-10345 (KM)(ESK), 2022 WL 1567797, at *2 (D.N.J. May 18, 2022)[2] (finding where an assignment is the very basis of plaintiff's entitlement to sue, it may reasonably be asked to at least allege its existence)).

Plaintiff does not dispute that it has failed to demonstrate any assignment of patient rights unto NES.  Rather, Plaintiff attempts to distinguish the case law cited by Horizon in support of its arguments on grounds that it is not seeking benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et. Seq.* ("ERISA").  Plaintiff's argument is misguided. Under ERISA, a provider may only assert a claim for ERISA benefits if it has a valid assignment of rights from the member of the ERISA plan.  *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 178-79 (3d Cir. 2014) (noting that the providers stand in the shoes of the participants and have standing to assert whatever rights the assignors possessed, assuming the validity of the

---

[1] A true and correct copy of the unpublished transcript of the Court's decision is attached to the Certification of Adam J. Petitt in support of Defendants' Motion to Dismiss as Exhibit 3.
[2] Unless otherwise noted herein, copies of all unpublished decisions are attached to Defendants' Motion to Dismiss as Exhibit 1.

participants' assignments to the providers).  As such, New Jersey court have routinely evaluated a plaintiff's complaint to determine whether it properly alleges standing by way of an assignment of rights to pursue claims under ERISA.  *See id.* at 176 n.10 (adopting "the majority position that health care providers may obtain standing to sue by assignment from a plan participant"); *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 450 (3d Cir. 2018) (when a patient assigns payment of insurance benefits to a healthcare provider in the absence of an anti-assignment clause, the provider gains standing to sue for that payment) (internal quotation marks and citation omitted); *see also Gotham City Orthopedics, LLC v. Aetna Inc.*, No. 20-cv-19634 (KM)(JBC), 2021 WL 9667963, at *8 (D.N.J. Sept. 10, 2021) ("Healthcare providers that are neither participants nor beneficiaries in their own right may obtain derivative standing by assignment from a plan participant or beneficiary.").  It's of no moment that Plaintiff claims it is not seeking ERISA benefits here.  Plaintiff is not relieved of its pleading obligations to establish that it has proper standing.  The fact of the matter is mere conclusory statements are insufficient to show Plaintiff has the right to pursue causes of action as if it were standing in the shoes of the NES physicians.

Moreover, Plaintiff's contention that its claims do not seek ERISA benefits is premature. As discussed in Horizon's brief in support of their motion to dismiss, Plaintiff has still not identified the claims at issue which it claims contains "65,000 benefit claims."  (Compl., ¶ 26). Undoubtedly, the claims at issue will be governed by employer-based plans that are governed by ERISA, other self-insured programs such as New Jersey's State Health Benefits Program and the Federal Employee Program, and plans administered by other Blue Cross Blue Shield entities for which Horizon is not responsible.  Accordingly, Horizon continues to reserve all rights to assert additional grounds for dismissal once the claims are produced and Horizon has the opportunity to

review and determine the governing health plans at issue.

**B.      Plaintiff Fails to State a Cause of Action for Relief Against Horizon.**

In its Opposition, Plaintiff argues that it sufficiently states its cause of action for quantum meruit, breach of implied contract, and violation of New Jersey's HCAPPA to survive dismissal. (Pl. Opp. at 8-16). However, for the reasons discussed below and as discussed in greater detail in Horizon's motion to dismiss, each cause of action fails to state a claim upon which relief can be granted.

**1.      Count One – Quantum Meruit**

Plaintiff relies heavily on *Saint Barnabas Medical Center v. County of Essex*, 111 N.J. 67 (1988), arguing that out-of-network emergency providers that fulfill the duty of another to provide emergency services are entitled to restitution in quasi contract. Plaintiff claims that the NES physicians fulfilled Horizon's legal duty to provide emergency services and care to their members and thereby conferred a benefit on Horizon. Plaintiff further contends that Horizon unjustly retained that benefit by paying NES significantly less than reasonable value of those emergency services and pocketing the difference in profits.

Plaintiff's reliance on *Saint Barnabas* is misplaced and misstates its application to the present matter. In *Saint Barnabas*, the Supreme Court of New Jersey addressed the extent to which a county is responsible for hospitalization costs of an indigent county jail inmate where the inmate remains hospitalized past the term of his sentence. *Saint Barnabas*, 111 N.J. at 70. The Court found that in the absence of an express or implied contract, the county is responsible for the hospitalization costs incurred during the tenure of the inmate's sentence and that the loss resulting from the unpaid portion of the bill is to be borne by the medical center. *Id.* at 70, 84. Moreover, the Court explained that "[s]ince the procurement of medical services for inmates is within the scope of a county's contracting powers, the application of *quasi*-contract principles is not barred

4

by defendant's mere failure to follow proper contracting procedures." *Id.* at 80.  Here, in contrast to the County of Essex's relationship to incarcerated inmates, Horizon had express contracts with its members regarding the coverage for medical services including emergency services.  Horizon's obligations, if any, to provide coverage to those members derive from the applicable health benefits plans, not state regulations.  Accordingly, Plaintiff's reliance on *Saint Barnabas* and subsequently the illustrations in Section 22 of the Restatement (Third) of Restitution and Unjust Enrichment are misplaced.

Moreover, Illustrations 10 and 12 do not support the conclusion that Horizon received a benefit and that restitution is due and owing to Plaintiff as NES' assignee and the owner of the claims. (Pl. Opp. at 9).  First, in Illustration 12, where a county arranged for a prisoner's admission to a hospital, the county was responsible for the reasonable cost of care furnished to the prisoner during the period of incarceration although there was no contract formed between the county and the hospital.  Restatement (Third) of Restitution and Unjust Enrichment § 22 (2011), Illustration 12.  Second, in Illustration 10, a hospital continued to provide emergency services to patients enrolled with Managed Care Organization although it no longer had an agreement to be compensated at the "preferred" rate.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 22 (2011), Illustration 10.  Under that illustration, where the hospital demanded compensation at the higher, "standard" rate invoiced to uninsured patients, there was no express or implied contract to fix the price of the hospital's services and that the hospital's right to payment from rests on a claim in restitution.  *Id.*

In support of its argument Plaintiff also relies on *Atlantic ER Physicians Team Pediatric Associates PA, et al. v. UnitedHealth Group Inc., et al.*, GLO-L-1196-20 (CBLP) (Aug. 23, 2022).  However, *Atlantic ER* is factually distinguishable from the circumstances at issue here.  In the

second amended complaint in *Atlantic ER*, the plaintiffs (emergency room physician groups) alleged that they had an express written contract with United which specified reimbursement rates for emergency services, that United and MultiPlan (a third-party administrator) conspired to terminate the contract, and that United then denied plaintiffs' billed amounts for emergency services relying on Multiplan's payment methodology. *Atlantic ER*, at pp. 1-3. As a result, plaintiffs claimed that United and Multiplan were able to pocket the difference in profits while simultaneously discharging United's contractual obligation to pay for out-of-network emergency care for its members.[3] *Id.* at p. 9. By contrast, here, Plaintiff simply alleges that NES provided emergency services and therefore it should be paid the reasonable value of the emergency health care services provided by the Physicians. (Compl. ¶24). However, merely asserting in conclusory fashion that Horizon benefitted by the mere fact that emergency services were rendered is not sufficient to state a quantum meruit claim.

Moreover, Plaintiff's recitation of federal law on the issue is misstated and misapplied. Contrary to district court's discussions in *MedWell* and *MHA*, *Plastic Surgery Center* is not Third Circuit precedent, and this Court is not bound by the decision in *Plastic Surgery Center*. In the context of an unjust enrichment claim, unlike quantum meruit, *Plastic Surgery Center* merely stated that the benefit conferred was the discharge of the insurer's obligation owed to its insured. In doing so, the Third Circuit recognized that the duty the insurer owed to the insured was "under the terms of the ERISA plan." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 241 (3d Cir. 2020) (emphasis omitted). As a result, the Third Circuit found the provider's unjust

---

[3] A true and correct copy of the unpublished decision in *Atlantic ER Physicians Team Pediatric Associates PA, et al. v. UnitedHealth Group Inc., et al.*, GLO-L-1196-20(CBLP) (Aug. 23, 2022), is attached as Exhibit A to the Certification of Dante B. Parenti in Support of Opposition to Motion to Dismiss Plaintiff's Complaint.

enrichment claim to be preempted. *Id.* at 241-42. Here, Plaintiff alleges quantum meruit, not unjust enrichment. Unjust enrichment requires an allegation that Horizon "received a benefit and that retention of that benefit without payment would be unjust." *Id.* at 240 (quoting *Thieme v. Aucoin-Thieme*, 227 N.J. 269 (2016)). On the other hand, Quantum meruit requires "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 172 N.J. 60, 68 (N.J. 2002). Here, NES's services were purportedly "accepted" by the Patients, but NES "expected" compensation from Horizon. *See id.*; *see also* Compl., ¶¶ 38, 40. In a more recent decision in the District of New Jersey, *Gotham City Orthopedics, LLC v. Aetna Inc.*,[4] the district court recognized that a quantum meruit claim fails because "the insured individual, rather than the insurer, derives the benefit from a health providers' provision of medical services." No. 20-cv-19634(KM)(JBC), 2021 WL 9667963, at *6 (D.N.J. Sept. 10, 2021) (collecting cases). Consequentially, the district court found that the provider's quantum meruit claim, asserted on behalf of the provider in its own right, is preempted. *Id.*

Furthermore, even if Plaintiff's quantum meruit claim could be supported by its argument that Horizon received a benefit by way of the fulfillment of its obligation under its plans to its members (which it cannot), Plaintiff's quantum meruit claim is expressly preempted under ERISA.[5] It is of no moment that Plaintiff claims it is not seeking benefits under any ERISA-governed plans. (Pl. Opp. at 7 ("Plaintiff does not, in this action, sue for benefits under any

---

[4] A true and correct copy of this unpublished decision is attached hereto as Exhibit A.

[5] Plaintiff has not identified or provided a list of the claims at issue which undoubtedly will include claims under employer-based plans that are governed by ERISA. To the extent the plans at issue are governed by ERISA, Plaintiff's quantum meruit claim is expressly preempted.

ERISA-governed benefit plan.")).  By arguing that a benefit is conferred to Horizon by satisfying its obligations under the plans, Plaintiff concedes that its claims are subject to the terms and conditions of the plans, including those governed by ERISA.  Accordingly, Plaintiff's quantum meruit claim must be dismissed as expressly preempted under ERISA where the plans at issue are governed by ERISA.  *See Plastic Surgery Center*, 967 F.3d at 241-42.

Accordingly, Plaintiff's quantum meruit claim against Horizon must be dismissed.

### 2.  Count Two – Breach of Implied Contract

Plaintiff contends that it sufficiently alleges in the Complaint that "[Horizon] and Plaintiff entered into an implied contract wherein Plaintiff would provide emergency medical services to members of [Horizon's] health plans and [Horizon] understood that they had to pay the reasonable value for the emergency services rendered by Plaintiff."  (Pl. Opp. at 11 (quoting Compl., ¶ 51) (internal quotation marks omitted)).  Plaintiff also argues that it sufficiently alleges an implied agreement between Horizon and NES to "make the necessary arrangements" because the emergency room physicians are out of network and Horizon represents to their members that hospital emergency room services are covered by Horizon.  (*Id.* at 12).  The Complaint, however, fails to allege a clear and unambiguous promise from Horizon to Plaintiff sufficient to state a cause of action for breach of contract.

Here, Plaintiff argues that there is a "promise to pay" by Horizon because pursuant to the court of dealing alleged in the Complaint, Horizon created an expectation that NES could expect to be paid "the reasonable value of the services."  However, as discussed in Horizon's initial brief, there was no mutual agreement between the parties as to the reimbursement that Horizon should purportedly have paid NES for emergency medical services to the Members, which is a material term for any such agreement.  Specifically, Plaintiff fails to allege that the parties agreed to a specific price term, which is required to establish the existence of a contract.  Here, the allegations

fail to demonstrate that there was mutual agreement between the parties concerning the rates that the Physicians would be paid.  Moreover, Plaintiff continues to rely solely on general statements of the parties' purported course of dealing, as it cannot cure the Complaint's failure to allege any specific instances where this conduct occurred between the parties.

In *Atlantic*, the provider and United Healthcare, the health insurer at issue, had a written contract in place which governed reimbursement for emergency services and then terminated that contract.  As such, the parties had no contract between them for reimbursement.  As a result, this Court dismissed the provider's breach of implied-in-fact contract claim where "the parties were not in agreement as [to the] benefit amount the defendants would pay for plaintiffs' services." *Atlantic*, Case No. GLO-L-001196-20, at 7.  This Court concluded that the essential term, price "is in no way an agreed upon term in this implied contract."  *Id.*  This holding rings true in the present case.  Plaintiff fails to assert a mutual agreement between the parties under which Horizon agreed to pay NES for emergency medical services to the Members.

In addition, Plaintiff fails to address Horizon's argument that the breach of implied contract claim is legally deficient because Plaintiff has not sufficiently alleged the necessary element of consideration.  That is, Plaintiff fails to allege that Horizon received consideration or enjoyed a bargained-for benefit in exchange for agreeing to pay the full amount of the Physician's billed charges. *See Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*, 366 N.J. Super. 501, 508 (App. Div. 2004) (contracts are not enforceable in the absence of consideration, i.e., "both sides must 'get something' out of the exchange").  As a matter of law, the consideration cannot be the Physicians' provision of emergency medical services to members of Horizon's health plans.  First, those medical services were not received by Horizon. *See Emergency Physician Servs. Of New York v. UnitedHealth Grp., Inc.*, No. 20-cv-9183 (AJN), 2021 WL 4437166, at *11 (S.D.N.Y.

Sept. 28, 2021) ("Plaintiffs do not plead consideration because Plaintiffs provide healthcare services to patients not in exchange for United's payments but instead out of 'a pre-existing legal obligation,' which 'does not amount to consideration.'") (citation omitted).  Second, Plaintiff admits that the Physicians were already obligated under federal and New Jersey State law to render these emergency medical services to the patients without regard to the terms of payment.  (Compl., ¶¶ 21-22).  *See J&M Interiors, Inc. v. Centerton Square Owners, LLC*, No. A-2536-19, 2021 WL 1976648, at \*6 (N.J. Super. Ct. App. Div. May 18, 2021) ("a subsequent promise to fulfil an obligation already required in a contract cannot be considered new or additional consideration"); *Temple Univ. Hosp., Inc. v. City of Philadelphia*, 2006 WL 51206, at \*3 (Pa. Com. Pl. Jan. 3, 2006) (dismissing claim for breach of implied in fact contract where "there was no exchange of consideration because . . . [the hospital] was legally bound to provide emergency care services" under EMTALA); *see also Emergency Physician Servs. Of New York*, 2021 WL 4437166, at \*12 (finding that the complaint "does not plead a necessary meeting of the minds as to the price of services").

Accordingly, Plaintiff's breach of implied contract claim against Horizon must be dismissed.

### 3.     Count Three – Violation of HCAPPA

In its Opposition, Plaintiff contends that it has a private right of action to purse its claims against Horizon under HCAPPA.  In support thereof, Plaintiff erroneously relies on *MHA, LLC v. Wellcare Health Plans, Inc.*, No. ESX-L-003949-19, 2020 WL 1427919 (N.J. Super. L. Mar. 17, 2020).[6]  First, *MHA, LLC* is a trial court order which is neither binding nor persuasive for this Court.  Second, the *MHA, LLC* court did not conduct an analysis of HCAPPA's provisions or its

---

[6] A true and correct copy of this unpublished decision is attached hereto as Exhibit B.

Legislative history in order to determine whether a private right of action was implied. Rather, the court merely noted that the "text appears to contemplate" that prompt pay interest may be paid directly to a provider. *Id.* at *23. Third, the court did not determine that HCAPPA gives an implied private right of action to providers. Lastly, more recent decisions from the District of New Jersey have concluded that providers, like Plaintiff standing in the shoes of NES, do not have a private right of action, express or implied, under HCAPPA. *See MHA, LLC v. Amerigroup Corp.*, 539 F. Supp. 3d 349, 359 (D.N.J. 2021) (finding no implied private right of action under the HCAPPA); *BrainBuilders, LLC v. Aetna Life Ins. Co.*, No. 17-cv-03626 (GC) (DEA), 2024 WL 358152, at *13 (D.N.J. Jan. 31, 2024) (same).

Accordingly, this Court should dismiss Plaintiff's claim for violation of HCAPPA against Horizon.

## **CONCLUSION**

For the foregoing reasons and those outlined in its initial brief and supporting certifications, the Court should grant Defendants' motion and dismiss the Complaint in its entirety, with prejudice.

Respectfully submitted,

By: _____
       Adam J. Petitt, Esq.

Dated: July 15, 2024

11

# EXHIBIT A

GLO-L-000242-24  07/15/2024 7:38:01 PM  Pg 17 of 49  Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 423 of 466 PageID: 442
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

2021 WL 9667963
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

GOTHAM CITY ORTHOPEDICS, LLC, Plaintiff,

v.

AETNA INC., et al. Defendants.

Civ. No. 20-19634 (KM)(JBC)
|
Signed September 10, 2021

**Attorneys and Law Firms**

Keith J. Roberts, Shannon M. Carroll, Brach Eichler LLC, Roseland, NJ, Paul Matthew Bishop, Mason, Griffin & Pierson, P.C., Princeton, NJ, for Plaintiff.

Colin D. Dougherty, Benjamin McCoy, Fox Rothschild LLP, Blue Bell, PA, for Defendants.

**OPINION**

KEVIN McNULTY, United States District Judge:

**\*1** Plaintiff Gotham City Orthopedics, LLC ("Gotham") initiated this action against Aetna Inc., Aetna Health Inc., Aetna Life Insurance Company, Aetna Insurance Company of Connecticut, and Non-New Jersey Aetna Plans 1-10 [1] (collectively "Aetna" or "Defendants") for their alleged repeated failure to make payments upon claims for emergency services rendered to participants in Aetna insured or administered health plans. Gotham asserted claims for breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, quantum meruit, and violations of certain New Jersey regulations governing payment for emergency services rendered by an out-of-network provider.

The Aetna Defendants moved to dismiss the initial Complaint. Gotham responded with a motion for leave to file a First Amended Complaint, which is now before the Court. For the reasons provided herein, I will deny Gotham's motion to amend. For the reasons stated herein, that order is entered without prejudice to a further motion to amend.

**I. Summary** [2]

**a. Factual Allegations**

Gotham is a medical practice located in Clifton, New Jersey. (Compl. ¶7.) The practice consists of a group of orthopedic surgeons who have visiting rights in numerous New Jersey hospitals. (*Id.* ¶13.) Defendant Aetna, a Pennsylvania corporation with offices in New Jersey, offers, underwrites, or administers health plans through its subsidiaries or affiliates. (*Id.* ¶¶8-9.) The individual insureds in this action are employees or relatives of employees covered under their employers' health insurance plans which are sponsored, funded, and/or administered by Aetna. (*Id.* ¶11.) Gotham alleges that each plan "provided health, medical and hospital coverage, including emergency room coverage, expressly and/or by operation of law." (*Id.*)

**\*2** As alleged in the Complaint, Gotham provided emergency, medically necessary surgical and medical services to twenty-nine patients who were covered under an Aetna health plan. (*Id.* ¶¶14-321.) Each patient (1) presented to the emergency room following an injury; (2) received "continuous, emergent medically necessary care" from Gotham; and (3) "had no choice in selecting their medical provider." (*Id.*) Gotham submitted a claim to Aetna for each of the services provided, and Aetna either underpaid or failed to pay each claim. (*Id.*) Gotham filed unsuccessful appeals for each claim. (*Id.*) Gotham alleges that, in total, Aetna owes $1,332,703.07 in underpaid claims. (*Id.* ¶4; *see also* Exhibit A to the Compl.)

**b. Procedural History**

Gotham initiated this action by filing its Complaint in the Superior Court of New Jersey, Law Division, Passaic County, No. PAS-L-003391-20, on November 6, 2020. (Compl.) The Complaint asserted the following state-law causes of action:

**Count I** – Breach of Implied Contract;

**Count II** – Breach of Covenant of Good Faith and Fair Dealing;

**Count III** – Promissory Estoppel;

**Count IV** – Quantum Meruit;

**Count V** – Violations of New Jersey Regulations Governing Payment for Emergency Services Rendered

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 18 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 424 of 466 PageID: 443
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

by an Out-of-Network Provider (N.J.A.C 11:22-5.8; 11:24-5.1; and 11:24-9.1(d))

(*Id.* ¶¶336-34.) As stated in the Complaint, Gotham "asserted direct claims and causes of action that are not predicated on an assignment of benefits from the patient." (*Id.* ¶333.)

Defendants removed the action to this Court on December 17, 2020, pursuant to 28 U.S.C. §§ 1332, 1441(a) and (b) and 1446. (DE 1.) Defendants then filed a motion to dismiss (DE 5) the Complaint on February 26, 2021, asserting that (1) Gotham's claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., and (2) the Complaint fails to state a claim under New Jersey law. (MTD Br. at 7-8.)

After briefing on Defendant's motion to dismiss was complete, Plaintiff filed the pending motion for leave to amend the Complaint. (DE 13.) On August 3, 2021, the Court administratively terminated Defendants' motion to dismiss, which would potentially be mooted by the motion for leave to amend. (DE 22.) Gotham seeks amend its complaint to add alternative claims predicated on certain insureds' assignment of benefits and execution of power of attorney forms.

## II. Discussion

### a. Legal Standard

A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under 12(b), (c), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a); *see also Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). "[L]eave [to amend] shall be freely given when justice so requires." *Id.* Accordingly, the courts "have shown a strong liberality ... in allowing amendments under Rule 15(a)." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing*, 663 F.2d 419, 425 (3d Cir.1981) (quoting 3 J. Moore, Moore's Federal Practice ¶ 15.08(2) (2d ed. 1989)).

In determining a motion for leave to amend, Courts consider the following factors: (1) undue delay on the part of the party seeking to amend; (2) bad faith or dilatory motive behind the amendment; (3) repeated failure to cure deficiencies through multiple prior amendments; (4) undue prejudice on the opposing party; and/or (5) futility of the amendment. *Foman v. Davis*, 371 U.S. 178 (1962); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010).

**\*3** "Futility" means that the complaint, as amended, "would not withstand a motion to dismiss." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983); *see also Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001); *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). Otherwise, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (internal quotation and citation omitted). Thus "delay," for example, entails more than the mere passage of time; to warrant denial of leave to amend, it must be "undue" or prejudicial. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). The Court should deny leave only when the *Foman* factors "suggest that amendment would be 'unjust'...." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006).

### b. Gotham's Motion to Amend

Aetna moved to dismiss the initial Complaint on the ground that, *inter alia*, Gotham's claims are preempted by ERISA. Gotham submits that, in the wake of that motion to dismiss, it reviewed its patient files and determined that certain insureds contractually assigned their insurance benefits to Gotham. Those assignments allegedly included the right to submit insurance claims, receive reimbursements, and pursue administrative and judicial appeals. (IAC ¶¶343-351.) Additionally, certain insureds appointed Gotham to serve as their agent pursuant to an executed power of attorney ("POA"). (*Id.*¶¶351-354.) Thus, in addition to the claims for underpayment of emergency services asserted in the initial Complaint, Gotham seeks to amend its pleadings to include claims for ERISA violations on behalf of those insureds who either assigned to Gotham their legal rights and benefits under their respective plans or who executed a POA authorizing Gotham to pursue claims on their behalf. (Br. at 8.)

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 19 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 425 of 466 PageID: 444
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

The Proposed First Amended Complaint contains the same claims for counts one through five as in the initial Complaint with the following caveats noted in italics:

**Count 1** – Breach of Implied Contract *for Emergency Services Provided*;

**Count 2** – Breach of Covenant of Good Faith and Fair Dealing *for Emergency Services Provided*;

**Count 3** – Promissory Estoppel *for Emergency Services Provided*;

**Count 4** – Quantum Meruit *for Emergency Services Provided*;

**Count 5** – Violations of New Jersey Regulations Governing Payment for Emergency Services Rendered by an Out-of-Network Provider

(1AC ¶¶397-426.)

Additionally, the proposed pleading asserts the following new counts:

**Count 6** – Violations of the Affordable Care Act Governing Payment for Emergency Services Rendered by an Out-of-Network Provider;

**Count 7** – Claim for Benefits Due Under ERISA § 502(a)(1)(B);

**Count 8** – Violation of Fiduciary Duties of Loyalty and Care;

**Count 9** – Penalties for Failure to Provide Plan Documents;

**Count 10** – Attorneys' Fees and Costs Under ERISA;

**Count 11** – Breach of Contract;

**Count 12** – Breach of the Covenant of Good Faith and Fair Dealing;

**Count 13** – Promissory Estoppel;

**Count 14** – Unjust Enrichment;

**Count 15** – Quantum Meruit

(*Id.* ¶¶427-519.)

### c. State law claims for emergency services (Counts 1 through 5) and parallel representative-capacity claims (Counts 11–15)

I first address Gotham's state law claims for emergency services, as pleaded in both the initial Complaint and the proposed First Amended Complaint, because they are preempted by ERISA. As to these, the Court essentially is adjudicating the grounds asserted in the prior, terminated motion to dismiss.

**\*4** ERISA "provide[s] a uniform regulatory regime over employee benefit plans," including health insurance plans. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). To that end, ERISA contains "a broad express preemption provision, which 'supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" *Plastic Surgery Ctr.*, 967 F.3d at 226 (quoting 29 U.S.C. § 1144(a)).

In deciding whether a state law "relates to" a benefit plan, courts assess the extent to which the law "has a connection with or reference to such a plan." *Gotham City Orthopedics, LLC v. Aetna Inc.*, No. 20-14915, 2021 WL 1541069, at *2 (D.N.J. Apr. 19, 2021) (citing *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 479 (2020)).

Recognizing that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course," the Supreme Court has sought to craft a functional test for express preemption, instructing that a state law "relates to" an employee benefit plan if it has either (1) a "reference to" or (2) a "connection with" that plan, The first applies "[w]here a State's law acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation." The second covers state laws that "govern[ ] ... a central matter of plan administration or interfere[ ] with nationally uniform plan administration," and those state laws that have "acute, albeit indirect, economic effects [that] force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." The latter inquiry is guided by "the objectives of the ERISA statute," which provide a blueprint for "the scope of the state law that Congress understood would survive."

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226–27 (3d Cir. 2020) (citations omitted). In enacting ERISA,

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 20 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 426 of 466 PageID: 445
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

Congress sought, *inter alia,* "to ensure that plans were not crippled by the administrative cost of complying with not only ERISA, but also innumerable, potentially conflicting state laws." *Id.* at 226.

With that in mind, the Third Circuit has held that a state law "relates to" an ERISA plan where "the existence of an ERISA plan [i]s a critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan." *See 1975 Salaried Ret. Plan for Eligible Emps. of Crucible, Inc. v. Nobers,* 968 F.2d 401, 406 (3d Cir. 1992). State laws that may "relate to" ERISA plan include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). "This includes not only state statutes, but also common law causes of action." *Plastic Surgery Ctr.,* 967 F.3d at 266.

Here, Gotham seeks to bring claims under state common law (breach of implied contract, breach of covenant of good faith and fair dealing, promissory estoppel, and quantum meruit) and statutory law (violation of New Jersey regulations governing payment for emergency services). Those claims rest on the theory that Defendants had a duty, under New Jersey law, to cover emergency services, independent of their obligations under the ERISA health plans. (Reply at 11; 1AC ¶¶397-426.) Plaintiff's theory, however, was recently rejected by another Court in this district. In *Gotham City Orthopedics, LLC v. Aetna Inc.,* Gotham asserted claims nearly identical to those before this court, and Judge Wigenton concluded that Gotham's common law and statutory claims were preempted by ERISA because they "relate to" the insured's ERISA plans. No. 20-14915, 2021 WL 1541069, at *2 (D.N.J. April 19, 2021).

**\*5** I first address the contract, covenant of good faith and fair dealing, and promissory estoppel claims (Counts 1, 2, and 3). First, I note, as did Judge Wigenton, that courts have routinely held "that when a party challenges the denial of ERISA benefits, but restyles those claims as common-law causes of action based on breach of contract, the implied covenant of good faith and fair dealing, promissory estoppel, or quantum meruit, those claims are preempted." *Id.* at *2 (citing *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc.,* 399 F. Supp. 3d 241, 250 (D.N.J. 2019); *Urbanik v. ITT Corp.,* Civ. No. 09-00627, 2009 WL 2132434, at *4 (D.N.J. July 13, 2009); *Schmelzle v. Unum Life Ins. Co. of Am.,* Civ. No. 08-0734, 2008 WL 2966688, at *3 (D.N.J. July 31, 2008)). Second, these claims are "generally premised on Defendants' alleged wrongful denial of the Patients' benefits *under their Aetna ERISA*

plans" and "repeatedly acknowledges that the Patients were insured under ERISA plans and demands payment according to those plan benefits." *Id.* (emphasis added); (*see also, e.g.,* 1AC ¶400 ("Plaintiff rendered emergent, medically necessary surgical and medical services to the Aetna's insureds which are indisputably covered under Aetna's healthcare plan and in doing so, Plaintiff reasonably expected Aetna to properly compensate Plaintiff.8."); ¶415 (At all relevant times, Aetna refused to pay Plaintiff correctly for the surgical and medical services Plaintiff provided to Aetna's insureds. [*sic*] who were covered under a plan sponsored, funded, insured and/or administered by Aetna, contrary to the insurance provided by the plan to the member and contrary to the common law, statutory and regulatory obligations of Aetna.").)

Further, as in the case before Judge Wigenton, Gotham does not here point to "any separate contractual relationship between Plaintiff and Defendants or assert that Defendants proffered any specific representations to Plaintiff (beyond the mere existence of the ERISA plans themselves)." *See Gotham City,* 2021 WL 1541069 at *3. (*See also* 1AC ¶¶ 397-426.) Unlike in-network providers, whose relationship with the insurer is governed by a provider agreement, "out of network providers do not have pre-existing contractual relationships with the insurer." *Plastic Surgery Ctr.,* 967 F.3d at 231. Thus, absent some agreement between the insurer and out-of-network provider, the provision of services from a provider to an insured does not create a contractual relationship between the provider and the insurer that is independent of the plan. *See id.* Here, Gotham has not alleged that Defendants made any representations or entered into any independent agreement separate from the insured's health plans.

Compare, for example, *Plastic Surgery Ctr., supra,* in which an out-of-network provider brought breach of contract, promissory estoppel, and unjust enrichment claims against an insurer who agreed to cover certain services that were not covered under the insureds' health plans. 967 F.3d at 223. The Third Circuit permitted the breach of contract and promissory estoppel claims because, *inter alia,* the insurer expressly agreed to cover the services. *Id.* at 231-32. Therefore, those claims sought to enforce contractual or quasi-contractual obligations that arose *independent* of the health plan (*i.e.,* that arose from the insurer's promise to pay for the uncovered services). *Id.* The Court also held that the contract and promissory estoppel claims did not have a "connection with" an ERISA plan because the provider did not allege that the plan covered the services in question; instead, the provider alleged that the insurer "must pay the cost of the[ ] services

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 427 of 466 PageID: 446

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 21 of 49   Trans ID: LCV20241755939
*Gotham City Orthopedics, LLC v. Aetna Inc.*, Not Reported in Fed. Supp. (2021)

only because, and to the extent, it promised the Center that it would." *Id.* at 237. This case is distinguishable on both of the key grounds cited by *Plastic Surgery*. Here, Gotham does not allege that the Aetna Defendants agreed to provide coverage for the out-of-network services. Moreover, Gotham repeatedly alleges that the insured's health plans covered those services. (See, *e.g.*, 1AC ¶¶400, 411, 415.)

Gotham's claims, then, cannot be divorced from the alleged coverage of its services under the Aetna plans in question. (1AC ¶398 ("Aetna knew as a matter of law that their members and beneficiaries *are entitled to be covered* for out-of-network emergency care."), ¶ 411 ("Through their course of dealings, and under New Jersey law, Plaintiff expected Aetna to process claims and issue benefits *in accordance with the terms of the Aetna Plans* through which the Aetna insureds received benefits."), ¶514 ("At all relevant times, Aetna refused to pay Plaintiff correctly for the surgical and medical services Plaintiff provided to Aetna's insureds. [*sic*] who were covered under a plan sponsored, funded, insured and/ or administered by Aetna, *contrary to the insurance provided by the plan* to the member and contrary to the common law, statutory and regulatory obligations of Aetna.") (emphasis added).) Thus, unlike the claims in *Plastic Surgery Ctr*, here, there is no basis independent of the ERISA governed plans for the provision of coverage. Therefore, because, "the existence of an ERISA plan [i]s a critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan," Gotham's common law claims "relate to" an ERISA plan and are preempted. *See 1975 Salaried Ret. Plan*, 968 F.2d at 406.

 *6  Gotham's quantum meruit claim (Count 4) is likewise preempted. As asserted on behalf of Gotham in its own right, it is legally flawed for another reason. Quantum meruit "is applied when, absent a manifest intention to be bound, one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 76 (D.N.J. 2018) (citing *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (App. Div. 2007)). Numerous courts, however, have held that "the insured individual, rather than the insurer, derives the benefit from a healthcare providers' provision of medical services." *Haghighi v. Horizon Blue Cross Blue Shield of New Jersey*, No. 19-20483, 2020 WL 5105234, at *5 (D.N.J. Aug. 31, 2020); *Small v. Oxford Health Ins., Inc.*, No. 18-13120, 2019 WL 851355, at *6 (D.N.J. Feb. 21, 2019) ("[A]n insurance company does not derive a benefit from services provided for an insured for purposes of a quantum meruit claim."); *Gotham City*, 2021 WL 1541069

at *3. It therefore is not a claim that Gotham can pursue independently.

Count 5, Gotham's statutory claim for reimbursement of emergency services, is also preempted by ERISA. The proposed First Amended Complaint submits that N.J.S.A. 26:2H-18 requires providers to "render emergent care to all patients, regardless of their ability to pay, or the source of the payment." (1AC ¶420.) Further, the First Amended Complaint contends that, to ensure access to emergency care, New Jersey insurance regulations (1) "mandate that payors determine coverage and pay promptly"; (2) require "payors to specifically notify their subscribers that they are entitled to have 'access' to emergency services, and 'payment of appropriate (health) benefits' for emergency conditions"; and (3) require that out-of-network providers be "paid a large enough amount to ensure that the patient is not balance billed." (*Id.* ¶¶420-422 (citing N.J.A.C. 11:24A-2.5(b)(2).).) Additionally, Gotham alleges that "the payor must pay the provider its actual billed charges minus the copayments, coinsurance and deductible that would have applied had the patient sought treatment from an in-network provider." (*Id.* ¶422.)

Like Judge Wigenton, I find that those regulatory mandates are not wholly independent, but rather that they affect the scope of benefits provided *by an ERISA plan* (*i.e.* coverage for certain emergency services regardless of the providers' out-of-network status). *Gotham City*, 2021 WL 1541069 at *3. Moreover, Gotham's proffered interpretation of the New Jersey regulatory scheme requires insurers pay out-of-network providers for emergency services to the same extent they would have paid for in-network providers. To determine what the insurer owes the out-of-network provider, then, the court would have to determine what the insurer would owe an in-network provider pursuant to the terms of the ERISA plan. For this additional reason, Count 5 must be preempted because, to determine liability, this "court's inquiry would be directed to the plan." *See 1975 Salaried Ret. Plan*, 968 F.2d at 406.

Because Gotham's statutory, contract, covenant of good faith and fair dealing, promissory estoppel, and quantum meruit claims are preempted, any amendment would be futile. I therefore deny Gotham's motion to amend as to Counts 1, 2, 3, 4, and 5. [3]

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 22 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 428 of 466 PageID: 447
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

### d. Newly asserted ERISA claims premised on assignment of benefits and executed POAs

#### i. Undue Delay and Prejudice to Defendants

**\*7** As explained, Gotham asserted its initial claims as direct causes of action on its own behalf. Following briefing of Defendants' motion to dismiss, and following Judge Wigenton's unfavorable decision in *Gotham City*, Gotham allegedly reviewed its patient files and determined that several insureds had executed POAs or assignments of their benefits to Gotham. (Carroll Cert. ¶4.) Gotham filed the current motion to amend the complaint to include alternative ERISA claims asserted by Gotham in a representative capacity on behalf of its insureds. (Br. at 5.)

Defendants respond that Gotham's motion to amend should be denied on threshold grounds because seeks to add the representative-capacity claims in bad faith and for dilatory purposes. (Opp. at 8.) Defendants submit that Gotham has been aware of the alleged assignments and POAs for years but made a strategic decision to pursue direct claims in order to circumvent ERISA and remain in state court. (*Id.* at 8.) Defendants further submit that Gotham's delay in seeking amendment is undue because (1) it was motivated by tactical considerations and (2) the allegations could have been pleaded much earlier. (*Id.* at 17.) [4]

"Delay" entails more than the mere passage of time and must be prejudicial to the non-amending party to warrant denial of leave to amend. *Cureton*, 252 F.3d at 273. Defendants here submit that the delay is prejudicial because Gotham's alternative theory could have been pleaded much earlier. (Opp. at 17.) Defendants rely on *Cureton*, where the Third Circuit affirmed the district court's denial of the plaintiff's post-judgment motion to amend because, *inter alia*, "the factual information on which the proposed amendment relied was known almost two-and-a-half years before plaintiffs sought leave to amend." 252 F.3d at 273-74. In that case, however, the motion to amend was also filed three years after the initial complaint was filed, and the court found that "the finality of the proceedings would be compromised by amendment." *Id.* Here, even assuming that Gotham was aware, as Defendants contend, of the assignments of benefits and POA for years before filing this action, the initial complaint was filed in state court in November 2020 (DE 1-1), less than a year ago. Further, this matter is still only

at the pleading stage, and at least some of the interim has been consumed by Defendants' removal of the case and its aftermath. We have not gone down a procedural road that requires the court to retrace its steps or undo prior rulings. Nor is there any indication of lost evidence or other forms of prejudice. Therefore, I find that any delay here does not prejudice the defense. Indeed, in such cases, courts "within the Third Circuit typically dismiss the preempted state law claims and grant leave to amend the complaint to plead ERISA claims, so as to provide defendants with proper notice of the nature of these claims." *Chang v. Prudential Ins. Co. of Am.*, No. 16-CV-3351, 2017 WL 402980, at \*3 (D.N.J. Jan. 30, 2017) (citing *Estate of Jennings v. Delta Air Lines, Inc.*, 126 F. Supp. 3d at 471 (collecting cases; rejecting Plaintiff's request to convert preempted state law claims into ERISA claims and granting leave to amend the complaint)).

Because I conclude amendment is not sought in bad faith, would not prejudice the defense, and would not cause undue delay, I will not deny leave to amend on that basis. However, as explained below, the proposed First Amended Complaint would not survive a motion to dismiss, and therefore I find amendment would be futile.

#### ii. Futility

**\*8** First, Defendants submit that Gotham lacks standing or is estopped to bring these representative-capacity ERISA claims because the original Complaint disavowed assignee status. (Br. at 20; Opp. at 15.) In Defendants' telling the factual allegations in the proposed First Amended Complaint contradict statements made in the original Complaint. However, the original Complaint did not allege that assignments of benefits did *not* exist. (*See generally* Compl.) Rather, Gotham stated that its direct claims were not predicated on an assignment of benefits. (Compl. ¶333.) The plaintiff, of course, is master of its complaint, and may assert or withhold whatever claims it wishes. That the proposed First Amended Complaint seeks to add alternative claims based on an assignment is not a factual contradiction but rather an alternative legal theory. To the extent, *arguendo,* that there is a contradiction, it is not one that has prejudiced the defense.

However, there are other flaws with the ERISA-based claims in the proposed First Amended Complaint.

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 429 of 466 PageID: 448
GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 23 of 49   Trans ID: LCV20241755939
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

1. Count 7's claim for benefits due under ERISA § 502(a)(1)
(B)

Section 502(a) of ERISA empowers "a participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan." ERISA § 502(a), 29 U.S.C. 1132(a); *see Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004). A "participant" is defined in the statute:

> [A "participant" is] any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

ERISA § 3(7), 29 U.S.C. § 1002(7). A "beneficiary" is statutorily defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." ERISA § 3(8), 29 U.S.C. § 1002(8). Healthcare providers that are neither participants nor beneficiaries in their own right may obtain derivative standing by assignment from a plan participant or beneficiary. *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014).

To recover under section 502(a)(1)(B), a plaintiff must demonstrate an entitlement to benefits. *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006). Thus, the District of New Jersey has dismissed ERISA claims where plaintiffs failed to cite to specific plan provisions. "It is the Plaintiff's burden of proof to have the plan documents and cite to specific plan provisions when filing a civil complaint to obtain ERISA benefits." *Ruiz v. Campbell Soup Co.*, No. 12–cv–6131, 2013 WL 1737242, at *3 (D.N.J. Apr. 22, 2013) (citing *Broad St. Surgical Center, LLC v. UnitedHealth Grp., Inc.*, No. 11–cv–2775, 2012, WL 762498, at *15 (D.N.J. Mar. 6, 2012)).

A plaintiff seeking to recover under section 502(a)(1) (B) must demonstrate that the benefits are actually 'due';

that is, he or she must have a right to benefits that is legally enforceable against the plan" and that the plan administrator improperly denied him or her those benefits. "ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits."

*Broad St. Surgical Ctr*, 2012 WL 762498, at *13 (citations omitted); *see also Manning v. Sanofi–Aventis, U.S. Inc.*, No. 11–cv–1134, 2012 WL 3542284, at *3 (M.D. Pa. Aug. 14, 2012) ("To state a claim under § 502(a)(1)(B), plaintiff must allege that she was eligible for benefits under the Plan, that defendant wrongfully denied her benefits and that in doing so, defendant violated § 502(a)(1)(B).").

Here, Gotham asserts certain insureds' ERISA 501(a) claims based on assignments of benefits from those insureds. (1AC ¶435.) However, Gotham has not identified the plan provisions that were allegedly breached. (*See id.* ¶¶433-449.) Instead, the proposed First Amended Complaint alleges generally, without identifying a plan provision, that Aetna violated its legal obligations "each time it failed to make payment, made only partial payment, or delayed payment of benefits," without complying with ERISA requirements governing the claims process and adverse benefit determinations and without complying with the terms of the health plans. (*Id.* ¶¶442-43.) The claim is not necessarily flawed as a matter of law, but it is insufficiently pled.

**\*9** To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plain language of ERISA section 502(a)(1)(B) requires a plaintiff to demonstrate his or her entitlement to "benefits due to him under the terms of his plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). To that end, the Third Circuit has explained that, "to assert an action to recover benefits under ERISA, a plaintiff must demonstrate that 'he or she [has] a right to benefits that is legally enforceable against the plan.' " *Saltzman v. Indep. Blue Cross*, 384 F. App'x 107, 111 (3d Cir. 2010) (quoting *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006)).

Gotham's claims lack the necessary allegations to set forth an ERISA claim. Gotham states in conclusory terms that it has been underpaid. While the proposed First

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 24 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 430 of 466 PageID: 449
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

Amended Complaint points to large disparity between the amount claimed by Gotham and the amount of Defendants' reimbursement, that disparity alone does not properly support a claim for relief. Gotham must point to the specific plan provisions that, in its view, plausibly entitle it to a greater sum of money. *See, e.g., Piscopo v. Pub. Serv. Elec. & Gas Co.,* No. 13–cv–552, 2015 WL 3938925, at *5 (D.N.J. June 25, 2015), *aff'd,* 650 F. App'x 106 (3d Cir. 2016) (dismissing plaintiff's ERISA section 502(a)(1)(B) claim for wrongful denial of pension and retirement benefits, where, *inter alia,* the plaintiff failed to identify "any provision of [the plan] suggesting he is entitled to pension or retirement contributions nor has he alleged any facts about the plan."); *McDonough v. Horizon Blue Cross Blue Shield of N. Jersey, Inc.,* No. 09–cv–571, 2009 WL 3242136, at *3 (D.N.J. Oct. 7, 2009) (dismissing plaintiff's claim for underpayment of benefits under ERISA section 502(a)(1)(B), where the complaint "fail[ed], under Rule 8(a), to give notice of what [the defendant] did in contravention of the terms of the health plan and/or in violation of ERISA."); *Prof'l Orthopaedic Assocs., PA v. 1199SEIU Nat'l Benefit Fund,* 697 F. App'x 39, 41 (2d Cir. 2017) (affirming the district court's dismissal of the plaintiff's ERISA section 502(a)(1)(B) claim where the complaint alleged that the defendant was "required to pay the 'usual, customary and reasonable rates' for services rendered by the out-of-network providers ... but it fail[ed] to identify any provision in the plan documents requiring the [defendant] to pay such rates."). Therefore, I find that the ERISA 502(a)(1)(B) claim under Count VII is futile as currently pleaded.[5]

### 2. Count 8's Breach of Fiduciary Duties Claim under ERISA 502(a)(3)(B)

**\*10** I also find the allegation in proposed Count 8 to be futile because Gotham fails to plausibly allege facts establishing that Defendants were fiduciaries.

To assert a claim for breach of fiduciary duty under ERISA, a plaintiff must establish that: "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan." *Chaaban v. Criscito,* 468 F. App'x 156, 161-62 (3d Cir. 2012) (citing *Leckey v. Stefano,* 501 F.3d 212, 225-26 (3d Cir. 2007)). For purposes of the first element, ERISA defines a plan fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002 (21)(A). A fiduciary under ERISA "must be someone acting in the capacity of manager, administrator, or financial adviser to a 'plan.' " *Pegram v. Herdrich,* 530 U.S. 211, 222, (2000) (citing 29 U.S.C. §§ 1002(21)(A)(i)-(iii)). Fiduciaries are defined "in functional terms of control and authority over the plan." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251, (1993). "[T]he linchpin of fiduciary status under ERISA," however, "is discretion." *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d Cir. 1994).

The issue of discretion turns on whether a party "maintained any authority or control over the management of the plan's assets, management of the plan in general, or maintained any responsibility over the administration of the plan." *Id.* On the other hand, "persons who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles." *Confer v. Custom Engineering Co.,* 952 F.2d 34, 39 (3d Cir. 1991).

Here, Gotham parrots the statutory definition of fiduciary and alleges in conclusory fashion that Defendants acted as fiduciaries because they "exercised discretion in determining the amounts of Plan benefits that would be paid to Plan beneficiaries." (1AC ¶456.) Without factual content, such bald assertions do not establish that Defendants were in fact fiduciaries under ERISA. *See Cohen v. Horizon Blue Cross Blue Shield of New Jersey,* No. 13-03057, 2013 WL 5780815, at *8 (D.N.J. Oct. 25, 2013) (dismissing plaintiff's complaint because while it was "draped with conclusory assertions that [defendant] acted as a fiduciary and exercised discretionary authority, it lack[ed] specific facts to support the plausible inference that [defendant] was, in fact, a fiduciary." (internal citations omitted).

GLO-L-000242-24 07/15/2024 7:38:01 PM Pg 25 of 49 Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD Document 1-1 Filed 08/16/24 Page 431 of 466 PageID: 450
Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)

Because the proposed First Amended Complaint fails to allege facts tending to establish that Defendants were fiduciaries, Count VIII is inadequately pled. I therefore decline to address Defendants' additional futility arguments with respect to this claim; they can be addressed in relation to any amended pleading.

3. Count 9's Claim for Failure to Provide Plan Documents under 29 U.S.C. § 1132(a)(1)(A) and 1132(c)(1)

**\*11** Proposed Count 9, asserting a claim for failure to provide plan documents, is also rejected as futile.

To state a claim for failure to provide plan documents under Section 502(c)(1)(B), a plaintiff must allege:

> (1) that he is a plan participant or beneficiary; (2) that he has made a written request to a plan administrator for information that falls within the purview of ERISA's disclosure requirements; and (3) that the plan administrator failed to provide the requested documents within thirty days of the written request.

*In re Wargotz v. NetJets, Inc.*, No. 09-4789, 2010 WL 1931247, at \*3 (D.N.J. May 13, 2010) (citing 29 U.S.C. § 1132(c)(1)(B)).

Here, the proposed first Amended Complaint alleges that certain insureds executed an assignment of benefits in favor of Gotham. (1AC ¶343.) And, as previously explained, while healthcare providers are neither participants nor beneficiaries in their own right, they may obtain derivative standing by assignment from a plan participant or beneficiary. *CardioNet,*, 751 F.3d at 176 n.10 (3d Cir. 2014). Defendants submit that two of the insureds in this matter had plans that contained an anti-assignment provision. However, for the other insureds, the proposed First Amended Complaint adequately alleges that Gotham is a plan beneficiary for those insureds that executed valid assignments of benefits. Therefore, the first element is satisfied. [6]

However, the proposed First Amended Complaint fails as to the second element because Gotham failed to allege that

it made a *written* request for documents. (*See* 1AC ¶474.) Courts in this district have dismissed without prejudice claims under ERISA 502(c)(1)(B) where the plaintiff failed to allege that the request for plan documents was in writing. *See Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross Blue Shield*, No. 16-01649, 2017 WL 751851, at \*5 (D.N.J. Feb. 27, 2017) ("Although Plaintiff alleges that it 'requested plan materials on behalf of Patients A.G., C.P., [and] B.G.,' Plaintiff does not allege that it sent a *written* request. For that reason, Count Eight is insufficiently pled and dismissed without prejudice.") (internal citations omitted); *See Piscopo v. Pub. Serv. Elec. & Gas Co.*, No. 13-552, 2015 WL 3938925, at \*6 (D.N.J. June 25, 2015), *aff'd*, 650 F. App'x. 106 (3d Cir. 2016) (granting motion to dismiss for claim under Section 502(c)(1)(B) when plaintiff failed to allege that it sent written request for information).

**\*12** Amendment would therefore be futile as to Count 9 as currently pled.

4. Count 10's Claim for Attorneys' Fees and Costs

ERISA 502(g)(1) provides courts with discretion to grant reasonable attorney's fees and costs to either party. 29 U.S.C.A. § 1132(g)(1) ("[T]he court in its discretion may allow a reasonable attorney's fee and costs of action to either party."). Because the prosed First Amended Complaint fails to state an ERISA claim at this juncture, I will deny amendment as to the associated claim for attorneys' fees and costs.

In sum, I find that amendment to assert the newly-raised ERISA claims would be futile, as they are inadequately pled. This aspect of my ruling, however, covering Counts 7–10, is entered without prejudice to a further motion to amend.

## III. ACA Claim

Finally, I address the newly-asserted claim under the Patient Protection Affordable Health Care Act ("ACA") (Count 6). The proposed First Amended Complaint alleges that Defendants failed to properly reimburse Gotham for emergency services rendered to the insurers in accordance with the ACA. (1AC ¶429.) Here, Plaintiff relies on 42 U.S.C. § 300gg-19a(b) and its accompanying regulations, which mandate coverage for emergency services. Further, Gotham submits that it has an implied right of action to enforce the ACA against Defendants pursuant to 42 U.S.C. § 300gg-19a. (1AC ¶432.) Because I find that provision does not grant plaintiffs a private right of action, I find the proposed ACA claim is futile as a matter of law.

Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 432 of 466 PageID: 451

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 26 of 49   Trans ID: LCV20241755939

*Gotham City Orthopedics, LLC v. Aetna Inc., Not Reported in Fed. Supp. (2021)*

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To determine whether a federal law implies a private right of action, a court must assess whether the statute "displays an intent to create not just a private right but also a private remedy." *Id.* (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)). Determination of whether a statute creates an implied right of action is a matter of statutory construction. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("The question of the existence of a statutory cause of action is, of course, one of statutory construction."). Importantly, " 'unless [the] congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.' " *Lawrence Twp. Bd. of Educ. v. New Jersey*, 417 F.3d 368, 371 (3d Cir. 2005) (quoting *Thompson v. Thompson*, 484 U.S. 174, 179 (1988)) (alteration in original).

As a court in this district recently found, 42 U.S.C. § 300gg-19a does not provide a private right of action. *Somerset Orthopedic Assocs., P.A. v. Horizon Healthcare Servs., Inc.*, No. 19-8783, 2021 WL 3661326, at *8 (D.N.J. Aug. 18, 2021). First, while Congress created private rights of action to enforce other sections of the ACA, there is no such "express right of action to enforce the emergency services requirement or any other requirement addressed in § 300gg-19a." *Id.* The inclusion of a private right in one section of law suggests that the omission of such a right from another section was intentional. *See Id.*; *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178, 186 (3d Cir. 2012) ("[W]here the same statute contains private causes of action in other sections ..., 'it is highly improbable that Congress absentmindedly forgot to mention an intended private action.' " Further, other courts have similarly found that there is no implied right of action to enforce those

provisions of the ACA that do not contain an express right of action. *Somerset Orthopedic*, 2021 WL 3661326 at *3; *Assoc. of N.J. Chiropractors, Inc. v. Horizon Healthcare Servs., Inc.*, No. 16-8400, 2017 WL 2560350, at *4 (D.N.J. June 13, 2017) ("In short, § 2706 [of the ACA] is devoid of any rights-creating language, and, because Congress did not prescribe a private remedy in that section, there is no basis for finding that Congress intended to create a private right of action by implication."); *Mills v. Bluecross Blueshield of Tenn., Inc.*, No. 15-552, 2017 WL 78488, at *6 (E.D. Tenn. Jan. 9, 2017) (concluding that there is no private right of action for individual plan members to enforce the ACA because Congress "expressly left enforcement of these requirements to the states and the Secretary of Health and Human Services, not individuals"). And, "there is no discussion of a remedy for patients to enforce non-compliance by an insurer in § 300gg-19a." *Somerset Orthopedic*, 2021 WL 3661326 at *8.

**\*13** For those reasons, I find there is no private right of action under section 300gg-19a and, therefore, amendment to assert Count 6 is rejected as futile.

### IV. Conclusion

For the reasons set forth above, I will deny Gotham's motion to amend (DE 13). As to Counts 1–5 and 11–15, state law claims which are preempted by federal law, my ruling is final and with prejudice, as further amendment would be futile. As to the remaining Counts, my ruling is without prejudice to a second motion to amend within 30 days.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 9667963

## Footnotes

1   Gotham also named fictitious defendants John Does 1-10. The parties subsequently stipulated dismissal of the action without prejudice against defendant Aetna Insurance Company of Connecticut. (DE 27.)

2   Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

GLO-L-000242-24   07/15/2024 7:38:01 PM   Pg 27 of 49   Trans ID: LCV20241755939
Case 1:24-cv-08519-RMB-AMD   Document 1-1   Filed 08/16/24   Page 433 of 466 PageID: 452
*Gotham City Orthopedics, LLC v. Aetna Inc.*, Not Reported in Fed. Supp. (2021)

"DE" = Docket entry number in this case.

"Compl." = Complaint and Jury Demand (DE 1-1)

"1AC" = Gotham's Proposed First Amended Complaint (Exhibit A to the Certification of Shannon Carroll in Support of Motion for Leave to File a First Amended Complaint (DE 13-2))

"Br." = Brief in Support of Plaintiff's Motion to Amend the Complaint (DE 13-1)

"Carroll Cert." = Certification of Shannon Carroll in Support of Motion for Leave to File a First Amended Complaint (DE 13-2)

"Opp." = Aetna Defendants' Response in Opposition to Plaintiff's Motion For Leave to Amend the Complaint (DE 17)

"Reply" = Reply Brief in Further Support of Plaintiff's Motion to Amend the Complaint (DE 21)

"Sur-reply" = Aetna Defendants' Sur-Reply in Further Opposition to Plaintiff's Motion for Leave to Amend the Complaint (DE 25)

"MTD Br." = Aetna Defendants' Memorandum in Support of their Motion to Dismiss Plaintiff's Complaint (DE 5-2)

3    The First Amended Complaint adds state law claims, closely parallel to those in the original complaint, but asserted by Gotham in a representative capacity, by virtue of POAs or assignments from insureds. These are likewise preempted.

Counts 11, 12, 13, and 15 of the proposed First Amended Complaint are parallel to the common law claims (breach of contract, breach of covenant of good faith and fair dealing, promissory estoppel, and quantum meruit) asserted in Counts 1, 2, 3, and 4. (1AC ¶¶481-510.) The conduct being challenged is essentially the same: namely, Defendants' alleged failure to provide coverage *in accordance with the ERISA health plans.* (*Compare* IAC ¶¶397-413, 419-426, *with* ¶¶481-510.) Counts 11, 12, 13, and 15, are preempted for the reasons given in connection with Counts 1, 2, 3, and 4.

In Count 14, Gotham asserts a common law claim for unjust enrichment which does not have a counterpart in the original complaint. (*Id.* ¶¶511-515.) It fares no better than the other common law claims, however, because it is likewise predicated on Defendants' alleged obligations under the plans. (*See* 1AC ¶514 ("By and through its failure to process claims and issue benefits for services rendered by Plaintiff *in accordance with the Aetna Plans* through which certain Aetna Insureds received benefits, Aetna has retained moneys to which it is not entitled and to which Plaintiff is entitled for services rendered to the Aetna Insureds."). Because this Court's "inquiry would be directed to the plan," the unjust enrichment claim "relates to" an ERISA plan and is preempted. *See 1975 Salaried Ret. Plan*, 968 F.2d at 406.

4    Defendants also assert that Gotham is bound by the original complaint, which did not allege that such assignments or POAs exist. *See infra.*

5    I note that Defendants also submit that Gotham seeks to assert claims that are time barred and that certain plans contained anti-assignment provisions. (Opp. at 23-24.) However, Defendants cite to only two plans that have contractual time limitations (*Id.* at 23 n.6.) and anti-assignment provision (*Id.* at 24 n.7.) Thus, other insureds may still have live claims.

Gotham's claims based upon its status as POA are vulnerable as a matter of law because "medical practices cannot act as attorneys-in-fact under the [New Jersey Revised Durable Power of Attorney Act, N.J.S.A.

Case 1:24-cv-08519-RMB-AMD  Document 1-1  Filed 08/16/24  Page 434 of 466 PageID: 453

GLO-L-000242-24  07/15/2024 7:38:01 PM  Pg 28 of 49  Trans ID: LCV20241755939

*Gotham City Orthopedics, LLC v. Aetna Inc.*, Not Reported in Fed. Supp. (2021)

46:2B-8.1 *et seq.*].” *Somerset Orthopedic Assocs., P.A. v. Horizon Healthcare Servs., Inc.*, No. 19-8783, 2020 WL 1983693, at *8 (D.N.J. Apr. 27, 2020 (“Because Plaintiffs cannot be attorneys-in-fact, as a matter of law, the POAs Plaintiffs use here do not convey Plaintiffs standing to assert claims on any patient’s behalf.”) Judge Vazquez explained that state-law limitation in *Somerset Orthopedic*:

> In New Jersey, a power of attorney is governed by the Revised Durable Power of Attorney Act (“RDPAA”), N.J.S.A. 46:2B-8.1, *et seq.* The Act provides that “the principal authorizes another *individual or individuals or a qualified bank* ... known as the attorney-in-fact to perform specified acts on behalf of the principal as the principal’s agent.” N.J.S.A. 46:2B-8.2(a) (emphasis added). Agent is defined as “the person authorized to act for another person pursuant to a power of attorney,” and banking institution “includes banks, savings banks, savings and loan associations and credit unions.” N.J.S.A. 46:2B-10. Based on the plain language of the statute, it does not appear that Plaintiffs can be attorneys-in-fact because they are neither individuals nor banking institutions.

> 2020 WL 1983693 at *7.

6    As for the insureds whose plans contained an anti-assignment provision, Gotham contends that Defendants waived enforcement of this provision by interacting with Gotham during the claims procedure. (Reply at 14-15.) Specifically, Gotham submits that Aetna would interact with Gotham regarding the status of claims and remitted reimbursement for claims directly to Gotham. (*Id.* at 15 (citing 1AC ¶¶350, 387, 437.).) However, it is now settled within this district that an insurer does not waive an anti-assignment clause by dealing directly with a provider in the claim review process or by directly remitting payment to a provider. *Arash Emami, MD, PC v. Quinteles IMS*, No. 17-3069, 2017 WL 4220329, at *3 (D.N.J. Sept. 21, 2017) (“[I]t is now well-settled law in the District of New Jersey that the Plan did not waive the Anti–Assignmnent Clause by dealing directly with the Medical Provider in the claim review process, or by directly remitting payment to the Medical Provider.*”); IGEA Brain & Spine, P.A. v. Blue Cross & Blue Shield of Minnesota*, No. 16-5844, 2017 WL 1968387, at *3 (D.N.J. May 12, 2017) (“Simply engaging in a claim review process with Plaintiff does not demonstrate a ‘clear and decisive act’ to waive the Plan’s anti-assignment provisions and confer upon Plaintiff standing to sue.”) *Advanced Orthopedics & Sports Med.*, 2015 WL 4430488, at *6–8 (D.N.J. July 20, 2015) (holding the same).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2020 WL 1427919 (N.J.Super.L.) (Trial Order)
Superior Court of New Jersey, Law Division.
Essex County

MHA, LLC f/k/a "Meadowlands Hospital Medical Center,", Plaintiff,

v.

WELLCARE HEALTH PLANS, INC.; Wellcare Health Plans of New Jersey, Inc.; Wellcare
of New Jersey Inc.; Wellcare of New York, Inc.; Wellcare of Ohio, Inc.; Wellcare of Florida,
Inc.; Wellcare of Kentucky, Inc.; Wellcare of Georgia, Inc.; and ABC Corps. 1-100, Defendants.

No. ESX-L-003949-19.
March 17, 2020.

**\*1**  Civil Action

## Order

Honorable Keith E. Lynott, Judge.

This matter coming to be heard on (1) the Defendants WellCare Health Plans, Inc., WellCare Health Plans of New Jersey, Inc., WellCare of Kentucky, Inc., WellCare of New York, Inc., WellCare of Florida, Inc. and WellCare of Georgia, Inc.'s (the "Defendants") Motion to Dismiss for Failure to State a Claim and (2) the Defendants WellCare of New York, Inc., WellCare of Florida, Inc. and WellCare of Georgia, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction; the Court having considered papers submitted by the parties and heard oral argument; for reasons stated in the accompanying Statement of Reasons; and for good cause shown,

**IT IS** on this 17 day of March, 2020,

**ORDERED** that the motion to dismiss for lack of personal jurisdiction is denied without prejudice; and it is further

**ORDERED** that the Plaintiff may conduct limited discovery as to the issue of in personam jurisdiction over the Defendants WellCare of New York, Inc., WellCare of Florida, Inc. and WellCare of Georgia and the Court will hold a telephonic case management conference on April 14, 2020 at 10:30AM to establish a basis for this discovery and renewal of the Defendants' motion (if desired); and it is further

**ORDERED** that the motion to dismiss for failure to state a claim is denied; and it is further ORDERED that a copy of this Order shall be served on all Counsel and parties within seven (7) days of the date thereof.

<<signature>>

The Honorable Keith E. Lynott

## Statement of Reasons

In this action alleging underpayments of bills for medical services, the Defendants WellCare Health Plans, Inc., WellCare Health Plans of New Jersey, Inc., WellCare of Kentucky, Inc., WellCare of New York, Inc., WellCare of Florida, Inc. and WellCare

**MHA, LLC v. Wellcare Health Plans, Inc., 2020 WL 1427919 (2020)**

of Georgia, Inc. (collectively, the "Defendants") move to dismiss the Complaint of the Plaintiff, MHA, LLC (the "Plaintiff or "MHA"), pursuant to R. 4:6-2(e). For the reasons set forth herein, the Court denies the motion to dismiss the Complaint.

The Defendants WellCare of New York, Inc., WellCare of Florida, Inc. and WellCare of Georgia, Inc. (collectively, the "out-of-state Defendants") also move to dismiss the Complaint for lack of personal jurisdiction. The Court denies this motion without prejudice and permits limited jurisdictional discovery as set forth herein.

## I

The Court first addresses whether it has in personam jurisdiction over the out-of-state Defendants. The out-of-state Defendants contend that "(1) they are not incorporated in New Jersey; (2) they do not maintain offices in New Jersey; (3) they do not have employees in New Jersey; (4) they do not contract with MHA; (5) they do not contract with any other hospitals or medical providers in New Jersey; (6) they do not solicit plan members in New Jersey; (7) they do not encourage or advise members to seek treatment from non-participating providers; (8) they only offer insurance coverage to individuals that reside outside of New Jersey; (9) they do not pay taxes in New Jersey; (10) they do not hold any New Jersey licenses; (11) they are not registered to do business in New Jersey; (12) they do not have a New Jersey registered agent; (13) they do not maintain a bank account in New Jersey; (14) they do not own property in New Jersey; (15) they do not have a New Jersey telephone number; and (16) they do not have a new Jersey post office box." The out-of-state Defendants argue that, under these circumstances, the Court does not have general or specific personal jurisdiction over them.

**\*2**  The Plaintiff counters that there were sufficient minimum contacts to establish in personam jurisdiction. It contends that the out-of-state Defendants instructed their members to seek pre-authorized and/or emergent medical services at the nearest facility, when their members were outside of their home states. The Plaintiff asserts that there were 30 instances in which MHA rendered medical services to patients insured by WellCare of New York; 8 instances of treatment rendered to patients insured by WellCare of Florida; and 3 instances of treatment rendered to patients insured by WellCare of Georgia. The Plaintiff further alleges that the out-of-state Defendants "sent correspondence to MHA in New Jersey and transmitted (inadequate) payment to New Jersey."

The Plaintiff also contends that WellCare "holds itself out as an integrated national company" and that correspondence and interactions between MHA and the WellCare Defendants were carried out from the parent company's headquarters in Florida. It asserts that the Defendants "cannot… hide behind false divisions between the WellCare family of entities to raise a facile jurisdictional defense." It argues that "[t]here is simply no evidence whatsoever before the Court that these WellCare entities are, in fact, operated as distinct entities."

The Plaintiff further contends that, even if the Court determines on the present record that there are insufficient minimum contacts, the Court should permit the Plaintiff limited jurisdictional discovery before dismissing the Complaint. The Plaintiff argues that "discovery is necessary to determine whether WellCare of New York, Florida and Georgia are subject to jurisdiction as affiliates, agents, or alter egos of the other defendants" that have not moved to dismiss for lack of in personam jurisdiction.

The out-of-state Defendants reply that the Court need not permit limited jurisdictional discovery. They allege that "[t]here is no reason to believe that additional discovery will provide any more information" establishing the Court's jurisdiction over the out-of-state Defendants.

On a motion to dismiss for lack of in personam jurisdiction, the plaintiff is not entitled to a presumption that jurisdiction exists simply because the plaintiff asserts that to be the case. Citibank. N.A. v. Estate of Simpson. 290 N.J. Super. 519, 534 (App. Div. 1996) ("Jurisdictional allegations cannot be accepted on their face if they are disputed"). Courts are not confined by the pleadings in making a jurisdictional determination. Id. at 532. Courts can rely on the pleading together with certifications to resolve a question of in personam jurisdiction. However, "if [a question as to in personam jurisdiction] cannot be resolved on pleadings and certifications, it must be resolved by a preliminary evidential hearing after affording the parties an appropriate opportunity for discovery." Ibid.

New Jersey permits long-arm service of process on a non-resident defendant "consistent with due process of law." R. 4:4-4(b)(l). "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Lebel v. Everglades Marina. Inc., 115 N.J. 317, 322 (1989) (quoting International Shoe Co. v. Washington. 325 U.S. 310, 316 (1945) (internal quotations omitted)).

In Lebel, the Supreme Court observed that it had in the past "implicitly endorsed the [United States] Supreme Court's 'specific'/'general' jurisdiction dichotomy." Id. at 323 (citing Charles Gendler & Co. v. Telecom Equipment Corp., 102 N.J. 460 (1986)). The court stated that "[g]eneral jurisdiction subjects the defendant to suit on virtually any claim, even if unrelated to the defendant's contacts with the forum, but is unavailable unless the defendant's activities in the forum state can be characterized as 'continuous and systematic' contacts." Ibid, (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall. 466 U.S. 408,416 (1984)). "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m]… bases for general jurisdiction.'" Daimler AG v. Bauman, 571 U.S. 117, 137 (2014).

*3  The concept of "specific jurisdiction" enables the Court to exercise jurisdiction over a defendant in a given case only in circumstance in which the action arises out of or relates to the defendant's contacts with the forum State. "The 'minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Lebel. 115 N.J. at 323 (quoting World-Wide Volkswagen Corp. v. Woodson. 444 U.S. 286, 297-98 (1980)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." Ibid. (quoting Burger King Corp. v. Rudzewicz. 471 U.S. 462, 475 (1985) (internal quotations omitted); World-Wide Volkswagen, 444 U.S. at 299). "The question is whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Id. at 324 (quoting World-Wide Volkswagen, 444 U.S. at 297). "Of course, the mere foreseeability of an event in another state is not a sufficient benchmark for exercising personal jurisdiction." Ibid. (quoting Burger King, 471 U.S. at 474 (internal quotations omitted)).

In Baanyan Software Services. Inc. v. Kuncha, 433 N.J. Super. 466, 477 (App. Div. 2013) (internal quotations omitted), the court stated that "the burden is on [the plaintiff] to 'allege or plead sufficient facts' to warrant the court's exercise of jurisdiction, and it must do so by way of 'sworn affidavits, certifications, or testimony.'" However, "once it is established that defendant's activities relating to the action established minimum contacts with the forum state," the burden shifts to the defendant to show that the exercise of jurisdiction does not comport with the "fair play and substantial justice inquiry." The "nonresident defendant who has been found to have minimum contacts with the forum must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." McKesson Corp. v. Hackensack Med. Imaging. 197 N.J. 262, 278 (2009) (internal citations and quotations omitted).

To support their position, the Defendants cite to Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga.. Inc.. 995 F. Supp. 2d 587, 596 (N.D. Tex. 2014). There, the plaintiffs provided medical services to three patients enrolled in the defendant's benefit plans. The defendant was a Pennsylvania health insurer. The plaintiffs initiated the action "for the underpayment and/or non-payment of reimbursement amounts pursuant to the terms of various health benefit plans administered by [the defendant]." The plaintiffs asserted causes of action for negligent misrepresentations and promissory estoppel based on the defendant's alleged representation that it would pay the plaintiffs for the services the plaintiffs rendered.

The court held that it did not have personal jurisdiction over the defendant. It stated that "nowhere in Plaintiffs' pleadings are there allegations that [the defendant] Capital's contacts with Texas arose from a decision by Capital to direct its commercial activity at Texas rather than Capital's members' independent decisions to travel to Texas to receive medical services." Id. at 619. The court based its determination on the facts that:

> Capital… only provides insurance coverage for individuals and groups within Capital's twenty-one county service area in Pennsylvania and does not contract with hospitals or medical facilities in Texas …
> Capital asserts that Plaintiffs are non-participating providers without a contract with Capital, and Capital

"do[es] not encourage or advise their members to seek treatment from non-participating providers." Capital also states that any coverage provided to members that seek treatment from non-participating providers "is not intended to expand sales or otherwise develop commercial activity in the forum state" where the non-participating provider is located… Capital also contends that it made the three payments because of Capital's members' respective decisions to seek care from Plaintiffs … in Texas …

**\*4**  [Id. at 619. (citations to record omitted)]

Similarly, in Whittaker v. Medical Mut. of Ohio, 96 F. Supp. 2d 1197, 1198 (D. Kan. 2000), the plaintiff was an employee of a university for which the defendant, located in Ohio, provided health care coverage. The plaintiff moved to Kansas for medical treatment. The defendant terminated the payments because it determined that the treatment sought was not medically necessary. The plaintiff sued the defendant and its agent that processed the plaintiff's insurance claims.

The plaintiff contended that there existed sufficient minimum contacts. The plaintiff alleged that: "(1) [the defendant] agreed to pay for medical care received in Kansas, (2) Payments were made to the Menninger Institute in Kansas; (3) Plaintiff and the Menninger Institute were informed in Kansas that payments would cease; and (4) Medical Mutual used [Blue Cross Blue Shield of Kansas] as its agent to process her insurance claims." Id. at 1200.

The court held that "[the defendant] is obligated to carry out its insurance contracts no matter in which state treatment is sought. Therefore, the fact that [the defendant] acknowledged its obligation to pay under the insurance plan if plaintiff sought treatment in Kansas is not purposeful availment." Id. at 1200; see also Northshore Reg'l Med. Ctr., L.L.C. v. Dill, 94 So. 3d 155, 163 (La. App. 1 Cir. 2012) ("[i]nsurers are obligated to carry out the insurance contract no matter where treatment is sought; therefore, the fact that White Horse acknowledged (through its claims' administrator) its obligation to pay pursuant to the insurance plan if [the insured] sought treatment at NorthShore is not purposeful availment").

The Whittaker court further stated that "payment and notice of nonpayment are not sufficient to establish minimum contacts." Id. at 1200. It reasoned that "[i]t was plaintiff's unilateral decision to seek treatment in Kansas which caused defendants to have to send payments and notice into Kansas. Mail and phone communications sent to plaintiff in the forum state are insufficient to support specific jurisdiction over a nonresident defendant." Id. at 1200-21.

This Court recognizes that none of the cases cited by the Defendants is controlling. However, the Court finds the cases discussed above present facts similar to those here and thus are instructive. The Plaintiff cites to two cases in its Opposition, Lebel, 115 N.J. 317 and Blakey v. Cont'l Airlines, 164 N.J. 38 (2000). Neither case involves a dispute between a patient/provider and an insurance company.

In the case at bar, the Plaintiff did not dispute any fact stated in the Certifications submitted by the out-of-state Defendants. It is thus not disputed that none of the out-of-state Defendants is incorporated in New Jersey, and that none maintains any office or conducts business in New Jersey. See Daimler, 571 U.S. at 137. There is no showing by the Plaintiff that any of the out-of-state Defendants has "continuous and systematic" contacts with New Jersey.

The Plaintiff contends that the Court has specific personal jurisdiction over the out-of-state Defendants because the out-of-state Defendants advised - even encouraged - their members to seek pre-authorized and/or emergent medical services at the nearest facility, when outside of their home states. It argues that the Plaintiff was in direct contact with representatives of each of the out-of-state Defendants when it rendered services to patients insured by them. It asserts that the out-of-state Defendants "sent correspondence to MHA in New Jersey and transmitted (inadequate) payment to New Jersey."

**\*5**  The Plaintiff cites statements in Medicaid manuals provided by each of the out-of-state Defendants. The cited paragraphs informed the insureds that they would be reimbursed in certain circumstances for services in out-of-state medical facilities.

The language of these manuals reflects the out-of-state Defendants' legal obligation to carry out the insurance contracts with the insureds without regard to where they seek medical treatment. The decision on the part of each patient to seek treatment from MHA in New Jersey was a unilateral one. There is no evidence presented on this record that any of the out-of-state Defendants approved in advance any insured's request to seek medical treatment at Meadowlands Hospital or in New Jersey. Absent further evidence, it appears that the Defendants communicated with and transmitted payment to the Plaintiff in New Jersey solely because of the insureds' unilateral decision to seek treatment in New Jersey.

Given these circumstances, the Court cannot conclude that it has general or specific jurisdiction over the out-of-state Defendants when the Court examines their respective activities individually. It finds the holdings in Whittker and Innova persuasive and on point. As in these cases, the unilateral decisions of the patients to seek treatment in New Jersey are an insufficient basis on which to exercise jurisdiction over the out-of-state Defendants.

However, the Court's analysis as to in personam jurisdiction does not end here. The Plaintiff also appears to argue that the Court has in personam jurisdiction over the out-of-state Defendants because WellCare holds itself out as an integrated national company and/or the out-of-state Defendants are agents, affiliates, or alter egos of the non-moving Defendants as to which the Court does have in personam jurisdiction.

The Plaintiff cites to Charles, 102 N.J. 460. In this case, the Supreme Court reasoned that "a manufacturer that distributes its products into the stream of commerce for widespread distribution derives both legal and economic benefits from the states in which its products are sold." Id. at 147. It concluded that "the system through which the manufacturer distributes its products evidences the manufacturer's purposeful penetration of the market." Id. at 478-49. It found that "[a] foreign manufacturer that purposefully avails itself of those benefits should be subject to personal jurisdiction, even though its products are distributed by independent companies or by an independent, but wholly-owned, subsidiary." Ibid.

Moreover, the Appellate Division has held that "where appropriate, courts of New Jersey have looked beyond the corporate form to the functional reality behind it... If the disputed facts are resolved sufficiently to provide a basis for holding liable the individual defendants under alter ego theory, their presence for jurisdictional purposes cannot be said to be either unfair or unreasonable. After all, fairness is the essential due process inquiry." Star Video Entertainment, L.P. v. Video USA Associates 1 L.P., 253 N.J. Super. 216, 223-224 (App. Div. 1992). The court also noted that "[i]n the Second Circuit, jurisdiction may be predicated on alter ego theory where plaintiff demonstrates the entities' common ownership plus one's financial dependency, the other's domination/control, or either's failure to observe corporate formalities." Id. at 225 (citing Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117 (2d Cir. 1984)).

 *6  The Court concludes that the present record is unclear as to whether any non-moving Defendant is an affiliate, agent or alter ego of any out-of-state Defendant. Additional limited discovery is necessary to establish a record concerning the relationship and operation of the Defendants either as independent entities or as an integrated national company and the extent of the out-of-state Defendants' financial benefits from the non-moving Defendants' activities related to the claims involved in this litigation. See, e.g., Jacobs v. Walt Disney World, Co., 309 N.J. Super. 443, 457 (App. Div. 1998).

The Court notes the alleged facts regarding the processing of the claims and mode of operations of the out-of-state Defendants and of WellCare Health Plans of New Jersey, Inc. -essentially by reliance on the central office in Florida - are sufficient to warrant limited jurisdictional discovery. A showing that the WellCare family of companies operate as an integrated national company could result in attribution of the contacts of the non-moving Defendants, including WellCare Health Plans of New Jersey, Inc., to the out-of-state Defendants.

For these reasons, the Court cannot determine at this time whether or not it has general or specific personal jurisdiction over the out-of-state Defendants on the present record. The Court thus denies the Defendants' motion to dismiss for lack of personal

jurisdiction without prejudice. The Court will permit discovery into issues pertaining to in personam jurisdiction, as more fully described herein.

## II

As to the Defendants' motion to dismiss the Complaint, a motion to dismiss for failure to state a claim is granted only in rare cases. In Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 772 (1989), the Supreme Court stated that trial courts must accord such motions "meticulous and indulgent examination" and, accordingly, should grant them in only "the rarest of instances." See also Smith v. SBC Communications. Inc., 178 N.J. 265, 282 (2004) ("The motion to dismiss should be granted only in rare instances and ordinarily without prejudice") (internal quotations omitted).

On a motion to dismiss a complaint pursuant to R. 4:6-2(e), the Court must determine whether "a cause of action is 'suggested' by the facts." Printing Mart-Morristown, 116 N.J. at 746 (quoting Velantzas v. Colgate-Palmolive Corp., 109 N.J. 189, 192 (1988)). The Court is required to examine the complaint "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned from an obscure statement of claim." Ibid.

The Court must accept the facts alleged in the pleading as true. See Malik v. Ruttenberg. 398 N.J. Super. 489,494 (App. Div. 2008) (the court must "accept as true the facts alleged in the complaint, and credit all reasonable inferences therefrom"). The pleading party is entitled to "every reasonable inference of fact." Printing Mart-Morristown, 116 N.J. at 746. The Court is "not concerned with the ability of plaintiffs to prove the allegation contained in the complaint," but merely with "the legal sufficiency of the facts alleged on the face of the complaint." Ibid.

The examination of the complaint "should be one that is at once painstaking and undertaken with a generous and hospitable approach." Ibid; see also Piscitelli v. Classic Residence by Hyatt. 408 N.J. Super. 83, 103 (App. Div. 2009) (the court must review the complaint with "a generous and hospitable approach") (internal quotations omitted). The Court must "search the complaint in depth and with liberality" to identify the causes of action asserted. Lieberman v. Port Auth. of N.Y. & N.J.. 132 N.J. 76, 79 (1993) (internal quotations omitted). In addition, "[a] complaint should not be dismissed under this rule where a cause of action is suggested by the facts and a theory of actionability may be articulated by way of amendment." Rieder v. State Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987).

 **\*7**  In examining a motion to dismiss, "the inquiry is confined to a consideration of the legal sufficiency of the alleged facts apparent on the face of the challenged claim." Ibid. (internal quotations omitted). "The court may not consider anything other than whether the complaint states a cognizable cause of action." Ibid. (internal quotations omitted). Thus, the Court may not examine materials extrinsic to the complaint itself in adjudicating a motion to dismiss. However, an exception exists for exhibits attached to the complaint, matters of public record and materials that the plaintiff relies upon in the complaint or that are integral to the plaintiff's claims. See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005) ("In evaluating motions to dismiss, courts consider allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim") (internal quotations omitted).

The Rules of Court require only that a pleading contain "a statement of facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which the pleader claims entitlement." R 4:5-2. The purpose of a pleading is not to provide a complete recitation of every possible fact or argument available, but to fairly apprise the adverse party of the claims and issues to be raised at trial. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 75 (1980) ("Although more by way of facts regarding the design defect would have been enlightening, see Rule 4:5-2, we agree with the Appellate Division's finding that '[t]o the extent that plaintiff's complaint was deficient, the judge properly looked to the entire record, giving plaintiff every favorable inference,' 225 N.J. Super. at 382 n.5, and that the trial court had correctly concluded that the complaint was sufficient to support a claim of design defect").

## III

The Court draws the pertinent facts from the Complaint. It accepts as true the averments of the Complaint solely for purpose of the pending motion to dismiss. As required by the case law, the Court examines the Complaint in depth and in its entirety and with a generous and hospitable approach.

The Complaint contains 92 separate paragraphs and seven separate counts stating causes of action for relief. The Plaintiff seeks relief for "over a thousand" Open Patient Accounts as set forth therein (the "Open Patient Accounts"). The Complaint incorporates a list of the disputed patient accounts, identifying the patient's ID number, the dates of admission and discharge, the amounts of total charges and balance. The Plaintiff alleges that "millions of dollars [] is owed by defendants to plaintiff."

MHA is "a privately held, limited liability company, organized under the laws of the State of New Jersey." It owned Meadowlands Hospital until December 2017 when its assets were sold pursuant to an Asset Purchase Agreement ("APA"). Pursuant to APA, Meadowlands "retained all receivables related to patient care prior to the date of the change of ownership including those receivables which are the subject of this litigation."

Meadowlands Hospital was a licensed general acute care hospital. It was "an out-of-network, or non-participating, healthcare provider, with respect to defendants, and provided emergency or preapproved non-emergency, medically necessary hospital and medical services to many patients who, at all relevant times, were covered under healthcare plans sponsored, funded, operated, controlled and/or administered by defendants."

The Complaint alleges that the Defendants "sponsored, funded, operated, controlled and/or administered Medicaid and Medicare plans, and provided coverage to certain of Meadowlands' patients as identified [in the Complaint]." The Plaintiff alleges that WellCare "has issued gross underpayments or no payment for the services rendered, and has engaged in a systematic pattern of downgrading and underpaying for the services rendered by the hospital."

 **\*8**  The Court notes that this is a direct action by the provider against the respective payers. As averred in the Complaint, the Plaintiff is suing in its own capacity as a provider and not in a derivative capacity as a holder of assignments from the patients/ subscribers to the Defendants' healthcare plans.

The Plaintiff asserts that it "rendered Medicaid and Medicare emergency and non-emergency pre-approved, medically necessary hospital and medical services - including inpatient, outpatient and same day surgeries" through ownership of Meadowlands Hospital. The Plaintiff alleges that "[a]fter rendering the services reflected in the Open Patient Accounts, [it] timely filed clean claims for reimbursement with WellCare." It then identifies four circumstances in which the Defendants refused to issue proper payment after the Plaintiff submitted the claims for reimbursement.

In some instances, "[p]rior to rendering several of the services reflected in the Open Patient Accounts, [the Plaintiff] had contacted [the Defendants] to request, and was provided by [the Defendants], pre-authorization and/or pre-certification to render the services. [The Plaintiff] then relied on said pre-authorization and/or pre-certification, as [the Defendants] intended, in agreeing to render the services." However, the Defendants eventually refused to issue proper payment.

In other cases, "[the Defendants] advised [the Plaintiff] prior to rendering services that pre-authorization/pre-certification was unnecessary, or the services were emergent or urgent, thereby not requiring pre-authorization/pre-certification." The Defendants then refused to issue payment.

In still other cases, "[the Defendants] indicated through word and deed that there was coverage for an initial treatment and in fact, paid for such treatment, but without notice refused to provide reimbursement for subsequent, related treatment, which should have been covered and is subject to the continuing care provision of WellCare's plans." As to other accounts, "upon receiving

[the Plaintiff]'s bill, [the Defendants] agreed to reimburse [the Plaintiff] for the services rendered. However, inexplicably [the Defendants] ha[ve] since refused to honor [the] payment agreement or failed to reimburse [the Plaintiff] the proper amount."

The Plaintiff alleges that the Defendants engaged in a "systematic practice of downgrading coverage by a variety of nefarious methods including, without limitation, downcoding and bundling of claims submitted by plaintiff, as well as the issuance of coverage denials to patients. WellCare did this without the benefit of sufficient medical or clinical information or consultation with the attending physicians, and often without consultation with the attending physicians at all."

The Plaintiff asserts that, under New Jersey law, statutes and regulations, "defendants are required to make payment to plaintiff within the time period set forth in the Healthcare Information Networks and Technologies Act ("HINT") and the Health Claims Authorization, Processing and Payment Act ("HCAPPA")… [and] 12% annual interest is due to plaintiff for late paid claims." It further alleges that the Plaintiff is "entitled to payment based on its usual, customary and reasonable ("UCR") fees." It also claims that it has "exhausted defendants' appeal process by filing repeated and numerous unsuccessful appeals for many of the claims."

**\*9** The Plaintiff contends that "[a]ll of the subject claims averred herein arise from New Jersey state common, statutory and regulatory law and not from any purported preemptive federal law or statue." It alleges that "[n]or do any of plaintiff's claims give rise to federal subject matter jurisdiction on any basis."

The First Count of the Complaint purports to state a claim for breach of an implied contract between the Plaintiff and the Defendants. It asserts that the Defendants indicated by a course of conduct, dealings and circumstances surrounding the relationship to the Plaintiff that they would pay for hospital and medical services, including emergency services, provided to the Defendants' insureds. The Plaintiff asserts that the Defendants represented that their members and beneficiaries were covered for out-of-network treatment and/or emergency care. The Plaintiff avers that the Defendants received premiums from those patients for out-of-network emergency healthcare coverage and the services of the Plaintiff were necessary to satisfy the needs of the patients.

The First Count further avers that the Defendants indicated through a course of conduct, dealings and circumstances surrounding the relationship that they would pay the Plaintiff its UCR amounts based upon what other healthcare providers of the same specialty and the same geographic area charge for services rendered by them. It alleges that the Defendants indicated by a course of conduct, dealings and circumstances surrounding the relationship that they would honor representations to the Plaintiff that the services rendered were pre-authorized or pre-certified or that preauthorization was not required due to the need for urgent or emergent care. The Plaintiff asserts that it rendered medically necessary surgical and medical services to the patients whose open accounts are the subject of the action and reasonably expected the Defendants to "pay for them appropriately."

The Second Count of the Complaint purports to state a claim for breach of the implied covenant of good faith and fair dealing contained in the alleged implied contract. It alleges that the Defendants acted with an improper motive and "injured" the Plaintiff's rights and benefits under such contract.

The Third Count purports to state claims for unjust enrichment and quantum meruit. The Complaint alleges that the Defendants refused to pay the Plaintiff the correct amounts for the surgical and medical services provided to the patients identified in the Complaint, which patients were covered under plans sponsored, funded, insured and/or administered by the Defendants. The Plaintiff alleges such refusal was contrary to the insurance provided by the plans, and to common law, statutory and regulatory obligations of the Defendants.

The Count alleges that the Defendants needed the Plaintiff to render hospital and medical services, including emergency and urgent medical care, to such patients in order to satisfy the Defendants' legal obligations to the patients. The Plaintiff asserts that, as a result of the services the Plaintiff provided, the Defendants have received and retained a benefit because the Plaintiff

rendered hospital and medical services for which the Plaintiff has been grossly underpaid. The Plaintiff alleges the Defendants were unjustly enriched by use of funds that they should have paid to the Plaintiff.

**\*10**  The Fourth Count asserts a claim for promissory estoppel. This Count alleges that the Defendants made promises to the Plaintiff that they would afford proper coverage for hospital and medical care to members of their plans, including by pre-authorizing or pre-certifying services or paying for initial care. The Count asserts the Defendants subsequently refused to pay when the Plaintiff submitted its bills. The Plaintiff avers that the Defendants expected or reasonably should have expected MHA to rely on such assurances and MHA did so to its "definite and substantial detriment."

The Fifth Count alleges a claim for negligent misrepresentation. It asserts that the Defendants negligently represented that they would provide proper coverage to the patients at issue and pay the Plaintiff's claims for reimbursement at the UCR rates, including by way of preauthorization or precertification or by paying for initial care. The Plaintiff avers that the Defendants materially misrepresented that their plans entitled the patients to receive coverage for the hospital and medical services provided by the Plaintiff. The Plaintiff asserts that such representations were false. This Count alleges that the Plaintiff reasonably relied on such representations to the Plaintiff's "substantial detriment," as it provided hospital and medical care to the patients and the Defendants, contrary to such representations, subsequently refused payment for bills submitted by the Plaintiff.

The Sixth Count purports to state a claim for tortious interference with economic advantage. The Plaintiff alleges a reasonable expectation of economic advantage arising from the patient/provider relationship. This Count alleges that the Defendants knew or reasonably should have known of the Plaintiff's expectation of economic advantage and that the Defendants wrongfully interfered with such expected economic benefit in circumstances in which it is reasonably probable that the Plaintiff would have realized the benefit.

The Seventh Count purports to state a claim under the Healthcare Information Networks and Technologies Act, as amended by the Health Claims Authorization Processing and Payment Act. It asserts that such laws and the regulations promulgated thereunder establish a time period (30 to 40 days) within which a payor must either pay or challenge a provider's bills. The Plaintiff asserts that, under such laws and regulations, it has a private right of action to prosecute claims for the Defendants' failures to comply with the same by refusing to pay the full amount of charges submitted by the Plaintiff.

The Plaintiff alleges that the Defendants "as a matter of practice and/or policy delayed payment of properly submitted claims from plaintiff and did not pay the claims correctly, and then did not pay interest on delayed payments." It also asserts that under HCAPPA, "[a]ll overdue payments must bear simple interest at the rate of twelve (12) percent per annum, pursuant to HCAPPA."

## IV

The Defendants contend that, because the Plaintiff ultimately seeks to recover for "underpayment" of Medicare reimbursement claims, the Plaintiff's cuases of action are preempted by the federal Medicare statute and implementing regulations. They also allege that the Court should dismiss the Medicare-related claims set forth in the Complaint, because the Plaintiff failed to "exhaust the exclusive federal administrative process required under the Medicare Act," citing to 42 U.S.C. § 405(g)-(h) and 42 U.S.C. §§ 1395ii, 1395w-22(g)(5).

The Defendants argue that the Medicare statute and regulations include a preemption provision, which expressly "supersedes all state laws that otherwise would apply, with the exception of licensing and plan solvency laws." In particular, the Defendants assert that the Medicare statute preempts the Plaintiff's First through Sixth Counts, as the statute prescribes the Medicare rates. They assert that the Medicare statute preempts the Seventh Count, as the statute and regulations address the timing of payments, citing to 42 C.F.R. § 422.520. [1]

**\*11**  The Defendants further contend that both federal and state law cap the payments to the Plaintiff for emergency services rendered to the Medicaid enrollees and that the Court should dismiss the Plaintiff's Medicaid claims for emergency services

seeking payment of amounts greater than the Medicaid-prescribed rate. Examining each Count of the Complaint separately, the Defendants further contend that the Plaintiff has failed in each instance to state a claim upon which relief can be granted.

The Plaintiff contends that there is a heightened presumption against preemption. It asserts that the Defendants "attempt[] to assert a fact-sensitive, affirmative defense." It states that "at this procedural posture, defendants' preemption defense is premature and must await summary judgment."

The Plaintiff argues that Medicare preemption is not a complete preemption scheme. Instead, preemption only operates to bar a state law claim if it interferes with a Medicare "standard." The Plaintiff asserts that the common law claims alleged in the Complaint do not interfere with a Medicare "standard."

The Plaintiff avers that the alleged cap on recovery does not warrant dismissal of the Plaintiff's claims. It contends that, at minimum, the Court needs to determine and compare the payment it received with the payment permitted under the Medicare statute as the Plaintiff, in at least some cases, seeks only the amount to which it was entitled under the Medicare fee schedule. Moreover, the Plaintiff argues that the Defendants "ha[ve] undertaken duties above and beyond those of the Medicare Act by its course of conduct and representations" and that Medicare preemption does not operate to bar claims grounded in such duties.

The Plaintiff also counters that failure to exhaust the established administrative process is an affirmative defense and that the Defendants must prove entitlement to this defense. MHA argues that it is premature for the Court to determine the issue at this juncture. Moreover, the Plaintiff alleges that 42 U.S.C. § 405(g) applies to enrollees, not health care providers. It contends that the Medicare Act does not provide a procedure for resolving disputes between the health care providers and Medicare plan sponsors and, in all events, does not operate to bar state law claims lodged in a state court.

The Court first addresses the issue of exhaustion of administrative remedies and related procedures. The Court concludes it cannot determine the issue at this stage of the litigation. Exhaustion of remedies is an affirmative defense as to which the Defendants bear the burden of proof. Even granting that the Plaintiff was or is required to exhaust administrative remedies and assuming the Plaintiff is required to plead exhaustion, the Plaintiff's Complaint alleges that it has done so.

Although the Defendants assert that the Plaintiff's averment as to exhaustion is limited to internal administrative appeals and overlooks the administrative remedy and procedures prescribed by federal law, the Court is required to examine the pleading indulgently. The Plaintiff also pleads that further invocation of administrative remedies would be futile. This is a recognized exception under New Jersey law to the obligation to exhaust. Nothing more is exigible of the Plaintiff at this juncture.

The Medicare statute has been described as "among the most completely impenetrable texts within human experience," requiring "dense reading of the most tortuous kind." Rehab. Ass'n of Virginia. Inc. v. Kozlowski, 42 F.3d 444, 1450 (4th Cir. 1994). At its enactment, Medicare consisted of only two parts, Parts A and B. Under "traditional" Medicare, the federal government paid health care providers directly for services rendered to Medicare beneficiaries. 42 U.S.C. §§ 1395c-1395i-5 (Part A), 1395j-1395w-6 (Part B). Congress authorized Part D of the Medicare Act in 2003, which provides for prescription drug coverage for Medicare enrollees. 42 U.S.C. §§ 1395w-101-154. Part E consists of "miscellaneous provisions." 42 U.S.C. §§ 1395x-lll.

**\*12** Part C of the Medicare Act, enacted in 1997, creates the Medicare Advantage program. 42 U.S.C. §§ 1395w-21-29. Under Part C, Medicare enrollees can receive Medicare benefits through private organizations called Medicare Advantage Organizations, or "MAOs," instead of the government. Id. The government pays MAOs monthly fees in exchange for assuming the risk of providing covered services to enrollees. 42 U.S.C. § 1395w-23. The amount that MAOs receive per enrollee is based on contracts with the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services. 42 U.S.C. § 1395w-27.

MAOs contract with certain health care providers to provide Medicare services in a manner akin to "in-network" arrangements of private healthcare insurers. 42 U.S.C. § 1395w-22(d)(1). However, MAOs must also provide coverage for emergency services

without regard to the emergency care provider's contractual relationship with the MAO. MAOs reimburse non-contracting providers who provide these emergency services based on rates set by the Medicare Act and related regulations. See 42 C.F.R. § 422.214(a) (payments limited to what "the provider would collect if the beneficiary were originally enrolled in Medicare").

42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g) is the sole avenue for judicial review of all "claims arising under" the Medicare Act. See Heckler v. Ringer, 466 U.S. 602, 614-615 (2013). 42 USCS § 405(g) provides that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the District Court of the United States for the District of Columbia [United States District Court for the District of Columbia]…

42 USCS § 405(h), in turn, provides that:

> (h) Finality of Commissioner's decision. The findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28, United States Code [28 USCS § 1331 or 1346], to recover on any claim arising under this title [42 USCS §§401 et seq.].

[Emphasis added.]

Under § 405(g), a final decision of the Secretary of Health and Human Services ("Secretary") may be reviewed by a federal court. Regulations promulgated by the Secretary, see 42 U.S.C. § 1395hh, indicate that a final decision is issued only after a case has progressed through all levels of administrative review provided for each Part of the Medicare Act. See 42 C.F.R §§ 405.701-405.753 (reconsideration and appeals under Part A); 42 C.F.R. §§ 405.801-405.877 (appeals under Part B); 42 C.F.R. §§ 422.560-422.626 (grievances, organization determinations, and appeals under Part C).

**\*13** 42 CFR § 405.906, titled "Parties to the initial determinations, redeterminations, reconsiderations, hearings, and reviews," limits the administrative appeals process for Medicare Part A and Part B claims to "[a] provider of services who files a claim for items or services furnished to a beneficiary." A "provider" means "a hospital… that has in effect an agreement to participate in Medicare, or clinic …" 42 CFR § 405.902.

There is no dispute that the Plaintiff does not have a contract with the Defendants to participate as a provider in the Medicare program. The Plaintiff alleges in the Complaint that it is "an out-of-network, or non-participating, healthcare provider, with respect to defendants." Therefore, as to Medicare Part A and Part B claims, if any, the Plaintiff is not subject to the administrative process, as it cannot appeal through this channel.

Federal regulations provide for a separate MAO administrative review process for MAO benefits determinations (or "organization determinations") for Medicare Advantage programs (i.e. Medicare Part C). See 42 C.F.R. §§ 422.582 (first step being request for MAO reconsideration), 422.592 (second step being appeal to private independent contractor), 422.600 (third step being request for administrative law judge hearing), 422.608 (fourth step being review by Medicare Appeals Council, a division of Health and Human Services). 42 C.F.R. §422.612(b) provides that "[a]ny party, including the MA organization, may

request judicial review … of the Council decision if it is the final decision of CMS and the amount in controversy meets the threshold established in paragraph (a)(2) of this section." 42 C.F.R. §422.612(c) further states that "[i]n order to request judicial review, a party must file a civil action in a district court of the United States in accordance with section 205(g) of the [Social Security] Act [i.e. 42 U.S.C. § 405(g)]."

As to step one, it appears that a provider, such as the Plaintiff, can appeal for MAO reconsideration. 42 C.F.R. § 422.582(d) provides that "[t]he parties to the reconsideration are the parties to the organization determination, as described in § 422.574, and any other provider or entity (other than the MA organization) whose rights with respect to the organization determination may be affected by the reconsideration, as determined by the entity that conducts the reconsideration." It is clear that the Plaintiff's right to reimbursement will be affected by the reconsideration. As to steps two, three and four, 42 CFR §§ 422.592(c), 422.600 (a) and 422.608 permit the same parties to MAO reconsideration to appeal under these provisions. [2]

In order to assess whether a provider such as MHA must exhaust the administrative remedies established by the Medicare Act, the Court must first determine if its claim "arises under" the Medicare Act. A claim "arises under" the Act, if "both the standing and the substantive basis for the presentation" of the claim is the Medicare Act, Ringer, 466 U.S. at 606 (quoting Weinberger v. Salfi, 422 U.S. 749, 760-61 (1975)), or if the claim is "inextricably intertwined" with a claim for Medicare benefits, see id. at 623; see also Affiliated Prof 1 Home Health Care Agency v. Shalala, 164 F.3d 282, 286 (5th Cir. 1999) (finding that even though claims were presented as constitutional claims, they were inextricably intertwined with a claim of entitlement to Medicare benefits and thus subject to the exhaustion requirements of the Medicare Act); see also Trostle v. Ctrs. for Medicare & Medicaid Servs., 709 Fed. Appx. 736, 739 (3rd Cir. 2017).

 **\*14**  In Prime Healthcare Huntington Beach. LLC v. SCAN Health Plan. 210 F. Supp. 3d 1225 (C.D. Cal. 2016), the court noted that federal courts have reached different results as to the exhaustion issue in cases presenting facts similar to the facts here. The plaintiffs were non-contract providers seeking reimbursement by the defendant for care provided to the defendant's members "based on [the plaintiffs'] reasonable and customary rates." The plaintiffs brought claims under state contract law. The court stated that:

> Most courts forego the 'standing and substantive basis' test in favor of the 'inextricably intertwined' test where plaintiffs do not invoke Medicare in their complaints, as is the case here. See, e.g., [Do Sung Uhm v. Humana. Inc., 620 F.3d 1134, 1142 (9th Cir. 2010)] (holding that claims formulated under sources of law other than Medicare can nevertheless be "inextricably intertwined" with Medicare). Some of these courts have concluded that claims brought by providers against MAOs are not "inextricably intertwined" with claims for Medicare benefits. See, e.g., Ohio State Chiropractic Association v. Humana Health Plan Inc., 647 F. App'x 619 (6th Cir. 2016) (opining in dicta that a non-contracting provider did not need to exhaust administrative remedies because its state-law claims against an MAO arose from a "private billing dispute," no beneficiary was denied benefits or reimbursement, and no one contested whether Medicare covered the provided services); RenCare, Ltd. v. Humana Health Plan of Texas, 395 F.3d 555 (5th Cir. 2004) (holding that a contracting provider's claims for reimbursement from an MAO did not 'arise under' Medicare because no enrollees sought benefits, the government had no financial interest in the case, and the dispute was between the provider and MAO).

> [Id. at 1232.]

The Prime Healthcare court dismissed the complaint. It held that "[a]ll of [the plaintiffs'] claims aim directly at reimbursement for alleged shortfalls for Medicare benefits calculated by [the defendant] under Medicare, disguised as claims for reimbursement under state law. Plaintiffs have neither alleged that they have exhausted administrative remedies nor alleged that they meet the conditions for waiver of exhaustion." Id. at 1234. It further stated that "[t]he fact that providers, and not just enrollees, can request and appeal MAO determinations supports this interpretation of the concept aimed at by Heckler." Id. at 1232.

In contrast, in RenCare, 395 F.3d 555, the court noted that, because the providers' claims were based on state law, the standing and substantive basis for its claims is clearly not the Medicare Act. Thus, the provider must exhaust its administrative remedies and appeal the resulting administrative decision in federal court only if its claims are "inextricably intertwined" with a claim for Medicare benefits.

The court determined that a review of relevant case law and Medicare regulations revealed that the provider's claims fell outside of the category of cases that arise under the Medicare Act. It reasoned that that there were no enrollees seeking Medicare benefits. Id. at 558. Furthermore, "the government ha[d] no financial interest in the ... case because it [had paid the MAO] a flat rate each month for [its] services to ... enrollees, regardless of the services it renderf[ed] to ... beneficiaries." Ibid. It noted that "[i]rrespective of who ultimately prevails, the government will not receive or pay out funds." Ibid. Instead, it found that "the dispute [wa]s solely between [the MAO] and [the provider] and [was] based on the parties' privately-agreed-to payment plan." Ibid.

 *15  The court further determined that the administrative appeals mechanism for Part C of the Medicare Act excluded claims such as those of the provider. It held that "it appears that the administrative review process attendant to Part C does not extend to claims in which an enrollee has absolutely no interest." Id. at 559. It further noted that "there is a complete absence of [enrollees's] beneficiary interest in this dispute. The only interest at issue is [the provider's] interest in receiving payment under its contract with [the MAO]." Ibid.

When the Court examines the statutory and regulatory scheme in relation to the circumstances here, it concludes it cannot and should not determine at this time whether the Plaintiff's claims are subject to the requirement of exhaustion of administrative remedies. As an initial matter, it is not clear from the Complaint which of the Open Patient Accounts are Part A or Part B claims and which are Part C-related claims. Although it is logical to suppose that most or all of the claims are Part C, there is no administrative process available to MHA for Part A or Part B claims comprising the Open Patient Accounts.

The Court further finds there should be a more complete record on which to determine if the Plaintiff's claims "arise under" the Medicare Act, requiring exhaustion as to the Part C claims - that is, whether MHA's claims are "inextricably intertwined" with the Medicare statute. The Court notes that the Plaintiff is suing in a direct capacity. In connection with the Part C claims, here as in RenCare there is no enrollee that claims benefits and the government has no interest in the outcome.

Moreover, the Plaintiff asserts a right to reimbursement under various legal theories that, so it contends, arise from independent legal obligations under state law to pay the Plaintiff's UCR charges for services provided to the Defendants' enrollees. It alleges such obligations arise from an independent, implied-in-fact contract, or from quasi-contract, based on an independent promise or obligation to pay for a benefit conferred. It also avers that its legal rights arise from negligent misrepresentations of the Defendants as to the coverage afforded to the plan enrollees. Thus, even though there is no express contract right, as was present in RenCare, there is an alleged implied contract right of reimbursement that allegedly governs the amount to be paid. [3]

In the circumstances, the Court concludes it is necessary to have a more complete record before determining whether any or all of the Plaintiff's claims are eligible for the administrative appeals process, "aris[e] under" the Medicare statute, and are ultimately subject to the requirement of exhaustion of administrative remedies. Before the Court were to determine these claims must proceed through the federal administrative process and ultimately to a federal court, it must first be in a position to examine the specific nature, terms and content of the parties' course of dealings and the representations and promises made to MHA. If, as alleged, promises of payment were made without regard to the Medicare Act and its regulatory scheme, then the Plaintiff's action would not be "inextricably intertwined" with the Act. The Court thus denies this aspect of the motion without prejudice to the Defendants' right to raise the issue at a later stage of the litigation.

 *16  The Court renders a similar conclusion as to the Medicare preemption claim. As the Plaintiff's claims are grounded in state law causes of action sounding in contract and tort and assert obligations or promises of payment independent of the Medicare Act and its regulatory scheme, the Plaintiff's claims may not interfere with a Medicare "standard."

The Court notes that in In re Reglan Litigation, 226 N.J. 315, 329 (2016), the New Jersey Supreme Court stated that, when Congress legislates in a field where states have traditionally exercised their historic police powers, "the preemption inquiry begins with the assumption that Congress did not intend to supersede a State statute unless that was Congress's clear and manifest purpose." This presumption against preemption is especially pertinent here, given the traditional role of States in regulating healthcare. See Freedman v. Redstone, 753 F. 3d 416, 429-430 (3d Cir. 2014).

42 U.S. Code § 1395w-26 provides as follows:

> The **standards** established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

> [Emphasis added.]

In New York City Health & Hosps. Corp. v. WellCare of N.Y., 801 F. Supp. 2d 126, 132 (S.D.N.Y. 2011), the court held that "'the preemption inquiry turns on the specific allegations forming the basis of [the] claims …' [and] focuses on whether the resolution of a common law claim would interfere with federal standards governing MA plans." Ibid. (quoting Do Sung Uhm v. Humana, Inc., 620 F.3d 1134, 1148 (9th Cir. 2010)). It stated that "[f]or purposes of the preemption provision, a standard is a statutory provision or a regulation promulgated under the MMA and published in the Code of Federal Regulations." Ibid. (quoting Med. Card Sys. v. Equipo Pro Convalecencia, 587 F. Supp. 2d 384, 387 (D.P.R. 2008)).

The Defendants rely principally upon provisions of the Medicare Act and implementing rules that cap the payments an out-of-network provider can obtain. The Medicare statute and regulations explicitly list the services for which an MA organization must reimburse a provider, cap the rates for non-participating providers, and include standards for the timing of review and payment of claims. 42 C.F.R. §§ 422.100(b), 422.214(b). The Defendants assert these are "standards" that preempt the Plaintiff's claims.

The preemption provision of the Medicare Act does not bar the Court from applying the Medicare-established rates in connection with the Plaintiff's claims. The Court observes that save for the provisions that cap the payment or govern the timing of payments, the Defendants do not rely upon any specific "standard" that preempts the Plaintiff's various causes of action. Putting aside the exhaustion issue already discussed, it thus appears the Plaintiff's causes of action, insofar as they seek an amount of reimbursement not in excess of the cap, would not be subject to preemption. In this regard, the Court notes that the Plaintiff alleges that, at least as to some of its Medicare-related claims, it is not seeking amounts in excess of the cap, but nonetheless claims it was underpaid. It asserts that, in relation to such claims, the Court needs to determine and compare the payment it seeks with the payment permitted under the Medicare statute. The Court's examination and disposition of such claims in accordance with the Medicare Act and regulations would not interfere with a Medicare "standard."

**\*17**  As to the claims in respect of which the Plaintiff asserts a right to payment of its UCR rates and the same are in excess of the prescribed cap, the Court notes that the Plaintiff seeks reimbursement on the basis of allegations, accepted as true for purposes of this motion, that the Defendants undertook independent obligations to pay such rates or represented they would do so. Although it would appear to the Court, given the broad scope and text of the rate capping provision, that it operates to cap the amount of the Plaintiff's payment that the Plaintiff may realize for its services to the Defendants' enrollees, the Court again defers any such determination until it has an adequate record concerning the nature and intent of the alleged undertakings or course of dealings on which the Plaintiff relies.

## V

The Defendants contend that, as to all emergency services provided to WellCare's Medicaid members, under both the federal Medicaid statute, 42 U.S.C. § 1396u-2(b)(2)(D), and New Jersey law, N.J.S.A. § 30:4D-6i and N.J.A.C. 10:74-9.1, the Plaintiff

is only entitled to the Medicaid rate prescribed in the applicable implementing regulations. The Defendants contend that the Court should dismiss the Plaintiff's causes of action seeking the UCR for emergency services and related hospitalization for Medicaid claims.

The Plaintiff counters that New Jersey permits an insurer and provider to enter into an implied agreement to pay a rate greater than the statutory rate. The Plaintiff further contends that "in any event, WellCare paid less than the statutory rate for emergency services rendered by MHA." The Plaintiff also pointed out at oral argument that further discovery is needed as to which Medicaid claims among the Open Patient Accounts alleged in the Complaint actually involve "emergency services" as defined in § 10:74-9.1(a).

The Court determines that, even granting the federal and state statutes cap the reimbursement the Plaintiff can seek from the Defendants for Medicaid claims, such cap does not warrant dismissal of the Plaintiff's claims. As in the case of the Medicare claims, insofar as the Plaintiff's claim is for underpayment of the prescribed amount of reimbursement, the Court's role will be to compare the Medicaid rate with the amount the Plaintiff seeks. In addition, as New Jersey law also regulates Medicaid claims, this Court is more than competent to apply and interpret the state law.

The Court notes that the parties dispute as to which claims alleged in the Complaint are Medicaid claims involving "emergency services" and whether the Plaintiff is seeking more than what applicable law permits in respect of such services. It will, at minimum, be necessary to determine, on the basis of a more complete record, which claims are potentially subject to the Medicaid cap on "emergency services" and which are not.

Finally, as noted, the Plaintiff is asserting that the Defendants undertook independent obligations to bear the Plaintiff's UCR rates. As previously discussed, the Court concludes that it is more appropriate to address the issue of whether the Medicaid rates apply in such circumstances on a more complete factual record concerning the existence, and specific nature and character of such obligations. The Court thus denies this aspect of the motion without prejudice to the Defendants' right to raise such defense at a later stage of the litigation.

## VI

The Defendants also challenge each pleaded cause of action on the basis that the pleading is insufficient to state a cause of action upon which relief can be granted. The Court now surveys each of the pleaded Counts in order to ascertain whether or not the Plaintiff has pleaded facts sufficient to sustain a viable cause of action.

The First Count claims a breach of an alleged implied contract. The Plaintiff alleges that as to each underlying reimbursement claim the Defendants engaged in a course of conduct giving rise to an implied-in-fact contractual obligation to pay the amounts subsequently billed by the Plaintiff based in at least some cases upon the Plaintiff's UCR charges.

 **\*18**  The Defendants contend that "MHA does not allege that WellCare ever agreed to pay the alleged UCR such that an implied contract formed. There are no alleged writings or oral statements evidencing such an agreement." The Defendants also assert that "there are no allegations describing the actual amount of any alleged UCR such that WellCare could even agree to such an amount."

As noted above, the Court must examine the factual contentions of the Complaint in their entirety and with a generous and hospitable approach to the same, as required by Printing Mart-Morristown, 116 N.J. 739. The Court finds that the Complaint alleges that, as to some of the disputed patient accounts, the Plaintiff contacted the Defendants and sought and obtained preauthorization to render the services provided to the subject patients. The Plaintiff alleges an implied-in-fact agreement by which it agreed to perform services in return for the pre-authorized payment of the UCR charges for such services.

The Court concludes the factual allegations of the Complaint, read liberally and in their entirety, are sufficient to state claims for breach of an implied contract as to the underlying disputed accounts. The allegations, if proved, establish a course of dealing between the putative contracting parties, the existence of an implied contract to perform surgical or medical services in return for payment, a flow of consideration, breach of the terms of the implied contract arising from the Defendants' failure to pay the amounts billed and resulting damages.

The mutual assent discernible from the Complaint arises from the factual allegations of the parties' conduct. The Complaint alleges direct communications seeking preauthorization for hospital services to be rendered by the Plaintiff, followed by authorization by the Defendants or a notification that such authorization was not necessary in light of the emergent nature of the services and the legal requirements imposed on both parties. The Complaint alleges a course of dealing by which the Defendants agreed to coverage for the services to be provided. The Complaint alleges performance of the services and demand for payment. The terms of the implied contract alleged involve performance of services in return for payment in many cases of the UCR applicable to the services.

The Court finds the Complaint alleges consideration flowing to the Defendants in connection with the implied contracts as the disputed patient accounts. The Complaint avers that the Defendants accepted premiums on behalf of patients for plans affording such subscribers the right to secure out-of-network services in certain circumstances and that the Defendants were legally obligated under federal and state laws to cover subscribers for emergency services and acknowledged such obligations. The Complaint alleges that, by providing out-of-network emergency and/or pre-authorized services to the Defendants' Medicare/ Medicaid enrollees, the Plaintiff enabled the Defendants to satisfy contractual or legal obligations to those individuals and to the Medicare/Medicaid programs. The Court finds that the Complaint contains sufficient factual allegations as to consideration to state a claim as to an implied contract.

Where a complaint alleges sufficient facts to establish the existence of a meeting of the minds as to the rendering of service in return for payment, it is not a quantum leap to conclude that a benefit of this nature is sufficient to establish consideration to support an express or as here an implied-in-fact contract. It is a hornbook principle of contract law that a court will not inquire into the amount or adequacy of consideration to support a determination that a contract exists.

 **\*19**  The Court concludes that the Plaintiff has alleged sufficient facts to determine the terms of the alleged implied-in-fact contract, namely a promise to provide out-of-network services, either emergency or pre-authorized non-emergency services, as the case may be, in return for a promise to pay the Plaintiff's charges, including UCR charges. The Complaint also alleges sufficient facts as to each underlying disputed account by detailing the patient's ID number, the dates of admission and discharge, and the amounts of total charges and balance due. The Court thus finds that the Plaintiff's pleading alleges facts from which may be derived the elements of an implied contract, including consideration, and a claim for breach thereof.

The Court finds only that the allegations of the Complaint, viewed liberally, establish the "fundament" of a cause of action for breach of an implied contract, and do so with sufficient clarity and precision to fairly apprise the Defendants of what they allegedly did wrong to permit them to answer and defend. Printing Mart-Morristown, 116 N.J. at 746. Whether on a full factual record the facts will establish a triable claim for the existence of an implied contract and a breach thereof remains a different matter. However, the Court is not concerned at this juncture with the Plaintiff's ability to prove its allegations as to existence vel non of an implied contract through a course of dealing or otherwise.

The Second Count purports to state a claim for a breach of the implied covenant of good faith and fair dealing. Having found that the pleading alleges an implied contract, that contract under New Jersey law perforce contains as one of its implied terms a covenant of good faith and fair dealing. The Plaintiff alleges that the Defendants, imbued with improper motive, breached this covenant of the contract. It alleges sufficient facts beyond the mere breach of the terms of the contract that could support a finding of breach of the covenant of good faith and fair dealing.

The Defendants contend that the Court should dismiss this Count, because the Second Count is "based on the same alleged breach of contract that MHA asserts in the First Count." The Complaint alleges that the Defendants were engaged in "systematic practice of downgrading coverage by a variety of nefarious methods including, without limitation, downcoding and bundling of claims submitted by plaintiff, as well as the issuance of coverage denials to patients." This conduct is distinguished from the alleged breach of the implied contract by refusing to pay the UCR charges for the pre-authorized/pre-certified services rendered by the Plaintiff.

The Complaint alleges a course of conduct that could support a finding of improper efforts to deprive the Plaintiff of the benefits of the implied contract. Once again, under the Printing Mart-Morristown standard, the Court finds it is possible, on a liberal reading of the Complaint, to glean the fundament of a cause of action for breach of the covenant of good faith and fair dealing from the facts alleged.

The Third Count of the Complaint also purports to state causes of action for unjust enrichment and quantum meruit. The elements of a claim for unjust enrichment are that "[the] defendant received a benefit and that retention of the benefit would be unjust." Castro v. NYT Television, 370 N.J. Super. 282, 299 (App. Div. 2004) (internal quotations omitted). Likewise, to recover under a theory of quantum meruit, a plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person [or the entity] to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Starkey v. Estate of Nicolaysen, 172 N.J. 60, 68 (2002).

 *20 The Court concludes that the Complaint states causes of action for unjust enrichment and quantum meruit after examining the Complaint in its entirety under the Printing Mart-Morristown standard. The Defendants dispute the existence of a benefit conferred by the Plaintiff on the Defendants. The causes of action for unjust enrichment or quantum meruit require the Plaintiff to allege that it conferred a benefit upon the Defendants and as to which it would be unjust to permit the Defendants to retain the benefit without remuneration or circumstances in which it reasonably expected compensation for the same. The Defendants assert that any benefit arising from the services provided by the Plaintiff accrued to the patients and not the Defendants.

However, the Court finds that the pleading alleges sufficient facts concerning a benefit conferred on the Defendants. The Complaint alleges the Defendants "were paid premiums by the members for out-of-network and/or emergency services coverage." The Complaint avers that the performance by the Plaintiff of out-of-network emergency or pre-authorized services for the Defendants' enrollees enabled the Defendants to discharge their contractual and/or legal obligations to the Medicare/ Medicaid programs and to those enrollees by permitting them to obtain such services. In light of these allegations, the Court finds that, under the Printing Mart-Morristown test, the facts pleaded are sufficient from which to glean the fundament of a cause of action for quasi-contractual relief.

The Defendants cite cases from the United States District Court for the District of New Jersey, none of which are controlling on this Court, in which courts determined that an insurer/payor received no benefit when a provider merely provides a service to an insured. But other courts, typically in cases involving claims grounded in quasi-contract arising from the performance of emergency services, have determined that the payor did receive a benefit from the provider's services - namely, the services enabled the payor to discharge a legal obligation owed to the patient/insured.

One such case is El Paso Healthcare Services v. Molina Healthcare of New Mexico, Inc., 683 F. Supp. 2d 454 (W. D. Tex. 2010). This case is particularly instructive to this Court, as it also involved a managed care organization providing coverage to Medicaid-eligible patients. [4]

 *21 In El Paso Healthcare Services, 683 F. Supp. 2d at 461, the court reasoned that "[w]hile it is true that the immediate beneficiaries of the medical services were the patients, and not Molina [the payor], that company *did* receive a benefit of having its obligations to plan members and to the state in the interests of plan members, discharged" (emphasis in original). The court noted that "Molina describes this discharging of obligations benefit as 'incidental,' but the Court finds this benefit material, due

to the aforementioned obligations." Ibid. It further observed that "[i]ndeed, Molina's very reason for existence is to ensure that such services are provided to plan members; seeing this core obligation fulfilled is hardly incidental." Ibid.

The court stated that "[i]f these obligations are not deemed material and central to the Medicaid managed care scheme, how is such a system supposed to function?" Id. at 462. It found that "[i]n sum, these discharges were furnished for the benefit of Molina, which enjoyed and accepted them, and Molina even acknowledged as much when it tendered payment for them at a rate it deemed to be proper." Ibid. Referring to the elements of a claim in quasi-contract, the court held that "prongs two and three [requiring a benefit to be conferred upon and accepted by the defendant] have been fulfilled as well as one and four, even though Molina disputes this characterization of the facts." Ibid.

In the Fourth Count, the Complaint purports to state a cause of action for promissory estoppel. The claim for promissory estoppel requires a showing of a clear and definite promise made with the expectation of reliance, reasonable reliance, and substantial detriment. See Lobiondo v. O'Callaghan. 357 N.J. Super. 488, 499 (App. Div. 2003). Here again, the facts set forth in the Complaint considered as a whole - accepted as true under the Printing Mart-Morristown standard - establish a cause of action for promissory estoppel.

The Plaintiff alleges a promise to pay for out-of-network or emergency services delivered as to each disputed patient account. The Complaint alleges the Defendants either gave prior authorization for the services or advised that such authorization was unnecessary. In either event, the Complaint alleges the result of such communication was a promise to pay for the services on which the Plaintiff relied to their detriment.

The Complaint lodges in the Fifth Count a claim for negligent misrepresentation. Karu v. Feldman, 119 N.J. 135, 146-147 (1990), sets forth the elements of a claim for negligent misrepresentation. A plaintiff pursuing such a claim must establish that the defendant committed a negligence misrepresentation of facts or information, that the plaintiff was a reasonably foreseeable recipient of such information, that the plaintiff reasonably relied on the false representations, and that the false statements caused damages.

The Plaintiff's Complaint alleges that, as to the disputed patient accounts, the Defendants falsely advised the Plaintiff of the precertification and/or preauthorization of the treatment and/or the lack of need for the same, and of an agreement or intention to pay for services to be provided to the enrollees, including at the UCR rates. These factual averments sufficiently establish a negligent misrepresentation. The Complaint also sets forth that the Plaintiff reasonably relied on the allegedly false assurances by providing the services on the basis of the same.

The Court finds, contrary to the Defendants' contention, that the Plaintiff has pleaded the circumstances of such misrepresentations as to the disputed patient accounts with the requisite particularity. The Complaint, read as a whole, sets forth the specific nature of the misrepresentation and the approximate time - the dates of admission and discharge - when it was given. The Complaint specifically alleges facts going to reliance on the alleged misrepresentation via allegations of performance of services for each patient/insured. The Plaintiff may, of course, be required in discovery to supply additional pertinent information as to each individual disputed patient account.

 *22  The Complaint purports to state a claim in the Sixth Count for interference with prospective economic advantage. To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege a protected interest, including a prospective economic relationship or contract, malice - defined as an intentional interference without justification, a reasonable likelihood that the interference caused the loss of the prospective gain and damages. See Printing Mart-Morristown, 116 N.J. at 751.

The prospective economic advantage alleged here is the economic benefit to be derived from the provider/patient relationship allegedly existing between MHA and the enrollees of the Defendants who sought treatment with MHA. The Complaint alleges facts from which one may glean a claim for interference with such relationship arising from the Defendants' alleged

precertification of the services to be rendered or its acknowledgment that precertification was not required for emergency services, followed by their failure or refusal to pay the full amount charged by MHA. The Complaint also sets forth facts supporting a claim that the Defendants acted intentionally, without justification and without proper purpose, at least to some Open Patient Accounts. As noted earlier, the Complaint alleges a "systematic pattern of downgrading and underpaying for the services rendered by the hospital."

The Court concludes that the facts alleged in the Complaint are sufficient to state a claim for tortious interference with prospective economic advantage. It notes that the Defendants assert there can be no claim for an interference with an economic relationship to which it is an integral party. Although that is so as a matter of law, the Complaint, liberally construed, alleges an independent relationship between the Plaintiff and the patients with which the Defendants tortiously interfered. Whether that proves to be the case upon examination of an appropriate record concerning the nature and character of the relationship among these parties remains to be seen, but this is not a basis for dismissal now.

The Seventh Count alleges an implied private cause of action under the Prompt Pay laws and regulations adopted in New Jersey. Specifically, the Plaintiff alleges that, pursuant to the Health Information Networks and Technologies Act, N.J.S.A. 17B:30-23, 17:48-8.4, 17:48A-7.12, 17:48E-10.1, 17B:26-9.1, 17B:27-44.2 and 26:2J-8.1 and implementing rules at N.J.A.C. 11:22-1 et seq., the Defendants were obligated to pay or contest the Plaintiff's statements within a specified time period. It further alleges that overdue payments bear simple interest under such statutes and regulations of 12 percent per annum. Indeed, N.J.S.A. 17B:27-44.2(d)(9) specifically provides that an overdue payment shall bear simple interest at a 12 percent per annum rate. It further provides that "interest shall be paid to the healthcare provider at the time the overdue payment is made" and that any such amount actually paid shall be credited to any civil penalty assessed for a violation.

Neither the cited regulations nor authorizing statutes provide an express private right of action. Accordingly, the Court must consider whether the Plaintiff is among the intended beneficiaries of the statute or rule, whether there is indicia of legislative intent to establish a private right of action, and whether an implied private right of action advances the statutory regulatory objectives. See R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 272 (2001).

**\*23** The statutory text appears to contemplate a payment of interest directly to the provider and thus the right of the provider to charge and recover the same. The provider, the Plaintiff here, is certainly among the parties whom the statute is intended to protect or benefit, in addition to the protection of the general public interest. It appears the manifest purpose of the statute - prompt payment of uncontested statements and/or prompt notice of billing disputes - would be advanced by finding an implied right of action.

The Court again finds that the Plaintiff has stated a claim for relief under the cited statutory and regulatory framework, and that the statute appears to evince an intention to permit a private right of action for interest at the established statutory and regulatory rate. For the reasons noted above, it denies the Motion to Dismiss in the Seventh Count without prejudice to the right of the Defendants to seek dismissal or summary judgment on the basis of a full record and/or more focused briefing.

## Footnotes

1    The Court notes that the Plaintiff does not dispute that Medicare's prompt payment standards preempt a state's own prompt payment laws. The Plaintiff states that it will dismiss Count VII of the Complaint as to those claims involving patients covered by Medicare Part C plans once discovery relating to this issue is completed. The Court thus does not address this issue.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**MHA, LLC v. Wellcare Health Plans, Inc., 2020 WL 1427919 (2020)**

---

2    MA organizations do not have a right to hearing under 42 CFR § 422.600, but they can appeal under 42 CFR § 422.608.

3    The Plaintiff also argues the administrative remedy effected by federal law operates as a condition precedent to seeking judicial review in a federal court, the jurisdiction of which limited by federal law. It contends this regulatory scheme has no application in a state court, which exercises general jurisdiction. The parties have not extensively briefed this aspect of yhe issue and the Court concludes it is not appropriate to rule on the point without more focused briefing.

4    See also Temple University Hospital. Inc. v. Healthcare Management Alternatives. Inc., 832 A.2d 501, 507-508 (Pa. Super. 2003)("Healthcare retained a benefit in this instance because it did not pay reasonable value for the services rendered. Accordingly, we find that all of the elements of unjust enrichment were established, and that Healthcare's payment of two million dollars did not render the doctrine inapplicable. If we adopted Healthcare's position, entities like Healthcare could pay a fraction of the value of the benefit supplied by health care providers who treat Medicaid recipients and successfully argue that the doctrine of unjust enrichment was not applicable. The very thought of permitting such a result is absurd; payment of less than actual costs in [sic] unreasonable and[,] thus, inequitable"); River Park Hospital. Inc. v. BlueCross Blue Shield of Tennessee. Inc., 173 S.W. 3d 43, 60 (Tenn. Ct. App. 2002)(In a case involving a emergency services provided by a hospital to a managed care organizations enrollees, the court stated that "we must find a contract implied in law, without the assent of either party, on the basis that it is dictated by reason and justice"); New York City Health and Hospitals Corp. v. WellCare of New York. Inc.. 35 Misc. 3d 250, 257 (N.Y. Sup. 2011)(Citing with approval to El Paso. Temple University and River Park, the court observed that "the three decisions from our sister states are variations on a basic theme—namely, that where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees").

---

**End of Document**                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW  :
JERSEY CORP.,                        :   SUPERIOR COURT OF NEW JERSEY
                                     :   LAW DIVISION: GLOUCESTER
                    Plaintiff,       :   COUNTY
                                     :
    -v-                              :   Docket No.: GLO-L-000242-24
                                     :
HORIZON HEALTHCARE SERVICES, INC., d/b/a  :   **ORDER - PARTIAL**
HORIZON BLUE CROSS BLUE SHIELD OF NEW  :
JERSEY, HORIZON HEALTHCARE OF NEW    :
JERSEY, INC., and DOES 1-20, inclusive,  :
                                     :
                    Defendants.      :
------------------------------------------------------------------- x

     **THIS MATTER** having been opened to the Court by Robinson & Cole LLP, attorneys

for Defendants, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New

Jersey and Horizon Healthcare of New Jersey, Inc. ("Defendants"), and the Court having

considered the papers within, and oral argument, if any; and for good cause having been shown,

     **IT IS** on this __30th___ day of July, 2024;

     **ORDERED** that Defendants' Motion to Dismiss is granted IN PART:

     1.  DENIED as to Count I;

     2.  DENIED as to Count II;

     3.  GRANTED as to Count III.

     and it is further **ORDERED** that a copy of this Order be served upon all counsel within
seven (7) days hereof.

/s/ *Timothy W. Chell, P.J.Cv.*
            Hon. Timothy W. Chell, P.J.Cv.

__X__ opposed
____ unopposed

COURT FINDINGS ATTACHED

Motion to Dismiss Complaint

New Jersey Court Rules provide that a court can dismiss a claim for failure to state a cause of action. R. 4:6-2(e). The test for determining the adequacy of a pleading is whether a cause of action is "suggested" by the facts. Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989). The court's inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the Complaint. Ibid. A reviewing court must search the Complaint in depth and with liberality, affording the plaintiff every reasonable inference, including the opportunity to amend if necessary. Ibid. The court is not concerned with the ability of Plaintiff to prove the allegations contained in the Complaint. Ibid. Such an examination "should be one that is at once painstaking and undertaken with a generous and hospitable approach." Ibid.

New Jersey is a "fact pleading" jurisdiction as opposed to "notice pleading." A plaintiff must plead the facts and give some detail of the cause of action. Id. at 768; quoting Kotok Bldg. v. Charvine Co., 183 N.J. Super. 101, 104 (Law Div. 1981). (The rules applicable to fact or "cause of action" pleading are: (1) the object of pleadings is to define the issues to be tried; (2) the statement of a cause of action is required; the statement is to be simple, concise, and direct; and (3) the essential elements of the statement of a cause of action, both as to substantive law and pleading, remain the same as at common law.)

Before the Court today is Defendant Horizon Healthcare Services' ("Horizon") motion to dismiss Plaintiff's Complaint pursuant to R. 4:6-2(e). Plaintiff opposes the motion. The test for determining the adequacy of a pleading is whether a cause of action is "suggested" by the facts. Count One of Plaintiff's Complaint alleges a cause of action for quantum meruit. Count Two asserts a cause of action under a theory of breached implied contract. Count Three alleges a violation of the New Jersey Health Claims Authorization, Processing, and Payment Act ("HCAPPA").

Defendant raises the threshold issue of whether Plaintiff's Complaint sufficiently establishes the assignment of the right to sue of the emergency medicine practice groups ("Physicians") to Plaintiff, the Healthcare Justice Coalition of New Jersey Corp. (the "Coalition"). The Physicians are employed by NES America, Inc. And NES Georgia, Inc. (collectively referred to by Defendant as "NES") and provided emergency medical services to Horizon members at Saint Michael's Medical Center and Trinitas Regional Medical Center hospitals in New Jersey.

*Plaintiff's Standing to Bring Suit*

Plaintiff's standing to bring suit in this action is addressed often in the Complaint:

- [...] Defendants either failed to pay or significantly underpaid the Physicians for their provision of emergency services. In order to improve the Physicians' capability to provide quality emergency care and be reasonably paid, **Physicians have assigned to the Coalition these accounts and the right to sue thereupon.** See Pl.'s Compl. at ¶ 4. (emphasis added)

2

- [...] [NES] set its own reasonable charges for the emergency services they provided. Defendants either failed to pay or significantly underpaid NES and Physicians for their provision of services. **The Coalition has since been assigned those accounts and the right to sue thereupon.** Id. at ¶ 14. (emphasis added)
- [R]estitution and equity demand that Physicians—and by means of **its valid assignment**, the Coalition—be paid the reasonable value of the lifesaving care that the Physicians rendered to the members of Defendants' health plan. Id. at ¶ 23. (emphasis added)

 The Court finds the following paragraphs of the Complaint provide facts and details well beyond what is required of the relatively low bar for New Jersey's "fact pleading" standard as addressed in Printing Mart- Morristown and Kotok Bldg.

- The Coalition has been assigned the reimbursement claims at issue from the Physicians and has the necessary rights and ability to sue to recover the full billed charges, or in the alternative, the reasonable value for the Physician services at issue. Id. at ¶ 5
- In total, this case involves 65,000 benefit claims spanning from dates of service from October 2017. The total unpaid by Horizon BCBS is over $17 million, excluding interest. [...] Id. at ¶ 26
- Given the commonalities among the unpaid claims, just a few examples will suffice to illustrate Defendants' repeated wrongdoing in underpaying for the Physicians' emergency service. Id. at ¶ 28.

The Complaint then goes on to detail three specific accounts of patients presenting to Physicians for emergency care and Physicians being underpaid by Horizon for the services rendered. The facts provided are sufficient to support the inference of an assignment. Affording Plaintiff every reasonable inference, Plaintiff would not have access to such voluminous and sensitive data but for the assignment of the right to sue and to pursue these outstanding balances in court. Indeed, the Complaint goes on to allege that:

- The Coalition will provide a full list of the underpaid claims to Defendants upon request. Such list has not been included with this Complaint in order to avoid the unnecessary disclosure of Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), given the sheer volume of claims at issue. The coalition reserves the right to add additional underpaid claims to the list. Id. at ¶ 32.

Plaintiff's counsel in oral argument has also represented that the assignment itself will be made available through discovery. At the pleading stage, this Court does not find that production of the assignment or the language contained therein is necessary for the Complaint to survive Defendant's motion to dismiss.

Finally, the assignment is alleged at least two more times in Plaintiff's Complaint:

3

- As alleged, the Physicians have now **assigned to Coalition their entire right to sue** Defendants for the reasonable value of their services. Id. at ¶ 55. (emphasis added)
- [...] The Coalition, **as the direct assignee of Physicians**, now seek to pursue **their rights thereunder**. Id. at ¶ 57. (emphasis added)

After a thorough review of the moving papers and relevant case law, the Court finds that Plaintiff's Complaint pleads facts sufficient to survive the motion to dismiss on this threshold issue of standing. The Court will thus review the counts of Plaintiff's Complaint in turn applying the applicable standards for dismissal under R. 4:6-2(e).

*Plaintiff's Allegations as Pled in Counts I-III*

COUNT I: QUANTUM MERUIT

In order to recover on a claim for the quasi-contractual theory of quantum meruit, a plaintiff must establish four elements: (1) the performance of services in good faith; (2) the acceptance of services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services. Sean Wood LLC v. Hegarty Group, 422 N.J. Super. 500, 513 (App. Div. 2011). "Quasi-contractual recovery on the basis of quantum meruit rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another" Id. at 512.

In order for plaintiff to sufficiently plead this cause of action, it must demonstrate that the services the Physicians performed in good faith conferred a benefit not only on the patients they served (who are not defendants) but rather on the insurers of the patients. The complaint alleges in paragraph 39:

The Defendants themselves, as well as their Members, benefited from the services Physicians provided under EMTALA. For example, and without limitation, Defendants used and enjoyed the benefit of Physicians' services because Physicians helped Defendants discharge their legal and contractual obligation to their insureds to provide them with emergency care.

Pl.'s Compl. at ¶ 39.

The complaint alleges that the Physicians performed services in good faith, those services were accepted by hospital patients covered by Horizon plans, the Physicians expected compensation, and the charges for those services were reasonable. Id. at ¶¶ 37-44. At this stage of the proceedings, this argument is persuasive. The complaint alleges that the insurer defendant received a benefit by paying the Physicians a rate of reimbursement significantly less than a reasonable rate. Id. at ¶¶ 43-45. Though the benefit conferred is not direct, the complaint alleges a benefit conferred to the defendants.

4

Count I pleads facts sufficient at this stage to survive Defendant's motion to dismiss Plaintiff's quantum meruit claim. The motion is denied as to Count I.

COUNT II: IMPLIED CONTRACT

In order to establish a valid implied contract claim, Plaintiff must allege facts showing that: (1) the parties entered into a valid contract; (2) that Defendants did not perform its obligations under the contract, despite Plaintiff performing its obligations; and (3) that Plaintiff suffered damages as a result. Murphy v. Implicito, 392 N.J. Super. 245, 265 (App. Div. 2007).

The essential feature of an implied-in-fact contract cause of action is that the asserted contractual obligation must have arisen from mutual agreement and intent to promise but where no written agreement is in place. To prevail on a breach of contract action, whether written or implied, a plaintiff must be able to prove all of the necessary terms of the contract.

Count II of Plaintiff's Complaint incorporates by reference all allegations set forth in the previous paragraphs. Pl.'s Compl. at ¶ 46. As to the first element of the implied contract claim, Plaintiff properly alleges that Defendants and Plaintiff entered into an implied contract wherein Plaintiff would provide emergency medical services to members of Defendants' health plans and that Defendants understood they "necessarily had to pay the reasonable value for the emergency services rendered by" Id. at ¶ 51.

As to the second element, the Complaint properly alleges that NES rendered out-of-network emergency services to Defendants' members in reliance on the expectation that Defendants would pay the reasonable value of their services. Id. at ¶¶ 37-41. The Complaint further alleges that Defendants routinely sent Explanation of Benefit (EOB) forms to NES that acknowledged Defendants' obligation to pay the reasonable value for emergency services - and frequently paid at least some amount. Id. at ¶¶ 52-54.

Finally, damages as a result of Defendants' alleged breach are also sufficiently pled throughout Plaintiff's complaint as Physicians' underpaid and unpaid out-of-network emergency claims. Id. at ¶ 65.

Coupled with the facts alleged earlier on in the complaint, the Court finds the following paragraphs sufficiently allege a breach of implied contract:

> • Defendants indicated, by a course of conduct, and in the context of the circumstances surrounding the relationship with Physicians, that Defendants would pay for the emergency and medical services provided. Id. at ¶ 47.
> • Defendants' failure to pay the reasonable value of the Physicians' services constitutes breach of their implied contract with physicians. Physicians were harmed as a direct result of this breach and suffered damages as a result. The Coalition, as the direct assignee of Physicians, now seek to pursue their rights thereunder. Id. at ¶ 57.

5

Count II pleads facts sufficient at this stage to survive Defendant's motion to dismiss Plaintiff's breach of implied contract claim. The motion is denied as to Count II.

COUNT III: NEW JERSEY HEALTH CLAIMS AUTHORIZATION, PROCESSING, AND PAYMENT ACT ("HCAPPA")

The issue presented by Count III of Plaintiff's Complaint is whether the HCAPPA confers an implied private right of action by a medical provider against an insurer.

Plaintiff's Count III seeks to enforce prompt pay provisions under the Health Claims Authorization, Processing and Payment Act ("HCAPPA"), P.L. 2005, c. 352 (N.J.S.A. 17B:30-48 et seq.), which establishes timetables for health insurers to pay healthcare providers for submitted claims. However, HCAPPA, under which the applicable prompt pay provisions exist, does not provide an express private right of action for Plaintiff to pursue its claims against Horizon. Count III of Plaintiff's Complaint fails to state a claim upon which relief can be granted under the statute unless Plaintiff can show an implied right to a private action.

Plaintiff contends that Horizon violated the prompt pay provisions under HCAPPA because, among other things, Horizon "failed to remit full reimbursement of the Physicians' charges for healthcare services or provide a written explanation for the failure to pay all or a portion of such claims within the statutorily proscribed time frames under HCAPPA or the OON Act." Pl.'s Compl. at ¶ 62. Plaintiff claims that it is therefore entitled to recover the full underpaid and unpaid amounts on all of Physicians' out-of-network emergency claims for services, plus statutory interest, from Horizon. Id. at ¶ 65.

In order to pursue such a claim, Plaintiff must first show that it has a private right of action under HCAPPA. See R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 272 (2001). Whether such a right exists is a matter of statutory construction: the statute at issue must display the Legislature's intent to create not just a private right but also a private remedy, and when a statute is silent as to whether it creates a private right of action **New Jersey courts are "reluctant" to the infer the existence of such a right.** Id. at 270 (emphasis added); see also Ryans v. N.J. Comm'n for the Blind & Visually Impaired, 542 F. Supp. 841, 848 (D.N.J. 1982) ("A court will not presume to find a private right of action in a statute silent as to remedy unless there is some evidence to indicate that the legislature impliedly intended to create one.").

The analysis of R.J. Gaydos Ins. Agency, Inc. required to determine whether the HCAPPA provides Plaintiff an *implied* private right of action goes beyond the scope of the motion before the Court today. The test for determining the adequacy of Count III is whether a cause of action is "suggested" by the facts. None of the statutes cited in Plaintiff's Complaint suggest a *private* cause of action for Physicians against the Horizon Defendants. The Court declines the invitation to engage in statutory interpretation on this point on a motion to dismiss. Consistent with Printing Mart-Morristown, this Court has searched the Complaint in depth and with liberality, affording the plaintiff every reasonable inference, and cannot find that Count III states a claim upon which relief may be granted. Defendant's motion to dismiss Count III is granted.

## <u>ORDER OF THE COURT</u>

  Therefore, Defendants' Motion to Dismiss Plaintiff's Complaint is DENIED as to Counts I and II. The Motion to dismiss is GRANTED as to Count III.

ROBINSON & COLE LLP
By: Adam J. Petitt, Esquire (N.J. ID # 020822008)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel: (215) 398-0562
Email: apetitt@rc.com
*Attorneys for Defendants*

```
------------------------------------------------------------------- x
HEALTHCARE JUSTICE COALITION OF NEW        :
JERSEY CORP.,                               :   SUPERIOR COURT OF NEW JERSEY
                                            :   LAW DIVISION: GLOUCESTER
                       Plaintiff,           :   COUNTY
                                            :
        -v-                                 :   Docket No.: GLO-L-000242-24
                                            :
HORIZON HEALTHCARE SERVICES, INC., d/b/a    :   STIPULATION EXTENDING TIME
HORIZON BLUE CROSS BLUE SHIELD OF NEW       :   TO RESPOND TO COMPLAINT
JERSEY, HORIZON HEALTHCARE OF NEW JERSEY,:
INC., and DOES 1-20, inclusive,             :
                                            :
                       Defendants.          :
------------------------------------------------------------------- x
```

      **IT IS STIPULATED AND AGREED** by and between counsel for Plaintiff, Healthcare

Justice Coalition of New Jersey Corp., and counsel for Defendants, Horizon Healthcare Services,

Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon Healthcare of New Jersey,

Inc., that the time within which said Defendants must answer, plead, or otherwise respond to the

Complaint is extended to and including August 16, 2024.

Dated: August 8, 2024

/s/ Dante B. Parenti                   /s/ Adam J. Petitt
Dante B. Parenti, Esq. (005571985)       Adam J. Petitt, Esq. (020822008)
**LAULETTA BIRNBAUM, LLC**          **ROBINSON & COLE LLP**
591 Mantua Blvd., Suite 200            1650 Market Street, Suite 3030
Sewell, NJ 08080                  Philadelphia, PA 19103
Tel: (856) 669-2584                 Tel : (215) 398-0562
Fax : (856) 232-1601                Fax : (215) 398-0599
E-mail: dparenti@lauletta.com         E-mail: apetitt@rc.com
                                      *Attorney for Defendants*

ERIC D. CHAN (California State Bar No. 253082) (*pro hac vice pending*)
AVI W. RUTSCHMAN (California State Bar No. 298922) (*pro hac vice pending*)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Los Angeles, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
E-mail: avi@athenelaw.com

*Attorneys for Plaintiff*

GLOUCESTER COUNTY COURTHOUSE
GLOUCESTER COUNTY CIVIL DIVISION
1 NORTH BROAD ST
WOODBURY          NJ 08096
                              DISMISSAL NOTICE

TELEPHONE - (856) 878-5050,A B. GLO          TEAM 100
COURT HOURS:  8:30 AM - 4:30 PM

                DATE: AUGUST 09, 2024
                  RE: HEALTHCARE JUSTICE C OALITION  VS HORIZON HEALTHC
              DOCKET: GLO L -000242 24
               PARTY:   HORIZON HEALTHCARE O HORIZON HEALTHCARE S


        PLEASE TAKE NOTICE THAT ON OCTOBER 08, 2024   (60 DAYS FROM DATE OF
THIS NOTICE), THE COURT WILL DISMISS THE ABOVE PARTY OR PARTIES FOR LACK OF
PROSECUTION WITHOUT PREJUDICE, PURSUANT TO RULE 1:13-7 OR RULE 4:43-2 UNLESS ACTION
REQUIRED UNDER THE ABOVE RULES IS TAKEN.


  HON JAMES R. SWIFT                          ATT: DANTE B. PARENTI
                                             LAULETTA BIRNBAUM, LLC
_____               591 MANTUA BLVD
        JUDGE                                STE 200
                                             SEWELL          NJ 08080